**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

_____

LEONARD NELSON,

       Petitioner,

v.                               Case No.

DARREL VANNOY, Warden of Louisiana
State Penitentiary,

       Respondent.

_____

## PETITION FOR WRIT OF HABEAS CORPUS

Introduction.................................................................................................................. 2
Jurisdiction and Venue.................................................................................................. 3
Parties............................................................................................................................. 3
Basic Procedural History............................................................................................... 4
    A.  The Initial Trial.................................................................................. 4
    B.  The State Hides its Files from Mr. Nelson...................................... 7
    C.  Litigating the Post-Conviction Claims............................................ 9
        1.      State Trial Court...................................................... 9
        2.      State Intermediate Appellate Court....................... 11
        3.      State Supreme Court................................................ 11
Legal Argument............................................................................................................ 11
I.      The _Napue_ Claim................................................................................ 11
A.  Prosecutors violated _Napue_ when they failed to correct material  testimony they
knew to be false.............................................................................................. 13
        1.      The testimony was false........................................... 13
        2.      Prosecutors knew the testimony was false............. 14
        3.      The false testimony was material........................... 22
    B.  The state court's decision was contrary to and involved an unreasonable
        application of clearly established Federal Law, as determined by the Supreme
        Court of the United States, and was based on an unreasonable determination
        of the facts in light of the evidence presented.................................................. 24
II:     The _Brady_ Claims............................................................................ 26
    A.  Prosecutors hid favorable evidence............................................... 26
        1.  Mr. Marigny Tried to Sell his Testimony................................. 26
        _2._  The Implicit Deal.......................................................... 28

    3. Testimonial Evidence About the Gun............................................................. 32

    4. Fingerprinting/Testing of the Gun.............................................................. 34

  B. The suppressed evidence was material............................................................... 35

  C. The state court's decision was contrary to and involved an unreasonable application of clearly established Federal Law, as determined by the Supreme Court of the United States, and was based on an unreasonable determination of the facts in light of the evidence presented................................................... 38

III. The Burden of Proof (Due Process) Claim........................................................ 39

  A. The jury instructions (incorrectly) told jurors prosecutors only had to prove the most important element by a preponderance of the evidence........... 40

  B. The state court's decision was contrary to and involved an unreasonable application of clearly established Federal Law, as determined by the Supreme Court of the United States, and was based on an unreasonable determination of the facts in light of the evidence presented....................................................... 44

IV. Miscellaneous Considerations............................................................................ 45

  A. Actual innocence.............................................................................................. 45

  B. Law and justice require granting the petition.................................................. 46

## INTRODUCTION

Thirty-five years ago, Leonard Nelson was charged with first-degree murder in the killing of a prominent New Orleans drug dealer (Harold 'Boss' Wilson), almost entirely on the word of Wilson's close associates and fellow drug dealers. Nelson never denied shooting Wilson: He candidly admitted it, both to police and to jurors from the witness stand at trial. But Nelson explained that he was acting in self-defense, only after Wilson and his associates drew their weapons on him (because, as Nelson explained, he had foolishly stolen drugs from Wilson the week before). Several additional witnesses backed up Nelson's account, including one who admitted trying to kill Nelson with Wilson. The jurors rejected the State's case in part—necessarily rejecting the State's theory that Nelson shot Wilson as part of jewelry heist—but nevertheless convicted Nelson of second-degree murder.[1]

---

[1] Leonard Nelson was initially charged alongside a co-defendant, Matthew Moore, but charges against Moore were later dropped. The DA files reveal that prosecutors were worried that if they continued forward with their prosecution against Moore, they would eventually have to disclose their deal with Marigny, which in turn would jeopardize the conviction they had just secured against Nelson.

After decades of diligently (but fruitlessly) seeking files from the Orleans Parish, Mr. Nelson finally began receiving previously withheld files in 2023. Only after he signed an agreement waiving civil claims against prosecutors did he receive additional files in May 2024 that demonstrated the many constitutional violations underlying his conviction. He alleges:

1. ***Napue* Claim** - There is now overwhelming evidence that prosecutors knew their star eyewitness, Derrick Marigny, committed perjury when he testified against Nelson and repeatedly denied any involvement in drug trafficking. *The Louisiana state courts rejected this claim on the theory that Marigny had "the absolute right" under the Fifth Amendment to commit perjury regarding unadjudicated misconduct.*

2. ***Brady* Claims** –

   A. Prosecutors violated Mr. Nelson's rights under *Brady* by failing to disclose that their star eyewitness, Derrick Marigny, offered to sell his testimony and insisted that he would only testify against Mr. Nelson only in exchange for a plea deal in his own pending drug cases. *The Louisiana state courts, at all levels, simply ignored this claim.*

   B. Prosecutors violated Mr. Nelson's rights under *Brady* by failing to disclose that their star eyewitness, Derrick Marigny, testified pursuant to an implied deal (for which he, in fact, received an incredibly generous reward for his cooperation immediately after trial). *The Louisiana courts rejected this claim on the merits, concluding that—although there was extraordinary circumstantial evidence of a deal—there was not "proof."*

   C. Prosecutors violated Mr. Nelson's rights under *Brady* by hiding testimonial evidence that the decedent was armed during the encounter, a fact that prosecutors vehemently denied at trial because it bolstered Mr. Nelson's self-defense claim. *The Louisiana state courts, at all levels, simply ignored this claim.*

   D. Prosecutors violated Mr. Nelson's rights under *Brady* by failing to disclose other circumstantial evidence supporting the contention that the decedent was armed during the encounter (as Nelson testified). *The Louisiana state courts found this evidence "concerning," but nevertheless rejected the claim without further explanation.*

3. ***Due Process Claim*** – Over Mr. Nelson's objection, the jury received an incorrect self-defense jury instruction that improperly failed to inform jurors that the State had to prove "beyond a reasonable doubt" that Nelson did not act in self-defense (and also erroneously stated that they could not begin to consider self-defense unless Mr. Nelson met an initial

"preponderance of the evidence" burden of production). *The state courts rejected the claim without any substantial analysis.*

Having tried in vain to vindicate his constitutional rights through the Louisiana courts, he now petitions this court for relief.

### JURISDICTION AND VENUE

This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 2241(c)(3), 28 U.S.C. § 1651, and Article I, § 9 of the U.S. Constitution.

Venue is proper in this judicial district under 28 U.S.C. 2241(d), because Petitioner Nelson is currently in custody in this district at Louisiana State Penitentiary in Angola, Louisiana.

### PARTIES

Petitioner Leonard Nelson is a state prisoner incarcerated in Angola, Louisiana.

Respondent Darrell Vannoy is the Warden of Louisiana State Penitentiary in Angola, Louisiana and has custody of Mr. Allen.

### BASIC PROCEDURAL HISTORY

#### A.  The Initial Trial

Though the claims in this petition do not involve jury selection, the inauspicious beginning of Mr. Nelson's trial helps explain the miscarriage of justice that occurred here. During jury selection, prosecutors used 100% of their peremptory strikes (8 of 8) to remove Black jurors, justifying several on the grounds that the jurors "seemed disinterested"; the trial court accepted prosecutors' explanations as "reasonable" (without conducting a proper "*Batson* Step Three" analysis to assess whether the reasonable reasons were pretextual or not). *See* Voir Dire Tr. (Excerpt).  Then, the trial judge also used voir dire to address jurors' fears of making a "mistake" in erroneously convicting Mr. Nelson, assuring them: "First of all, remember . . . that this thing is . . . If you convict the defendant and if you find that he should get

the death penalty, it goes through a whole gauntlet of appeal process, et cetera, et cetera." Voir Dire Tr.

at 3. *But see Caldwell v. Mississippi*, 472 U.S. 320 (1985).[2]

At trial, the State called four non-law enforcement witnesses. Two of these witnesses were associates

of the decedent who were with him on the night that he was killed: Derrick Marigny and Curtis Miller.

Both Mr. Miller and Mr. Marigny had open criminal cases in Orleans Parish at the time of trial and both

denied under oath that they were receiving any favorable treatment from the DA's office in exchange for

their testimony. *See* Trial Tr. (March 3, 1991) at 65. Mr. Marigny's testimony was particularly important;

he was referred to in a note found in OPDA's file as an "essential and material witness . . . [and] without

his testimony, we should not have had sufficient evidence to convict Leonard Nelson." *See* Evidentiary

Hearing Ex. 9.[3] Mr. Marigny testified that Mr. Nelson shot his friend "Boss" Wilson during an attempted

robbery, and that neither he nor anyone else present at the time of the shooting possessed firearms (or

otherwise threatened Mr. Nelson). The State offered no motive for the killing other than the attempted

robbery. *See, e.g.,* Trial Tr. (March 5, 1991) at 215 ("According to our story, ladies and gentlemen, which

makes sense with all the evidence, according to our story, ladies and gentlemen, our witnesses are here.

They're minding their own business, and this robber comes across the street, . . .").

---

[2]    The State's Closing Argument also improperly targeted defense counsel. *See* Day 2 Trial Tr. (1991.03.05) at 214-16 ("It is [defense counsel] Mr. Merritt's job as a defense attorney to let this man get up and walk out of here . . . And Clyde, Mr. Merritt, is all tricky . . . because that's his job – to confuse you all. [DEFENSE:] Your Honor, that's objectionable. [THE COURT: Overruled.]").

[3]    Throughout this pleading, Mr. Nelson references state court exhibits according to their Exhibit Numbers at the state trial court evidentiary hearing. All of the state trial court exhibits were reproduced as Exhibit O (e.g., Ex. O4, Ex. O8) to Mr. Nelson's Louisiana Supreme Court filing, which is attached as the first exhibit here. The sole exception is "Exhibit 1" at the state trial court (Exhibit 01 in the Louisiana Supreme Court filing), a flash drive containing the entirety of the documents tendered by OPDA through May 2024. A "motion for leave to file physical exhibit" will follow to provide the court with a copy of this exhibit, as well.

The State's remaining non-law enforcement witnesses, Tracy Johnson and his girlfriend Christine Boatner, did little to bolster the State's case. Instead, their testimony helped to support Mr. Nelson's theory of self-defense: Mr. Johnson testified on direct examination that he had seen *Mr. Marigny* (the alleged victim) "go under his shirt" immediately prior to the shooting, and that he ducked for cover because he anticipated Mr. Marigny would begin shooting. *See* Trial Tr. (March 5, 1991) at 19, 27 (confirming he saw "Derrick draw for a gun"), 28 ("I knew what was about to happen"), 28-29 ("Because I seen him [Derrick Marigny] pulling a gun out, you know, going under his shirt reaching for what I though [sic] to believe was a gun."). Johnson confirmed that all three (Boss, Marigny, and Miller) were drug dealers and were known to carry guns. *Id.* at 31-32. Boatner testified that she wasn't sure whether Boss, Marigny, and Miller had guns, *id.* at 72-75, and her obstructed view of the incident was through a rear-view mirror. Her description of the location of Nelson and his co-defendant at the moment she first heard gunshots contradicted the State's evidence, and supported the defense theory that Boss, Marigny, and Miller shot first. *Id.* at 75-76.

