STATE OF LOUISIANA                    CRIMINAL DISTRICT COURT

        VS                            PARISH OF ORLEANS

LEONARD NELSON                        CASE NO. 344-648, "H"


        CONTINUATION OF THE TRIAL ON THE MERITS IN THE

        ABOVE NAMED AND NUMBERED MATTER HELD IN OPEN

        COURT ON MARCH 5, 1991, BEFORE THE HONORABLE

        JAMES F. MC KAY, III, JUDGE PRESIDING, SEC. "H"

_____


APPEARANCES:

        MARY MC DONALD          ASSISTANT DISTRICT ATTORNEY
        ROBIN O'BANNON          ASSISTANT DISTRICT ATTORNEY


        CLYDE MERRITT, ESQ.     ATTORNEY FOR THE DEFENDANT,
                                LEONARD NELSON

        JOHN RUSKIN, ESQ.       ATTORNEY FOR THE DEFENDANT,
                                LEONARD WILSON

_____


REPORTED BY:  MIRIAM B. GEERKEN
              CERTIFIED SHORTHAND REPORTER

BY THE COURT:

LET THE RECORD RFLECT THAT THE JURY IS PRESENT AND ACCOUNTED FOR. CALL YOUR NEXT WITNESS.

BY MR. O'BANNON:

STATE CALLS NORMAN PIERCE.


DETECTIVE NORMAN PIERCE

CALLED BY THE STATE AND AFTER FIRST HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:    DIRECT EXAMINATION

EXAMINATION BY MS. O'BANNON:

Q    STATE YOUR NAME FOR THE RECORD FOR THE JURY, PLEASE.

A    DETECTIVE NORMAN PIERCE, ASSIGNED TO THE NEW ORLEANS HOMICIDE DIVISION.

Q    WERE YOU SO ASSIGNED ON MAY 6, 1990, ABOUT 1:30 A.M.?

A    YES, MA'AM, I WAS.

Q    AT THAT TIME WERE YOU CALLED TO INVESTIGATE A SHOOTING THAT OCCURRED ON TREASURE AND BRUXELLES STREET?

A    YES, MA'AM.

Q    JUST FOR THE JURY'S INFORMATION, ARE HOMICIDE DETEC- TIVES ALWAYS CALLED TO A SHOOTING... INCIDENTS?

A    WHENEVER THERE'S A MURDER WE'RE CALLED. WHENEVER THERE'S A SHOOTING THAT LOOKS BAD, THAT LOOKS LIKE IT'S GOING TO TURN INTO A MURDER, YES, MA'AM.

Q    WHEN YOU ARRIVED ON THE SCENE AT TREASURE AND BRUXELLES STREET, WAS THE VICTIM ON THE SCENE?

A    NO, MA'AM, HE HAD BEEN TRANSPORTED TO CHARITY HOSPITAL ALREADY.

Q    DID YOU AT THAT TIME KNOW WHO THE VICTIM WAS?

3

A   YES, MA'AM, FROM THE DISTRICT OFFICERS ON THE SCENE.

Q   WHO WAS THAT VICTIM?

A   HAROLD "BOSS".

Q   WHEN YOU ARRIVED AT THE SCENE WHAT DID YOU OBSERVE
    ABOUT THE SCENE ITSELF?

A   WHEN I ARRIVED ON THE SCENE ... THE SCENE IS LOCATED
    ACROSS THE STREET FROM A LOUNGE I
    CAN'T THINK OF THE NAME OF RIGHT NOW,
    RIGHT ON THE CORNER OF TREASURE AND
    BRUXELLES. THERE WERE MAYBE 60, 70
    PEOPLE OUT THERE. THERE WAS A REVOLVER
    LYING ON THE SIDEWALK. WELL, NOT ON
    THE SIDEWALK, RIGHT ON THE STREET, RIGHT
    OFF OF THE SIDEWALK. AND THERE WERE
    SOME BLOODY CLOTHING ABOUT 20 FEET
    UP THE STREET ON THE SIDEWALK FROM
    THE GUN.

Q   AT THIS TIME, DETECTIVE, I WANT TO SHOW YOU WHAT
    I'VE MARKED AS STATE'S EXHIBIT #3
    FOR IDENTIFICATION AND ASK IF YOU RECOG-
    NIZE THIS GUN?

A   YES, MA'AM, THE SAME ITEM NUMBER, THE SAME GUN THAT
    WAS ON THE SCENE.

Q   IS IT IN REASONABLY THE SAME CONDITION AS IT WAS
    ON THAT EVENING?

A   YES, MA'AM. I THINK IT WAS LIKE THIS, LYING LIKE
    THIS IN THE STREET. IT WAS LYING
    SIMILAR TO THIS ON THE STREET.

Q   AND HOW MANY ... YOU'LL HAVE TO EXCUSE ME, BECAUSE
    I'M NOT THAT FAMILIAR WITH THE LINGO
    OF GUNS, BUT HOW MANY BULLETS DOES
    THIS REVOLVER HOLD IN THE CASING?

4

A    I THINK THIS PARTICULAR REVOLVER HOLDS FIVE.

Q    FIVE. AND DID YOU MAKE ANY OBSERVATIONS OR CON-
CLUSIONS ABOUT THIS WEAPON WHEN YOU
SAW IT ON THE SCENE?

A    NO, WHEN I FIRST SAW IT ON THE SCENE WE DIDN'T KNOW
IF IT WAS INVOLVED IN THE MURDER OR NOT.
WE DIDN'T LEARN MORE ABOUT THE GUN UNTIL
AFTER THE CRIME LAB HAD TAKEN PHOTO
GRAPHS AND PLACED IT ON THE SCENE WITH
MEASUREMENTS, AND THAT'S WHEN THE GUN
WAS CHECKED, AND IT WAS FULLY LOADED AT
THAT TIME. AND BY THE SMELL OF IT IT
HADN'T BEEN FIRED. IT HAD FIVE ROUNDS
IN IT, AND ALL FIVE ROUNDS WERE LIVE.

Q    WHEN YOU SMELL A GUN HOW DO YOU KNOW WHETHER OR
NOT IT WAS FIRED?

A    WELL, YOU CAN SMELL THE GUNPOWDER IF IT'S JUST
BEEN FIRED.

Q    AND WHAT DID YOU SMELL?

A    OIL.

Q    I'M GOING TO SHOW YOU WHAT I'M NOW MARKING AS
STATE'S EXHIBIT 3. I'M GOING TO SHOW
THIS TO DEFENSE COUNSEL. THIS IS
STATE'S 3. DO YOU RECOGNIZE THAT?

A    THAT'S WHERE THE E.M.T.S HAD CUT THE CLOTHES OFF THE
VICTIM BEFORE TRANSPORTING HIM TO
CHARITY.

Q    DOES THIS PICTURE FAIRLY AND REASONABLY DEPICT THE
SCENE AS IT WAS ON THAT EVENING?

A    YES, MA'AM, IT DOES.

Q    HOW MANY PEOPLE WERE ON THE SCENE WHEN YOU ARRIVED?

5

A    OH, I'D SAY IT WAS 50, 60 PEOPLE.

Q    AND AT THE TIME DID YOU SEEK OUT ANY WITNESSES TO THE EVENT?

A    YES, MA'AM, WE ASKED AROUND IF ANYONE HAD WITNESSED THE INCIDENT. EVERYONE HAD SAID THAT THEY WERE ALL INSIDE THE PLACE WHEN THE SHOOTING HAPPENED. THEY CAME OUT AFTER.

Q    NOW, THE ON-THE-SCENE OFFICER, THE FIRST OFFICER ON THE SCENE, DID HE GIVE YOU ANY NAME OF PEOPLE THAT HAD REPORTED WHAT THEY HAD SEEN TO HIM?

A    YES, MA'AM. HE GAVE ME THE NAME OF TWO EYE WITNESSES.

Q    DID YOU DO ANYTHING ELSE ON THE SCENE AFTER YOU LOOKED AT THE EVIDENCE AND LOOKED FOR WITNESSES?

A    THAT WAS BASICALLY PART OF THE INVESTIGATION ON THE SCENE.

Q    AND WHAT DID YOU DO WHEN YOU CONCLUDED YOUR ON-SCENE INVESTIGATION?

A    I RETURNED BACK TO THE HOMICIDE OFFICE TO TRY AND LOCATE MORE INFORMATION ON THE TWO WITNESSES WHO HAD GIVEN THE DISTRICT PEOPLE INFORMATION ON WHAT HAD HAPPENED, BECAUSE THE DISTRICT HAD LEFT THEM GO BEFORE WE ARRIVED ON THE SCENE.

Q    WHEN YOU RETURNED TO YOUR OFFICE DID YOU FIND OUT ... PRIOR TO RETURNING TO YOUR OFFICE DID YOU FIND OUT THE CONDITION OF THE VICTIM?

A    NO, MA'AM. WHILE I WAS AT THE OFFICE I RECEIVED A

6

PHONE CALL FROM CHARITY HOSPITAL. THERE WAS A SUBJECT THERE THAT POSSIBLY HAD A GUNSHOT WOUND TO THE LEG AND THEY WANTED TO TALK TO ME.

Q  AND WHAT DID YOU DO AS A RESULT OF THAT CALL?

A  AFTER I ARRIVED AT CHARITY I WAS MET BY ONE MR. DERRICK MARIGNY, I THINK HIS NAME WAS. AND I GOT A TAPE-RECORDED STATEMENT FROM MR. MARIGNY AT THAT TIME.

Q  AT THAT TIME DID YOU FIND OUT THE VICTIM'S CONDITION?

A  YES, MA'AM. THE VICTIM WAS DECEASED AT THE TIME.

Q  I'M SHOWING DEFENSE COUNSEL WHAT I MARKED STATE EXHIBIT 4. DETECTIVE, I'M SHOWING YOU STATE EXHIBIT 4 AND ASK YOU IF YOU RECOGNIZE THIS DOCUMENT?

A  YES, MA'AM. THIS IS THE EVIDENCE AND PROPERTY CARD THAT I RECEIVED AFTER I TURNED IN THE PROPERTY THAT I RECOVERED ... WELL, I DIDN'T RECOVER IT. CHARITY HOSPITAL RECOVERED IT AND TURNED OVER TO ME.

Q  WHAT PROPERTY DID CHARITY HOSPITAL RECOVER FROM THE VICTIM?

A  ONE YELLOW METAL RING.

BY MR. MERRITT:

WELL, I DON'T KNOW ... THAT'S OBJECTIONABLE. THAT'S HEARSAY. SOMEBODY AT CHARITY HOSPITAL CAN TELL YOU WHAT THEY RECEIVED.

BY THE COURT:

GIVE ME THE QUESTION.

BY MS. O'BANNON:

WHAT PROPERTY WAS RECOVERED FROM CHARITY HOSPITAL

7

AND GIVEN TO YOU?

BY THE COURT:

OVERRULED.

EXAMINATION RESUMED BYMS. O'BANNON:

A       ONE YELLOW METAL RING WITH FIVE CLEAR STONES, A YELLOW METAL CHAIN WITH A YELLOW METAL MEDALLION WITH THE NAME "KENNETH" IN-SCRIBED IN IT AND ONE YELLOW METAL EAR-RING WITH A CLEAR STONE.

Q       AND WHAT DID YOU DO WITH THIS PROPERTY... WHEN YOU SIGN A CARD LIKE THIS WHAT DOES THAT MEAN AS FAR AS THE PROPERTY IS CONCERNED.

A       WELL, THAT MEANS THE PROPERTY IS TURNED OVER TO THE PROPERTY AND EVIDENCE ROOM TO BE TURNED OVER TO THE DISTRICT ATTORNEY'S OFFICE.

Q       AS A RESULT OF YOUR INVESTIGATION, YOUR CONVERSATION WITH DERRICK MARIGNY, AS WELL AS THE INVESTIGATION OF THE TWO EYE WITNESSES THAT LEFT THEIR NAMES ON THE SCENE, WHAT DID YOU DO WITH THAT INFORMATION?

A       I OBTAINED A PHOTO LINEUP WITH THE NAMES THAT I HAD RECEIVED FROM THE WITNESSES, AND IN TURN, I SHOWED THE WITNESSES THESE PHOTO LINEUPS WHERE THEY IDENTIFIED THE PERPETRATOR.

Q       DID YOU SHOW THE PHOTOGRAPHIC LINEUP TO DERRICK MARIGNY?

A       YES, MA'AM, I DID.

Q       AS A RESULT OF HIS VIEWING, WAS A PHOTOGRAPH

8

PARTICULARLY POINTED OUT TO YOU?

A    YES, MA'AM, THE PHOTOGRAPH THAT HE PARTICULARLY PICKED OUT HE SIGNED HIS FULL NAME ON THE BACK OF IT.

Q    I'M SHOWING DEFENSE COUNSEL WHAT WE MARKED AS STATE EXHIBIT 1. DETECTIVE, THIS IS WHAT WAS MARKED PREVIOUSLY AS STATE'S EXHIBIT 1 FOR IDENTIFICATION AND ASK YOU IF YOU RECOGNIZE THOSE PHOTOGRAPHS?

A    YES, MA'AM.

Q    WHAT PHOTOGRAPHS ARE THOSE?

A    THESE ARE THE PHOTOGRAPHS OF THE PERPETRATORS WHICH WERE SIGNED BY TWO OF THE WITNESSES.

Q    WITH MY INITIALS ON EACH PHOTOGRAPH.

Q    WHOSE SIGNATURES ARE ON THE BACK OF THAT PHOTOGRAPH?

A    CURTIS RAY MILLER AND DERRICK MARIGNY.

Q    AND WHO IS THAT A PHOTOGRAPH OF?

A    THIS IS, I THINK, A PHOTOGRAPH OF "SKINNY MAN," LEONARD NELSON.

Q    DETECTIVE, WHEN VIEWING THOSE PHOTOGRAPHS, DID YOU PROMISE DERRICK MARIGNY OR CURTIS MILLER ANYTHING FOR PICKING OUT THAT PARTICULAR PHOTOGRAPH?

A    NO, MA'AM

Q    DID YOU FORCE, THREATEN OR COERCE THEM INTO MAKING AN IDENTIFICATION?

A    NO, MA'AM.

Q    DID YOU IN ANY WAY SUGGEST THAT THE PHOTOGRAPH OF LEONARD NELSON WAS THE PHOTO OF THE MURDERER?

A    NO, MA'AM.

9

Q        Do you see Leonard Nelson in the courtroom today?

A        Yes, ma'am, sitting by the table with the black and green shirt.

BY MS. O"BANNON:

        Let the record reflect that the witness has identified the defendant before the bar.

EXAMINATION RESUMED BY MS. O'BANNON:

Q        I'll show defense counsel what I have marked as State Exhibit #5 for identification. Do you recognize this photograph?

A        Yes, ma'am, that's a photograph of the street corner.

Q        The victim had fell right between this vehicle, I believe, and this building.

Q        Okay, is there anything that photograph shows as far as the evidence is concerned?

A        There's several spots, but I can't make out what they are.

Q        On this photograph can you point out the approximate location of the weapon.

A        The weapon should have been about right here where the spots are.

Q        Thank you.

BY MS. O"BANNON:

        Thank you, officer.

## CROSS EXAMINATION

EXAMINATION BY MR. MERRITT:

10

Q        OFFICER PIERCE, PLEASE MARK HERE.  THE JURY WILL NEVER KNOW WHERE IT IS.  JUST MARK A "G" WHERE YOU SAY YOU FOUND THE GUN, SIR.

BY MS. MC DONALD:

I'M SORRY.  I MISSED THE QUESTION.

BY MR. MERRITT:

HE'S GOING TO MARK A "G" WHERE HE JUST PUT HIS FINGER.

BY THE WITNESS:

FROM WHAT I CAN RECALL, IT'S RIGHT UP IN THIS AREA HERE.

BY MR. MERRITT:

JUST PUT A CIRCLE, WHATEVER YOU WANT, WITH A "G" BY IT.

BY THE WITNESS:

THE "G" IS CIRCLED.

BY MR. MERTITT:

OKAY.

EXAMINATION RESUMED BY MR. MERRITT;

Q        THE PHOTOGRAPHIC LINEUP THAT YOU DISPLAYED TO THE INDIVIDUALS, THAT'S A FORMALITY, ISN'T IT,

A        YES, SIR.

Q        THEY KNEW THE PEOPLE.  YOU JUST WANTED TO MAKE SURE THAT IT'S THE SAME GUY THEY SAID THEY KNEW?

A        YES.

Q        WHEN YOU PICKED THE GUN UP HOW DID YOU HANDLE IT?

A        I DIDN'T.  THE CRIME LAB HANDLED  THE GUN, SIR.

Q        DO YOU KNOW HOW THEY HANDLED IT?

11

A    WELL, I DON'T REALLY RECALL, NO, SIR.

Q    WELL, AT YOUR INSTRUCTIONS DID YOU TELL THEM YOU WANTED IT FINGERPRINTED OR ...

A    YES, I ASKED TO HAVE IT PRINTED AND HAVE IT CHECKED... WE CHECKED AND SMELLED IT ON THE SCENE TO SEE IF IT HAD BEEN FIRED, AND THEY OPENED IT TO SEE HOW MANY ROUNDS WAS IN IT.

Q    WHEN YOU INTERVIEWED DERRICK MARIGNY ... OR CURTIS MILLER, YOU GOT WRITTEN REPORTS FROM THEM?

A    NO, I GOT TAPE-RECORDED STATEMENT FROM DERRICK MARIGNY AT CHARITY HOSPITAL. AND MR. MILLER, I DON'T RECALL. I BELIEVE IT WAS JUST AN ORAL STATEMENT ON MR. MILLER.

Q    AND THE TAPE-RECORDING FROM DERRICK MARIGNY, WHERE IS IT NOW?

A    THAT SHOULD BE IN THE CASE FILE IN THE DISTRICT ATTORNEY'S OFFICE.

Q    DID YOU ULTIMATELY DISCOVER A CHRISTINE BOATNER AND TALK TO HER AND TRACY JOHNSON? DID YOU TALK TO HIM?

A    YES, SIR.

Q    WHEN YOU TALKED TO THEM DID YOU REALIZE THAT THERE WERE TWO OTHER PEOPLE TO TALK TO?

A    WHAT?

Q    DID THEY TELL YOU THAT NICOLE COPELAND AND ERNEST DEJEUNNE (SPELLED PHONETICALLY) WAS ALSO IN THE CAR?

A    THEY SAID THERE WERE TWO OTHER PEOPLE THERE BUT THEY

12

DIDN'T GIVE ME NO NAMES.

Q  DID YOU ASK THEM?

A  YES, SIR.

Q  DID THEY SAY THEY DIDN'T KNOW?

A  THAT'S RIGHT.

Q  AND THE NELSON AUTOMOBILE HAD LONG BEEN GONE WHEN YOU
GOT THERE.  RIGHT?

A  WHAT, SIR?

Q  THE NELSON AUTOMOBILE, THE SECOND AUTOMOBILE THAT
WAS INVOLVED HAD BEEN MOVED.

A  NO,  THE SECOND AUTOMOBILE INVOLVED, YOU SAID?

Q  IT HAD  BEEN MOVED?

A  YES, SIR.

Q  SO, YOU NEVER SAW A SCENE.  YOU JUST SAW A PLACE WHERE
THE GUN WAS AND ANYBODY ELSE TOLD YOU ...
YOU HAD TO ASK OTHER PEOPLE WHERE THE
BODY WAS, OR ...

A  WHEN I ARRIVED, YES, SIR, WHERE THE GUN WAS.  THEY
SAID THE GUN HAD NOT BEEN TOUCHED,
AND ALSO WHERE THE CLOTHING HAD BEEN
CUT FROM THE VICTIM AT THAT POINT WHERE
THERE WAS SOME BLOOD.

Q  DO YOU HAVE ANY PICTURES WHERE THE BLOOD  WAS LOCATED
BY CHANCE?

A  IT WAS PLACED INTO EVIDENCE, THE ONE WITH THE CLOTHING.

Q  THE BLOOD THAT YOU SAW, THE ACCUMULATED BLOOD, WHERE
WAS IT?  TELL THE MEMBERS OF THE JURY
SINCE YOU DON'T HAVE A PHOTOGRAPH?
WHERE WAS IT?

A  ABOUT FIFTEEN OR TWENTY FEET OFF THE CORNER, GOING
IN A DOWNTOWN DIRECTION  BETWEEN

13

A BUILDING AND A CAR THAT WAS PARKED ON THE SIDE OF THE STREET.

Q     CAN YOU ESTIMATE THE MIDDLE OF THE CAR THAT WAS PARKED THERE?

A     IT WAS MORE TOWARD THE FRONT FENDER.

BY MR. MERRITT:

THANK YOU, DETECTIVE PIERCE.

BY MS. O'BANNON:

THE STATE HAS NO FURTHER QUESTIONS.

BY MR. MERRITT:

I HAVE SOME MORE QUESTIONS.


RE-CROSS EXAMINATION

EXAMINATION BY MR. MERRITT:

Q     I'LL SHOW YOU PAGE 2 OF AN 8-PAGE EVIDENCE COLLECTED REPORT, AND ASK IS THIS YOUR HANDWRITING OR GALLAGHER'S HANDWRITING?

BY MS. MC DONALD:

MR. MERRITT, CAN WE SEE A COPY OF THAT BEFORE YOU ASK?

BY MR. MERRITT:

YES, SUR.

BY MS. MC DONALD:

THANK YOU.


REPORTER'S NOTE:

COMPLIED
MR. MERRITT/WITH THE REQUEST OF THE ASSISTANT DISTRICT ATTORNEY.


EXAMINATION RESUMED BY MR. MERRITT:

Q     THIS IS NOT YOUR REPORT?  THIS IS BY GALLAGHER?

14

A        NO, SIR.  IT INVOLVED MR. (INAUDBILE) I THINK IT IS.

Q        DOES IT NOT INDICATE THAT FOUR CARTRIDGES WERE FOUND?

A        YES, SIR.

BY MS. O'BANNON:

YOUR HONOR, AT THIS TIME THE STATE WOULD LODGE AN OBJECTION TO THIS OFFICER TESTIFYING OFF OF A REPORT BELONGING TO ANOTHER OFFICER.

BY THE COURT:

HE CAN LOOK AT IT; HE CAN BE ASKED QUESTIONS, BUT THEY MAY TRIGGER SOME OBJECTIONS TO SOME OF THE QUESTIONS.

BY MR. MERRITT:

THE QUESTION HAS BEEN ANSWERED, YOUR HONOR.

BY THE COURT:

STAND DOWN.  I TAKE IT EVERYBODY'S FINISHED?

BY MS. O'BANNON:

YES.

BY MR. MERRITT:

YES.

BY THE COURT:

CALL YOUR NEXT WITNESS.

BY MS. MC DONALD:

YOUR HONOR, THE STATE WILL CALL TRACY JOHNSON.

BY THE COURT:

WHO'S THAT?

BY MS. MC DONALD:

TRACY JOHNSON.

15

TRACY JOHNSON

CALLED BY THE STATE AND AFTER FIRST HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

EXAMINATION BY MS. MC DONALD:

Q    STATE YOUR NAME FOR THE RECORD, PLEASE.

A    TRACY JOHNSON.

Q    AND HOW OLD ARE YOU, TRACY?

A    NINETEEN.

Q    AND, TRACY, WHERE ARE YOU CURRENTLY ... WHAT'S YOUR HOME ADDRESS?

A    WHAT, IN JAIL OR HOME?

Q    AT HOME.

A    6812 EDGEWATER LANE.

Q    AND YOU'RE IN JAIL RIGHT NOW. IS THAT CORRECT?

A    AH-HA.

Q    OKAY. NOW, TRACY, HAVE YOU EVER BEEN CONVICTED OF A CRIME?

A    YES, I HAVE.

Q    AND WHAT CRIME HAVE YOU BEEN CONVICTED OF?

A    POSSESSION OF COCAINE.

Q    ANY OTHER CRIME THAT YOU HAVE BEEN CONVICTED OF?

A    NO, MA'AM.

Q    NOW, TRACY, YOU'RE GOING TO HAVE TO PULL THE MICROPHONE TOWARD YOU AND SPEAK TOWARDS THE JURY, SO THEY CAN UNDERSTAND YOU. OKAY? DO YOU KNOW A MAN, OR DID YOU KNOW A MAN BY THE NAME OF HAROLD "BOSS" WILSON?

A    YES, I DID.

Q    AND HOW DID YOU KNOW HAROLD?

16

A     FROM THE STREETS.

Q     AND DID YOU KNOW HIM FOR A LONG ... HOW LONG HAD YOU KNOWN HIM?

A     FIVE OR TEN YEARS.

Q     AND, TRACY, LET ME DRAW YOUR ATTENTION TO THE EARLY MORNING OF MAY 6, 1990. DO YOU REMEMBER THAT DATE?

A     YES.

Q     DO YOU REMEMBER THE NIGHT THAT HAROLD WAS SHOT?

A·    YES, I DO.

Q     OKAY. AND WHERE WERE YOU ON THAT NIGHT?

A     BY THE END ZONE BAR.

Q     OKAY. BY THE END ZONE LOUNGE?

A     UM-HMM.

Q     AND WHERE WERE YOU AND WHAT WERE YOU DOING?

A     I WAS COMING OUT THE CLUB GOING ACROSS THE STREET TO MY CAR.

Q     OKAY. AND WHO WERE YOU WITH?

A     I WAS WITH ONE OF MY FRIENDS, HIS GIRLFRIEND AND MY GIRLFRIEND.

Q     AND IS YOUR GIRLFRIEND CHRISTINE BOATNER?

A     YES, SHE IS.

Q     OKAY. YOU WERE GOING TO YOUR CAR. IS THAT CORRECT?

A     AH-HA.

Q     AND WHERE WAS YOUR CAR PARKED?

A     I'M NOT FAMILIAR WITH THE NAME OF THE STREET. NOT BRUXELLES, BUT THE OTHER STREET.

Q     WHERE I'M STANDING, IF YOU'RE IN THE END ZONE LOUNGE IS IT CATERCORNERED? IT'S ACROSS THE STREET?

17

A     ON THIS SIDE .

Q     OKAY.  IT'S ACROSS THIS WAY?

A     YES.

Q     OKAY.  AND YOU HAD YOUR CAR PARKED THERE?

A     AH-HA.

Q     OKAY.  AND WHO ELSE WAS IN YOUR CAR WITH YOU?  THOSE THREE OTHER PEOPLE, OR TRACY OR ...

A     THREE OTHER PEOPLE.

Q     OKAY.  NOW, WAS ANYONE ELSE AROUND IN THE AREA?

A     WHILE I WAS IN THE CAR?

Q     YES.

A     THEY HAD A LOT OF PEOPLE.

Q     DERRICK THERE?

A     AH-HA?

Q     CURTIS THERE?

A     AH-HA.

Q     WAS HAROLD THERE?

A     AH-HA.

Q     AND WHERE WERE THEY?

A     ON THE CORNER OF BRUXELLES AND THE OTHER STREET WHERE MY CAR WAS PARKED.

Q     TREASURE?

A     AH-HA, TREASURE.

Q     OKAY.  AND WERE THEY BEHIND YOU OR IN FRONT OF YOU?

A     BEHIND ME

Q     OKAY.

A     TO MY LEFT.

Q     OKAY.  NOW, AT ANY POINT WHILE YOU WERE THERE DID YOU SEE ANYONE APPROACH DERRICK, PERCY AND HAROLD?

A     NOT REALLY APPROACH THEM BUT WALKING TOWARD TO THEM.

18

TOWARDS THEIR DIRECTION, YES.

Q    OKAY.  AND WHO WAS THAT?

A    LEONARD NELSON AND MATTHEW MOORE.

Q    DO YOU KNOW LEONARD NELSON AND MATTHEW MOORE?

A    YES, I DO.

Q    AND WHAT'S LEONARD NELSON ... WHAT'S HIS NICKNAME?

A    "SKINNY MAN."

Q    "SKINNY MAN".  OKAY.  AND DID YOU SEE SKINNY MAN COMING OVER?

A    COMING UP THE STREET.

Q    OKAY.  TELL ME WHAT HAPPENED.

A    WELL, WHEN I WAS LEAVING THE CLUB GOING TO THE CAR I NOTICED THEM COMING UP THE STREET GOING TOWARD THE CLUB AND NOTICED DERRICK AND THEM OVER ON THE CORNER.  AND WHEN I SAW DERRICK GO UNDER HIS SHIRT I WAS TRYING TO GET OUT THE WAY GOING TO THE CAR, AND BY THE TIME I GOT IN THE CAR TO CLOSE THE DOOR I HEARD THE FIRST SHOT COMING FROM MY LEFT BEHIND ME.

Q    AND WHAT HAPPENED AFTER  YOU HEARD THAT?  NOW, YOU SAY DERRICK WAS GOING FOR A ... FUMBLING IN HIS WAIST.  DID YOU EVER SEE A GUN ON DERRICK?

A    I DIDN'T ACTUALLY SEE A GUN BUT I KNEW WHAT WAS GOING ON.

Q    DID YOU EVER SEE ... MY QUESTION, MR. TRACY:  DID YOU EVER SEE A GUN?

A    NO.

Q    DID YOU EVER SEE DERRICK PICK UP A GUN AND FIRE?

19

A    NO.

Q    PLEASE GO ON WITH YOUR STORY.

A    AFTER I CLOSED THE DOOR I HEARD THE FIRST SHOT, AND ABOUT THREE MORE SHOTS AFTER FOLLOWED.

Q    I'M SORRY?

A    WHEN LEONARD NELSON SHOT THE VICTIM.

Q    OKAY. LET'S TAKE IT SLOWER. WHEN YOU HEARD THE FIRST SHOT, DID YOU LOOK BEHIND YOU?

A    YES.

Q    OKAY. AND WHO ... DID YOU SEE LEONARD NELSON AT THAT TIME?

A    AFTER THE FIRST SHOT.

Q    DID HE HAVE A GUN IN HIS HAND?

A    YES.

Q    OKAY. WHAT DID YOU SEE NEXT?

A    APPARENTLY ...

Q    WHAT DID/LEONARD NELSON DO NEXT?

A    SHOOT THE GUN, SHOOT THE GUY.

Q    WHAT GUY?

A    HAROLD MOORE.

Q    OKAY. AND YOU WERE IN YOUR CAR AT THIS TIME?

A    AH-HA.

Q    AND YOU WERE LOOKING AT HIM?

A    AH-HA.

Q    AND TELL ME WHAT YOU SAW HAROLD DO BEFORE LEONARD NELSON ... BEFORE SKINNY MAN SHOT HIM.

A    WELL, APPARENTLY, HE TRIPPED BECAUSE BY ME LOOKING THROUGH THE WINDOW I SAW HIM PASS, AND THEN HE JUST DISAPPEARED, LIKE FAST.

Q    AND DID HE FALL IN THE FRONT OR THE BACK OF YOU?

A    I DON'T KNOW.

20

Q    OKAY. AND HE FELL DOWN?

A    YES.

Q    AND WHAT/SKINNY MAN DO WHEN HAROLD, THE VICTIM, FELL
DID
DOWN?

A    AFTER HE SHOT HIM HE RAN OFF.

Q    NO. NO. WHAT DID HE DO BEFORE? WHEN HE CAME OVER...
YOU SAW SKINNY MAN COME OVER AND HAROLD
WAS LAYING ON THE GROUND. IS THAT A
CORRECT?

A    YES.

Q    OKAY. WHY DON'T YOU STEP OFF THE SEAT. I WANT YOU
TO DEMONSTRATE. HAROLD FELL RIGHT HERE.
YOU SHOW ME WHAT LEONARD NELSON CAME
UP AND DID.

A    I'M COMING AFTER YOU; YOU FALL AND ...

Q    OKAY. I'M FALLING AND I'M ON THE FLOOR RIGHT NOW.

A    HE SHOT AND RAN OFF.

Q    HUH?

A    HE SHOT AND RAN OFF.

Q    WHAT I'M TRYING TO DO, TRACY, IS I WANT YOU TO SHOW
ME HOW LEONARD NELSON SHOT HIM.

A    ALL RIGHT. YOU'RE RUNNING , SHOOTING.

Q    OKAY. I'M ON THE GROUND. RIGHT?

A    AFTER HE FELL, HE RAN OFF.

Q    OKAY. SHOOT ME. PRETEND WHAT YOU SAW SKINNY MAN
DO THAT DAY.

A    AFTER THAT HE RAN OFF.

Q    DID YOU SEE HIM SHOOT ME AFTER I FELL DOWN?

A    NO.

Q    YOU DIDN'T SEE HIM STAND OVER AND SHOOT ME?

A    NO, NOT OVER.

21

Q.     OKAY.  HOW MANY TIMES DID YOU SEE SKINNY MAN SHOOT
            HIM?

A     HOW MANY SHOTS? I HEARD FIVE, THREE.  FOUR SHOTS
            IN ALL, THE FIRST SHOT AND THEN THREE
            MORE FOLLOWED AFTER.

Q     AND YOU SAW SKINNY MAN SHOOT HAROLD?

A     YES.

Q     WHAT WAS SKINNY MAN SAYING WHEN HE APPROACHED HAROLD?
            DID YOU HEAR ANYTHING OR COULD YOU NOT
            HEAR HIM?

A     I WAS GETTING  OUT, YOU KNOW.

Q     WHAT HAPPENED AFTER HE SHOT HAROLD?

A     HE RAN OFF.

Q     IN WHICH DIRECTION DID HE RUN OFF?

A     BACK, BACK.  I DON'T ...

Q     AND SO YOU'RE COMING FORWARD TO ME AND SHOOTING ME
            AND THEN HE TOOK OFF THAT WAY?

A     NO.  THEY'RE GOING THIS WAY.  THEY'RE GOING THE
            OPPOSITE WAY.

Q     OKAY.   DID YOU EVER SEE HAROLD WITH A GUN THAT NIGHT?

A     NO.

Q     DID HAROLD RUN OVER TO SKINNY MAN OR THREATEN SKINNY
            MAN IN ANY WAY?

A     I WOULDN'T KNOW.

Q     YOU/SAW SKINNY MAN COMING TOWARD DERRICK?

BY MR. MERRITT:

       YOUR HONOR, SHE'S LEADING OR REPEATING THE TESTIMONY.


EXAMINATION  RESUMED BY MS. MC DONALD:

Q     WHERE DID YOU SEE SKINNY MAN COMING FROM?

A     I WAS COMING FROM THE CLUB; HE WAS COMING UP THE

22

STREET ON THE SAME SIDE OF THE CLUB.
THEY WERE ACROSS THE STREET ON THE NEXT
CORNER.

Q    "THEY" MEANING DERRICK, CURTIS AND HAROLD?

A    DERRICK, CURTIS AND HAROLD.

Q    OKAY.  IF I'M DERRICK, CURTIS AND HAROLD, IF I'M
STANDING RIGHT HERE, DID YOU EVER SEE
THEM WHEN THEY SAW HAROLD, DID YOU
EVER SEE THEM GO APPROACH HAROLD.  I
MEAN, ... EXCUSE ME, SKINNY MAN?

A    PARDON?

Q    IF I'M HAROLD, CURTIS AND DERRICK (THIS IS THE AREA
THEY WERE IN).

A    UM-HMM.

Q    OKAY.  AND YOU WERE THERE WHERE?  BEHIND IN THIS
CAR?

A    NO.

Q    IF YOU'RE ON THE CORNER LIKE THIS, THE CAR'S
RIGHT HERE; THE CLUB IS THERE.

A    YES.

Q    ALL RIGHT.  WHERE DID SKINNY MAN COME FROM?

A    THIS WAY.

Q    DID YOU EVER SEE AFTER YOU SAW DERRICK, HAROLD AND
CURTIS STANDING HERE, DID YOU EVER
SEE ANY OF THEM GO TOWARDS SKINNY
MAN?

A    AH-AH.

Q    THEY STOOD HERE?

A    I JUST GOT OUT THE WAY.  I PASSED THEM UP.  I
SAW THEM GOING LIKE THIS, AND I KEPT
GOING.  AFTER THAT I DIDN'T LOOK BACK
AT ALL UNTIL I HEARD THE FIRST SHOT.

23

Q    OKAY.

AND THE FIRST SHOT YOU HEARD IS OVER IN THIS DIRECTION.

A    YES. BY ME BEING OVER HERE, BEHIND ME ON MY LEFT.

Q    OKAY. DO YOU SEE SKINNY MAN HERE IN COURT TODAY?

A    YES, I DO.

Q    PLEASE POINT HIM OUT AND DESCRIBE WHAT HE'S WEARING.

A    SITTING AT THE BENCH WITH THE BLACK AND GREEN SHIRT ON.

Q    IS THIS THE MAN THAT YOU SAW SHOOT HAROLD WILSON THAT NIGHT?

A    YES, IT IS.

Q    ALL RIGHT, TRACY, YOU WERE IN THE CAR WITH YOUR GIRLFRIEND, CHRISTINE, AND TWO OTHER INDIVIDUALS. IS THAT CORRECT?

A    YES.

Q    YOU AND CHRISTINE, DID YOU AND CHRISTINE STAY ON THE SCENE?

A    WELL, WHEN THE POLICE CAME. THE POLICE CALLED HER OVER AND ASKED HER HER NAME AND MY NAME, AND THEN WE LEFT.

Q    AND YOU GAVE THEM A STATEMENT?

A    SHE GAVE ... THEY JUST SAID ... WHATEVER SHE SAID, YOU KNOW. I GUESS THEY JUST PUT IT DOWN FOR ME, TOO.

Q    DID THE OTHER ONES/THAT WERE IN THE CAR, DID THEY STICK AROUND, OR DID THEY LEAVE?

A    THEY CAME WITH US.

Q    I'M SORRY?

A    THEY CAME WITH US. THEY WERE IN THE CAR WITH US.

Q    RIGHT. BUT DID THEY EVER MAKE A STATEMENT TO THE

24

POLICE?

A     AH-AH.

Q     OKAY. DO YOU KNOW IF HAROLD WAS WEARING ANY JEWELRY THAT NIGHT? IF YOU CAN REMEMBER.

A     (NO RESPONSE.)

Q     YOU CAN'T REMEMBER?

A     I CAN'T REMEMBER.

BY MS. MC DONALD:

     OKAY. I TENDER THIS WITNESS.


CROSS EXAMINATION

EXAMINATION BY MR. MERRITT:

Q     MR. JOHNSON, I'M GOING TO SHOW YOU A DIAGRAM OF THE AREA. I'VE LABELED IT D-2 AND ASK YOU TO LOOK AT IT AND FAMILIARIZE YOURSELF WITH HOW YOU SEE THE LOCATION. I'LL MARK THIS AS TREASURE. STREET FOR YOU AND THIS FOR BRUXELLES, IF THAT WILL HELP YOU. IF YOU WANT TO CHANGE THAT ... I WANT TO KNOW WHERE YOUR CAR WAS, WHERE THE OTHER CAR WAS.

REPORTER'S NOTE:

     THE WITNESS COMPLIED WITH MR. MERRITT'S REQUEST.

EXAMINATION RESUMED BY MR. MERRITT:

Q     YOUR CAR, THEN, AS YOU'RE GOING DOWN TREASURE STREET ABREAST, OR AHEAD OF, THE PARKED CAR?

25

A    UM-HMM.

Q    AND WHERE DID THE SHOOTING OCCUR?

A    WHERE THE BODY WAS?

Q    YES.

A    RIGHT HERE.

Q    NOW, WILL YOU MARK WHERE YOU SAW DERRICK, BOSS
     AND CURTIS?

A    (WITNESS COMPLIED.)

Q    WILL YOU MARK WHERE'S THE FIRST TIME YOU SAW SKINNY
     MAN OR LEONARD?

A    (WITNESS COMPLIED.)

Q    FROM THE TIME THAT YOU SAW LEONARD ... LET'S MARK
     THESE WITH AN INITIAL WHILE I'LL
     MARK THAT LEONARD AND ...

A    MAMOO.

Q    AND MARK THESE AS YOU REMEMBER THEIR INITIALS.

A    (WITNESS COMPLIED.)

Q    THANK YOU.  FROM THE TIME THAT YOU SAW ... WITHDRAW
     THAT.  HOW MUCH TIME PASSED FROM THE
     TIME YOU SAW LEONARD AND MAMOO DOWN
     ON BRUXELLES STREET BEFORE YOU SAW ANY
     ACTION BY THESE PARTIES?  IF YOU
     CAN REMEMBER.

A    WELL, THAT'S LIKE SAYING FOR ME  WALKING FROM THE
     CLUB TO THE CORNER.

Q    OKAY.  ALL RIGHT, YOU DIDN'T SEE THEM IN THE CAR; YOU
     SAW THEM AS YOU WERE COMING OUT OF
     THE END ZONE, YOU'RE SAYING?

A    YES.

Q    OH, ALL RIGHT.  SO, YOU'RE TALKING ABOUT MAYBE A
     MINUTE OR MORE?

26

Q    OKAY.  DID YOU HEAR OR SEE LEONARD TALK TO ANYBODY ON THE CORNER?

A    AH-AH, NO.

Q    DID YOU HEAR ANY WORDS EXCHANGED BETWEEN LEONARD AND ANY OF THE PARTIES?

A    UM-UMM.

Q    WHEN DID YOU SEE DERRICK DRAW FOR A GUN?

A    WHEN I GOT ABOUT RIGHT HERE.

Q    WERE YOU IN THE CAR?

A    YES.

Q    AND YOU SAY YOU HURRIED TO GET IN THE CAR?

A    YES.

Q    AND TELL THE JURY YOUR STATE OF MIND AT THAT TIME WITH WHAT YOU KNEW WAS GOING DOWN.

A    YES, I HAD A FEELING SOMEONE WAS GOING DOWN, BECAUSE I KNEW THEY WERE GETTING INTO IT.

Q    CAN YOU EXPLAIN ANY MORE?  IT WAS IN YOUR MIND ... WHAT YOUR STATE OF MIND  WAS AT THE TIME.

BY MS. MC DONALD:

YOUR HONOR.  I'M GOING TO OBJECT.  HE'S JUST ANSWERED THE QUESTION.  ASKED AND ANSWERED.

BY MR. MERRITT:

WELL,  IF HE CAN CLARIFY IT ANY.  THAT'S ALL I'M ASKING.

BY THE COURT:

ALL RIGHT.  OVERRULED.

BY MS. MC DONALD:

YOU CAN ANSWER THE QUESTION.

27

EXAMINATION RESUMED BY MR. MERRITT:

A       ALL OF US ARE FROM AROUND THAT SAME NEIGHBORHOOD, AND YOU KNOW, THEY'VE BEEN GETTING INTO IT.

BY MS. MC DONALD:

I'M GOING TO OBJECT. AND ASK TO APPROACH THE BENCH.

REPORTER'S NOTE:

ALL COUNSELS APPROACHED THE BENCH FOR A BRIEF CONFERENCE.

BY THE COURT:

THE RULING IS OVERRULED. TAKE A QUESTION AT ONE TIME AND NOT NARRATIVE. YOU ANSWER THE QUESTIONS SPECIFICALLY AND DON'T GO OFF INTO YOUR OWN LITTLE CONVERSA-TIONS. DO YOU UNDERSTAND?

BY THE WITNESS:

YES.

EXAMINATION RESUMED BY MR. MERRITT:

Q       TELL THE MEMB ERS OF THE JURY WHAT WAS ON YOUR MIND AND THE REASON WHY YOU HURRIED TO GET IN THE CAR.

A       I KNEW WHAT WAS ABOUT TO HAPPEN.

BY THE COURT:

TELL THE MEMBERS OF THE JURY WHY YOU GOT IN A HURRY TO GET IN THE CAR.

BY THE WITNESS:

BECAUSE I SEEN HIM PULLING A GUN OUT, YOU KNOW, GOING UNDER HIS SHIRT REACHING FOR WHAT I

28

THOUGH TO BELIEVE WAS A GUN.

BY THE COURT:

ALL RIGHT.  NEXT QUESTION.

EXAMINATION RESUMED BY MR. MERRITT:

Q    AND HOW SOON AFTER HE REACHED FOR THE GUN DID YOU HEAR THE SHOT?

A    THE TIME IT TOOK ME FROM WHEN I NOTICED IT HE WAS PULLING ONE OUT UNTIL THE TIME I WAS GETTING IN THE BACK SEAT OF THE CAR.

Q    DID YOU NOTICE WHETHER HE HAD A GUN OR NOT?

A    NO, I DIDN'T ACTUALLY SEE A GUN, BUT ...

Q    YOU'RE NOT PREPARED TO SAY HE DIDN'T HAVE A GUN, THOUGH?

A    UM-UMM.

Q    WHEN YOU WERE TESTIFYING EARLIER YOU SAID, "THEY DID THIS," MEANING WHAT?

A    HMM?

Q    YOUR TESTIMONY ACCORDING TO THE WAY YOU SAID IT WAS, AS YOU APPROACHED, "THEY DID IT; THEY DID THIS."  WHO WAS "THEY"? WHO WERE YOU TALKING ABOUT?

A    THE GROUP OF THEM -- HAROLD, DERRICK AND CURTIS.

Q    EACH OF THEM WERE GOING FOR GUNS, YOU SAY?

A    WELL, I JUST NOTICIED DERRICK.

Q    OKAY.  BUT WHEN YOU SAID "THEY" YOU MEANT DERRICK?

A    YES.

Q    OKAY.  I'LL POINT OUT TO YOU EXHIBIT D-2.  WILL YOU PLEASE INDICATE WHERE WERE YOU WHEN YOU HEARD THE FIRST SHOT, AS YOU RECALL?

29

A     GETTING IN THE BACK OF HIS CAR.

Q     YOU WERE NOT IN YET?  JUST GETTING ...

A     GETTING IN THE BACK SEAT OF THE CAR.

Q     ALL RIGHT.  AFTER THE FIRST SHOT FIRED ... WHEN YOU WERE GETTING INTO THE BACK SEAT OF THE CAR WHO WAS NEXT TO YOU?

A     ERNEST DEJEUNNE.

Q     AND WHERE WAS CHRISTINE BOATNER?

A     IN THE FRONT SEAT, THE DRIVER'S SEAT.

Q     WHEN THE SHOT FIRED WHAT DID CHRISTINE DO?

A     LOOKED ... I DON'T KNOW.  I DON'T KNOW WHAT SHE DID.

Q     DID YOU EVER SEE HER JUMP UNDER THE WHEEL, THE DRIVER'S WHEEL?

A     NO.

Q     OKAY.

A     WHEN I HEARD THE FIRST SHOT I LOOKED, I LOOKED.

Q     OKAY.  WHEN YOU..EXCUSE ME ONE MOMENT, YOUR HONOR. YOU SAID YOU KNOW DERRICK MARIGNY?

A     AH-HA.

Q     HOW LONG DO YOU KNOW DERRICK?

A     VERY WELL.  WE GREW UP IN THE SAME NEIGHBORHOOD.

Q     IS DERRICK MARIGNY KNOWN AS A DRUG PUSHER?

BY MS. MC DONALD:

        OBJECTION.

BY MR. MERRITT:

        HE DENIED IT.

BY THE COURT:

        SUSTAINED.

BY MR. MERRITT:

        NOTE AN EXCEPTION.

30

BY THE COURT:

LET IT BE NOTED.

EXAMINATION RESUMED BY MR. MERRITT:

Q    HAVE YOU EVER SEEN DERRICK MARIGNY SELL DRUGS?

A    YES.

BY MS. MC DONALD:

OBJECTION, YOUR HONOR, AS TO THE RELEVANCY.

BY THE COURT:

OVERRULED.

EXAMINATION RESUMED BY MR. MERRITT:

Q    HAVE YOU EVER SEEN HIM PERSONALLY SELL DRUGS?

A    YES.

Q    HAVE YOU EVER SEEN CURTIS MILLER PERSONALLY SELL
        DRUGS?

A    YES.

Q    HAVE YOU EVER SEEN HAROLD "BOSS" WILSON PERSONALLY
        SELL DRUGS?

A    YES.

Q    AND HAVE YOU EVER SEEN DERRICK MARIGNY, CURTIS
            MILLER OR HAROLD "BOSS" EACH WITH
            GUNS AND EXPLAIN THE KIND OF GUNS THAT
            THEY OWN.

BY MS. MC DONALD:

OBJECTION, YOUR HONOR.

BY THE COURT:

OVERRULED.

31

EXAMINATION RESUMED BY MR. MERRITT:

A     YES.

Q     EXPLAIN TO THE JURY THE TYPE OF GUNS THAT EACH HAVE.

A     BASICALLY, AUTOMATIC GUNS.

Q     YOU KNOW THE VARIOUS TYPES OF AUTOMATICS THEY HAVE --
.45 AND .9 MILIMETER, OR ANY KIND AT
ALL?

A     NO.

Q     OKAY.


BY MR. MERRITT:

      THANK YOU, MR. JOHNSON.

BY MS. MC DONALD:

      I HAVE A FEW MORE QUESTIONS.


### RE-DIRECT EXAMINATION

EXAMINATION BY MS. MC DONALD:

Q     TRACY, YOU TESTIFIED ON CROSS EXAMINAITON BY MR.
MERRITT THAT WHEN YOU HEARD THE FIRST
SHOT IN THE CAR AND YOU TURNED AROUND.

A     UM-HMM.

Q     DID YOU EVER SEE DERRICK WITH A GUN THEN WHEN YOU
TURNED AROUND?

A     I DIDN'T ACTUALLY SEE HIM WITH A GUN. I SAW HIM
REACHING IN HIS SHIRT.

Q     AND MY QUESTIONS: WHEN YOU HEARD THE FIRST SHOT AND
YOU TURNED AROUND, DID YOU SEE DERRICK
IN PHYSICAL POSSESSION OF A GUN?

A     NO.

Q     WHO DID YOU SEE WITH A GUN THAT NIGHT?

32

A      LEONARD NELSON.

BY MS. MC DONALD:

     NO MORE QUESTIONS.

BY MR. MERRITT:

     I HAVE A QUESTION, YOUR HONOR, THAT I SHOULD HAVE
          ASKED BEFORE.

BY MS. MC DONALD:

     YOUR HONOR, ...

BY THE COURT:

     WHAT WAS THE QUESTION?

BY MR. MERRITT:

     DOES HE KNOW JANET PEREZ, AND DID HE SEE JANET PEREZ
          OUT THAT EVENING?

BY THE COURT:

     I'LL LET YOU ASK IT.

### RE-CROSS EXAMINATION

EXAMINATION BY MR. MERRITT:

Q      DO YOU KNOW JANET PEREZ?

A      I DO.

Q      DID YOU SEE HER ON THE MORNING HOURS OF MAY 6TH?

A      YES.

Q      AND WHERE DID YOU SEE HER?

A      AROUND THE END ZONE CLUB.

Q      PARDON?

A      AROUND THE END ZONE.

BY MR. MERRITT:

     THANK YOU.

### RE-DIRECT EXAMINATION

EXAMINATION BY MS. MC DONALD:

Q      DID YOU EVER SEE LEONARD NELSON ... I'M SORRY.

33

I'LL WITHDRAW THAT. NOTHING FURTHER.

BY THE COURT:

ALL RIGHT, STEP DOWN. ALL RIGHT, CALL YOUR NEXT WITNESS.

BY MS. O'BANNON:

OFFICER GAHAGAN.

BY THE COURT:

OFFICER GAHAGAN

OFFICER JAMES O. GAHAGAN

CALLED BY THE STATE AND AFTER FIRST HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

EXAMINATION BY MS. O'BANNON:

Q   OFFICER, STATE YOUR NAME AND ASSIGNMENT FOR THE RECORD FOR THE JURY, PLEASE.

A   JAMES GAHAGAN. I'M A CRIME LAB TECHNICIAN WITH THE NEW ORLEANS POLICE DEPARTMENT.

Q   HOW LONG HAVE YOU BEEN ASSIGNED AS A CRIME LAB TECH-NICIAN.

A   SIX YEARS.

Q   WOULDYOU EXPLAIN TO THE JURY WHAT THE JOB DESCRIP-TION IS OR WHAT YOUR DUTIES AS A CRIME TECHNICIAN ARE.

A   I COLLECT EVIDENCE ON THE CRIME SCENE AND PROCESS IT INTO CENTRAL EVIDENCE AND PROPERTY.

Q   OFFICER, I'LL HAVE TO ASK YOU TO SPEAK LOUDER, SO WE CAN HEAR YOU. YOU COLLECT THE EVI-DENCE, AND CONTINUE FROM THERE.

A   WE PROCESS IT AND TURN IT INTO CENTRAL EVIDENCE AND PRO ... EVIDENCE, PROPERTY.

Q   WHEN YOU SAY "PROCESS EVIDENCE," WHAT DO YOU MEAN

34

BY THAT?

A    PROCESS IT.  I FINGERPRINT IT, PHOTOGRAPH IT, PACKAGE IT AND LABEL IT.

Q    DO YOU REMEMBER GOING TO A CRIME SCENE ON MAY 6TH, 1990, BRUXELLES AND TREASURE STREET?

A    YES.  WE HAD RECEIVED A CALL OF A HOMICIDE AT APPROXIMATELY 2:00 A.M.  WE ARRIVED THERE ABOUT 2:15.

Q    WHAT IS THE FIRST THING YOU DID, AS YOU RECALL, WHEN YOU GOT TO THAT SCENE?

A    PARDON ME?

Q    WHAT IS THE FIRST THING YOU DO WHEN YOU GET ON A HOMICIDE SCENE?

A    I START MY PHOTOGRAPHS, TALK TO THE INVESTIGATING OFFICER.

Q    I'LL SHOW YOU DEFENSE COUNSEL 6, 7, AND 8 AND ASK YOU IF YOU RECOGNIZE THOSE PHOTOGRAPHS?

A    THESE ARE PHOTOGRAPHS TAKEN AT THE SCENE.

Q    AND I'LL SHOW YOU WHAT HAS BEEN PREVIOUSLY MARKED AS STATE 3 AND 5, AND ASK YOU IF YOU ALSO RECOGNIZE THOSE PHOTOGRAPHS.

A    THESE ARE ALL ADDITIONAL PHOTOGRAPHS OF THE SCENE.

Q    COULD YOU TELL THE JURY WHAT EVIDENCE YOU FOUND ON THE SCENE?

A    I COLLECTED ONE RG .38 CALIBER REVOLVER, TWO BLOOD STAINED SHIRTS, AND WE FOUND A SPENT PELLET IN ONE OF THE SHIRTS.  I ALSO DUSTED A VEHICLE ON THE SCENE AND LIFTED FOUR PRINTS.

Q    WERE YOU ABLE TO DETERMINE WHO THE PRINTS BELONGED TO?

35

A    NO, I WASN'T. I JUST TURNED THEM IN TO IDENTIFICATION.
AND THEY DO THAT.

Q    WHAT DID YOU DO WITH THE GUN?

A    IT WAS PACKAGED AND LABELED AND TURNED INTO THE
FIREARMS SECTION.

Q    I'LL SHOW YOU WHAT HAS BEEN PREVIOUSLY MARKED
STATE'S EXHIBIT 2 AND ASK YOU IF YOU
RECOGNIZE THIS.

A    THIS IS THE GUN I RECOVERED FROM THE SCENE.  IT HAS
MY INITIALS ON IT.

Q    AND DO YOU RECALL WHERE THIS WEAPON WAS LOCATED?

A    IT WAS AT THE CORNER OF BRUXELLES AND TREASURE,
LAYING IN THE STREET.

Q    OFFICER, DO YOU RECALL THE LIGHTING THAT EVENING?

A    EXCUSE ME?

Q    THE LIGHTING  OF THE SCENE.  DO YOU RECALL?

A    IT WAS DARK.  I BELIEVE THERE WAS A STREET LIGHT
ON ONE OF THE CORNERS.

BY MS. O'BANNON:

I'LL TENDER THE WITNESS.

CROSS EXAMINATION

EXAMINATION BY MR. RUSKIN:

Q    OFFICER, MY NAME IS JOHN RUSKIN.  YOU RECOVERED FROM
THE SCENE ALONG WITH THE WEAPON FOUR
CARTRIDGES INSIDE THE WEAPON.  CORRECT?

A    RIGHT, LOADED CARTRIDGES.

Q    NOW, WHEN YOU PICKED IT UP ... YOU PICKED IT UP OFF
THE GROUND?

A    YES.

Q    AT THE TIME THIS PIN HERE, THAT PIN WAS INSIDE THE GUN?

A    YES, IT WAS.

Q    YOU JUST PUT IT IN A PLASTIC BAG OR YOU JUST BROUGHT IT BACK TO THE OFFICE AND GAVE IT TO SOMEBODY?

A    PUT IT IN A PAPER BAG.

Q    WHO ELSE HANDLED IT AFTER YOU?

A    OH, I IMAGINE THE FIREARMS INSPECTOR.

Q    DID YOU/THAT FOR FINGERPRINTS?

A    NO, I DIDN'T.

Q    THE STREET LIGHTING THAT YOU DESCRIBED ... OFFICER, LET ME START ... I'M GOING TO GIVE YOU A DOCUMENT THAT PURPORTS TO BE A MAP OF THAT STREET CORNER SHOWING THE ENDZYME ... END ZONE.  IT'S MARKED D-3 LET ME GIVE YOU A PEN OR YOU MAY USE YOUR OWN, AND MARK FOR ME THE APPROXIMATE LOCATION THAT YOU FOUND THE GUN ON THIS MAP.  TO ASSIST, I'LL DO THIS.  I'LL MARK A "T" FOR TREASURE AND A "B" FOR BRUXELLES.  NOW, YOU'RE PLACING THE GUN NOT DIAGONALLY ACROSS FROM THE, FROM THE END ZONE.  IS THAT CORRECT?

A    WHAT IS THE END ZONE?

Q    THAT'S THE LOUNGE THAT'S ON ONE OF THE CORNERS.  IT'S A LITTLE BAR.

A    I DON'T REMEMBER ANYTHING ABOUT A LOUNGE.

Q    DID YOU MAKE A MAP OF THE SCENE?

A    NO, I DIDN'T.

37

Q     AND YOU REVIEWED THE ASSEMBLED CRIME LAB REPORTS?

A     YES, I DID.

Q     I'LL SHOW YOU THIS TO REFRESH YOUR MEMORY.

BY MS. O'BANNON:

      LET ME SEE IT, PLEASE.


EXAMINATION RESUMED BY MR. RUSKIN:

Q     I WANT TO ASK IF THIS WILL REFRESH YOUR MEMORY AS TO
                LOCATION OF THE END ZONE AND THE
                WEAPON ZONE.

A     THIS MAP IS WRONG.

Q     NOW, WHO PREPARED THAT MAP?

A     OFFICER RODRIGUEZ.  HE HAS THE STREETS WRONG.

Q     ASIDE FROM THAT DOES THAT HELP YOU SHOW WHERE THE GUN
                WAS AT?

A     WELL, IT WAS ON THE CORNER HERE, BUT THIS IS TREASURE
                          (SIC.)
                HERE, ROCHELLE/GOES THIS WAY, NORTH
                TO SOUTH.

Q     WHAT I'M GOING TO DO HERE I'M GOING TO MARK THIS
                D-4, AND I'M GOING TO STRIKE OUT
                TREASURE AND WRITE THE LETTER "B" FOR
                BRUXELLES, AND WRITE "T".  WHERE IS
                THE END ZONE ON D-4?  DO YOU KNOW
                WHICH CORNER IT'S ON?

A     IT'S NOT IN THE SKETCH.  IT MIGHT HAVE BEEN ON THIS
                CORNER.

Q     NOW, YOU'RE REFERRING TO THE LOWER LEFT?

A     RIGHT.

Q     OKAY.

A     NOW, THE GUN WAS VERY CLOSE TO THE CORNER, WASN'T
                IT?

38

A        APPROXIMATELY FIVE FEET FROM THE CORNER.

Q        OFFICER RODRIGUE ACTUALLY MEASURE IT?

A        YES, SIR.

Q        THE STREET LAMP THAT YOU DESCRIBED TO THE DISTRICT ATTORNEY, IT'S ACTUALLY ON THE OTHER SIDE OF THE STREET, IS IT NOT?

BY MS. O'BANNON:

         OBJECTION, YOUR HONOR, TO THIS. DEFENSE ATTORNEY IS TESTIFYING?

EXAMINATION RESUMED BY MR. RUSKIN:

Q        LET ME REPHRASE THAT QUESTION. ON D-3 YOU PUT A MARK. ARE YOU SURE OF WHERE THAT MARK IS OR IS IT POSSIBLE IT'S ON THE OTHER SIDE?

A        IT MAY BE ON THIS SIDE.

Q        OKAY. I'M GOING TO MARK AN "X" FOR WHERE YOU THINK IT MIGHT BE. THE STREET LAMP THAT YOU'RE REFERRING TO WAS IN THE LOCATION WHERE MY FINGER IS? APPROXIMATELY.

A        APPROXIMATELY. I'M NOT REALLY SURE.

BY MS. O'BANNON:

         OBJECT AGAIN TO THE DEFENSE COUNSEL POINTING OUT.

BY THE COURT:

         WAIT A MINUTE. LOOK. LISTEN. IF SOMEBODY OBJECTS LET THEM MAKE THEIR STATEMENT. I CAN'T LISTEN TO BOTH AT THE SAME TIME. WHAT'S YOUR OBJECTION?

BY MS. O'BANNON:

         I OBJECT TO DEFENSE COUNSEL POINTING OUT THE MARKINGS ON THE MAP. THE WITNESS IS

39

IDENTIFYING THE MARK. THEY'RE NOT ALL PREVIOUSLY MARKED. HE'S ASKING THE WITNESS TO FIND DIFFERENT LOCATIONS BUT YET HE'S POINTING THEM OUT. IT'S NOT HIS MAP. HE DIDN'T TESTIFY THAT IT WAS HIS MAP.

BY THE COURT:

ALL RIGHT. OVERRULED. OVERRULED. WHAT SEEMS TO BE THE PROBLEM, COUNSELOR?

BY MR. RUSKIN:

THE STREET MAP THAT YOU TOLD THE DISTRICT ATTORNEY ABOUT ...

BY THE COURT:

ASK HIM TO PUT THE STREET LAMP IN, AND DON'T TELL HIM WHERE IT IS.

EXAMINATION RESUMED BY MR. RUSKIN:

Q        WHERE'S THE PHONE POLE THAT THAT STREET LAMP IS AT?

A        I'M REALLY NOT SURE. I DON'T REMEMBER.

Q        IS IT POSSIBLE THAT IT'S WHERE MY FINGER IS?

BY THE COURT:

NO. HE SAID HE DIDN'T KNOW, COUNSELOR. ALL RIGHT? THAT OBJECTION WOULD BE SUSTAINED.

BY MS. O'BANNON:

THANK YOU, YOUR HONOR.

BY MR. RUSKIN:

I HAVE NO FURTHER QUESTIONS.

BY THE COURT:

ALL RIGHT. STEP DOWN, OFFICER. IS THE OFFICER FREE

40

TO GO?

BY MS. MC DONALD:

YES.

BY THE COURT:

ALL RIGHT. STEP DOWN, OFFICER. YOU'RE FREE TO GO.

BY MS. MC DONALD:

YOUR HONOR, MAY WE APPROACH THE BENCH, PLEASE?

BY THE COURT:

YES.

REPORTER'S NOTE:

ALL COUNSELS APPROACHED THE BENCH FOR A BRIEF CONFERENCE.

BY THE COURT:

LET'S TAKE A SHORT BREAK. DON'T DISCUSS ANYTHING THAT YOU HEARD TODAY IN THE COURT. ALL RIGHT. EVEN THOUGH I KNOW IT'S TEMPTING, DO NOT. IF YOU CATCH SOMEBODY TALKING ABOUT IT, REMIND THEM OF THEIR OATH. OKAY? SHERIFF, TAKE THE JURY UPSTAIRS, PLEASE. ON THE CONVERSATIONS ABUT THE QUESTIONS CONCERNING YOUR FAMILY, I CANNOT LET YOU TALK TO YOUR FAMILY. YOU CAN GIVE A NOTE TO THE SHERIFF WHO CAN MAKE A PHONE CALL, BUT I CANNOT LET YOU HAVE TELEPHONIC CONTACT. THE TRIAL HAS BEGUN. THE SEQUESTRATION ORDER IS IN EFFECT. SHERIFF, TAKE THE JURY UPSTAIRS

41

PLEASE.

REPORTER'S NOTE:

THE COURT ORDERED A SHORT RECESS, AFTER WHICH THE
JURORS RETURNED TO THE COURTROOM.

BY MS. O'BANNON:

MS. RUBY ORY.


RUBY P. ORY

CALLED BY THE STATE AND AFTER FIRST HAVING BEEN DULY
SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

EXAMINATION BY MS. O'BANNON:

Q     STATE YOUR NAME FOR THE JURY, PLEASE.

A     MY NAME IS RUBY P. ORY.

Q     MS. ORY, WHAT IS YOUR JOB?

A     I'M EMPLOYED BY THE ORLEANS PARISH CORONER'S
OFFICE AS AN ANALYTICAL TOXICOLOGIST.

Q     COULD YOU BRIEFLY DESCRIBE YOUR TRAINING IN THAT
FIELD?

A     I HAVE A DEGREE IN CHEMISTRY AND I HAVE WORKED FOR
THE LAST 25 YEARS IN THIS PARTICULAR
FIELD UNDER THE DIRECTION OF BOARD
CERTIFIED  FORENSIC TOXICOLOGISTS AND
PATHOLOGISTS.

Q     HAVE YOU EVER TESTIFIED IN COURT BEFORE AS AN
EXPERT IN THE FIELD OF TOXICOLOGY?


BY MR. MERRITT:

WE'LL STIPULATE.

42

BY THE WITNESS:

    YES, I HAVE.

BY MR. MERRITT:

    THAT MS. ORY IS AN EXPERT, YOUR HONOR.

BY MS. O'BANNON:

    YOUR HONOR, AT THIS TIME WE'RE GOING TO OFFER A STIPULATION THAT MS. ORY IS AN EXPERT IN THE FIELD OF TOXICOLOGY.

BY THE COURT:

    DO YOU HAVE ANY PROBLEMS WITH THAT, GENTLEMEN?

BY MR. MERRITT:

    I OFFERED IT, YOUR HONOR.

BY MR. RUSKIN:

    WE OFFERED IT; HE OFFERED IT.

BY THE COURT:

    ALL RIGHT. LET THE RECORD REFLECT THAT MS. ORY HAS BEEN DEEMED TO BE ... IT'S STIPULATED TO AS TO HER EXPERTISE IN THE FIELD OF TOXICOLOGY. THAT'S THE IDENTIFICATION OF BODY FLUIDS?

BY THE WITNESS:

    THE IDENTIFICATION OF POISONS AND BODY FLUIDS.

BY THE COURT:

    POISONS AND BODY FLUIDS. OKAY.

EXAMINATION RESUMED BY MS. O"BANNON:

Q    MS. ORY, DID YOU HAVE THE OCCASION TO TEST SAMPLES FROM A DECEASED BY THE NAME OF HAROLD "BOSS" WILSON?

A    YES, I DID.

Q    WOULD YOU PLEASE TELL THE JURY WHAT SAMPLES WERE

43

TAKEN FROM THE DECEASED?

A  THE SAMPLES WERE SUBMITTED TO THE LABORATORY. THEY WERE SAMPLES OF BLOOD, URINE AND VITREOUS, AND WE WERE TO DETECT THE PRESENCE OR ABSENCE OF ALCOHOL AND SOME OF THE COMMONLY ABUSED DRUGS.

Q  WHO SUBMITTED THE SPECIMENS TO YOUR LAB?

A  DR. SPROOL WAS THE PATHOLOGIST WHO DID THE AUTOPSY.

Q  WHAT IS VITREOUS FLUID?

A  VITREOUS FLUID IS THE FLUID INSIDE THE EYEBALL.

Q  AND WHAT CAN YOU TELL BY EXAMINING VITREOUS FLUID?

A  VITREOUS FLUID IS AN ACCEPTABLE TISSUE TO DO VARIOUS DRUGS ON.

Q  AND IN TESTING THE VITREOUS FLUIDS, WHAT SPECIFICALLY WERE YOU LOOKING FOR IN THIS DECEASED?

A  IN THIS PARTICULAR INSTANCE WE WERE LOOKING FOR THE PRESENCE OR ABSENCE OF COCAINE AND I WAS NOT ABLE TO ESTABLISH THE PRESENCE OF COCAINE IN THE VITREOUS FLUID. ALL OF THE RESULTS GAVE NEGATIVE RESULTS.

Q  IN THE URINE SAMPLE, WHAT WERE YOU LOOKING FOR?

A  IN THE URINE SAMPLE WE WERE LOOKING FOR A WIDE SPAN OF DRUGS, INCLUDING EVERYTHING FROM ASPIRIN DOWN TO MORPHINE. NONE OF THESE DRUGS APPEARED IN THE URINE SPECIMEN SCAN.

Q  WAS A BLOOD ALCOHOL TEST DONE ON HIM?

A  YES, THE BLOOD ALCOHOL TEST WAS DONE ON THE SAMPLE OF BLOOD, AND THE RESULT OF THAT WAS A LEVEL OF 0.02%.

44

Q     HOW MUCH ALCOHOL DOES ONE HAVE TO CONSUME IN YOUR
OPINION TO HAVE A LEVEL 0.02?

A     THAT MIGHT BE AS LITTLE AS A CAN OF BEER OR EVEN
LESS.

Q     SO, IN YOR OPINION, THE DECEASED WAS NOT ON ANY DRUGS
OR ALCOHOL AT THE TIME OF THE TESTS?

A     HE  WAS NOT UNDER THE INFLUENCE OF ANY OF THE DRUGS
OR ALCOHOL THAT I TESTED FOR.

Q     AND WHAT TYPE OF TESTING DID YOU USE TO DETERMINE ...
WHAT TYPE OF TESTS ...

A     THE STANDARD METHODS IN OUR LABORATORY ARE THIN-LAYER
CHROMOTOGRAPHY, GAS CHROMOTOGRAPHY
AND ALSO, MASS-SPECTRO-CHROMOTOGRAPHY.

Q     AND THIS IS THE BASIS OF YOUR CONCLUSION BASED
ON WHAT THESE TESTS REVEALED TO YOU?

A     THAT WOULD BE CORRECT.

BY MS. O' BANNON:
YOUR HONOR, AT THIS TIME THE STATE WILL TENDER.

CROSS EXAMINATION

EXAMINATION BY MR. RUSKIN:

Q     THE TESTS THAT OU DO ARE BASED ON THE FLUIDS YOU
RECEIVED. RIGHT?

A     YES.

Q     AND DO YOU KNOW WHEN THE FLUIDS WERE TAKEN FROM
THE DECEASED.

A     THE SAMPLES WERE DRAWN/AUTOPSY THAT WAS DONE ON
5-7-90, AND THE AUTOPSY  WAS DONE
AT 7:50 IN THE MORNING.

45

Q     IS IT NOT TRUE NOW THAT THE TESTS THAT YOU
      PERFORMED WERE IN THE ... BASED ON
      THE CONDITION AT THE TIME OF AUTOPSY?

A     THAT'S CORRECT.

Q     AND IS IT NOT TRUE THAT THE CHEMICALS THAT YOU TESTED
      FOR, THE ABUSED DRUGS, HAVE A HALF-LIFE
      IN A PERSON'S BODY?

A     THE HALF-LIFE IS USUALLY CALCULATED IN REFERENCE TO
      A LIVING INDIVIDUAL.

Q     SO, BUT BY THE TIME THE AUTOPSY WAS PERFORMED YOU
      MAKE A DISCOVERY ABOUT WHAT DRUGS
      WERE IN THE SYSTEM AT THE TIME THE PERSON
      DIED. RIGHT?

A     THAT'S CORRECT, THE TIME OF DEATH.

Q     AND IF A HALF-LIFE WAS, SAY, TWO OR THREE HOURS
      YOU COULD GO BACK A FEW HOURS BEFORE
      THE INDIVIDUAL DIED HE MAY HAVE HAD
      USED A DRUG, BUT YOU WON'T DETECT
      IT.

A     HE MAY HAVE USED A DRUG PRIOR TO HIS DEATH?

Q     RIGHT

A     YES.

Q     NOW, YOU TESTED FOR ALCOHOL IN THE BLOOD, DID YOU
      NOT?

A     THAT'S CORRECT.

Q     AND THAT CAME FROM AUTOPSY.

A     THAT'S RIGHT.

Q     ALL RIGHT. TELL ME IF YOU KNOW WHETHER OR NOT THIS
      INDIVIDUAL HAD MASSIVE BLEEDING OR
      NOT.

A     I HAVE NO IDEA.

46

Q    TO YOUR KNOWLEDGE, HAVE YOU SEEN CASES WHERE THERE
HAS BEEN MASSIVE BLEEDING, WHERE THE
INJURY INCLUDES SAY, A SEVERANCE OF
AN ARTERY, A MAJOR ARTERY?

A    YES.

Q    THAT KIND OF INDIVIDUAL GETS MAJOR TRANSFUSIONS,
DOESN'T HE?

A    IF HE ...

BY MS. O'BANNON:

OBJECTION, YOUR HONOR.  THAT'S ASKING FOR MEDICAL
CONCLUSION.  SHE'S AN EXPERT IN THE
FIELD OF TOXICOLOGY.

BY MR. RUSKIN:

I'LL WITHDRAW IT; I'LL WITHDRAW IT.


EXAMINATION RESUMED BY MR. RUSKIN:

Q    THE TESTS THAT YOU MADE ON THE BLOOD WOULD HAVE
BEEN AFTER ANY TRANSFUSIONS WOULD HAVE
BEEN ... MIGHT HAVE BEEN GIVEN.

A    IF ANY TRANSFUSIONS OCCURRED THEY WOULD NOT BE TO
MY KNOWLEDGE.

Q    BUT CERTAINLY YOUR TEST WOULD HAVE BEEN ACCURATE
IF THERE WAS HOSPITAL CARE.

A    IF THERE WAS HOSPITAL CARE, YES.


BY MR. RUSKIN:

I HAVE NO FURTHER QUESTIONS.

BY MS. O'BANNON:

I HAVE A COUPLE OF QUESTIONS.


47

<u>RE-DIRECT EXAMINATION</u>

EXAMINATION BY MS. O'BANNON:

Q     WHAT IS THE PROCEDURE FOR PRESERVING SPECIMENS THAT ARE TAKEN FORM AN AUTOPSY?

A     THE SPECIMENS ARE IMMEDIATELY PLACED IN A REFRIGERATOR, STANDARD REFRIGERATOR THAT KEEPS THE SPECIMENS COLD SO THAT NO FURTHER DECOMPOSITION TAKES PLACE.

Q     SO, WHEN YOU RECEIVE THE SPECIMENS THEY'RE IN THE SAME CONDITION AS THEY WERE WHEN THEY WERE REMOVED FROM THE BODY?

A     FOR ALL PRACTICAL PURPOSES THAT IS A TRUE STATEMENT.

Q     HAVE YOU EVER DONE AN AUTOPSY ... I'M SORRY. HAVE YOU EVER TESTED SPECIMENS ON A DECOMPOSED BODY?

A     YES, I HAVE.

Q     AND AT THAT TIME WERE YOU ABLE TO DETECT DRUGS FROM THOSE TISSUES?

A     YES, WE ARE STILL ABLE TO DETECT MANY DRUGS IN DECOMPOSED TISSUED.

BY MR. O'BANNON:

     NOTHING FURTHER, YOUR HONOR.

BY MR. RUSKIN:

     NO FURTHER QUESTIONS, YOUR HONOR.

BY THE COURT:

     ALL RIGHT; STAND DOWN. YOU'RE FREE TO GO, MS. ORY. THANK YOU. NEXT WITNESS.

BY MS. MC DONALD:

     YOUR HONOR, THE STATE AT THIS TIME ASKS FOR A RECESS, OUR WITNESS BEING BROUGHT IN AT THIS

48

TIME. THERE'S A CAPIAS OUT AND SHE'S BEING BROUGHT IN AT THIS TIME. THE STATE'S BEEN MADE AWARE BY DETECTIVES THAT THEY ARE ON THEIR WAY WITH THIS INDIVIDUAL.

BY THE COURT:

WHAT ABOUT YOUR CORONER?

BY MS. MC DONALD:

I'M SORRY?

BY THE COURT:

YOUR CORONER.

BY MS. MC DONALD:

YOUR HONOR, MAY WE APPROACH?

REPORTER'S NOTE:

ALL COUNSELS APPROACHED THE BENCH FOR A BRIEF CONFERENCE.

BY THE COURT:

LADIES AND GENTLEMEN, WE'RE WAITING FOR A CORONER WHO NO LONGER WORKS IN ORLEANS PARISH, BUT WORKS IN CRYSTAL SPRINGS. HE'S SUPPOSED TO HAVE LEFT MISSISSIPPI THIS MORNING AT 8:00. I DON'T KNOW IF I BELIEVE THAT, BUT IT'S FIVE AFTER 12:00 NOW. WE'VE GOT TO WAIT FOR THIS PARTICULAR WITNESS. IF IT WAS SOME OTHER TYPE OF WITNESS I WOULDN'T BE SO LENIENT, BUT THIS IS A PROFESSIONAL AND THEY'RE TRANSFERRED OUT OF TOWN, AND SHE'S THE ONE THAT DID THE WORK. SO, WOULD YOU

49

ALL GO UPSTAIRS. OUR LUNCH IS HERE.
WE MIGHT AS WELL HAVE LUNCH NOW AND
TAKE THE BREAK. AS SOONAS YOU ALL
ARE FINISHED KNOCK. YOUKNOCK ON THE
DOOR AND WE'RE GOING TO PROCEED,
WITH OR WITHOUT WITNESSES.

BY MC. MC DONALD:

YES, YOUR HONOR.

BY THE COURT:

ENOUGH IS ENOUGH. ALL RIGHT. SHERIFF, TAKE THE
JURY UPSTAIRS.


DR. FAY G. SPRUILL

CALLED BY THE STATE AND AFTER FIRST HAVING BEEN DULY
SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

EXAMINATIONBY MS. O'BANNON:

Q       PLEASE STATE YOUR NAME FOR THE RECORD.

A       FAY G. SPRUILL, S P R U I L L. I AM A MEDICAL DOCTOR
                WITH THE SPECIALTY OF FORENSIC
                PATHOLOGY.


BY MS. O'BANNON:

AT THIS TIME THE STATE WOULD LIKE TO OFFER A STIPU-
                LATION THAT DR. SPRUILL IS AN EXPERT
                IN THE FIELD OF FORENSIC PATHOLOGY.

BY MR. MERRITT:

IS SHE A SPECIALIST IN PATHOLOGY?

BY THE COURT:

WHY DON'T YOU GIVE US A LITTLE BACKGROUND, DOCTOR,
                ON YOUR PATHOLOGY.

50

BY THE WITNESS:

I GRADUATED FROM THE UNIVERSITY OF MISSISSIPPI SCHOOL OF MEDICINE IN 1964, FOLLOWED BY AN INTERNSHIP AT THE UNIVERSITY MEDICAL CENTER IN JACKSON, MISSISSIPPI, FOLLOWED BY A TOUR OF DUTY IN THE SERVICE, FOLLOWED BY GENERAL PRACTICE AT STENACOLA (SPELLED PHONETICALLY) CLINIC IN BATON ROUGE, LOUISIANA, AT WHICH TIME I BEGAN A SPECIALIZATION IN PATHOLOGY, BEGINNING AT THE UNIVERSITY OF MISSISSIPPI IN JACKSON, MISSISSIPPI, WITH THE SECOND YEAR AT M. D. ANDERSON HOSPITAL IN HOUSTON, TEXAS, THE NEXT TWO YEARS AT BAYLOR UNIVERSITY IN DALLAS, TEXAS, WHERE I BECAME CERTIFIED IN HOSPITAL PATHOLOGY, AND THIS WAS FOLLOWED BY A RESIDENCY IN FORENSIC PATHOLOGY AT THE SOUTHWESTERN INSTITUTE OF FORENSIC SCIENCES IN DALLAS, TEXAS. IN 1973 I WAS BOARD CERTIFIED IN FORENSIC PATHOLO-GY.

BY THE COURT:

AND HOW MANY PATHOLOGIES ... I MEAN, HOW MANY AUTOPSIES HAVE YOU PERFORMED?

BY THE WITNESS:

SOMEWHERE IN THE NATURE OF BOTH PERFORMING AND SUPERVISING AUTOPSIES SOMEWHERE IN THE NEIGHBORHOOD OF 6,000.

BY THE COURT:

HAVE YOU EVER BEEN REFUSED EXPERT STATUS IN A

51

COURT OF LAW?

BY THE WITNESS:

No, SIR.

BY THE COURT:

ALL RIGHT.

BY MR. MERRITT:

I'LL STIPULATE, YOUR HONOR.

BY THE COURT:

THE COURT WILL FIND THAT THIS WITNESS IS AN EXPERT IN THE FIELD OF FORENSIC PATHOLOGY, AND THAT IS AS TO CAUSES OF DEATH, IN-VOLVING CRIMINAL ACTIVITIES.

EXAMINATION RESUMED BY MS. O'BANNON:

Q    DR. SPRUILL, DID YOU HAVE THE OCCASION TO PERFORM AN AUTOPSY ON ONE HAROLD BOSS WILSON ON MAY 7, 1990, AROUND 7:50 A.M.?

A    YES, I DID.

Q    WOULD YOU JUST GENERALLY EXPLAIN TO THE JURY WHAT AN AUTOPSY ENTAILS. WHAT IS AN AUTOPSY?

A    AN AUTOPSY INCLUDES A THOROUGH EXTERNAL EXAMINATION OF A BODY, FRONT AND BACK, AND AN INTERNAL EXAMINATION OF THE MAJOR CAVITIES OF THE BODY INCLUDING THE HEAD, CHEST AND ABDOMEN, AND THE TISSUES WITHIN THOSE CAVITIES.

Q    IN YOUR AUTOPSY OF HAROLD "BOSS" WILSON WHAT WERE YOUR FINDINGS?

A    THE PERTINENT FINDINGS WERE THREE GUNSHOT WOUNDS. THERE WAS A GUNSHOT WOUND OF THE RIGHT

52

ARM THAT ENTERED THE MEDIAL ASPECT OF
THE UPPER ARM AT ABOUT WHERE I'M POINT-
ING WITH A STIPPLING WITH AN EXIT WOUND
RIGHT NEXT TO IT, AND STIPPLING MEANS
THAT UNBURNED POWDER GRAINS HIT THE
SKIN AT THAT AREA. UNBURNED POWDER
GRAINS WILL TRAVEL FROM THE MUZZLE
OF THE GUN ABOUT $1\frac{1}{2}$ TO 2 FEET ON
AVERAGE. THE SECOND AND THIRD WOUNDS
WERE TO THE BODY. THE FIRST WOUND
THAT I'LL DESCRIBE TO THE BODY WAS JUST
BELOW THE UMBILICUS, (THAT'S THE BELLY
BUTTON). IT WENT INTO THE ABDOMEN,
LACERATING, THAT IS, OPENING LOOPS
OF GUT AND PASSING FROM THE FRONT TOWARDS
THE BACK AND UPWARD AND TOWARDS THE
LEFT WITH A LARGE CALIBER MISSILE RE-
COVERED IN THE LEFT SIDE CLOSE TO THE
BACK, JUST ABOUT THE AREA OF THE
UPPER PORTION OF THE HIP BONE. THE
LAST ONE THAT I'LL DESCRIBE IS A GUN-
SHOT WOUND OF THE RIGHT CHEST WHICH
ENTERED ABOUT THE AREA WHERE THE
CHEST AND THE ABDOMEN MEET, PASSING
THROUGH THE LIVER GOING AGAIN UPWARD
TOWARDS THE LEFT, TOWARDS THE BACK,
PASSING THROUGH THE TOP OF THE HEART,
INCLUDING LACERATING OR OPENING THE
MAIN CORONARY ARTERY OF THE HEART
ACROSS THE LEFT LUNG, AND AT THE LOWER
PART OF THE BACK OF THE SCAPULAR WING

53

BONE AREA, A LARGE MISSILE WAS RECOVERED

Q    I'M GOING TO SHOW DEFENSE COUNSEL WHAT I'VE MARKED STATE'S EXHIBIT 9. DOCTOR, LET ME SHOW YOU WHAT I'VE MARKED STATE'S EXHIBIT 9 FOR IDENTIFICATION, AND ASK YOU IF YOU RECOGNIZE THIS.

A    THIS IS A DIAGRAM OF THE GUNSHOT WOUNDS I DESCRIBED WITH THE BODY IN THE ANATOMIC POSITION, WHICH IS WITH THE ARMS DOWN BESIDE THE BODY.

Q    AND THE DRAWINGS ON THIS DIAGRAM ARE REFLECTIVE OF THE WOUNDS THAT WERE SUSTAINED IN THE DECEASED?

A    THAT'S CORRECT.

Q    CAN YOU TELL BY THE TRAVEL OF THE BULLETS WHAT DIRECTION THE GUN WAS FIRED?

A    WE DESCRIBE THE TRACK OF A BULLET THROUGH THE BODY BY USING WHAT WE CALL THE "ANATOMIC POSITION", WHICH MEANS A PERSON THAT IS STANDING STRAIGHT WITH THE ARMS DOWN. SO, THIS IS THE WAY WE DESCRIBE IT. IN OTHER WORDS, IF IT GOES IN, THE ONE THAT WAS BELOW THE BELLY-BUTTON WENT IN TO THE LEFT TOWARDS THE BACK AND UPWARD. BUT THAT DOESN'T INDICATE THE POSITION OF THE BODY AT THE TIME THE BULLETS ENTERED. THIS IS JUST THE ROUTINE WAY OF DESCRIBING THE TRACK OF THE BULLET THROUGH THE BODY.

Q    DOCTOR, ARE THE WOUNDS SUSTAINED IN THE DECEASED'S BODY CONSISTENT WITH THE DECEASED

54

BEING SHOT AS HE WAS ON THE GROUND TRYING TO ROLL OVER AND MOVE AWAY FROM THE DIRECTION OF FIRE?

A    I WOULD HAVE TO KNOW WHERE THE SIGHT IN THE GUN MUZZLE WOULD BE.

Q    THE GUN MUZZLE BEING AT HIS FEET ... THE PERSON WITH THE GUN BEING BEHIND THE DECEASED, BEING HERE, AND THE DECEASED BEING ON THE GRUOND ROLLING.

A    BOTH OF THESE BULLETS GO FROM THE RIGHT TO THE LEFT, SLIGHTLY UPWARD AND FRONT TO BACK, SO IT WOULD BE CONSISTENT.

Q    THANK YOU. DID YOU TAKE ANY BLOOD SAMPLES, VITREOUS FLUID SAMPLES AND URINE SAMPLES FROM THE DECEASED?

A    WE ALWAYS TAKE BIOLOGIC SPECIMENS AT THE TIME OF AUTOPSY, YES.

Q    AND WHAT DO YOU DO WITH THOSE SPECIMENS?

A    THEY ARE SUBMITTED TO THE TOXICOLOGY LABORATORY FOR FURTHER ANALYSIS.

Q    AND FINALLY, DOCTOR, IN YOUR OPINION WHAT WAS THE FINAL CAUSE OF DEATH OF HAROLD BOSS WILSON?

A    THE GUNSHOT WOUND OF THE ABDOMEN AND CHEST WITH THE GUNSHOT WOUND OF THE CHEST MORE IMME-DIATELY FATAL, AS IT WENT THROUGH THE HEART.

BY MS. O'BANNON:

TENDER, YOUR HONOR.

BY MR. MERRITT:

I JUST HAVE A FEW QUESTIONS.

55

CROSS EXAMINATION

EXAMINATION BY MR. MERRITT:

Q      IT'S PRONOUNCED "SPOOL" OR "SPROOL"?

A      SPROOL IS FINE.

Q      IS IT SAFE TO SAY, THE BEST THAT YOU CAN SAY IN TERMS OF THE AREA OF ENTRY, THE TRACK OF THE BULLET THAT'S RELATIVE TO WHERE THE GUN CAME FROM AND WHERE THE ...( THE POSITIONS OF THE TWO PARTIES. IS THAT CORRECT?

A      I'M SORRY. I'M NOT UNDERSTANDING THE LAST PART OF THAT QUESTION.

Q      THAT THE ... FOR YOU TO BE ABLE TO SAY ANYTHING ABOUT THE MANNER IN WHICH THE BODY WAS LOCATED WHEN SHOT YOU WOULD HAVE TO KNOW FIRST LOCATION ... THE CONDITION OF THE BODY AT THE TIME OF THE SHOOTING OR ITS POSITION, THE POSITION OF THE PARTY DOING THE SHOOTING ...

A      THAT'S CORRECT. I WAS NOT PRESENT AND WOULD NOT BE ABLE TO SAY WITH CERTAINTY WHAT THE POSITINS WERE.

Q      AND YOU WERE ... YOUR TESTIMONY, AS YOU SAID, THE BODY BEING STANDING UP.

A      WE DESCRIBED THE INJURIES IN THE ANATOMIC POSITION. THIS IS DONE IN ALL CASES AND DOES NOT IMPLY THE POSITION OF THE BODY AT THE TIME OF INJURY.

Q      AND THE WOUND IN THE ARM TRAVELLED HOW?

A      THROUGH THE SIDE OF THE ARM, ALMOST STRAIGHT THROUGH, BUT SLIGHTLY UPWARD.

Q      THE ENTRY IS THE RIGHT ARM AND THE ENTRY WAS FROM THE LEFT SIDE OR THE OUTSIDE ... FROM

56

THE INSIDE TOWARDS THE OUTSIDE.

A     FROM THE INSIDE TOWARDS THE OUTSIDE.

Q     ALL RIGHT. LIKE A MAN STANDING LIKE THIS, TOO. RIGHT?

A     SOMETHING OF THAT POSITION.

Q     BUT IN ALL INSTANCES THE GUNSHOTS WERE FROM THE FRONT, EACH OF THE THREE SHOTS. IS THAT CORRECT?

A     THE ONE IN THE CHEST IS FROM THE SIDE.

Q     FROM THE SIDE. AND YOU REMOVED TWO BULLETS. IS THAT CORRECT?

A     THAT'S CORRECT.

Q     AND YOU INITIALED THEM?

A     THAT'S CORRECT.

Q     AND YOU GAVE THEM TO THE STATE, IS THAT RIGHT?

A     THAT'S CORRECT.

Q     YOU GAVE THEM TO THE HOMICIDE OFFICE?

A     THEY ARE SUBMITTED FROM THE CORONER'S OFFICE TO THE CRIME LAB.

Q     AND AS YOU REMEMBER THOSE BULLETS, THEY WERE DIFFERENT, WEREN'T THEY?

BY MS. MC DONALD:

I'M SORRY, YOUR HONOR. I WOULD OBJECT.

BY THE WITNESS:

THEY WERE LARGE CALIBER MISSILES, AND I'M NOT AN EXPERT IN BULLETS.

BY MR. MERITT:

WHAT IS YOUR NEXT EXHIBIT?

BY MR. RUSKIN:

NUMBER 5.

EXAMINATION RESUMED BY MR. MERRITT:

Q    I'LL SHOW YOU WHAT WE'VE MARKED AS DEFENSE EXHIBIT #5 AND DEFENSE EXHIBIT #6, WHICH WAS REMOVED FROM A GUN THAT THE STATE HAD MARKED S-1 AND ASK YOU IF YOU WOULD OPEN THESE AND SEE IF THEY BEAR YOUR INITIALS. OR DO YOU WANT ME TO OPEN THEM FOR YOU?

A    THAT'S FINE.

Q    IS THAT YOUR SIGNATURE ON THE OUTSIDE?

A    YES, IT IS MY HANDWRITING AND MY SIGNATURE.

Q    OKAY.

A    YOU MAY HAVE TO OPEN THEM FOR ME. THEY'VE BEEN RESEALED. LET'S SEE.

Q    DOES IT BEAR YOUR INITIAL ON THOSE, ON THAT BULLET?

A    EXCUSE ME. LET ME GET MY MAGNIFYING GLASS.

REPORTER"S NOTE:

THE WITNESS EXAMINED THE EXHIBIT.

EXAMINATION RESUMED BY MR. MERRITT:

A    DO WE HAVE ANY BETTER LIGHT? I'M HAVING A LITTLE TROUBLE SEEING OVER HERE. I CAN SEE THE "F", BUT I'M NOT SURE I CAN SEE THE "S".

BY THE COURT:

DO WE HAVE A MAGNIFYING GLASS?

BY THE WITNESS:

I'VE GOT A MAGNIFYING GLASS.

BY THE COURT:

OH, YOU HAVE ONE.

58

BY THE WITNESS:

IS THERE A FLASHLIGHT?

BY THE COURT:

NO, MA'AM.  YOU CAN TAKE IT OVER BY THAT WINDOW IF YOU WOULD PREFER.

BY THE WITNESS:

I WOULD PREFER ... I CAN SEE MY "F" GOOD, BUT I CAN'T SEE THE "S"

REPORTER'S NOTE:

THE WITNESS EXAMINED THE EXHIBIT BY THE WINDOW IN THE COURTROOM.

BY THE COURT:

YES, MA'AM, YOU CAN SIT BACK DOWN.

BY THE WITENSS:

I CAN SEE IT NOW.  I CAN SEE IT, TOO.  DID YOU WANT ME TO LOOK AT THE OTHER ONE?

BY THE MERRITT:

YES, MA'AM.

BY THE WITNESS:

THIS IS MUCH PLAINER, AND I CAN SEE IT QUITE WELL.

EXAMINATION RESUMED BY MR. MERRITT:

Q    THOSE ARE YOUR INITIALS; THESE ARE THE BULLETS THAT YOU REMOVED?

A    BOTH BULLETS BEAR MY INITIALS AND THOSE ARE THE BULLETS THAT I REMOVED.

Q    AND D-5 IS FROM THE LEFT SHOULDER.  THIS IS THE ONE THAT WOULD BE THE SIDE WOUND?

A    THAT'S FROM HERE, AND THE OTHER FROM THE BACK.

59

Q    ALL RIGHT.

A    THAT'S CORRECT.

Q    IN TERMS OF THE POWDER BURNS THERE WAS STIPPLING, AND IT WAS ONLY ON THE ARM WOUND.

A    THAT IS CORRECT.

Q    THE OTHER TWO WOUNDS WERE NOT.

A    THE CHARACTERISTICS OF THOSE WOUNDS WERE ONLY ABRASIONS WHICH/ARE CONSIDERED LONG RANGE, MEANING THE MUZZLE WAS MORE THAN TWO FEET AWAY.

Q    DOCTOR, HAVE YOU LOOKED AT YOUR AUTOPSY PROTOCOL RECENTLY?

A    YES, I HAVE.

Q    AND HAROLD "BOSS" WILSON WAS A FAIRLY BIG MAN, WASN'T HE?

A    IF I MAY REFER TO MY NOTES. THE BODY LENGTH WAS 5'10" AND WEIGHED 200 POUNDS.

Q    AND WHEN YOU SAW THE BODY HAD NUMEROUS SCARS, ARE YOU ABLE TO TELL US WHAT THOSE SCARS ARE FROM?

A    NO, SIR.

Q    CAN YOU TELL US IF THEY WERE CONSISTENT WITH PRIOR BULLET WOUNDS?

BY MS. MC DONALD:

OBJECTION, YOUR HONOR.

BY THE COURT:

CAN YOU TELL THAT, DOCTOR. WE COULD GO ON LIKE THIS ..

BY THE WITNESS:

THE SCARS ARE SUCH THAT WHEN A SCAR IS FORMED IT IS EXTREMELY DIFFICULT, IF NOT IM-POSSIBLE, TO TELL WHAT MADE THE SCAR.

60

BY THE COURT:

DIFFICULT IF NOT IMPOSSIBLE. OBJECTION SUSTAINED.

EXAMINATION RESUMED BY MR. MERRITT:

Q    HOW MANY DID YOU OBSERVE?

A    I'D HAVE TO REFER TO MY NOTES WITH REGARD TO SCARS. THERE WAS A 3" VERTICLE UP AND DOWN SCAR OF THE ABDOMEN AND A 1" SCAR OF THE UPPER ABDOMEN. THERE WAS A 2" SCAR OF THE RIGHT LATERAL UPPER LEG, A 2½ BY 1" SCAR OF THE RIGHT KNEE, 1" SCAR OF THE LOWER LEFT UPPER LEG, A 2" OLD SCAR OF THE LEFT LOWER LEG ADJACENT TO THE KNEE, SEVERAL OLD SCARS OF THE RIGHT LOWER LEG WITH THE LARGEST MEASURING 2½ BY 1". THERE WAS HYPERPIGMENTED SCARRING OF THE ANTERIOR PART OF THE LEFT FOOT. THAT MEANS JUST DARK-COLORED SCARRING. THERE WAS A VACCINATION OF THE LEFT UPPER ARM WITH A ½" OLD SCAR ADJACENT TO THAT. THERE WERE SCARS OF THE LEFT LOWER ARM, RIGHT ELBOW AND RIGHT WRIST AND A FINE HYPERPIGMENTED RASH OF THE UPPER ARMS AND OF THE TRUNK. THERE WAS A 6½" OLD LEFT FLANK SCAR. THAT'S IN THE MID PORTION BETWEEN THE CHEST AND THE ABDOMEN.

Q    SIX AND A HALF INCHES?

A    THAT'S CORRECT.

Q    DOCTOR, YOU NOTED THERE WERE SOME NEEDLE PUNCTURE SITES; IS THAT CONSISTENT WITH THE

61

BLOOD TRANSFUSIONS AT THE HOSPITAL.

A     NEITHER PUNCTURE SITES ARE CONSISTENT WITH MEDICAL ATTENTION. HE HAD MULTIPLE EVIDENCE OF MEDICAL ATTENTION INCLUDING HIS CHEST HAD BEEN OPENED. HIS PERICARDIAL SAC HAD BEEN OPENED AND HIS HEART MASSAGED. HE HAD WHAT WE CALL "CUT-DOWNS". THAT MEANS LITTLE INCISIONS IN BOTH FEMORAL AREAS LOOKING FOR VESSELS, AND HE HAD TWO NEEDLE PUNCTURE SITES, I BELIEVE, OF THE RIGHT ARM IN THE AREAS WHERE WE START I.V. FLUIDS. BUT I COULDN'T TELL YOU WHAT FLUIDS WERE STARTED.

Q     OKAY.

BY MR .MERRITT:

THANK YOU, DOCTOR.


RE-DIRECT EXAMINATION

EXAMINATION BY MS. O'BANNON:

Q     IS IT UNUSUAL TO SEE SCARRING ON THE HUMAN BODY?

A     NO, IT ISN'T. WE ALWAYS GET/SOME SCARS DURING LIFE.

BY MS. O'BANNON:

NOTHING FURTHER.

BY THE COURT:

ALL RIGHT. STEP DOWN, DOCTOR. IS THIS DOCTOR FREE TO GO?

BY MS. O'BANNON:

YES.

62

BY MR. MERRITT:

YES.

BY THE COURT:

ALL RIGHT, DOCTOR, YOU'RE FREE TO GO.

BY THE WITNESS:

THANK YOU.

BY THE COURT:

THANK YOU SO MUCH.

BY MS. MC DONALD:

YOUR HONOR, THE STATE WILL CALL CHRISTINE BOATNER.

BY THE COURT:

CHRISTINE BOATNER.

<u>CHRISTINE BOATNER</u>

CALLED BY THE STATE AND AFTER FIRST HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

<u>DIRECT EXAMINATION</u>

EXAMINAITON BY MS. MC DONALD:

Q     PLEASE STATE YOUR NAME FOR THE RECORD, YOUR FULL NAME.

A     CHRISTINE BOATNER.

Q     CHRISTINE, HOW OLD ARE YOU?

A     TWENTY-TWO.

Q     CHRISTINE, WHERE DO YOU LIVE?

A     12151 I-10 SERVICE ROAD.

Q     AND DO YOU REMEMBER BACK LAST YEAR MAY 6TH, 1990?

A     UM-HMM.

Q     DO YOU REMEMBER AROUND APPROXIMATELY 1:30 IN THE MORNING, DO YOU REMEMBER WHERE YOU

63

WERE?

BY MS. MC DONALD:

YOU'RE GOING TO HAVE TO SPEAK UP. PULL THE MICROPHONE A LITTLE CLOSER TO YOU. YOU'RE GOING TO HAVE TO SPEAK UP SO EVERY MEMBER OF THE JURY CAN HEAR YOU. OKAY?

EXAMINATION RESUMED BY MS. MC DONALD:

Q    NOW, CHRISTINE, WHERE WERE YOU APPROXIMATELY 1:30 ON MAY 6, 1990?

A    SITTING IN A CAR ACROSS THE STREET FROM THE END ZONE LOUNGE.

Q    NOW, CHRISTINE, I'M GOING TO DRAW YOUR ATTENTION TO ... IT'S NOT BEEN MARKED AS AN EXHIBIT THIS PICTURE. I'M GOING TO MARK, YOUR HONOR, THE STATE'S GOING TO MARK THIS AS STATE'S EXHIBIT 10.

BY MR. RUSKIN:

NOTE MY OBJECTION TO THE INTRODUCTION OF THIS, YOUR HONOR.

BY THE COURT:

LET IT BE NOTED.

EXAMINATION RESUMED BY MS. MC DONALD:

Q    CHRISTINE, CAN YOU SEE THIS?

A    UM-HMM.

Q    CHRISTINE, WHERE WERE YOU AT 1:30 IN THE MORNING?

A    SITTING ACROSS THE STREET FROM THE END ZONE LOUNGE.

Q    AND WHERE WERE YOU SITTING?

A    INSIDE THE CAR.

64

Q    AND WHICH CAR IS THAT?  THIS CAR OR THIS CAR.

A    THE FIRST CAR.

Q    THE FIRST CAR?

A    UM-HMM.


BY THE COURT:

LET THE RECORD REFLECT ACCORDING TO A DRAWING OF A FIGURE TOWARD THE MIDDLE OF THE STREET, NOT ON THE CORNER, NOT ON THE CURB.


EXAMINATION RESUMED BY MS. MC DONALD:

Q    AND WHERE WERE YOU SITTING IN THIS CAR THE NIGHT OF THE INCIDENT?

A    IN THE DRIVER'S SIDE.

Q    IN THE DRIVER'S SIDE.  I'M GOING TO PUT A "T", YOUR HONOR, ....


BY MR. RUSKIN:

I'M GOING TO OBJECT.  THAT'S ... HAVE THE WITNESS DO THAT.

BY THE COURT:

NO.  I'LL DECIDE WHO DOES WHAT, MR. RUSKIN.

BY MR. RUSKING:

NOTE MY OBJECTION.

BY THE COURT:

LET IT BE NOTED.


EXAMINATION RESUMED BY MS. MC DONALD:

Q    ALL RIGHT, WHO ELSE WAS IN THAT CAR?  WHERE WAS TRACY?

65

A       ON THE PASSENGER SIDE BEHIND ME.

Q       IN THE BACK HERE?

A       UM-HMM.

BY MS. MC DONALD:

        LET THE RCORD REFLECT I PUT A "T" WHERE TRACY WAS

                SITTING.

EXAMINATION RESUMED BY MS. MC DONALD:

Q       NOW, CHRISTINE, WHAT DID YOU SEE THAT NIGHT?  WHO DID
        YOU SEE THAT NIGHT?  DID YOU SEE LEONARD
        NELSON AND MATTHEW MOORE?

A       DID I SEE THEM THAT NIGHT?

Q       YES.

A       I ONLY SAW THEM WHEN I LOOKED OUT THE REAR VIEW
        MIRROR.

Q       LET ME BACK UP JUST A SECOND.  DO YOU KNOW HAROLD,
        CURTIS AND DERRICK?

A       UM-HMM.

Q       AND WHERE WERE THEY?

A       SITTING ON THE BACK OF A CAR ON THE CORNER.

Q       NOW, THIS IS ALREADY REPRESENTED THAT HAROLD, DERRICK
        AND CURTIS WERE SITTING HERE.  IS THIS
        WHERE THEY WERE SITTING?

BY MR. MERRITT:

        I KNOW THAT'S WRONG.  I OBJECT TO IT.

BY THE COURT:

        SUSTAINED.

EXAMINATION RESUMED BY MS. MC DONALD:

Q       OKAY, WHERE WERE THEY?

BY THE COURT:

DON'T LEAD, MS. MCDONALD. ALL RIGHT? THAT'S CLEARLY LEADING, AND I'M GOING TO INTERRUPT EVERYTIME. IT'S BEEN SOMETIME NOW, AND I'VE GIVEN YOU A LOT OF LEEWAY. DO NOT LEAD. YOU'RE ASKING QUESTIONS. YOU'RE NOT HAVING A CONVERSATION.

EXAMINATION RESUMED BY MS. MC DONALD:

Q    CHRISTINE, WHERE/WERE HAROLD AND CURTIS AND DERRICK?

A    SITTING ON THE BACK OF THE CAR.

Q    OKAY. WHEN DID YOU SEE LEONARD NELSON AND MATTHEW MOORE? WHEN WAS THE FIRST TIME YOU SAW THEM?

A    THE FIRST TIME WAS WHEN ERNEST SAID, "LOOK AT SKINNY MAN AND MAT MO." AND I LOOKED OUT THE REARVIEW MIRROR, AND THERE THEY WAS.

Q    I CAN HARDLY HEAR YOU. YOU LOOKED OUT THE REARVIEW MIRROR?

A    YES.

Q    OKAY. WHO DID YOU SEE WHEN YOU LOOKED OUT THE REARVIEW MIRROR?

A    SKINNY MAN AND MAT MO.

Q    AND WHERE WERE THEY ON THIS MAP?

A    THEY WAS RUNNING TOWARDS WHERE HAROLD, CURTIS AND DERRICK WAS.

Q    THEY WERE RUNNING ... I'M SORRY. THEY WERE RUNNING?

A    RUNNING TOWARDS WHERE THEY WERE SITTING ON THE BACK OF

67

THE CAR.  THEY WAS RUNNING TOWARDS THEM.

Q   DID THEY HAVE ANYTHING WITH THEM?

A   YES, THEY HAD GUNS WITH THEM.

Q   THEY HAD GUNS WITH THEM?

A   UM-HMM.

Q   DID YOU SEE A GUN IN LEONARD NELSON'S HAND?

A   YES.

Q   OKAY.  TELL ME WHAT ELSE YOU SAW.

A   I SAW DERRICK RAN THIS WAY, AND HAROLD AND CURTIS RAN TOWARDS THE CAR THAT WAS SITTING NEXT TO US.

Q   HAROLD AND CURTIS RAN TOWARD THE CAR THAT YOU WERE SITTING IN?

A   YES, YOU KNOW, THEY COME LIKE THIS.

Q   AND TELL ME WHAT YOU SAW WHEN HAROLD AND CURTIS RAN TOWARDS YOU.

A   CURTIS RAN UNDERNEATH THE CAR, AND AS HAROLD .WAS LOOKING BACK TO SEE WHAT HAPPENED HE TRIPPED AND FELL.  AND SKINNY MAN STOOD OVER HIM AND SHOT HIM.

Q   AND HOW MANY TIMES DID YOU SEE SKINNY MAN STAND OVER HAROLD AND SHOOT HIM?

A   THREE.

Q   OKAY.  NOW, DID HAROLD HAVE A GUN THAT NIGHT?

A   NO.

Q   DID YOU EVER SEE HAROLD WITH A GUN THAT NIGHT?

A   NO.

Q   DID YOU SEE DERRICK HAVE A GUN THT NIGHT?

A   NO.

Q   DID YOU SEE CURTIS HAVE A GUN THAT NIGHT?

A    NO.

Q    WHO DID YOU SEE WITH A GUN THAT NIGHT?

A    SKINNY MAN AND MAT MO.

Q    ALL RIGHT, NOW, AFTER SKINNY MAN STOOD OVER HAROLD, AND AFTER HE SHOT HIM WHAT HAPPENED NEXT?

A    AS THEY WAS LEAVING THEY RAN UP THE STREET AND MAT MO DROPPED THE GUN AND HE JUST KEPT GOING.

Q    WHICH WAY DID THEY RUN?

A    TOWARDS PARIS AVENUE, UP TREASURE TOWARDS PARIS AVENUE.

Q    UP TREASURE TOWARDS PARIS?

A    AH-HA.

Q    OKAY. AND WHO DROPPED THE GUN?

A    MAT MO.

Q    OKAY. AND WHERE DID MATTHEW MOORE DROP THE GUN ON S-10?

A    RIGHT UP IN THERE.

Q    I DON'T WANT TO PUT THE MARK ON THE BOARD. CAN YOU PLEASE STEP DOWN AND SHOW US WHERE THE GUN WAS DROPPED?

BY THE COURT:

ONLY IF IT'S UNCLEAR. YOU KNOW THIS IS WASTING A LOT OF TIME. GO AHEAD DOWN THERE.


REPORTER'S NOTE:

THE WITNESS COMPLIED WITH THE REQUEST OF MS. MCDONALD AND THE COURT.

BY MS. MC DONALD:

RIGHT THERE. OKAY.

BY THE COURT:

ALL RIGHT, NOW GET BACK UPON THE STAND, PLEASE.

EXAMINATION RESUMED BY MS. MC DONALD:

Q    WHO RAN ... WHEN LEONARD NELSON RAN WHO RAN WITH HIM?

A    MAT MO.

Q    OKAY. AND MATTHEW MOORE, YOU SAID, IS THE ONE WHO DROPPED THE GUN?

A    UM-HMM.

Q    DO YOU KNOW LEONARD NELSON? DO YOU KNOW SKINNY MAN? SEEN HIM AROUND?

A    UM-HMM.

Q    DID YOU, THAT NIGHT, DID YOU MAKE A STATEMENT; DID YOU STAY AROUND AND MAKE A STATEMENT TO THE POLICE?

A    I GAVE 'EM MY NAME, AND THEY ASKED ME DID I SAW WHAT HAPPENED, AND I TOLD THEM YES.

Q    AND DID YOU GIVE THEM THE NAME OF THE INDIVIDUAL YOU SAW?

A    YES.

Q    DO YOU SEE THAT SAME INDIVIDUAL WHO STOOD OVER HAROLD AND SHOT HIM? DO YOU SEE HIM HERE IN COURT TODAY?

A    YES, I DO.

Q    WOULD YOU PLEASE POINT HIM OUT FOR THE JURY AND DESCRIBE WHAT HE'S WEARING.

A    HE'S WEARING A BLACK AND A GREEN SHIRT. HE'S OVER THERE.

BY MS. MC DONALD:

70

YOUR HONOR, LET THE RECORD REFLECT THAT THE WITNESS HAS IDENTIFIED THE DEFENDANT BEFORE THE BAR.

EXAMINATION RESUMED BY MS. MCDONALD:

Q     CHRISTINE, WHO ELSE WAS IN THE CAR BESIDES TRACY?

A     MY FRIEND SHAWN AND HIS FRIEND, IRMA.

Q     DID THEY EVER STAY AROUND AND MAKE ANY STATEMENTS?

A     DO YOU KNOW OF YOUR OWN PERSONAL KNOWLEDGE ARE THEY WILLING TO GET INVOLVED IN THIS?

BY MR. MERRITT:

THAT'S OBJECTIONABLE, YOUR HONOR.

BY MS. MC DONALD:

YOUR HONOR, OF HER OWN PERSONAL KNOWLEDGE.

BY MR. MERRITT:

IT'S STILL NOT RELEVANT.

BY THE COURT:

SUSTAINED.   YOU MAY WANT TO LAY SOME PREDICATE, BUT THAT QUESTION IS SUSTAINED.

EXAMINATION RESUMED BY MS. MC DONALD:

Q     CHRISTINE, WHO WERE THE ONLY INDIVIDUALS YOU SAW ON THAT SCENE THAT HAD GUNS?

A     WHO ARE THE ONLY ONES?

Q     YES.

A     SKINNY MAN AND MAT MO.

BY MS. MC DONALD:

I HAVE NOTHING FURTHER.

71

<u>CROSS EXAMINATION</u>

EXAMINATION BY MR. MERRITT:

Q    CHRISTINE, YOU ARE NOT SAYING THAT DERRICK DIDN'T HAVE A GUN, ARE YOU?

A    I'M SAYING I DIDN'T SEE HIM WITH ONE.

Q    YOU DIDIN'T SEE A GUN. AND YOU'RE NOT SAYING THAT CURTIS DIDN'T HAVE A GUN?

A    I DIDN'T SEE ONE.

Q    YOU'RE NOT SAYING THAT HAROLD DIDN'T HAVE A GUN?

A    I DIDN'T SEE ONE.

Q    AND THIS WAS FIRST BROUGHT TO YOUR ATTENTION WHEN, FIRST OF ALL, YOU'RE LOOKING THROUGH THE REARVEIW MIRROR.

A    UM-HMM.

Q    AND ERNEST SAYS, "LOOK AT SKINNY MAN AND MAT MO."

A    UM-HMM.

Q    AND YOUR REARVIEW MIRROR, YOU'RE LOOKING THROUGH THE REVERSE, IT WAS STRAIGHT OR CROOKED?

A    IT WAS WHERE I COULD SEE IN THE BACK OF ME.

Q    YOU COULD SEE RIGHT IN THE BACK OF YOU.

A    UM-HMM.

Q    AND A LITTLE BIT ON THE SIDE OF YOU YOU COULD SEE THIS OTHER CAR OR WAS THIS CAR FURTHER UP? YOU'RE RIGHT HERE; YOUR REARVIEW MIRROR WOULD BE RIGHT HERE. CORRECT?

A    UM-HMM.

Q    AND YOU CAN SEE THESE PEOPLE HERE, OR HAD THEY COME OUT IN THE STREET?

A    I SAW THEM WHEN I FIRST DROVE UP.

Q    OKAY. YOU DON'T KNOW WHAT THEY WERE DOING WHEN ERNEST SAYS, "LOOK AT SKINNY MAN AND

72

MAT MO."

A    THEY WAS ON THE BACK OF THE CAR TALKING WHEN I SAW
THEM.

Q    WELL, BUT NOT AT THE SAME TIME.  YOU DIDN'T SEE BOTH
OF THEM AT THE SAME TIME.

A    I DIDN'T SEE BOTH OF WHO?

Q    SKINNY MAN ...

A    NO, I DIDN'T SEE THEM ... I DIDN'T SEE THEM WHEN,
SKINNY MAN AND MAT MO. I DIDN'T SEE
THEM UNTIL THEY GOT IN MY REARVIEW
MIRROR.

Q    OKAY.  AND THE THREE SITTING ON THE CAR, YOU COULDN'T
SEE IN YOUR REARVIEW MIRROR.  YOU SAW
THEM WHEN YOU PASSED ON THE CORNER
AND PARKED THERE.

A    RIGHT.

Q    NOW HOW LONG HAD YOU PARKED THERE BEFORE ERNEST
SAYS, "LOOK AT MAT MO AND ..."

A    HE WAS PARKED THERE ABOUT MAYBE ABOUT 20 MINUTES.

Q    TWENTY MINUTES?  OKAY.  HOW LONG HAD TRACY BEEN IN
THE CAR WHEN ERNEST SAID, "LOOK AT
SKINNY MAN AND MAT MO?"

A    MAYBE ABOUT FIFTEEN MINUTES.

Q    FIFTEEN MINUTES.  AND THE FIRST TIME YOU SEE SKINNY
IN
MAN AND MAT MO IS WHEN/THE BACK OF
YOUR MIRROR.

A    UM-HMM.

Q    YOU DIDN'T SEE THEM COMING UP BRUXELLES STREET OR
TREASURE STREET?  YOU DIDN'T SEE THEM
BY THE LOUNGE OR IN THE LOUNGE; YOU
DIDN'T SEE THEM UP BRUXELLES STREET

73

THIS WAY?

A    NO.

Q    YOU ONLY SAW THEM AT THE BACK OF YOUR CAR.

A    UM-HMM.

Q    AND THESE PEOPLE OVER HERE, YOU'RE NOT PREPARED TO SAY THAT DERRICK DIDN'T PULL OUT A GUN OR MAKE A MOTION TO PULL OUT A GUN OUT OF YOUR SIGHT, ARE YOU?

A    NO.

Q    OKAY. BECAUSE HE WAS OUT OF YOUR SIGHT. HE WAS NOT IN THE REARVIEW MIRROR.

A    NO, HE WAS NOT IN THE REARVIEW MIRROR.

Q    OKAY. SO, LIKEWISE, IT'S SAFE TO SAY YOU DO NOT KNOW WHAT POSITION HAROLD BOSS WAS IN WHEN HE WAS BEING SHOT, DO YOU?

A    DO I KNOW WHAT POSITION HE WAS IN?

Q    RIGHT.

A    NO.

Q    YOU HAD A CAR BLOCKING YOU, DIDN'T YOU?

A    THAT'S RIGHT.

Q    SO, YOU'RE NOT PREPARED TO SAY HE WASN'T LIKE THIS SHOOTING AT A MAN, OR ABOUT TO SHOOT AT A MAN?

A    HE WASN'T LIKE THAT.

Q    WELL, DID YOU SEE HIM?

A    I COULD SEE FROM THE WAIST ON DOWN FROM THE NEXT CAR NEXT TO ME. I COULD SEE THAT MUCH.

Q    YOU COULD SEE LEONARD FROM THE WAIST UP?

A    HIS WAIST.

Q    YOU COULND'T SEE ...

A    HAROLD.

74

Q    HAROLD AT ALL, COULD YOU?

A    NO.

Q    IN ORDER FOR YOU TO SEE ... TELL ME HOW ... DERRICK HAD TO BE OUT HERE TO TURN AND RUN BACK DOWN ... YOU DIDN'T SEE DERRICK RUN; YOU JUST FIGURED HE RAN?

A    I SAW HIM RUN IN THE STREET.

Q    WELL, HE HAD TO BE IN YOUR REARVIEW MIRROR FOR YOU TO SEE THAT.

A    NO, I LOOKED THIS-A-WAY.

Q    WELL, THEN YOU TURNED AROUND?  AFTER THE SHOT DIDN'T YOU JUMP DOWN UNDER THE WHEEL FOR A WHILE?

A    NO, I WASN'T UNDER THE WHEEL, BUT I DUCKED DOWN.

Q    AND THE FIRST SHOT YOU HEARD CAME FROM BACK HERE, DIDN'T IT?

A    I DIDN'T KNOW ...

Q    THE BACK SIDE OF THE CAR?

A    NO.

Q    HOW MANY SHOTS DID YOU HEAR?

A    THREE.

Q    ONLY THREE?

A    THAT'S ALL I HEARD.

Q    YOU'RE SURE?

A    I'M SURE.

Q    ALL YOU HEARD WAS THREE SHOTS?

A    THAT'S ALL I HEARD.

Q    THEN, IT'S SAFE TO SAY YOU DIDN'T HEAR ANY SHOTS BEFORE YOU SAW SKINNY MAN AND HAROLD BY THE CAR HERE?

A    NO, I DIDN'T HEAR ANY SHOTS.

75

Q        SO, THE FIRST SHOT YOU HEARD WAS THE BULLET BEING FIRED RIGHT HERE.

A        THAT'S RIGHT.

Q        OKAY.


BY MR. MERRITT:

        THANK YOU, MS. BOATNER.

BY MS. MC DONALD:

        I HAVE A FEW MORE QUESTIONS FOR YOU.



                    RE-DIRECT EXAMINATION

EXAMINATION BY MS. MC DONALD:

Q        DID YOU SEE HAROLD FALL?

A        YES,

Q        DID HE HAVE ANYTHING IN HIS HANDS WHEN HE FELL?

A        NO.

Q        DID HE HAVE A GUN IN HIS HAND?

A        NO.


BY MR. MERRITT:

        SHE'S LEADING.

BY MR. MC DONALD:

        NOTHING FURTHER.

BY THE COURT:

        NO, IT'S NOT, COUNSELOR.  ANYTHING ELSE?

BY MR. MERRITT:

        NO.

BY THE OCURT:

        ALL RIGHT, STAND DOWN, MS. BOATNER, PLEASE.  MS. BOATNER, DO NOT LEAVE.  JUST STEP

76

OUTSIDE UNTIL YOUR NAME IS CALLED. AND DO NOT DISCUSS YOUR TESTIMONY WITH ANYONE OUTSIDE OF THIS COURTROOM.

BY MS. MC DONALD:

YOUR HONOR, AT THIS TIME THE STATE WOULD OFFER, FILE AND INTRODUCE INTO EVIDENCE STATE'S EXHIBIT #1, WOULD BE A PICTURE; STATE'S EXHIBIT #2, THE GUN; STATE'S EXHIBIT #3, PICTURE OF THE ALLEY; STATE'S EXHBIIT #4, WHICH IS THE EVIDENCE CARD PERTAINING TO THE GOLD NECKLACE AND THE EARRING THAT THE VICTIM HAD ON; STATE'S EXHIBIT #5, A PICTURE OF THE GUN IN THE STREET; STATE'S EXHIBIT 6, 7, AND 8, WHICH ARE ALSO PICTURES OF THE SCENE. STATE'S EXHIBIT #9, WHICH IS A DIAGRAM OF THE BODY INTRODUCED BY DR. SPRUILL; AND STATE'S EXHIBIT #10, WHICH WOULD BE THE CHALKBOARD DRAWING.

BY THE COURT:

ALL RIGHT. ANY OBJECTIONS?

BY MR. MERRITT:

TO THIS, YES. EVERYTHING ELSE, NO.

BY THE COURT:

ALL RIGHT. LET IT ALL BE INTRODUCED INTO EVIDENCE.

BY MR. MC DONALD:

YOUR HONOR, I'M SORRY. I'M ALSO GOING TO MARK THE OTHER SIDE OF THIS BLACKBOARD AS STATE'S EXHIBIT #11, WHICH IS ALSO THE ... THE STATE WOULD ALSO OFFER, FILE AND

*77*

INTRODUCE INTO EVIDENCE.

BY THE COURT:

ALL RIGHT. LET IT BE MARKED. THE JURY'S ALREADY SEEN IT. WE'LL LET IT INTO EVIDENCE. ALL RIGHT, TAKE THE ... SHERIFF, PUT ALL OF THE EVIDENCE THAT'S JUST BEEN INTRODUCED ON THE TABLE, ON THE MINUTE CLERK'S TABLE IN FRONT OF THE SHERIFF. AND THEN, SHERIFF, WOULD YOU TAKE THE THINGS THAT CAN BE PASSED AROUND AND GIVE THEM TO THE JURORS SO THAT THEY CAN TAKE A LOOK AT THEM, PLEASE.

BY MS. MC DONALD:

YOUR HONOR, MAY WE APPROACH?

BY THE COURT:

YES.

REPORTER'S NOTE:

ALL COUNSELS APPROACHED THE BENCH FOR A BRIEF CONFERENCE.

BY THE COURT:

ALL RIGHT, SHERIFF, TAKE IT AND START PASSING IT TO THE JURY, PLEASE. ALL RIGHT. WHAT ELSE DO YOU HAVE, MS. O'BANNON?

BY MS. McDONALD:

YOUR HONOR, THE BULLETS THAT WERE REMOVED FROM THE BODY, AS WELL AS THE BULLETS THAT WERE A TEST BEFORE MR. RUSKIN REMOVED THEM.

BY MR. RUSKIN:

LET'S APPROACH BEFORE WE DO THIS.

BY THE COURT:

COME ON. PUT THE GUN ON THE BAR. I DON'T LIKE TO PASS GUNS AROUND, LADIES AND GENTLEMEN. IF YOU WANT TO GET A CLOSER LOOK AT IT YOU CAN COME DOWN AND GET A CLOSER LOOK AT IT.

REPORTER'S NOTE:

ALL COUNSELS APPROACHED THE BENCH FOR A BRIEF CONFERENCE.

BY THE COURT:

ALL RIGHT, WHAT ELSE DO YOU HAVE?

BY MS. MC DONALD:

YOUR HONOR, ...

BY THE COURT:

GIVE THEM TO THE SHERIFF AND LET HIM GIVE IT TO THE ... FOR THE JURY TO VIEW.

BY MS. MC DONALD:

YOUR HONOR, THIS WAS ALL STATE'S ... IN GLOBO WITH THE GUN.

BY THE COURT:

ALL RIGHT. THAT CAN BE PASSED.

REPORTER'S NOTE:

THE JURORS VIEWED THE EVIDENCE.

BY MS. MC DONALD:

AT THIS TIME THE STATE WOULD REST IT'S CASE SUBJECT TO ITS RIGHT OF REBUTTAL.

BY THE COURT:

    PROCEED. THE STATE HAS RESTED. CALL YOUR FIRST WITNESS, MR. MERRITT. AND GET THE LIST OF THOSE PRISONERS YOU WANT BROUGHT UP TO THE SHERIFF SO WE CAN GET IT RIGHT NOW.

BY MR. MERRITT:

    WE'VE DONE THAT. THANK YOU, YOUR HONOR.

BY THE COURT:

    YOU'VE DONE IT ALREADY?

BY MR. MERRITT:

    YES.

BY THE COURT:

    WHO DO YOU WANT? WALTER WHO?

BY MR. MERRITT:

    WALTER HEBERT.

BY THE COURT:

    WALTER HEBERT. SHERIFF, CALL IN THE HALLS FOR WALTER HEBERT. HE'S IN THE BACK?

BY MR. MERRITT:

    (INAUDIBLE)

BY THE COURT:

    LET ME SEE THE PIECE OF EVIDENCE.

BY MR. MC DONALD:

    STATE'S EXHIBIT 4.

BY THE COURT:

    ALL RIGHT. WHILE WE'RE WAITING FOR THE WITNESS, LET THE JURY VIEW THAT.

<u>WALTER HEBERT</u>

CALLED BY THE DEFENSE, AND AFTER FIRST HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

<u>DIRECT EXAMINATION</u>

EXAMINATION BY MR. MERRITT:

Q     PLEASE GIVE YOUR NAME TO THE COURT REPORTER.

A     WALTER HEBERT.

Q     IS IT ALL RIGHT IF I CALL YOU "WALTER"?

A     YES, SIR.

Q     TELL THE MEMBERS OF THE JURY OF CONVICTION OR CONVIC-
TIONS THAT YOU MIGHT HAVE.

A     I GOT CONVICTED FOR ARMED ROBBERY, A THEFT AND A
CRUELTY TO A JUVENILE.

BY MS. MC DONALD:
I'M SORRY.  I DIDN'T GET THAT SECOND THING YOU
SAID.

BY THE WITNESS:
A THEFT AND A CRUELTY TO A JUVENILE.

BY MS. MC DONALD:
THEFT.


EXAMINATION RESUMED BY MR. MERRITT:

Q     AND IN MAY OF 1990 WHERE WERE YOU LIVING?  PARTICULARLY,
MAY 6TH, OR THE WEEK BEFORE IT.

A     I WAS LIVING MAINLY IN THE ST. BERNARD HOUSING
PROJECT.

Q     WHAT STREET?

A     BETWEEN GIBSON AND (INAUDIBLE.)

Q     WHILE ON THE STREET DID YOU KNOW DERRICK MARIGNY?

A     YES, I DID.

Q     DID YOU KNOW CURTIS MILLER?

81

A    YES, I DID.

Q    AND HAROLD "BOSS" WILSON.

A    YES, I DID.

Q    DO YOU KNOW THE MAN THEY CALL "SKINNY MAN", LEONARD NELSON?

A    YES, I DO.

Q    AND HOW LONG HAVE YOU KNOWN SKINNY MAN?

A    I'D SAY OFF AND ON ABOUT TWO YEARS.

Q    HOW LONG HAVE YOU KNOWN DERRICK MARIGNY?

A    SINCE HE WAS BORN.

Q    HOW LONG HAVE YOU KNOWN HAROLD WILSON?

A    HAROLD WILSON OR HAROLD BOSS?

Q    BOSS.

A    SINCE HE WAS BORN.

Q    PARDON?

A    SINCE HE WAS SMALL.

Q    AND HOW LONG HAVE YOU KNOWN CURTIS MILLER?

A    ABOUT THREE YEARS.

Q    ON OR ABOUT ... DO YOU RECALL THE DAY, RATHER, THAT HAROLD BOSS WAS KILLED?

A    I REMEMBER THE NIGHT HE WAS KILLED.

Q.    OKAY. AND BEFORE THAT TIME DID YOU HAVE OCCASION TO SEE HIM, DERRICK ....

BY MS. O'BANNON:

    I'M GOING TO OBJECT TO THE LEADING NATURE OF THE QUESTION.

BY MR. MERRITT:

    I'L DO IT ANOTHER WAY.

EXAMINATION RESUMED BY MR. MERRITT:

Q    DURING THE WEEK BEFORE THAT TELL THE MEMBERS OF THE JURY WHAT YOU SAW INVOLVING ALL THE

82

PARTIES YOU KNOW.

A        ALL RIGHT.

BY MS. O'BANNON:

I'M GOING TO OBJECT TO THE RELEVANCE OF SOMETHING ABOUT "ALL THE PARTIES" THE WEEK BEFORE THAT, TO THE RELEVANCE AND ALSO, TO THE TIME PERIOD.  A WHOLE WEEK?

BY THE COURT:

SUSTAINED.

EXAMINATION RESUMED BY MR. MERRITT:

Q        ALL RIGHT, ON THE AFTERNOON HOUR, APPROXIMATELY THREE DAYS BEFORE HAROLD "BOSS" WILSON MET HIS DEATH, DID YOU SEE THOSE FIVE PEOPLE, AND TELL THE JURORS THE AREA IN WHICH YOU SAW THEM AND WHAT THEY WERE DOING.

BY THE COURT:

WHICH FIVE PEOPLE, COUNSELOR?

BY MR. MERRITT:

DERRICK MARIGNY, CURTIS MILLER, HAROLD "BOSS" WILSON, SKINNY MAN AND MAT MO.

BY THE COURT:

AND THE VICTIM'S INCLUDED IN THAT GROUP?

BY MR. MERRITT:

YES.

BY MS. O'BANNON:

YOUR HONOR, JUST TO CLARIFY FOR THE RECORD, MR. MERRITT IS SPEAKING ABOUT MAY 3RD, 1990 IN THE AFTERNOON?

BY MR. MERRITT:

COUNSELOR.  NEXT QUESTION.

EXAMINATION RESUMED BY MR. MERRITT:

Q        AND WHAT, IF ANYTHING, DID YOU SEE HAPPEN?

A        ME, DERRICK MARIGNY, HENRY BOSS, NOT HENRY BOSS, HAROLD BOSS, CURTIS MILLER, WE ALL PARTICIPATED IN A SHOOTING MATCH OF SKINNY MAN AND MAT MO.

Q        AND DO YOU RECALL HOW THIS HAPPENED?  WHO INSTIGATED IT?

BY MS. O'BANNON:

        I'M GOING TO ... I DIDN'T QUITE HEAR THE END OF MR. MERRITT'S QUESTION, YOUR HONOR.  IF IT COULD BE REPEATED.

BY THE COURT:

        HE SAID HE SAW THEM INVOLVED IN A SHOOTOUT.  THEN, WHAT WAS YOUR NEXT QUESTION?

BY MR. MERRITT:

        TELL ME WHO INSTIGATED IT, HOW IT HAPPENED.

BY MS. O'BANNON:

        I'M GOING TO OBJECT BECAUSE THAT IS CALLING FOR HEARSAY.

BY THE COURT:

        YES.  YOU'RE GOING TO HAVE TO REWORD THE QUESTION. MR. RUSKIN, ONE MOUTH AT A TIME.  OKAY?

BY MR. RUSKIN:

        YES, SIR.

EXAMINATION RESUMED BY MR. MERRITT:

Q        ON THE NEXT MORNING , EARLY MORNING HOURS, WILL YOU TELL THE MEMBERS OF THE JURY WHAT,

85

NO, THE CONTENTS, WHAT HE SAID.

BY THE COURT:

NO. SUSTAINED TO THAT.

BY MERRITT:

ALL RIGHT.

BY THE COURT:

NOT TO WHAT WAS SAID, THE FACT THAT HE SPOKE TO HIM.

EXAMINATION RESUMED BY MR. MERRITT:

Q    DID CURTIS MILLER TELL YOU THAT FOR HIS TESTIMONY ...

BY MS. O'BANNON:

OBJECTION.

BY THE COURT:

SUSTAINED. COUNSELOR, SUSTAINED. ALL RIGHT? THE FIRST WITNESS DENIED THAT THERE WAS A CONVERSATION MADE. YOU CAN IMPEACH HIM AS TO WHETHER THERE WAS A CONVERSATION MADE, BUT NOT TO WHAT WAS SAID. AND THAT IS MY RULING. TAKE THE OBJECTION AND MOVE ON. BUT LET'S GET ON WITH THIS TRIAL.

BY MR. MERRITT:

NOTE AN EXCEPTION.

BY THE COURT:

LET IT BE NOTED.

BY MR. MERRITT:

THANK YOU. ANSWER THE QUESTIONS OF THE STATE.

90

<u>CROSS EXAMINATION</u>

EXAMINATION BY MS. O'BANNON:

Q    MR. HEBERT, YOU HAVE THREE PRIOR CONVICTIONS FOR ARMED ROBBERY, THEFT AND CRUELTY TO A JUVENILE?

A    YES, MA'AM.

Q    WHAT ARE YOU IN PRISON FOR SERVING RIGHT NOW?

A    CRUELTY TO A JUVENILE.

Q    ON MAY 3, 1990, WHAT TIME DID THIS SHOOTOUT OCCUR?

A    OH, ROUGHLY BETWEEN 6:00 P.M. AND 12:00. IT WAS DARK.

Q    IT WAS DARK? SO YOU CAN'T PINPOINT IT TO A TIME BETWEEN 6:00 AND 12:00?

A    RIGHT. I COULDN'T PINPOINT IT.

Q    WAS IT AFTER DINNER OR BEFORE DINNER? OR DO YOU EAT DINNER?

A    I DON'T EAT ... I WASN'T EATING DINNER.

Q    WERE YOU BUSY DOING ROCK COCAINE OR SNORTING COCAINE AT THAT TIME?

A    RIGHT. I'M NOT A DRUG USER; I WAS A DRUG ABUSER.

Q    YOU SAID YOU USED DRUGS. CORRECT?

A    RIGHT.

Q    YOU PUT THEM IN YOUR BODY. IS THAT TRUE?

A    THAT'S TRUE.

Q    ISN'T IT ALSO A FACT THAT YOU DO OR SAY ANYTHING FOR DRUGS?

A    NO.

Q    NO. SO WHEN YOU TOLD MR. MERRITT THAT YOU PULLED A GUN AND SHOT AT SKINNY MAN AND LEONARD NELSON FOR A POUND OF COCAINE, YOU WERE DOING IT JUST BECAUSE YOU

91

WANTED TO KILL SKINNY MAN OR BECAUSE YOU WANTED THE COCAINE?

A    ASK ME THAT AGAIN.

Q    WHEN YOU TOLD MR. MERRITT ON MAY 3RD, 199C, YOU PULLED A GUN AND SHOT AT SKINNY MAN COCAINE... SKINNY MAN, LEONARD NELSON, WAS THAT BECAUSE YOU SIMPLY WANTED TO KILL LEONARD NELSON OR WAS IT BECAUSE YOU WANTED A POUND OF COCAINE?

A    THAT DEPENDS.  THAT'S WHAT I WAS GETTING PAID FOR.

Q    I'M SORRY?

A    I WAS GETTING PAID TO DO DERRICK MARIGNY DIRTY.

Q    IN WHAT KIND OF FORM WERE YOU GETTING PAID? HOW WAS HE PAYING YOU?

A    SOMETIME CASH, SOMETIME COKE, SOMETIME HEROIN.

Q    SO, WHAT DID HE PAY YOU ON THIS PARTICULAR DAY?

A    OH, HE GAVE ME A QUARTER OUNCE OF COCAINE.

Q    OKAY.  SO, YOU TRIED TO KILL LEONARD NELSON FOR A QUARTER OUNCE OF COCAINE?

A    RIGHT.

Q    AND YOU'RE SAYING DERRICK MARIGNY GAVE YOU THAT CO-CAINE.  IS THAT CORRECT?

A    RIGHT.  THAT WASN'T THE FIRST TIME.

Q    YOU ALSO TESTIFIED EARLIER THAT YOU WERE DERRICK MARIGNY'S BODYGUARD?

A    WHAT I  USED TO DO, LIKE PUSHERS, I USED TO WATCH THEIR BACK WHILE HE WAS SELLING.

Q    HOW LONG DID THAT EMPLOYMENT LAST FOR YOU?

A    I GUESS OFF AND ON FOR ABOUT TWO YEARS.

Q    WERE YOU EVER EMPLOYED AT ANYTHING LAWFUL?

A    NO.

Q       So, anything you've ever done has been illegal or unlawful. Correct?

A       Correct.

Q       You weren't by the End Zone Lounge on May 6th, 1990, were you?

A       No. I wish I was.

Q       But you weren't there though, were you?

A       No, I wasn't there that night.

Q       So, you weren't around to see Leonard Nelson shoot down Harold "Boss" Wilson. Isn't that correct?

BY MR. MERRITT:

        Objectionable, Your Honor.

BY THE COURT:

        You weren't there to see what?

BY MR. o"BANNON:

        To see Leonard Nelson shoot down Harold "Boss" Wilson.

BY THE COURT:

        Overruled.

BY THE WITNESS:

        No.

BY MS. O'BANNON:

        Nothing further.

BY MR. MERRITT:

        Nothing.

BY THE COURT:

        Nothing else? All right. Step down.

BY MR. MERRITT:

        Gregory Davis.

93

GREGORY DAVIS

CALLED BY THE DEFENSE AND AFTER FIRST HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

EXAMINATIN BY MR. MERRITT:

Q    STATE YOUR FULL NAME FOR THE RECORD, PLEASE.

A    GREGORY GERARD DAVIS.

Q    AND / DO THE FELLOWS THAT KNOW YOU CALL YOU?
      WHAT

A    "DEANO."

Q    DEANO, DO YOU KNOW A DERRICK MARIGNY?

A    I WAS IN PRISON WITH DERRICK MARIGNY, 1984 IN W.C.I.

Q    DO YOU KNOW SKINNY MAN?

A    I MET SKINNY MAN BRIEFLY IN 1990 AFTER I COME HOME
                              FROM PRISON.

Q    DO YOU KNOW CURTIS MILLER?

A    I KNOW CURTIS. BOTH OF THEM. DERRICK AND CURTIS
                ARE RELATED. I KNOW CURTIS FROM BEING
                WITH DERRICK. HIM, DERRICK AND A
                GUY NAMED "HAROLD", YOU KNOW, THEY
                SELL DRUGS.

BY MR. O'BANNON:
          OBJECTION. UNRESPONSIVE.

BY THE COURT:
          JUST YES OR NO. DO YOU KNOW HIM?

BY THE WITNESS:
          YES, I KNOW HIM.

BY THE COURT:
          ALL RIGHT. NEXT QUESTION.


EXAMINATION RELSUMED BY MR. MERRITT:

Q    DO YOU KNOW OR RECALL THE DAY THAT HAROLD "BOSS"

WILSON LOST HIS LIFE?

A    YES, I RECALL.

Q    SHORTLY BEFORE THAT, HAD YOU MET WITH DERRICK MARIGNY?

A    I MET DERRICK MARIGNY ... I DIDN'T MEET DERRICK;
     I MET WITH HAROLD THE DAY BEFORE.

Q    AND WHAT WAS THE PURPOSE OF THAT MEETING?

BY MS. MC DONALD:
     OBJECTION, YOUR HONOR, TO HEARSAY THAT HE'S GOING
     TO BE TESTIFYING ABOUT WHAT HAPPENED
     AT THE MEETING.

BY THE COURT:
     YES, IF IT INVOLVES HEARSAY TESTIMONY, SUSTAINED.

BY MR. MERRITT:
     THE WORDS OF THE DECEASED IN TERMS OF ...

BY THE COURT:
     NOT THREE DAYS BEFORE, COUNSELOR.

BY MR. MERRITT:
     THREE DAYS BEFORE, YES, SIR.

BY THE COURT:
     NO, SIR.

EXAMINATION RESUMED BY MR. MERRITT:

Q    AS A RESULT OF YOUR MEETING WITH "BOSS" WILSON,
     DID YOU TELL LEONARD NELSON ANYTHING?

A    YES, I TOLD LEONARD NELSON THAT HIS LIFE WAS IN
     DANGER BECAUSE THE GUYS THAT COME
     TOLD ME THAT THEY ...

BY MS. MC DONALD:
     WAIT.  I CAN'T UNDERSTAND YOU.  CAN YOU SLOW DOWN
     JUST A LITTLE BIT, SIR?

95

BY THE COURT:

     YOU TOLD HIM THAT ...

BY THE WITNESS:

     I TOLD HIM THAT HE OUGHT TO CONSIDER HIS WHEREABOUTS AND WHERE HE HANGS OUT BECAUSE DERRICK MARIGNY AND HAROLD HAD TOLD ME THAT THEY WANTED ...

BY MR. MC DONALD:

Q    OBJECTION, YOUR HONOR, HE'S TESTIFYING TO HEARSAY.

BY MR. MERRITT:

     WELL, LET'S PUT SOME OF THIS ON THE RECORD. LET'S LET IT BE STRAIGHT.

BY THE COURT:

     DO WHAT?

BY MR. MERRITT:

     PUT THIS ON THE RECORD.

BY THE COURT:

     IT'S HEARSAY.

REPORTER'S NOTE:

     ALL COUNSELERS APPROACHEDD THE BENCH FOR A BRIEF CONFERENCE.

BY THE COURT:

     OBJECTION SUSTAINED.

BY MR. MERRITT:

     NOTE AN EXCEPTION TO THE COURT'S COMMENTS AND MAKE A MOTION FOR A MISTRIAL, YOUR HONOR.

BY THE COURT:

     DENIED.

BY THE COURT:

96

AND DON'T COME UP HERE FOR SIDE BARS
LIKE THAT ANY MORE, LADIES AND GENTLE-
MEN. YOU UNDERSTAND?

EXAMINATION RESUMED BY MR. MERRITT:

Q      ON A DAY OR TWO BEFORE HAROLD "BOSS" WILSON MET
HIS DEATH, DID YOU MEET WITH DERRICK
MARIGNY FOR THE PURPOSE OF FORMING
A CONTRACT TO KILL LEONARD NELSON?

A      YES, I DID.

BY MS. MC DONALD:

YOUR HONOR, I'M GOING TO OBJECT. IT CALLS FOR
HEARSAY CONVERSATION ...

BY THE COURT:

NO, IT DOESN'T, COUNSELOR. THAT IS A CORRECT QUESTION.
IT'S AN ART. OKAY? THAT IS CORRECT.
AND THAT'S WHY I DON'T WANT ANY MORE
SIDE BAR CONFERENCES. ASK THE QUESTION
OVER. OBJECTION OVERRULED.

EXAMINATION RESUMED BY MR. MERRITT:

Q      ON THE DAY THAT YOU MET WITH THEM TO FORM THE
CONTRACT TO ...

BY MS. MC DONALD:

YOUR HONOR, I'M NOW GOING TO OBJECT TO LEADING
QUESTION.

BY THE COURT:

SUSTAINED.

BY MR. MERRITT:

IT'S IMPEACHMENT. THAT'S ALL.

BY THE COURT:

97

SUSTAINED. YOU TAKE THE OBJECTION. YOU LISTEN TO MY RULING.

BY MR. MERRITT:

I HEARD YOUR RULING, YOUR HONOR.

BY THE COURT:

SUSTAINED.

BY MR. MERRITT:

I HEARD IT.

EXAMINATION RESUMED BY MR. MERRITT:

Q    WHO WAS PRESENT AT THIS CONTRACT MEETING?

A    ME, DERRICK MARIGNY AND HAROLD "BOSS".

Q    DID YOU TAKE THEM UP ON THAT OFFER?

A    NO, I DIDN'T.

Q    WHAT DID YOU DO IN TURN?

A    I WENT AND TREID TO FIND LEONARD TO LET HIM KNOW WHAT THEY WAS TRYING TO DO.

Q    DID YOU IN FACT EVER FIND HIM?

A    YES, I DID FIND HIM.

Q    AND WHAT DID YOU TELL HIM WHEN YOU SAW HIM?

A    I TOLD LEONARD THAT I HAD MET WITH THEM BECAUSE MY PURPOSE WAS TO TRY TO SETTLE THE THING THEY WAS INTO, BUT THEN BEFORE I COULD EXPLAIN TO THEM WHY I WANTED TO MEET WITH THEM THEY EXPLAINED TO ME WHY THEY WANTED TO MEET WITH ME.

BY MS. MC DONALD:

YOUR HONOR, I'M ALSO GOING TO OBJECT TO THE HEARSAY THAT HE'S NOW TESTIFYING TO.

BY THE COURT:

WELL, HE'S IN AND OUT OF IT. I'M GOING TO SUSTAIN

98

ANY HEARSAY CONVERSATIONS.   ALL RIGHT?

EXAMINATION RESUMED BY MR. MERRITT:

Q      JUST TELL WHAT YOU DID AND WHAT YOU TOLD LEONARD NELSON.

A      I TOLD LEONARD NELSON THAT I HAD MET WITH DERRICK MARIGNY AND HAROLD "BOSS", AND THAT THEY WAS PLOTTING ...

BY MR. MC DONALD:

YOUR HONOR, I'M GOING TO OBJECT  AGAIN.  WHAT HE'S GOING TO TESTIFY TO IS THE HEARSAY CONVERSATION BETWEEN HIMSELF AND HAROLD AND DERRICK.

BY THE COURT:

OVERRULED.  HE TOLD SOMEONE THIS, COUNSELOR.

EXAMINATION RESUMED BY MR. MERRITT:

A      I TOLD LEONARD THAT I MET WITH DERRICK MARIGNY AND HAROLD "BOSS", AND THEY TOLD ME THAT THEY WANTED ME TO HELP HIM TO GET RID OF HIM AND A GUY NAME "MO", AND I TOLD HIM HE OUGHT TO  WATCH HIMSELF.  AND IF HE TOLD ME, TELL IT TO ME, HE'D TELL IT TO SOMEBODY ELSE, BECAUSE I TOLD THEM I WOULDN'T DO IT.

Q      AND WHAT REVENUE DID THEY OFFER YOU?

A      SOME DRUGS.

Q      GREGORY, WHERE DO YOU LIVE?

A      I LIVE AT 225 S. DUPRE, BUT I WAS RESIDING AT THAT PERIOD WITH A YOUNG LADY BY THE NAME OF SYLVIA SPOON IN FLORIDA PARKWAY.

99

Q    AND HOW FAR IS THAT FROM DERRICK'S SISTER OR HIS MOTHER?

A    THAT'S ABOUT A BLOCK AWAY.

Q    ALL RIGHT. WAS THERE A TIME SHORTLY BEFORE YOU MET WITH DERRICK AND BOSS THAT YOU ALSO HAD AN OCCASION TO HAVE SKINNY MAN RUN INTO YOUR HOUSE?

A    RIGHT. THE NIGHT BEFORE I HEARD A LOT OF SHOOTING, A SHOOTING INTO THE FLOOR IN MY HOUSE BECAUSE YOU KNOW THEY DO A LOT OF SHOOTING AROUND THE PROJECT. SHORTLY AFTER THE SHOOTING I HEARD A BAMMING ON MY DOOR, AND I ASKED WHO WAS IT. HE SAID HE WAS SKINNY MAN, HURRY UP AND LET HIM IN; SOMEBODY WAS SHOOTING AT HIM. SO I OPENED THE DOOR, AND HE WAS FRIGHTENED. I SAT HIM DOWN ON THE SOFA, AND I SAID, "WHAT HAPPENED?"

BY MS. O'BANNON:

OBJECTION, YOUR HONOR, TO ANY HEARSAY.

BY THE COURT:

SUSTAINED.

BY MR. MERRITT:

IT'S THE WORDS OF THE ACCUSED, YOUR HONOR. IT'S ALSO AN EXCITED UTTERANCE, YOUR HONOR, AND IT'S OFFERED FOR THAT PURPOSE.

BY THE COURT:

"EXCITED UTTERANCE?"

BY MR. MERRITT:

YES.

BY THE COURT:

100

AND WHEN DID THIS CONVERSATION TAKE PLACE, THIS EXCITED UTTERANCE?

BY MR. MERRITT:

WELL, IT WOULD BE TAKING IT BACK WITHOUT THE DAYS BECAUSE THE DAYS... THEY DIDN'T LOOK AT CALENDARS. IT'S ROUGHLY THREE DAYS BEFORE HAROLD BOSS MET HIS DEATH AND ONE DAY BEFORE THAT THEY OFFERED A CONTRACT TO HIM, AND MOMENTS AFTER THE GUNSHOTS THAT HE HEARD THE FIRING OF.

BY MS. MC DONALD:

THIS OCCURRED THREE DAYS BEFORE THE INCIDENT, YOUR HONOR.

BY THE COURT:

SUSTAINED.

BY MR. MERRITT:

NOTE AN EXCEPTION.

BY THE COURT:

LET IT BE NOTED. LET'S GO, COUNSELOR.

BY MR. MERRITT:

I'M TRYING TO MAKE A DETERMINATION, YOUR HONOR.

BY THE COURT:

ALL RIGHT.

BYMR. MERRITT:

ANSWER THE QUESTIONS FOF THE PRESECUTOR, PLEASE.


CROSS EXAMINATION

EXAMINATION BY MS. MC DONALD:

Q     DO YOU WORK?

A     I WAS WORKING AT JACK DEMPSEY'S SEAFOOD RESTAURANT.

101

Q       AND WHAT ARE YOU IN THE BACK FOR RIGHT NOW?  HAVE YOU BEEN CONVICTED?

BY MR. MERRITT:

        THAT'S OBJECTIONABLE, YOUR HONOR.

BY MS. MC DONALD:

        I'LL WITHDRAW IT, YOUR HONOR.

EXAMINATION RESUMED BY MS. MC DONALD:

Q       DO YOU HAVE ANY CONVICTIONS?

A       I HAVE A CONVICTION 1979, ARMED ROBBERY.

Q       FOR ARMED ROBBERY.  AND HOW MANY YEARS DID YOU RECEIVE ON THAT CHARGE?

A       TEN-YEAR SENTENCE.

Q       TEN YEARS?

A       RIGHT.

Q       AND YOU'VE BEEN OUT FOR WHAT, APPROXIMATELY ONE YEAR NOW?

A       NO.

Q       HOW LONG HAVE YOU BEEN BACK?

A       I WAS RELEASED ON THAT CHARGE IN 1985.

Q       ARE YOU IN THE BACK FOR A  CONVICTION RIGHT NOW?

A       NO, I'M ON ...

Q       JUST ANSWER MY QUESTION, IF YOU'RE IN THE BACK FOR A CONVICTION.

A       NO.

Q       WHY ARE YOU IN THE BACK?

A       PAROLE VIOLATION.

BY MR MERRITT:

        OBJECTION.

BY THE COURT:

        NO.  OVERRULED.

102

EXAMINATION RESUMED BY MS. MC DONALD:

Q      WHY ARE YOU IN THE BACK?

A      PAROLE VIOLATION.

Q      WHAT DID YOU DO IN VIOLATION OF YOUR PAROLE?

BY THE COURT:

       THAT'S NOT RELEVANT.  LET'S GO.


EXAMINATION RESUMED BY MS. MC DONALD:

Q      HOW MANY TIMES HAVE YOU BEEN ARRESTED?


BY MR. MERRITT:

       THAT'S OBJECTIONABLE, TOO.

BY THE COURT:

       SUSTAINED.


EXAMINATION RESUMED BY MS. MC DONALD:

Q      DO YOU KNOW EILEEN WINCHESTER?

A      YES, I DO.

Q      AND HOW FAR AWAY DOES SHE LIVE FROM YOUR HOUSE?

A      ABOUT TWO BLOCKS.

Q      ARE YOU ALL GOOD FRIENDS?

A      WE'RE ASSOCIATES.

Q      AND HOW WELL DO YOU KNOW SKINNY MAN?

A      HOW WELL DO I KNOW SKINNY MAN?

Q      YES.

A      I'D SAY WELL AS YOU CAN GET TO KNOW A PERSON IN
       ABOUT A MONTH PERIOD.  YOU KNOW, I DON'T
       KNOW HIM THAT GOOD.  I JUST KNOW HIM
       THROUGH MY STEPSON.

Q      AND DO YOU KNOW HAROLD, DERRICK AND CURTIS?

A      I KNOW DERRICK PRETTY GOOD. I KNOW HAROLD AND THE

103

OTHER ONE THROUGH DERRICK.

Q AND IT'S YOUR TESTIMONY THAT YOU MET WITH DERRICK CONCERNING A CONTRACT TO KILL THIS MAN HERE?

A I MET WITH HAROLD.

Q AND DERRICK? OR JUST HAROLD?

A HAROLD CALLED ME FOR DERRICK. DERRICK WAS STANDING ACROSS THE STREET. HE TOLD ME THAT; HAROLD ... I MEAN, HAROLD TOLD ME THAT DERRICK WANTED TO TALK TO ME.

Q DID YOU MEET WITH THEM REGARDING A CONTRACT?

A RIGHT.

Q TO KILL LEONARD NELSON?

A RIGHT.

Q YOU KNOW THAT KILLING AN INDIVIDUAL IS AGAINST THE LAW. IS THAT CORRECT?

A RIGHT.

Q DID YOU EVER CALL THE POLICE AND REPORT THIS CONVER- SATION?

A NO, I DIDN'T, BECAUSE I DIDN'T ACCEPT IT.

Q DID YOU EVER CALL POLICE AND SAY, "HEY, YOU ALL BETTER WATCH OUT. SKINNY MAN'S GOT A CONTRACT ON HIS LIFE."

A NO, I DIDN'T.

Q OKAY. NOW, THE NIGHT BEFORE YOU'RE SAYING THAT SKINNY MAN KNOCKED ON YOUR DOOR IN ORDER TO RUN THROUGH YOUR HOUSE. IS THAT RIGHT?

A NO. TO GET INTO MY HOUSE.

Q TO SEEK SHELTER?

A RIGHT.

104

Q        AND DID HE SAY HE WAS GOING TO BE MURDERED THAT
                    NIGHT?
A        HE SAID HE HAD JUST BEEN AMBUSHED, SOMEBODY WAS
                    SHOOTING AT HIM.
Q        OKAY.  DID YOU ALL CALL THE POLICE RIGHT THEN?
A        NO, I CLOSED MY DOOR, AND I  WENT TO MY (INAUDIBLE)
                    CAUSE THE SHOOTING HAD STOPPED.  THE
                    SHOOTING HAD CEASED.                    i
Q        SO, AN AMBUSH WAS RIGHT OUTSIDE OF YOUR DOOR ON
                    THIS INDIVIDUAL, ...
A        NO, THE AMBUSH ...
Q        AND YOU DIDN'T CALL ... LET ME FINISH MY QUESTION.
BY THE COURT:
            YOU BOTH CAN'T TALK AT THE SAME TIME.  ONE QUESTION
                        WILL BE ASKED; THEN SILENCE; THEN
                        THE QUESTIONS WILL BE ANSWERED; THEN
                        SILENCE.  ALL RIGHT.  START YOUR QUES-
                        TION AGAIN.

EXAMINATION RESUMED BY MS. MC DONALD:
Q        MY QUESTON IS THIS:  LEONARD NELSON CAME INTO
                    YOUR HOUSE THAT DAY.  IS THAT CORRECT?
                    THAT NIGHT?
A        RIGHT.
Q        WHEN HE CAME IN HE TOLD YOU HE  WAS BEING AMBUSHED.
                    IS THAT CORRECT?
A        YES, BEEN...
Q        AMBUSHED?
A        RIGHT.
Q        WAS HE SEEKING SHELTER IN YOUR HOUSE?
A        RIGHT.

105

Q   DID YOU CALL THE POLICE THAT NIGHT?

A   NO, I DID NOT.

Q   WHERE WAS THE AMBUSH TAKING PLACE?

A   APPROXIMATELY A BLOCK FROM MY HOUSE.

Q   OKAY.  DID YOU EVER THINK TO SAY, "HEY, I'M GOING TO CALL THE POLICE TO STOP THIS GUNFIRE ON MY STREET."

A   NO, I DIDN'T.

Q   WHEN YOU WERE IN THE BACK, DID YOU TALK TO SKINNY MAN WHILE HE'S BEEN IN THE BACK?

A   NO, I HAVEN'T.

Q   HAVEN'T TALKED TO HIM AT ALL, AND YOU'VE ALL BEEN IN THE SAME PRISON?

A   WE'RE NOT IN THE SAME PRISON.

Q   WHO ELSE IS ON THE DOCK OUT THERE?  HAVE YOU BEEN TALKING TO EVERYBODY OUT THERE?

A   I TALKED WITH GREGORY.  I KNOW GREGORY.

Q   SO, YOU'VE GOT A REPUTATION AS AN ARMED ROBBER.  IS THAT CORRECT?

BY MR. MERRIT:

        THAT'S OBJECTIONABLE.

BY MR. RUSKIN:

        OBJECTION, YOUR HONOR.

BY THE COURT:

        SUSTAINED.

BY THE WITNESS:

        I DON'T HAVE A REPUTATION AS AN ARMED ROBBER.

BY THE COURT:

        SUSTAINED.

BY MR. MERRITT:

        NOT ANY MORE THAN DERRICK HAS.

106

BY THE COURT:

ALL RIGHT, LET'S NOT TESTIFY, COUNSELOR.

EXAMINATION RESUMED BY MS. MC DONALD:

Q     HAVE YOU TALKED TO MR. MERRITT ABOUT WHAT YOU'RE
GOING TO SAY ON THIS WITNESS STAND?

A     NO, I HAVEN'T.

Q     HE'S GOING TO CALL YOU AS A WITNESS IN A FIRST
DEGREE MURDER TRIAL AGAINST HIS
CLIENT, AND HE'S NEVER SPOKEN TO YOU?

A     HE ASKED ME TO TELL THE TRUTH ABOUT THIS. HE ASKED
ME DID I KNOW HIS CLIENT AND WHAT
DID I KNOW HIS CLIENT FROM.

Q     SO, YOU HAVE GONE OVER YOUR TESTIMONY WITH HIM.
IS THAT CORRECT?

A     NO, HE ASKED ME DID I RECALL THE EVENTS. I SAID
YES. HE SAID WOULD I REPEAT THE
EVENTS IN COURT.

Q     SO, YOU TALKED TO HIM ABOUT YOUR TESTIMONY?

A     WHEN YOU SAY "GO OVER," I'M TRYING TO SAY, "DID
WE REHEARSE IT?" NO, WE HAVEN'T
REHEARSED IT. HE ASKED ME DID I
RECALL THE EVENTS. I TOLD HIM YES.
HE ASKED ME TO SPEAK THE TRUTH IN
COURT.

BY MS. MC DONALD:

I HAVE NOTHING FURTHER.

BY THE COURT:

NOTHING ELSE?

BY MR. MERRITT:

NO, YOUR HONOR.

<u>RE-DIRECT EXAMINATION</u>

EXAMINATION BY MR. MERRITT:

Q    HOW MANY TIMES DID I MEET WITH YOU?

A    WE MET ONCE FOR ABOUT A 8-MINUTE PERIOD AT C.C.C.

BY MR. MERRITT:

BY MR. MERRITT:

THANK YOU.

BY THE COURT:

ALL RIGHT. STEP DOWN. CALL YOUR NEXT WITNESS.

BY MR. MERRITT:

YES, YOUR HONOR. GREGORY JULIAN.


<u>GREGORY JULIAN</u>

CALLED BY THE DEFENSE, AND AFTER HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

<u>DIRECT EXAMINATION</u>

EXAMINATION BY MR. MERRITT:

Q    STATE YOUR FULL NAME FOR THE RECORD PLEASE.

A    GREGORY JULIAN.

Q    AND WHERE ARE YOU LIVING NOW, GREGORY?

A    H.O.D., C.L.U.

Q    AND DO YOU HAVE ANY PRIOR CONVICTIONS?

A    YES.

Q    AND WHAT ARE THEY?

A    POSSESSION OF MARIJUANA, CONVICTED FELON IN POSSESSION OF A FIREARM.

Q    AND ARE YOU DOING TIME NOW?

A    NO, SIR.

Q    WHAT IS YOUR SENTENCE FOR POSESSION OF MARIJUANA?

A    TWO YEARS, PROBATION.

Q    AND WHAT WAS YOUR SENTENCE FOR FELON IN POSSESSION

108

OF A FIREARM?

A    THREE YEARS.

Q    AND WHAT FELON WERE YOU  CONVICTED OF TO BE FOUND A FELON IN POSSESSION OF A GUN?

A    POSSESSION OF MARIJUANA.

Q    WITH INTENT TO DISTRIBUTE?

A    YES.

Q    OKAY.

Q    WERE YOU IN CUSTODY IN THE MONTHS OF SEPTEMBER, OCTOBER AND NOVEMBER?

A    YES, SIR.

Q    AND WHILE IN CUSTODY DID YOU HAVE OCCASION TO MEET ONE CURTIS MILLER?

A    YES, SIR.

Q    DID YOU KNOW CURTIS MILLER?
A    YES.
Q    HOW LONG HAVE YOU KNOWN HIM?
             HIM
Q    I KNOW/PREVIOUSLY TWO YEARS.

A    DID CURTIS TELL YOU ANYTHING WITH REFERENCE TO ...

BY MS. O'BANNON:

OBJECTION, YOUR HONOR.

BY MR. MERRITT:

THIS IS AN IMPEACHMENT WITNESS.

BY MS. O'BANNON:

HE'S LEADING THE WITNESS, AND HE'S ELICITING HEARSAY.

BY THE COURT:

OVERRULED.  OBJECTION OVERRULED ON LEADING.

NOW, WHAT ELSE?

BY MS. MCDONALD:

HEARSAY, YOUR HONOR, IS THE SECOND OBJECTION THE STATE WOULD LIKE TO MAKE.

BY THE COURT:

109

WHAT ARE YOU ASKING?

BY MR. MERRITT:

THE SPECIFIC QUESTIONS THAT CURTIS DENIES SAYING WHEN CURTIS WAS ON THE STAND.

BY THE COURT:

WELL, UNTIL YOU PHRASE IT CORRECTLY, OBJECTION SUSTAINED.

EXAMINATION RESUMED BY MR. MERRITT:

Q     DID YOU HAVE A CONVERSATION WITH CURTIS?

A     YES, SIR.

Q     WAS THAT CONVERSATION RELATIVE TO HIS PARTICIPATION AND KNOWLEDGE OF THE EVENTS ...

BY MS. O'BANNON:

OBJECT.

BY THE COURT:

OVERRULED.

EXAMINATION ARESUMED BY MR. MERRITT:

Q     ...LEADING TO THE DEATH OF HAROLD "BOSS" WILSON?

A     YES, SIR.

Q     WAS THAT CONVERSATION IN REFERENCE TO WHAT HE EXPECTED TO GET ...

BY MR. MC DONALD:

YOUR HONOR, I'M GOING TO OBJECT. HE'S TALKING ABOUT HEARSAY.

BY THE COURT:

SUSTAINED.

BY MR. MERRITT:

IT'S IMPEACHMENT TESTIMONY, YOUR HONOR.

BY THE COURT:

110

COUNSELOR.  YOU KNOW, YOU CAN THROW THAT IMPEACHMENT AROUND A LOT, AND YOU HAVE BEEN.  MY RULING IS NOT CHANGED.

BY MR. MERRITT:

ALL RIGHT.  JUST LET ME ASK THE QUESTIONS AND THEN YOU RULE, YOUR HONOR.

EXAMINATION RESUMED BY MR. MERRITT:

Q     DID CURTIS AT ANY TIME EVER TELL YOU THAT HE DID NOT SEE ANYTHING NOR ...

BY MS. MC DONALD:

OBJECTION TO HEARSAY, YOUR HONOR.

BY MR. MERRITT:

YOU HAVE TO HEAR MY QUESTION  FIRST.

BY THE COURT:

THAT'S RIGHT.  AND I WISH YOU'D LET PEOPLE TALK FIRST.  ALL RIGHT?

BY MS. MC DONALD:

YES, JUDGE.

EXAMINATION RESUMED BY MR. MERRITT:

Q     IN YOUR CONVERSATION WITH CURTIS IN THOSE MONTHS IN ... WHERE WERE YOU AT THAT TIME?

A     E.D.C.

Q     AND WHAT IS THAT CALLED?

A     EMERGENCY  DETENTION CENTER.

Q     AND THE NICKNAME IS WHAT?

A     E.D.C.

Q     TENT CITY, IS IT NOT?

A     TENT CITY.

Q     OKAY.  ON HOW MANY OCCASIONS DID YOU SEE OR TALK TO

111

CURTIS ... ON HOW MANY OCCASIONS DID YOU SEE HIM ESCORTED OUT OF TENT CITY?

A    HOW MANY OCCASIONS DID I EVER SEE HIM LEAVING THE GROUNDS?

Q    RIGHT.

A    POSSIBLE THREE.

Q    AND DID YOU COME TO LEARN WHY HE LEFT?

BY MS. O'BANNON:

OBJECTION, YOUR HONOR.

BY THE WITNESS:

YES.

BY THE COURT:

AND YOUR OBJECTION IS WHAT?

BY MS. MC DONALD:

HEARSAY.  DID HE TELL YOU WHY HE WAS LEAVING?

BY THE COURT:

NOW, THAT'S NOT WHAT WAS ASKED.  WHAT WAS ASKED WAS: DID YOU LEARN WHY HE WAS LEAVING?

BY MS. MC DONALD:

OKAY, WELL, THEN ANY KNOWLEDGE THAT HE WOULD LEARN WOULD BE HEARSAY, YOUR HONOR.

BY THE COURT:

ALL RIGHT.  SUSTAINED, NOT TO MENTION RELEVANCE.

EXAMINATION RESUMED BY MR. MERRITT:

Q    DID CURTIS TELL YOU ON EACH OF THESE OCCASIONS THAT HE MET WITH HIS LAWYER?

A    YES, SIR.

Q    DID CURTIS TELL YOU THAT HE DID NOT HAVE ANYTHING TO DO, OR RATHER, DID WANT TO HAVE ANYTHING TO DO WITH THIS BECAUSE HE SAW NOTHING?

112

BY MS. MC DONALD:

YOUR HONOR, I'M GOING TO OBJECT. AND MY OBJECTION IS THIS. HE'S ALLOWED TO SAY WHETHER OR NOT HE SPOKE TO CURTIS, BUT OF THE CONTENTS OF CURTIS'S STATEMENT I'M OBJECTING TO HEARSAY.

BY THE COURT:

SUSTAINED.

EXAMINATION RESUMED BY MR. MERRITT:

Q        DID CURTIS TELL YOU THAT ...

BY MS. MC DONALD:

YOUR HONOR, HE'S ASKING THE SAME QUESTION IN A BACK DOOR SIDE.

BY MR. MERRITT:

I'M PROFFERING THE RECORD. SEND THE JURY OUT, AND I'LL PROFFER THE RECORD.

BY THE COURT:[

NO. NO. OH, YOU'RE GOING TO PROFFER THE RECORD, COUNSELOR. DON'T WORRY ABOUT THAT. YOU'RE GOING TO DO/WHEN I TELL YOU TO DO IT, AND YOU'RE NOT GOING TO DO IT NOW. NOW, OBJECTION SUSTAINED.

BY MR. MERRITT:

ARE YOU TELLING ME I CAN'T ASK THE QUESTIONS, YOUR HONOR?

BY THE COURT:

I'M TELLING YOU YOU CAN'T ASK THE QUESTION THAT ELICITS A HEARSAY ANSWER, COUNSELOR. THAT'S WHAT I'M TELLING YOU.

113

EXAMINATION RESUMED BY MR. MERRITT:

Q     DO YOU KNOW OF YOUR OWN KNOWLEDGE WHETHER CURTIS OWNED A GUN AND CARRIED A GUN REGULARLY?

A     YES, SIR.

Q     WHAT TYPE OF GUN WAS THAT?

A     IT WAS A .9 MILIMETER.

Q     DO YOU KNOW OF YOUR OWN KNOWLEDGE WHETHER CURTIS SOLD COCAINE?

A     YES, SIR.

Q     DO YOU KNOW OF YOUR OWN KNOWLEDGE WHETHER DERRICK SOLD COCAINE?

A     YES, SIR.

Q     DO YOU KNOW OF YOUR OWN KNOWLEDGE WHETHER DERRICK OWNED A GUN?

A     YES, SIR.

Q     WHAT TYPE OF GUN HE OWNED.

A     .9 MILIMETER.

Q     HAVE YOU EVER PURCHASED COCAINE FROM DERRICK?

BY MS. MC DONALD:

        OBJECTION, YOUR HONOR.

BY THE COURT:

        HAVE YOU WHAT?

BY MR. MERRITT:

        HAVE YOU EVER PURCHASED COCAINE FROM DERRICK?

BY THE COURT:

        HAVE YOU EVER PURCHASED COCAINE FROM DERRICK?

BY MR. MERRITT:

        THAT'S RIGHT.

BY MS. MC DONALD:

114

FROM DERRICK, YOUR HONOR.

BY MR. MERRITT:

DERRICK SAID HE DIDN'T SELL ANY.

BY THE COURT:

OVERRULED.

EXAMINATION RESUMED BY MR. MERRITT:

Q　HAVE YOU EVER PURCHASED COCAINE FROM DERRICK?

A　YES, SIR.

Q　HAVE YOU EVER PURCHASED COCAINE FROM MILLER?

BY MS. MC DONALD:

YOUR HONOR, I'M OBJECTING. HE NEVER ASKED THAT QUESTION OF MR. MILLER.

BY MR. MERRITT:

I DIDN'T. SHE'S RIGHT ABOUT THAT. I'LL WITHDRAW THAT QUESTION. I'LL TENDER MR. JULIAN.

CROSS EXAMINATION

EXAMINATION BY MS. MC DONALD:

Q　HOW LONG HAVE YOU BEEN IN PRISON?

A　HOW LONG HAVE I BEEN IN PRISON NOW?

Q　YES.

Q　APPROXIMATELY TWO AND A HALF MONTHS.

Q　AND WHAT ARE YOU IN FOR RIGHT NOW?

A　ARMED ROBBERY.

BY MR. MERRITT:

OBJECTION.

BY THE COURT:

OVERRULED.

EXAMINATION RESUMED BY MS. MC DONALD:

Q　ARMED ROBBERY. AND YOU'VE GOT A FELON WITH A FIREARM CONVICTION. IS THAT CORRECT?

115

A    YES, SIR (SIC.).

Q    AS WELL AS A POSSESSION OF MARIJUANA WITH INTENT TO DISTRIBUTE CONVICTION?

A    YES, MA'AM.

Q    AND AS WELL YOU STATED THAT YOU PURCHASED COCAINE FROM DERRICK AND FROM CURTIS?

A    YES.

Q    SO, YOU ARE A COCAINE USER, TOO?

A    NO, SIR (SIC).

Q    YOU JUST PURCHASE THE COCAINE?

A    YES.

Q    ALL RIGHT. NOW, YOU KNOW THAT ... DOES CURTIS USE DRUGS?

A    NO, MA'AM.

Q    OKAY. DIDN'T YOU JUST SAY THAT CURTIS WAS A USER OF DRUGS?

A    NO.

Q    OKAY. CURTIS JUST SOLD DRUGS?

A    YES.

Q    AND DERRICK SOLD DRUGS?

A    YES.

Q    OKAY. AND YOU BOUGHT FROM BOTH THESE INDIVIDUALS?

A    I NEVER HAVE BOUGHT ANYTHING FROM THEM. I PURCHASED IT.

Q    SO WHEN I JUST STATED YOU PURCHASED COCAINE FROM DERRICK AND YOU SAID YES, THAT WAS A LIE?

A    NO.

Q    WHAT WAS...WAS IT A LIE OR NOT A LIE?

A    I HAVE PURCHASES (INAUDIBLE) BEING GIVEN TO ME.

Q    FROM DERRICK?

A    DERRICK AND CURTIS.

116

Q    WHY?

A    BECAUSE I KNOW THEM.

Q    AND HE JUST GAVE YOU COCAINE?

A    YES.

Q    BECAUSE YOU'RE A COCAINE USER?

A    I DIDN'T SAY I WAS A COCAINE USER.  I HAVE PURCHASED IT FROM THEN, THOUGH.  THEY HAVE GIVEN IT TO ME.

Q    OH, SO YOU'RE A SELLER OF COCAINE?

A    NO.

Q    WHY DID YOU PURCHASE COCAINE FROM DERRICK IF, 1. YOU'RE NOT GOING TO USE IT, OR 2. YOU'RE NOT GOING TO SELL IT ON THE STREETS?  NEVER MIND.  I WITHDRAW THE QUESTION, YOUR HONOR.  NOW, YOU'RE A FELON WITH A FIREARM, SO YOU ALSO OWN A GUN.  IS THAT CORRECT?

A    NO, MA'AM.

Q    WELL, ACTUALLY YOU WERE CONVICTED OF POSSESSION OF MARIJUANA WITH INTENT TO DISTRIBUTE IT.  THAT'S CORRECT?

A    YES.

Q    AND THEY TOLD YOU THAT FOR A PERIOD OF TEN YEARS YOU'RE NOT ALLOWED TO HAVE A GUN ON YOU.  IS THAT CORRECT?

A    RIGHT.

Q    YET, WHEN WERE YOU CONVICTED OF FELON WITH A FIREARM?

A    IN '86.

Q    AND WHEN WERE YOU CONVICTED OF POSSESSION OF MARIJUANA WITH INTENT TO DISTRIBUTE?

A    IN '85.

117

Q    So, '85, '86 ... So, not only one year later you violated your rule, and you were in possession of a firearm. Is that correct?

A    Yes.

Q    And you were in possession of that firearm, weren't you?

A    No. No, ma'am.

Q    You were not?

A    No.

Q    So, did you plead guilty in that case?

A    Yes.

Q    Okay. And you remember filling a Boykin form when you pled guilty to felon with a firearm?

A    Yes.

Q    You remember signing the spot that said, "I am pleading guilty because I am in fact guilty."

A    I acknowledged to knowing that I wasn't supposed to be in possession of a firearm because I was on probation.

Q    And my question was: When you filled out the form you said, "I am pleading guilty to felon with a firearm," you had to mark, "Yes," on whether or not, "I am pleading guilty because I am in fact guilty of the crime." Is that correct?

A    Because I acknowledged to knowing that I wasn't supposed to be in possession of a firearm because I was on probation.

Q    So, the answer is yes. You pled guilty because you were in fact guilty of that crime.

118

Is that correct?

A    Just like I said, I had knowledge to knowing that I wasn't supposed to be nowhere in the area of a firearm because I was on probation.

Q    Your Honor, at this time the State would ask that you direct the witness to answer my question.

BY MR. MERRITT:

I think he's answered the question.

BY MS. MC DONALD:

He stated he had knowledge of it. My question is, Your Honor: Did you plead guilty to possession of a firearm, and did you mark on the little form, "Yes, I am pleading guilty because I am in fact guilty of possession of a firearm by a convicted felon."

BY THE WITNESS:

I pled guilty because I had knowledge...

BY MS. MC DONALD:

Yes or no. Your Honor, ...

BY THE WITNESS:

To knowing that I was on probation.

BY THE COURT:

Wait a minute. Wait a minute. First of all, answer yes or no, and then you can explain your answer. Did you sign the form and plead guilty?

BY THE WITNESS:

Yes.

119

BY THE COURT:

ALL RIGHT.

BY THE WITNESS:

BECAUSE I HAD KNOWLEDGE TO KNOWING THAT I WAS ON PROBATION I WASN'T SUPPOSED TO BE IN POSSESSION OF A FIREARM OR NOWHERE IN THE AREA OF A FIREARM.

EXAMINATION RESUMED BY MR. MC DONALD:

Q   AND YOU WERE IN POSSESSION OF A FIREARM.

A   NO, I WAS NOT IN POSSESSION.  I WAS AN ACCESSORY OF A FIREARM.

Q   ALL RIGHT.  WHEN YOU SIGNED THIS FORM THAT SAID, "I AM PLEADING GUILTY BECAUSE I AM IN FACT GUILTY OF POSSESSION OF A FIREARM BY A FELON," THAT WAS INCORRECT.  YOU WERE LYING AT THAT TIME BECAUSE YOU DID NOT HAVE POSSESSION OF THAT FIREARM.  IS THAT CORRECT?  IS THAT CORRECT?

A   IS THAT CORRECT?  NO.

Q   YOU WERE UNDER OATH AT THE TIME YOU PLED GUILTY TO FELON WITH A FIREARM.  IS THAT CORRECT?

A   YES.

Q   AND YOU WERE IN FRONT OF A JUDGE.  IS THAT CORRECT?

A   YES.

Q   YOU PLED GUILTY TO POSSESSION OF A FIREARM BY A FELON.  IS THAT CORRECT?

A   YES.

Q   BUT YOU WERE NOT ... JUST TO MAKE SURE I GET THIS RIGHT.  YOU WERE NOT IN POSSESSION

120

OF A FIREARM.

A    RIGHT.

Q    OKAY. SO, YOU WERE UNDER OATH AT THAT TIME. YOU ARE UNDER OATH AT THIS TIME, TOO, AREN'T YOU?

A    YES.

Q    AND THERE'S A JUDGE HERE, ISN'T THERE?

A    YES.

Q    AND THERE'S A COURT REPORTER AND THE D.A. AND THE DEFENSE ATTORNEY. ARE YOU LYING NOW BECAUSE YOU LIED THEN?

A    NO. JUST LIKE I EXPLAINED TO YOU I WAS ON PROBATION AT THE TIME AND I HAD KNOWLEDGE TO KNOWING THAT I WASN'T SUPPOSED TO BE IN NO AREA OF A FIREARM. THIS IS THE REASON WHY I PLED GUILTY.

BY THE COURT:
        WELL, THEN DID YOU PLEAD GUILTY BECAUSE YOU WERE GUILTY?

BY THE WITNESS:
        YES.

BY THE COURT:
        OKAY. COME ON. LET'S GO. HE PLED GUILTY BECAUSE HE WAS GUILTY. LET'S MOVE ON.

BY MS. MC DONALD:
        OKAY.

EXAMINATION RESUMED BY MS. MC DONALD:

Q    AFTER YOU GOT CONVICTED OF POSSESSION OF A FIREARM, YOU'RE NOT ALLOWED TO HAVE POSSESSION OF COCAINE, ARE YOU?

A    YES.

121

Q   YOU'RE NOT ALLOWED ... THE STATE OF LOUISIANA SAYS YOU CANNOT BE IN POSSESSION OF COCAINE. IS THAT CORRECT?

A   YES.

Q   YET, DERRICK ... YOU BOUGHT ... EXCUSE ME. DERRICK GAVE YOU, OUT OF THE GOODNESS OF HIS HEART, COCAINE, AND YOU WERE IN POSSESSION OF IT. IS THAT CORRECT?

A   YES.

Q   DO YOU HAVE ANY RESPECT FOR THE LAW WHATSOEVER?

BY MR. MERRITT:

    THAT'S OBJECTIONABLE.

BY MS. MC DONALD:

    I'LL WITHDRAW IT. I'VE NO FURTHER QUESTIONS.

BY THE COURT:

    ANYTHING ELSE?

BY MR. MERRITT:

    NO.

BY THE COURT:

    STEP DOWN, PLEASE. CALL YOUR NEXT WITNESS.

BY MS. MC DONALD:

    I'M SORRY?

BY THE COURT:

    LET ME TELL YOU SOMETHING, SON, YOU OPEN YOUR MOUTH IN MY COURT WHEN YOU'RE NOT SUPPOSED TO AND YOU'LL BE DOING A HECK OF A LOT MORE YEARS FOR CONTEMPT THAN YOU'RE DOING NOW. DO YOU UNDERSTAND ME?

BY THE WITNESS:

    YES, SIR.

BY THE COURT:

122

GET HIM OUT OF HERE.

BY MR. MERRITT:

I OBJECT TO THE COURT CHASTIZING THE WITNESS AND MOVE FOR A MISTRIAL, YOUR HONOR.

BY THE COURT:

WELL, THAT'S TOUGH. THE WITNESS SHOULDN'T HAVE CHASTIZED THE D.A. IN FRONT OF MY PRESENCE, COUNSELOR. LET'S MOVE ON; AND THAT GOES FOR ANYBODY, NOT JUST WITNESSES, ANYBODY. LET'S GO. CALL YOUR NEXT WITNESS NOW.

BY MR. MERRITT:

HENRY HUDSON.

HENRY HUDSON

CALLED BY THE DEFENSE, AND AFTER FIRST HAVING BEEN DULY SWORN, TESTIFIED AS OLLOWS:

DIRECT EXAMINATION

EXAMINATION BY MR. MERRITT:

BY THE COURT:

LET ME CAUTION, MR. HUDSON. ONLY ANSWER THE QUESTIONS THAT ARE ASKED. SAY NOTHING ELSE. DO YOU UNDERSTAND?

BY THE WITNESS:

YES, SIR.

BY THE COURT:

ALL RIGHT. LET'S GO.


EXAMINATION BY MR. MERRITT:

Q     STATE YOUR NAME FOR THE RECORD, PLEASE.

123

A       HENRY HUDSON.

Q       HENRY HUDSON, DO YOU KNOW A CURTIS MILLER?

A       YES.

Q       AND WHEN WAS THE LAST TIME YOU SAW CURTIS?

A       TWO WEEKS AGO.

Q       PARDON?

A       ABOUT TWO WEEKS AGO.

Q       WHERE DID YOU SEE HIM?

A       ON THE DOCKS.

Q       WHAT WAS  HE  DOING THERE?

A       ON A COCAINE CHARGE.

Q       AND DID YOU SEE HIM BEFORE THAT?

A       YES, ON THE STREET.

Q       AND HOW LONG HAVE YOU BEEN INCARCERATED?

A       TWO MONTHS.

Q       AND HAVE YOU BEEN CONVICTED OF ANYTHING IN THE PAST?

A       MY LAST CONVICTION WAS IN '85.

Q       AND WHAT WAS THAT?

A       POSSESSION OF COCAINE.

Q       AND BEFORE THAT TIME IN '85 WERE  YOU CONVICTED OF ANYTHING?

A       NO, SIR.

Q       YOU HAVE ONE CONVICTION FOR POSSESSION OF COCAINE, YOU SAY?

A       YES.

Q       DID YOU HAVE A CONVERSATION WITH CURTIS ON THE DOCKS?

A       NO.

Q       HAVE YOU EVER TALKED TO CURTIS WITH REFERENCE TO ...

BY MS. O'BANNON:

        OBJECTION.  HE'S  LEADING.  HE ASKED HIM ...

BY THE COURT:

124

OVERRULED.

EXAMINATION RESUMED BY MR. MERRITT:

Q      DID YOU HAVE A CONVERSATION WITH CURTIS WITH REFERENCE TO A CONTRACT PLACED ON LEONARD NELSON?

BY MR. O'BANNON:

OBJECTION, YOUR HONOR.  NOW, HE'S CALLING FOR HEARSAY IN THE ANSWER.  HE'S ALSO TESTIFYING IN HIS QUESTION.

BY THE COURT:

ALL RIGHT.  GIVE ME THE QUESTION AGAIN, COUNSELOR.

BY MR. MERRITT:

DID YOU HAVE A CONVERSATION WITH CURTIS WITH REFERENCE TO A CONRACT THAT WAS PLACED ON LEONARD NELSON?

BY THE COURT:

OVERRULED.  YOU CAN ANSWER IT.

BY THE WITNESS:

YES.

BY THE COURT:

BEG YOUR PARDON?  DID YOU HAVE A CONVERSATION WITH CURTIS CONCERNING A DEATH CONTRACT?

BY THE WITNESS:

YES, I DID.

EXAMINATION BY MR. MERRITT:

Q      AND WHAT EXACTLY DID CURTIS TELL YOU?

BY MS. O'BANNON:

OBJECTION, YOUR HONOR.

BY THE COURT:

125

SUSTAINED.

BY MR. MERRITT:

NOTE AN EXCEPTION.

BY THE COURT:

LET IT BE NOTED.

EXAMINATION RESUMED BY MR. MERRITT:

Q    DID CURTIS TELL YOU THAT THERE WAS MONEY ON LEONARD'S HEAD?

BY MS. O'BANNON:

OBJECTION, YOUR HONOR.

BY THE COURT:

SUSTAINED.

BY MR. MERRITT:

NOTE AN EXCEPTION, YOUR HONOR.

BY THE COURT:

LET IT BE NOTED.

EXAMINATION RESUMED BY MR. MERRITT:

Q    DO  YOU HAVE PERSONAL KNOKWLEDGE OF DERRICK AND CURTIS SELLING COCAINE?

A    YES.

Q    DO  YOU HAVE PERSONAL KNOWLEDGE OF DERRICK AND CURTIS OWNING WEAPONS?

A    YES.

Q    HAVE YOU EVER SEEN OR HAVE A PERSONAL KNOWLEDGE     - OF HAROLD "BOSS" WILSON CARRYING A GUN?

A    A REVOLVER.

BY MR. MC DONALD:

I'M SORRY.  I DIDN'T HEAR THE ANSWER.

126

BY THE COURT:

A REVOLVER.

EXAMINATION RESUMED BY MR. MERRITT:

Q     DID YOU HAVE PERSONAL KNOWLEDGE OF AN AMBUSH?

BY MR. O'BANNON:

I'M GOING TO OBJECT.  THAT'S A LEADING QUESTION IN
ITS FORM AT THIS STATE.

BY THE COURT:

OVERRULED.

EXAMINATION RESUMED BY MR. MERRITT:

Q     DO YOU HAVE PERSONAL KNOWLEDGE OF AN AMBUSH INVOLVING
DERRICK MARIGNY, CURTIS MILLER, "BOSS"
WILSON SHOOTING AT LEONARD NELSON?

A     NO.

BY MS. O'BANNON:

I'M GOING TO OBJECT.

BY THE COURT:

ASKED AND ANSWERED.  LET'S GO.

EXAMINATION RESUMED BY MR. MERRITT:

Q     HAD YOU BEEN TOLD OF THAT AMBUSH  BY CURTIS MILLER?

BY MS. O'BANNON:

OBJECT.

BY THE COURT:

SUSTAINED.  DON'T ASK A QUESTION THAT'S OBVIOUSLY
LEADING, COUNSEL.

EXAMINATION RESUMED BY MR. MERRITT:

Q     DID YOU HAVE A CONVERSATION WITH CURTIS IN REFERENCE

127

TO THE AMBUSH?

BY MS. O'BANNON:

    I'M GOING TO OBJECT AGAIN, YOUR HONOR.

BY THE COURT:

    HE ANSWERED THAT HE KNEW NOTHING ABOUT IT. ALL RIGHT?

BY MR. MERRITT:

    HE DIDN'T SEE IT, PERSONAL KNOWLEDGE.

BY THE COIURT:

    DID YOU HAVE ANY CONVERSATION WITH ANYBODY CONCERNING AN AMBUSH?

BY THE WITNESS:

    I DIDN'T HAVE NO PERSONAL KNOWLEDGE OF IT. I WAS TOLD ABOUT IT.

EXAMINATION RESUMED BY MR. MERRITT:

Q    AND WHO TOLD YOU ABOUT IT?

A    CURTIS.

BY MS. O'BANNON:

    I'M GOING TO OBJECT, YOUR HONOR.

BY THE COURT:

    OVERRULED, MADAM, OVERRULED. WHO TOLD? ·FIONE. IF IT WAS SAID, FINE. WHAT WAS SAID IS HEARSAY.

BY MR. MERRITT:

    TENDER THE WITNESS, YOUR HONOR.

    . .

CROSS EXAMINATION

EXAMINATION BY MS. O'BANNON:

Q    HENRY, WHAT ARE YOU HERE FOR IN THE BACK FOR? WHY ARE YOU IN JAIL?

128

BY MR. RUSKIN:

OBJECTION, YOUR HONOR.

BY THE COURT:

WHAT'S THE QUESTION?

BY MS. O'BANNON:

WHY ARE YOU IN THE BACK RIGHT NOW?

BY THE COURT:

OVERRULED.

BY MR. MERRITT:

UNLESS HE'S SERVING SENTENCE.

BY THE COURT:

OVERRULED.

BY MR. MERRITT:

NOTE AN EXCEPTION.

EXAMINATION RESUMED BY MS. O'BANNON:

Q      ARMED ROBBERY.

Q      WHEN DID THAT INCIDENT TAKE PLACE?

BY MR. MERRITT:

OBJECTION, YOUR HONOR.

BY THE COURT:

SUSTAINED.

EXAMINATION RESUMED BY MS. O'BANNON:

Q      WHERE DO YOU KNOW CURTIS MILLER FROM?

A      ON THE STREET.

Q      ABOUT HOW LONG HAVE YOU KNOWN HIM?

A      TWO YEARS.

Q      HOW ABOUT DERRICK MARIGNY?

A      ON THE STREET.

Q      HOW LONG HAVE YOU KNOWN DERRICK?

129

A     YEARS.

Q     I'M SORRY?

A     YEARS.

Q     FIVE YEARS?  TEN YEARS?

A     TEN, FIFTEEN.

Q     HOW OLD ARE YOU?

A     I'M TWENTY-FOUR.

Q     TWENTY-FOUR.  AND YOU HAVE A PRIOR CONVICTION FOR
      POSSESSION OF COCAINE?

A     YES.

Q     WERE YOU THERE ON MAY 6TH, 1990 WHEN HAROLD "BOSS"
      WILSON WAS SHOT DOWN BY LEONARD NELSON?

A     NO.


BY MS. O'BANNON:
      NOTHING FURTHER.
BY THE COURT:
      CALL YOUR NEXT WITNESS.
BY MR. MERRITT:
      ONE MOMENT, YOUR HONOR.




                    CRAIG JONES
      CALLED BY THE DEFENSE, AND AFTER FIRST HAVING BEEN
DULY SWORN, TESTIFIED AS FOLLOWS:
                    DIRECT EXAMINATION
EXAMINATION BY MR. RUSKIN:
BY THE COURT:
      MR. JONES, I CAUTION YOU TO ANSWER ONLY THE QUESTIONS
      THAT ARE ASKED TO YOU, AND DON'T SAY
      ANYTHING ELSE IN THIS COURTROOM WITHOUT

                                                     130

MY PERMISSION. ALL RIGHT. PROCEED.

EXAMINATION BY MR. RUSKIN:

Q     FOR THE RECORD, SIR, WOULD YOU TELL THE COURT REPORTER YOUR FULL NAME.

A     CRAIG JOSEPH JONES.

Q     AND YOU ARE IN JAIL NOW?

A     YES, SIR.

Q     AND WHERE IS THAT?

A     TEMPLEMAN.

Q     TEMPLEMAN ... IS THAT TENT CITY OR THAT'S A DIFFERENT PLACE?

A     THAT'S DIFFERENT.

Q     AND IS THAT THE SAME JAIL AS C.C.C. OR IS IT A DIFFERENT PLACE?

A     IT'S A DIFFERENT PLACE.

Q     NOW, DO YOU KNOW ANYBODY BY THE NAME OF CURTIS MILLER?

A     YES, SIR.

Q     AND HOW DID YOU COME TO MEET HIM?

A     I COME TO MEET HIM IN THE PROJECT.

Q     ALL RIGHT. HOW LONG HAVE YOU KNOWN HIM?

A     I'VE KNOWN HIM ABOUT ...

BY MS. MC DONALD:

YOUR HONOR, WE'VE GOT COMPETITION HERE FROM THE OUT-SIDE, AND I CAN'T HEAR A THING.

BY THE COURT:

WE CAN HEAR YOU, MR. RUSKIN, BUT WE CAN'T HEAR HIM. ALL RIGHT. WHAT WAS YOUR ANSWER TO THE LAST QUESTION?

BY THE WITNESS:

I KNOW HIM ABOUT TWO YEARS.

131

BY THE COURT:

    TWO YEARS?

BY THE WITNESS:

    YES, SIR.

EXAMINATION RESUMED BY MR. RUSKIN:

Q    DO YOU KNOW A PERSON BY THE NAME OF DERRICK MARIGNY?

A    YES, SIR.

Q    AND HOW LONG HAVE YOU KNOWN HIM?

A    I KNOW DERRICK ABOUT FIVE YEARS.

Q    AND WHERE DO YOU KNOW HIM FROM?

A    FROM THE PROJECTS.

Q    WHERE IN THE PROJECTS HE LIVES OR HANGS OUT?

A    YES.

Q    WHERE IS THAT?

A    HE LIVE ON MILTON STREET. THAT'S WHERE HE HANG OUT AT.

Q    NOW, MILTON, IS THAT NEAR DUPLESSIS AND FOY?

A    YES.

Q    NOW, DO YOU KNOW ... DID YOU KNOW A FELLOW NAMED HAROLD "BOSS", HAROLD WILSON?

A    YES, SIR.

Q    AND HOW DO YOU KNOW HIM? OR HOW LONG DO YOU KNOW HIM?

A    I BEEN KNOWING HAROLD FOR ... I JUST BEEN KNOWING HIM SINCE WE CAME IN, YOU KNOW, FROM ANGOLA PENITENTIARY.

Q    YOU'VE BEEN TO JAIL?

A    YES, SIR.

Q    HAVE YOU EVER BEEN CONVICTED OF ANYTHING?

A    I BEEN CONVICTED OF CARRYING A CONCEALED WEAPON.

132

Q     THAT'S A MISDEMEANOR.

A     FELONY.

Q     FELONY?  EVER PLEAD GUILTY OR GET PROBATION FOR ANY-
THING ELSE?

A     YES, SIR.

Q     AND WHAT WAS THAT?

A     THAT WAS THE CONVICTION I HAD GOT.

Q     AND WHAT ELSE?  ANYTHING ELSE?

A     THAT'S IT'.

Q     YOU GOT SIX MONTHS ON THAT?

A     YES, SIR.  SIX MONTHS AND TWO YEARS PROBATION AND
THREE YEARS SUSPENDED SENTENCE.

Q     DO YOU KNOW OR HAVE YOU EVER SEEN HAROLD AND DERRICK
AND CURTIS TOGETHER?

A     YES, SIR.

Q     HOW OFTEN?

A     I WOULD SEE THEM A LOT OF TIMES.

Q     HAVE YOU EVER SEEN THEM IN THE AREA OF 1470 MILTON
STREET?

BY MS. MC DONALD:

      YOUR HONOR, I OBJECT TO THE RELEVANCE OF THIS NOW.

BY MR. RUSKIN:

      IT'S BY DUPLESSIS AND FOY, THE PARTICULAR ADDRESS,
THE 1400 BLOCK OF MILTON.

BY THE COURT:

      OVERRULED.


EXAMINATION RESUMED BY MR. RUSKIN:

A     YES, SIR.

Q     DUPLESSIS AND FOY, WHERE IS THAT RELATIVE TO MILTON,
THE 1400 BLOCK OF MILTON?

133

A     IT'S RIGHT ACROSS THE STREET, RIGHT ACROSS THE STREET.

Q     NOW, DID THERE EVER COME A TIME WHEN YOU MET CURTIS MILLER IN THE JAIL?

A     YES, SIR.

Q     AND WHERE WAS THAT?

A     ON THE DOCKS.

Q     THE DOCKS, YOU MEAN THE TENTS OR TEMPLEMAN OR C.C.C.?

A     OVER HERE IN THE OLD PARISH COMING TO COURT.

Q     NOW, FOR THE JURY, BECAUSE I DON'T THINK THEY MAY KNOW, YOU WERE COMING FROM WHERE TO COME TO COURT?

A     I WAS COMING FROM TEMPLEMAN.

Q     OKAY. AND CURTIS, DO YOU KNOW WHERE HE WAS COMING FROM?

A     I THINK THE HOUSE OF D. I'M NOT SURE.

Q     WHY DO THEY BRING YOU TO THE DOCKS?

A     FOR TO COME TO COURT.

Q     SO, IT'S LIKE ASSEMBLY POINT OR SOMETHING?

A     YES.

Q     OKAY. NOW, YOU SAID THAT YOU KNOW DERRICK FROM THE STREET. FROM YOUR PERSONAL KNOWLEDGE, HAVE YOU EVER SEEN HIM CARRY A GUN?

A     A LOT OF TIMES.

Q     FROM YOUR PERSONAL KNOWLEDGE, HAVE YOU EVER SEEN HIM SHOOT A GUN?

A     NO, NOT REALLY.

Q     HAVE YOU EVER SEEN CURTIS CARRY A GUN?

A     YES, SIR.

Q     HAVE YOU EVER SEEN HAROLD CARRY A GUN?

A     YES, SIR.

Q     DO YOU HAVE ... DID YOU SAY THAT YOU SPENT SOME TIME IN JAIL WITH ONE OF THOSE THREE GUYS?

134

A       SPENT TIME?  NO.

Q       DO YOU KNOW FROM PERSONAL KNOWLEDGE IF THEY'VE
        BEEN CONVICTED OF FELONIES?

A       YES, SIR.

BY MS. MC DONALD:
        OBJECTION, YOUR HONOR.

BY THE COURT:
        SUSTAINED.  DON'T ASK THOSE KIND OF QUESTIONS,
        MR. RUSKIN.  ALL RIGHT?


EXAMINATION RESUMED BY MR. RUSKIN:

Q       DO YOU KNOW OF YOUR OWN PERSONAL KNOWLEDGE, HAVE
        YOU EVER SEEN DERRICK POSSESS AND
        SELL DRUGS?

A       YES, A LOT OF TIMES.

Q       WHAT GENERAL AREA WAS THAT IN?

A       THE 1400 BLOCK OF MILTON.

Q       HAVE YOU EVER SEEN HAROLD POSESS OR SELL DRUGS?

A       YES, SIR.

Q       AND WHAT GENERAL AREA WAS THAT?

A       THE 1400 BLOCK OF MILTON.

Q       WHAT ABOUT CURTIS MILLER?

A       1400 BLOCK OF MILTON.

Q       YOU KNOW THE THREE GENTLEMEN. FROM YOUR OWN PERSONAL
        KNOWLEDGE, WAS ONE OF THEM IN CHARGE?
        DO YOU KNOW?

BY MS. MC DONALD:
        I'M GOING TO OBJECT TO THE IRRELEVANCE OF THE QUESTION,
        WHETHER OR NOT ONE INDIVIDUAL WAS
        IN CHARGE OF ANOTHER.

BY THE COURT:

135

SUSTAINED.

EXAMINATION RESUMED BY MR. RUSKIN:

Q      DID EITHER OF THE TWO INDIVIDUALS WORK FOR THE
THIRD ONE?

BY MS. MC DONALD:

OBJECT.

BY THE COURT:

SUSTAINED.

EXAMINATION RESUMED BY MR. RUSKIN:

Q      DID YOU EVER SEE ONE OF THOSE THREE INDIVIDUALS HOLD-
ING MONEY WHILE YOU WATCHED THEM
DISTRIBUTING COCAINE?

BY MS. MC DONALD:

OBJECTION.

BY THE COURT:

SUSTAINED.  AND DON'T TRY AND DO ANY MORE, COUNSELOR,
ALL RIGHT, ALONG THAT LINE.  OBJECTION
SUSTAINED ALONG THOSE LINES.  THAT'S
NOT WHAT WE'RE HERE FOR TODAY.

BY MR. RUSKIN:

NOTE MY EXCEPTION.

BY THE COURT:

LET IT BE NOTED.

EXAMINATION RESUMED BY MR. RUSKIN:

Q      DID YOU EVER HAVE A CONVERSATION WITH CURTIS ABOUT
WHAT HE KNEW ABOUT THE KILLING OF HAROLD
"BOSS"?

A      I ...

136

BY THE COURT:

DID YOU OR DID YOU NOW HAVE A CONVERSATION WITH THAT MAN?

BY THE WITNESS:

YES, I HAD.  I HAD A CONVERSATION.

BY THE COURT:

THE ANSWER'S YES .  NEXT QUESTION.

EXAMINATION RESUMED BY MR. RUSKIN:

Q     FOR PURPOSES OF IMPEACHMENT, YOUR HONOR, DID HE TELL YOU WHAT HE KNEW?

BY MS. MC DONALD:

OVERRULED.

BY THE COURT:

DID HE TELL YOU WHAT HE KNEW?

BY THE WITNESS:

NO, SIR.  HE TOLD ME ...

BY THE COURT:

WHAT WAS YOUR ANSWER?  YES, SIR, OR NO, SIR?

BY THE WITNESS:

NO, SIR.

BY THE COURT:

HE DID NOT TELL YOU WHAT HE KNEW?

BY THE WITNESS:

HE TOLD ME. ..

BY THE COURT:

DON'T TELL ME WHAT HE SAID.  DID HE OR DID HE NOT TELL YOU WHAT HE KNEW?

BY THE WITNESS:

HE DIDN'T TELL ME WHAT HE KNEW.

BY THE COURT:

137

ALL RIGHT.  NEXT QUESTION.

EXAMINATION RESUMED BY MR. RUSKIN:

Q       DID YOU HAVE A CONVERSATION ABOUT WHETHER OR NOT HE WOULD GET ANY BENEFIT FOR TESTIFYING?

BY MS. MC DONALD:

OBJECTION.  IT CALLS FOR HEARSAY.

BY THE COURT:

YES, SUSTAINED, COUNSELOR.  HE SAID HE DID NOT TELL HIM WHAT HE KNEW.  ALL RIGHT?  EVERY-THING ELSE IS IRRELEVANT.

BY MR. RUSKIN:

ABOUT THIS INCIDENT.

BY THE COURT:

THIS INCIDENT?

BY MR. RUSKIN:

THE HAROLD "BOSS" KILLING.

BY THE COURT:

ALL RIGHT.  ALL RIGHT.

BY MR. RUSKIN:

THAT WAS THE FIRST QUESTION.

BY THE COURT:

ALL RIGHT.

EXAMINATION RESUMED BY MR. RUSKIN:

Q       DID HE EVER TELL ... DID HE EVER DISCUSS WITH YOU WHETHER OR NOT HE GOT ANY BENEFIT OR WAS GOING TO GET ANY BENEFIT FOR TESTIFYING?

BY MS. MC DONALD:

138

OBJECTION. IT WOULD CALL FOR HEARSAY.

BY THE COURT:

DID HE EVER TALK TO YOU ABOUT ANY OF THAT?

BY THE WITNESS:

NO, SIR.

BY THE COURT:

ALL RIGHT. THE ANSWER IS, NO, HE DID NOT. NEXT QUESTION.

EXAMINATION RESUMED BY MR. RUSKIN:

Q       DID CURTIS EVER DISCUSS WITH YOU WHETHER OR NOT HAROLD, CURTIS AND DERRICK FIRED AT THE DEFENDANT?

BY MS. MC DONALD:

YOUR HONOR, I'M GOING TO OBJECT. IT CALLS FOR HEARSAY. MR. RUSKIN KNOWS BETTER.

BY THE COURT:

WELL, IT'S AT THIS POINT AND TIME OVERRULED. DID HE EVER DISCUSS WITH YOU WHAT?

BY MR. RUSKIN:

DID HE EVER TALK TO YOU ABOUT DERRICK, HAROLD AND CURTIS SHOOTING AT THE DEFENDANT HERE?

BY THE WITNESS:

NO.

BY THE COURT:

NO, SIR. NEXT QUESTION.

EXAMINATION RESUMED BY MR. RUSKIN:

Q       ARE YOU AWARE OF THE SHOOTOUT?

A       I'M AWARE?

Q       ARE YOU AWARE OF THE SHOOTOUT BETWEEN THEM? DO YOU KNOW ABOUT A SHOOTOUT BETWEEN

139

                                    HAROLD, CURTIS AND DERRICK AND THE
                                    DEFENDANT?

BY MR. MC DONALD:

        YOUR HONOR, I'M GOING TO OBJECT TO THE FORM OF THE
                            QUESTION.  IF HE KNOWS FROM HIS OWN
                            PERSONAL KNOKWLEDGE, HE CAN ANSWER
                            THAT, NOT FROM HEARSAY INFORMATION.

BY THE COURT:

        SUSTAINED.


EXAMINATION RESUMED BY MR. RUSKIN:

Q       DO YOU HAVE PERSONAL KNOKWLEDGE OF IT?

A       NO, I WAS INCARCERATED.


BY THE COURT:

        ALL RIGHT.  NEXT QUESTION.  COME ON, MR. RUSKIN.

BY MR. RUSKIN:

        I'LL TENDER, YOUR HONOR.

BY THE COURT:

        ALL RIGHT, ANYTHING?

BY MS. MC DONALD:

        JUST A FEW QUESTIONS, YOUR HONOR.



                            CROSS EXAMINATION

EXAMINATION  BY MS. MC DONALD:

Q       YOU'VE BEEN CONVICTED FOR A GUN CHARGE, IS THAT
                            CORRECT?

A       YES, MA'AM.

Q       AND YOU RECEIVED THREE YEARS ON A SUSPENDED SENTENCE?

A       YES, MA'AM.

                                                            140

Q     AND THAT'S A FELONY CONVICTION.  IS THAT CORRECT?

A     YES, MA'AM.

Q     WAS THAT A FELON WITH A FIREARM?

A     NO, THAT WAS MY FIRST FELONY CONVICTION.

Q     I'M SORRY?

A     THAT WAS MY FIRST FELONY CONVICTION.

Q     IT WAS YOUR FIRST FELONY CONVICTION.  OKAY.  DO
      YOU HAVE ANY OTEHR MISDEMEANOR CON-
      VICTIONS?

A     NO, MA'AM.

Q     NO OTHER CONVICTIONS BESIDES THIS ONE?

A     I GOT A BATTERY.

Q     HAVE YOU EVER BEEN CONVICTED ...

BY MR. RUSKIN:

      WAIT.  WAIT.  I DIDN'T ...

BY THE WITNESS:

      BATTERY.

BY THE COURT:

      BATTERY.


EXAMINATION RESUMED BY MS. MC DONALD:

Q     AN AGGRAVATED BATTERY

A     YES, MA'AM.

Q     AND IS THAT A FELONY, ALSO?

A     NO, IT'S A MISDEMEANOR.

Q     AND WHAT KIND OF WEAPON WERE YOU USING TO GET AN
      AGGRAVATED BATTERY?

A     I AIN'T USED NO AGGRAVATED BATTERY.  IT WAS BATTERY.

Q     OKAY.  WHAT SECTION ... DID YOU PLEAD GUILTY OR
      WERE FOUND GUILTY?

A     I PLEADED GUILTY.

141

Q        IN WHAT SECTION WAS THAT?  WAS THAT SECTION "B"?

BY MR. RUSKIN:

YOUR HONOR, BEFORE WE MOVE ON PERHAPS THE STATE HAS
SOME CERTIFIEDS.  I SHOULD BE ENTITLED
...

BY MS. MC DONALD:

IS THIS AN OBJECTION, YOUR HONOR.

BY MR. RUSKIN:

THIS IS AN OBJECTION.  I THINK THAT THE STATE SHOULD
SHOW ME SOME CERTIFIEDS, IF THIS IS
WHAT THEY'RE LEADING AT.

BY THE COURT:

NO, THEY DON'T HAVE TO SHOW YOU ANYTHING.  HE'S
ON CROSS EXAMINATION, CONSEL.  NOW,
IF YOU HAVE AN OBJECTION, MAKE IT.

BY MR. RUSKIN:

HE'S ALREADY ADMITTED THE CONVICTION.

BY THE COURT:

YOU HAVE AN OBJECTION, COUNSELOR?

BY MR. RUSKIN:

YES, OBJECTION TO THE CONTINUING NATURE OF THE
TESTIMONY.

BY THE COURT:

OVERRULED.

EXAMINATION RESUMED BY MS. MC DONALD:

Q        WERE YOU EVER CONVICTED OF AN ATTEMPTED ARMED
ROBBERY?

A        NO, MA'AM.

Q        HAVE YOU EVER BEEN CONVICTED OF BATTERY OF A POLICE

142

OFFICER?

A    YES, MA'AM.

Q    SO, JUST SO I CAN GET THIS STRAIGHT. YOU ONLY ADMITTED TO ONE CONVICTION, BUT UPON MY CROSS EXAMINATION YOU ADMITTED TO THREE CONVICTIONS?

BY MR. MERRITT:

THAT'A ARGUMENTATIVE?

BY MS. MC DONALD:

YOUR HONOR, THIS IS CROSS EXAMINATION.

BY THE COURT:

OVERRULED.

BY MR. MERRITT:

OBJECT.

BY THE COURT:

LET IT BE NOTED.

EXAMINATION RESUMED BY MS. MC DONALD:

Q    THREE CONVICTIONS?

A    THAT'S IT. I WAS TELLING YOU ABOUT IT.

Q    YOU'RE SURE?

A    YES, MA'AM.

Q    THREE'S ALL YOU GOT?

A    THAT'S IT.

Q    HOW MANY COUNTS OF BATTERY ON A POLICE OFFICER WERE YOU CONVICTED OF?

A    I WAS CONVICTED ON ONE.

Q    JUST ONE?

A    TO MY KNOWLEDGE.

Q    ON MAY 6, 1990, WERE YOU THERE ON THE SCENE WHEN SKINNY MAN SHOT DOWN HAROLD WILSON?

143

A       NO, MA'AM, I WAS INCARCERATED.

BY MS. MC DONALD:

        NOTHING FURTHER, YOUR HONOR.

BY MR. RUSKIN:

        NOTHING FURTHER, JUDGE.

BY THE COURT:

        ALL RIGHT, STEP DOWN.  CALL YOUR NEXT WITNESS.

BY MR. MERRITT:

        JANET PEREZ.


                        JANET PEREZ

        CALLED BY THE DEFENSE, AND AFTER FIRST HAVING BEEN
DULY SWORN, TESTIFIED AS FOLLOWS:

                    DIRECT EXAMINATION

EXAMINATION BY MR. MERRITT:

Q       PLEASE GIVE YOUR FULL NAME TO THE COURT REPORTER.

A       JANET SHANTEL CAMILLE PEREZ.

Q       AND HOW OLD ARE YOU, MS. PEREZ?

A       SEVENTEEN.

Q       AND WHEN WILL YOU BE EIGHTEEN?

A       OCTOBER 20TH.

Q       ON MAY 6TH, 1990, HOW OLD WERE YOU?

A       SIXTEEN.

Q       AND ON THAT DAY SOMETIME AROUND 1:30 IN THE MORNING
                WERE YOU IN THE END ZONE BAR?

A       YES.

Q       AND WAS CURTIS MILLER THERE, TOO?

BY MS. O'BANNON:

        I'M GOING TO OBJECT TO THE LEADING NATURE OF THE
                QUESTION.

                                                        144

BY MR. MERRITT:

    JUST YES OR NO. IT'S NO ...

BY THE COURT:

    YES. OVERRULED. ESPECIALLY AT THIS POINT.

EXAMINATION RESUMED BY MR. MERRITT:

Q    DID YOU SEE CURTIS MILLER THAT NIGHT AT THE BAR?

A    YES.

Q    HOW OFTEN DOES CURTIS MILLER GO INTO THE BAR?

BY MS. O'BANNON:

    I OBJECT. HOW COULD SHE POSSIBLY KNOW HOW OFTEN HE GOES IN THE BAR.

BY THE COURT:

    YES. WHAT? THAT DAY? THAT YEAR? THAT WEEK?

BY MR. MERRITT:

    THAT EVENING, HOW LONG WAS HE IN THE BAR?

BY THE WITNESS:

    ABOUT 45 MINUTES, CLOSE TO A HOUR.

EXAMINATION RESUMED BY MR. MERRITT:

Q    APPROXIMATELY SOMETIME AROUND 1:30, DID YOU HAVE THE OCCASION TO SEE LEONARD NELSON AND MAT MO?

A    YES.

Q    TELL THE MEMBERS OF THE JURY ON WHAT OCCASION YOU SAW THEM, WHERE THEY WERE COMING FROM, WHAT YOU DID AND WHAT THEY DID.

A    I WAS COMING OUT THE END ZONE, AND THEY WAS WALKING UP BRUXELLES TO THE CORNER OF TREASURE. AND CURTIS, DERRICK AND HAROLD WERE STANDING ACROSS THE STREET ON THE CORNER

145

OF TREASURE AND BRUXELLES, LEANING ON A CAR. WHEN THEY SEEN LEONARD AND MAT MO COMING UP THE STREET DERRICK AND HAROLD REACHED FOR THEIR GUN. WHEN THEY REACHED FOR THEIR GUN I RAN ACROSS THE STREET BECAUSE I KNOW LEONARD AND MATTHEW WELL. I TOLD THEM THAT THEY SHOULD LEAVE, BECAUSE IT LOOKS LIKE THEY WAS GOING TO KILL THEM. AND AFTER I TURNED AROUND TO WALK BACK IN THE END ZONE I HEARD A FIRED SHOT.

Q    AT THE TIME OF ... THAT IS, ON MAY 6TH, DID THEY HAVE A METAL SCREENING DEVICE FOR ALLOWING YOU IN AND OUT OF THE BAR AT THE END ZONE?

A    NO.

Q    WHEN DID THEY GET ONE?

A    AFTER THE SHOOTING.

BY MR. MERRITT:

TENDER THE WITNESS, YOUR HONOR.

BY TEH COURT:

ALL RIGHT.

CROSS EXAMINATION

EXAMINATION BY MS. O'BANNON:

Q    MA'AM, MAY 6TH, 1990, YOU WERE 16 YEARS OLD?

A    YES.

Q    AND YOU WERE INSIDE THE END ZONE AT THAT TIME WHEN YOU WERE 16 YEARS OLD?

A    YES..

Q    SO, YOU  DRANK?

146

A    No.

Q    You just hang out inside barrooms?

A    Yes.

Q    They don't have anybody checking I.D.s?

A    Nowadays, they do.

Q    What's the legal age to drink?

A    Twenty-one.

Q    What's the legal age to be in a barroom?

A    Twenty.

Q    You say that you saw Curtis inside the barroom?

A    Yes.

Q    Do you know how old Curtis is?

A    No, I don't.

Q    How long have you known Curtis?

A    About two years because we went to school together.

Q    Janet, you said you saw Derrick pull a gun?

A    Yes.

Q    And then as soon as you saw Derrick pull a gun you told Leonard ...

A    And Matthew.

Q    What exactly did you tell them?

A    I said that they should leave cause it looked like they were going to kill them.

Q    And after that you walked back into the End Zone Lounge?

A    Yes.

Q    You were so concerned for Leonard's welfare you didn't say, "Leonard, come into the bar with me so they don't kill you."

A    No, ma'am.

Q    You were so concerned about Leonard's welfare that

147

AFTER HAROLD WAS SHOT, AFTER YOU HEARD ALL THE SHOTS, YOU DIDN'T GO OUTSIDE AND TELL THE POLICE WHAT YOU HAD SEEN.

A     NO, MA'AM.

Q     IN FACT, THIS IS THE FIRST TIME THAT YOU'RE EVER TELLING ANYBODY WHAT HAPPENED ON THAT EVENING. IS THAT CORRECT?

A     NO.

Q     WHO ELSE HAVE YOU TOLD? HAVE YOU EVER TOLD ANYBODY

A     AT THE D.A.'S OFFICE?

A     NO, I SPOKE...

Q     HAVE YOU EVER TALKED TO THE POLICE?

A     NO.

Q     HAVE YOU TALKED TO ANY LAW ENFORCEMENT AGENCY ABOUT WHAT YOU SAW THAT NIGHT?

A     YES.

Q     WHO WOULD THAT BE?

A     THE LAWYER OVER THERE.

Q     THAT IS NOT A LAW ENFORCEMENT AGENCY.

MR. MERRITT:

WHY NOT?

BY THE COURT:

WHO DID SHE TELL?

BY MS. O'BANNON:

THE LAWYER, THE DEFENDANT'S LAWYER.

BY THE COURT:

ALL RIGHT. DON'T TESTIFY AS TO WHAT IT IS. YOU TOLD THE LAWYER. RIGHT?

BY THE WITNESS:

YES.

148

EXAMINATION RESUMED BY MS. O-BANNON:

Q        JANET, WERE YOU OUTSIDE WHEN THE SHOOTING BEGAN?

A        NO.

Q        SO, IN FACT, YOU DIDN'T SEE WHAT HAPPENED AFTER YOU WALKED INTO THE BAR.  ISN'T THAT CORRECT?

A        CORRECT.

Q        SO, YOU DIDN'T SEE WHEN LEONARD NELSON RAN ACROSS THE STREET AND PULLED A GUN ON HAROLD; ISN'T THAT CORRECT?

A        NO, I DIDN'T SEE THAT.

Q        AND YOU DIDN'T SEE LEONARD NELSON CHASE HAROLD DOWN THE STREET, DID YOU?

A        NO, I DIDN'T.

Q        AND YOU DIDN'T SEE LEONARD NELSON SHOOT HAROLD THREE TIMES, DID YOU?

A        NO, I DIDN'T.

BY MS. O'BANNON:

        THANK YOU.  I HAVE NOTHING FURTHER.

BY MR. MERRITT:

        THANK YOU, MS. PEREZ.  EILEEN WINCHESTER.

BY THE COURT:

        EILEEN WINCHESTER.


                    EILEEN WINCHESTER

        CALLED BY THE DEFENSE, AND AFTER FIRST HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

                    DIRECT EXAMINATION

EXAMINATION BY MR. RUSKIN:

149

Q    WOULD YOU TELL THE COURT REPORTER AND THE JURY YOUR NAME.

A    EILEEN WINCHESTER.

Q    WILL YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHERE YOU LIVE?

A    1470 MILTON, ST. BERNARD HOUSING PROJECT.

Q    THAT NEAR DUPLESSIS AND FOY?

A    ACROSS THE STREET.

Q    HOW LONG HAVE YOU BEEN LIVING THERE AS OF MAY OF LAST YEAR?

A    ABOUT FIVE YEARS, SIX YEARS, MAYBE.

Q    DO YOU KNOW A MR. DERRICK MARIGNY?

A    YES, I DO.

Q    HOW LONG HAVE YOU KNOWN HIM?

A    I BEEN KNOWING HIM ALL HIS LIFE.

Q    DO YOU KNOW WHERE HE LIVES?

A    NOT RIGHT NOW, NO.

Q    DO YOU KNOW WHERE HE LIVED IN MAY OF 1990?

A    IN THE EAST SOMEWHERE.

Q    DID YOU EVER SEE HIM AROUND YOUR ADDRESS?

A    EVERY DAY.

Q    DOES HE HAVE FAMILY OR ANYTHING IN THE NEIGHBORHOOD?

A    HIS MOTHER USED TO LIVE UPSTAIRS OVER ME.

Q    WHEN DID SHE MOVE OUT?

A    THIS WEEK, THIS WEEKEND.

Q    THIS PAST WEEK?

A    YES, AND LAST WEEK.

Q    DO YOU KNOW A CURTIS MILLER?

A    YES.

Q    AND HOW LONG HAVE YOU KNOW HIM?

A    SINCE ABOUT 1989.

Q       AND DID YOU KNOW MR. HAROLD "BOSS".

A       YES, I DID.

Q       HOW LONG DID YOU KNOW HIM?

A       I BEEN KNOWING HIM ABOUT FIFTEEN YEARS.

Q       BACK IN MAY OF 1990, DID YOU KNOW FROM YOUR OWN PERSONAL KNOWLEDGE THAT DERRICK WAS ENGAGED IN THE DISTRIBUTION OF NARCOTICS, SELLING NARCOTICS, SELLING DRUGS?

A       YES, I DID.

Q       YOU LOOK NERVOUS.

A       NO, IT'S NOT THAT I JUST FEEL... I DON'T UNDERSTAND WHAT THAT'S GOT TO DO WITH THIS CASE.

Q       DO YOU KNOW THAT CURTIS, FROM YOUR OWN PERSONAL KNOWLEDGE, THAT CURTIS MILLER WORKED FOR DERRICK?

A       YES.  WHEN YOU SAY ...

BY MS. MCDONALD:

        OBJECTION, YOUR HONOR.

BY THE WITNESS:

        WHAT DO YOU MEAN?


EXAMINATIONA RESUMED BY MR. RUSKIN:

Q       SELLING DRUGS.

A       YES.

Q       DO YOU KNOW FROM YOUR OWN PERSONAL KNOWLEDGE THAT HAROLD "BOSS" WILSON WAS ENGAGED ...

BY MS. MC DONALD:

        YOUR HONOR, I'M GOING TO OBJECT.  I THINK DEFENSE ATTORNEY IS CONFUSING THE WITNESS

151

WITH HIS QUESTIONS.

BY MR. RUSKIN:

I'LL REPHRASE IT.

BY MS. MC DONALD:

I THINK HE SHOULD BE ABLE TO ASK, "DID SHE KNOW THIS, NOT FROM HER ..." I DON'T THINK ... I THINK IT'S CONFUSING, YOUR HONOR.

BY MR. RUSKIN:

I'LL REPHRASE IT.

EXAMINATION RESUMED BY MR. RUSKIN:

Q    DID YOU EVER SEE DERRICK MARIGNY SELL DRUGS?

A    YES, I SEEN HIM ALL THE TIME.

Q    DID YOU SEE HIM DO IT IN MAY, 1990?

A    I BEEN SEEING HIM DO IT EVER SINCE HE'S BEEN HOME FROM JAIL.

Q    THAT WAS THEN?

A    ABOUT FIVE YEARS NOW.

Q    DID YOU EVER SEE CURTIS MILLER SELL DRUGS?

A    EVERY DAY.

Q    DID YOU EVER SEE HAROLD "BOSS" WILSON SELL DRUGS?

A    EVER SINCE HE BEEN OUT OF JAIL BEFORE HE GOT KILLED. AND BEFORE HE WENT TO JAIL.

Q    DO YOU RECALL THE DAY THAT HAROLD "BOSS" WILSON DIED?

A    VAGUELY. I DON'T REMEMBER EXACTLY WHAT DAY, NO.

Q    WAS IT ABOUT IN MAY, 1990?

A    IT WAS IN MAY. I DON'T REMEMBER WHAT DATE.

Q    IN THE FEW DAYS PRECEEDING THAT, DID YOU HAVE AN OC-CASTION TO SEE AN INCIDENT THAT INVOLVED DERRICK MARIGNY, CURTIS MILLER AND HAROLD "BOSS" AND LEONARD NELSON AND

152

MATTHEW MOORE?  DID YOU EVER SEE AN INCIDENT IN THE DAYS PRECEEDING THAT?

A    I SAW DERRICK, HAROLD AND CURTIS TWO TIMES SHOOTING AT THIS LITTLE BOY AND THE LITTLE BOY, MATTHEW.

Q    NOW, YOU SAY YOU SAW THEM SHOOTING AT THEM.  WHERE WERE DERRICK, CURTIS AND HAROLD STANDING WHEN THAT HAPPENED?

A    DERRICK COME OUT HIS SISTER BLANCHE HOUSE.  CURTIS AND HAROLD CAME OUT THE LADY NEXT DOOR HOUSE UPSTAIRS.

Q    NOW, FOR THEIR BENEFIT, THIS WAS IN THE ST. BERNARD PROJECT?

A    AT FOY AND DUPLESSIS.

Q    THESE BUILDINGS ... WOULD YOU DESCRIBE THE BUILDINGS?

A    STRAIGHT THROUGH, LONG PORCH, FOUR APARTMENTS ON THE PORCH.

Q    AND ON EACH PORT THERE'S A HALLWAY?

A    NOW, ON THIS PARTICULAR PORCH THERE'S JUST TWO HALLWAYS, THE HALLWAY DERRICK'S SISTER LIVES IN AND THE LADY NEXT DOOR.

Q    BEFORE THAT OCCURRED DID YOU EVER KNOW LEONARD OR MATTHEW TO CARRY A GUN?

A    I CAN'T SAY THAT I SAW THIS, NO.

Q    YOU NEVER SAW THEM?

A    NO.

Q    BEFORE THAT, BEFORE HAROLD "BOSS" DIED, DID YOU EVER SEE HAROLD "BOSS" WITH A GUN?

BY MS. MC DONALD:

OBJECTION, YOUR HONOR, OBJECTION, YOUR HONOR.

153

BEFORE WHEN? I MEAN, A YEAR BEFORE? A DAY BEFORE? A MONTH BEFORE?

BY MR. RUSKIN:

DURING THE MONTH PRECEEDING HAROLD "BOSS" ...

BY MS. MC DONALD:

OBJECTION.

BY THE WITNESS:

HAROLD "BOSS" CARRIED A GUN EVERY DAY HE WAS OUTSIDE.

BY MR. MC DONALD:

YOUR HONOR, I WOULD ASK YOU TO ADMONISH THE WITNESS THAT WHEN I MAKE AN OBJECTION OR WHEN THE STATE MAKES AN OBJECTION SHE SHOULD STOP AND AWAIT YOUR RULING.

BY THE COURT:

ALL RIGHT. MS. WINCHESTER, WHEN YOU HEAR AN OBJECTION, AND YOU SEE ME TALK, THE LAWYERS TALK, YOU STOP TALKING.

BY THE WITNESS:

I UNDERSTAND; I UNDERSTAND. I NEVER BEEN ON THE STAND. I'M SORRY.

BY THE COURT:

THAT'S ALL RIGHT; THAT'S ALL RIGHT. I'M NOT MAD YET.

EXAMINATION RESUMED BY MR. RUSKIN:

Q     IN THE MONTH PRECEEDING ... THAT'S APRIL, MAY, THE MONTHS PRECEEDING THE TIME THAT HAROLD "BOSS" DIED, DID YOU EVER SEE HIM WITH A GUN?

A     EVERY DAY IN FRONT OF MY HOUSE SELLING DOPE.

Q     DID YOU EVER SEE IN THE MONTH PRECEEDING THE DAY

154

THAT HAROLD DIED, THE TIME THAT HAROLD DIED, DID YOU EVER SEE DERRICK WITH A GUN?

A    EVERY DAY IN FRONT OF MY DOOR.

Q    HOW ABOUT CURTIS?

A    YES.

Q    DO YOU KNOW IF CURTIS AND DERRICK ARE RELATED?

A    CURTIS IS SUPPOSED TO BE RELATED TO DERRICK'S YOUNGER BROTHER.

Q    BY...

A    BY HIS DADDY, BY DERRICK'S YOUNGER BROTHER DADDY.

Q    BY MARRIAGE OR BY BLOOD?

A    BY HIS MOTHER'S LAST MARRIAGE, HERMAN.

Q    DID YOU EVER SEE THE POLICE COME OUT THERE WHILE DERRICK AND CURTIS AND HAROLD WERE SELLING DRUGS?

A    A BUNCH OF TIMES.

Q    WAS THAT BEFORE ...

A    BEFORE AND AFTER.

Q    DID YOU EVER SEE ... WELL, LET'S GO BACK TO THAT INCIDENT YOU WERE TALKING ABOUT WHERE YOU SAID YOU SAW THEM SHOOTING. IT HAPPENED HOW MANY TIMES?

A    TWICE I SAW MYSELF.

Q    YOU HAVE NO PERSONAL KNOWLEDGE OF IT EVER HAPPENING OTHER THAN THOSE TWO TIMES?

A    NO, NOTHING BUT HEARSAY.

Q    THE FIRST TIME THAT ... THE SECOND TIME THAT IT HAPPENED, HOW MANY DAYS BEFORE HAROLD DIED?

A    I DON'T KNOW.  IT COULD HAVE BEEN FOUR OR FIVE.  I

155

THINK HAROLD DIED ON THE WEEKEND. I REALLY DON'T KNOW.

Q DO YOU REMEMBER AFTER ... DO YOU REMEMBER WHAT HAPPENED AFTER YOU SAW THEM START TO SHOOT? TELL THE JURY WHAT YOU SAW RIGHT THEN.

A DERRICK AND THEM WAS SHOOTING AT THE TWO YOUNG BOYS ONE DAY WHEN THEY WAS WALKING UP THE COURT. THE NEXT TIME THEY WERE SHOOTING AT THEM IT WAS AT NIGHTTIME; AND I SAW IT MYSELF.

Q THE NIGHTTIME, DID THE POLICE COME OUT?

A YES.

Q NOW, ANYBODY GO AND TELL THE POLICE THAT DERRICK ...

A A LONG TIME AFTER IT HAPPENED.

Q WELL,  DID THE PEOPLE GO UP TO THE POLICE AND SAY ...

A NO, NO, NOBODY GO UP TO THE POLICE.

Q LET ME FINISH THE QUESTION. DID ANYBODY GO UP TO THE POLICE AND SAY, "YOU KNOW THAT WAS DERRICK AND CURTIS AND HAROLD ..."

BY MS. MC DONALD:

YOUR HONOR, I OBJECT TO LEADING.

BY THE WITNESS:

NO.

EXAMINATION RESUMED BY MR. RUSKIN:

Q DID YOU EVER SEE ANYODY GO TO THE POLICE AND TELL THEM WHAT HAPPENED?

A THE POLICE CAME OUT AFTER THE SHOOTING OCCURRED, AND IT WAS A LONG WHILE AFTER THAT. DERRICK AND THEM WAS GONE.

156

Q    DO YOU KNOW HOW THEY LEFT?

A    IN A CAR, A WHITE CAR.

Q    WHO WAS DRIVING?

A    DERRICK WAS.

Q    DO YOU KNOW WHAT THEY DID ... DID YOU SEE GUNS?

A    THEY THREW THE GUNS IN THE TRUNK OF THE WHITE CAR. DERRICK WAS DRIVING. CURTIS WAS SITTING ON THE PASSENGER SIDE AND HAROLD WAS SITTING IN THE BACK SEAT. THEY COME OUT THE DRIVEWAY ACROSS THE STREET ON THE PORCH I LIVE ON, WENT UPSTAIRS TO HIS MOTHER'S HOUSE, COME DOWNSTAIRS, THREW THE GUNS IN THE TRUNK AND PULLED OFF. I WAS STANDING ON MY PORCH. THAT'S HOW I KNOW. I SAW THIS. (INAUDIBLE.)

BY THE COURT:

    REMEMBER WHAT I SAID. DON'T TALK.


EXAMINATION RESUMED BY MR. RUSKIN:

Q    THE NIGHT THAT ... THE NIGHT OF THAT SHOOTING, DID YOU SEE WHAT LEONARD AND MAT MO DID?

A    RIGHT.

Q    DO YOU KNOW WHERE ... DID YOU SEE WHERE THEY WENT?

A    I KNOW WHERE HE WENT AT.

Q    WHAT DIRECTION FIRST?

A    TO THE LEFT.

Q    OKAY.

A    GOING TOWARD ST. BERNARD.

Q    NOW, DO YOU KNOW GREGORY DAVIS?

A    YES, I KNOW HIM EVERY WELL.

Q    DOES GREGORY DAVIS LIVE IN THAT DIRECTION?

157

A     YES, HE DOES.  HE WAS THEN.

Q     THEN, NOT NOW?

A     NOT NOW.  HE IN JAIL.

Q     DID YOU COME TO FIND OUT WHERE LEONARD AND MAT MO
      ENDED UP?

A     GREGORY DAVIS CALLED ME.

Q     THE PHONE CALL YOU RECEIVED YOU KNEW THE VOICE?

A     YES, IT WAS DEANO.  HE CALLED ME.

Q     GREGORY DAVIS?

A     YES, GREGORY DAVIS.

Q     AND WAS HE EXCITED OR CALM?

A     HE WAS NERVOUS.


BY MS. MC DONALD:

      OBJECTION; IT CALLS FOR HEARSAY, YOUR HONOR.

EXAMINATION RESUMED BY MR. RUSKIN:

Q     WHAT WAS HIS MOOD?

A     DEANO CALLED ME UP AND ASKED ME ...

Q     WHAT WAS HIS MOOD?

A     WHO?  DEANO'S?

Q     DEANO'S.

A     HE WAS UPSET, TALKING FAST, YOU KNOW.

Q     HOW LONG AFTER THE GUNSHOTS WAS THAT?

A     LET ME SEE.  I'D SAY ABOUT TWENTY MINUTES. ABOUT
      TWENTY MINUTES.  COULD I SAY SOMETHING?

BY THE COURT:

      WELL, GO AHEAD.

BY THE WITNESS:

      I RECEIVED DEANO'S SECOND CALL.  THE FIRST CALL HE
      MADE I WASN'T HOME.  MY DAUGHTER
      ANSWERED THE PHONE.

EXAMINATION RESUMED BY MR. RUSKIN:

Q      DO YOU KNOW HOW LONG THAT WAS AFTER THE INCIDENT?

A      NO, BECAUSE I WAS IN THE COURT WHERE THE SHOOTING WAS GOING ON. WHEN I COME IN MY DOOR, MY DAUGHTER SAID, "MA, DEANO CALLED. HE SAID CALL HIM." I COULDN'T THINK OF SYLVIA'S NUMBER, SO I COULDN'T CALL. AND THEN HE CALLED ME.

Q      WHAT DID YOU TELL DEANO?

A      I TOLD HIM DERRICK AND THEM HAD DONE LEFT. THEY HAD DONE PULLED OUT BECAUSE HE ASKED ME THAT.

Q      DID YOU TELL HIM ANYTHING ELSE?

A      I TOLD HIM THEY WAS SHOOTING AT THIS LITTLE CHILD HERE.

Q      I GOT ONE LAST QUESTION. ARE YOU TIRED OF DRUGS AND THE SHOOTING BY YOUR HOUSE?


BY MS. MC DONALD:

       OBJECTION, YOUR HONOR. EVERYONE IN THE CITY IS.

BY THE COURT:

       SORRY?

BY MS. MC DONALD:

       ARE YOU TIRED OF DRUGS IN THE CITY?

BY MR. RUSKING:

       NO, DRUGS AND THE SHOOTINGS IN FRONT OF YOUR HOUSE.

BY MS. MC DONALD:

       OBJECTION.

BY THE COURT:

       SUSTAINED.

159

EXAMINATION RESUMED BY MR. RUSKIN:

Q    WHY ARE YOU UPSET NOW?

BY MS. MC DONALD:

OBJECTION.

BY THE COURT:

SUSTAINED.  THAT HAS NOTHING TO DO WITH WHAT WE'RE HERE FOR TODAY.

BY MR. RUSKIN:

PLEASE ANSWER THE DISTRICT ATTORNEY'S QUESTIONS.

BY MS. MC DONALD:

I JUST HAVE A FEW QUESTIONS FOR YOU, MA'AM.  MY NAME IS MARY MCDONALD.


CROSS EXAMINATION

EXAMINATION BY MS. MC DONALD:

Q    THIS LITTLE CHILD IS TWENTY-FOUR YEARS OLD.  IS THAT CORRECT?

A    I DON'T KNOW HOW OLD.

Q    OKAY.  NOW YOU REMEMBER EVERY SINGLE DETAIL ABOUT THAT NIGHT.  IS THAT CORRECT?

A    ABOUT THE NIGHT OF THE SHOOTING?

Q    YES.

A    EVERY SINGLE DETAIL?

A    YES, JUST ABOUT.

Q    WERE YOU THERE ON MAY 6TH, 1990 WHEN LEONARD NELSON FIRED SHOTS AND KILLED HAROLD "BOSS"?

A    NO, I DON'T GO TO BARROOMS.

Q    AND YOU WEREN'T ANYWHERE NEAR THAT SCENE?

A    NO, I WAS AT MY HOUSE.

160

BY MS. MC DONALD:

    I HAVE NOTHING FURTHER.

BY THE COURT:

    STEP DOWN.

BY THE WITNESS:

    THANK YOU.  YOU'RE FREE TO GO.  NEXT WITNESS.

BY MR. MERRITT:

    CAN WE HAVE A RECESS?

BY THE COURT:

    NOT UNLESS YOU TELL ME WHY.


REPORTER'S NOTE:

    ALL COUNSELS APPROACHED THE BENCH FOR A BRIEF
CONFERENCE, AND THE JURY WAS EXCUSED
FROM THE COURTROOM FOR A BRIEF RECESS.

BY MR. RUSKIN:

    THIS MORNING I TENDERED TO THE STATE A COPY OF THE
DOCUMENT FILED INTO THE RECORD TWO
MOTIONS, A MOTION FOR DISCLOSURE OF
BRADY MATERIAL AND A MOTION FOR SUBPOENA
DUCES TECUM AND SUBPOENAES CONSTITUT-
ING THE THIRD PAGE OF THE DOCUMENT.
THESE WERE PREPARED LAST NIGHT AS A
CONSEQUENCE OF THE TESTIMONY OF
DERRICK MARIGNY AND CURTIS MILLER.
THEY ARISE IN A SITUATION WHERE THE
STATE HAS ACCUSED THESE TWO INDIVIDUALS
OF NARCOTICS TRAFFICKING...

BY MS. O'BANNON:

    YOUR HONOR, I'M GOING TO OBJECT AT THIS POINT.
THERE IS AN ACCUSATION...

161

BY THE COURT:

LET HIM TALK, AND THEN YOU CAN GET UP AND TALK AGAIN.

BY MR. RUSKIN:

I THINK IN THE RECORD THERE ARE TWO, BECAUSE THERE ARE, IN FACT, TO MY KNOWLEDGE THREE PENDING CHARGES -- TWO POSSESSION WITH INTENTS AND A POSSESSION CHARGE, ALL OF WHICH WERE IN AD HOC. I UP UNTIL MOST RECENTLY AS LAST FRIDAY IT LAST APPEARED UP THERE ON THAT CHARGE. THAT WAS DERRICK MARIGNY. YESTERDAY, OF COURSE YOU REALIZE, MR. MARIGNY CHOSE TO TESTIFY AND DENY SUCH INVOLVEMENT. THE STATE OF LOUISIANA HAS IN ITS POS- SESSION, ASIDE FROM TWO OF THE THREE POLICE REPORTS WHICH I WAS ABLE TO GET OTHER INFORMATIN WHICH CORROBORATES THE FACTS OF HIS DISTRIBUTION BEHAVIOR AND POSSESSION BEHAVIOR, AND WHICH WOULD IMPEACH THE TESTIMONY OF DERRICK AND WHICH WOULD IMPEACH THE TESTI- MONY OF CURTIS MILLER. THAT, AND I SPEAK FROM MY OWN PERSONAL EXPERIENCE IN THE NARCOTICS COURT WOULD INCLUDE ...

BY THE COURT:

BUT, COUNSELOR, FIRST OF ALL, THOSE ARE POLICE REPORTS OF ALLEGATIONS. THEY ARE PROVEN. HE HAS PLED NOT GUILTY TO WHATEVER CHARGES HE'S ON, AND HE STANDS INNOCENT, ALTHOUGH I WILL ADMIT IT'S HIGHLY QUESTIONABLE, BUT THE LAW PRESUMES

162

HIM TO BE INNOCENT UNTIL PROVEN
GUILTY.

BY MR. RUSKIN:

I ACKNOWLEDGE THAT AS A DEFENSE ATTORNEY, YOUR HONOR.
HOWEVER, THE POINT I'M RAISING IS
THE STATE HAS IN ITS POSSESSION OTHER
MATERIAL RELATIVE TO THOSE ... NOT ONLY
TO THOSE TWO ACCUSATIONS, BUT TO HIS
ENTIRE BEHAVIOR, EVEN WHICH DID NOT
RESULT IN ARRESTS OF NARCOTICS SALES
IN THE AREA OF MILTON, FOY AND DUPLESSIS
STREETS, ST. BERNARD. FROM MY EXPERI-
ENCE ... AGAIN I SPEAK AS SOMEBODY WHO
WORKED IN THE DRUG COURTS EXTENSIVELY,
ALTHOUGH ON THE OTHER SIDE, WOULD BE
STUFF LIKE SUPPLEMENTAL REPORTS, INTERNAL
TELEXES FROM NARCOTICS TO THE N.E.F.
HEADQUARTERS, NARCOTICS ENFORCEMENT
IN PUBLIC HOUSING WOULD INCLUDE IN-
FORMATION ABOUT THE EXISTENCE OF CON-
FIDENTIAL INFORMANTS WHO ALLEGE THAT
THESE PEOPLE WERE DOING THAT KIND OF
ACTIVITY. AND THE REASON I FILED IT
THIS MORNING WAS SO THAT WE COULD GET
THAT INFORMATION AND USE IT TO IMPEACH
THE TESTIMONY OF DERRICK AND CURTIS,
AND FURTEHR SUBSTANTIATE THE NATURE OF
OUR CASE. THE INFORMATION WOULD ALSO
INCLUDE THE GRAND JURY TESTIMONY. YOU'VE
REVIEWED THAT, YOUR HONOR. AND FOR
THE RECORD, I THINK YOU SAID THERE WAS

163

NOTHING IN THAT WOULD BE ...

BY THE COURT:

THERE'S NOTHING IN THERE THAT HE DIDN'T DO ON DIRECT. THERE WAS NOTHING IN THERE THAT HAD ANY PERTINENT INFORMATION CONCERNING CROSS EXAMINATION. I DON'T KNOW WHAT YOUR PROBLEM IS. STATE YOUR PROBLEM.

BY MR. RUSKIN:

I WANTED THE SUPPLEMENTAL REPORTS, THE INITIAL REPORTS ON EVERYTHING HAS TO DO WITH DERRICK MARIGNY AND CURTIS MILLER.

BY THE COURT:

NO, COME ON, MR. RUSKIN.

BY MR. RUSKIN:

RELATIVE TO ...

BY THE COURT:

FIRST OF ALL, THE DEFENDANT ... THE WITNESS, DERRICK MARIGNY, IS NOT ON TRIAL TODAY. HE COULD VERY WELL BE ON TRIAL ... HE IS GOING TO BE ON TRIAL ON OTHER CHARGES, ETCETERA. YOU HAVE IMPEACHED ... YOU HAVE ATTEMPTED TO IMPEACH, AND YOU MAY HAVE DONE SO SUCCESSFULLY, MANY, MANY WITNESSES PERTAINING TO HIS DRUG DEALINGS. HE HAS A RIGHT TO GET ON THE STAND AND SAY WHAT HE DID SAY, THAT HE HAS NOT BEEN INVOLVED. I COULDN'T ALLOW IMPEACHMENT OF WHAT POLICEMEN SAY, WHAT POLICEMEN DON'T SAY. WE WOULD WIND UP TRYING THAT CASE, OF THIS NARCOTIC POSSESSION, IN THIS FIRST

164

DEGREE MURDER TRIAL. AND FOR THOSE REASONS, I THINK THAT THE MOTION THAT YOU FILED HAS BEEN ADEQUATELY SATISFIED BY PRETRIAL DISCOVERY, BY YOUR OWN VERY DILIGENT DISCOVERY, BY YOUR DUCES TECUMS THAT WERE RECEIVED, BY THE CONVERSATIONS THAT I HAD WITH THE RECORDS DEPARTMENT, IN WHICH ALL POLICE REPORTS THAT YOU ASKED FOR WERE RECEIVED, EVEN SOME THAT YOU WERE NOT ENTITLED TO, BECAUISE I UNDERSTAND SOME OF THE JUVENILE REPORTS WERE GIVEN AND WERE MADE.

BY MR. RUSKIN:

NO, THEY WERE NOT, YOUR HONOR.

BY THE COURT:

WELL, THEY ASSUMED THAT THEY WERE. THERE WERE THREE REPORTS THAT CAME OVER AS LATE AS THIS MORNING, WHICH WERE TURNED OVER TO YOU AT YOUR REQUEST. I THINK THAT THE STATE ... I THINK THAT THE COURT HAS BENT OVER BACKWARDS TO SECURE WHATEVER INFORMATION THE STATE HAS ON DERRICK MARIGNY AND SOME OF THE OTHER PEOPLE THAT ... QUITE FRANKLY, I THINK YOU GIVE MUCH TOO MUCH CREDIT TO THE STATE FOR ALL THIS INFORMATION THAT YOU ASSUME THAT THEY HAVE.

BY MR. RUSKIN:

YOUR HONOR, NOTE MY OBJECTION TO YOUR RULING.

WITH RESPECT TO THE SECOND REQUEST WHICH CONSTITUTED THE THIRD PAGE, I HAD WISHED

165

TO SUBPOENA FOR TESTIMONY FOR PURPOSES OF IMPEACHMENT AND FOR PURPOSES OF SUBSTANTIATING OTHER FACTUAL PARTS OF OUR CASE. THE N.E.F.F. OFFICERS INVOLVED ... TWO CASES WHICH I DO KNOW ABOUT, N.E.F.F. BEING NARCOTICS ENFORCEMENT IN PUBLIC HOUSING ...

BY THE COURT:

MR. RUSKIN, IF IT'S ON THE SAME LINES AS DERRICK MARIGNY INVOLVEMENT WITH DRUGS, IT IS DENIED. WE'RE NOT GOING TO TRY THAT CASE.

BY MR. RUSKIN:

I UNDERSTAND, JUDGE, ...

BY THE COURT:

THAT WITNESS, NO MATTER HOW GOOD OR BAD HE IS, HAS THE SAME RIGHTS THAT YOU HAVE, MR. RUSKIN. ALL RIGHT?

BY MR. RUSKIN:

I UNDERSTAND THAT. OF COURSE, HE ELECTED TO TESTIFY, AND I BELIEVE I SHOULD HAVE THE RIGHT TO IMPEACH. RESPECTFULLY NOTE MY OBJECTION.

BY THE COURT:

I THINK YOU DID. I THINK YOU DID ADEQUATELY, BUT THE COURT STANDS ON ITS RULING. LET'S GO. BRING THE JURY DOWN.

BY MR. RUSKIN:

YOU'RE DENYING THE RULING AS TO ALL THE ELEMENTS OF THE SUBPOENA.

BY THE COURT:

I THINK I GRANTED WHAT YOU WERE ENTITLED TO. I GRANTED

166

WHAT YOU ALREADY HAVE. I DON'T KNOW OF ANY INFORMATION THAT YOU'RE ENTITLED TO EXCEPT AS IT PERTAINS TO THE DEFENDANT. THE COURT'S NOT GOING TO STATE YOUR CASE FOR YOU, BUT MR. MARIGNY IS THE WITNESS IN THIS PARTICULAR CASE THAT OBSERVED THIS INCIDENT HAPPENING.

BY MR. RUSKIN:

I UNDERSTAND THAT.

BY THE COURT:

AND TO SINGLE OUT ONE PERSON AND PUT HIM ON TRIAL IS NOT ONLY AN OBVIOUS DEFENSE MANEUVER AND TACTIC, AND NOT THAT WE'RE DISCREDITING YOU. IT'S DONE EVERY DAY. WE THINK THAT THAT IS ALL THAT IT IS. OKAY? AND IT DOES NOT SERVE THE ENDS OF JUSTICE. BRING THE JURY DOWN.

BY MR. RUSKIN:

YOUR HONOR, I WILL SUPPLEMENT THE RECORD WITH THE COPY OF THE ...

BY THE COURT:

MR. RUSKIN, YOU CAN DO WHATEVER YOU WOULD LIKE TO DO. OKAY?

BY MR. RUSKIN:

THE ORDER THAT YOU SIGNED THAT HAS THE RECEIPT, THE ONES THAT I RECEIVED.

BY THE OCURT:

WHATEVER YOU WOULD LIKE TO SUBMIT AT YOUR OWN TIME IS OF NO CONSEQUENCE TO THIS COURT AT THIS TIME.

BY MR. RUSKIN:

167

THANK YOU, YOUR HONOR.

BY THE COURT:

PLEASE FEEL FREE TO ADD WHATEVER YOU WANT TO THE
RECORD.

BY MR. RUSKIN:

THANK YOU.

REPORTER'S NOTE:

THE FOREGOING COLLOQUY OCCURRED OUT OF THE PRESENCE
OF THE JURY.

BY TEH COURT:

LET THE RECORD REFLECT THAT THE JURY IS PRESENT AND
ACCOUNTED FOR.  CALL YOUR NEXT WITNESS,
COUNSELOR.

BY MR. MERRITT:

LEONARD NELSON, YOUR HONOR.

BY THE COURT:

LEONARD NELSON.


LEONARD NELSON

CALLED BY THE DEFENSE, AND AFTER FIRST HAVING BEEN
DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

EXAMINATION BY MR. MERRITT:

Q    AND YOUR FULL NAME IS LEONARD NELSON?

A    YES, SIR.

Q    AND YOU RESIDE TODAY WHERE?  WHERE DO YOU LIVE TODAY?

A    SIR?

Q    WHERE ARE YOU LIVING AT THIS TIME?

A    I LIVE IN OLD ORLEANS PARISH PRISON.

Q    AND HOW LONG HAVE YOU BEEN BACK THERE?

A    TEN MONTHS, SIR.

Q    THAT'S SINCE MAY 13TH?

A    SINCE MAY 14TH, SIR.

Q    AND WHERE DID YOU LIVE BEFORE THAT?

A    IN THE ST. BERNARD HOUSING PROJECT.

Q    WHO DID YOU LIVE WITH?

A    MY MOTHER.

Q    AND HOW MANY BROTHERS OR SISTERS DO YOU HAVE?

A    NONE, SIR.

Q    AND DO YOU KNOW DERRICK MARIGNY?

A    YES, SIR.

Q    HOW LONG HAVE YOU KNOWN DERRICK MARIGNY?

A    ALL OUR LIFE.  WE GROWED UP TOGETHER.

Q    WERE YOU AND HE CONSIDERED FRIENDS BEFORE APRIL
           29TH?

A    YES, SIR.

Q    AND DID YOU KNOW HAROLD WILSON, HAROLD "BOSS" WILSON?

A    YES, SIR.

Q    AND DID YOU KNOW CURTIS MILLER?

A    YES, SIR.

Q    HOW LONG HAVE YOU KNOWN BOTH HAROLD AND CURTIS?

A    I KNOWED HAROLD ALL MY LIFE.  WE PLAYED PARK BALL
           TOGETHER.  I MET CURTIS LAST YEAR IN
           APRIL OF 1990.

Q    DID YOU KNOW HAROLD, DERRICK AND CURTIS TO BE
           SELING DOPE?

A    YES, SIR.

Q    AND ON APRIL 29TH DID YOU HAVE OCCASION TO MEET OR
           SEE ONE OF THEM IN ACTION?  AND WHAT,

169

IF ANYTHING, HAPPENED, AND WHAT DID YOU DO AND WHY? TELL THE MEMBERS OF THE JURY.

BY MS. MC DONALD:

YOUR HONOR, I'M GOING TO OBJECT. ONE QUESTION AT A TIME, PLEASE.

BY THE COURT:

ALL RIGHT. WHEN? WHERE? WHAT ARE YOU ASKING HIM?

BY MR. MERRITT:

ON APRIL 29TH, IN THE AFTERNOON HOURS, DID HE SEE ONE OR MORE OF THE TRIO SELLING COCAINE? WHAT DID HE DO AS A RESULT OF IT?

BY THE COURT:

ALL RIGHT.

EXAMINATION RESUMED BY MR. MERRITT:

Q    WELL, APRIL 29TH, BETWEEN 3 TO 4:00 P.M. IN THE EVENING THEY HAD A BLOCK PARTY OUT IN THE ST. BERNARD HOUSING PROJECT. AND HAROLD "BOSS" WILSON WAS SELLING COCAINE, CRACK COCAINE. AND HE HAD ... I ASKED HIM, I SAID, "HAROLD, YOU (INAUDIBLE)?" THAT MEANS "YOU DOING GOOD." HE SAID, "YES. ME AND MY BOY." I SAID, "WHO?" HE SAID, "ME AND DERRICK." AND I SAID, "YES." HE SAID, "MY BOY PUT ME CN MY FEET." I SAID, "YES." SO, HE WAS SELL-ING , AND AS HE'S SELLING HE TAKES... EVERYTIME A CUSTOMER COME HE HAD TO GO WHERE HE STASHED THE CRACK COCAINE THERE.

170

AND HE'LL PICK IT UP AND HE'LL GIVE WHATEVER THEY WANT OUT, AND HE'LL KEEP IT THERE. AND SO, ME AND MAT MO WAS SITTING THERE, AND SO, HE SAY, "WHAT YOU ALL UP TO?" I SAID, "WE AIN'T UP TO NOTHING." HE SAY, "YES." SO, WHEN HE WALKED ...

BY MS. MC DONALD:

I'M SORRY. I CAN'T UNDERSTAND ANYTHING. BUT WHAT?

EXAMINATION RESUMED BY MR. MERRITT:

A    SO, WHEN HAROLD WALKED OFF AFTER HE SOLD SOME TO A CUSTOMER, HE JUST ASKED US WHAT WE WAS DOING, JUST "CHILLING OUT?" (SPELLED PHONETICALLY) I SAID, "YES." AND SO HE WALKED OFF, YOU KNOW, LIKE ON THE ... THERE'S A LITTLE ALLEYWAY IN MILTON STREET LIKE THIS. AND THEN THERE'S MILTON STREET LIKE THIS. AND THEN THERE'S MILTON COURT, AND THEN THERE'S DUPLESSIS. THERE'S MILTON BUILDING; THERE'S DUPLESSIS BUILDING, AND THERE'S THE LITTLE ALLEYWAY WITH MILTON STREET LIKE THIS. AND WHEN HE WALKS LIKE TO MILTON STREET BY THE GATE HE'LL LEAN ON THE GATE SO THAT HE CAN SEE THE POLICE COME UP MILTON STREET, AND H HE CAN SEE IF THE POLICE COME THROUGH THE ALLEYWAY, SO WHEN MAT MO WAS SITTING ON DUPLESSIS PORCH AND HAROLD/HAD THE CRACK COCAINE STASHED BY MILTON PORCH IN

171

THE BUSHES ON THE SIDE IN A BROWN PAPER
BAG.  SO, I TOLD MATTHEW MOORE, I SAID,
"MAN, LET'S GET THAT ...(INAUDBI_E)"

BY THE COURT REPORTER:

YOU'RE TOO CLOSE TO THE MICROPHONE.

TESIMONY BY THE WITNESS RESUMED:

Q        SO, HE SAY  HE WOULDN'T MISS ... I SAY HE WOULDN'T
MISS NOTHING.  SO, MATTHEW MOORE
SAID, "YES, COME ON."  SO, WHEN I
PICKED IT UP AND HAROLD SAW US, HE SAID,
"WHAT WAS YOU ALL DOING?"  SO, WE JUST
TOOK OFF RUNNING.  SO, HE SAY, "ALL
RIGHT; ALL RIGHT."  SO, AFTER THAT WE
JUST HAD "CHILL OUT" ALL THAT NIGHT
BY MY HOUSE.  WHEN MY MAMA COMES HOME
WE LEFT.  SO, WE LEFT, YOU KNOW, WAS
GONE.  WE WENT BY HIS SISTER.  WE WAS JUST
"CHILLING".  WE WERE SMOKING SOME OT
IT, PUTTING IT WEAK, WHICH YOU CALL
"GEEK" AND WE ARE SMOKING, AND WE
WOULD SELL SOME AND SMOKE SOME OF IT
AWAY.  AND WE MADE A LOT OF MONEY. WHEN
WE SOLD IT ALL OUT, WE WENT SHOPPING.
SO, ALL RIGHT, I WENT TO MY GRANDMOTHER
HOUSE AND MATTHEW MOORE STOOD BY HIS
SISTER HOUSE, SO HE COME TO MY GRAND-
MOTHER HOUSE; TOO.  AND HE SAY, "MAN,
DERRICK TALKING ABOUT THEY GOING TO
KILL US."

BY MS. MC DONALD:

172

I'M SORRY.  I'M NOT UNDERSTANDING THIS.  WHO CAME ...  CAN MR.  MERRITT ASK INDIVIDUAL  QUESTIONS?

BY THE WITNESS:

MATTHEW MOORE COME TO MY GRANDMOTHER'S HOUSE THAT TUESDAY AND TOLD ME THAT DERRICK SAY SOMETING ABOUT THEY GOING TO KILL US.  I SAID, "OH, MAN, DON'T WORRY ABOUT THAT, MAN.  THEY AIN'T WORRYING ABOUT KILLING, ALL THE COKE THEY GOT."  SO, WE GETS IN THE PROJECT THAT NIGHT.  WE SITS ON THE PORCH.  NEXT THING YOU KNOW, THE AMBUSH COME -- DERRICK, CURTIS AND HAROLD SHOOTING AT US.  WE WALKED OFF.  WE HEARD ABOUT SEVEN OR EIGHT SHOTS BEFORE WE EVEN LOOKED AROUND KNOWING THAT THEY WAS SHOOTING AT US.  SO, WHEN WE LOOKED AROUND MATTHEW MOORE  SAID, "MAN, LOOK OUT."  SO, HE RUN.  SO, I COULDN'T RUN RIGHT THEN AND THERE BECAUSE THE BULLETS COMING ACROSS MY HEAD.  SO, I JUST LIKE STOPPED AND FROZE AND THEN RAN, AND I SLIPPED.  WHEN I SLIPPED I LOOKED, AND I WAS TRYING TO SEE WHO THAT DID THE SHOOTING.  SO, WHEN THEY BUST IN THE HOUSE WHERE THEY WAS SHOOTING AT I SPOTTED WHO THEY WAS.  I SAID, "OH, MAN, THEY AIN'T GOING TO DO NOTHING."  SO, THE NEXT DAY, THAT EVENING, WE COMING THROUGH THE COURT-WAY, AND THEY COMING UP.  SEE, DERRICK

173

HAVE SOMEBODY, PAY SOMEBODY EVERYTIME THEY SEE US THEY LET THEM KNOW AND HE GOING TO COME OUT. SO, WHEN I SAW THEM THEY COMING AGAIN, AND WE TRY TO BREAK, SO THEY THOUGHT WE DIDN'T SEE THEM, SO THEY TRIED TO BREAK BEHIND THE BUILDING. BUT THEY THOUGHT WE WERE GOING TO KEEP RUNNING COMING THEIR WAY. WE RAN THE OPPOSITE WAY, SO BY US RUNNING THE OPPOSITE WAY THEY JUST SHOT FROM A FAR DISTANCE. SO, THAT'S WHEN WE LEFT. SO, A COUPLE DAYS AFTER THAT, THAT SATURDAY, GREGORY DAVIS, DEANO, COME TO ME AND TOLD ME ...

BY MS. MC DONALD:

OBJECTION, HEARSAY.

BY THE COURT:

WHO CAME IN? I'M SORRY.

BY MR. MC DONALD:

GREGORY "DEANO" CAME TO HIM AND TOLD HIM ...

BY THE COURT:

ALL RIGHT, SUSTAINED.

BY MR. MERRITT:

BUT, YOUR HONOR, THIS IS HIS INFORMATION ABOUT THREATS ON HIS LIFE. HE'S NOW BEING TOLD.

BY THE COURT:

WHEN?

BY MR. MERRITT:

THIS IS SATURDAY.

BY THE COURT:

174

AND WHEN DID THE CRIME OCCUR?

BY MR. MERRITT:

SATURDAY NIGHT OR EARLY SUNDAY MORNING.

BY THE COURT:

ALL RIGHT. I'M GOING TO OVERRULE IT.


EXAMINATION RESUMED BY MR. MERRITT:

A      SO, WHEN GREGORY THEN COME TO US THAT NIGHT, IT WAS LIKE ABOUT 8:00, BETWEEN 8:00 ... I'M NOT EXACTLY SURE, BUT I KNOW IT WAS BETWEEN 8:00 AND 9:00 OR 10:00, BETWEEN THEM THREE TIMES. SO, HE SAID, "MAN, LOOK," HE SAID, "BROTHER, YOU BETTER GET FROM BACK HERE BECAUSE DERRICK AND THEM TALKING ABOUT KILLING YOU ALL. THEY JUST OFFERED ME SOME MONEY AND SOME COKE TO KNOCK YOU ALL OFF." I SAID, "ALL RIGHT." HE SAID, "WELL, YOU KNOW MY LIFE'S IN DANGER FROM TELLING YOU THAT." I SAID, "DON'T WORRY ABOUT IT; WE ABOUT TO GO." SO, WHEN WE LEFT THAT'S WHEN WE ALREADY HAD AND GONE AND BORROWED SOME GUNS. SO, THAT'S WHEN WE LEFT, WHEN WE COMES TO GO HOME WE LEAVES FROM MY GRANDMOTHER HOUSE AND WE PASS AROUND ANOTHER CLUB ON ST. ANTHONY AND CLAIBORNE, CALLED CLUB POLO. WE JUST PASSED THROUGH THAT BAR DOWN THROUGH THE BACK STREET TO GO HOME. SO, WHEN WE WALKS DOWN THE BACK STREET WE COMES DOWN AROUND ST. AUGUSTINE

175

AROUND A.P. TUREAU AND COME AROUND ... COME ACROSS BROAD. THEN WE COME AROUND OTHER LITTLE SIDE STREETS. AND THAT'S WHEN WE COME TO BRUXELLES. SO, WHEN WE COME TO BRUXELLES AND TURNED THE BLOCK BEFORE TREASURE ON BRUXELLES. AND SW WE CROSSED THE SIDE WHERE THE CLUB. AND SO I SAID, "OH, OH, MAT MO, LOOK AT DERRICK AND THEM." AND HE SAY, "YES, WHO THAT WITH HIM? AND I SAID, "HAROLD AND CURTIS." HE SAID, "WHO ELSE IS THAT THERE?" I SAID, "JOHNNY WHITE." AND SO, WE MAKE IT TO THE CLUB. JOHNNY WHITE JUST LIKE WALK IN THE CLUB, AND HE SAID, "WHAT'S UP, FELLA?" LIKE HE KNOW SOMETHING ABOUT TO BLOW UP. AND SAY, (INAUDIBLE). SO, THAT'S WHEN WE WALKED 'TIL JANIE PEREZ (SHE WAS STANDING RIGHT THERE) ... I SAY, "WHAT YOU DOING, GIRL?" SHE SAY, "NOTHING, WORKING FOR ...

BY MS. MC DONALD:

OBJECTION, YOUR HONOR.

BY THE COURT:

SUSTAINED. WE'RE NOT GOING TO TAKE EVERY LITTLE DETAIL. LET'S GO.

EXAMINATION RESUMED BY MR. MERRITT:

A        SO, SHE WAS STANDING THERE, AND SHE SAID, "LOOK ...

BY MS. MC DONALD:

OBJECTION.

176

BY THE COURT:

SUSTAINED. DON'T TELL US WHAT SHE SAID. TAKE IT ON A QUESTION AND ANSWER BASIS.

BY THE WITNESS:

SO, AT THAT TIME...

BY MR. MERRITT:

YOU'RE NOT INSTRUCTING ME HOW TO HANDLE MY WITNESS, ARE YOU, YOUR HONOR.

BY THE COURT:

I'M SORRY?

BY MR. MERRITT:

YOU'RE NOT INSTRUCTING ME HOW TO HANDLE MY WITNESS?

BY THE COURT:

YES, I AM. I'M INSTRUCTING YOU HOW TO HANDLE YOUR WITNESS BECAUSE THERE'S TOO MUCH HEARSAY THAT COULD COME IN AND DOESN'T NECESSARILY .... SHOULDN'T COME IN.

BY MR. MERRITT:

I OBJECT TO THE COURT REGULATING THE ...

BY THE COURT:

WELL, THAT'S FINE. OBJECTION SUSTAINED. NO FURTHER TESTIMONY ALONG HEARSAY LINES. NEXT QUESTION, COUNSELOR.

BY MR. MERRITT:

PLEASE DO NOT REPEAT WHAT JANET TOLD YOU.

BY THE WITNESS:

YES, SIR.

EXAMINATION RESUMED BY MR. MERRITT:

A    SO, AS WE SEE ... AS WE SEE ...

Q    WHAT HAPPENED AFTER YOU TALKED TO JANET AT THE BAR

177

APPROXIMATELY 1:30 THAT MORNING? WHERE DID YOU GO AFTER YOU LEFT?

A   WE WAS ABOUT TO WALK DOWN TREASURE TOWARDS PARIS, AND WE SEE DERRICK TOOK HIS GUN OUT. HAROLD GOT HIS GUN; CURTIS GOT HIS GUN, AND DERRICK LIKE GOT A HANDKERCHIEF IN HIS HAND. AND I SEE LIKE HAROLD AND CURTIS IF LIKE THEY'RE READY TO BREAK TOWARDS US. AND THAT'S WHEN DERRICK SAID, "YOU ...

BY MS. MC DONALD:

OBJECTION, YOUR HONOR, TO HEARSAY.

BY MR. MERRITT:

HE'S REPEATING WHAT HE HEARD DERRICK ... WHAT THE THREAT IS.

BY THE COURT:

NO, AT THIS POINT IN TIME IT'S ...

BY MR. MERRITT:

WHAT IF DERRICK SAYS, "I'M GOING TO KILL YOU, MAN," AND THE WITNESS SAYS .. THIS IS A SELF DEFENSE CASE, THEN IT'S WHAT IS IN HIS MIND AND WHAT WE'RE TRYING TO SAY.

BY THE COURT:

WELL, I KNOW, COUNSELOR, BUT NOW YOU'RE GETTING TO ... YOU'RE NOT IMPEACHING ANYTHING NOW. NOW, IT'S JUST PURE HEARSAY.

BY MR. MERRITT:

HE'S TELLING YOU WHAT HIS STATE OF MIND IS AND WHY HE THOUGHT HE WAS IN TROUBLE.

BY THE COURT:

178

HOW LONG BEFORE THIS DID THIS OCCUR?

BY MR. MERRITT:

TWO MINUTES, FORTY-FIVE SECONDS.

BY THE COURT:

OVERRULED. IT'S RES GESTAE.

EXAMINATION RESUMED BY MR. MERRITT:

A    SO, AS DERRICK SAID ... HAROLD SAY, "COME ON, MAN, LET'S KILL THEM NIGGERS." THAT'S WHEN DERRICK FIRED A SHOT. "POW!" SO, WHEN HE SHOT I DUCKED AND MATTHEW MOORE DUCKED. SO, I COME OUT WITH MY GUN, AND I WENT TO SHOOTING, "POW!" SO, THAT'S WHEN THEY LIKE SKATTERED OUT, AND I RAN. I TRIED TO RUN BEHIND DERRICK. SO, WHEN I TRIED TO RUN BEHIND DERRICK WHEN I GOT AROUND THE CAR, DERRICK HAD DONE BROKE UP BRUXELLES TOWARDS GENTILLY. SO, I JUMPED ON THE SIDE OF THE BUILDING TO SEE WHERE HAROLD AND CURTIS WAS. SO, WHEN I LOOKED I SEE HIM; I SEE LIKE HAROLD TURNING AROUND, SO I JUST FIRED TWO SHOTS, "POW! POW!" THEN I HEARD A THIRD SHOT COME FROM LIKE CURTIS, BUT I COULDN'T SEE THAT. SO, THAT'S WHEN I JUST BROKE OUT IN THE STREET, BROKE OUT RUNNING. AND WE RAN INTO THE PRO-JECT. WE RAN TO CURTIS (INAUDIBLE) HOUSE. AND I TOLD THEM, "MAN I I THINK I SHOT HIM, BUT I DON'T KNOW IF I KILLED HIM. I JUST SHOT HIM."

179

AND THAT'S WHAT HAPPENED.

Q   TELL THE MEMBERS OF THE JURY WHY YOU SHOT HAROLD "BOSS" WILSON.

A   BECAUSE HE WAS GOING TO KILL ME IF I WOULDN'T HAVE KILLED HIM. IF I WOULD HAVE BROKE OUT TOWARDS PARIS, THEY WERE GOING TO AMBUSH. ALL THREE OF THEM GOT GUNS. THEY HAD MORE BULLETS THAN I DID. THEY WAS GOING TO KILL ... SOMEBODY LIFE WAS IN DANGER.

Q   WHAT DID YOU DO WITH YOUR GUN AFTERWARDS?

A   I THROWED IT IN THE RIVER.

Q   WHERE, SIR?

A   IN THE MISSISSIPPI RIVER.

Q   WHEN DID YOU DO THAT?

A   I DID THAT THE NEXT DAY.

Q   DID YOU LEAVE TOWN?

A   NO, SIR.

Q   DID YOU HAVE MONEY TO HIRE A LAWYER AT THAT TIME TO SURRENDER YOURSELF?

A   NO, SIR.

Q   ARE YOU IN A POSITION ... OR DO YOU REMEMBER HOW MUCH TIME HAD PASSED FROM THE FIRST SHOT YOU FIRED AT CURTIS AND THE SECOND SHOT?

A   WELL, THE FIRST SHOT IT'S LIKE A CANNON. YOU EVER HEARD A CANNON GO OFF? LIKE, "BOOM!" SO, THAT'S WHEN WE DUCKS BEHIND THE CAR. SO, THEY LIKE ... THEY STILL LIKE TOGETHER TRYING TO SEE IF WE HIT. AND SO, WHEN I COME FROM BETWEEN THE

180

TWO CARS THAT WAS PARKED ON THE SIDE THE CLUB, AND I COME UP WITH MY GUN, AND THAT'S WHEN I SHOT FROM WAY...

Q    HOW MUCH TIME HAD PASSED BETWEEN?

A    ABOUT ONE ... ABOUT A MINUTE, A MINUTE OR TWO, TWO MINUTES, YOU KNOW. AND THAT'S WHEN I COME, AND I SHOT. AND THAT'S WHEN DERRICK AND HAROLD, YOU KNOW, BROKE APART. AND THAT'S WHEN HE RAN I RUN TOWARDS HIM. THAT'S WHEN CURTIS AND HAROLD WENT DOWN ... SO, WHEN I GOT ROUND THE CAR WHERE THEY WAS STANDING, WHERE DERRICK RAN OFF, I RUN BEHIND THEM, SO WHEN I SAW HIM GO TOO FAR FOR ME TO SHOOT, I JUMPED, PUT MY BACK TO THE BUILDING BECAUSE I DIDN'T KNOW EXACTLY HOW FAR HAROLD AND CURTIS WENT. THEY COULD HAVE GONE AROUND THE CAR AND COME AND SHOOTING ME WHILE I'M BY THE WALL. SO, I STOOD BY THE WALL AND I TURNED TO THE WALL I COME LIKE THIS, AND THAT'S HOW I GET TO SEE HAROLD AND CURTIS. AND SO, HE LIKED TURNED AROUND, TOO. SO, I JUST FIRED TWO SHOTS, "POW! POW!" THAT'S WHEN ONE MORE SHOT COME LIKE TOWARDS ME. AND THAT'S WHEN I JUST BROKE OUT RUNNING.

Q    DID YOU AT ANY TIME SAY TO ANYONE, "GIVE IT UP."

A    NO, SIR, I NEVER SAY NOTHING ABOUT "GIVE IT UP," OR NO JEWELRY. I AIN'T NEVER SEEN IF THEY DID HAVE JEWELRY, THEY MUST HAVE HAD IT

181

UNDER THEIR SHIRT. I DIDN'T EVEN SEE NO JEWELRY. THAT'S WHY I DON'T UNDERSTAND WHY HE GOT ON THE STAND AND LIED AND TALKED ABOUT A ROBBERY. THERE NEVER WAS A ROBBERY IN THIS. IT WAS ALL ABOUT STEALING DERRICK'S DOPE. THAT WAS THE WHOLE THING ABOUT IT. THEY TRYING TO COVER THEIRSELF, SAYING IT WAS OVER HAROLD'S JEWELRY. AND CURTIS IS GOING TO GO WITH DERRICK CAUSE THAT'S HIS COUSIN.

BY MR. MERRITT:

OKAY. ANSWER THE QUESTIONS OF THE DISTRICT ATTORNEY.

BY THE WITNESS:

YES, SIR.


CROSS EXAMINATION

EXAMINATIN BY MS. MC DONALD:

Q     YOU'RE A CONVICTED FELON. IS THAT CORRECT?

A     YES, MA'AM.

Q     WHAT ARE YOU CONVICTED FOR?

A     I HAD THREE YEARS PROBATION, THREE YEARS SUSPENDED SENTENCE IN THIS SECTION HERE FOR SIMPLE BURGLARY OF A BUSINESS IN 1986.

Q     AND YOU PLED GUILTY TO THAT?

A     YES.

Q     AND WERE YOU, IN FACT, GUILTY OF THAT CHARGE?

A     YES, MA'AM.

Q     OKAY. NOW, YOU SAID THAT YOU STOLE COCAINE FROM DERRICK. IS THAT CORRECT?

182

A    YES, MA'AM.

Q    AND HOW MUCH COCAINE DID YOU STEAL FROM HIM?

A    ACCORDING TO ON THE SCALE OR STREET VALUE?

Q    YOU'RE THE EXPERT.  YOU TELL ME.

A    WELL, IT'S THREE OUNCES AND A HALF.

Q    THREE AND A HALF OUNCES?

A    YES, MA'AM.

Q    OKAY.  SO, YOU'RE A COCAINE USER.  IS THAT CORRECT?

A    I USE IT MYSELF.

Q    YOU USE COCAINE; YOU SOLD COCAINE.  YOU ALSO MIXED IT WITH MARIJUANA.  IS THAT WHAT YOU SAID?

A    YES, MA'AM.

Q    AND THEN DID YOU SNORT THAT OR DID YOU SMOKE THAT OFTEN?

A    NO, IT WAS COOKED COCAINE.  IT WAS ROCKS.

Q    OKAY.  NOW, AFTER YOU STOLE THAT DAY, AND THEY CAME BACK, OR DERRICK CAME BACK, YOU RAN AWAY AT THAT TIME?

A    AT THE TIME THAT I STOLE THE DRUGS?

Q    YES.

A    YES, MA'AM.

Q    ALL RIGHT.  AND YOU DIDN'T GIVE IT BACK?

A    NO, MA'AM.

Q    ALL RIGHT.  LET'S TALK ABOUT THAT AMBUSH, THAT SUPPOSED AMBUSH THAT HAPPENED.  WHO WAS WITH YOU WHEN THEY AMBUSHED YOU?

A    ME AND MATTHEW MOORE.

Q    DID YOU EVER GET HURT THAT NIGHT?

A    NO, I JUST SKINNED MY KNEE  FROM FALLING, CRAWLING FROM THE BUSHES.

Q    HOW MANY TIMES DID THEY FIRE AT YOU?

A     WELL, BEFORE I LOOKED BACK I HEARD BETWEEN SEVEN AND EIGHT SHOTS, BUT ALTOGETHER I'D SAY ABOUT 19 TO 20 SHOTS.

Q     OKAY.  AND YOU HAD A GUN THAT NIGHT, TOO?

A     NO, MA'AM.

Q     YOU DIDN'T HAVE A GUN THAT NIGHT?

A     NO, MA'AM.

Q     WOULD HAROLD "BOSS" WILSON BEEN DEAD THAT NIGHT?

A     IF I HAD A GUN ... THEY WAS SHOOTING AT ME; I WOLD SHOOT BACK TO DEFEND MYSELF.

Q     AH-HA.  DID YOU EVER CALL THE POLICE THAT DAY?

A     NO, MA'AM.

Q     DID YOU EVER CALL AND SAY, "LOOK, I'VE BEEN ALMOST MURDERED HERE.  SOMEONE'S BEEN SHOOTING ..."  WHAT DID YOU SAY?" EIGHTEEN OR NINETEEN TIMES AT ME."

A     I'D SAY BETWEEN 18 AND 20 TO 19.

Q     OKAY.  BUT YOU NEVER CALLED THE POLICE?

A     NO, MA'AM.

Q     ALL RIGHT, DO YOU REMEMBER JUST STATING ON DIRECT EXAMINATION THAT AFTER THE AMBUSH WHEN YOU LOOKED BACK YOU SAW IT WAS DERRICK AND THOSE GUYS, AND YOU SAID, "OH, THEY WOULDN'T DO ME NOTHING."  YOU WEREN'T SCARED, WERE YOU?

A     NO, I WASN'T SCARED BECAUSE THEY WAS LIKE A NICE DISTANCE.  THE BULLETS WAS COMING SO CLOSE.

Q     NOW, WHEN YOU TALKED TO DEANO ... DEANO CAME OVER AND TOLD YOU ABOUT THE THREATS TO KILL YOU OR THE SUPPOSED THREATS TO

184

KILL YOU.  IS THAT CORRECT?

A    YES, HE COME TO ME.

Q    OKAY.  DID YOU EVER CALL THE POLICE ABOUT THAT?

A    NO, MA'AM.

Q    SO, THEY SHOT AT YOU EIGHTEEN TO TWENTY TIMES, AND
     YOU HEARD THAT THERE  WAS A CONTRACT
     OUT ON YOUR LIFE, AND YOU DIDN'T CALL
     THE POLICE?

A    NO, MA'AM.

Q    OKAY.  NOW, YOU STOLE THE COCAINE FROM DERRICK,
     NOT HAROLD.  IS THAT CORRECT?

A    I STOLE IT FROM HAROLD AND IT'S FOR DERRICK.

Q    IT'S DERRICK'S COCAINE.

A    IT'S DERRICK'S COCAINE.

Q    OKAY.  HOW MANY GUNS DO YOU OWN?

A    I DON'T OWN NONE, MA'AM.

Q    YOU THREW THE MURDER WEAPON INTO THE RIVER.

A    IN THE RIVER.

Q    OKAY.  NOW, WHEN YOU WERE OVER THERE AT THE BAR AND
     WHEN YOU WERE TALKING TO MAT MO, AND MAT
     MO, SAID, "OH, OH, SKINNY, LOOK OVER
     THERE.  IT'S HAROLD AND DERRICK."  IS
     THAT WHAT HE SAID?

A    NO, HE SAID, ... I SAID IT FIRST.  I SAID, "MAT MO,
     LOOK AT DERRICK."

Q    OKAY.

A    I SAID, "OH, OH, LOOK AT DERRICK."  AND HE SAID,
     "LOOK AT HAROLD AND CURTIS, TOO."
     AND I SAID, "OH, LOOK AT JOHNNY, TOO."
     ONCE WE GOT TO THE CORNER JOHNNY MADE
     IT IN THE CLUB.  HE HAD SAID, "WHAT'S

185

UP, FELLOWS," LIKE HE ...

BY MS. MC DONALD:

YOUR HONOR, I'D ASK THE WITNESS TO BE RESPONSIVE TO MY QUESTIONS.

BY MR. MERRITT:

HE IS BEING RESPONSIVE.

BY THE COURT:

WELL, TAKE IT ONE QUESTION AT A TIME. ALL RIGHT?

BY MS. MC DONALD:

I'M TRYING TO, YOUR HONOR.

BY THE COURT:

ALL RIGHT. AND LET HIM ANSWER YES OF NO, AND THEN THE CAN EXPLAIN HIS ANSWER.

EXAMINATION RESUMED BY MS. MC DONALD:

Q    WHEN YOU SAID, "OH, OH, MAT MO, LOOK OVER THERE;" HOW FAR AWAY WAS SKINNY MAN ... HOW FAR AWAY WAS HAROLD, DERRICK AND CURTIS? WHEN YOU FIRST SAW THEM.

A    I SAID, "OH, OH, LOOK AT DERRICK!"

Q    OKAY, HOW FAR AWAY WAS DERRICK AT THAT TIME?

A    WE WAS ON ...

Q    HOW FAR AWAY FROM ME? YOU TELL ME WHEN TO STOP.

A    YOU GOT TO KEEP GOING.

Q    FARTHER BACK?

A    PARDON?

Q    ANOTHER TEN FEET?

A    AH-AH, FURTHER THAN THAT

Q    FARTHER THAN THAT?

A    YES.

Q    DID YOU EVER TURN AROUND AND WALK AWAY?

A    IF I'D HAVE TURNED AROUND THEY SPOTTED US, SO THAT WHEN WE SPOTTED THEM, EVERYBODY TURNED AROUND. EITHER WAY WE GO THEY WERE GOING TO COME BACK AT US CAUSE THE WAY WE WAS GOING HOME WE HAD TO GO ACROSS GENTILLY, SO IF WE HAD TURNED BACK THEY COULD HAVE COME BEHIND US.

Q    YOU WERE FIFTY FEET AWAY FROM THEM, AND YOU DIDN'T TURN AND RUN. INSTEAD YOU BROUGHT OUT YOUR GUNS...

A    NO.

Q    YOU DIDN'T BRING OUT A GUN?

A    NOT RIGHT THEN AND ... I WASN'T GOING TO SHOOT.

Q    OKAY, ISN'T IT TRUE, SKINNY, ISN'T IT TRUE THAT AS SOON AS YOU SAW DERRICK, CURTIS AND HAROLD WHO WERE JUST SITTING ON THEIR CAR THAT YOU AND MAT MO SAID, "LOOK AT THAT GOLD; I'M GOING TO GO ROB THEM."

A    NO, MA'AM; NO, MA'AM.

Q    AND IT'S NOT A FACT THAT YOU CAME ACROSS THE STREET ON THIS DIAGRAM AND ACROSS TO HAROLD, CURTIS AND DERRICK. THAT'S NOT TRUE, EITHER?

A    NO, MA'AM, THAT'S NOT TRUE.

Q    ALL THESE WITNESSES ARE LYING?

A    YES, MA'AM.

BY MR. MERRITT:

NO, NO, NO. THAT'S NOT FAIR. ALL OF THEM DIDN'T SAY THAT.

BY THE COURT:

ASKED AND ANSWERED. LET'S GO. MOVE ON.

187

EXAMINATION RESUMED BY MS. MC DONALD:

Q    WHEN YOU SAW THE GOLD AROUND HAROLD'S NECK, YOU WENT OVER TOWARDS THEM, DIDN'T YOU?

A    NO, MA'AM.  I WASN'T GOING TO GO TOWARDS THEM UNTIL THEY FIRED THEIR SHOT.  IF THEY WOULDN'T HAVE NEVER FIRED, I WAS GOING TO KEEP WALKING.

Q    WELL, LET'S SEE.  ACCORDING TO YOUR STORY, HAROLD HAD A GUN?

A    YES, MA'AM.

Q    DERRICK HAD A GUN?

A    YES, MA'AM.

Q    CURTIS HAD A GUN?

A    YES, MA'AM.

Q    ALL THREE OF THOSE INDIVIDUALS GOT IN HERE TODAY, SWORE TO THIS JURY, AND SAID THEY DIDN'T HAVE A GUN.

BY MR. MERRITT:

ALL THREE DID NOT.  AND THAT'S AN UNFAIR QUESTION.

BY THE COURT:

WELL, IT'S A QUESTION HE CAN ANSWER OR CAN'T ANSWER.  THE JURY WILL DETERMINE WHAT THEY HEARD AND WHAT THEY DIDN'T HEAR.

BY MR. MERRITT:

ASSUMES FACTS NOT IN EVIDENCE.

BY THE COURT:

OVERRULED, IF IT IS THAT.  DON'T TESTIFY, COUNSELOR.  ALL RIGHT?  LET'S GO.

BY MR. MERRITT:

I'M LETTING BE KNOWN MY OBJECTION, YOUR HONOR, AND THE BASIS FOR IT.

188

BY THE COURT:

LET IT BE NOTED. NO MORE.

EXAMINATION RESUMED BY MS. MC DONALD:

Q     DERRICK AND CURTIS BOTH GOT UP HERE TODAY AND SAID THAT ALL THREE OF THEM DID NOT HAVE GUNS. IS THAT CORRECT?

A     THEY SAID IT, BUT THEY LIED.

Q     THEY'RE LYING?

A     YES, MA'AM.

Q     NOW, WHO FIRED THE FIRST SHOT?

A     DERRICK.

Q     OKAY. NOW, AFTER DERRICK FIRED THE FIRST SHOT HOW FAR AWAY WERE YOU?

A     WE WAS ON ...

Q     BACK ON MY DIAGRAM. BACK TO THE DOOR OR FARTHER BACK?

A     WE WAS IN THE STREET ...

BY MS. MC DONALD:

WAIT, MY QUESTION ... EXCUSE ME.

BY MR. RUSKIN:

YOUR HONOR, I'M GOING TO OBJECT. LET HIM ANSWER THE QUESTION.

BY THE COURT:

OVERRULED. ANSWER THE QUESTION FIRST. KEEP QUIET UNTIL SHE FINISHES HER QUESTION, AND THEN YOU ANSWER IT YES OR NO, AND THEN YOU EXPLAIN IT.

BY THE WITNESS:

YES, SIR.

BY THE COURT:

ALL RIGHT. ASK YOUR QUESTION.

EXAMINATION RESUMED BY MS. MC DONALD:

Q       HOW FAR WERE YOU WHEN DERRICK FIRST FIRED THE GUN? FARTHER BACK THAN I WAS AT THE END OF THE COURTROOM?

A       OKAY. THE WAY THE STREETS MADE ...

BY THE COURT:

WAIT A MINUTE, SON. DON'T GIVE ME THE WAY THE STREETS WERE MADE. HOW MANY FEET WAS HE AWAY FROM YOU? HOW MANY CAR LENGTHS? GIVE IT TO ME IN SOMETHING YOU KNOW.

BY THE WITNESS:

WE WAS A NICE LITTLE DISTANCE.

BY MS. MC DONALD:

OKAY.

BY THE WITNESS:

BYT THE BULLETS COULD HAVE HIT ...

BY THE COURT:

MORE THAN THREE CAR LENGTHS? MORE THAN FOUR CAR LENGTHS?

BY THE WITNESS:

THEY STILL ON THE SAME SIDE OF THE STREETS WHERE THEY WERE STANDING. WE'RE ON THE OTHER SIDE WHERE THE ...

BY THE COURT:

WELL, SON, HOW MANY CAR LENGTHS BETWEEN YOU, BETWEEN YOU AND THE MAN SHOOTING AT YOU? HOW MANY FEET WERE BETWEEN YOU AND HIM?

BY MR. MERRITT:

190

I OBJECT TO YOU ASKING ANY QUESTIONS OF THE WITNESS, YOUR HONOR.

BY THE COURT:

OVERRULED. SIT DOWN. SIT DOWN, MR. MERRITT. SIT DOWN.

BY MR. MERRITT:

NOTE AN EXCEPTION.

BY THE COURT:

SIT DOWN.

BY MR. MERRITT:

MOVE FOR A MISTRIAL.

BY THE COURT:

DENIED. SIT DOWN. SIT DOWN, MR. MERRITT.

BY MR. MERRITT:

WELL, ...

BY THE COURT:

MR. MERRITT, YOU CAN TALK; YOU CAN OBJECT, BUT YOU DO IT SITTING DOWN.

BY MR. MERRITT:

PLEASE RULE ON MY MISTRIAL, YOUR HONOR.

BY THE COURT:

DENIED. SON, HOW MANY FEET BETWEEN YOU AND THE MAN WHO SHOT ...

BY MR. MERRITT:

FOR EVERYTIME YOU ASK A QUESTION, THERE'S A MISTRIAL MOVE.

BY THE COURT:

CONTINUING. DON'T OPEN YOUR MOUTH WHILE I'M TALKING, MR. MERRITT. IF YOU DO IT, YOU'RE IN CONTEMPT. HOW MANY FEET BETWEEN YOU AND THE MAN WHO WAS SHOOTING AT YOU?

191

BY THE WITNESS:

IT WAS THE WAY IT'S MADE, IT WASN'T THAT FAR DISTANCE. HE COULD HAVE HIT ME IF I WOULDN'T ...

BY THE COURT:

SON, THAT'S NOT WHAT WE'RE ASKING YOU. THE QUESTION THAT WAS PRESENTED TO YOU WAS: HOW MUCH DISTANCE WAS IT BETWEEN YOU AND THE MAN WHO WAS SHOOTING? WAS IT ONE CAR LENGTH, TWO CAR LENGTHS OR THREE CAR LENGTHS OR WHATEVER MEASURE-MENT THAT YOU WANT TO USE? A BLOCK AWAY?

BY THE WITNESS:

NO.

BY THE COURT:

A HALF A BLOCK AWAY?

BY THE WITNESS:

AH-AH, NOT THAT FAR.

BY THE COURT:

WELL, TELL US HOW FAR?

BY THE WITNESS:

ABOUT ... THEY HAD ONE CAR, AND ANOTHER CAR, AND WE WAS LIKE RIGHT THERE BETWEEN THEM CARS RIGHT THERE STANDING UP. BUT WHEN THEY FIRST SHOT THAT'S WHAT MADE US JUMP BEHIND THOSE TWO CARS. THAT'S HOW I COME BETWEEN THEM TWO CARS.

BY THE COURT:

NEXT QUESTION.

EXAMINATION RESUMED BY MS. MC DONALD:

Q    WERE YOU AT THE END ZONE LOUNGE AT THAT TIME?

192

A        YES, MA'AM.

Q        NOW, YOU ALSO TESTIFIED ON DIRECT EXAMINATION BY MR. MERRITT THAT YOU SAW THEM PULL OUT THEIR GUNS AND READY TO BREAK TOWARDS YOU. IS THAT CORRECT?

A        YES, MA'AM.

Q        DID YOU RUN AWAY AT THAT TIME?

A        I THOUGHT THEY WASN'T GOING TO SHOOT. THAT'S WHY I WAS GOING TO KEEP WALKING AND ONCE I WOULD HAVE GOT A NICE DISTANCE I WAS GOING TO BREAK AND RUN.

Q        WAIT. LET ME JUST MAKE SURE I HAVE THIS RIGHT. YOU DIDN'T THINK THEY WERE GOING TO SHOOT AT YOU EVEN THOUGH SUPPOSEDLY THEY HAD THESE AMBUSHES FOR THE LAST THREE DAYS AND YOU WERE SCARED TO DEATH.

A        YES, MA'AM.

Q        BUT WHEN YOU SAW THEM TAKE OUT THEIR GUNS YOU THOUGHT, "OH, THEY'RE NOT GOING TO SHOOT AT YOU."

A        I THOUGHT THEY WASN'T GOING TO DO IT AROUND ALL THEM PEOPLE.

Q        NOW, DERRICK IS THE ONLY ONE THAT SHOT AT YOU. IS THAT RIGHT?

A        YES, MA'AM.

Q        AND YOUR STORY IS SUPPOSEDLY DERRICK SHOT AND THEN YOU WHIPPED OUT YOUR GUN AND CAME ACROSS THE STREET. IS THAT CORRECT?

A        I SHOT MY GUN. THAT'S WHEN I MADE THEM ... THEY SPLIT UP. THAT'S HOW THEY BROKE, YOU KNOW, FROM EACH OTHER.

Q    AND WHICH WAY DID DERRICK GO?  DOWN THIS WAY?

A    NO, HE WAS ON A ... ALL RIGHT.  WHEN HAROLD AND
     CURTIS BROKE THAT WAY HE COME LIKE
     THAT.  HE COME DOWN THE SIDEWALK.

Q    THIS WAY?

A    YES.  HE WENT STRAIGHT DOWN.

Q    AND ...

A    THAT'S HOW I COME ACROSS... AROUND THE CAR LIKE THAT.
     THAT'S WHEN THEY JUMP AND PUT MY BACK
     ON THAT BUILDING.  AND I SAW THEM BY
     THEIR CAR RIGHT THERE.

Q    ALL RIGHT.  MY QUESTION AGAIN IS:  DERRICK WENT IN
     THIS DIRECTION?

A    YES, STRAIGHT DOWN INTO GENTILLY.

Q    AND HAROLD AND CURTIS WENT IN THIS DIRECTION?

A    YES.  CURTIS HAD DUCKED AROUND THAT CAR THERE.
     HAROLD WAS ABOUT TO GO, BUT HE TURNS
     AROUND LIKE HE WANTED TO SHOOT, BUT
     IF I WOULD HAVE LEFT THEM AND RAN THEY
     WERE GOING TO COME ALL THE  WAY AROUND
     THAT CAR; THEY WOULD HAVE SHOT ME.

Q    YOU'RE SAYING HAROLD HAD A GUN?

A    YES, HE DID.

Q    AND HAROLD RAN FROM YOU, EVEN THOUGH HE HAD A GUN.
     HIS GROUP STARTED SHOOTING FIRST.

A    THEY WERE TRYING TO CATCH COVER FIRST.

Q    AH-HA.

A    THEY WERE TRYING TO CATCH COVER SO THEY COULD GET
     THEYSELF IN A POSITION TO SHOOT.

Q    NOW, WHEN HAROLD WAS RUNNING AWAY FROM YOU, NOT
     ATTACKING YOU, BUT RUNNING AWAY FROM

194

YOU, YOU SHOT HIM DOWN.  IS THAT CORRECT?

A    I DIDN'T SHOOT HIM ... I SHOT HIM WHEN HE WAS RUNNING BACKWARDS LIKE HE WAS DOING LIKE THIS TRYING TO SEE WHERE I'M AT, AND I JUST SHOT HIM.

Q    YOU MEAN HE WAS TRYING TO GIVE YOU THE CHAIN AROUND HIS NECK AND THE EARRING IN HIS EAR?

A    NO, MA'AM.

Q    DID HE FALL ON HIS BACK?

A    I DON'T KNOW HOW HE FELL.  I JUST RAN THE OTHER WAY.

Q    SO, CHRISTINE BOATNER IS LYING WHEN SHE SAID ...

BY MR. MERRITT:

OBJECTION THERE, YOUR HONOR.

BY THE COURT:

SUSTAINED.

BY MR. MC DONALD:

YOUR HONOR, MAY I FINISH THE QUESTION?

EXAMINATION RESUMED BY MS. MC DONALD:

Q    HAROLD NEVER FELL DOWN ON THE GROUND?

A    I KNOW HE WAS FALLING BUT I RAN WHEN I SEEN HE WAS GOING TO FALL ON THE GROUND.

Q    AND YOU NEVER STOOD OVER HAROLD, EXECUTION STYLE, AND FIRED THREE SHOTS INTO HIM?

A    NO, MA'AM.

Q    WHEN HAROLD TURNED AROUND DID YOU SEE A GUN IN HIS HAND?

A    NO, MA'AM.  I DON'T KNOW.  I DIDN'T REALLY PAY ATTENTION ONCE I BROKE IN A RUN.

Q    AND WOULD IT SURPRISE YOU THAT NO GUN WAS FOUND ON

195

THE SCENE NEAR HAROLD?

A   THEY FOUND A GUN.

Q   YES. BUT NOT NEAR HAROLD, DID THEY?

A   THAT'S CLOSE ENOUGH WHERE HE WAS STANDING.

Q   AND THAT WAS MAT MO'S GUN, BY THE WAY?

A   NO, MA'AM. MAT MO WAS STILL DOWN THE STREET HIDING BEHIND THE OTHER TWO CARS WHERE HE FELL AT.

Q   WHERE DID YOU SHOOT HAROLD? WHICH WAY WAS HAROLD TURNING WHEN YOU SUPPOSEDLY FIRED ON HIM?

A   SIDEWAYS, SIDEWAYS LIKE THIS. LIKE, HE WAS COMING LIKE THAT AND I WAS JUST COMING FROM AROUND THE BUILDING, JUST FIRED TWO SHOTS.

Q   WHICH WAY DID HE ... I'M SORRY. WHICH WAY?

A   COMING LIKE THIS.

Q   HE TURNED AROUND AND HE WAS GOING TO FIRE ON YOU?

A   I GUESS SO, IF HE HAD HAD HIS CHANCE.

Q   YOU KNOW YOU DIDN'T SEE A GUN.

A   I KNOW THAT HE HAS ... HE HAD A GUN.

Q   YOU FIRED STRAIGHT INTO HIM WHEN HE WAS STANDING UP?

A   I JUST FIRED.

Q   AND DID YOU SEE A GUN FLY OUT OF HIS HAND AT THAT TIME?

A   I DIDN'T REALLY PAY ATTENTION AT THE TIME, BUT I JUST KNOW HE HAD A GUN.

Q   THE REASON YOU DIDN'T PAY ATTENTION IS BECAUSE HE DIDN'T HAVE A GUN, AND YOU SHOT HIM IN COLD BLOOD WHEN HE ...

A   NO, I DIDN'T, MA'AM, NO, I DIDN'T.

196

Q    SO YOU ARE SAYING THAT YOU NEVER SAW THE CHAIN AROUND HAROLD'S NECK AND THE EARRING IN HIS EAR.

BY MR. MERRITT:

THAT'S BEEN ASKED AND ANSWERED THREE TIMES.

BY THE COIURT:

SUSTAINED.

EXAMINATION RESUMED BY MS. MC DONALD:

Q    SO, YOU'RE SAYING TO THIS COURT AND THESE LADIES AND GENTLEMEN YOU'RE NOT A ROBBER; YOU'RE JUST A MURDERER.

A    I'M NOT NONE OF THEM.

Q    YOU DIDN'T SHOOT HAROLD?

A    YES, I SHOT HAROLD. I SHOT HIM IN SELF DEFENSE. IF I WOULND'T HAVE SHOT HIM I'D BE DEAD TODAY.

Q    WHEN HAROLD HAD NO GUN. YOU STOLE COCAINE.

A    YES, MA'AM.

Q    SO, YOU'RE A USER OF COCAINE IN ITSELF?

A    YES.

Q    YOU STOLE IT SO YOU'RE A THIEF.

A    YES.

Q    YOU'RE A MURDERER?

BY MR. MERRITT:

THAT'S OBJECTIONABLE, YOUR HONOR.

BY THE COURT:

SUSTAINED.

EXAMINATION RESUMED BY MS. MC DONALD:

Q    WHAT WAS CURTIS TRYING TO DO WHEN YOU SHOT DOWN HAROLD?

197

WAS HE TRYING TO GET UNDER THE CAR, LIKE HE STATED?

A     I THOUGHT HE WAS GOING TO RUN AROUND ... THE WAY HE WAS TRYING TO POSTION HISSELF, LIKE IF HE WAS GOING TO GET AROUND THE CAR, AND HANG ON TOP· OF THE HOOD AND GO TO SHOOTING.

Q     YOU WERE UP HERE WHEN YOU FIRST SAW THEM.  IS THAT RIGHT?

A     WHEN I FIRST SAW THEM I COME DOWN A LITTLE ABOUT RIGHT IN HERE.

Q     YOU WERE RIGHT HERE  WHEN YOU SAW THEM?

A     YES, MA.'AM.

Q     SO, YOU WERE AT LEAST ONE BLOCK AWAY FROM WHERE THEY WERE?

A     NO.  THEM BLOCKS ARE LONG.

Q     DID THEY COME TOWARDS ' YOU?  DID THEY RUN OVER TOWARDS YOU?

A     DERRICK, LIKE ...

Q     LET ME ASK YOU THIS.  THE INCIDENT HAPPENED OVER HERE, SO COMMON SENSE WOULD TELL US, WOULDN'T IT, AND TELL THIS JURY THAT THEY DIDN'T RUN OVER TOWARDS YOU ...

BY MR. MERRITT:
     OBJECTION.  "COMMON SENSE TELLS US AND TELLS THE JURY, ..."  THAT'S ARGUMENTIVE IS WHAT IT IS.

BY THE COURT:
     OVERRULED.

BY MR. MERRITT:
     NOTE AN EXCEPTION, YOUR HONOR.

198

BY THE COURT:

IT'S CROSS EXAMINAITON.

EXAMINATION RESUMED BY MS. MC DONALD:

Q       THAT YOU WERE THE AGGRESSOR, AND THAT YOU WERE THE ONE
THAT RAN OVER HERE.

BY MR. MERRITT:

THAT IS OBJECTIONABLE.  IT'S A CONCLUSION OF THE LAW.

BY THE COURT:

LET HIM ANSWER THE QUESTION.  OVERRULED.  ANSWER THE
QUESTION.

BY THE WITNESS:

WHAT WAS THE QUESTION?

EXAMINAION RESUMED BY MS. MC DONALD:

Q       SINCE DERRICK, CURTIS AND  HAROLD WERE  ALL SITTING
DOWN HERE AND MINDING THEIR OWN
BUSINESS, AND YOU WERE UP HERE, AND THE
INCIDENT OCCURRED DOWN HERE, YOU'VE
GOT TO ADMIT THAT YOU WERE THE AGGRESSOR,
THAT YOU WERE THE ONE THAT RAN ACROSS THE
STREET TO THEM.  IS THAT CORRECT?

BY MR. MERRITT:

OBJECTION.

BY THE COURT:

OVERRULED, COUNSELOR.  IT'S CALLED  CROSS EXAMINATION.

EXAMINATION RESUMED BY MS. MC DONALD:

Q       I HAD DONE TURNED THE CORNER, NO, WHEN HE FIRED
THREE SHOTS.  DERRICK TOOK A STEP OR
TWO IN THE MIDDLE OF THE STREET AND ...

199

BY MS. MC DONALD:

WAIT.  I CAN'T HEAR YOU.  I'M SORRY.

EXAMINATION RESUMED BY MS. MC DONALD:

A     WHEN DERRICK TOOK A STEP OR TWO IN THE STREET ...

Q     HE TOOK A STEP UP?

A     A STEP OR TWO.

Q     WELL, LET'S MAKE HIM ... OH, TWO STEPS.  LET'S MAKE HIM HERE FOR BIG STEPS.

A     AND HAROLD SAID, "KILL THEM (INAUDIBLE)."  JUST LIKE THAT.  THAT'S WHEN DERRICK FIRED HIS WEAPON.

Q     AND THEN YOU RAN ALL THE WAY OVER THERE.

A     I WAS TURNING THE CORNER.  NO.  NO.  TURN.  TURN.  TURN RIGHT THERE.

Q     OH, SO YOU RAN ALL THE WAY OVER HERE EVEN FARTHER.

A     NO.

Q     IN ORDER TO KILL HAROLD.

A     THE SIDE ... THE CORNER IS NOT THAT BIG.

Q     WHERE DID YOU KILL HAROLD?

A     I SHOT HIM RIGHT THERE.

Q     RIGHT WHERE THE INCIDENT OCCURRED.  IS THAT CORRECT?

A     RIGHT WHERE HE SHOT AT ME AT.

Q     NOW, YOU SHOT HIM IN SELF DEFENSE.  IS THAT BECAUSE HE PULLED A GUN ON YOU OR BECAUSE OF PAST THINGS THAT YOU WERE SO SCARED YOU THOUGHT HE WAS GOING TO SHOOT?

A     THEY WAS GOING TO KILL ME IF I WOULD HAVE NEVER ... IF I'D HAVE RAN THEY WERE GOING TO AMBUSH ME AGAIN.  THEY WAS GOING TO KILL ME.

Q     MY QUESTION WAS ...  PLEASE ANSWER THE QUESTION.

200

DID YOU KILL HIM IN SELF DEFENSE BECAUSE HE WAS TURNING AROUND WITH A SUPPOSED GUN TO SHOOT YOU OR IT WAS BECAUSE OF ALL THIS AMBUSH, THIS AMBUSH STUFF THAT HAD HAPPENED TWO DAYS AGO?

A    NO, I AIN'T WORRIED ABOUT NO AMBUSH STUFF. IT'S JUST THAT THEY WAS GOING TO KILL ME THAT NIGHT THERE. IF I HAD KNOWED THEY WAS AROUND THERE I WOULND'T HAVE WENT THERE. I WOULD HAVE GONE HOME. I WOULD HAVE GONE ALL THE WAY AROUND. I WOULD HAVE WALKED STRAIGHT DOWN ST. BERNARD.

Q    I'M HAROLD. I PULLED A GUN ON YOU. SHOW ME HOW YOU SHOT ME.

BY MR. MERRITT:

THAT'S OBJECTIONABLE. THAT'S FIVE TIMES. THAT'S REPETITIOUS.

BY THE COURT:

NO, THAT'S ASKING FOR DEMONSTRATIVE EVIDENCE. OVERRULED.

EXAMINATION RESUMED BY MS. MC DONALD:

Q    HOW DID YOU SHOOT?

A    YOU GOT TO RUN. YOU'RE RUNNING. YOU LIKE RUNNING SIDEWAYS.

Q    OKAY. I'M RUNNING SIDEWAYS. TELL ME HOW YOU SHOT ME.

A    YOU GOT YOUR HAND UP LIKE ...

Q    LIKE I GOT TO GO.

A    AND I JUST SHOT THEM TWO SHOTS AND JUST BROKE.

Q    OKAY. SHOW ME. HOW MANY TIMES?

A    JUST TWICE.

201

Q      SHOW ME.

A      I JUST SHOT LIKE THAT. IT WAS A REVOLVER, SO YOU KNOW A REVOLVER, "POW! POW!" I RAN. AND/HEARD THE THIRD SHOT COME, "POW!" SO, I DON'T KNOW WHO SHOT THE THIRD SHOT, AND THEN I RAN AND CAUGHT UP WITH MAT MO BECAUSE MAT MO WAS LIKE ON THE SIDE OF THE CLUB, STILL HIDING BEHIND A CAR, AND HE COME RUNNING WITH ME.

Q      SO, YOU ONLY SHOT HAROLD TWICE.

A      THAT'S ALL.

Q      HOW DID HAROLD GET THE THIRD GUNSHOT? OH, LET ME ASK. WAIT. CURTIS CAME AROUND THE CORNER AND SHOT HIM.

A      THAT'S THE ONLY PERSON I KNOW COULD HAVE SHOT HIM.

Q      ONCE WASN'T ENOUGH. YOU HAD TO SHOOT HIM TWICE? ACTUALLY, YOU HAD TO SHOOT HIM THREE TIMES?

A      I DIDN'T SHOT HIM THREE TIMES.

Q      NOT ONE PERSON TODAY TESTIFIED THAT HAROLD HAD A GUN ON HIM. IS EVERYBODY THAT TESTIFIED LYING?

A      YES, THEY LYING BECAUSE THEY COULDN'T REALLY SEE WHAT WAS HAPPENING LIKE WE HAD DID.

Q      SO, DERRICK'S LYING?

A      YES, DERRICK LIED BECAUSE HAROLD ... HE HAD A GUN. HE'S LYING BECAUSE HE HAD A GUN, TOO.

Q      CURTIS LIED?

A      YES, BECAUSE HE HAD A GUN. HE GONNA LIE FOR DERRICK. THEY GONNA TAKE UP FOR ONE ANOTHER. THEM THREE WAS BROS (SIC.).

Q      TRACY JOHNSON'S LYING?

202

A        TRACY JOHNSON ...

BY MR. MERRITT:

        YOUR HONOR, IT'S OBJECTIONABLE.

BY THE COURT:

        YES.  CHARACTERIZATION - LYING.  CALLS FOR A

                        CONCLUSION.


EXAMINATION RESUMED BY MS. MC DONALD:

Q        YOU'VE GOT A LOT AT STAKE TODAY WITH YOUR TESTIMONY.

                        ISN'T THAT RIGHT?

A        MA'AM?

Q        YOU'VE GOT A LOT AT STAKE TODAY WITH YOUR TESTIMONY,

                        DON'T YOU?

A        AT STAKE?

Q        IF YOU' LOSE THIS TRIAL WHAT ARE YOU DOING?

                        I'LL REPHRASE THIS.  YOU'VE GOT A
                        GOOD
                        PRETTY/MOTIVE TO LIE HERE TO THIS JURY.
                        ISN'T THAT CORRECT?

BY MR. MERRITT:

        THAT'S OBJECTIONABLE, YOUR HONOR.

BY THE WITNESS:

        I'M NOT LYING, MA'AM.

BY THE COURT:

        OVERRULED.  HE'S ON CROSS EXAMINATION.


EXAMINATION RESUMED BY MS. MC DONALD:

A        I'M NOT LYING.  I'M TELLING THE GOD'S HONEST

                        TRUTH WHAT I SAW AND WHAT MATTHEW MOORE

                        SAW AND WHAT DERRICK, CURTIS AND HAROLD

                        SAW.  BUT DERRICK AND CURTIS AIN'T

                        GOING TO TELL THE TRUTH.  I KNOW THIS.

                        THEY NOT GOING TO TELL THE TRUTH BE-

                        CAUSE THEY GOING TO TAKE UP FOR THEIR

203

BRO. THEY GOING TO COME TELL YOU ALL IT'S SOME JEWELRY CAUSE THEY GOING TO TRY AND COME DEFEND THEIRSELF. BUT I KNOW. IT'S NOT OVER NO JEWELRY. IT WAS OVER SOME DRUGS WE STOLE, AND THEY WAS GOING TO KILL US THAT NIGHT. AND THEY HAD GUNS. IF THEY WOULD HAVE NEVER HAD NO GUNS AND THEY WOULDN'TA SHOT AT US I WOULDN'TA SHOT AT THEM. I'M TELLING YOU THE TRUTH, MA'AM. I WOULDA WENT ABOUT MY BUSINESS, KEPT WALKING, AND HAROLD WOULD BE LIVING TODAY, AND YOU WOULND'T BE SETTING IN THIS COURT-HOUSE TODAY.

Q AND YOU WOULDN'T HAVE SHOT AT HAROLD. IS THAT WHAT YOU SAID?

A I WOULND'TA SHOT HAROLD. HE WAS STANDING UP. I WOULDN'TA NEVER SHOT HAROLD. DERRICK WOULDN'TA BEEN HERE TODAY. CURTIS WOULDN'TA BEEN HERE TODAY, AND I WOULDN'TA HAD TO BEEN HERE TODAY. WE WOULDA BEEN RIGHT ON THE STREETS TODAY, IF THEY WOULND'TA NEVER SHOT AT ME AND TRIED TO KILL ME THAT NIGHT.

Q EVEN THOUGH AFTER THEY SHOT AT YOU YOU RAN ACROSS THE STREET AND FINISHED OFF THE JOB. WHY HAROLD?

A THEY HAD GUNS. IF I WOULDA RAN, THAT'S WHAT THEY WANT ME TO DO, RUN. THEY WAS GOING TO TRAP ME. WHERE I WAS GOING TO RUN? EITHER WAY WHERE I WAS HEADING WHERE

204

THE LOT IS THEY WAS GOING TO COME ACROSS THE LOT OR COME BEHIND POPEYE'S OR JUST RUN BEHIND ME AND SHOOT ME DOWN. EITHER WAY, I JUST DEFENDED MYSELF.

BY THE COURT:

ALL RIGHT. NEXT QUESTION.

BY MS. MC DONALD:

NOTHING FURTHER, YOUR HONOR.

BY THE COURT:

ANY QUESTIONS?

BY MR. MERRITT:

NO, YOUR HONOR.

BY THE COURT:

ALL RIGHT. STEP DOWN. ANY OTHER WITNESSES?

BY MR. MERRITT:

WE'RE PREPARED TO REST, YOUR HONOR. BEFORE THAT, I WOULD LIKE TO INTRODUCE SEVERAL EXHIBITS.

BY THE COURT:

ALL RIGHT.

BY MR. MERRITT:

WE'LL WITHDRAW AND OFFER IN ITS PLACE DS-10.

BY THE COURT:

WELL, IT'S ALREADY BEEN INTRODUCED INTO EVIDENCE.

BY MR. MERRITT:

D-1, WHICH IS OFFICER KEVIN WILLIAMS MARKING OF WHERE HE FOUND THE GUN, YOUR HONOR.

BY THE COURT:

ALL RIGHT.

BY MR. MERRITT:

D-5 AND 6, THE TWO PELLETS.

BY THE COURT:

205

THAT'S ALREADY BEEN INTRODUCED INTO EVIDENCE. YES, IT HAS BEEN INTRODUCED INTO EVIDENCE. MR. RUSKIN KNOWS. THE TWO PELLETS HAVE ALREADY BEEN INTRODUCED INTO EVIDENCE.

BY MR. RUSKIN:

AS STATE'S EVIDENCE.

BY THE COURT:

COME ON, GENTLEMEN.

BY MR. MERRITT:

WHERE ARE THEY?

BY THE COURT:

I DON'T KNOW. I SHOWED THEM TO THE JURY. I WOULD IMAGINE THEY'RE THERE. GIVE ME THE PHYSICAL EVIDENCE UP HERE.

BY MR. MERRITT:

TWO SEPARATE ENVELOPES. D-5 AND D-6.

BY THE COURT:

YES. GIVE IT HERE.

BY MR. MERRITT:

IDENTIFIED BY THE DOCTOR, YOUR HONOR.

BY THE COURT:

GIVE IT HERE. SHOW ME WHAT S-5 AND S-6 IS .

BY MR. MERRITT:

S-5 IS THE PHOTOS.

BY THE COURT:

S-5 IS THE PHOTOGRAPHS. WHAT IS S-6?

BY THE MINUTE CLERF:

PHOTOGRAPHS.

BY MR. MERRITT:

TALKING ABOUT D-5 AND D-6, YOUR HONOR.

206

BY THE COURT:

WELL, WHAT IS D-5 AND D-6?

BY MR. MERRITT:

D-5 AND D-6 ARE TWO PELLETS REMOVED FROM THE BODY OF ...

BY THE COURT:

WELL, I DON'T KNOW WHAT YOUR'E TALKING ABOUT. I KNOW THAT S-1 IN GLOBO IS SUPPOSED TO BE PELLETS. ALL RIGHT? THE JURY HAS SEEN IT.

BY MR. MERRITT:

MAY I SEE IT, PLEASE?

BY THE COURT:

YES. NO, IT'S THE SECOND ENVELOPE, MR. MERRITT.

BY MR. MERRITT:

THERE ARE TWO EXTRA ENVELOPES.

BY THE COURT:

WELL, I DON'T KNOW WHAT YOU'RE TALKING ABOUT.

BY MR. RUSKIN:

THERE ARE TWO EXTRA ENVELOPES, EACH WHICH HAVE BULLETS IN THEM TAKEN FROM THE BODY OF THE VICTIM. THOSE ARE THE EVIDENCE WE WOULD LIKE ...

BY MR. MERRITT:

HERE IT IS. OFFER D-5 AND D-6.

BY THE COURT:

D-5 AND D-6. D-5, D-6, S-1 AND S-2. EXCUSE ME. D-1 AND D-2?

BY MR. MERRITT:

YES, YOUR HONOR.

BY THE COURT:

207

ALL RIGHT. INTRODUCE IT INTO EVIDENCE.

LET THE JURY SEE IT. MS. McDONALD, HAVE YOUR REBUTTAL WITNESS AVAILABLE, IF THERE'S GOING TO BE A REBUTTAL WITNESS

BY MS. MC DONALD:

YES, SIR.

BY THE COURT:

MR. MERRITT, YOU HAVE RESTED?

BY MR. MERRITT:

BEG YOUR PARDON?

BY THE COURT:

YOU HAVE RESTED?

BY MR. MERRITT:

THE DEFENSE RESTS, YOUR HONOR.

BY THE COURT:

ALL RIGHT.

BY MR. MC DONALD:

YOUR HONOR, THE FIRST WITNESS IN THE CASE IN STATE REBUTTAL, WE CALL CHRISTINE BOATNER TO THE STAND.

BY THE COURT:

AND SOON AS THE JURY FINISHES THE DEFENSE EVIDENCE, GET MS. CHRISTINE BOATNER READY TO COME UP.

REPORTER'S NOTE:

THE JURORS VIEWED THE EVIDENCE INTRODUCED BY THE DEFENSE.

BY THE COURT:

CHRISTINE BOATNER. MS. BOATNER, YOU'RFE STILL UNDER OATH. PLEASE STEP UP AND SPEAK INTO THE MICROPHONE. KEEP YOUR QUESTIONS REVOLVING AROUND REBUTTAL.

208

CHRISTINE BOATNER

HAVING PREVIOUSLY BEEN SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

EXAMINATION BY MS. MC DONALD:

Q       MS. BOATNER, AS THE JUDGE REMINDED YOU, YOU ARE UNDER OATH. I HAVE JUST A FEW QUESTIONS FOR YOU. DID YOU EVER SEE DERRICK IN YOUR REARVIEW MIRROR?

BY MR. RUSKIN:

OBJECTION, YOUR HONOR. THAT HAS BEEN ASKED AND ANSWERED.

BY THE COURT:

OVERRULED.

EXAMINATION RESUMED BY MS. MC DONALD:

Q       DID YOU EVER SEE DERRICK IN YOUR REARVIEW MIRROR?

A       NO.

Q       WHO DID YOU SEE IN YOUR REARVIEW MIRROR?

A       SKINNY MAN AND MAT MO.

BY THE COURT:

I CAN'T HEAR YOU, MADAM.

BY THE WITNESS:

SKINNY MAN AND MAT MO.

EXAMINATION RESUMED BY MS. MC DONALD:

Q       AND WHAT DID SKINNY MAN HAVE IN HIS HAND?

A       A GUN.

Q       DID YOU EVER SEE DERRICK WITH A GUN THAT NIGHT?

A       NO.

Q       DID YOU EVERY SEE CURTIS WITH A GUN THAT NIGHT?

A       NO.

Q       DID YOU EVER SEE HAROLD, THE VICTIM ...

209

BY MR. MERRITT:

SHE ASKED EACH OF THAT TWICE ON DIRECT.

BY THE COURT:

AND YOU ASKED IT AGAIN ON CROSS ON YOUR CASE IN CHIEF. SO, DON'T ASK ME ... DON'T BRING UP OBJECTIONS LIKE THAT ANY MORE. OVERRULED.

EXAMINATION RESUMED BY MS. MC DONALD:

Q       DID YOU EVER SEE HAROLD, THE VICTIM, WITH A GUN?

A       NO.

Q       WHERE WAS HAROLD WHEN SKINNY MAN SHOT HIM?

A       ON THE GROUND.

BY MR. MERRITT:

SHE TESTIFIED TO THAT ON DIRECT. IT'S NOT REBUTTAL.

BY THE COURT:

SORRY. OVERRULED.

EXAMINATION RESUMED BY MS. MC DONALD:

Q       WHERE WAS HAROLD WHEN SKINNY MAN SHOT HIM?

A       ON THE GROUND.

Q       HOW MANY TIMES DID YOU SEE SKINNY MAN STAND OVER HAROLD AND SHOOT HIM?

BY MR. RUSKIN:

OBJECTION, YOUR HONOR.

BY THE COURT:

SUSTAINED.

BY MR. MC DONALD:

I'M SORRY, YOUR HONOR.

EXAMINATION RESUMED BY MS. MC DONALD:

210

Q       HAROLD  WAS NOT RUNNING?

BY MR. MERRITT:

SHE'S LEADING THE WITNESS, JUDGE, TOO.

BY THE COURT:

SUSTAINED.


EXAMINATION RESUMED BY MS. MC DONALD:

Q       WHEN HAROLD FELL, DID HE HAVE ANYTHING IN HIS HAND?

BY MR. RUSKIN:

OBJECTION.

BY THE COURT:

OVERRULED.

EXAMINATION RESUMED BY MS. MC DONALD:

Q       DID HE HAVE A GUN IN HIS HAND?

A       NO.

BY MR. MC DONALD:

I HAVE NOTHING FURTHER.



                    CROSS EXAMINAION

EXAMINATION BY MR. MERRITT:

Q       LET'S SEE.  AS I UNDERSTAND, YOU HAVE SAID THAT YOU
                DIDN'T SEE A GUN.  YOU'RE NOT SAYING
                HE DIDN'T HAVE A GUN.  IS THAT CORRECT?

A       I DIDN'T SEE ONE.

Q       AND YOU DIDN'T SEE DERRICK AT ALL IN YOUR MIRROR.
                ALL YOU SAW HIM IS WHEN YOU WALKED OUT
                TO YOUR CAR.

A       I DIDN'T SEE HIM WHEN I WALKED OUT TO THE CAR.

Q       AS I UNDERSTAND, YOU DIDN'T SEE EITHER LEONARD
                NELSON OR MAT MO COME TO THIS CORNER.

211

IN FACT, DID YOU?

A     NO.

Q     YOU DIDN'T SEE THEM  WALK IN THIS DIRECTION, DID
YOU?

A     NO.

Q     YOU DIDN'T SEE THEM UNTIL THEY WERE RIGHT IN YOUR
REARVIEW MIRROR.  IS THAT CORRECT?

A     YES.

Q     NOW I UNDERSTAND BEFORE ON CROSS EXAMINATION, YOU SAID
YOU DO NOT KNOW WHETHER HAROLD WAS
DOWN OR NOT, YOU ONLY KNEW YOU COULD
NOT SEE HIM.  AND YOU COULD  ONLY SEE
THIS MUCH OF LEONARD NELSON.  IS THAT
CORRECT?

A     UM-HMM.

Q     OKAY.  THAT'S ALL.


### RE-DIRECT EXAMINATION

EXAMINATION BY MS. MC DONALD:

Q     WHAT DID YOU SEE HAROLD DO RIGHT BEFORE LEONARD
SHOT HIM?

BY MR. MERRITT:

     OBJECTION.

BY THE WITNESS:

     FELL.

BY MS. MC DONALD:

     FELL.  THANK YOU.  I HAVE NOTHING FURTHER.

BY THE COURT:

     STAND DOWN.  ALL RIGHT, LET'S BEGIN ARGUMENTS.

BY MR. RUSKIN:

212

YOUR HONOR, WE WOULD LIKE TO HAVE, SINCE WE JUST COMPLETED OUR CASE AT LEAST AN HOUR.

BY THE COURT:

NO, COUNSELOR, NO COUNSELOR. YOU HAD A BREAK. LET'S GO. MAKE THE RECORD. TAKE YOUR OBJECTION. I'LL GIVE YOU TIME TO PROFFER AT THE END. LET'S GO.

---

OPENING CLOSING ARGUMENT

BY MS. O'BANNON:

REPORTER'S NOTE:

THERE WERE NO ASSIGNMENTS OF ERROR NOTED IN THE STATE'S OPENING CLOSING ARGUMENT.

---

CLOSING ARGUMENT

BY MR. MERRITT:

REPORTER'S NOTE:

THERE WERE NO ASSIGNMENTS OF ERROR NOTED IN THE DEFENSE'S CLOSING ARGUMENT.

---

REBUTTAL ARGUMENT

BY MS. MC DONALD:

REPORTER'S NOTE:

THE FOLLOWING ASSIGNMENTS OF ERROR WERE NOTED IN THE STATE'S REBUTTAL ARGUMENT:

BY MS. MC DONALD:

213

THANK YOU, YOUR HONOR. LADIES AND GENTLEMEN; I ALWAYS THANK YOU FROM THE STATE'S POINT OF VIEW. I KNOW IT'S BEEN A LONG TRIAL FOR YOU, AND WE THANK YOU FOR STAYING THROUGH THIS BEING JURORS TAKING YOUR OATH TO FOLLOW THE LAW, BECAUSE WHAT I'M GOING TO TALK TO YOU A LOT ABOUT TODAY IS FOLLOWING THE LAW. AND I'M GOING TO ASK YOU TO FOLLOW THE LAW, AND I'M GOING TO TELL YOU ALL THAT YOU TOOK AN OATH AT THE VERY BEGINNING TO FOLLOW THE LAW, AND I WANT YOU TO DO THAT. NOW, YOU'RE GOING TO BE HERE FOR A MONTH. THIS IS YOUR FIRST DAY OF JURY SERVICE. IT IS MR. MERRITT'S JOB AS A DEFENSE ATTORNEY TO LET THIS MAN GET UP AND WALK OUT OF HERE HERE.

BY MR. MERRITT:

NOW, THAT IS NOT FAIR, AND I OBJECT TO THAT AND ASK TO ADMONISH THE JURY.

BY THE COURT:

LADIES AND GENTLEMEN, THAT'S NOT TO BE YOUR CONSIDERATION. YOUR CONSIDERATION IS MERELY TO DETERMINE WHETHER OR NOT THE FACTS FIT IN WITH THE LAW. ALL RIGHT? YOU'RE NOT WORRIED ABOUT WHO WALKS OUT AND WHO DOESN'T WALK OUT AND ALL THAT KIND OF STUFF. KEEP IN YOUR MIND IN THIS COURTROOM WHAT YOU HEARD IN THIS COURTROOM AND FORGET ABOUT T.V. AND WHAT COULD HAPPEN OR WHAT COULDN'T HAPPEN. YOU HAVE A SIMPLISTIC SITUATION, AND YOU'LL HEAR FROM ME FROM MY CHARGE LATER ON ON WHAT

214

YOU OUGHT TO DO. NOW, PROCEED, MS. MCDONALD.

* * * * *

BY MS. MC DONALD:

LADIES AND GENTLEMEN, THERE ARE MANY DEFENSES FOR FIRST DEGREE MURDER. THERE ARE MANY DEFENSES TO THEFT, TO ARMED ROBBERY, TO ANY OF THEM. YOU'RE GOING TO HEAR A LOT OF THEM THROUGHOUT THE COURT. FIRST ONE IS, WELL, "IT WASN'T ME; I DIDN'T DO IT. I WAS HOME WITH MY AUNT ..."

BY MR. MERRITT:

YOUR HONOR, THAT IS NOT REBUTTAL AND FAR OUTSIDE THE EVIDENCE.

BY THE COURT:

IT IS ARGUMENT, MR. MERRITT. OBJECTION OVERRULED. COME ON; LET'S GO. LADIES AND GENTLEMEN, REMEMBER WHAT I TOLD YOU ABOUT ALL THE OTHER OBJECTIONS DURING ARGUMENTS. LET'S GO.

ARGUMENT RESUMED BY MS. MC DONALD:

"I WAS HOME AT MY AUNT'S HOUSE HAVING A BIRTHDAY PARTY AND HAVE FIFTEEN WITNESSES TO PROVE IT."

* * * * *

BY MR. MC DONALD:

ACCORDING TO OUR STORY , LADIES AND GENTLEMEN, WHICH MAKES SENSE WITH ALL THE EVIDENCE, ACCORDING TO OUR STORY, LADIES AND GENTLEMEN, OUR WITNESSES ARE HERE. THEY'RE MINDING THEIR OWN BUSINESS, AND THIS ROBBER COMES ACROSS THE STREET,

215

MOVES UP THIS WAY TO FAKE HIM OUT, AND COMES ACROSS THE STREET. CHRISTINE BOATNER SAYS, "I DIDN'T SEE DERRICK IN MY REARVIEW MIRROR." SUPPOSEDLY DERRICK WAS THE ONE FIRING THE GUN. "I DIDN'T SEE DERRICK WITH A GUN." AND CLYDE, MR. MERRITT, IS ALL TRICKY, AND SAYS, "OBVIOUSLY SHE DIDN'T SEE HIM WITH A GUN." WELL, LADIES AND GENTLEMEN, IT'S A SMOKE. IT'S YOUR JOB IN HERE TO PICK UP A PIECE OF PAPER AND BLOW THAT SMOKE AWAY, BECAUSE THAT'S HIS JOB -- TO CONFUSE YOU ALL.

BY MR MERRITT:

YOUR HONOR, THAT'S OBJECTIONABLE.

BY THE COURT:

OVERRULED.

BY MR. MERRITT:

NOTE AN EXCEPTION TO THE COURT'S RULING.

BY THE COURT:

OVERRULED.

* * * * *

BY MS. MC DONALD:

HOW DO WE KNOW WHAT TO SAY ABOUT THEIR WITNESSES? I COULD GO THROUGH THEM ALL. FIRST ONE WAS WALTER HEBERT. HE WAS GOING TO KILL SOMEONE OVER A QUARTER OUNCE OF COCAINE. SO, DISREGARD HIS TESTIMONY. GREGORY JULIAN, ONLY ... OH, THIS IS THE GUY WHO CAN'T ADMIT TO PLEADING GUILTY TO

216

A 95.1. "OH, I WASN'T GUILTY." "BUT YOU PLED GUILTY." "OH, YES, I PLED GUILTY."

BY MR. MERRITT:

OBJECTION, YOUR HONOR, THAT'S NOT WHAT HE SAID.

BY THE COURT:

LET THEM DECIDE THAT, COUNSELOR. MOVE ON.

BY MS. MC DONALD:

AND HENRY HUDSON. WHEN I SAID, "HOW MANY CONVICTIONS DO YOU HAVE?" "ONE". AFTER I PRESSED HIM AND PRESSED HIM, AND I HAVE MY OWN INFORMATION OVER HERE, HE SAID, "OH, YES, I GOT THREE." WELL, HE LIED TO YOU ONCE, LADIES AND GENTLEMEN. HE'S LYING TO YOU ABOUT THE WHOLE THING.

---

BY THE COURT:

FOR THE RECORD, BEFORE I START THE CHARGE, YOUR SPECIAL CHARGES HAVE BEEN DENIED. AND I'LL GIVE THE REASONS OUTSIDE THE HEARING OF THE JURY.

BY MR. MERRITT:

ALL OF THEM, YOUR HONOR?

BY THE COURT:

ALL OF THEM, 1 TO 22. I'LL GIVE YOU MY REASONS.

BY MR. MERRITT:

WELL, JUST KEEP THEM IN THE RECORD. THAT'S ALL.

BY THE COURT:

I'M SORRY?

BY MR. MERRITT:

217

FILE THEM IN THE RECORD.  JUST LEAVE THEM IN THE RECORD.

BY THE COURT:

EVERYTHING'S IN THE RECORD; MR. MERRITT.  EVERYTHING'S TAKEN CARE OF.

COURT'S CHARGE TO THE JURY

BY THE COURT:

REPORTER'S NOTE:

THE FOLLOWING ASSIGNMENTS OF ERROR WERE NOTED BY THE DEFENSE TO THE COURT'S CHARGE TO THE JURY OUT OF THE PRESENCE OF THE JURY.

BY MR. MERRITT:

MAY I SAY MY OBJECTIONS NOW, YOUR HONOR?

BY THE COURT:

YES.

BY MR. MERRITT:

I OBJECT AND MOVE FOR A MISTRIAL BASED ON THE DEFINITION OF REASONABLE DOUBT GIVEN TO THIS JURY.

BY THE COURT:

ALL RIGHT.  DENIED.

BY MR. MERRITT:

I OBJECT AND MOVE FOR A MISTRIAL BASED ON THE DEFINITION OF CRIMINAL INTENT EM-PHASIZING THE CRIMINAL INTENT REQUIRED IN A HOMICIDE.

BY THE COURT:

ALL RIGHT.  DENIED.

BY MR. MERRITT:

218