A fully loaded handgun—of disputed provenance—was found near the decedent. The State was unable to produce any physical evidence linking Mr. Nelson (or his co-defendant, Matthew Moore) to the gun. A crime lab technician for the NOPD, Officer James Gahagan, testified that he "lifted" four fingerprints from the scene, *id.* at 35, but the gun recovered at the scene had *not* been dusted for fingerprints and had *not* been tested, *id.* at 37. This testimony left open the possibility that the gun belonged to Mr. Nelson or Mr. Moore, as the State argued. At trial, there was no evidence adduced that Mr. Moore had fired his weapon, thus supporting the inference that the recovered weapon belonged to him (as opposed to Marigny or Miller, as Mr. Nelson maintained).

The defense presented a very different story. Mr. Nelson argued that Wilson, Marigny, and Miller were well-known drug dealers—and because Mr. Nelson had recently stolen drugs from them—all three were attempting to kill him. Taking the stand himself, Mr. Nelson stated that he and Mr. Moore had stolen drugs from Mr. Wilson approximately a week before the fatal incident, and that in the intervening days, Mr. Wilson, Mr. Marigny, and Mr. Miller had attempted to kill him on several occasions. Mr. Nelson testified that, on the evening of May 6, 1990, he crossed paths with Mr. Wilson, Mr. Marigny, and Mr. Miller outside a popular local club. All three were armed and attacked. After stating, "Come on, man, let's kill them n----rs," "Boss" fired at Mr. Nelson and Mr. Moore; while ducking for cover, Mr. Nelson returned fire. He shot back only "because he was going to kill me if I wouldn't have killed him . . . All three of them got guns. They had more bullets than I did." *See id.* at 179-81.

Mr. Nelson additionally presented five witnesses that all supported his claim that credible threats to his life had been made against him in the days leading up to the shooting *and* at the time of the shooting. Mr. Walter Hebert—a lifelong friend of the decedent and former bodyguard to Mr. Marigny—testified that he and Mr. Marigny had attempted to kill Mr. Nelson (alongside the decedent) just three days before the fatal incident. Both Hebert and Mr. Gregory Julian testified that Mr. Wilson, Mr. Marigny, and Mr. Miller had approached them both on separate occasions and asked them to kill Mr. Nelson. Ms. Janet Perez testified that she saw Mr. Marigny and Mr. Wilson "reach[] for their gun[s]" on the night of the shooting, *id. at* 146, corroborating the testimony of *the State's* witness (Mr. Johnson) who saw Mr. Marigny reaching for his waistband immediately prior to the shooting. *See id.* at 28-29 ("I seen him pulling a gun out, you know, going under his shirt reaching for what I thought to believe was a gun."); *see also id.* at 33 (Johnson confirming Perez was at the scene). Mr. Julian, Mr. Henry Hudson, and

7

Mr. Craig Jones all testified that they knew Mr. Wilson, Mr. Marigny, and Mr. Moore to be drug dealers and to carry guns.

After the jury rejected the state's attempt to obtain a first-degree murder conviction, Mr. Nelson was convicted of second-degree murder on March 5, 1991. He was sentenced to life without the possibility of parole, probation, or suspension of sentence on July 29, 1991. His conviction was affirmed on appeal.

### B.  The State Hides its Files from Mr. Nelson

After Mr. Nelson's conviction became final on October 15, 1992, he began diligently and relentlessly requesting his records from the Orleans Parish District Attorney's Office (OPDA). From 1993 until 2009, Mr. Nelson initiated communication with OPDA—either via formal public records requests or letters requesting a status check—over fifteen times. *See, e.g.,* Evidentiary Hearing Ex. 3-7. In 2009, Mr. Nelson sued OPDA in civil court, requesting that OPDA be ordered to give him his records. The case was heard on July 25, 2009, and Judge Madeline M. Landrieu made two findings: 1) that Mr. Nelson's request was timely and that OPDA had a duty to preserve his records, and 2) that OPDA did not preserve his records and are not in possession of his records. *See* Evidentiary Hearing Ex. 6. On June 29, 2022, nearly twenty-eight years after Mr. Nelson submitted his first request, a redacted copy of some of OPDA's records related to his case were finally sent to him. Upon review, the Civil Rights Division of OPDA had determined that these records contained exculpatory and impeachment evidence that OPDA had failed to disclose, in violation of *Brady v. Maryland*.

Despite recognizing grave infirmities in Mr. Nelson's conviction, OPDA did *not* initially turn over all of the evidence in their exclusive possession at that time (and, indeed, they still have not done so today in March 2026). But recognizing the potential for serious injustice, the OPDA Civil Rights

Division helped secure Mr. Nelson *pro bono* counsel in December 2023. In January 2024, at the request of the Orleans Parish District Attorney's office, Mr. Nelson and *pro bono* counsel signed an agreement in which OPDA committed to undertaking a review of his case and "obtaining all relevant documents in the case" and agreeing to "share . . . all OPDA records permitted under the law, to include attorney notes[,] internal memos, and other work-product." In exchange, Mr. Nelson agreed that he would "not use any information received from the disclosure of these non-mandatory records to form the basis of any [civil] claim." Only then did OPDA electronically share some of the files that subsequently formed the basis, in part, for Mr. Nelson's state post-conviction relief (PCR) application. And slowly, they shared more: On March 19, 2024, OPDA turned over for the first time the 64-page NOPD homicide file that was previously suppressed (even though such records had been in OPDA's possession for moths). *See* Evidentiary Hearing Ex. 1 (flash drive), <Leonard Nelson NOPD Homicide File (E-07223-90)_Redacted.pdf>. On May 28, 2024, counsel inquired whether OPDA was withholding additional information that could support Mr. Nelson's *Brady* and *Napue* claims in additional files. On May 29, 2024, OPDA responded that they had such files (and were in the process of seeking more), but wrote:

> The 341-057 file [related to the prosecution of Derrick Marigny] contains another memo, this one from ADA McDonald, requesting the post-trial deal offered to Marigny. I just want to double check that Mr. Nelson signed our conviction review agreement and acknowledges and understands that ["]no litigation["] clause before I share additional work product."

Upon being reminded that Mr. Nelson executed the waiver in January, OPDA shared hundreds of more pages of documents on May 29, 2024 related to Derrick Marigny's prosecutions that make up the core of Mr. Nelson's *Napue* claim, revealing that prosecutors were subjectively aware their star witness, Derrick Marigny, committed perjury. *See* Evidentiary Hearing Ex. 1 (flash drive), <Derrick Marigny files> (folder containing two booking cards and "DA File" PDFs for five separate prosecutions); *see also* Evidentiary

Hearing Ex. 11-14. The final files were shared in early June 2024. Mr. Nelson updated a previously pending post-conviction relief petition containing other claims on June 27, 2024.

By then, however, the political winds in Orleans Parish had shifted. The OPDA Civil Rights Division was taken off the case, and the matter was transferred to the OPDA Appeals Division, who have adamantly opposed relief ever since.

### C. Litigating the Post-Conviction Claims

#### 1. State Trial Court

With the assistance of counsel, Mr. Nelson memorialized these claims in his updated Application for Post-Conviction Relief filed on June 27, 2024. The PCR petition advanced three chief claims: (1) violations of *Brady*; (2) violations of *Napue*; and (3) violation of Mr. Nelson's Due Process rights based on incorrect self-defense jury instructions. (Mr. Nelson also alleged ineffective assistance of appellate counsel, insofar as appellate counsel did not challenge the burden-shifting framework of the self-defense jury instruction.) The District Attorney initially argued that Mr. Nelson's claims were untimely, insisting that Mr. Nelson had not been sufficiently "diligent" in seeking the records that their office had hidden, suppressed, been ordered to disclose, "lost," and then found in 2022. *See* LASC Filing, Ex. D (State's Procedural Objections). On September 20, 2024, the trial court rejected the State's procedural objections to these claims and ordered a response on the merits by October 20, 2024. *See* LASC Filing, Ex. F (Ruling Denying Procedural Objections). The State opted not to seek supervisory review of this ruling. *Cf. State v. Copelin*, 206 So.3d 990 (La. App. 4 Cir. 2016) (holding decision not to seek supervisory review of decision, when special procedures exist to review those rulings, can constitute waiver of claim).

The State also chose to ignore the trial court's order to file a merits opposition to Mr. Nelson's petition. After the deadline lapsed, on October 22, 2024, Mr. Nelson filed a "Response to Non-Filed

Merits Opposition" and asked the Court to grant immediate relief. *See* LASC Filing, Ex. I. The trial court ignored the pleading.

On November 7, 2024, less than twelve hours from the previously scheduled ruling date, a junior Assistant District Attorney opted to file a new pleading that contained a mix of (untimely, and hence, waived) procedural objections and (untimely, and hence, waived) merits responses. *See* LASC Filing, Ex. J. As to the jury instruction claim, the State offered no merits response at all. *Id.* The trial court cancelled the ruling date to "review" the State's last-minute pleading and ordered a new evidentiary hearing.

In the interim, the State all but conceded error as to Mr. Nelson's jury instruction claim. On November 13, 2024, Petitioner filed a "Motion for Ruling on Jury Instruction Claim and Motion to Cancel Evidentiary Hearing on *Brady* Claim as Moot." *See* LASC Filing, Ex. L. The motion explained that "[o]n the merits, there is no actual dispute that Mr. Nelson was convicted based on a self-defense instruction that mangled [the] relevant law, improperly assigning to Mr. Nelson an initial 'preponderance of the evidence burden.'" *Id.* The pleading also objected to the State's indefensible (and willful) violation of the trial court's orders to raise other issues/defenses. *Id.* Simultaneously, the Chief of the OPDA Appeals Division (the direct supervisor of the junior ADA who filed the untimely brief on November 7, 2024) filed a remarkable concession:

> The parties agree that the State's filing of November 7, 2024—as it relates to the self-defense issue (pages 4-6, 9)—contains untimely raised procedural objections **that are not properly before the Court and may be disregarded by the Court.** The parties agree that the question of the accuracy of the self-defense jury instruction is fully briefed and should be ruled upon at the Court's earliest convenience. Should the Court agree with the petitioner that relief is warranted on Petitioner's self-defense jury instruction claim (Claim I.B), the parties agree that the matter is ripe for immediate ruling, as such ruling may render the December 17, 2024 hearing date moot.

LASC Filing, Ex. K ("Joint Motion . . ."). Inexplicably, the trial court ignored the filings, prompting Petitioner to file further briefing related to the *Brady* and *Napue* claims.

11

The trial court conducted an evidentiary hearing on December 17, 2024. *See* Ex. N (hearing transcript). Without objection from the State, Mr. Nelson called his *pro bono* attorney, who testified for nearly an hour and introduced hundreds of pages of documentary exhibits (including a flash drive containing all materials provided by OPDA between January 2024 and June 2024). *Id.*; LASC Filing, Ex. 01-018. The State called no witnesses and re-introduced some of the same documents already in evidence. Following this hearing, the trial court announced it would take the matter under advisement; it issued a ruling denying Mr. Nelson's application for post-conviction relief on January 10, 2025. LASC Filing, Ex. A.

### 2.    State Intermediate Appellate Court

Mr. Nelson timely sought supervisory relief from the Louisiana Court of Appeal, Fourth Circuit. On May 21, 2025, the Louisiana Court of Appeal, Fourth Circuit summarily denied Mr. Nelson's writ, by a vote of 2-1. The majority offered no reasoned decision beyond that offered by the trial court; Judge Jenkins wrote a short opinion explaining why she would have reversed. *See* LASC Filing (Ex. A to Volume 1).

### 3.    State Supreme Court

Mr. Nelson timely sought review of the appellate court ruling through an application filed with the Louisiana Supreme Court on June 19, 2025. On December 4, 2025, the Louisiana Supreme Court ordered the State to supply additional briefing on Mr. Nelson's *Brady* and *Napue* claims by December 30, 2025. Once again, the State ignored the court's order, opting not to file any merits opposition. On January 6, 2026, the State filed a "motion for extension of time," which was granted. The State filed its opposition memorandum on January 9, 2026. On January 23, 2026, the Louisiana Supreme Court

summarily denied relief by a 5-2 vote. Two justices explained that they would have granted relief for the reasons assigned by the dissenting judge below. *See State v. Nelson*, No. 2025-KP-00782 (La. 1/28/26).

This federal habeas petition follows.

**LEGAL CLAIMS**

I.      **The *Napue* Claim**

Prosecutors ran a risk when they based their case on the testimony of two individuals who they knew to be violent drug dealers, both of whom they were prosecuting for drug distribution at the time; the witnesses, too, took a risk by taking the stand and testifying rather than invoking their Fifth Amendment privilege. While it is true that drug dealers may be the victims of crimes, as the State claimed Mr. Marigny and his friends were in this case, the State's trial strategy was risky because individuals like Marigny may be reluctant to tell the truth about their own criminal behavior when testifying. And, when they fail to tell the truth, the Constitution requires prosecutors to correct their witness's false testimony (regardless of whether defense counsel attempts, successfully or unsuccessfully, to impeach the witness). See *Wearry v. Cain,* 577 U.S. 385, 393–94 (2016) (rejecting prosecutors' argument that evidence was immaterial because witness's credibility was "already impugned"); *cf. Strickland v. Washington*, 466 U.S. 668, 695 (1984); *Glossip v. Oklahoma*, 145 S. Ct. 612 (2025); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment").

The documents eventually disclosed by OPDA in May 2024 reveal that prosecutors knew their key eyewitness against Mr. Nelson repeatedly lied about his criminal behavior, but the State failed to correct the record, as *Napue* and its progeny require.

13

A criminal defendant's right to due process of law is violated when the prosecution, even if not soliciting false evidence, allows false evidence to go uncorrected. *See Napue*, 360 U.S. at 269; *see also Alcorta v. Texas*, 355 U.S. 28, 78 (1957); *United States v. Agurs*, 427 U.S. 97, 110 (1976); *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Glossip*, 145 S. Ct. at 616. To succeed on a *Napue* claim, a Petitioner must demonstrate that (1) the witness's testimony was false, (2) the prosecution knew the testimony was false, and (3) the testimony was material. *See Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996). All three elements of the *Napue* claim are satisfied in Mr. Nelson's case and, notably, it does not even appear that the trial court disagreed. (Instead, the trial court rejected the claim based on a bizarre interpretation of the Fifth Amendment.) This section details how the evidentiary record supports Mr. Nelson's *Napue* claims and then explores the egregious shortcomings in the trial court's analysis of these claims.

### A. Prosecutors violated *Napue* when they failed to correct material testimony they knew to be false.

This section details each of the three elements of a valid *Napue* claim and explains why each element was satisfied here.

### 1. The Testimony Was False.

In this case, Mr. Nelson's defense counsel attempted (very unsuccessfully) to portray Marigny as a drug dealer, and Mr. Marigny (very successfully) parried these attacks. Rather than plead the Fifth Amendment to questions about his drug dealing, Mr. Marigny chose to repeatedly lie:

| | |
|---|---|
| Q: | Isn't it a fact that Harold 'Boss' Wilson sells cocaine for you? |
| A: | No, it's not true at all. |
| Q: | Is it a fact that Curtis Miller sells cocaine for you? |
| A: | No. |
| [ADA Ms. McDonald] | Objection, Your Honor. |
| [By the Court]: | Overruled. . . . |
| Q: | Did Curtis Miller tell you on April 29th at about 3:45 that Leonard Nelson stole a bag of cocaine that he was selling for you? |

| | |
|---|---|
| A: | No, sir. . . . |
| Q: | Isn't it a fact that you deal cocaine occasionally from that corner, Foy and Milton? |
| [ADA Ms. McDonald]: | Objection, Your Honor. |
| A: | I deals cocaine from no corner at all. . . . |
| Q: | Do you deny that you either sold or possessed drugs at 1470 Milton Street? |
| [ADA Ms. McDonald]: | Objection, Your Honor. When are we talking about? Is this way in the past? |

Trial Tr. (May 3, 1991) at 36-41. At *no time* during his testimony did Mr. Marigny acknowledge that he was, in fact, a drug dealer, that he regularly dealt drugs in the St. Bernard Projects near Foy St. and Milton St., or that he had previously offered to plead guilty to these offenses and testify against Mr. Nelson, in exchange for favorable treatment in his pending drug dealing cases.

There is no serious dispute that this testimony was false, because (1) there was overwhelming evidence of the falsity revealed in the May 2024 disclosures, and (2) Immediately after Mr. Nelson was sent away for life imprisonment, Mr. Marigny pleaded guilty to repeatedly selling drugs near Foy St. and Milton St.

### 2. Prosecutors knew the testimony was false

As meticulously documented at the evidentiary hearing, the May 2024 disclosures prove that prosecutors knew that Mr. Marigny was engaged in perjury from the stand at the time of trial. At the time of Mr. Marigny's testimony, prosecutors and NOPD had overwhelming evidence in their possession that Mr. Marigny was lying when he testified "I deals cocaine from no corner at all," and that the overall impression intentionally communicated by his testimony (that he had no connection to the drug trade) was wildly misleading.

In fact, at the time of Derrick Marigny's fateful encounter with Mr. Nelson, he was inexplicably out on bond on *four* different serious drug cases (for which he was facing up to 130 years in prison)

15

being prosecuted by Orleans Parish prosecutors. Here's what the OPDA files finally shared in May 2024 reveal.

On April 12, 1989, Marigny was arrested on the 3700 block of Gibson Street (in the St. Bernard Project at Milton Street) where he and Ms. Henrene Brown were standing together on a corner. Evidentiary Hearing Ex. 1, <*Marigny, Derek. DA File_334-550_Redacted.pdf*, \*29>; *see also* Evidentiary Hearing Ex. 11. As NOPD Officers Coats and Caesar approached, "[t]he officers saw Marigny throw a clear plastic bag to the ground," which Brown then picked up. *Id.* Inside the bag were multiple rocks of crack cocaine. *Id.* The case (Case No. 334-550) against Marigny seemed strong—at minimum for the felony offense of possession of crack cocaine—but when Ms. Brown pleaded guilty, she insisted on giving a statement absolving Marigny of responsibility. (Per Ms. Brown, Marigny chivalrously knocked the drugs out of *her* hands when he noticed the police.) *Id.* The files do not indicate that prosecutors who made the decision to drop the case with Ms. Brown yet realized Mr. Marigny was a key witness against Mr. Nelson at that time. In any event, when prosecutors decided to drop *that* case against Marigny in June 1990, Mr. Marigny had much more serious problems on his hands.

The first of his major problems was Case No. 341-057, which resulted from an arrest on January 16, 1990 on the 1400 block of Milton Street in the St. Bernard Project.  That evening, six NOPD officers (Neal, Recansner, Slack, Jewitt, Irving and Thomas) were engaged in drug enforcement in the neighborhood. Evidentiary Hearing Ex. 1, *Marigny, Derek. DA file_341-057_Redacted.pdf*, \*41; *see also* Evidentiary Hearing Ex. 12. Marigny was watching some of the officers conduct a different drug arrest from about a half block away, when several plain clothes officers walked up behind him. *Id.* Not knowing he was being watched, Marigny "ben[t] down and place[d] a small object at the end of a post

16

that was lying on the ground and cover[ed] it over with leaves. [He] then started to fumble with his shoe laces as if he was attempting to tie his shoe." *Id.* The officers promptly seized Marigny and recovered what he had concealed under the leaves: a clear bagging containing 64 rocks of crack cocaine. *Id.*, *44. In a worksheet prepared by OPDA prosecutors, prosecutors identified no "PROBLEMS" with the case. *Id.* at 29. Curiously, someone subsequently annotated the form with the names "Matthew Moore / Leonard Nelson," and the name of the prosecutor initially assigned to the matter ("Ahern"); prosecutors plainly recognized the connection between this drug case and the murder prosecution against Nelson.



*Id.*, *29.[4]

Just *ten days* after his arraignment in the previous crack cocaine case, Mr. Marigny was arrested against for crack cocaine dealing on March 19, 1990 in the 1400 block of Milton Street. *See* Evidentiary Hearing Ex. 1, <*Marigny, Derek. DA File_342-951_Redacted.pdf*, *15>; *see also* Ex. 13. This time, four NOPD narcotics task force officers (Neal, Irving, Thomas, and Walsh) watched Marigny conduct several hand-to-hand drug deals; jumped out of their vehicles; and tackled Marigny as he began to flee. *Id.* They caught him with 28 rocks of crack cocaine and $105 cash. *Id.* *19.  Again, prosecutors

---

[4]    The files also show something incredibly peculiar in the progression of this drug case. Marigny had a court date on February 22, 1990, an arraignment on March 9, 1990, and then his matter was reset on April 4, 1990, May 25, 1990, July 6, 1990, August 6, 1990, August 10, 1990, November 5, 1990, November 26, 1990, December 19, 1990, February 28, 1991, March 27, 1991, May 23, 1991, June 12, 1991, and June 19, 1991. *Id.* at 4. No explanation appears in the file for the 1½ year delay. *See* LASC Filing, Ex. N (hearing transcript) at 68-69 ([THE COURT:] So what took so long for the cases to go? I mean, it was over a year in most instances on a PWIT case. So I'm just trying to understand. It's one thing to say, 'No, you're not getting your deal.' And if they – if there was this conversation with the ADA that he said he wanted to plead 'Guilty,' and he would plead 'Guilty' if he got a deal. If the answer was absolutely not, why not just take him to trial? [THE STATE:] I don't know, Judge. Those were in different sections of court? We don't know what the docket looked like. There's a lot of reasons why it wouldn't go to trial. [THE COURT:] And one of those could be, 'Okay, I'm going to give you your deal, but we have to wait until after the trial so it can't come up in cross examination.' But, okay. . . .").
    On June 21, 1991, the file reflects Mr. Nelson's murder prosecutor, Missy McDonald, who had not previously appeared in the case, appeared in the court to consummate the plea bargain. *Id.* At the hearing on Mr. Nelson's post-conviction claims, OPDA speculated (without any evidence) that the incredible coincidence might have been the result of the ordinary prosecutor being sick that day.



identified no weaknesses in their possession with intent to distribute crack cocaine case, apart from the fact that "these P/O [police officers] have gotten D before!" *Id.*

Mr. Marigny made bail in that matter (Case No. 342-951), but he was arrested for dealing crack cocaine yet again less than a month later, on April 9, 1990. *See* Evidentiary Hearing, Ex. 1, <*Marigny, Derek. DA File_343-461_Redacted.pdf*, *28>; *see also* Evidentiary Hearing, Ex. 14. In Case No. 343-461, the OPDA files reflects another open and shut case against Marigny. This time, officers Thomas, Neal, Irving received information that Derrick Marigny was selling crack cocaine (yet again) in the

1400 block of Milton. This time, a known reliable source[5] told them that Marigny was selling crack out of a brown pickup truck, and sure enough, the officers went to the scene and saw Marigny standing next to a 1974 brown pickup truck:

> As officers approached [Marigny] for a closer look they observed that Marigny was counting money; Marigny then handed an unknown object to a [black male] who was standing next to him. Upon making eye contact with the officers, Marigny immediately threw an unknown object into the 1974 truck. Officers immediately approached the subject at which time the subject fled away from the vehicle into an unknown project apartment.

*Id.*, *26-*27. Officers arrested Marigny about five minutes later and obtained a search warrant for the truck. *Id.* Inside, they found $1,351 in cash, 5.79 grams of crack cocaine inside of matchbox, Marigny's ID card and social security card, and a bill of purchase (in Marigny's name) for the truck. *Id.* *37, *39. Somehow, while already under arrest and one of the officers was distracted with paperwork, Marigny "grabbed the matchbox, threw it to the ground, and stepped on it, causing the rocks to become [partially] crushed." *Id.* *31. (The drugs were nevertheless recovered, tested, and booked into evidence.) Yet again, prosecutors' internal notes reveal the chief "PROBLEM" in the case to be that Marigny *kept* getting around by some of the same officers (that is, members of NOPD's task force assigned to making narcotics arrests in the St. Bernard Project).[6]

---

[5]    The identity of this individual does not appear in the materials OPDA has provided, but of course, once Marigny lied on the stand about his crack cocaine dealing at this precise location (and prosecutors declined to correct the false testimony), this witness's identity would likely constitute *Brady* information, too.

[6]    Unlike the memoranda in Case No. 342-951 and Case No. 341-057, the memorandum in Case No. 343-461 flagged one other possible problem: "Whose truck?" Of course, as outlined above, there was overwhelming evidence that the truck belonged to Marigny, but the notation highlights the extent to which OPDA's internal memoranda strained to anticipate *hypothetical* defenses that might be raised, even those that were highly unlikely to succeed.

Once more, the unexplained delays in the prosecution lend substantial support for the proposition that prosecutors wanted to keep the matter open until *after* Marigny testified against Nelson at the murder trial. Marigny was arraigned on July 16, 1990, and then the matter was delayed on August 6,

The files amount to hundreds and hundreds of pages of evidence demonstrating one thing: OPDA prosecutors knew that Marigny was a drug dealer at the time of his testimony. There is no hint—anywhere in the voluminous disclosures—that anyone affiliated with NOPD or OPDA harbored the slightest doubt that Marigny was personally involved in the distribution of crack cocaine.

Obviously, defense counsel also believed that Mr. Marigny was lying when he testified otherwise, but this awareness does not absolve prosecutors of their responsibility to correct the testimony. *Glossip*, 145 S. Ct. at 651 (holding that despite defense counsel's awareness of the falsity of the prosecution's witness's testimony and the witness's already-damaged credibility, "the responsibility and duty to correct false testimony lies with representatives of the State, not with defense counsel.") (internal quotations omitted); *see also United States v. Sanfilippo*, 564 F.2d 176, 177-78 (5th Cir. 1977) (holding defendant's due process rights were violated despite defense awareness at trial that prosecution witness's testimony was false, emphasizing that "the duty to correct the false testimony of a Government witness is on the prosecutor"). Nor can prosecutors argue, improbably, that ADA McDonald might have secretly harbored some doubt as to whether Marigny truly was a cocaine dealer. *See* LAFAVE, ET AL., 6 CRIMINAL PROCEDURE § 24.3(d) (4th ed.) ("The duty to correct false evidence") ("[T]he Court has indicated that the *Mooney* principle does not require actual knowledge by the prosecution of the perjured testimony.")[7];

---

1990, August 10, 1990, September 6, 1990, September 17, 1990, September 19, 1990, December 19, 1990, February 28, 1991, March 1, 1991, May 6, 1991, May 20, 1991, and resolved by plea on June 21, 1991. Once again, Missy McDonald handled the plea. *Id.* *1-*2, *8.

[7]   Even if this were true—as the State now implausibly hypothesizes ("There is no way, because the prosecutor in this case was not a witness to the underlying crimes of PWIT and Possession, there is no way she could have known this was a false statement.")—then plainly there was a *Brady* violation. *But see* Poulin, *Convictions Based on Lies: Defining Due Process Protection*, 116 PENN. ST. L. REV. 331 (2011) (discussing "prosecution knowledge" requirement and collecting, *inter alia*, cases in which false testimony does not involve government culpability). If ADA McDonald really believed that Mr. Marigny was innocent, Mr. Marigny's offer to plead guilty would be an offer to commit perjury by falsely accepting responsibility for these drug-dealing cases, in order to procure better treatment for himself. The fact that

21

*Glossip*, 145 S. Ct. at 630 (rejecting a claim that testimony was not "clearly false" because the witness believed his testimony to be true, and holding that even if a witness earnestly believes his testimony to be true the prosecutorial duty to prevent the use of false testimony is absolute).

### 3.    The false testimony was material

In the context of a *Napue* claim, materiality is satisfied if there is a reasonable likelihood that the uncorrected false testimony may affected the trial's outcome, a standard which focuses on whether the falsehood had the *potential* to influence the jury's judgment, not whether it definitively altered the verdict. *See Napue*, 360 U.S. at 271; *see also Glossip*, 145 S. Ct. at 626 (holding that if a defendant shows the prosecution allowed false testimony "to go uncorrected when it appeared" then "a new trial is warranted so long as the false testimony may have had an effect on the outcome of the trial"). The *Napue* materiality analysis is tipped significantly in favor of the defendant, as once the falsity of testimony is established, the burden is shifted to the prosecution "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*; *see also* LaFave, et al., 6 Criminal Procedure § 24.3(d) (4th ed.) ("The duty to correct false evidence"). Unless the state can overcome this significant burden of proof, a new trial is warranted. *Id.*

Despite its superficial similarity to the *Brady* materiality standard, the "reasonable likelihood" standard of materiality in the *Napue* context is a particularly "low threshold." *See United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979). The materiality of any given *Brady/Napue* violation must be evaluated

---

a star prosecution witness offered to commit perjury is a form of *Brady* evidence that should have been told to Mr. Nelson's jurors. *See* LASC Filing, Ex. N at 73 (urging this point in response to improbable argument that no *Napue* obligation is triggered unless ADA personally witnesses witness's criminal wrongdoing).

(1) in light of the strength of the State's case at trial, and (2) in light of additional *Brady/Napue* violations that might compound the cumulative impact or import of the suppressed evidence. *See Kyles*, 514 U.S. at 436; *see also Glossip*, 640 U.S. at 13. The Supreme Court has held that "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence," and in situations where false testimony is provided, "the standard [to find a constitutional violation] is considerably less onerous." *See Napue*, 360 U.S. at 269; *see also Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) (contrasting the materiality standard applicable to *Brady* claims with that applicable to "claims that the prosecution has knowingly used perjured testimony or false evidence"); *see generally* LAFAVE, ET AL., 6 CRIMINAL PROCEDURE § 24.3(d) (4th ed.) ("The duty to correct false evidence") (discussing lower materiality standard for "false testimony" cases as compared to *Brady* cases).

Under *Napue*, material evidence includes not only exculpatory evidence, but also information that could be used to impeach government witnesses when the reliability or credibility of that witness may determine guilt or innocence. *See Bagley*, 473 U.S. at 676; *accord Giglio*, 405 U.S. at 154-55; *Kemp*, 828 So.2d at 545; *Napue*, 360 U.S. at 269 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. . . ."); see also *Kyles*, 514 U.S. at 444-52 (discussing impeachment uses of undisclosed evidence); *Bright*, 875 So.2d at 41 ("For purposes of the State's due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence."); *Barham*, 595 F.2d at 241-42 ("It is also immaterial whether the false testimony directly concerns an essential element of the Government's proof or whether it bears only upon the credibility of the witness.").

The federal Fifth Circuit has held that a conviction must be reversed when false testimony went uncorrected, even if "[t]here is no doubt that the evidence in this case was sufficient to support a verdict

of guilty," and sister circuits have described the need to reverse in such cases as "virtually automatic." *See Barham*, 595 F.2d at 242; *see also United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991) ("Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'") (quoting *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975)); *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1114 (9th Cir. 2001).

Mr. Marigny's testimony was central to the prosecution's case, as evidenced by the recently disclosed D.A. file note that emphasized the "critical and essential" nature of Mr. Marigny's testimony, noting "without [Marigny's] testimony, we would not have had sufficient evidence to convict Leonard Nelson." *See* Evidentiary Hearing, Ex. 9. By the prosecution's own admission, no evidence could be more material to Mr. Nelson's conviction than the false testimony provided by Mr. Marigny. *Id.* On multiple levels Mr. Marigny's false testimony was material. First, as in any case, the credibility of the State's key eyewitness is generally important to the prosecution's case. Had the jury known Mr. Marigny was willing to commit perjury regarding Issue A (his criminal history), there exists at least a reasonable likelihood that jurors might doubt his veracity as to Issue B (the issue of self-defense). But here, there is a second, and independent, reason why this false testimony was so important. If jurors believed Mr. Marigny's testimony that he was not involved in the drug trade, it would vitiate the entire defense theory of the case: The lie was directly material to the *motive* for Marigny and Boss to attack Mr. Nelson on the night in question. The jury already did not believe the State's version of events entirely, and the false testimony would have further eroded their assessment of the veracity of the State's theory. *See* Evidentiary Hearing, Ex. N at 20-22, 53-55.[8]

---

[8]   *Napue*'s materiality inquiry requires the reviewing court to consider what the outcome might have been had prosecutors complied with their constitutional obligation. As Mr. Nelson argued in briefing before the evidentiary hearing, the result would have looked dramatically different if trial

It is important to emphasize that *neither* the State *nor* the trial court have disputed that this false

testimony was material at any stage in state court. Indeed, the State cannot do so, because their own

internal files underscore that Mr. Marigny's testimony was "essential" to securing the conviction against

prosecutors had made the following (constitutionally required) disclosures once their key eyewitness committed perjury:

> Members of the Jury, I regret to tell you that I am obligated to share some information known to the State at this time. While we still think you should believe Mr. Marigny's testimony that Mr. Nelson was the aggressor, the State knows that Mr. Marigny testified falsely just a moment ago. Indeed, he has previously told me, personally, that he would plead guilty to multiple different charges of distributing cocaine at this precise location in exchange for favorable treatment, and that he was willing to testify against Mr. Nelson *only* if we did so. In fact, we're prosecuting Mr. Marigny in those three drug-dealing cases because we have overwhelming evidence that he is a drug dealer.
>
> Let me share with you the evidence, from our personal files, that leads me to believe that our star eyewitness just lied. On April 12, 1989, two NOPD officers saw Marigny throw a clear plastic bag of cocaine to the ground one block off of Milton Street. Marigny and the woman he was with were both arrested, but we had to drop the charges against Marigny when the woman stated under oath that the drugs were hers. On January 16, 1990, he was arrested about 50 feet away from that spot on Milton Street. Six NOPD officers caught Marigny red-handed as he tried to conceal a plastic bag containing more than 60 rocks of crack cocaine under some leaves. We only charged him with possession in that case, which is pending now. But on March 19, 1990, in the exact same spot, the Narcotics Strike Force arrested him again with 28 pieces of crack cocaine on his person; he's facing PWIT charges for that one. Somehow that didn't stop him. After a Confidential Informant told NOPD that he was *still* selling crack cocaine from the exact same spot on Milton St., on April 9, 1990, another team of NOPD officers arrested him yet again: Once more, he had dozens of rocks of crack cocaine and more than $1350 in cash on him at the time of his arrest. The shooting in this case occurred on May 5, 1990. In our private notes, we've written that these cases are airtight; there are no real weaknesses in our case against Mr. Marigny to speak of. And we can put him in prison for over 100 years if and when we convict him of these PWIT charges because of his past violent criminal history.
>
> Members of the jury, this does not make Marigny a liar with respect to his testimony against Mr. Nelson. But in the unusual circumstance where I put someone on the stand as a key witness in our case-in-chief, and I know he's provided false testimony, I have to tell you that. Defense counsel has a duty to win; the State has a duty to see that justice is done, win or lose. So that's what I'm doing here.

*See* LASC Filing, Ex. M at 3. Unfortunately, the prosecution did not uphold its duty in this case.

Mr. Nelson, and likewise acknowledge they would have to admit (at a hypothetical trial of Mr. Nelson's codefendant) that Mr. Nelson lied on the stand as a result of his subsequent guilty pleas.

> **B. The state court's decision was contrary to and involved an unreasonable application of clearly established Federal Law, as determined by the Supreme Court of the United States, and was based on an unreasonable determination of the facts in light of the evidence presented.**

The last reasoned state court opinion here is the state trial court's. Unsurprisingly, prosecutors made no attempt to defend the reasoning of the trial court when briefing the matter before the Louisiana Supreme Court (because they know it is unsupportable). Still, it is *that* opinion to which the federal habeas court should refer.

The trial court rejected Mr. Nelson's *Napue* claim based on a radical, legally unsupported proposition: that prosecutors' duties under *Napue* are void because a key government witness "ha[s] the absolute right to not self-incriminate as to unadjudicated charges that were pending against him." LASC Filing, Ex. A at 2-3. But the fact that Mr. Marigny's multiple drug-dealing cases "**had not yet been adjusdicated**" (bold, underline, and typo in original state court opinion) is irrelevant. *Id.* Mr. Marigny did not lie in response to questioning about whether he had been *convicted* of drug offenses. Rather, he chose to lie in response to questioning about whether he had engaged drug dealing, a critical point in Mr. Nelson's particular trial.

The right against self-incrimination does not grant witnesses the right to lie under oath; even if the Fifth Amendment did convey such a right, however, this privilege would not and could not trump a defendant's rights under the Due Process Clause. In *Harris v. New York*, the Supreme Court held "[The Fifth Amendment] privilege cannot be construed to include the right to commit perjury." 401 U.S. 222, 225 (1971). Similarly, in *United States v. Rodriguez-Rios* the Fifth Circuit held, "[a]lthough the Fifth Amendment protects a person's right to remain silent in response to an incriminating question, an

outright lie is not protected." 14 F.3d 1040, 1049 (5th Cir. 1994). Mr. Marigny did not have the right to provide false testimony, and the State's decision to allow this crucial testimony to go uncorrected was a violation of Mr. Nelson's due process rights. There is not an iota of support anywhere in federal or state law for the trial court's illogical and bizarre understanding of the due process rights of criminal defendants (or the Fifth Amendment rights of criminal suspects who testify as witnesses), and notably, the State did not even attempt to defend the trial court's reasoning in briefing before the Louisiana Supreme Court.

## II.  The *Brady* Claims

This section introduces four different claims that favorable evidence known to prosecutors was suppressed, finally being disclosed to Mr. Nelson after he spent more than three decades wrongfully imprisoned. It then explains why this evidence was favorable and then explains why it is material. It concludes by emphasizing the ways in which the state courts (to the extent they even considered the claims) came to radically misplaced factual and legal conclusions.

### A.  Prosecutors hid favorable evidence

The evidence now available to Mr. Nelson proves that prosecutors failed to disclose several different types of critical *Brady* evidence. First, the State failed to disclose evidence in their possession that Mr. Marigny had sought to "sell" his testimony in this case in exchange for more favorable treatment in his three pending criminal cases being prosecuted by the same DA's office. The State has candidly admitted that it did not turn over this critical piece of impeachment evidence to the defense, but has adopted the position that such an unseemly offer is not *Brady* material. *See* LASC Filing, Ex. N (hearing transcript) at 65. Second, the files—taken as a whole—contain overwhelming circumstantial evidence supporting the conclusion that prosecutors failed to disclose an implied deal with their witnesses to testify in exchange for favorable treatment. Third, prosecutors failed to disclose that Derrick Marigny told them

that Mr. Nelson's co-defendant had *also* fired his gun, meaning that the (fully loaded) gun found at the crime scene must have belonged to Marigny or his friends. Finally, prosecutors also failed to disclose that the same gun "was tested" forensically (in hopes of linking it to Mr. Nelson's co-defendant) and that such testing had yielded "negative results." These four pieces of *Brady* evidence are discussed below.

**1.   Mr. Marigny Tried to Sell his Testimony**

On June 7, 1991, shortly after Mr. Nelson's trial, ADA Mary "Missy" McDonald (one of the two prosecutors on Mr. Nelson's case) wrote a memorandum concerning Mr. Nelson's co-defendant, who still had not gone to trial. In this memo, ADA McDonald wrote that "[p]rior to [Mr. Nelson's trial], Mr. Marigny stated that he would not testify unless the office offered him a deal concerning his outstanding drug charges."

```
TO: RAY BIGELOW
FROM: MISSY MCDONALD
RE: DEREK MARIGNY
DATE: 6/7/91

     Derek Marigney is an essential and material witness in
the murder case against Mathew Moore. (Case # 344-648) Presently
this case is set for trial on 7/24/91.  Earlier this year, Ms.
O'Bannon and I prosecuted the co-defendant Leonard Nelson, and
a verdict of second degree was returned.
     Prior to the first trial, Mr. Marigney stated that he would
not testify unless the office offered him a deal concerning his
outstanding drug charges. (See cases 341-057, 342-951, and 343-
```

*See* Evidentiary Hearing, Ex. 17. At the time, Mr. Marigny faced the prospect of being multiple billed and sentenced to over a century in prison on three pending drug cases. *See* Ex. N at 64. The State has acknowledged that this information was never disclosed to Mr. Nelson or his attorney. *See id.* at 65. (when asked whether that information was given to the defense, the prosecution replied, "I don't believe so.").

Mr. Marigny's attempt to sell his testimony, at a time when he was facing more than a century in prison, satisfies the "favorable evidence" prong of the *Brady* inquiry. Had jurors known that Mr. Marigny had insisted on a deal as a prerequisite for his prosecution-friendly testimony at trial, they could have concluded his true motivation was not sharing the truth, but rather receiving a favor from the prosecutors charging him with a crime. *See Napue v. Illinois*, 360 U.S. 264, 270 (1959) (explaining that, upon learning of a witness's request for a sentence reduction in exchange for testimony, a jury "might well have concluded that [the witness] had fabricated testimony in order to curry the [prosecution's] favor."). Instead, prosecutors falsely insisted that Mr. Marigny had nothing but altruistic motivations for testifying (and, remarkably, still insist as much today). This undisclosed request for a deal has some value to Mr. Nelson's case due to its ability to call into question the credibility of Mr. Marigny. *See Wearry v. Cain*, 577 U.S. 385, 390, 393-94 (2016) (holding, based on the witness's two undisclosed requests to the police for a sentence reduction, "any juror who found [the witness] more credible might have thought differently had she learned that [the witness] may have been motivated to come forward not by [the claimed reason] but by the possibility of a reduced sentence on an existing conviction."). In fact, the trial court initially appeared skeptical of the prosecutions position, asking, "Do you not think that that's *Brady*? I mean, I'm just asking," before inexplicably ignoring the issue altogether in its opinion. *See* LASC Filing, Ex. N (hearing transcript) at 65.

### 2.  <u>The Implicit Deal</u>

Petitioner adduced overwhelming circumstantial evidence not only that Mr. Marigny attempted to sell his testimony, but also, that there *was* an unwritten deal in place between Mr. Marigny and the prosecution that was never disclosed to the defense. As the trial court astutely put it at the evidentiary

hearing: "So it looks like a duck, walks like a duck, quacks like a duck, but it's a chicken? I guess it's a chicken. Okay." *Id.* at 71.

Even absent an explicit plea agreement in exchange for testimony, a defendant's Fourteenth Amendment right to due process is violated when the State fails to disclose an implicit, unwritten deal or a witness's expectation of favorable treatment in exchange for his testimony. *Tassin v. Cain*, 517 F.3d 770 (5th Cir. 2008). In Mr. Marigny's case, the series of events that happened prior to and after his testimony against Mr. Nelson establish, by a preponderance of the evidence, that there was an understanding about a plea deal or favorable treatment. In exchange for his critical testimony, Mr. Marigny expected favorable treatment, and ultimately, he received the exact deal he requested. Here are just some data points in support of this contention.

First, as previously discussed, the D.A. file reveals that Mr. Marigny initially refused to testify absent a deal from the prosecution. *See* Evidentiary Hearing, Ex. 17. Based on the D.A. files, it appears the trial attorneys were willing to cut such a deal, but ranking attorneys initially denied their requests. *Id.* Implausibly, "approximately one hour before the trial started," prosecutors recorded in an internal memorandum that Mr. Marigny spontaneously committed to "do the right thing." *Id.*[9]

---

[9]    As the undisputed testimonial evidence established at the evidentiary hearing, the private memos in the D.A. files contained many self-serving and patently false statements, so it would be a mistake to accept any self-serving statement at face value. LASC Filing, Ex. N (hearing transcript), at 20-21 (discussing self-serving and false statements in OPDA internal memoranda). For example, the memorandum seeking authorization for a possible probationary ("no bill") sentence for Mr. Marigny, when he faced over 100 years in prison, claimed that his testimony was "honest" and the jury "fully believed" him. Evidentiary Hearing, Ex. 9. Yet by pleading guilty to the drug crimes, Mr. Marigny admitted that he was committing perjury at Mr. Nelson's trial when he denied being a drug dealer, and other D.A. memorandum (correctly) note that the jury *disbelieved* Mr. Marigny in key respects. Evidentiary Hearing, Ex. 8. The State opted not to call any witnesses to rebut or explain these contradictions after Mr. Nelson established, at the evidentiary hearing, that self-serving statements within the OPDA memorandum should not be accepted literally.

Second, without any alternative explanation, Mr. Marigny's three pending drug cases were kept open during the pendency of Mr. Nelson's case, likely so that prosecutors could have significant leverage over their star witness. Indeed, if prosecutors *weren't* aiming to offer a benefit in exchange for testimony, the decision to keep the cases open for over one and a half years is nonsensical; when pressed by the trial court, OPDA had no explanation. The D.A. files contain no hint of an explanation why—and the State offers no explanation today—Mr. Marigny's cases were allowed to linger, apart from the obvious inference that they were being used to extract favorable testimony from Mr. Marigny. As the trial court later stated in its ruling, "this sequence of events certainly raises the Court's hackles"; as even the State acknowledges, "I admit, there's an appearance [of impropriety] . . . [T]here can be an appearance of a deal, but that's not enough." LASC Filing, Ex. N (hearing transcript) at 70-71.; *see also id.* at 68 (trial court asking prosecutors "so what took so long for these cases to go?"); *id.* at 68-69 ("Okay, I'm going to give you your deal, but we have to wait until after the trial so it can't come up in cross examination.").

Third, Mr. Marigny ultimately *did* receive a massive and inexplicable sentence reduction in exchange for his testimony against Mr. Nelson immediately after testifying. Absent the grace of DA Connick, Mr. Marigny was facing a mandatory-minimum sentence of at least 15 years (flat) as a habitual offender convicted of cocaine trafficking, and a maximum of 60 years (flat), for each of his two "PWIT" cases; he was facing an additional decade in prison for his possession of crack cocaine case, which easily could have been "up-charged" to a PWIT, as well. Hence, he could have been sentenced to well over a century in prison at hard labor. But immediately after providing his testimony at trial (while Mr. Nelson's motion for a new trial remained pending), prosecutors secured for Mr. Marigny the requested benefit. In

*their own words*, this was a quid pro quo: they "help[ed] Mr. Marigny, as he helped us." Marigny resolved all of his open cases with probation.[10]

> His testimony will be required again in the trial of Matthew Moore. The evidence is very weak against defendant Moore and the trial will suffer immensely without Mr. Marigny's testimony. Again, we are requesting that we can help Mr. Marigny, as he helped us.

Fourth, there are the nakedly pretextual rationales for the leniency offered at the hearing, which the trial judge (a veteran of District Attorney Harry Connick's office) recognized as implausible. For example, at the evidentiary hearing, the State argued that one reason Mr. Marigny—a well-known, high-profile drug dealer with a history of armed robbery—was given probation to resolve all of his pending crack cocaine distribution charges was because he "had completed a rehabilitation program[;] was in active counseling[;] and he had been gainfully employed for the past 14 months. Those are all really good reasons to get a no-bill!" LASC Filing, Ex. N (hearing transcript) at 63-64 (argument of prosector). The trial judge responded with common sense: "But seriously, we're talking about Harry Connick's administration. And I'm only saying that because I was hired by Harry Connick. You're telling [me] that no-bills on drug cases wasn't mandatory?" *Id.* at 64.

Fifth, there is the suspicious fact that although a different ADA had been prosecuting Mr. Marigny's drug cases at all prior settings, the day Mr. Marigny entered his pleas, his cases were personally

---

[10]  Although this petition focuses mainly on Mr. Marigny because he was, as the DA acknowledges, the "main witness" (whose testimony was essential to securing a conviction), Evidentiary Hearing, Ex. 9, OPDA's records provide the same circumstantial evidence with respect to a deal for Mr. Miller. Mr. Miller was facing revocation proceedings at the time of his testimony because of new criminal activity while out on conditional release, which was inexplicably and curiously left to linger until *after* he testified against Mr. Nelson. After his testimony, he was permitted to plead guilty to a new criminal offense and *not* have his probation revoked. OPDA e has not turned over its prosecution files with respect to Mr. Miller.

handled by ADA McDonald, the homicide prosecutor on Mr. Nelson's case. *See, e.g.,* Evidentiary Hearing, Ex. 11-14. There was no reason for ADA McDonald to take over Mr. Marigny's prosecutions, or for there to be any connection between ADA McDonald and Mr. Marigny, other than the quid pro quo arrangement for his testimony in Mr. Nelson's trial. At the evidentiary hearing, the State speculated that perhaps the homicide prosecutor needed to step in because the ordinary drug-crime prosecutor may have been ill that day. *See* LASC Filing, Ex. N (hearing treanscript) at 71. Again, the explanations strain credulity.

Sixth, the hidden D.A. files reveal that prosecutors were subjectively aware (and worried about) the devastating effect it would have on their case(s) if/when the implicit deal with Marigny became explicit. Evidentiary Hearing, Ex. 8. In a memo asking for permission to drop the case against Mr. Nelson's co-defendant (Moore), the prosecutors wrote that it was important to drop the case, because "any testimony about the No Bill [given to Mr. Marigny] would give the appearance of impropriety at the Nelson trial." *Id.* Prosecutors dropped the case again the co-defendant so they would not "**give the ammunition [Mr. Nelson] needs for a reversal of the Nelson conviction**." *Id.* (emphasis added). As the trial judge, a veteran of the Connick administration put it, the obvious conclusion is that there was an *implicit* deal or expectation of leniency at the time of trial that was not disclosed. Evidentiary Hearing, Ex. N (hearing transcript) at 68-69 ("Okay, I'm going to give you your deal, but we have to wait until after the trial so it can't come up in cross examination.").

In sum, there is overwhelming evidence that there was, at least, an *implicit* deal in place at the time of the trial. Although Petitioner concededly was unable to come forward with a "smoking gun"— prosecutors do not typically memorialize their disbar-able misconduct in memos, after all—Petitioner

33

has adduced a vast amount of unrebutted circumstantial evidence to meet his burden. It is at least more likely than not that an undisclosed implicit agreement existed.[11]

### 3.   Testimonial Evidence about the Gun

The provenance of the recovered, unfired gun was a major issue at trial: The State argued it belonged to Mr. Nelson's co-defendant (Miller), whereas Mr. Nelson argued it belonged to Boss (or one of his drug-dealing compatriots). If the "victims" were armed—and especially if they were armed and lied about it at trial—that fact would obviously support Mr. Nelson's self-defense claim. But inside the D.A.'s file, Mr. Nelson learned that prosecutors had spoken to an unnamed and undisclosed eyewitness who stated that Mr. Nelson's co-defendant had *also* fired his gun on the night in question.

```
-g.  ...  ...  ...  ...  ...ing up and attempting to remove a gold
medallion that he had on around his neck.  However, as he backed
up he fell on his back.  Marigny and Miller were able to get out
of the line of fire, each of them running in different directions.
     Both Nelson  and Moore stood over the victim with guns pointed
at him and it appeared that both of them shot.  However, Christine
Boatner was sitting in a car and she says that Moore dropped his
gun as they were running away and the gun located on the scene
was fully loaded.
```

*See* Evidentiary Hearing, Ex. 18. And inside the NOPD Homicide File in the case, first disclosed in March 2024, there is an even more shocking revelation: it was none other than *Derrick Marigny* who supplied prosecutors with that information. In an interview with NOPD Det. Norman Pierce on the night of the shooting, Marigny told officers that he saw *both* Nelson and his co-defendant firing shots.

---

[11]   It is unclear whether the State of Louisiana even disagrees with this proposition. Before the Louisiana Supreme Court, OPDA took the remarkable position: "Having extensively searched Westlaw, this author was unable to find any jurisprudence assigning a specific burden of proof" for a *Brady* claim. *See OPDA LASC Opposition*, *3. The State had to adopt this position, because if the trial court applied anything other than a "beyond a reasonable doubt" standard when it demanded "proof" of an implicit deal, its rejection of Mr. Nelson's *Brady* claim—or, rather, this portion of the *Brady* claim—would be non-sensical. *But see Profitt v. Waldron*, 831 F.2d 1245 (5th Cir. 1987) (approving "preponderance of the evidence" standard for violation-of-*Brady* claims); *United States v. Reese*, 745 F.3d 1075, 1083 (10th Cir. 2014) ("A *Brady* claim consists of three elements, which the defendant must prove by a preponderance of the evidence . . .").

```
page# 2 of statement of Derek Marigny
Q.    Who was, who was doing the shooting?
A.    They both came, "Skinnyman",  I seen, we seen when he was coming up
      with his gun.  We didn't really think it was anything to do with us.
      But as he come across the street saying give it up, give it up, give
      up the medallion, and he shot.  And I figured the first shot was to
      scare everybody off.

Q.    Alright the first shot, was up in the air, down into the ground?
A.    Down towards the crowd, down towards us.

Q.    Alright did you see "mamoo" doing any shooting?
A.    He came up with his gun and when, say I turn my head for a brief
      second.  To, no to face the fire that was coming my way.  But as I
      was running back, as Harold and them ran in a different direction,
      Harold and the rest of the crowd.  They took in pursue  of them.  And
      Harold clip and fell as he was trying to take off his chain, medallion.
      And then I seen both of them you know, firing over him.

Q.    After, after they fired over him.  Did you see anyone of them reach
```

Evidentiary Hearing, Ex. 1, <Leonard Nelson NOPD Homicide File (E-07223-90)_Redacted.pdf>, at

8. At the end of the interview—perhaps because he already realized what Marigny's claim signified as it

pertains to the *unfired* weapon found next to the decedent—NOPD confirmed this precise point.

```
Q.    Okay, is this statement true and correct to the best of your knowledge?
A.    It's true and correct to the best of my knowledge.

Q.    Is there anything you want to change, or take out of it, that you
      told me?
A.    No.

Q.    Okay and you are positive that this skinnyman, and mamoo.  Both of
      them are from the St. Bernard project, did the shooting?
A.    Right.

      Statement is completed at 4:47AM.

rb
```

*Id.* at 10. At trial, Marigny was conspicuously silent about having seen co-defendant Moore firing his gun.

This information was never disclosed to the defense, in violation of Mr. Nelson's *Brady* rights.

### 4.   <u>Fingerprinting/Testing of the Gun</u>

There is a subtle, but important, different between saying that evidence was *not* tested and saying

that it *was* tested with negative results. This case illustrates the important distinction.

When a gun is recovered at a homicide scene, law enforcement will typically test the weapon to see if the fingerprints on the weapon match the suspects; presumably, if there is a "match," that evidence will be introduced. At trial, the State called witnesses who testified that the weapon was *not* tested (thus leaving open the possibility that the gun belonged to co-defendant Matthew Moore). Trial Tr. (March 5, 1991) at 37. But in the OPDA files, prosecutors noted that the gun presented at trial *was* tested and produced "negative results."

> drop his weapon in the middle of the street as the two were running away. The gun was tested with negative results.
>
> On March 4, 1991, Leonard Nelson was convicted of second degree murder and subsequently sentenced to life imprisonment without benefits. He and Matthew Moore are still awaiting trial in three

*See* Evidentiary Hearing, Ex. 16. Once again, this information—which would have supported the defense theory that the supposedly unarmed Marigny was, in fact, brandishing a gun—was never disclosed to defense counsel.

### B. The suppressed evidence was material

Evidence is material and must be disclosed if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would be different. *See Kyles*, 514 U.S. at 432-34 (quoting *Bagley*, 473 U.S. at 682). Establishing a reasonable probability of a different outcome does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Id.* Material evidence includes not only exculpatory evidence, but also information that could be used to impeach government witnesses when the reliability or credibility of that witness may determine guilt or innocence. *See id.* at 676; *accord Giglio v. United States*, 405 U.S. 150, 154-55

36

(1972); *State v. Kemp*, 00-2228, p.7 (La. 2002), 828 So.2d 540, 545; *Napue*, 360 U.S. at 269 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. . . ."); *State v. Bright*, 875 So.2d 37, 41 (La. 2004) ("For purposes of the State's due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence.").

Mr. Marigny's attempt to sell his testimony (*Brady* claim #1), the implicit deal between prosecutors and Mr. Marigny (*Brady* claim #2), and the undisclosed information about the recovered gun (*Brady* claims #3 and #4) were all material.

Mr. Marigny's testimony was critical to the State's case against Mr. Nelson. The prosecutor's own internal assessment of just how crucial Mr. Marigny's testimony was underscores this point: "Marigney [sic] is an essential and material witness in the murder case against [co-defendant] Mathew [sic] Moore [and] without his testimony, we would not have had sufficient evidence to convict Leonard Nelson." Evidentiary Hearing, Ex. 9. Because of the importance of Mr. Marigny's testimony to the State's case, it was imperative for the defense to challenge his credibility. While prosecutors at trial argued that Mr. Marigny's motivations for testifying were purely altruistic and philanthropic (*see* LASC Filing, Ex. N (hearing transcript) at 48), and the State repeats this argument in 2025, (*see id.* at 61), it is undisputed that Mr. Marigny's unseemly effort to sell his testimony paints a different picture. *See id.* at 70-71 (State acknowledges "appearance of impropriety"). A fully informed jury certainly could have concluded that Marigny's motivations for testifying were *not* what prosecutors claimed, if jurors were given the evidence suppressed in the D.A.'s file, and that's why prosecutors refused to turn it over. Evidence regarding Mr. Marigny's previous unwillingness to testify without a deal from the prosecution could have, and certainly *would* have, been used against Mr. Marigny in court to attack his credibility as a reliable witness. *See id.* at 41.

At trial, Mr. Marigny denied the existence of any explicit plea deal. *See Id.* ("[N]o, no deal was made with me whatsoever."). Had prosecutors complied with *Brady*, Mr. Nelson's counsel at trial could have called into question the truthfulness of this statement, perhaps by asking undeniably powerful questions like: "[I]sn't it true that you told prosecutors that you wouldn't testify without a deal?" Or perhaps: "Up until an hour ago this morning, you refused to testify. Then you had a conversation with the prosecution and suddenly had a change of heart. Are you hopeful that your other charges will be reduced?"

In a case that hinged so heavily on Mr. Marigny's testimony, there is a reasonable probability that had information about his attempts to sell his testimony been disclosed, Mr. Marigny's entire testimony could have been called into question. *See Giglio,* 405 U.S. at 154-55 ("Here the Government's case depended almost entirely on [witness] testimony; without it there could have been no indictment and no evidence to carry the case to the jury. [The Witness's] credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.").

Moreover, Mr. Marigny's attempt to sell his testimony—regardless of whether it ultimately succeeded—raises serious concerns about his character for truthfulness and credibility. Had this improper conduct been disclosed, a reasonable jury could, and likely would, have questioned his credibility. Independently, the failure to disclose this information constitutes a sufficient basis to overturn Mr. Nelson's conviction. In *Glossip v. Oklahoma*, the Supreme Court held that a revelation of a witness's willingness to lie on the stand would be "significant in any case" and is especially so when a witness's credibility is already in doubt. *Glossip v. Oklahoma*, 604 U. S. 226, 248-49 (2025) ("... Sneed [the star witness] was willing to lie to them [the jury] under oath. Such a revelation would be significant

in any case, and was especially so here where Sneed was already 'nobody's idea of a strong witness.'... Even if Sneed's bipolar disorder were wholly irrelevant, as amicus argues, his willingness to lie about it to the jury was not. 'A lie is a lie, no matter what its subject.') (quoting *Napue*, 360 U.S. at 269); *see also Wearry*, 577 U.S. at 394 (citing *Napue*, 360 U.S. at 270) ("[E]ven though the State had made no binding promises, a witness' attempt to obtain a deal before testifying was material.").

Both pieces of gun evidence that prosecutors withheld in this case were also material. Prosecutors suppressed evidence that supported Mr. Nelson's theory at trial that he acted in self-defense. Both Marigny and Miller testified that neither they nor "Boss" were armed on the night in question. If prosecutors had disclosed that Marigny had previously told law enforcement that he had seen Moore *also* firing his gun, it would have provided substantial additional support for the contention that the State's critical witnesses were armed (and liars). If the State disclosed the fact that testing of the weapon yielded "negative" results (presumably when tested against prints for Nelson and Moore), that would also have supported the conclusion that the recovered gun belonged to Boss or Marigny. Had this information been shown to the jury, there is a reasonably probability that they would have further questioned the ownership of the gun holder, and more importantly, the State's entire theory of the case.

At no time has the State ever contested the materiality prong with respect to such *Brady* information. Prosecutors defending Mr. Marigny's conviction have instead simply insisted that none of the foregoing evidence needed to be disclosed in the first instance.

      **C.  The state court's decision was contrary to and involved an unreasonable application of clearly established Federal Law, as determined by the Supreme Court of the United States, and was based on an unreasonable determination of the facts in light of the evidence presented.**

The trial court erroneously failed to state and adhere to the appropriate standard for determining whether or not there has been a violation of *Brady,* making no attempt to assess favorability or materiality (and, indeed, ignoring most of Mr. Nelson's *Brady* claims altogether).

First, the trial court never inquired as to whether any of the foregoing evidence was *favorable* information. *But see* LASC Filing, Ex. N (hearing transcript) at 65 ([THE COURT (addressing prosecutors):] "Do you not think that that's *Brady*? I mean, I'm just asking"); *Id.* at 72-73 ([PETITIONER'S COUNSEL: "[F]rankly, every attorney in this room knows that that's good information that could have been used to attack and destroy his credibility on the stand"). There was no inquiry into how the undisclosed evidence that Mr. Marigny tried to sell his testimony could have been used by Mr. Nelson to call into question Mr. Marigny's credibility, even though it was undisputed that this evidence existed. *See* LASC Filing (Vol. I), Ex. A, at 2 (trial court's ruling). The same is true for the suppressed information regarding the recovered gun, including Marigny's suppressed interview with NOPD, which the trial court simply ignored. *Id.* As far as the *Brady* claim alleging a failure to disclose an implicit deal, in an abrupt change from its questions during the evidentiary hearing, the trial court simply concluded that because there was no "proof" of a plea deal, "there is no evidence that would support a finding by this Court that petitioner had met his burden" of establishing a *Brady* violation. *Id.* However, it is entirely unclear what the trial court meant by "proof" or "burden." Before the Louisiana Supreme Court, the State appeared to argue that the trial court was properly holding Mr. Nelson to a "beyond a reasonable doubt" burden of proof as to the existence of a deal; they will likely abandon that argument now. And, of course, there was voluminous evidence adduced: the trial court reached its conclusion by ignoring it, refusing to consider the aforementioned evidence either in isolation or cumulatively.

Second, the trial court never inquired as to whether the undisclosed information was *material*. At no point did the trial court (or any state appellate court) seem to realize that *Brady* requires an assessment of the materiality of the suppressed evidence (that is, Mr. Marigny's attempts to sell his testimony in exchange for a deal, the effect of the circumstantial evidence of the implied deal, or the significance of the gun evidence). By failing to apply the correct test and failing to run each piece of evidence through the correct test (alone and cumulatively), the trial court erred in its ruling that Mr. Nelson's *Brady* rights were not violated.

In short, the trial court simply ignored the governing law of *Brady* and its progeny altogether, and made unreasonable factual determinations (in part, it seems, because it misapplied the relevant legal standard and simply overlooked the vast majority of the factual predicates for the *Brady* claims).

### III.    The Burden of Proof (Due Process) Claim

At trial, Mr. Nelson's entire case was based on self-defense. However, the jury was instructed incorrectly on this critical issue. Jurors were told the following:

> If you find that by a preponderance of the evidence the defendant has raised the defense of justification, then the burden is upon the state to show that the homicide was not committed in self-defense.

*See* Jury Charge, at 13-14. The State waived any procedural objection to the trial court considering the question *de novo* and conceded that this instruction was "not a standard jury instruction." LASC Filing, Ex. N (hearing transcript) at 59. Still, the state courts affirmed the conviction.

There were three main problems with this instruction, which was critical given that the entire case turned on the question of self-defense. The instruction (1) tasked the jury to decide whether Mr. Nelson had properly raised a self-defense claim, which is not (and has never been) a question for the jury under Louisiana law; (2) incorrectly told jurors that Mr. Nelson had an initial burden of proving by a "preponderance of the evidence" that he had properly raised such a claim; and (3) inaccurately indicated

41

that the State must meet its burden (to negate a claim of self-defense) by only a "preponderance of the evidence," whereas Louisiana law has always required the State to affirmative negate self-defense "beyond a reasonable doubt" in all self-defense cases.

To illustrate the dangers (and constitutional infirmity) of this instruction, consider how a reasonable juror would return a verdict based on the following evidence. If the jurors were 25% convinced that Mr. Nelson acted in self-defense and 75% convinced that he did not, he was entitled to an acquittal under Louisiana law. A juror scrupulously following the trial court's instructions, however, likely would have returned a conviction for two independent reasons. First, they would likely conclude that they should *not* consider self-defense in the first instance, because Mr. Nelson did not clear the "preponderance of the evidence threshold." Second, if they did consider the issue, they would have concluded that the State had overcome its burden of disproving a *prima facie* case of self-defense, since the only burden referenced in the instruction is "preponderance of the evidence" (which would be met on these hypothetical facts).

### B.   The jury instructions (incorrectly) told jurors prosecutors only had to prove the most important element by a preponderance of the evidence

There has never been any dispute over whether Mr. Nelson shot Mr. Wilson: He took the stand at trial and candidly told the jury that he shot the decedent. *See* Trial Tr. (March 5, 1991) at 179. Mr. Nelson testified that he had done so only because "because [Mr. Wilson] was going to kill me if I wouldn't have killed him." *Id.* at 180. His case, then, hinged on a single issue at trial: self-defense.

Where there is "*any* evidence which tended to show" that the accused's conduct was in self-defense, or where there is at least "*some* evidence relevant" to that issue, then the jury must consider whether the State has met its burden of proof with respect to that defense. *Stevenson v. United States*, 162 U.S. 313, 314-15 (1896) (emphasis added). Mr. Nelson testified at trial that (1) he had stolen cocaine from Mr. Wilson several days before the shooting; (2) as a result, he had received death threats in the days leading up to the shooting;

(3) Mr. Wilson had attempted to kill him days before the shooting; and (4) Mr. Wilson was actively shooting at him and that he only returned fire in self-defense. *See id.* at 172-73, 175-76, 179-80.

Mr. Nelson's testimony plainly constitutes "evidence which tended to show" that his conduct was in self-defense as a matter of law. Therefore, the jury was required to consider whether the State had met its burden of proof with respect to his claim. *Stevenson*, 162 U.S. at 314-15.

Mr. Nelson offered several proposed jury instructions to that accurately stated the law, including the following:

> When an accused pleads self-defense, suggesting that the killing was justifiable, he undertakes no legal burden. The burden, when self-defense is at issue, is not upon the defendant to prove that his actions were reasonable and believed necessary, but rather upon the State to show that the actions were not in self-defense. In other words, once the plea of self-defense has been interposed the burden of proof does not shift to the defendant to prove to your satisfaction and beyond a reasonable doubt that the killing was justifiable. . . .

Special Charge No. 1 (Denied), in ROA, Vol. 1, 137 of 226. The trial court erroneously rejected this proposed charge. Mr. Nelson again proposed a materially similar charge with different language, which the trial court also improperly rejected:

> The burden of proof of the facts relating to a plea of self-defense rests, not upon the defendant, but upon the State. As self-defense is not a special plea, the burden of proof rests upon the State to show, beyond a reasonable doubt, that the killing was done feloniously, and not in self-defense, in order to convict the party accused of felonious homicide. The plea of self-defense does not place upon the accused the burden of proving it, nor does it change the duty of the State to prove the guilt of the accused beyond a reasonable doubt. Accused, relying on self-defense, does not have the burden of proving that the killing was justifiable; but the State has the burden of proving beyond a reasonable doubt that the killing was not justifiable.

Special Charge No. 5 (Denied), in ROA, Vol. 1, 141 of 226.[12]

---

[12] Trial counsel for Mr. Nelson also, inexplicably, proposed several instructions that misstated the relevant burdens. This fact, however, is immaterial, since the trial court rejected these proposed instructions, too. The oft-repeated rule that a defendant cannot complain of a jury instruction that he himself proposes applies only when said instruction is actually granted.

Each of these proposed instructions align with the well-settled rule in Louisiana that "a defendant in a homicide prosecution who asserts that he acted in self-defense does not have the burden of proof on that issue. The State bears the burden of proving beyond a reasonable doubt that the homicide was . . . not perpetrated in self-defense." *State v. Patterson*, 295 So.2d 792 (La. 1974); *State v. Carter*, 80 So.2d 420, 423 (La. 1955) (holding that "[i]t is the well-settled jurisprudence of this court that an accused relying on self-defense does not have the burden of proving that the killing was justifiable or that he acted in self-defense); *State v. Conda*, 156 La. 679, 101 So. 19, 202 (La. 1924) (holding that "[i]t is upon the state to prove beyond a reasonable doubt that the killing was done feloniously, and therefore not in self-defense."). Instead, the instructions ultimately given to the jury by the trial court read:

> If you find that by a preponderance of the evidence the defendant has raised the defense of justification, then the burden is upon the state to show that the homicide was not committed in self-defense.

At no time did the trial court define the legal term of art "preponderance of the evidence," or explain that "the burden [that] is upon the state" is *different* from the burden identified and explained in the clause immediately preceding it.

The State raised no merits defense on this point before oral argument at the conclusion of the evidentiary hearing (ignoring a direct order to file a merits objection, if any, by a date certain) nor could the State, because it is undisputed that the trial court gave an incorrect instruction. The question of whether the Defendant has put self-defense "at issue" is not a jury question, and the Defendant does not need to satisfy any "preponderance of the evidence" burden on this point. That was true at the time of trial. *See State v. Savoy*, 418 So. 2d 547, 550 (La. 1982) ("The State has the entire and affirmative burden of proving beyond a reasonable doubt that a homicide was not perpetrated in self-defense. The defendant who raises the issue of self-defense does not assume any burden of proof whatsoever."); *State v. Ardoin*, 54 So. 407, 407 (La. 1911) (reversing murder conviction where "the onus of proof [was] made to shift from the state to defendant" on

44

question of self-defense). It remains true today. *State v. Bridges*, 2023-0166 (La. App. 4 Cir. 2024) ("In a homicide case in which the defendant asserts he acted in self-defense, the State has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense.").

It is difficult to overstate the import of this error, particularly in a case where a defendant takes the stand to testify in support of a self-defense claim. "[W]here the defendant's proposed charge presents, when properly framed, a valid defense, and where there has been *some* evidence relevant to that defense adduced at trial, then the trial judge may not refuse to charge on that defense." *Strauss v. United States*, 376 F.2d 416, 419 (5th Cir. 1967) (emphasis added). When the accused presents a justification defense, they are admitting that: (1) *yes*, they caused bodily injury to the other person; and (2) *yes*, they did so purposefully or knowingly; *but only because* (3) they believed using the force that caused the injury at issue was necessary to protect themself from the other person's imminent use of unlawful force against them. *See, e.g.*, *Gilmore v. Taylor*, 508 U.S. 333, 364 (1993) (Blackmun, J., dissenting) (discussing how a defendant who testifies to self-defense "takes the stand and concedes the elements of murder in order to prove his affirmative defense."). The defendant is, in effect, admitting to the necessary elements of the offense in order to defend against the allegation as a whole. And as long as there is "*any* evidence which tended to show" that the accused's conduct was in self-defense, or at least "*some* evidence relevant" to that issue, then the jury *must* consider whether the State has met its burden of proof with respect to that defense. *See Stevenson*, 162 U.S. at 314-15 (emphasis added); *id*. at 315-16, 322-23 (ruling that, even if the "judge may be entirely satisfied, from the whole evidence in the case," that the accused committed the crime alleged without any complete or mitigating defense, "if there by any evidence fairly tending to bear upon the issue…it is the province of the jury to determine from all the evidence what the condition of mind was, and to say whether the crime" was committed or not).

While the State made a half-hearted attempt to defend the accuracy of these jury instructions orally at the evidentiary hearing—saying, effectively, that the instructions were "good enough"—the State

45

*affirmatively waived* any merits opposition to Mr. Nelson's jury instruction claim through written pleadings prior to the hearing. *See* LASC Filing, Ex. K. Ultimately, Mr. Nelson was convicted based on a self-defense jury instruction, central to his case, that completely misstated the law.

**C. The state court's decision was contrary to and involved an unreasonable application of clearly established Federal Law, as determined by the Supreme Court of the United States, and was based on an unreasonable determination of the facts in light of the evidence presented.**

Jury instructions that improperly shift burdens, or relieve the State of its burden to prove intent beyond a reasonable doubt, deprive defendants of due process. *See Sandstrom v. Montana*, 442 U.S. 510 (1979); *Francis v. Franklin*, 471 U.S. 307 (1985); *see also Sullivan v. Louisiana*, 508 U.S. 275 (1993).

The trial court's merits decision, which cited no law beyond the procedural history of this very case—and ignored the State's affirmative waiver and forfeiture of both procedural and substantive objections—disregarded all of the foregoing. Instead, the state trial court held:

> Appellate counsel Sherry Watters did raise the jury instruction issue in general, though not specifically attacking the notion of "burden shifting" (the instruction to the jury that they needed to find first by a preponderance that the defendant has raised the issue of self-defense before it could assess whether the State had proven it was not self-defense). While Watters may not have articulated in the exact language that Petitioner's current counsel would (or surmises they would have), the issue in general of improper jury instruction was raised as an assignment of error (Error No. 4). . . . Its strains this Court's imagination that the Appeals Court would somehow not carefully scrutinize the record as it related to jury instructions in connection with Petitioner's Appeal, Assignment of Error no. 4, and somehow fail to consider the constitutionality of those jury instructions in its analysis. In reality, it did assess the issue of improper jury instructions. Because the issue of erroneous jury instructions was fully litigated on appeal, this claim is without merit.

The appellate courts denied relief without explanation.

It is important to focus carefully on what the trial court did (and did not) hold. The court did *not* hold that the claim was procedurally barred, or conclude that the claim was non-cognizable on state post-

46

conviction relief. Rather, the state trial court concluded that the claim was "without merit." By affirming without explanation, the Louisiana appellate courts evidently agreed.

But Mr. Nelson's jury instruction claim is not "without merit." If the State must negate self-defense "beyond a reasonable doubt," a jury instruction that directly indicates it must do so only by a preponderance of the evidence is plainly and manifestly wrong. (The same is true of a jury instruction that erects a non-existent initial "preponderance of the evidence" burden on the defendant before self-defense can even be considered.) True, Louisiana's courts apparently think that such an instruction is constitutional, but this decision was contrary to and involved an unreasonable application of clearly established Federal Law, as determined by the Supreme Court of the United States. And, to the extent that that conclusion was based on a factual decision as to how a rational juror might interpret said instructions in the context of this case, said determination was also unreasonable.

### IV.    Miscellaneous Considerations

Mr. Nelson cannot anticipate what, if any, non-merits objections Respondent may raise in opposition to this application. The court need not consider such objections (if raised), however, because Mr. Nelson is actually innocent and his continued unconstitutional imprisonment constitutes a manifest injustice; no reasonable juror would have convicted him of the charged offense given the information contained in OPDA files. *See McQuiggin v. Perkins*, 569 U.S. 383 (2013). Separately, given the extraordinary history of this case, the State's decades of delay supplying Mr. Nelson with necessary evidence, the constitutional violations at issue, and Mr. Nelson's innocence, "law and justice" require relief.

**Prayer for Relief**

WHEREFORE, based upon the above, Petitioner prays that this Court grant his petition for a writ of habeas corpus and order his release from Respondent Vannoy's custody, insofar as his current incarceration is in violation of the U.S. Constitution.

Respectfully submitted,

/s/ *Thomas W. Frampton*
Thomas W. Frampton, La. Bar No. 35775
*Counsel for Petitioner Leonard Nelson*
University of Virginia School of Law
580 Massie Road
Charlottesville, VA 22903
tel: 202.352.8341
*Affiliation for Identification Only*