No. _____

---

**STATE**

**v.**

**LEONARD NELSON**

---

On writ to review an order from the Fourth Circuit Court of Appeal
No. 2025-K-0149
Denying petitioners application for post-conviction relief on the order
of the Honorable Kimya Holmes
Section D
Orleans Parish, Louisiana, in case 344-648

---

**PETITION FOR SUPERVISORY WRITS TO REVIEW THE TRIAL COURT'S ORDER DENYING
PETITIONER'S APPLICATION FOR POST-CONVICTION RELIEF**

**VOLUME I**

Thomas Frampton, La. Bar. No. 35775
University of Virginia School of Law
*(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: tframpton@law.virginia.edu

Kelly Orians, La. Bar No. 36920
University of Virginia School of Law
*(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: korians@law.virginia.edu

**SUPREME COURT OF LOUISIANA**

**CRIMINAL**

**WRIT APPLICATION FILING SHEET**

TO BE COMPLETED BY COUNSEL OR PRO SE LITIGANT FILING APPLICATION

CASE TITLE: State v. Leonard Nelson

APPLICANT PARTY NAME(S): Leonard Nelson

Have there been any other filings in this Court in this matter: □ YES ■ NO

Are you seeking a Stay Order? □ YES ■ NO. If so, you MUST complete a criminal priority form.

Are you seeking Priority Treatment? □ YES ■ NO. If so, you MUST complete a criminal priority form.

Does this pleading contain confidential information? □ YES ■ NO. If so, please file a motion to seal.

Does any pleading contain a constitutional challenge to any Louisiana codal or statutory provision? □ YES ■ NO

If yes, which pleading? _____

If yes, has the Office of the Louisiana Attorney General been notified pursuant to La. R.S. 13:4448? □ YES □ NO

## LEAD COUNSEL / PRO SE LITIGANT INFORMATION

**APPLICANT:**

Lead Counsel Name: Thomas Frampton          Bar Roll No. 35775

Email address: tframpton@law.virginia.edu          Cell No. 202-352-8341

**RESPONDENT:**

Lead Counsel Name: Brad Scott (Orleans Parish ADA)          Bar Roll No. _____

Email address: bscott@orleansda.com          Cell No. _____

Is the pleading being filed: □ In proper person. ■ In forma pauperis

Are there any pro se litigants involved in this matter: □ YES ■ NO

## TYPE OF PLEADING

□ Felony (death penalty) ■ Felony (non-death penalty) □ Misdemeanor □ Post-Conviction (death penalty)

□ Post-Conviction (non-death penalty) □ Criminal other

## LOWER COURT INFORMATION

Parish and Judicial District Court: Orleans Parish Criminal District Court          Docket No: 344-648

Judge and Section: Holmes          Date of Ruling: 1/10/25

## APPELLATE COURT INFORMATION

Circuit: 4th          Docket No.: 25-K-149          Applicant: Nelson          Filing date: 3/5/25

Was this pleading simultaneously filed? □ YES ■ NO

Ruling date: 5/21/25          Action: Writ Denied

Panel of Judges: Ledet, Lobrano, Jenkins          En Banc: □

## REHEARING INFORMATION

Applicant: _____          Filing date: _____          Ruling date: _____

Action: _____          Panel of Judges: _____          En Banc: □

## PRESENT STATUS

□ pre-trial

□ hearing; scheduled date: _____

□ trial. Scheduled date: _____

□ trial in progress

Is there a stay now in effect? □ YES ■ NO

## VERIFICATION

I certify that the above information and all of the information contained in this application is true and correct to the best of my knowledge and that all relevant pleadings and rulings, as required by Supreme Court Rule X, are attached to this filing. I further certify that a copy of this application has been mailed or delivered to the appropriate court of appeal, to the lower court judge, and to all other counsel and unrepresented parties.

Date: June 18, 2025     Signature: /s/ Thomas Frampton          (Rev. 12/2022)

**VOLUME I - TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................4

STATEMENT ADVISING WRIT CONSIDERATIONS.........................................................4

STATEMENT OF CASE.................................................................................................... 5

ASSIGNMENT OF ERRORS............................................................................................ 8

SUMMARY OF ARGUMENT............................................................................................9

LAW AND ARGUMENT................................................................................................. 10

      I.      THE *BRADY* CLAIMS............................................................................ 10

      II.     THE *NAPUE* CLAIMS............................................................................ 18

      III.    THE JURY INSTRUCTION / DUE PROCESS CLAIM....................................25

CONCLUSION.............................................................................................................. 29

VERIFICATION AND CERTIFICATION............................................................................ 30

        Ex. A – Fourth Circuit Opinion

**VOLUME II – TABLE OF CONTENTS (with Bates Numbering)**

Mr. Nelson's Fourth Circuit Writ Application and Accompanying Exhibits
Ex. A – 000001 – Ruling denying application for PCR (and minute entry setting
      return date)
Ex. B – 000006 – Bill of Indictment
Ex. C – 000008 – PCR Petition (and Notice of Errata)
Ex. D – 000038 – State's Procedural Objections
Ex. E – 000051 – Memorandum in Response to State's Procedural Objections
Ex. F – 000056 – Ruling Denying State's Procedural Objection (Sept. 20, 2024)
Ex. G – 000064 – State's Notice of Intent to Seek a Writ of Review and for
      Extension of Return Date
Ex. H – 000066 – Opposition to Procedurally Improper "Motion for Extension of
      Return Date"
Ex. I – 000068 – Response to Non-Filed Merits Opposition and Supplemental
      Opposition to "Motion to Extend"
Ex. J – 000071 – "State's Opposition to the Merits and Article 930.4 Objections to
      Application for Post Conviction Relief"
Ex. K – 000082 – Joint Motion for Immediate Ruling on Jury Instruction Claim
Ex. L – 000083 – Motion for Ruling on Jury Instruction Claim and Motion to
      Cancel Evidentiary Hearing on *Brady* Claim as Moot
Ex. M – 000088 – Reply Memorandum to State's Merits Opposition
Ex. N – 000094 – Transcript of Evidentiary Hearing Held Dec. 17, 2024
Ex. O – Petitioner's Exhibits
      1 – 000171 - Flash Drive [note: physical copy submitted this day to the Clerk of Court]
      2 – 000172 - Executed Agreement w/ Civil Rights Division
      3 – 000177 - Affidavit of John Rohr (explaining file was "lost or misplaced"
      4 – 000182 - Apology from DA upon Finding File
      5 – 000183 - Letter from Devin Flemming to CRD
      6 – 000184 - Transcript of civil court hearing regarding missing file
      7 – 000200 - Correspondence from OPDA confirming records had not been
        located
      8 – 000212 - Memo seeking permission to reduce Moore charges (explaining
        jurors did not entirely believe State's theory or witnesses against Nelson)
      9 – 000216 – Memo acknowledging Marigny's testimony was "the main
        witness" and testimony was essential to conviction
      10 – [Not introduced]
      11 – 000219 - DA file in Case No. 334-550 (State v. Marigny)
      12 – 000267 - DA file in Case No. 341-057 (State v. Marigny)

    13 – 000315 - DA file in Case No. 342-951(State v. Marigny)

    14 – 000341 - DA file in Case No. 343-461 (State v. Marigny)

    15 – [Not introduced]

    16 – 000386 - Memo acknowledging gun was tested with "negative results"

    17 – 000390 - Memo acknowledging Marigny's attempt to sell testimony

    18 – 000392 - DA screening memo referencing witness who saw both
       defendants shooting

Ex. P – State's Exhibits[1]

Ex. Q – 000394 - Minute Entry from Dec. 17, 2024 (evidentiary hearing and
      exhibit list)

Ex. R – 000395 - Notice of Intent

Ex. S – 000397 - Extension of Return Date (minute entry and motion)

---

[1]   Omitted because duplicative of Petitioner's exhibits

3

**TABLE OF AUTHORITIES**

**Cases**

*Alcorta v. Texas*, 355 U.S. 28 (1957)................................................................................. 19
*Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996)................................................................. 19
*Brady v. Maryland,* 373 U.S. 83 (1963)........................................................................ passim
*Giglio v. United States*, 405 U.S. 150 (1972)................................................. 16, 17, 19, 24
*Gilmore v. Taylor*, 508 U.S. 333 (1993)........................................................................... 29
*Glossip v. Oklahoma*, 604 U. S. ____ (2025)............................................................ passim
*Harris v. New York*, 401 U.S. 222 (1971)....................................................................... 26
*Hinton v. Alabama*, 571 U.S. 263 (2014)........................................................................ 30
*Kirkpatrick v. Whitley*, 992 F.2d 491 (5th Cir. 1993).................................................... 23
*Kyles v. Whitley*, 514 U.S. 419 (1995)................................................................ 11, 16, 24
*Napue v. Illinois*, 360 U.S. 264 (1959)....................................................................... passim
*Northern Mariana Islands v. Bowie*, 243 F.3d 1109 (9th Cir. 2001)............................. 24
*Strauss v. United States*, 376 F.2d 416 (5th Cir. 1967).................................................. 29
*State v. Ardoin*, 54 So. 407 (La. 1911)............................................................................ 28
*State v. Bridges*, 2023-0166 (La. App. 4 Cir. 2024)........................................................ 28
*State v. Bright*, 875 So.2d 37 (La. 2004).................................................................... 16, 24
*State v. Carter*, 80 So.2d 420 (La. 1955)......................................................................... 28
*State v. Conda*, 156 La. 679, 101 So. 19 (La. 1924)....................................................... 28
*State v. Copelin*, 206 So.3d 990 (La. App. 4 Cir. 2016).................................................... 8
*State v. Kemp*, 00-2228, 828 So.2d 540 (La. 2002)..................................................... 16, 24
*State v. Murray*, 223 So. 3d 566 (La. App. 4th Cir. 2017)...................................... 22, 23, 25
*State v. Patterson*, 295 So.2d 792 (La. 1974)................................................................... 28
*State v. Savoy*, 418 So. 2d 547 (La. 1982)....................................................................... 28
*Stevenson v. United States*, 162 U.S. 313 (1896)........................................................ 27, 29
*Tassin v. Cain*, 517 F.3d 770 (5th Cir. 2008)................................................................. 13
*United States v. Agurs*, 427 U.S. 97 (1976)................................................................... 19
*United States v. Bagley*, 473 U.S. 667 (1985)...................................................... 11, 16, 24
*United States v. Barham*, 595 F.2d 231 (5th Cir. 1979)................................................. 24
*United States v. Rodriguez-Rios*, 14 F.3d 1040 (5th Cir. 1994)...................................... 26
*United States v. Sanfilippo*, 564 F.2d 176 (5th Cir. 1977)............................................. 22
*United States v. Stofsky*, 527 F.2d 237 (2d Cir. 1975).................................................... 24
*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991).................................................. 24
*Wearry v. Cain,* 577 U.S. 385 (2016).................................................................. 12, 17, 19

**Other Sources**

LaFave, et al., 6 Criminal Procedure (4th ed.)........................................................... 22, 23
Anne Bowen Poulin, *Convictions Based on Lies: Defining Due Process Protection*,
        116 Penn. St. L. Rev. 331 (2011) ......................................................................... 22

**STATEMENT ADVISING WRIT CONSIDERATIONS**

The Fourth Circuit's ruling has erroneously interpreted or applied the constitution and laws of this state and the United States, and the decision will cause material injustice and significantly affect the public interest. The decision below additionally conflicts with a decision of both this Court and the Supreme Court of the United States on the same legal issue. And, in applying the wrong standard of review and simply ignoring central arguments raised in Mr. Nelson's writ application, the Fourth Circuit's decision departed from proper judicial proceedings sufficiently to call for an exercise of this court's supervisory authority.

**STATEMENT OF CASE**

Mr. Nelson and a co-defendant, Matthew Moore, were indicted by a grand jury in Orleans Parish for first-degree murder for the killing of Harold "Boss" Wilson. *See* Ex. B. Nelson was tried by himself on March 3 and 4, 1991. The jury rejected the State's theory of the case (that the murder occurred during an armed robbery) and acquitted Mr. Nelson of first-degree murder, but also necessarily rejected Mr. Nelson's self-defense claim, convicting him of second-degree murder. Charges were dropped against the co-defendant, Matthew Moore, after Nelson's trial.

A.    **The Evidence at Trial**

At trial, the State called four non-law enforcement witnesses.[2] Two of these witnesses were associates of the decedent who were with him on the night that he was killed: Derrick Marigny and Curtis Miller. Both Mr. Miller and Mr. Marigny had open criminal cases in Orleans Parish at the time of trial and both denied under oath that they were receiving any favorable treatment from the DA's office in exchange for their testimony. *See* Trial Tr. at 65. Mr. Marigny's testimony was particularly important; he was referred to in a note found in OPDA's file as an "essential and material witness . . . [and] without his testimony, we should not have had sufficient evidence to convict Leonard Nelson." *See* Ex. O9. Mr. Marigny testified that Mr. Nelson shot his friend "Boss" Wilson during an attempted robbery, and that neither he nor anyone else present at the time of the shooting possessed firearms (or otherwise threatened Mr. Nelson).

The State's remaining non-law enforcement witnesses, Tracy Johnson and Christine Boatner, did little to bolster the State's case. Instead, their testimony helped to support Mr. Nelson's theory of self-defense: Mr. Johnson testified on direct examination that he had seen *Mr. Marigny* (the alleged victim) reaching for his waistband immediately prior to the shooting, and that he ducked for cover because he anticipated Mr. Marigny would begin shooting. *See* Trial Tr. at 16-19, 66.

A fully loaded handgun—of disputed provenance—was found near the decedent. The State was unable to produce any physical evidence linking Mr. Nelson (or the co-defendant, Matthew Moore, whose charges were subsequently reduced) to the gun. A crime lab technician for the NOPD, Officer James Gahagan, testified that the gun recovered at the scene had *not* been dusted for fingerprints and had *not* been tested, thus leaving open the possibility that the gun belonged to Mr. Nelson or Mr. Moore (as the State argued). *See id.* at 16-19.

The defense presented a very different story. Mr. Nelson argued that Wilson, Marigny, and Miller were well-known drug dealers—and because Mr. Nelson had recently stolen drugs from them—all three were attempting to kill him. Taking the stand himself, Mr. Nelson stated that he and Mr. Moore had stolen drugs from Mr. Wilson

---

[2] For a more complete summary of the evidence presented at trial and the jury's partial rejection of the State's theory of the case, *see* Ex. C at 1-6; *see also* Ex. J at 21, 54.

5

approximately a week before the fatal incident, and that in the intervening days, Mr. Wilson, Mr. Marigny, and Mr. Miller had attempted to kill him on several occasions. Mr. Nelson testified that, on the evening of May 6, 1990, he crossed paths with Mr. Wilson, Mr. Marigny, and Mr. Miller outside a popular local club. All three were armed and attacked. After stating, "Come on, man, let's kill them n----rs," "Boss" fired at Mr. Nelson and Mr. Moore; while ducking for cover, Mr. Nelson returned fire. He shot back only "because he was going to kill me if I wouldn't have killed him . . . All three of them got guns. They had more bullets than I did." *See id.* 179-81.

Mr. Nelson additionally presented five witnesses that all supported his claim that credible threats to his life had been made against him in the days leading up to the shooting *and* at the time of the shooting. Mr. Walter Hebert— a lifelong friend of the decedent and former bodyguard to Mr. Marigny—testified that he and Mr. Marigny had attempted to kill Mr. Nelson (alongside the decedent) just three days before the fatal incident. Both Hebert and Mr. Gregory Julian testified that Mr. Wilson, Mr. Marigny, and Mr. Miller had approached them both on separate occasions and asked them to kill Mr. Nelson. Ms. Janet Perez testified that she saw Mr. Marigny and Mr. Wilson "reach[] for their gun[s]" on the night of the shooting, *id. at* 146, corroborating the testimony of *the State's* witness (Mr. Johnson) who saw Mr. Marigny reaching for his waistband immediately prior to the shooting. *See id.* 28-29 ("I seen him pulling a gun out, you know, going under his shirt reaching for what I thought to believe was a gun."). Mr. Julian, Mr. Henry Hudson, and Mr. Craig Jones all testified that they knew Mr. Wilson, Mr. Marigny, and Mr. Moore to be drug dealers and to regularly carry guns.

After the jury rejected the state's attempt to obtain a first-degree murder conviction, Mr. Nelson was convicted of second-degree murder on March 5, 1991. He was sentenced to life without the possibility of parole, probation, or suspension of sentence on July 29, 1991. His conviction was affirmed on appeal.

### B.    The State Hides Their Files from Mr. Nelson

After Mr. Nelson's conviction became final on October 15, 1992, he began diligently and relentlessly requesting his records from the Orleans Parish District Attorney's Office (OPDA). From 1993 until 2009, Mr. Nelson initiated communication with OPDA—either via formal public records requests or letters requesting a status check—on at least fifteen different occasions. *See, e.g.,* Ex. O7 at 000202-11. In 2009, Mr. Nelson sued OPDA in civil court, requesting that OPDA be ordered to give him his records. The case was heard on July 25, 2009, and Judge Madeline M. Landrieu made two findings: 1) that Mr. Nelson's request was timely and that OPDA had a duty to preserve his records, and 2) that OPDA did not preserve his records and are not in possession of his records. *See* Ex. O6 at 000195. On June 29, 2022, nearly twenty-eight years after Mr. Nelson submitted his first request, a copy of OPDA's records for his case were finally sent to him. *See* Ex. C (000037). Upon review, the Civil Rights Division of

6

OPDA determined that these records contained exculpatory and impeachment evidence that OPDA had failed to disclose, in violation of *Brady v. Maryland*.

### C.     Litigating the Post-Conviction Claims

With the assistance of counsel, Mr. Nelson memorialized these claims in his Application for Post-Conviction Relief filed on June 27, 2024. *See* Ex. C. The PCR petition advanced three chief claims: (1) violations of *Brady*; (2) violations of *Napue*; and (3) violation of Mr. Nelson's Due Process rights based on incorrect self-defense jury instructions. (Mr. Nelson also alleged ineffective assistance of appellate counsel, insofar as appellate counsel did not challenge the burden-shifting framework of the self-defense jury instruction.) The District Attorney initially argued that Mr. Nelson's claims were untimely, insisting that Mr. Nelson had not been sufficiently "diligent" in seeking the records that their office had hidden, suppressed, been ordered to disclose, "lost," and then found in 2022. *See* Ex. D. On September 20, 2024, the trial court rejected the State's procedural objections to these claims and ordered a response on the merits by October 20, 2024. *See* Ex. F. The State opted not to seek supervisory review of this ruling. *Cf. State v. Copelin*, 206 So.3d 990 (La. App. 4 Cir. 2016) (holding decision not to seek supervisory review of decision, when special procedures exist to review particular rulings, constitutes waiver of claim).

The State also chose to ignore the Court's order to file a merits opposition to Mr. Nelson's brief. On October 22, 2024, Mr. Nelson filed a "Response to Non-Filed Merits Opposition" and asked the Court to grant immediate relief. *See* Ex. I. The trial court ignored the pleading.

On November 7, 2024, less than twelve hours from the previously scheduled ruling date, a junior Assistant District Attorney opted to file a new pleading that contained a mix of (untimely, and hence, waived) procedural objections and (untimely, and hence, waived) merits responses. As to the jury instruction claim, the State offered no merits response at all. The trial court cancelled the ruling date to "review" the State's last-minute pleading and ordered a new evidentiary hearing.

In the interim, the State all but conceded error. On November 13, 2024, Petitioner filed a "Motion for Ruling on Jury Instruction Claim and Motion to Cancel Evidentiary Hearing on *Brady* Claim as Moot." Ex. L. The motion explained that "[o]n the merits, there is no actual dispute that Mr. Nelson was convicted based on a self-defense instruction that mangled [the] relevant law, improperly assigning to Mr. Nelson an initial 'preponderance of the evidence burden.'" *Id.*; *see also id.* at 3 ("**The State has raised no merits defense on this point.**") (emphasis in original). The pleading also objected to the State's indefensible (and willful) violation of the trial court's orders to raise other issues/defenses. *Id.* at 3-4. Simultaneously, the Chief of the Appeals Division (the direct supervisor of the ADA who filed the untimely brief on November 7, 2024) filed a remarkable concession:

7

> The parties agree that the State's filing of November 7, 2024—as it relates to the self-defense issue (pages 4-6, 9)—contains untimely raised procedural objections **that are not properly before the Court and may be disregarded by the Court.** The parties agree that the question of the accuracy of the self-defense jury instruction is fully briefed and should be ruled upon at the Court's earliest convenience. Should the Court agree with the petitioner that relief is warranted on Petitioner's self-defense jury instruction claim (Claim I.B), the parties agree that the matter is ripe for immediate ruling, as such ruling may render the December 17, 2024 hearing date moot.

*See* Ex. K (emphasis added). Inexplicably, the trial court ignored the filings, prompting Petitioner to file further briefing related to the *Brady* and *Napue* claims. *See* Ex. M.

### D.    The Evidentiary Hearing and Trial Court Ruling

The trial court conducted an evidentiary hearing on December 17, 2024. The Petitioner called one witness who testified for nearly an hour and introduced hundreds of pages of documentary exhibits. *See* Ex. N; Ex. O1-O18. The State called no witnesses and re-introduced some of the same documents already in evidence. Following this hearing, the trial court announced it would take the matter under advisement; it issued a ruling denying Mr. Nelson's application for post-conviction relief on January 10, 2025.

### E.    Fourth Circuit

Ex. A. On March 5, 2025 Mr. Nelson sought supervisory relief from the Louisiana Court of Appeal, Fourth Circuit. *See* Vol. II, Exhibit G. On May 21, 2025 the Louisiana Court of Appeal, Fourth Circuit denied Mr. Nelson's writ, by a vote of 2-1. *See* Vol. I, Exhibit A. Judge Jenkins would have reversed. This application now follows.

### ASSIGNMENT OF ERRORS

1. **The trial court and the Louisiana Fourth Circuit Court of Appeal erred in concluding that the state did not violate Mr. Nelson's rights pursuant to *Brady v. Mayland* when they concealed that their star eyewitness attempted to sell his testimony (and likewise suppressed numerous other categories of material exculpatory information).**

2. **The trial court and the Louisiana Fourth Circuit Court of Appeal erred in concluding that the state did not violate Mr. Nelson's rights pursuant to *Napue v. Illinois* when prosecutors failed to correct repeated and critical falsehoods from their star eyewitness witness and police investigators, concluding that the star witness had a "an absolute . . . Fifth Amendment right" to commit perjury.**

3. **The trial court and the Louisiana Fourth Circuit Court of Appeal erred in concluding that in a self-defense case, even when the defendant requests proper self-defense instructions and timely objects, that a jury may still be told: (1) it is a jury question whether to consider self-defense in the first instance; (2) the defendant has an initial "preponderance of the evidence" burden with respect to self-defense; and (3) that the State carries the ultimate burden of disproving self-defense by some unspecified quantum (e.g., preponderance of the evidence, clear and convincing evidence, beyond a reasonable doubt).**

**SUMMARY OF ARGUMENT**

In June 2022, the Orleans Parish District Attorney disclosed extensive exculpatory and impeachment evidence that they had failed to disclose, in violation of *Brady v. Maryland*. This includes evidence that the State's star witness sought to sell their testimony in exchange for more favorable treatment, overwhelming circumstantial evidence supporting the conclusion that prosecutors failed to disclose an implied deal with their star witnesses to testify in exchange for favorable treatment, that prosecutors failed to disclose that they had spoken to a witness indicating that Mr. Nelson's co-defendant had fired a gun (revealing that there was likely a third gun belonging to neither Mr. Nelson nor his co-defendant found at the crime scene), that prosecutors also failed to disclose the fact that the same critical gun was forensically tested (in hopes of linking it to Mr. Nelson's co-defendant) and that such testing had yielded negative results. This writ application explains why the trial court and the Louisiana Court of Appeal, Fourth Circuit erred in failing to find that this evidence amounts to a violation of Mr. Nelson's due process rights pursuant to *Brady*.

The D.A. files recently disclosed also reveal that prosecutors knew their key eyewitness against Mr. Nelson repeatedly lied about his criminal behavior, and the State failed to correct the record, in violation of Mr. Nelson's rights pursuant to *Napue v. Illinois*. (Additionally, prosecutors failed to correct false testimony from a law enforcement witness who claimed that the recovered gun had not been tested, when in fact that they knew it had been tested for links to the defendants and it had yielded "negative results.") This writ application explains why the trial court and the Louisiana Court of Appeal, Fourth Circuit erred in failing to find that this evidence amounts to a violation of Mr. Nelson's due process rights pursuant to *Napue*.

At trial, Mr. Nelson's entire case was based on self-defense. However, the jury was instructed incorrectly on this affirmative defense. The trial court instructed the jury that a jury must engage in a multistep process which puts the preliminary burden on the defendant to prove self-defense. After *denying* the State's procedural objections and agreeing to assess the jury instruction claim *de novo*, and then ignoring the State's stipulation that it was not opposing Mr. Nelson's claim on either procedural *or* substantive grounds, the trial court still ruled against Mr. Nelson. This writ application explains why the trial court and the Louisiana Court of Appeal, Fourth Circuit erred in failing to find that this instruction deprived Mr. Nelson of his constitutional rights.

9

**LAW AND ARGUMENT**

### I.  The *Brady* Claims

The prosecution's suppression of evidence favorable to the accused violates a defendant's Fourteenth Amendment due process rights where the evidence is material, without regard to the good or bad faith of the prosecution. *Brady v. Maryland,* 373 U.S. 83, 87 (1963). In the *Brady* context, evidence is favorable if it would have "some value" or "some weight" in helping the defendant's case. *Kyles v. Whitley,* 514 U.S. 419, 450 (1995). There is value to the defendant's case when the evidence is exculpatory or when it can be used for witness impeachment. *Id.* Evidence is material and must be disclosed if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would be different. *See Kyles*, 514 U.S. at 432-34 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

This section first explains why Mr. Nelson's rights under *Brady* were violated and then addresses some obvious errors in the trial court's opinion.

### A.  Mr. Nelson's rights under *Brady v. Maryland* were violated

This section addresses five different categories of favorable evidence that were discovered in prosecutors' files, finally disclosed more than three decades after Mr. Nelson's trial. It next explains why this evidence was favorable and then explains why it is material.

#### 1.  Prosecutors hid favorable evidence

The evidence now available to Mr. Nelson proves that prosecutors failed to disclose several different types of critical *Brady* evidence. First, the State failed to disclose evidence in their possession that Mr. Marigny had sought to "sell" his testimony in this case in exchange for more favorable treatment in his three pending criminal cases being prosecuted by the same DA's office. The State has candidly admitted that it did not turn over this critical piece of impeachment evidence to the defense, but has adopted the position that "it's not [*Brady*]," *See* Ex. N at 65. Second, the D.A.'s files—taken as a whole—contain overwhelming circumstantial evidence supporting the conclusion that prosecutors failed to disclose an implied deal with their witnesses to testify in exchange for favorable treatment. Third, prosecutors failed to disclose that they had spoken to a witness indicating that Mr. Nelson's co-defendant had fired a gun, revealing that there was likely a third gun belonging to neither Mr. Nelson nor his co-defendant found at the crime scene. Finally, prosecutors also failed to disclose the fact that the same critical gun was forensically tested (in hopes of linking it to Mr. Nelson's co-defendant) and that such testing had yielded negative results. These four pieces of *Brady* evidence are discussed below.

##### a.  Mr. Marigny's Attempt to Sell his Testimony

On June 14, 2022, Mr. Nelson learned that within his OPDA files there was a memo prepared by ADA Mary "Missy" McDonald (one of the two prosecutors on Mr. Nelson's case), related to the prosecution of Mr. Nelson's co-defendant. In this memo, ADA McDonald wrote that "[p]rior to [Mr. Nelson's trial], Mr. Marigny stated that he would not testify unless the office offered him a deal concerning his outstanding drug charges." *See* Ex. O17.

```
TO: RAY BIGELOW
FROM: MISSY MCDONALD
RE: DEREK MARIGNY
DATE: 6/7/91


        Derek Marigney is an essential and material witness in
the murder case against Mathew Moore. (Case # 344-648) Presently,
this case is set for trial on 7/24/91. Earlier this year, Ms.
O'Bannon and I prosecuted the co-defendant Leonard Nelson, and
a verdict of second degree was returned.
        Prior to the first trial, Mr. Marigney stated that he would
not testify unless the office offered him a deal concerning his
outstanding drug charges. (See cases 341-057, 342-951, and 343-
```

At the time, Mr. Marigny faced the prospect of being multiple billed and sentenced to over a century in prison on three pending drug cases. *See* Ex. N at 64. The State has acknowledged that this information was never disclosed to Mr. Nelson or his attorney. *See id.* at 65. (when asked whether that information was given to the defense, the prosecution replied, "I don't believe so.").

Mr. Marigny's attempt to sell his testimony clearly satisfies the "favorable evidence" prong of the *Brady* inquiry. Had jurors known that Mr. Marigny had insisted on a deal as a prerequisite for his prosecution-friendly testimony at trial, they could have concluded his true motivation was not sharing the truth, but rather receiving a favor from the prosecutors charging him with a crime. *See Napue v. Illinois*, 360 U.S. 264, 270 (1959) (explaining that, upon learning of a witness's request for a sentence reduction in exchange for testimony, a jury "might well have concluded that [the witness] had fabricated testimony in order to curry the [prosecution's] favor."). Thus, this undisclosed request for a deal has some value to Mr. Nelson's case due to its ability to call into question the credibility of Mr. Marigny. *See Wearry v. Cain*, 577 U.S. 385, 390, 393-94 (2016) (holding, based on the witness's two undisclosed requests to the police for a sentence reduction, "any juror who found [the witness] more credible might have thought differently had she learned that [the witness] may have been motivated to come forward not by [the claimed reason] but by the possibility of a reduced sentence on an existing conviction."). In fact, the trial court initially appeared skeptical of the prosecutions position, asking, "Do you not think that that's *Brady*? I mean, I'm just asking," before inexplicably ignoring the issue altogether in its opinion. *See* Ex. N at 65.

11

### b. __The Implicit Deal__

Petitioner adduced overwhelming circumstantial evidence not only that Mr. Marigny attempted to sell his testimony, but also, that there *was* an unwritten deal in place between Mr. Marigny and the prosecution that was never disclosed to the defense. As the trial court astutely put it at the evidentiary hearing: "So it looks like a duck, walks like a duck, quacks like a duck, but it's a chicken? I guess it's a chicken. Okay." Ex. N at 71.

Even absent an explicit plea agreement in exchange for testimony, a defendant's Fourteenth Amendment right to due process is violated when the State fails to disclose an implicit, unwritten deal or a witness's expectation of favorable treatment in exchange for his testimony. *Tassin v. Cain*, 517 F.3d 770 (5th Cir. 2008). In Mr. Marigny's case, the series of events that happened prior to and after his testimony against Mr. Nelson strongly suggest that there was an understanding about a plea deal or favorable treatment. In exchange for his critical testimony, Mr. Marigny expected favorable treatment, and ultimately, he received the exact deal he requested. Here are just some data points in support of this contention.

First, as previously discussed, the D.A. file reveals that Mr. Marigny initially refused to testify absent a deal from the prosecution. *See* Ex. O17. Based on the D.A. files, it appears the trial attorneys were willing to cut such a deal, but ranking attorneys initially denied their requests. *Id.* Implausibly, "approximately one hour before the trial started," prosecutors recorded in an internal memorandum that Mr. Marigny spontaneously committed to "do the right thing." *Id.*[3]

Second, without any alternative explanation, Mr. Marigny's three pending drug cases were kept open during the pendency of Mr. Nelson's case, likely so that prosecutors could have significant leverage over their star witness. The D.A. files contain no hint of an explanation why—and the State offers no explanation today—Mr. Marigny's cases were allowed to linger, apart from the obvious inference that they were being used to extract favorable testimony from Mr. Marigny. As the trial court later stated, "this sequence of events certainly raises the Court's hackles," Ex. A; as even the State acknowledges, "I admit, there's an appearance [of impropriety] . . . [T]here can be an appearance of a deal, but that's not enough." Ex. N at 70-71.; *see also* Ex. N at 68 (trial court asking prosecutors "so what took so long for these cases to go?"); *id.* at 68-69 ("Okay, I'm going to give you your deal, but we have to wait until after the trial so it can't come up in cross examination.").

---

[3] As explained at the evidentiary hearing, the private memos in the D.A. files contained many self-serving and patently false statements, so it would be a mistake to accept any self-serving statement at face value. For example, the memorandum seeking authorization to "no bill" Mr. Marigny's drug cases claimed that his testimony was "honest" and the jury "fully believed" him. Ex. O9. Yet by pleading guilty to the drug crimes, Mr. Marigny admitted that he was committing perjury at Mr. Nelson's trial when he denied being a drug dealer, and other D.A. memorandum (correctly) note that the jury *disbelieved* Mr. Marigny in key respects. Ex. O8. The State opted not to call any witnesses to rebut or explain these contradictions.

Third, Mr. Marigny ultimately *did* receive a massive and inexplicable sentence reduction in exchange for his testimony against Mr. Nelson immediately after testifying. Absent the grace of DA Connick, Mr. Marigny was facing a mandatory-minimum sentence of at least 15 years (flat) as a habitual offender convicted of cocaine trafficking, and a maximum of 60 years (flat), for each of his two "PWIT" cases; he was facing additional time for his possession case, which easily could have been "up-charged" to a PWIT, as well. Hence, he could have been sentenced to well over a century in prison at hard labor. But immediately after providing his testimony at trial (while Mr. Nelson's motion for a new trial remained pending), prosecutors secured for Mr. Marigny the requested benefit. In *their own words*, this was a quid pro quo: they "help[ed] Mr. Marigny, as he helped us." Marigny resolved all of his open cases with probation.[4]

> His testimony will be required again in the trial of Matthew Moore. The evidence is very weak against defendant Moore and the trial will suffer immensely without Mr. Marigny's testimony. Again, we are requesting that we can help Mr. Marigny, as he helped us.

Fourth, there are the nakedly pretextual rationales for the leniency offered at the hearing, which the trial judge (a veteran of District Attorney Harry Connick's office) recognized as implausible. For example, at the evidentiary hearing, the State argued that one reason Mr. Marigny—a well-known, high-profile drug dealer—was given a "no bill" on all of his open cases was because he "had completed a rehabilitation program[;] was in active counseling[;] and he had been gainfully employed for the past 14 months. Those are all really good reasons to get a no-bill!" Ex. N at 63-64. The trial judge responded with common sense: "But seriously, we're talking about Harry Connick's administration. And I'm only saying that because I was hired by Harry Connick. You're telling [me] that no-bills on drug cases wasn't mandatory?" *Id.* at 64.

Fifth, there is the suspicious fact that although a different ADA had been prosecuting Mr. Marigny's drug cases at all prior settings, the day Mr. Marigny entered his pleas, his cases were personally handled by ADA McDonald, the homicide prosecutor on Mr. Nelson's case. *See, e.g.,* Ex. O14 at 000349. There was no reason for ADA McDonald to take over Mr. Marigny's prosecutions, or for there to be any connection between ADA McDonald and Mr. Marigny, other than the quid pro quo arrangement for his testimony in Mr. Nelson's trial. At the evidentiary hearing, the State speculated that perhaps the ordinary drug prosecutor may have been ill that day. *See* Ex. N at 71. Again, the explanations strain credulity.

---

[4] Although this brief focuses mainly on Mr. Marigny because he was, as the DA acknowledges, the "main witness" (whose testimony was essential to securing a conviction), Ex. O9, the DA's records provide the same circumstantial evidence with respect to a deal for Mr. Miller. Mr. Miller was facing revocation proceedings at the time of his testimony because of new criminal activity while out on conditional release, which was inexplicably and curiously left to linger until *after* he testified against Mr. Nelson. After his testimony, he was permitted to plead guilty to a new criminal offense and *not* have his probation revoked.

13

Sixth, the hidden D.A. files reveal that prosecutors were subjectively aware (and worried about) the devastating effect it would have on their case(s) if/when the implicit deal with Marigny became explicit. Ex. O8. In a memo asking for permission to drop the case against Mr. Nelson's co-defendant (Moore), the prosecutors wrote that it was important to drop the case, because "any testimony about the No Bill [given to Mr. Marigny] would give the appearance of impropriety at the Nelson trial." *Id.* Prosecutors dropped the case again the co-defendant so they would not "give the ammunition [Mr. Nelson] needs for a reversal of the Nelson conviction." *Id.* As the trial judge, a veteran of the Connick administration put it, the obvious conclusion is that there was an *implicit* deal or expectation of leniency at the time of trial that was not disclosed. Ex. N at 68-69 ("Okay, I'm going to give you your deal, but we have to wait until after the trial so it can't come up in cross examination.").

In sum, there is overwhelming evidence that there was, at least, an *implicit* deal in place at the time of the trial. Although Petitioner concededly was unable to come forward with a "smoking gun"—prosecutors do not typically commit their misconduct to writing, and all of the most relevant actors (including Mr. Marigny) are now dead— Petitioner has adduced a vast amount of unrebutted circumstantial evidence to meet his burden: It is at least more likely than not that an undisclosed implicit agreement existed.

    c.  **Testimonial evidence about the gun**

The provenance of the recovered, unfired gun was a major issue at trial: The State argued it belonged to Mr. Nelson's co-defendant, whereas Mr. Nelson argued it belonged to the decedent (or one of his drug-dealing compatriots). *See* Ex. N at 37-40. If the "victims" were armed (but lied about it), that would obviously support Mr. Nelson's self-defense claim. But inside the D.A.'s file, Mr. Nelson learned that prosecutors had spoken to an undisclosed eyewitness who stated that Mr. Nelson's co-defendant had *also* fired his gun on the night in question.

```
up. The victim began backing up and attempting to remove a gold
medallion that he had on around his neck. However, as he backed
up he fell on his back. Marigny and Miller were able to get out
of the line of fire, each of them running in different directions.
     Both Nelson  and Moore stood over the victim with guns pointed
at him and it appeared that both of them shot.  However, Christine
Boatner was sitting in a car and she says that Moore dropped his
gun as they were running away and the gun located on the scene
was fully loaded.
```

*See* Ex. O18. This information is critical, because it means that the (unfired) gun recovered at the crime scene likely belonged to the decedent or his friends. This information was never disclosed to the defense, in violation of Mr. Nelson's *Brady* rights.

    d.  **Fingerprinting/testing of the gun**

When a gun is recovered at a homicide scene, law enforcement will typically test the weapon to see if the fingerprints on the weapon match the suspects. At trial, the State called witnesses who testified that the weapon was *not* tested (thus leaving open the possibility that the gun belonged to co-defendant Matthew Moore). Trial tr. at 37.

But in the recently disclosed files, prosecutors noted that the gun presented at trial *was* tested and produced "negative results." *See* Ex. O16.

> drop his weapon in the middle of the street as the two were running
> away. The gun was tested with negative results.
>
> On March 4, 1991, Leonard Nelson was convicted of second
> degree murder and subsequently sentenced to life imprisonment without
> benefits. He and Matthew Moore are still awaiting trial in three

Once again, this information—which would have supported the defense theory that the supposedly unarmed Marigny was, in fact, brandishing a gun—was never disclosed to defense counsel.

### 2. The evidence that the State failed to disclose was material

Evidence is material and must be disclosed if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would be different. *See Kyles*, 514 U.S. at 432-34 (quoting *Bagley*, 473 U.S. at 682). Establishing a reasonable probability of a different outcome does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Id.*

Material evidence includes not only exculpatory evidence, but also information that could be used to impeach government witnesses when the reliability or credibility of that witness may determine guilt or innocence. *See id.* at 676; *accord Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *State v. Kemp*, 00-2228, p.7 (La. 2002), 828 So.2d 540, 545; *Napue*, 360 U.S. at 269 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. . . ."); *State v. Bright*, 875 So.2d 37, 41 (La. 2004) ("For purposes of the State's due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence.").

Mr. Marigny's attempt to sell his testimony, the implicit deal between prosecutors and Mr. Marigny, and the undisclosed information about the recovered gun were all material. Each of these pieces of evidence directly implicates the credibility of Mr. Marigny's testimony, and for that reason, the materiality of each of them is directly related to the weight of Mr. Marigny's testimony in securing a conviction against Mr. Nelson.

Mr. Marigny's testimony was critical to the State's case against Mr. Nelson. The prosecutor's own internal assessment of just how crucial Mr. Marigny's testimony was underscores this point: "Marigney [sic] is an essential and material witness in the murder case against [co-defendant] Mathew [sic] Moore [and] without his testimony, we would not have had sufficient evidence to convict Leonard Nelson." Ex. O9. Because of the importance of Mr. Marigny's testimony to the State's case, it was imperative for the defense to challenge his credibility. While prosecutors at trial argued that Mr. Marigny's motivations for testifying were purely altruistic and philanthropic (*see* Ex. N at 48.),

and the State *today* repeats this argument, (*see id.* at 61), it is undisputed that Mr. Marigny's unseemly effort to sell his testimony paints a different picture. *See* Ex. N at 70-71 (State acknowledges "appearance of impropriety"). A fully informed jury certainly could have concluded otherwise, if jurors were given the evidence suppressed in the D.A.'s file, and that's why prosecutors refused to turn it over. Evidence regarding Mr. Marigny's previous unwillingness to testify without a deal from the prosecution could have, and (it is undisputed) *would* have, been used against Mr. Marigny in court to attack his credibility as a reliable witness. *See id.* at 41.

In fact, the issue of Mr. Marigny's credibility was so critical that even without knowing that he told prosecutors he would not testify without a deal, Mr. Nelson's counsel attempted to cross-examine Mr. Marigny about a deal related to his pending charges. *See* Trial Tr. at 40-41. However, Mr. Nelson's counsel was limited in his ability to effectively cross-examine Mr. Marigny about the truthfulness of his statements related to a deal in exchange for his testimony because the prosecution failed to inform defense counsel of Mr. Marigny's efforts to sell his testimony. At trial, Mr. Marigny denied the existence of any explicit plea deal. *See* Trial Tr. at 40 ("[N]o, no deal was made with me whatsoever."). Had prosecutors complied with *Brady*, Mr. Nelson's counsel at trial could have called into question the truthfulness of this statement, by saying something along the lines of: "[I]sn't it true that you told prosecutors that you wouldn't testify without a deal?"

In a case that hinged so heavily on Mr. Marigny's testimony, there is a reasonable probability that had this information been disclosed, Mr. Marigny's entire testimony could have been called into question. *See Giglio,* 405 U.S. at 154-55 ("Here the Government's case depended almost entirely on [witness] testimony; without it there could have been no indictment and no evidence to carry the case to the jury. [The Witness's] credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.").

Moreover, Mr. Marigny's attempt to sell his testimony—regardless of whether it ultimately succeeded—raises serious concerns about his character for truthfulness and credibility. Had this improper conduct been disclosed, a reasonable jury could, and likely would, have questioned his credibility. Independently, the failure to disclose this information constitutes a sufficient basis to overturn Mr. Nelson's conviction. In *Glossip v. Oklahoma*, the Supreme Court held that a revelation of a witness's willingness to lie on the stand would be "significant in any case" and is especially so when a witness's credibility is already in doubt. *Glossip v. Oklahom*a, 604 U. S. ____ at 19 (2025) (". . .Sneed [the star witness] was willing to lie to them [the jury] under oath. Such a revelation would be significant in any case, and was especially so here where Sneed was already 'nobody's idea of a strong witness.'. . . Even if Sneed's bipolar disorder were wholly irrelevant, as amicus argues, his willingness to lie about it to the jury was not. 'A lie is a lie, no matter what its subject.') (quoting *Napue*, 360 U.S. at 269); *see also Wearry,* 577 U.S. at 394 (citing *Napue*, 360 U.S.

16

at 270) ("[E]ven though the State had made no binding promises, a witness' attempt to obtain a deal before testifying was material.").

There is also at least a reasonable probability that once Mr. Marigny's credibility was called into question, jurors would have no longer believed anything Mr. Marigny said, and consequently the result of Mr. Nelson's proceeding could have been different. Consider the following scenario: Mr. Nelson's counsel says to Mr. Marigny "up until an hour ago this morning, you refused to testify. Then you had a conversation with the prosecution and suddenly had a change of heart. Are you hopeful that your other charges will be reduced?" Given the opportunity to hear this line of cross examination, there is a reasonable probability that jurors would have been skeptical of the truthfulness of Mr. Marigny's motivations, and there is a reasonable probability that the outcome of the trial would have been different.

Both pieces of gun evidence that prosecutors withheld in this case were also material. Prosecutors suppressed evidence that supported Mr. Nelson's theory at trial that he acted in self-defense. Both Marigny and Miller testified that neither they nor "Boss" were armed on the night in question. If prosecutors had disclosed the existence of a witness who said Moore had *also* fired his gun, and the fact that testing of the weapon yielded "negative" results, jurors might have concluded the State's critical witnesses were liars and were armed (as several other witnesses indicated). Had this information been shown to the jury, there is a reasonably probability that they would have further questioned the ownership of the gun holder, and more importantly, the State's entire theory of the case.

## B. The trial court erred in concluding otherwise

The trial court erroneously failed to state and adhere to the appropriate standard for determining whether or not there has been a violation of *Brady*. In an abrupt change from its questions during the evidentiary hearing, the trial court simply concluded that because there was no "proof" of a plea deal, "there is no evidence that would support a finding by this Court that petitioner had met his burden" of establishing a *Brady* violation. Ex. A at 2.

First, the trial court never inquired as to whether there was undisclosed *favorable* information, focusing instead on whether there was rock solid proof of an explicit plea deal in exchange for testimony. *Id. But see* Ex. N at 65 ("Do you not think that that's BRADY? I mean, I'm just asking"); *Id.* at 72-73 ([PETITIONER'S COUNSEL: "[F]rankly, every attorney in this room knows that that's good information that could have been used to attack and destroy his credibility on the stand"). There was no inquiry into how these statements could have been used by Mr. Nelson to call into question Mr. Marigny's credibility, nor was there mention of whether or not witness credibility is favorable evidence. Ex. A at 2. As far as the implied deal is concerned, the trial court appeared to acknowledge the existence of an *implicit* agreement between the prosecution and Mr. Marigny by stating, "So it looks like a duck, walks like a duck, quacks like a duck, but it's a chicken? I guess it's a chicken. Okay." Ex. N at 71. But instead of then asking

17

whether the circumstantial evidence established that it was more likely than not that an implicit deal was in place, the trial court erroneously continued to insist upon the need for definitive proof that Mr. Marigny testified only in expectation of an explicit deal. Ex. A at 2. The same is true for the suppressed information regarding the recovered gun, which the trial court simply ignored. *Id.*

Second, the trial court never inquired as to whether the undisclosed information was *material*. Since the trial court focused entirely on figuring out whether there was rock solid evidence of a clear deal, it erroneously failed to evaluate the materiality of Mr. Marigny's undisclosed attempt to sell his testimony in exchange for a deal, the effect of the circumstantial evidence of the implied deal, or the significance of the gun evidence. By failing to apply the correct test and failing to run each piece of evidence through the correct test (alone and cumulatively), the trial court erred in its ruling that Mr. Nelson's *Brady* rights were not violated.

## II. The *Napue* Claims

Prosecutors ran a risk when they based their entire case on the testimony of individuals who they *knew* to be violent drug dealers and who were defendants in multiple pending drug distribution cases; the witnesses, too, took a risk by taking the stand and testifying (rather than pleading the Fifth Amendment when asked about these cases). While it is true that drug dealers may be victims of crimes, as the State claimed Mr. Marigny was in this case, the State's trial strategy was risky because drug dealers such as Marigny may be reluctant to tell the truth about their own criminal behavior when testifying. And, when they fail to tell the truth, the Constitution requires prosecutors to correct their witness's false testimony (regardless of whether defense counsel attempts, successfully or unsuccessfully, to impeach the witness). See *Wearry*, 577 U.S. at 393–94 (*per curiam*) (rejecting the argument that evidence was immaterial because witness's credibility was "already impugned"); cf. *Strickland v. Washington*, 466 U.S. 668, 695 (1984); *Glossip*, 604 U. S. ____, slip op. at 13; *Napue*, 360 U.S., at 269 ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment").

The D.A. files recently disclosed reveal that prosecutors knew their key eyewitness against Mr. Nelson repeatedly lied about his criminal behavior, but the State failed to correct the record, as *Napue* and its progeny require. (Additionally, prosecutors failed to correct false testimony from a law enforcement witness who claimed that the recovered gun had not been tested, when in fact that they knew it had been tested for links to the defendants and it had yielded "negative results.")

A criminal defendant's right to due process of law is violated when the prosecution, even if not soliciting false evidence, allows false evidence to go uncorrected. *See Napue*, 360 U.S. at 269; *see also Alcorta v. Texas*, 355 U.S. 28, 78 (1957); *United States v. Agurs*, 427 U.S. 97, 110 (1976); *Giglio*, 405 U.S. at 154; *Glossip*, 604 U. S. at 13. To succeed on a *Napue* claim, a Petitioner must demonstrate that (1) the witness's testimony was false, (2) the prosecution knew

the testimony was false, and (3) the testimony was material. *See Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996). All three elements of the *Napue* claim are satisfied in Mr. Nelson's case and, notably, it does not even appear that the trial court disagreed. *See* Ex. A at 2 (focusing, apparently, on Marigny's "Fifth Amendment right" to commit perjury).

This section details how the evidentiary record supports Mr. Nelson's *Napue* claims and then explores shortcomings in the trial court's analysis of these claims.

### A. Prosecutors violated *Napue* when they failed to correct multiple witnesses' false testimony.

This section details each of the three elements of a valid *Napue* claim and explains why each element was satisfied here.

#### 1. The testimony was false.

In this case, Mr. Nelson's defense counsel attempted (very unsuccessfully) to portray Marigny as a drug dealer, and Mr. Marigny (very successfully) parried these attacks. Rather than plead the Fifth Amendment to questions about his drug dealing, Mr. Marigny chose to repeatedly lie:

| | |
|---|---|
| Q: | Isn't it a fact that Harold 'Boss' Wilson sells cocaine for you? |
| A: | No, it's not true at all. |
| Q: | Is it a fact that Curtis Miller sells cocaine for you? |
| A: | No. |
| [ADA Ms. McDonald] | Objection, Your Honor. |
| [By the Court]: | Overruled. . . . |
| Q: | Did Curtis Miller tell you on April 29th at about 3:45 that Leonard Nelson stole a bag of cocaine that he was selling for you? |
| A: | No, sir. . . . |
| Q: | Isn't it a fact that you deal cocaine occasionally from that corner, Foy and Milton? |
| [ADA Ms. McDonald]: | Objection, Your Honor. |
| A: | I deals cocaine from no corner at all. . . . |
| Q: | Do you deny that you either sold or possessed drugs at 1470 Milton Street? |
| [ADA Ms. McDonald]: | Objection, Your Honor. When are we talking about? Is this way in the past? |

Trial Tr. at 36-41. At *no time* during his testimony did Mr. Marigny acknowledge that he was, in fact, a drug dealer, or that he had previously offered to plead guilty to these offenses and testify against Mr. Nelson, in exchange for "no bill" treatment.

There is no serious dispute that this testimony was false, because (1) there was overwhelming evidence of the falsity of this testimony hidden in the D.A. files, and (2) Mr. Marigny subsequently pleaded guilty to repeatedly selling drugs from the 1400 block of Milton Street immediately after he testified against Mr. Nelson.

Prosecutors also elicited false testimony related to the recovered gun. Specifically, a law enforcement witness testified that the gun *had not* been tested (thus leaving open the possibility that it belonged to Mr. Nelson's co-defendant, Matthew Moore), when in fact it *had* been tested with "negative" results (i.e., the testing affirmatively ruled out that the gun matched either of the defendants).

19

### 2. Prosecutors knew the testimony was false

As meticulously documented at the evidentiary hearing, the recently disclosed D.A. files reveal that prosecutors knew that Mr. Marigny was engaged in perjury from the stand at the time of trial. At the time of Mr. Marigny's testimony, prosecutors and NOPD had overwhelming evidence in their possession that Mr. Marigny was lying when he testified "I deals cocaine from no corner at all," *see* Ex. N at 22-37, and that the overall tenor of his testimony (implying no connection with the drug trade) was wildly misleading.

Prosecutors were aware that Mr. Marigny had been *repeatedly* arrested at that precise location for drug dealing, and their own files indicated no "problems" in their pending cases against him (apart from the fact that he *kept* getting arrested at the same location by the same officers).



Ex. O12 at 000296



Ex. O13 at 000329. The files are replete with details establishing that Mr. Marigny's testimony was false, including the names of lay and police witnesses, and prosecutors' own subjective estimations of the strength of their case(s) against Mr. Marigny for drug dealing. In short, the evidence adduced at the evidentiary hearing conclusively shows

that prosecutors *knew* Marigny was lying. *See* Ex. N at 22-37; Exs. O11-14. Moreover, we now know that Mr. Marigny had offered to plead guilty to these very offenses *before* his testimony (in exchange for leniency), which is further evidence that the prosecution knew Mr. Marigny's testimony was false. Ex. O17.

This Court has consistently held that the knowledge of false testimony by any member of the prosecution team, *including investigators*, is imputed to the prosecuting attorney. *State v. Murray*, 223 So. 3d 566, 572 (La. App. 4th Cir. 2017) (finding reversible error where witness provided false testimony about previous drug dealing activity that was contrary to past statements to law enforcement). Here, both NOPD officers *and* prosecutors knew that Marigny's testimony was false. And, at the time of Mr. Marigny's testimony, it was the official position of the Orleans Parish District Attorney's office that Mr. Marigny repeatedly dealt drugs from the precise corner where he denied doing so, as evidenced by the State's filing of valid bills of information which resulted in pending charges against Mr. Marigny. *See* La. R. Prof. Resp. 3.8.

Obviously, defense counsel also believed that Mr. Marigny was lying, but this awareness does not absolve prosecutors of their responsibility to correct the testimony. *Glossip*, 604 U.S. at 23 (holding that despite defense counsel's awareness of the falsity of the prosecution's witness's testimony and the witness's already-damaged credibility, "the responsibility and duty to correct false testimony lies with representatives of the State, not with defense counsel.") (internal quotations omitted); *see also United States v. Sanfilippo*, 564 F.2d 176, 177-78 (5th Cir. 1977) (holding defendant's due process rights were violated despite defense awareness at trial that prosecution witness's testimony was false, emphasizing that "the duty to correct the false testimony of a Government witness is on the prosecutor"). Nor can prosecutors argue (improbably) that ADA McDonald might have secretly harbored some doubt as to whether Marigny truly was a cocaine dealer. *See* LAFAVE, ET AL., 6 CRIMINAL PROCEDURE § 24.3(d) (4th ed.) ("The duty to correct false evidence") ("[T]he Court has indicated that the *Mooney* principle does not require actual knowledge by the prosecution of the perjured testimony."[5]; *Glossip*, 604 U.S. at 13 (rejecting a claim that testimony was not "clearly false" because the witness believed his testimony to be true, and holding that even if a

---

[5]  Even if this were true—as the State now implausibly hypothesizes ("There is no way, because the prosecutor in this case was not a witness to the underlying crimes of PWIT and Possession, there is no way she could have known this was a false statement.")—then plainly there was a *Brady* violation. *But see* Poulin, *Convictions Based on Lies: Defining Due Process Protection*, 116 PENN. ST. L. REV. 331 (2011) (discussing "prosecution knowledge" requirement and collecting, *inter alia*, cases in which false testimony does not involve government culpability). If ADA McDonald really believed that Mr. Marigny was innocent, Mr. Marigny's offer to plead guilty would be an offer to commit perjury by falsely accepting responsibility for these drug-dealing cases, in order to procure better treatment for himself. The fact that a star prosecution witness offered to commit perjury is a form of *Brady* evidence that should have been told to Mr. Nelson's jurors. *See* Ex. J at 73.

witness earnestly believes his testimony to be true the prosecutorial duty to prevent the use of false testimony is absolute).

The *Murray* case is precisely on-point. There, an NOPD officer had extensive knowledge about a key government witness's own drug dealing behavior, and he communicated that information to prosecutors. *Murray*, 223 So. 3d at 571-72. At trial, the witness *denied* being a drug dealer. *Id.* The Fourth Circuit had little trouble concluding that the information contained in the officer's report "leads to a reasonable inference that the State was aware that Wales [the witness] was not being truthful when she testified at Murray's trial." *Id.* at 572. The same is true here.

### 3.   The false testimony was material

In the context of a *Napue* claim, materiality is satisfied if there is a reasonable likelihood that the uncorrected false testimony may affected the trial's outcome, a standard which focuses on whether the falsehood had the *potential* to influence the jury's judgment, not whether it definitively altered the verdict. *See Napue*, 360 U.S. at 271; *see also Glossip*, 604 U.S. at 10 (holding that if a defendant shows the prosecution allowed false testimony "to go uncorrected when it appeared" then "a new trial is warranted so long as the false testimony may have had an effect on the outcome of the trial"). The *Napue* materiality analysis is tipped significantly in favor of the defendant, as once the falsity of testimony is established, the burden is shifted to the prosecution "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*; *see also* LAFAVE, ET AL., 6 CRIMINAL PROCEDURE § 24.3(d) (4th ed.) ("The duty to correct false evidence"). Unless the state can overcome this significant burden of proof, a new trial is warranted. *Id.*

Despite its superficial similarity to the *Brady* materiality standard, the "reasonable likelihood" standard of materiality in the *Napue* context is a particularly "low threshold." *See United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979). The materiality of any given *Brady/Napue* violation must be evaluated (1) in light of the strength of the State's case at trial, and (2) in light of additional *Brady/Napue* violations that might compound the cumulative impact or import of the suppressed evidence. *See Kyles*, 514 U.S. at 436; *see also Glossip*, 640 U.S. at 13. The Supreme Court has held that "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence," and in situations where false testimony is provided, "the standard [to find a constitutional violation] is considerably less onerous." *See Napue*, 360 U.S. at 269; *see also Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) (contrasting the materiality standard applicable to *Brady* claims with that applicable to "claims that the prosecution has knowingly used perjured testimony or false evidence"); *see generally* LAFAVE, ET AL., 6 CRIMINAL

PROCEDURE § 24.3(d) (4th ed.) ("The duty to correct false evidence") (discussing lower materiality standard for "false testimony" cases as compared to *Brady* cases).

Under *Napue*, material evidence includes not only exculpatory evidence, but also information that could be used to impeach government witnesses when the reliability or credibility of that witness may determine guilt or innocence. *See Bagley*, 473 U.S. at 676; *accord Giglio*, 405 U.S. at 154-55; *Kemp*, 828 So.2d at 545; *Napue*, 360 U.S. at 269 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. . . ."); see also *Kyles*, 514 U.S. at 444-52 (discussing impeachment uses of undisclosed evidence); *Bright*, 875 So.2d at 41 ("For purposes of the State's due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence."); *Barham*, 595 F.2d at 241-42 ("It is also immaterial whether the false testimony directly concerns an essential element of the Government's proof or whether it bears only upon the credibility of the witness.").

The federal Fifth Circuit has held that a conviction must be reversed when false testimony went uncorrected, even if "[t]here is no doubt that the evidence in this case was sufficient to support a verdict of guilty," and sister circuits have described the need to reverse in such cases as "virtually automatic." *See Barham*, 595 F.2d at 242; *see also United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991) ("Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'") (quoting *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975)); *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1114 (9th Cir. 2001).

Mr. Marigny's testimony was central to the prosecution's case, as evidenced by the recently disclosed D.A. file note that emphasized the "critical and essential" nature of Mr. Marigny's testimony, noting "without [Marigny's] testimony, we would not have had sufficient evidence to convict Leonard Nelson." *See* Ex. O9. By the prosecution's own admission, no evidence could be more material to Mr. Nelson's conviction than the false testimony provided by Mr. Marigny. *Id.* On multiple levels Mr. Marigny's false testimony was material. First, Mr. Marigny's testimony was the only evidence that contradicted the defense's case in its entirety, and if jurors believed his testimony that he was not involved in the drug trade, it would vitiate the entire defense theory of the case. Second, apart from the defense theory, Mr. Marigny's credibility was central to the prosecution's case. Had the jury known Mr. Marigny's testimony was false and that the NOPD official's testimony that the gun had not been tested was untrue, there exists at least a reasonable likelihood that their verdict would have been different because the testimony was so central to the prosecution's case. *See* Ex. O9 and O16.[6] Mr. Marigny was the star witness for the prosecution, yet, as discussed

---

[6]    As Mr. Nelson argued in briefing before the evidentiary hearing, trial prosecutors should have made the following disclosures once their key eyewitness committed perjury (and it is all but certain that the trial outcome would have been different if they had done what the Constitution required):

above, his credibility was doubtful. The jury already did not believe the State's version of events entirely, and the false testimony would have further eroded their assessment of the veracity of the State's theory. *See* Ex. N at 20-22, 53-55.

It is important to emphasize that *neither* the State *nor* the trial court have disputed that this false testimony was material. Indeed, the State cannot do so, because their own internal files underscore that Mr. Marigny's testimony was "essential" to securing the conviction against Mr. Nelson, and likewise acknowledge they would have to admit (at a hypothetical trial of Mr. Nelson's codefendant) that Mr. Nelson lied on the stand as a result of his subsequent guilty pleas. But if this Court were inclined to re-weigh the evidence and make its own assessment anyway, *Murray* is (again) helpful. As this Court explained there: "[The witness] Wales's statements [about her own drug-dealing] were material as the State's case against Murray rested heavily upon a determination of her credibility, considering that Murray's own testimony contradicted Wales's version of events." *Murray*, 223 So. 3d at 572-73.

### B. The trial court erred in concluding otherwise

The trial court rejected Mr. Nelson's *Napue* claim based on a radical, legally unsupported proposition that was not even urged by the State: that prosecutors' duties under *Napue* are void because a key government witness

---

Members of the Jury, I regret to tell you that I am obligated to share some information known to the State at this time. While we still think you should believe Mr. Marigny's testimony that Mr. Nelson was the aggressor, the State knows that Mr. Marigny testified falsely just a moment ago. Indeed, he has previously told me, personally, that he would plead guilty to multiple different charges of distributing cocaine on Milton St. if we would treat him as a "no bill" in those cases, and that he was willing to testify against Mr. Nelson *only* if we did so. In fact, we're prosecuting Mr. Marigny in those three drug-dealing cases because we have overwhelming evidence that he is a drug dealer.

Let me share with you the evidence, from our personal files, that leads me to believe that our star eyewitness just lied. On April 12, 1989, two NOPD officers saw Marigny throw a clear plastic bag of cocaine to the ground one block off of Milton Street. Marigny and the woman he was with were both arrested, but we had to drop the charges against Marigny when the woman stated under oath that the drugs were hers. On January 16, 1990, he was arrested about 50 feet away from that spot on Milton Street. Six NOPD officers caught Marigny red-handed as he tried to conceal a plastic bag containing more than 60 rocks of crack cocaine under some leaves. We only charged him with possession in that case, which is pending now. But on March 19, 1990, in the exact same spot, the Narcotics Strike Force arrested him again with 28 pieces of crack cocaine on his person; he's facing PWIT charges for that one. Somehow that didn't stop him. After a Confidential Informant told NOPD that he was *still* selling crack cocaine from the exact same spot on Milton St., on April 9, 1990, another team of NOPD officers arrested him yet again: Once more, he had dozens of rocks of crack cocaine and more than $1350 in cash on him at the time of his arrest. The shooting in this case occurred on May 5, 1990. In our private notes, we've written that these cases are airtight; there are no real weaknesses in our case against Mr. Marigny to speak of. And we can put him in prison for over 100 years if and when we convict him of these PWIT charges because of his past violent criminal history.

Members of the jury, this does not make Marigny a liar with respect to his testimony against Mr. Nelson. But in the unusual circumstance where I put someone on the stand as a key witness in our case-in-chief, and I know he's lied about something material, and the falsity of his testimony is *not* exposed by defense counsel, I have to tell you that. Defense counsel has a duty to win; the State has a duty to see that justice is done, win or lose. So that's what I'm doing here.

*See* Ex. M at 3. Unfortunately, the prosecution did not uphold its duty in this case.

24

"ha[s] the absolute right to not self-incriminate as to unadjudicated charges that were pending against him." Ex. A at 2-3.

The right against self-incrimination does not grant witnesses the right to lie under oath, and even if the witness had not *waived* his right against self-incrimination by testifying, a witness's rights do not trump a defendant's rights under the Due Process Clause. In *Harris v. New York*, the Supreme Court held "[The Fifth Amendment] privilege cannot be construed to include the right to commit perjury." 401 U.S. 222, 225 (1971). Similarly, in *United States v. Rodriguez-Rios* the Fifth Circuit held, "[a]lthough the Fifth Amendment protects a person's right to remain silent in response to an incriminating question, an outright lie is not protected." 14 F.3d 1040, 1049 (5th Cir. 1994). Mr. Marigny did not have the right to provide false testimony, and the State's decision to allow this crucial testimony to go uncorrected was a violation of Mr. Nelson's due process rights.

That Mr. Marigny's multiple drug-dealing cases "**had not yet been adjusdicated**" (bold, underline, and typo in original) is irrelevant. *See* Ex. A. Mr. Marigny did not lie in response to questioning about whether he had been *convicted* of drug offenses, but rather, he chose to lie in response to questioning about whether he had engaged in that activity. The critical distinction—never urged by the State, and obviously confirmed by decades of U.S. Supreme Court precedent—was ignored by the trial court.

### III. The Jury Instruction / Due Process Claim

At trial, Mr. Nelson's entire case was based on self-defense. However, the jury was instructed incorrectly on this affirmative defense. Jurors were told the following:

> If you find that by a preponderance of the evidence the defendant has raised the defense of justification, then the burden is upon the state to show that the homicide was not committed in self-defense.

*See* ROA, Vol. 1, at 25-26. The State has conceded that this instruction was "not a standard jury instruction." Ex. N at 59. The State has *withdrawn* any procedural objections to this claim being decided *de novo*, Ex. K, but nevertheless claims that the above instruction is proper. It is not.

There were three main problems with this instruction, which was critical given that the entire case turned on the question of self-defense. The instruction (1) tasked the jury to decide whether Mr. Nelson had properly raised a self-defense claim, which is question for the trial court, and not a question for the jury; (2) improperly instructed jurors that Mr. Nelson had the burden to prove by a "preponderance of the evidence" that he had properly raised such a claim, when no such burden existed; and (3) strongly and inaccurately implied that the State must meet its own burden to show that Mr. Nelson did not act in self-defense by only a "preponderance of the evidence," rather than "beyond a reasonable doubt." If, for example, the jurors were 25% convinced that Mr. Nelson acted in self-defense and 75% convinced that he did not, he was entitled to an acquittal under Louisiana law; a juror

25

scrupulously following the trial court's instructions, however, would have likely concluded that they should not consider self-defense in the first instance (or, if they did, that the State had overcome its burden of disproving a *prima facie* case of self-defense).

Nevertheless, the trial court denied Mr. Nelson's claim. The following section explains how these errors deprived Mr. Nelson of his constitutional rights, and then addresses errors in the trial court's opinion

### A. The jury instructions misstated the law

There has never been any dispute over whether Mr. Nelson shot Mr. Wilson: He took the stand at trial and candidly told the jury that he shot the decedent. *See* Trial Tr. at 179. Mr. Nelson testified that he had done so only because "because [Mr. Wilson] was going to kill me if I wouldn't have killed him." *Id.* at 180. His case, then, hinged on a single issue at trial: self-defense.

Where there is "*any* evidence which tended to show" that the accused's conduct was in self-defense, or where there is at least "*some* evidence relevant" to that issue, then the jury must consider whether the State has met its burden of proof with respect to that defense. *Stevenson v. United States*, 162 U.S. 313, 314-15 (1896) (emphasis added). Mr. Nelson testified at trial that (1) he had stolen cocaine from Mr. Wilson several days before the shooting; (2) as a result, he had received death threats in the days leading up to the shooting; (3) Mr. Wilson had attempted to kill him days before the shooting; and (4) Mr. Wilson was actively shooting at him and that he only returned fire in self-defense. *See* Trial Tr. at 172-73, 175-76, 179-80.

Mr. Nelson's testimony plainly constitutes "evidence which tended to show" that his conduct was in self-defense as a matter of law. Therefore, the jury was required to consider whether the State had met its burden of proof with respect to his claim. *Stevenson*, 162 U.S. at 314-15.

Mr. Nelson offered several proposed jury instructions to that accurately stated the law, including the following:

> When an accused pleads self-defense, suggesting that the killing was justifiable, he undertakes no legal burden. The burden, when self-defense is at issue, is not upon the defendant to prove that his actions were reasonable and believed necessary, but rather upon the State to show that the actions were not in self-defense. In other words, once the plea of self-defense has been interposed the burden of proof does not shift to the defendant to prove to your satisfaction and beyond a reasonable doubt that the killing was justifiable. . . .

Special Charge No. 1 (Denied), in ROA, Vol. 1, 137 of 226. The trial court erroneously rejected this proposed charge. Mr. Nelson again proposed a materially similar charge with different language, which the trial court also improperly rejected:

> The burden of proof of the facts relating to a plea of self-defense rests, not upon the defendant, but upon the State. As self-defense is not a special plea, the burden of proof rests upon the State to show, beyond a reasonable doubt, that the killing was done feloniously, and not in self-defense, in order to

> convict the party accused of felonious homicide. The plea of self-defense does not place upon the accused the burden of proving it, nor does it change the duty of the State to prove the guilt of the accused beyond a reasonable doubt. Accused, relying on self-defense, does not have the burden of proving that the killing was justifiable; but the State has the burden of proving beyond a reasonable doubt that the killing was not justifiable.

Special Charge No. 5 (Denied), in ROA, Vol. 1, 141 of 226.[7]

Each of these proposed instructions align with the well-settled rule in Louisiana that "a defendant in a homicide prosecution who asserts that he acted in self-defense does not have the burden of proof on that issue. The State bears the burden of proving beyond a reasonable doubt that the homicide was … not perpetrated in self-defense." *State v. Patterson*, 295 So.2d 792 (La. 1974); *State v. Carter*, 80 So.2d 420, 423 (La. 1955) (holding that "[i]t is the well-settled jurisprudence of this court that an accused relying on self-defense does not have the burden of proving that the killing was justifiable or that he acted in self-defense); *State v. Conda*, 156 La. 679, 101 So. 19, 202 (La. 1924) (holding that "[i]t is upon the state to prove beyond a reasonable doubt that the killing was done feloniously, and therefore not in self-defense."). Instead, the instructions ultimately given to the jury by the trial court read:

> If you find that by a preponderance of the evidence the defendant has raised the defense of justification, then the burden is upon the state to show that the homicide was not committed in self-defense.

ROA, Vol. 1, 25-26 of 226. At no time did the trial court define the legal term of art "preponderance of the evidence," or explain that "the burden [that] is upon the state" is *different* from the burden identified and explained in the clause immediately preceding it.

The State raised no merits defense on this point (ignoring a direct order to file a merits objection, if any, by a date certain) nor could the State, because it is undisputed that the trial court gave an incorrect instruction. The question of whether the Defendant has put self-defense "at issue" is not a jury question, and the Defendant does not need to satisfy any "preponderance of the evidence" burden on this point. That was true at the time of trial. *See State v. Savoy*, 418 So. 2d 547, 550 (La. 1982) ("The State has the entire and affirmative burden of proving beyond a reasonable doubt that a homicide was not perpetrated in self-defense. The defendant who raises the issue of self-defense does not assume any burden of proof whatsoever."); *State v. Ardoin*, 54 So. 407, 407 (La. 1911) (reversing murder conviction where "the onus of proof [was] made to shift from the state to defendant" on question of self-defense). It remains true today. *State v. Bridges*, 2023-0166 (La. App. 4 Cir. 2024) ("In a homicide case in which the

---

[7] Trial counsel for Mr. Nelson also, inexplicably, proposed several instructions that misstated the relevant burdens. This fact, however, is immaterial, since the trial court rejected these proposed instructions, too. The oft-repeated rule that a defendant cannot complain of a jury instruction that he himself proposes only applies when said instruction is actually granted.

defendant asserts he acted in self-defense, the State has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense.").

It is difficult to overstate the import of this error, particularly in a case where a defendant takes the stand to testify in support of a self-defense claim. "[W]here the defendant's proposed charge presents, when properly framed, a valid defense, and where there has been *some* evidence relevant to that defense adduced at trial, then the trial judge may not refuse to charge on that defense." *Strauss v. United States*, 376 F.2d 416, 419 (5th Cir. 1967) (emphasis added). When the accused presents a justification defense, they are admitting that: (1) *yes*, they caused bodily injury to the other person; and (2) *yes*, they did so purposefully or knowingly; *but only because* (3) they believed using the force that caused the injury at issue was necessary to protect themself from the other person's imminent use of unlawful force against them. *See, e.g.*, *Gilmore v. Taylor*, 508 U.S. 333, 364 (1993) (Blackmun, J., dissenting) (discussing how a defendant who testifies to self-defense "takes the stand and concedes the elements of murder in order to prove his affirmative defense."). The defendant is, in effect, admitting to the necessary elements of the offense in order to defend against the allegation as a whole. And as long as there is "*any* evidence which tended to show" that the accused's conduct was in self-defense, or at least "*some* evidence relevant" to that issue, then the jury *must* consider whether the State has met its burden of proof with respect to that defense. *See Stevenson*, 162 U.S. at 314-15 (emphasis added); *id*. at 315-16, 322-23 (ruling that, even if the "judge may be entirely satisfied, from the whole evidence in the case," that the accused committed the crime alleged without any complete or mitigating defense, "if there by any evidence fairly tending to bear upon the issue...it is the province of the jury to determine from all the evidence what the condition of mind was, and to say whether the crime" was committed or not).

While the State made a half-hearted attempt to defend the accuracy of these jury instructions orally at the evidentiary hearing—saying, effectively, that the instructions were "good enough"—the State *affirmatively waived* any merits opposition to Mr. Nelson's jury instruction claim through written pleadings prior to the hearing. *See* Ex. K. Ultimately, Mr. Nelson was convicted based on a self-defense jury instruction, central to his case, that completely misstated the law.

**B. The trial court erred in concluding otherwise.**

The trial court's merits decision, which cited no law beyond the procedural history of this very case—and ignored the State's affirmative waiver and forfeiture of both procedural and substantive objections—disregarded all of the foregoing.

After *denying* the State's procedural objections and agreeing to assess the jury instruction claim *de novo*, *see* Ex. F, and then ignoring the State's stipulation that it was not opposing Mr. Nelson's claim on either procedural *or* substantive grounds, *see* Ex. K, the trial court still ruled against Mr. Nelson. The trial court appeared to rule that

28

Fourth Circuit precedent foreclosed Mr. Nelson's claim that the jury instructions were erroneous, though the only case cited for this (obviously incorrect) position was Mr. Nelson's own direct appeal. (Importantly, however, this court never considered on direct appeal the argument that the jury instruction improperly placed an initial "preponderance of the evidence" burden on Mr. Nelson.)

The trial court also erroneously rejected Mr. Nelson's claim that he received ineffective assistance of appellate counsel. The court correctly recognized that Appellate counsel Sherry Watters did "not specifically attack[] the notion of 'burden shifting,'" but effectively held that she did an adequate job litigating the appeal because she unsuccessfully raised *other* objections to the jury instruction. This, of course, is nonsense: The unexplained failure to litigate a clear and obvious flaw in the critical jury instruction is not excused because the same attorney may have done other things right. *Hinton v. Alabama*, 571 U.S. 263, 268 (2014) (rejecting the State's argument that because the attorney in question had performed other aspects of representation well, he was not ineffective for failing to rectify an "obvious" problem in the defense.).

Though the trial court correctly concluded that Mr. Nelson's jury instruction claim could and should be reconsidered pursuant to Louisiana Code of Criminal Procedure 930.4(A) in the "interests of justice" (and the State did not seek supervisory review), and the State basically waived all further procedural and substantive opposition, the trial court inexplicably denied relief. Perhaps the trial court felt that only this Court could correct an error it made three decades ago; if so, this court should act now.

## CONCLUSION

WHEREFORE, for all the reasons given above and for any other reasons that may occur to this Honorable Court, defendant respectfully asks this Court to grant supervisory relief and reverse the trial court's denial of Mr. Nelson's application for post-conviction relief.

Respectfully submitted,

_____

Thomas Frampton, La. Bar. No. 35775
University of Virginia School of Law
*(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: rframpton@law.virginia.edu

Kelly Orians, La. Bar No. 36920
University of Virginia School of Law
(for identification purposes only)
580 Massie Drive
Charlottesville, VA 22903
Email: korians@law.virginia.

**VERIFICATION AND CERTIFICATION**

COMES NOW Thomas Frampton, being duly sworn, and deposes and states that he has reviewed the forgoing petition; that all the facts therein are true and accurate to the best of his information and belief; that he has notified or will immediately notify the parties listed below that this writ application has been filed; and that he has caused, or will immediately cause, a true and accurate copy of this petition to be served forthwith on the parties listed below:

Hon. Kimya M. Holmes, Section "D"
Orleans Criminal District Court
2700 Tulane Avenue
New Orleans, LA 70119

District Attorney Jason Williams or his designee
619 S. White St.
Orleans Parish District Attorney's Office
Orleans, LA 70119

_____
Thomas Frampton, Bar No. 35775

Date: June 18, 2025



**LASC**
**Ex. A**

**Office Of The Clerk**
## Court of Appeal, Fourth Circuit
**State of Louisiana**

**Justin I. Woods**
**Clerk of Court**

**400 Royal Street**
**Third Floor**

**JoAnn Veal**
**Chief Deputy Clerk of Court**

**Mailing Address:**
**410 Royal Street**
**New Orleans, Louisiana**
**70130-2199**
**(504) 412-6001**
**FAX (504) 412-6019**

## NOTICE OF JUDGMENT AND
## CERTIFICATE OF MAILING

I CERTIFY THAT A COPY OF THE WRIT DISPOSITION IN THE BELOW-NUMBERED MATTER HAS BEEN E-MAILED ON THIS DAY **05/21/2025** TO THE TRIAL JUDGE, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

_____JIW/tap_____
**JUSTIN I. WOODS**
**CLERK OF COURT**

### 2025-K-0149

**Thomas Ward Frampton**
UVA School of Law
580 Massie Road
Charlottesville, VA 22903
tframpton@law.virginia.edu

**Kelly Orians**
UVA School of Law
580 Massie Drive
Charlottesville, VA 22903
korians@law.virginia.edu

**Jason Rogers Williams**
District Attorney Orleans Parish
619 South White Street
New Orleans, LA 70119
jrwilliams@orleansda.com

**Brad Scott**
Chief of Appeals
Orleans Parish Assistant District Attorney
619 S. White Street
New Orleans, LA 70119
bscott@orleansda.com

LASC
Ex. A

NO. 2025-K-0149

COURT OF APPEAL, FOURTH CIRCUIT

STATE OF LOUISIANA


STATE OF LOUISIANA

VERSUS

LEONARD NELSON


IN RE:          LEONARD NELSON

APPLYING FOR: SUPERVISORY WRIT

DIRECTED TO:   HONORABLE KIMYA M. HOLMES
               CRIMINAL DISTRICT COURT ORLEANS PARISH
               SECTION "D", 344-648

**WRIT DENIED**

Relator, Leonard Nelson, seeks review of the trial court's January 10, 2025

denial of his application for post-conviction relief.  The writ is denied.

New Orleans, Louisiana this 21st day of May 2025.


*RML*

_____ _____
JUDGE ROSEMARY LEDET

*JCL*

_____
JUDGE JOY COSSICH LOBRANO

*JENKINS, J., DISSENTS*

_____
JUDGE SANDRA CABRINA JENKINS

**LASC**
**Ex. A**

| | | |
|---|---|---|
| STATE OF LOUISIANA | * | NO. 2025-K-0149 |
| VERSUS | * | COURT OF APPEAL |
| LEONARD NELSON | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |
| | * | |
| | * | |

\* \* \* \* \* \* \*

SCJ    **JENKINS, J., DISSENTS**

I find Relator was denied a right to a fair trial by the prosecution's failure to disclose *Brady* material. The State violates a defendant's due process rights under the Fourteenth Amendment when it withholds favorable evidence that has been requested by the defense where such evidence is material to the issues of guilt or punishment, whether the prosecutor acted in good or bad faith. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963); *State v. Bright*, 2002-2793 (La. 5/25/04), 875 So.2d 37; *State v. Fields*, 2013-1493 (La. App. 4 Cir. 10/18/14), 151 So.3d 756. Evidence is material if it is needed to impeach the testimony of a witness whose reliability or credibility may determine guilt or innocence. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375 (1985); *State v. Bright*; *State v. Fields*. In order to show materiality, a defendant must show the withheld evidence resulted in the denial of his right to a fair trial. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392 (1976). As discussed in *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566 (1995) (citations omitted), a reviewing court need not determine "whether defendant would have more likely than not have received a different verdict with the evidence, but whether in its absence, he received a ***fair trial, understood as a trial resulting in a verdict worthy of confidence.***" [emphasis supplied].

1

LASC
Ex. A

In the present matter, Relator complains the State withheld *Brady* evidence between the State and Derrick Marigny, one of the State's main witnesses, regarding plea deal discussions and an implicit agreement to reduce Marigny's pending cocaine-related charges in exchange for Marigny's testimony at Relator's murder trial.  Relator also notes the State failed to disclose test results of a gun found on at the murder scene.

I find the cumulative effect of the State's failure to disclose *Brady* material deprived Relator of a fair trial, resulting in a guilty verdict not worthy of confidence.  Specifically, "[t]he *Brady* rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence." *Bright*, 2002-2793, p. 5, 875 So.2d at 41 (citations omitted).  In this matter, Relator properly notes the State withheld evidence regarding Marigny, a principal witness.  This withholding of evidence deprived Relator of the opportunity to impeach the credibility of Marigny—whose testimony could determine guilt or innocence— as to whether Marigny's testimony was tainted by an offer for a reduced sentence.

Based on the foregoing reasons, I dissent.  I would grant Relator's writ application and reverse the trial court's judgment which denied Relator's application for post-conviction relief.

No. _____

STATE

**v.**

**LEONARD NELSON**

On writ to review an order from the Fourth Circuit Court of Appeal
No. 2025-K-0149
Denying petitioners application for post-conviction relief on the order
of the Honorable Kimya Holmes
Section D
Orleans Parish, Louisiana, in case 344-648

**PETITION FOR SUPERVISORY WRITS TO REVIEW THE TRIAL COURT'S ORDER
DENYING PETITIONER'S APPLICATION FOR POST-CONVICTION RELIEF**

**VOLUME II**

Thomas Frampton, La. Bar. No. 35775
University of Virginia School of Law
*(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: tframpton@law.virginia.edu

Kelly Orians, La. Bar No. 36920
University of Virginia School of Law
*(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: korians@law.virginia.edu

1

**EXHIBITS**

Mr. Nelson's Fourth Circuit Writ Application and Accompanying Exhibits

Ex. A – 000001 – Ruling denying application for PCR (and minute entry setting return date)

Ex. B – 000006 – Bill of Indictment

Ex. C – 000008 – PCR Petition (and Notice of Errata)

Ex. D – 000038 – State's Procedural Objections

Ex. E – 000051 – Memorandum in Response to State's Procedural Objections

Ex. F – 000056 – Ruling Denying State's Procedural Objection (Sept. 20, 2024)

Ex. G – 000064 – State's Notice of Intent to Seek a Writ of Review and for Extension of Return Date

Ex. H – 000066 – Opposition to Procedurally Improper "Motion for Extension of Return Date"

Ex. I – 000068 – Response to Non-Filed Merits Opposition and Supplemental Opposition to "Motion to Extend"

Ex. J – 000071 – "State's Opposition to the Merits and Article 930.4 Objections to Application for Post Conviction Relief"

Ex. K – 000082 – Joint Motion for Immediate Ruling on Jury Instruction Claim

Ex. L – 000083 – Motion for Ruling on Jury Instruction Claim and Motion to Cancel Evidentiary Hearing on *Brady* Claim as Moot

Ex. M – 000088 – Reply Memorandum to State's Merits Opposition

Ex. N – 000094 – Transcript of Evidentiary Hearing Held Dec. 17, 2024

Ex. O – Petitioner's Exhibits

  1 – 000171 - Flash Drive [note: physical copy submitted this day to the Clerk of Court]
  2 – 000172 - Executed Agreement w/ Civil Rights Division
  3 – 000177 - Affidavit of John Rohr (explaining file was "lost or misplaced")
  4 – 000182 - Apology from DA upon Finding File
  5 – 000183 - Letter from Devin Flemming to CRD
  6 – 000184 - Transcript of civil court hearing regarding missing file
  7 – 000200 - Correspondence from OPDA confirming records had not been located
  8 – 000212 - Memo seeking permission to reduce Moore charges (explaining jurors did not entirely believe State's theory or witnesses against Nelson)
  9 – 000216 – Memo acknowledging Marigny's testimony was "the main witness" and testimony was essential to conviction
  10 – [Not introduced]
  11 – 000219 - DA file in Case No. 334-550 (State v. Marigny)
  12 – 000267 - DA file in Case No. 341-057 (State v. Marigny)
  13 – 000315 - DA file in Case No. 342-951(State v. Marigny)
  14 – 000341 - DA file in Case No. 343-461 (State v. Marigny)
  15 – [Not introduced]
  16 – 000386 - Memo acknowledging gun was tested with "negative results"
  17 – 000390 - Memo acknowledging Marigny's attempt to sell testimony
  18 – 000392 - DA screening memo referencing witness who saw both defendants shooting

Ex. P – State's Exhibits[1]

Ex. Q – 000394 - Minute Entry from Dec. 17, 2024 (evidentiary hearing and exhibit list)

Ex. R – 000395 - Notice of Intent

Ex. S – 000397 - Extension of Return Date (minute entry and motion)

---

[1]    Omitted because duplicative of Petitioner's exhibits

2

IN THE FOURTH CIRCUIT COURT OF APPEAL

STATE OF LOUISIANA

No. _____

---

**STATE OF LOUISIANA**

**v.**

**LEONARD NELSON**

---

On Writ to Review a Ruling Denying Post-Conviction Relief on the Merits
from the Criminal District Court of Orleans Parish
Case No. 344-648, Section "D"
Honorable Kimya M. Holmes, Judge Presiding

---

**POST-CONVICTION RELIEF PETITIONER'S
APPLICATION FOR SUPERVISORY WRITS**

---

Thomas Frampton, La. Bar. No. 35775
University of Virginia School of Law
*(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: Tframpton@law.virginia.edu

Kelly Orians, La. Bar No. 36920
University of Virginia School of Law
*(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: Korians@law.virginia.edu

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................... 4

STATEMENT OF JURISDICTION ................................................................. 6

ISSUES PRESENTED .................................................................................... 7

STATEMENT OF THE CASE ....................................................................... 8

LAW AND ARGUMENT ............................................................................. 12

    I.    The *Brady* Claims ........................................................................ 12

        A.  Mr. Nelson's rights under *Brady v. Maryland* were violated ................... 12

            1.    Prosecutors hid favorable evidence ...................................... 14

            2.    The evidence that the State failed to disclose was material .................. 21

        B.  The trial court erred in concluding otherwise ......................................... 24

    II.    The *Napue* Claims ...................................................................... 25

        A.  Prosecutors violated *Napue* when they failed to correct multiple witnesses' false testimony. ...................................................................... 26

            1.    The testimony was false. ..................................................... 25

            2.    Prosecutors knew the testimony was false ............................... 27

            3.    The false testimony was material ............................................ 31

        B.  The trial court erred in concluding otherwise ......................................... 34

    III.    The Jury Instruction Claim ......................................................... 35

        A.  The jury instructions misstated the law ..................................................... 37

        B.  The trial court erred in concluding otherwise. ......................................... 41

VERIFICATION AND CERTIFICATION ....................................................... 43

**EXHIBIT LIST**

Ex. A – 000001 – Ruling denying application for PCR (and minute entry setting return date)

Ex. B – 000006 – Bill of Indictment

Ex. C – 000008 – PCR Petition (and Notice of Errata)

Ex. D – 000038 – State's Procedural Objections

Ex. E – 000051 – Memorandum in Response to State's Procedural Objections

Ex. F – 000056 – Ruling Denying State's Procedural Objection (Sept. 20, 2024)

Ex. G – 000064 – State's Notice of Intent to Seek a Writ of Review and for Extension of Return Date

Ex. H – 000066 – Opposition to Procedurally Improper "Motion for Extension of Return Date"

Ex. I – 000068 – Response to Non-Filed Merits Opposition and Supplemental Opposition to "Motion to Extend"

Ex. J – 000071 – "State's Opposition to the Merits and Article 930.4 Objections to Application for Post Conviction Relief"

Ex. K – 000082 – Joint Motion for Immediate Ruling on Jury Instruction Claim

Ex. L – 000083 – Motion for Ruling on Jury Instruction Claim and Motion to Cancel Evidentiary Hearing on *Brady* Claim as Moot

Ex. M – 000088 – Reply Memorandum to State's Merits Opposition

Ex. N – 000094 – Transcript of Evidentiary Hearing Held Dec. 17, 2024

Ex. O – Petitioner's Exhibits
    1 – 000171 - Flash Drive [note: physical copy submitted this day to the Clerk of Court]
    2 – 000172 - Executed Agreement w/ Civil Rights Division
    3 – 000177 - Affidavit of John Rohr (explaining file was "lost or misplaced"
    4 – 000182 - Apology from DA upon Finding File
    5 – 000183 - Letter from Devin Flemming to CRD
    6 – 000184 - Transcript of civil court hearing regarding missing file
    7 – 000200 - Correspondence from OPDA confirming records had not been located
    8 – 000212 - Memo seeking permission to reduce Moore charges (explaining jurors did not entirely believe State's theory or witnesses against Nelson)
    9 – 000216 – Memo acknowledging Marigny's testimony was "the main witness" and testimony was essential to conviction
    10 – [Not introduced]
    11 – 000219 - DA file in Case No. 334-550 (State v. Marigny)
    12 – 000267 - DA file in Case No. 341-057 (State v. Marigny)
    13 – 000315 - DA file in Case No. 342-951(State v. Marigny)
    14 – 000341 - DA file in Case No. 343-461 (State v. Marigny)
    15 – [Not introduced]
    16 – 000386 - Memo acknowledging gun was tested with "negative results"
    17 – 000390 - Memo acknowledging Marigny's attempt to sell testimony
    18 – 000392 - DA screening memo referencing witness who saw both defendants shooting
Ex. P – State's Exhibits[1]
Ex. Q – 000394 - Minute Entry from Dec. 17, 2024 (evidentiary hearing and exhibit list)
Ex. R – 000395 - Notice of Intent
Ex. S – 000397 - Extension of Return Date (minute entry and motion)

---

[1] Omitted because duplicative of Petitioner's exhibits

3

**TABLE OF AUTHORITIES**

**Cases**

*Alcorta v. Texas*, 355 U.S. 28 (1957)................................................................... 26
*Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996)...................................................... 26
*Brady v. Maryland,* 373 U.S. 83 (1963).......................................................... *passim*
*Giglio v. United States*, 405 U.S. 150 (1972)..................................... 21, 23, 26, 32
*Gilmore v. Taylor*, 508 U.S. 333 (1993)................................................................ 40
*Glossip v. Oklahoma*, 604 U. S. ____ (2025).................................................. *passim*
*Harris v. New York*, 401 U.S. 222 (1971).............................................................. 35
*Hinton v. Alabama*, 571 U.S. 263 (2014)............................................................... 42
*Kirkpatrick v. Whitley*, 992 F.2d 491 (5th Cir. 1993).......................................... 32
*Kyles v. Whitley*, 514 U.S. 419 (1995)......................................... 13, 21, 32, 33
*McCormick v. Parker*, 821 F.3d 1240 (10th Cir. 2016)…………………………20, 25
*Napue v. Illinois*, 360 U.S. 264 (1959)........................................................ *passim*
*Northern Mariana Islands v. Bowie*, 243 F.3d 1109 (9th Cir. 2001).................... 33
*Strauss v. United States*, 376 F.2d 416 (5th Cir. 1967)........................................ 40
*State v. Ardoin*, 54 So. 407 (La. 1911)................................................................... 40
*State v. Bridges*, 2023-0166 (La. App. 4 Cir. 2024)............................................. 40
*State v. Bright*, 875 So.2d 37 (La. 2004)......................................................... 21, 33
*State v. Carter*, 80 So.2d 420 (La. 1955).............................................................. 39
*State v. Conda*, 156 La. 679, 101 So. 19 (La. 1924)............................................. 39
*State v. Copelin*, 206 So.3d 990 (La. App. 4 Cir. 2016)....................................... 11
*State v. Kemp*, 00-2228, 828 So.2d 540 (La. 2002)......................................... 21, 32
*State v. Murray*, 223 So. 3d 566 (La. App. 4th Cir. 2017)............................. *passim*
*State v. Patterson*, 295 So.2d 792 (La. 1974)....................................................... 39
*State v. Savoy*, 418 So. 2d 547 (La. 1982)............................................................ 40
*Stevenson v. United States*, 162 U.S. 313 (1896)..................................... 37, 38, 41
*Tassin v. Cain*, 517 F.3d 770 (5th Cir. 2008)....................................................... 16
*United States v. Agurs*, 427 U.S. 97 (1976).......................................................... 26
*United States v. Bagley*, 473 U.S. 667 (1985)............................................ 13, 21, 32
*United States v. Barham*, 595 F.2d 231 (5th Cir. 1979)...................................32, 33
*United States v. Rodriguez-Rios*, 14 F.3d 1040 (5th Cir. 1994)........................... 35
*United States v. Sanfilippo*, 564 F.2d 176 (5th Cir. 1977)................................... 30
*United States v. Stofsky*, 527 F.2d 237 (2d Cir. 1975)......................................... 33
*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991)....................................... 33
*Wearry v. Cain,* 577 U.S. 385 (2016)........................................................ 15, 23, 25

**Statutes**

La. C.Cr.P. art. 911......................................................................................... 6
La. C.Cr.P. art. 912......................................................................................... 6
La. C.Cr.P. art. 930.4....................................................................................... 42
La. R. Prof. Resp. 3.8. ...................................................................................... 27

**Other Sources**

LAFAVE, ET AL., 6 CRIMINAL PROCEDURE (4th ed.)........................................ *passim*
Anne Bowen Poulin, *Convictions Based on Lies: Defining Due Process Protection*, 116 PENN. ST. L. REV. 331 (2011) ...……..................................................... 30

**STATEMENT OF JURISDICTION**

Jurisdiction is conferred by Article I, §§ 19 and 22, and Article V, §§ 1 and 10 of the Louisiana Constitution of 1974, and La. C. Cr. P. Arts. 911 and 912(A). On January 10, 2025, the district court denied Leonard Nelson's application for post-conviction relief by oral and written judgment. On January 10, 2025, Mr. Nelson noticed his intent to seek supervisory writs, and a return date was set for February 10, 2025. On Petitioner's motion, the return date was subsequently extended on January 30, 2025, to March 12, 2025. This application timely follows.

**ISSUES PRESENTED**

1. Under *Brady v. Maryland*, may prosecutors conceal that their star eyewitness attempted to sell his testimony (and likewise suppress numerous other categories of material exculpatory information)?

2. Under *Napue v. Illinois* and *Glossip v. Oklahoma*, do prosecutors have a duty to correct repeated and critical falsehoods from their star eyewitness witness (or, as the trial court concluded, did the witness have a "an absolute . . . Fifth Amendment right" to commit perjury) and to correct other false testimony from police investigators?

3. In a self-defense case, when the defendant requests proper self-defense instructions and timely objects, may the jury be told: (1) it is a jury question whether to consider self-defense in the first instance; (2) the defendant has an initial "preponderance of the evidence" burden with respect to self-defense; and (3) that the State carries the ultimate burden of disproving self-defense by some unspecified quantum (e.g., preponderance of the evidence, clear and convincing evidence, beyond a reasonable doubt)?

4. Did Mr. Nelson receive ineffective assistance of appellate counsel when his attorney failed to challenge the burden-shifting instruction on direct appeal?

STATEMENT OF THE CASE

Mr. Nelson and a co-defendant, Matthew Moore, were indicted by a grand jury in Orleans Parish for first-degree murder for the killing of Harold "Boss" Wilson. *See* Ex. B. Nelson was tried by himself on March 3 and 4, 1991. The jury rejected the State's theory of the case (that the murder occurred during an armed robbery) and acquitted Mr. Nelson of first-degree murder, but also rejected Mr. Nelson's self-defense claim, convicting him of second-degree murder. Charges were reduced against the co-defendant, Matthew Moore, soon after Nelson's trial.

A.    The Evidence at Trial[2]

At trial, the State called four non-law enforcement witnesses. Two of these witnesses were associates of the decedent who were with him on the night that he was killed: Derrick Marigny and Curtis Miller. Both Mr. Miller and Mr. Marigny had open criminal cases in Orleans Parish at the time of trial and both denied under oath that they were receiving any favorable treatment from the DA's office in exchange for their testimony. *See, e.g.,* Trial Tr. at 65. Mr. Marigny's testimony was particularly important; he was referred to in a note found in OPDA's file as "the main witness," an "essential and material witness . . . [and] without his testimony, we should not have had sufficient evidence to convict Leonard Nelson." *See* Ex. O9. Mr. Marigny testified that Mr. Nelson shot his friend "Boss" during an attempted robbery, and that neither he nor anyone else present at the time of the shooting possessed firearms (or otherwise threatened Mr. Nelson).

The State's remaining non-law enforcement witnesses, Tracy Johnson and Christine Boatner, did little to bolster the State's case. Instead, their testimony helped to support Mr. Nelson's theory of self-defense: Mr. Johnson testified on

---

[2] Because each of Mr. Nelson's claims require some "prejudice"-type inquiry, a basic summary of the evidence is provided. For a more complete summary of the evidence presented at trial and the jury's partial rejection of the State's theory of the case, see the trial transcript or Ex. C at 1-6.

direct examination that he had seen *Mr. Marigny* reaching for his waistband immediately prior to the shooting, and that he ducked for cover because he anticipated Mr. Marigny would begin shooting. *See* Trial Tr. at 16-19, 66.

A fully loaded handgun—of disputed provenance—was found near the decedent. The State was unable to produce any physical evidence linking Mr. Nelson (or his co-defendant, Matthew Moore) to the gun. However, a crime lab technician for the NOPD, Officer James Gahagan, testified that the gun recovered at the scene had *not* been dusted for fingerprints and had *not* been tested, thus leaving open the possibility that the gun belonged to Mr. Nelson or Mr. Moore (as the State argued). *See id.* at 16-19.

The defense presented a very different story. Mr. Nelson argued that Wilson, Marigny, and Miller were well-known drug dealers—and because Mr. Nelson had recently stolen drugs from them—all three were attempting to kill him. Taking the stand himself, Mr. Nelson stated that he and Mr. Moore had stolen drugs from Mr. Wilson approximately a week before the fatal incident, and that in the intervening days, Mr. Wilson, Mr. Marigny, and Mr. Miller had repeatedly attempted to kill him. Mr. Nelson testified that, on the evening of May 6, 1990, he crossed paths with Mr. Wilson, Mr. Marigny, and Mr. Miller outside a popular local club. All three were armed and attacked. After stating, "Come on, man, let's kill them n----rs," "Boss" fired at Mr. Nelson and Mr. Moore; while ducking for cover, Mr. Nelson returned fire. He shot back only "because he was going to kill me if I wouldn't have killed him . . . All three of them got guns. They had more bullets than I did." *See id.* 179-81.

Mr. Nelson additionally presented five witnesses that all supported his claim that credible threats to his life had been made against him in the days leading up to the shooting *and* at the time of the shooting. Mr. Walter Hebert—a lifelong friend of the decedent and former bodyguard to Mr. Marigny—testified that he and Mr.

Marigny had attempted to kill Mr. Nelson (alongside the decedent) just three days before the fatal incident. Both Hebert and Mr. Gregory Julian testified that Mr. Wilson, Mr. Marigny, and Mr. Miller had approached them both on separate occasions and asked them to kill Mr. Nelson. Ms. Janet Perez testified that she saw Mr. Marigny and Mr. Wilson "reach[] for their gun[s]" on the night of the shooting, *id. at* 146, corroborating the testimony of the State's witness (Mr. Johnson) who saw Mr. Marigny reaching for his waistband immediately prior to the shooting. *See id.* 28-29 ("I seen him pulling a gun out, you know, going under his shirt reaching for what I thought to believe was a gun."). Mr. Julian, Mr. Henry Hudson, and Mr. Craig Jones all testified that they knew Mr. Wilson, Mr. Marigny, and Mr. Moore to be drug dealers and to regularly carry guns.

Mr. Nelson was convicted of second-degree murder on March 5, 1991. He was sentenced to life without the possibility of parole, probation, or suspension of sentence on July 29, 1991. His conviction was affirmed on appeal.

**B.    The State Hides Their Files from Mr. Nelson**

After Mr. Nelson's conviction became final on October 15, 1992, he began diligently and relentlessly requesting his records from the Orleans Parish District Attorney's Office (OPDA). From 1993 until 2009, Mr. Nelson initiated communication with OPDA—either via formal public records requests or letters requesting a status check—on at least fifteen different occasions. *See, e.g.,* Ex. O7 at 000202-000211. In 2009, Mr. Nelson sued OPDA in civil court, requesting that OPDA be ordered to give him his records. The case was heard on July 25, 2009, and Judge Madeline M. Landrieu made two findings: 1) that Mr. Nelson's request was timely and that OPDA had a duty to preserve his records, and 2) that OPDA had lost his records (i.e., the office did not preserve his records and were not in possession of his records). *See* Ex. O6 at 000195. On June 29, 2022, nearly twenty-eight years after Mr. Nelson submitted his first request, a copy of OPDA's records for his case

were finally sent to him. *See* Ex. C (000037). Upon review, the Civil Rights Division of OPDA determined that these records contained exculpatory and impeachment evidence that OPDA had failed to disclose, in violation of *Brady v. Maryland*.

### C.    Litigating the Post-Conviction Claims

With the assistance of counsel, Mr. Nelson memorialized these claims in his Application for Post-Conviction Relief filed on June 27, 2024. *See* Ex. C. The PCR petition advanced three chief claims: (1) violations of *Brady*; (2) violations of *Napue*; and (3) violation of Mr. Nelson's Due Process rights based on incorrect self-defense jury instructions. (Mr. Nelson also alleged ineffective assistance of appellate counsel, insofar as appellate counsel did not adequately challenge the burden-shifting framework of the self-defense jury instruction.) The District Attorney initially argued that Mr. Nelson's claims were untimely, insisting that Mr. Nelson had not been sufficiently "diligent" in seeking the records that their office had hidden, suppressed, been ordered to disclose, "lost," and then found in 2022. *See* Ex. D. On September 20, 2024, the trial court rejected the State's procedural objections to all claims and ordered a response on the merits by October 20, 2024. *See* Ex. F (ruling *Brady* and *Napue* claims were timely and agreeing to hear remaining claims in the interest of justice). The State opted not to seek supervisory review of this ruling. *Cf. State v. Copelin*, 206 So.3d 990 (La. App. 4 Cir. 2016) (holding decision not to seek supervisory review of decision, when code article exists to review that particular type of ruling, constitutes waiver of claim).

The State also chose to ignore the Court's order to file a merits opposition to Mr. Nelson's brief. On October 22, 2024, after the State decided not to file a merits opposition, Mr. Nelson filed a "Response to Non-Filed Merits Opposition" and asked the Court to grant immediate relief. *See* Ex. I. The trial court took no action on the pleading.

On November 7, 2024, less than twelve hours from the previously scheduled ruling date, a junior Assistant District Attorney opted to file a new pleading that contained a mixed of (untimely, and hence, waived) procedural objections and (untimely, and hence, waived) merits responses. As to the jury instruction claim, however, the State offered *no* merits response at all. Over Mr. Nelson's objections, trial court cancelled the previously scheduled ruling date to "review" the State's last-minute pleading and ordered an evidentiary hearing.

In the interim, the State all but conceded error. On November 13, 2024, Petitioner filed a "Motion for Ruling on Jury Instruction Claim and Motion to Cancel Evidentiary Hearing on *Brady* Claim as Moot." Ex. L. The motion explained that "[o]n the merits, there is no actual dispute that Mr. Nelson was convicted based on a self-defense instruction that mangled [the] relevant law, improperly assigning to Mr. Nelson an initial 'preponderance of the evidence burden.'" *Id.* The pleading also reiterated Mr. Nelson's objections to the State's indefensible (and willful) violation of the trial court's orders to timely raise other issues/defenses. *Id.* at 3-4. Simultaneously, the Chief of the Appeals Division—the direct supervisor of the ADA who filed the untimely brief on November 7, 2024—filed a remarkable concession:

> The parties agree that the State's filing of November 7, 2024—as it relates to the self-defense issue (pages 4-6, 9)—contains untimely raised procedural objections **that are not properly before the Court and may be disregarded by the Court.** The parties agree that the question of the accuracy of the self-defense jury instruction is fully briefed and should be ruled upon at the Court's earliest convenience. Should the Court agree with the petitioner that relief is warranted on Petitioner's self-defense jury instruction claim (Claim I.B), the parties agree that the matter is ripe for immediate ruling, as such ruling may render the December 17, 2024 hearing date moot.

*See* Ex. K (emphasis added). Inexplicably, the trial court ignored the filings, prompting Petitioner to file further briefing related to the *Brady* and *Napue* claims. *See* Ex. M.

11

### D.    The Evidentiary Hearing

The trial court conducted an evidentiary hearing on December 17, 2024. The Petitioner called one witness who testified for nearly an hour and introduced hundreds of pages of documentary exhibits. *See* Ex. N; Ex. O1-O18. The State called no witnesses and re-introduced some of the same documents already in evidence. Following this hearing, the trial court announced it would take the matter under advisement; it issued a ruling denying Mr. Nelson's application for post-conviction relief on January 10, 2025. Ex. A.

### LAW AND ARGUMENT

### I.  The *Brady* Claims

The prosecution's suppression of evidence favorable to the accused violates a defendant's Fourteenth Amendment due process rights where the evidence is material, without regard to the good or bad faith of the prosecution. *Brady v. Maryland,* 373 U.S. 83, 87 (1963). In the *Brady* context, evidence is favorable if it would have "some value" or "some weight" in helping the defendant's case. *Kyles v. Whitley,* 514 U.S. 419, 450 (1995). There is value to the defendant's case when the evidence is exculpatory or when it can be used for witness impeachment. *Id.* Evidence is material and must be disclosed if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would be different. *See Kyles*, 514 U.S. at 432-34 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

This section first explains why Mr. Nelson's rights under *Brady* were violated and then addresses some obvious errors in the trial court's opinion.

### A. Mr. Nelson's rights under *Brady v. Maryland* were violated

This section addresses four different categories of favorable evidence that were discovered in prosecutors' files, finally disclosed more than three decades after

Mr. Nelson's conviction. It first explains why this evidence was favorable and then explains why it is material.

### 1. Prosecutors hid favorable evidence

The evidence now available to Mr. Nelson proves that prosecutors failed to disclose several different types of critical *Brady* evidence. First, the State failed to disclose evidence in their possession that Mr. Marigny had sought to "sell" his testimony in this case in exchange for more favorable treatment in his three pending criminal cases being prosecuted by the same DA's office. The State has candidly admitted that it did not turn over this critical piece of impeachment evidence to the defense, but has adopted the position that "it's not [*Brady*]," *See* Ex. N at 65. Second, the D.A.'s files—taken as a whole—contain overwhelming circumstantial evidence supporting the conclusion that prosecutors failed to disclose an implied deal with their witnesses to testify in exchange for favorable treatment. Third, prosecutors failed to disclose that they had spoken to a witness who told them that Mr. Nelson's co-defendant had fired his gun; if true, the State knew that the (unfired) gun found at the crime scene must have belonged to the decedent or his friends. Finally, prosecutors also failed to disclose the fact that the same critical gun was forensically tested (in hopes of linking it to Mr. Nelson's co-defendant) and that such testing had yielded *negative* results. These four pieces of *Brady* evidence are discussed below.

### a. Mr. Marigny's Attempt to Sell his Testimony

On June 14, 2022, Mr. Nelson learned that within his OPDA files there was a memo prepared by ADA Mary "Missy" McDonald (one of the two prosecutors on Mr. Nelson's case), related to the prosecution of Mr. Nelson's co-defendant. In this memo, ADA McDonald wrote that "[p]rior to [Mr. Nelson's trial], Mr. Marigny stated that he would not testify unless the office offered him a deal concerning his outstanding drug charges." *See* Ex. O17.

13

> TO: RAY BIGELOW
> FROM: MISSY MCDONALD
> RE: DEREK MARIGNY
> DATE: 6/7/91
>
>     Derek Marigney is an essential and material witness in the murder case against Mathew Moore. (Case # 344-648) Presently, this case is set for trial on 7/24/91. Earlier this year, Ms. O'Bannon and I prosecuted the co-defendant Leonard Nelson, and a verdict of second degree was returned.
>     Prior to the first trial, Mr. Marigney stated that he would not testify unless the office offered him a deal concerning his outstanding drug charges. (See cases 341-057, 342-951, and 343-

*Id.* At the time, Mr. Marigny faced the prospect of being multiple billed and sentenced to over a century in prison on three pending drug cases. *See* Ex. N at 64. The State has acknowledged that this information was never disclosed to Mr. Nelson or his attorney. *See id.* at 65. ("[Q:] Was that information give to Defense? [A:] I don't believe so. [Q:] Do you not think that that's <u>Brady</u>? I mean, I'm just asking.").

Mr. Marigny's attempt to sell his testimony satisfies the "favorable evidence" prong *Brady*. Had jurors known that Mr. Marigny had insisted on a deal as a prerequisite for his prosecution-friendly testimony at trial, they could have concluded his true motivation was not altruistic. *See Napue v. Illinois*, 360 U.S. 264, 270 (1959) (explaining that, upon learning of a witness's request for a sentence reduction in exchange for testimony, a jury "might well have concluded that [the witness] had fabricated testimony in order to curry the [prosecution's] favor."). The undisclosed insistence on a *quid pro quo* for a deal has some value to Mr. Nelson's case due to its ability to call into question the credibility of Mr. Marigny. *See Wearry v. Cain*, 577 U.S. 385, 390, 393-94 (2016) (holding, based on the witness's two undisclosed requests to the police for a sentence reduction, "any juror who found [the witness] more credible might have thought differently had she learned that [the witness] may have been motivated to come forward not by [the claimed reason] but by the possibility of a reduced sentence on an existing conviction.").

b.  <u>The Implicit Deal</u>

14

Petitioner adduced not only direct evidence that Mr. Marigny sought to sell his testimony—which, without more, constitutes critical *Brady* evidence—but also strong circumstantial evidence that Mr. Marigny succeeded in striking an unwritten deal prior to testifying. As the trial court astutely put it at the evidentiary hearing: "So it looks like a duck, walks like a duck, quacks like a duck, but it's a chicken? I guess it's a chicken. Okay." Ex. N at 71; *but see* Ex. A at 1-2 (faulting Mr. Nelson for failing to call Mr. Marigny, who is now dead, to contradict his trial testimony that he did not have a deal).

Even absent an explicit plea agreement in exchange for testimony, a defendant's Fourteenth Amendment right to due process is violated when the State fails to disclose an implicit, unwritten deal or a witness's expectation of favorable treatment in exchange for his testimony. *Tassin v. Cain*, 517 F.3d 770 (5th Cir. 2008). In Mr. Marigny's case, the series of events that happened prior to and after his testimony against Mr. Nelson strongly suggest that there was an understanding about a plea deal or favorable treatment. In exchange for his critical testimony, Mr. Marigny expected favorable treatment, and ultimately, he received the exact deal he requested. Here are just some data points in support of this contention.

First, as previously discussed, the D.A. file reveals that Mr. Marigny initially refused to testify absent a deal from the prosecution. *See* Ex. O17. Based on the D.A. files, it appears the trial attorneys were willing to cut such a deal, but ranking attorneys initially denied their requests. *Id.* Implausibly, "approximately one hour before the trial started," prosecutors recorded in an internal memorandum that Mr. Marigny spontaneously committed to "do the right thing." *Id.*[3]

---

[3] As explained at the evidentiary hearing, the private memos in the D.A. files contained many self-serving and patently false statements, so it would be a mistake to accept any self-serving statement at face value. For example, the memorandum seeking authorization to "no bill" Mr. Marigny's drug cases claimed that his testimony was "honest" and the jury "fully believed" him. Ex. O9. Yet by pleading

Second, without any alternative explanation, Mr. Marigny's three pending drug cases were kept open during the pendency of Mr. Nelson's case, likely so that prosecutors could have significant leverage over their star witness. The D.A. files contain no hint of an explanation why—and the State offers no explanation today— Mr. Marigny's cases were allowed to linger, apart from the obvious inference that they were being used to extract favorable testimony from Mr. Marigny. As the trial court later stated, "this sequence of events certainly raises the Court's hackles," Ex. A; as even the State acknowledges, "I admit, there's an appearance [of impropriety] . . . [T]here can be an appearance of a deal, but that's not enough." Ex. N at 70-71.; *see also* Ex. N at 68 (trial court asking prosecutors "so what took so long for these cases to go?"); *id.* at 68-69 ("Okay, I'm going to give you your deal, but we have to wait until after the trial so it can't come up in cross examination.").

Third, Mr. Marigny ultimately *did* receive a massive and inexplicable sentence reduction in exchange for his testimony against Mr. Nelson immediately after testifying. Absent the grace of DA Connick, Mr. Marigny was facing a mandatory-minimum sentence of at least 15 years (flat) as a habitual offender convicted of cocaine trafficking, and a maximum of 60 years (flat), for each of his two "PWIT" cases; he was facing additional time for his possession case, which easily could have been "up-charged" to a PWIT, as well. Hence, he could have been sentenced to well over a century in prison at hard labor. But immediately after providing his testimony at trial, prosecutors secured for Mr. Marigny the requested

---

guilty to the drug crimes, Mr. Marigny was admitting that he was committed perjury at Mr. Nelson's trial when he denied being a drug dealer, and other D.A. memorandum (correctly) note that the jury *disbelieved* Mr. Marigny in key respects. Ex. O8 (noting jury rejected prosecutors' "armed robbery" theory). Though the State lodged (overruled) objections to Mr. Nelson's witness testifying about these lies at the evidentiary hearing, the State opted not to call any witnesses to rebut or explain these contradictions.

benefit. In *their own words*, this was a quid pro quo: they "help[ed] Mr. Marigny, as he helped us." Marigny resolved all of his open cases with probation.[4]

> His testimony will be required again in the trial of Matthew Moore. The evidence is very weak against defendant Moore and the trial will suffer immensely without Mr. Marigny's testimony. Again, we are requesting that we can help Mr. Marigny, as he helped us.

Fourth, there are the nakedly pretextual rationales for the leniency offered at the hearing, which the trial judge (a veteran of District Attorney Harry Connick's office) recognized as implausible. For example, at the evidentiary hearing, the State argued that one reason Mr. Marigny—a well-known, high-profile drug dealer—was given a "no bill" on all of his open cases was because he "had completed a rehabilitation program[;] was in active counseling[;] and he had been gainfully employed for the past 14 months. Those are all really good reasons to get a no-bill[!]" Ex. N at 63-64. The trial judge responded with common sense: "But seriously, we're talking about Harry Connick's administration. And I'm only saying that because I was hired by Harry Connick. You're telling [me] that no-bills on drug cases wasn't mandatory?" *Id.* at 64.

Fifth, there is the suspicious fact that although a different ADA had been prosecuting Mr. Marigny's drug cases at all prior settings, the day Mr. Marigny entered his pleas, his cases were personally handled by ADA McDonald, the homicide prosecutor on Mr. Nelson's case. *See, e.g.,* Ex. O14 at 000349. There was no reason for ADA McDonald to take over Mr. Marigny's prosecutions, or for there to be any connection between ADA McDonald and Mr. Marigny, other than the *quid*

---

[4] Although this brief focuses mainly on Mr. Marigny because he was, as the DA acknowledges, the "main witness" (whose testimony was essential to securing a conviction), Ex. O9, the DA's records provide the same circumstantial evidence with respect to a deal for Mr. Miller. Mr. Miller was facing revocation proceedings at the time of his testimony because of new criminal activity while out on conditional release, which was inexplicably and curiously left to linger until *after* he testified against Mr. Nelson. After his testimony, he was permitted to plead guilty to a new criminal offense related to guns and *not* have his probation for a gun crime revoked.

*pro quo* arrangement for his testimony in Mr. Nelson's trial. At the evidentiary hearing, the State speculated that perhaps the ordinary drug prosecutor may have been ill that day. *See* Ex. N at 71. Again, the explanations strain credulity.

Sixth, the hidden D.A. files reveal that prosecutors were subjectively aware (and worried about) the devastating effect it would have on their case(s) if/when the implicit deal with Marigny became explicit. Ex. O8. In a memo asking for permission to drop the case against Mr. Nelson's co-defendant (Moore), the prosecutors wrote that it was important to drop the case, because "any testimony about the No Bill [given to Mr. Marigny] would give the appearance of impropriety at the Nelson trial." *Id.* Prosecutors dropped the case again the co-defendant so they would not "give the ammunition [Mr. Nelson] needs for a reversal of the Nelson conviction." *Id.* As the trial judge, a veteran of the Connick administration put it, the obvious conclusion is that there was an *implicit* deal or expectation of leniency at the time of trial that was not disclosed. Ex. N at 68-69 ("Okay, I'm going to give you your deal, but we have to wait until after the trial so it can't come up in cross examination.").

In sum, there is overwhelming evidence that there was, at least, an *implicit* deal in place at the time of the trial. Although Petitioner concededly was unable to come forward with a "smoking gun"—prosecutors do not typically commit their misconduct to writing, and all of the most relevant actors (including Mr. Marigny) are now dead—Petitioner has adduced a vast amount of unrebutted circumstantial evidence to meet his burden. Petitioner did not have a duty to prove beyond a reasonable doubt that there was an implicit deal, nor did he have a duty to prove by clear and convincing evidence that there was an implicit deal. Rather, it was simply his job to show that it was more likely than not that such a deal existed. *McCormick v. Parker*, 821 F.3d 1240, 1246 (10th Cir. 2016). Even the trial court appears to have agreed that he did so.

18

c. Testimonial evidence about the gun

The provenance of the recovered, unfired gun was a major issue at trial: The State insisted it must have belonged to Mr. Nelson's co-defendant, whereas Mr. Nelson argued it belonged to the decedent (or one of his drug-dealing compatriots). *See* Ex. N at 37-40. But inside the D.A.'s file, Mr. Nelson learned that prosecutors had spoken to an undisclosed eyewitness who stated that Mr. Nelson's co-defendant had *also* fired his gun on the night in question. *See* Ex. O18 ("[I]t appeared that both of them shot.").

> ... ... ... began backing up and attempting to remove a gold medallion that he had on around his neck. However, as he backed up he fell on his back. Marigny and Miller were able to get out of the line of fire, each of them running in different directions.
> Both Nelson and Moore stood over the victim with guns pointed at him and it appeared that both of them shot. However, Christine Boatner was sitting in a car and she says that Moore dropped his gun as they were running away and the gun located on the scene was fully loaded.

*See* Ex. O18. This information is critical, because it means that the (unfired) gun recovered at the crime scene likely belonged to the decedent or his friends. This information was never disclosed to the defense, in violation of Mr. Nelson's *Brady* rights.

d. Fingerprinting/testing of the gun

When a gun is recovered at a homicide scene, law enforcement will typically test the weapon to see if the fingerprints on the weapon match the suspects. At trial, the State called witnesses who testified that the weapon was *not* tested (thus leaving open the possibility that the gun belonged to Mr. Nelson or his co-defendant Matthew Moore). Trial tr. at 37. But in the recently disclosed files, prosecutors noted that the gun presented at trial *was* tested and produced "negative results." *See* Ex. O16.

> drop his weapon in the middle of the street as the two were running away. The gun was tested with negative results.
> On March 4, 1991, Leonard Nelson was convicted of second degree murder and subsequently sentenced to life imprisonment without benefits. He and Matthew Moore are still awaiting trial in three

19

The trial court correctly found the disparity between the State's evidence at trial and the contradictory information hidden in their own files "again, concerning." *See* Ex. A at 3. It was "again, concerning" because it was still more evidence that—if disclosed to defense counsel—would have supported the defense theory that the supposedly unarmed Marigny was, in fact, brandishing a gun.

### 2.  The evidence that the State failed to disclose was material

Evidence is material and must be disclosed if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would be different. *See Kyles*, 514 U.S. at 432-34 (quoting *Bagley*, 473 U.S. at 682). Establishing a reasonable probability of a different outcome does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Id.*

Material evidence includes not only exculpatory evidence, but also information that could be used to impeach government witnesses when the reliability or credibility of that witness may determine guilt or innocence. *See id.* at 676; *accord Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *State v. Kemp*, 00-2228, p.7 (La. 2002), 828 So.2d 540, 545; *Napue*, 360 U.S. at 269 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. . . ."); *State v. Bright*, 875 So.2d 37, 41 (La. 2004) ("For purposes of the State's due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence.").

Mr. Marigny's attempt to sell his testimony, the implicit deal between prosecutors and Mr. Marigny, and the undisclosed information about the recovered gun were all material.

Mr. Marigny's testimony was critical to the State's case against Mr. Nelson. The prosecutor's own internal assessment of just how crucial Mr. Marigny's

20

testimony was underscores this point: "Marigney [sic] is an essential and material witness in the murder case against [co-defendant] Mathew [sic] Moore [and] without his testimony, we would not have had sufficient evidence to convict Leonard Nelson." Ex. O9. Because of the importance of Mr. Marigny's testimony to the State's case, it was imperative for the defense to challenge his credibility. While prosecutors at trial argued that Mr. Marigny's motivations for testifying were purely altruistic and philanthropic (*see* Ex. N at 48.), and the State *today* repeats this same argument, (*see id.* at 61), it is undisputed that Mr. Marigny's unseemly effort to sell his testimony paints a different picture. *See* Ex. N at 70-71 (State acknowledges "appearance of impropriety"). A fully informed jury certainly could have concluded that Mr. Marigny was motivated by a desire to "help" prosecutors (as they later put it), if jurors were given the evidence suppressed in the D.A.'s file. Evidence regarding Mr. Marigny's previous unwillingness to testify without a deal from the prosecution could have, and (it is undisputed) *would* have, been used against Mr. Marigny in court to attack his credibility as a reliable witness. *See id.* at 41 (unchallenged testimony of Mr. Nelson's witness that suppressed information in D.A. Files could have been used to attack Marigny's credibility).

In fact, the issue of Mr. Marigny's credibility was so critical that even without knowing that he told prosecutors he would not testify without a deal, Mr. Nelson's counsel attempted to cross-examine Mr. Marigny about a deal related to his pending charges. *See* Trial Tr. at 40-41. However, Mr. Nelson's counsel was limited in his ability to effectively cross-examine Mr. Marigny about the truthfulness of his statements related to a deal in exchange for his testimony because the prosecution failed to inform defense counsel of Mr. Marigny's efforts to sell his testimony. At trial, Mr. Marigny denied the existence of any explicit plea deal. *See* Trial Tr. at 40 ("[N]o, no deal was made with me whatsoever."). Had prosecutors complied with *Brady*, Mr. Nelson's counsel at trial could have responded: "[I]sn't it true that you

21

told prosecutors that you wouldn't testify without a deal? And up until an hour ago this morning, you refused to testify? Then you had a conversation with the prosecution and suddenly had a change of heart?" This devastating line of cross-examination was not explored.

In a case that hinged so heavily on Mr. Marigny's testimony, there is a reasonable probability that, had this information been disclosed, Mr. Marigny's entire testimony could have been called into question. *See Giglio,* 405 U.S. at 154-55 ("Here the Government's case depended almost entirely on [witness] testimony; without it there could have been no indictment and no evidence to carry the case to the jury. [The Witness's] credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."). Just last week in *Glossip v. Oklahoma*, the Supreme Court held that a revelation of a witness's willingness to lie on the stand would be "significant in any case" and is especially so when a witness's credibility is already in doubt. *Glossip v. Oklahom*a, 604 U. S. ____ at 19 (2025) ("Sneed [the star witness] was willing to lie to them [the jury] under oath. Such a revelation would be significant in any case, and was especially so here where Sneed was already 'nobody's idea of a strong witness.'. . . Even if Sneed's bipolar disorder were wholly irrelevant, as amicus argues, his willingness to lie about it to the jury was not. 'A lie is a lie, no matter what its subject.') (quoting *Napue*, 360 U.S. at 269); *see also Wearry,* 577 U.S. at 394 (citing *Napue*, 360 U.S. at 270) ("[E]ven though the State had made no binding promises, a witness's attempt to obtain a deal before testifying was material.").

Both pieces of gun evidence that prosecutors withheld in this case were also material (or, "again, concerning" as the trial court put it). Prosecutors suppressed evidence that supported Mr. Nelson's theory at trial that he acted in self-defense. Both Marigny and Miller testified that neither they nor "Boss" were armed on the

night in question. If prosecutors had disclosed the existence of a witness who said Moore had *also* fired his gun, and the fact that testing of the weapon yielded "negative" results when NOPD tried to link the gun to the arrested suspects, jurors might have concluded the State's critical witnesses were liars and were armed (as several *other* witnesses indicated). Had this information been shown to the jury, there is a reasonably probability that they would have further questioned the ownership of the gun holder, and more importantly, the State's entire theory of the case.

### B. The trial court erred in concluding otherwise

The trial court erroneously failed to state and adhere to the appropriate standard for determining whether or not there has been a violation of *Brady.* In an abrupt change from its questions during the evidentiary hearing, the trial court simply concluded that because there was no "proof" of a plea deal, "there is no evidence that would support a finding by this Court that petitioner had met his burden" of establishing a *Brady* violation. Ex. A at 2. The trial court did not identify whether it was applying a "beyond a reasonable doubt," "clear and convincing evidence," or "preponderance of the evidence" standard of proof, because the trial court cited no law whatsoever. *But see McCormick*, 821 F.3d at 1246 (noting "preponderance" standard of proof).

First, the trial court never inquired as to whether there was undisclosed *favorable* information, focusing instead on whether there was rock solid proof of an explicit plea deal in exchange for testimony. *Id. But see* Ex. N at 65 ("Do you not think that that's BRADY? I mean, I'm just asking"); *Id.* at 72-73 ([PETITIONER'S COUNSEL: "[F]rankly, every attorney in this room knows that that's good information that could have been used to attack and destroy his credibility on the stand"). The trial court simply ignored that Mr. Marigny's attempt to sell his testimony had independent significance, and then faulted Mr. Nelson for failing to

23

definitively prove the existence of the implied deal. *But see* Ex. N at 71 ("So it looks like a duck, walks like a duck, quacks like a duck, but it's a chicken? I guess it's a chicken. Okay."). As to the gun, the trial court appeared to agree that the State suppressed favorable information. *See* Ex. A at 2 ("again, concerning").

Second, the trial court never inquired as to whether the undisclosed information was *material*. Since the trial court focused entirely on figuring out whether there was rock solid evidence of a express deal at the time of trial, it erroneously failed to evaluate the materiality of Mr. Marigny's undisclosed attempt to sell his testimony in exchange for a deal, the effect of the circumstantial evidence of the implied deal, or the significance of the gun evidence. (Or, alternatively, the trial court *did* consider the effect of this "concerning" suppression of evidence but failed to recognize the legal significance of this fact.) The trial court also erroneously failed to consider the cumulative impact of the independent pieces of *Brady* evidence. In so doing, the trial court erred.

## II. The *Napue* Claims

Prosecutors ran a risk when they based their entire case on the testimony of individuals who they *knew* to be violent drug dealers and who were defendants in multiple pending drug distribution cases; the witnesses, too, took a risk by taking the stand and testifying (rather than pleading the Fifth Amendment when asked about these cases). While it is true that drug dealers may be victims of crimes, as the State claimed Mr. Marigny was in this case, the State's trial strategy was risky because drug dealers such as Marigny may be reluctant to tell the truth about their own criminal behavior when testifying. And, when they fail to tell the truth, the Constitution requires prosecutors to correct their witness's false testimony (regardless of whether defense counsel attempts, successfully or unsuccessfully, to impeach the witness). See *Wearry*, 577 U.S. at 393–94 (*per curiam*) (rejecting the argument that evidence was immaterial because witness's credibility was "already

24

impugned"); *Glossip*, 604 U.S. __ at 13; *Napue*, 360 U.S., at 269 ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment").

The recently disclosed D.A. files reveal that prosecutors knew their key eyewitness against Mr. Nelson repeatedly lied about his criminal behavior, but the State failed to correct the record, as *Napue* and its progeny require. (Additionally, prosecutors failed to correct false testimony from a law enforcement witness who claimed that the recovered gun had not been tested, when in fact that they knew it had been tested for links to the defendants and it had yielded "negative results.")

A criminal defendant's right to due process of law is violated when the prosecution, even if not soliciting false evidence, allows false evidence to go uncorrected. *See Napue*, 360 U.S. at 269; *see also Alcorta v. Texas*, 355 U.S. 28, 78 (1957); *United States v. Agurs*, 427 U.S. 97, 110 (1976); *Giglio*, 405 U.S. at 154; *Glossip*, 604 U. S. at 13. To succeed on a *Napue* claim, a Petitioner must demonstrate that (1) the witness's testimony was false, (2) the prosecution knew the testimony was false, and (3) the testimony was material. *See Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996). All three elements of the *Napue* claim are satisfied in Mr. Nelson's case and, notably, it does not even appear that the trial court disagreed. *See* Ex. A at 2 (focusing, apparently, on Marigny's "Fifth Amendment right" to commit perjury and ignoring *Napue* claim with respect to gun).

This section details how the evidentiary record supports Mr. Nelson's *Napue* claims and then explores shortcomings in the trial court's analysis of these claims.

### A. Prosecutors violated *Napue* when they failed to correct multiple witnesses' false testimony.

This section details each of the three elements of a valid *Napue* claim and explains why each element was satisfied here.

#### 1. The testimony was false.

25

In this case, Mr. Nelson's defense counsel attempted (very unsuccessfully) to portray Marigny as a drug dealer, and Mr. Marigny (very successfully) parried these attacks. Rather than plead the Fifth Amendment to questions about his drug dealing, Mr. Marigny chose to repeatedly lie:

Q:                          Isn't it a fact that Harold 'Boss' Wilson sells
                            cocaine for you?

A:                          No, it's not true at all.
Q:                          Is it a fact that Curtis Miller sells cocaine for you?

A:                          No.

[ADA Ms. McDonald]          Objection, Your Honor.

[By the Court]:             Overruled. . . .

Q:                          Did Curtis Miller tell you on April 29th at about
                            3:45 that Leonard Nelson stole a bag of cocaine
                            that he was selling for you?

A:                          No, sir. . . .

Q:                          Isn't it a fact that you deal cocaine occasionally
                            from that corner, Foy and Milton?

[ADA Ms. McDonald]:         Objection, Your Honor.

A:                          I deals cocaine from no corner at all. . . .

Q:                          Do you deny that you either sold or possessed
                            drugs at 1470 Milton Street?

[ADA Ms. McDonald]:         Objection, Your Honor. When are we talking
                            about? Is this way in the past?

Trial Tr. at 36-41. At *no time* during his testimony did Mr. Marigny (or the State) acknowledge that the "main witness" was, in fact, a drug dealer, or that he had previously offered to plead guilty to these offenses and testify against Mr. Nelson, in exchange for favorable treatment.

There is no serious dispute that this testimony was false, because (1) there was overwhelming evidence of the falsity of this testimony hidden in the D.A. files, and (2) Mr. Marigny subsequently pleaded guilty to repeatedly selling drugs from the

26

1400 block of Milton Street immediately after he testified against Mr. Nelson. (All three of Mr. Marigny's pending cases, and a fourth recent case, occurred within one block of 1470 Milton Street. *See* Ex. O11-O14.)

Prosecutors also elicited false testimony related to the recovered gun. Specifically, a law enforcement witness testified that the gun *had not* been tested (thus leaving open the possibility that it belonged to Mr. Nelson's co-defendant, Matthew Moore), when in fact it *had* been tested with "negative" results (i.e., the testing affirmatively ruled out that the gun matched either of the defendants).

### 2. Prosecutors knew the testimony was false

As established at the evidentiary hearing, the D.A. files reveal that prosecutors knew that Mr. Marigny was engaged in perjury from the stand at the time of trial. Prosecutors and NOPD had overwhelming evidence in their possession that Mr. Marigny was lying when he testified "I deals cocaine from no corner at all," *see* Ex. N at 22-37, and that the overall tenor of his testimony (implying no connection with the drug trade) was wildly misleading.

Prosecutors were aware that Mr. Marigny had been *repeatedly* arrested at that precise location for drug dealing, and their own files indicated no "problems" in their pending cases against him (apart from the fact that he *kept* getting arrested at the same location by the same officers).



Ex. O12 at 000296



Ex. O13 at 000329. The D.A. files are replete with details establishing that Mr. Marigny's testimony was false, including the names of lay and police witnesses, and prosecutors' own subjective estimations of the strength of their case(s) against Mr. Marigny for drug dealing. In short, the evidence adduced at the evidentiary hearing conclusively shows that prosecutors *knew* Marigny was lying. *See* Ex. N at 22-37; Exs. O11-14. Moreover, we now know that Mr. Marigny had offered to plead guilty to these very offenses *before* his testimony (in exchange for leniency), which is further evidence that the prosecution knew Mr. Marigny's testimony was false. Ex. O17.

This Court has consistently held that the knowledge of false testimony by any member of the prosecution team, *including investigators*, is imputed to the prosecuting attorney. *State v. Murray*, 223 So. 3d 566, 572 (La. App. 4th Cir. 2017) (finding reversible error where witness provided false testimony about previous drug dealing activity that was contrary to past statements to law enforcement). Here, both NOPD officers *and* prosecutors knew that Marigny's testimony was false. And, at the time of Mr. Marigny's testimony, it was the official position of the Orleans Parish District Attorney's office that Mr. Marigny repeatedly dealt drugs from the precise corner where he denied doing so, as evidenced by the State's filing of valid bills of

28

information which resulted in pending charges against Mr. Marigny. *See* La. R. Prof. Resp. 3.8.

Obviously, defense counsel also believed that Mr. Marigny was lying, but his unsuccessful effort to expose this dishonesty did not absolve prosecutors of their responsibility to correct the testimony. *Glossip*, 604 U.S. at 23 (holding that despite defense counsel's awareness of the falsity of the prosecution's witness's testimony and the witness's already-damaged credibility, "the responsibility and duty to correct false testimony lies with representatives of the State, not with defense counsel.") (internal quotations omitted); *see also United States v. Sanfilippo*, 564 F.2d 176, 177-78 (5th Cir. 1977) (holding defendant's due process rights were violated despite defense awareness at trial that prosecution witness's testimony was false, emphasizing that "the duty to correct the false testimony of a Government witness is on the prosecutor"). Nor can prosecutors argue (improbably) that ADA McDonald might have secretly harbored some doubt as to whether Marigny truly was a cocaine dealer. *See* LAFAVE, ET AL., 6 CRIMINAL PROCEDURE § 24.3(d) (4th ed.) ("The duty to correct false evidence") ("[T]he Court has indicated that the *Mooney* principle does not require actual knowledge by the prosecution of the perjured testimony.")[5]; *Glossip*, 604 U.S. at 13 (rejecting a claim that testimony was not "clearly false"

---

[5] Even if this were true—as the State now implausibly hypothesizes ("There is no way, because the prosecutor in this case was not a witness to the underlying crimes of PWIT and Possession, there is no way she could have known this was a false statement," Ex. N. at 61)—then plainly there was a *Brady* violation. If ADA McDonald really believed that Mr. Marigny was innocent, she should have told Mr. Nelson's jurors that Mr. Marigny agreed to commit perjury by falsely accepting responsibility for these drug-dealing cases, in order to procure better treatment for himself. *See* Ex. N at 73. And if *Napue* only applied when the prosecutor was an eyewitness to the crime, it would be a dead letter, insofar as such a prosecutor would almost certainly be conflicted off of any such prosecution. *See also* Poulin, *Convictions Based on Lies: Defining Due Process Protection*, 116 PENN. ST. L. REV. 331 (2011) (discussing "prosecution knowledge" requirement and collecting, *inter alia*, cases in which false testimony does not involve government culpability).

29

because the witness believed his testimony to be true, and holding that even if a witness earnestly believes his testimony to be true the prosecutorial duty to prevent the use of false testimony is absolute).

The *Murray* case is on-point. There, an NOPD officer had extensive knowledge about a key government witness's own drug dealing behavior, and he communicated that information to prosecutors. *Murray*, 223 So. 3d at 571-72. At trial, the witness *denied* being a drug dealer. *Id.* This Court had little trouble concluding that the information contained in the officer's report "leads to a reasonable inference that the State was aware that Wales [the witness] was not being truthful when she testified at Murray's trial." *Id.* at 572. The same is true here.

### 3. The false testimony was material

There does not appear to be any dispute that—assuming prosecutors knew the testimony was false, and assuming the Fifth Amendment does not confer on witnesses a right to commit perjury—the *Napue* violations were material.

In the context of a *Napue* claim, materiality is satisfied if there is a reasonable likelihood that the uncorrected false testimony may affected the trial's outcome, a standard which focuses on whether the falsehood had the *potential* to influence the jury's judgment, not whether it definitively altered the verdict. *See Napue*, 360 U.S. at 271; *see also Glossip*, 604 U.S. at 10 (holding that if a defendant shows the prosecution allowed false testimony "to go uncorrected when it appeared" then "a new trial is warranted so long as the false testimony may have had an effect on the outcome of the trial"). The *Napue* materiality analysis is tipped significantly in favor of the defendant, as once the falsity of testimony is established, the burden is shifted to the prosecution "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*; *see also* LaFave, et al., 6 Criminal Procedure § 24.3(d) (4th ed.) ("The duty to correct false evidence"). Unless the

30

State can overcome this significant burden of proof, the Due Process Clause requires a new trial. *Id.*

Despite its superficial similarity to the *Brady* materiality standard, the "reasonable likelihood" standard of materiality in the *Napue* context is a particularly "low threshold." *See United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979). The materiality of any given *Brady*/*Napue* violation must be evaluated (1) in light of the strength of the State's case at trial, and (2) in light of additional *Brady*/*Napue* violations that might compound the cumulative impact or import of the suppressed evidence. *See Kyles*, 514 U.S. at 436; *see also Glossip*, 640 U.S. at 13. The Supreme Court has held that "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence," and in situations where false testimony is provided, "the standard [to find a constitutional violation] is considerably less onerous." *See Napue*, 360 U.S. at 269; *see also Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) (contrasting the materiality standard applicable to *Brady* claims with that applicable to "claims that the prosecution has knowingly used perjured testimony or false evidence"); s*ee generally* LAFAVE, ET AL., 6 CRIMINAL PROCEDURE § 24.3(d) (4th ed.) ("The duty to correct false evidence") (discussing lower materiality standard for "false testimony" cases as compared to *Brady* cases). *Cf. Murray*, 223 So. 3d at 572-73 ("[The witness] Wales's statements [about her own drug-dealing] were material as the State's case against Murray rested heavily upon a determination of her credibility, considering that Murray's own testimony contradicted Wales's version of events.").

Under *Napue*, material evidence includes not only exculpatory evidence, but also information that could be used to impeach government witnesses when the reliability or credibility of that witness may determine guilt or innocence. *See Bagley*, 473 U.S. at 676; *accord Giglio*, 405 U.S. at 154-55; *Kemp*, 828 So.2d at 545; *Napue*, 360 U.S. at 269 ("The jury's estimate of the truthfulness and reliability of a

given witness may well be determinative of guilt or innocence. . . .”); see also *Kyles*, 514 U.S. at 444-52 (discussing impeachment uses of undisclosed evidence); *Bright*, 875 So.2d at 41 (“For purposes of the State’s due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence.”); *Barham*, 595 F.2d at 241-42 (“It is also immaterial whether the false testimony directly concerns an essential element of the Government's proof or whether it bears only upon the credibility of the witness.”).

The federal Fifth Circuit has held that a conviction must be reversed when false testimony went uncorrected, even if “[t]here is no doubt that the evidence in this case was sufficient to support a verdict of guilty,” and sister circuits have described the need to reverse in such cases as “virtually automatic.” *See Barham*, 595 F.2d at 242; *see also United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991) (“Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is ‘virtually automatic.’”) (quoting *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975)); *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1114 (9th Cir. 2001).

Mr. Marigny’s testimony was central to the prosecution’s case, as evidenced by the recently disclosed D.A. file note that emphasized the “critical and essential” nature of Mr. Marigny’s testimony, noting “without [Marigny’s] testimony, we would not have had sufficient evidence to convict Leonard Nelson.” *See* Ex. O9. By the prosecution’s own admission, no evidence could be more material to Mr. Nelson’s conviction than the false testimony provided by Mr. Marigny. *Id.* On multiple levels Mr. Marigny’s false testimony was material. First, Mr. Marigny’s testimony was the only evidence that contradicted the defense’s case in its entirety, and if jurors believed his testimony that he was not involved in the drug trade, it would vitiate the entire defense theory of the case. Second, apart from the defense

32

theory, Mr. Marigny's credibility was central to the prosecution's case. Had the jury

known Mr. Marigny's testimony was false and that the NOPD official's testimony

that the gun had not been tested was untrue, there exists at least a reasonable

likelihood that their verdict would have been different because the testimony was so

central to the prosecution's case. *See* Ex. O9 and O16.[6] Mr. Marigny was the star

---

[6]   As Mr. Nelson argued in briefing below, trial prosecutors should have made the following disclosures once their key eyewitness committed perjury (and it is all but certain that the trial outcome would have been different if they had done what the Constitution required):

> Members of the Jury, I regret to tell you that I am obligated to share some information known to the State at this time. While we still think you should believe Mr. Marigny's testimony that Mr. Nelson was the aggressor in this shooting, the State knows that Mr. Marigny testified falsely just a moment ago. Indeed, he has previously told me, personally, that he would plead guilty to multiple different charges of distributing cocaine on or near 1740 Milton St. if we would treat him as a "no bill" in those cases, and that he was willing to testify against Mr. Nelson *only* if we did so. In fact, the Orleans Parish District Attorney is prosecuting Mr. Marigny in those three drug-dealing cases because we have overwhelming evidence that he is a drug dealer.

> Let me share with you the evidence, from our personal files, that leads me to believe that our star eyewitness just lied. On April 12, 1989, two NOPD officers saw Marigny throw a clear plastic bag of cocaine to the ground one block off of Milton Street. Marigny and the woman he was with were both arrested, but we had to drop the charges against Marigny when the woman stated under oath that the drugs were hers. On January 16, 1990, he was arrested about 50 feet away from that spot on Milton Street. Six NOPD officers caught Marigny red-handed as he tried to conceal a plastic bag containing more than 60 rocks of crack cocaine under some leaves. We only charged him with possession in that case, which is pending now. But on March 19, 1990, in the exact same spot, the Narcotics Strike Force arrested him again with 28 pieces of crack cocaine on his person; he's facing PWIT charges for that one. Somehow that didn't stop him. After a Confidential Informant told NOPD that he was *still* selling crack cocaine from the exact same spot on Milton St., on April 9, 1990, another team of NOPD officers arrested him yet again: Once more, he had dozens of rocks of crack cocaine and more than $1350 in cash on him at the time of his arrest. The shooting in this case occurred on May 5, 1990. In our private notes, we've written that these cases are airtight; there are no real weaknesses in our case against Mr. Marigny to speak of. And we can put him in prison for over 100 years if and when we convict him of these PWIT charges because of his past violent criminal history.

> Members of the jury, this does not make Marigny a liar with respect to his testimony against Mr. Nelson. But in the unusual circumstance

witness for the prosecution, yet, as discussed above, his credibility was doubtful. The jury already did not believe the State's version of events entirely, and the false testimony would have further eroded their assessment of the veracity of the State's theory. *See* Ex. N at 20-22, 53-55. The same is true for the "again, concerning" false testimony elicited by the State regarding the testing of the recovered gun.

### B. The trial court erred in concluding otherwise

The trial court rejected Mr. Nelson's *Napue* claim based on a radical, legally unsupported proposition that was not even urged by the State: that prosecutors' duties under *Napue* are void because a key government witness "ha[s] the absolute right to not self-incriminate as to unadjudicated charges that were pending against him." Ex. A at 2-3. (And the trial court simply ignored Mr. Nelson's *Napue* claim with respect to the gun.)

The right against self-incrimination does not grant witnesses the right to lie under oath, and even if the witness had not *waived* his right against self-incrimination by testifying, a witness's rights do not trump a defendant's rights under the Due Process Clause. In *Harris v. New York*, the Supreme Court held "[The Fifth Amendment] privilege cannot be construed to include the right to commit perjury." 401 U.S. 222, 225 (1971). Similarly, in *United States v. Rodriguez-Rios* the Fifth Circuit held, "[a]lthough the Fifth Amendment protects a person's right to remain silent in response to an incriminating question, an outright lie is not protected." 14 F.3d 1040, 1049 (5th Cir. 1994). Mr. Marigny did not have the right

---

> where I put someone on the stand as a key witness in our case-in-chief, and I know he's lied about something material, and the falsity of his testimony is *not* exposed by defense counsel, I have to tell you that. Defense counsel has a duty to win; the State has a duty to see that justice is done, win or lose. So that's what I'm doing here.

*See* Ex. M at 3. Unfortunately, the prosecution did not uphold its duty in this case.

to provide false testimony, and the State's decision to allow this crucial testimony to go uncorrected was a violation of Mr. Nelson's due process rights. The Fifth Amendment is utterly irrelevant in this case, and the trial court's decision to base its entire *Napue* analysis on the purported Fifth Amendment right of Mr. Marigny to lie is the clearest of errors.

That Mr. Marigny's multiple drug-dealing cases "**had not yet been adjusdicated**" (bold, underline, and typo in original) is irrelevant. *See* Ex. A. Mr. Marigny was never asked whether he had been *convicted* of drug offenses; rather, he chose to lie in response to questioning about whether he had engaged in drug dealing activity.

### III.     The Jury Instruction Claim

At trial, Mr. Nelson's entire case was based on self-defense. However, the jury was instructed incorrectly on this affirmative defense. Jurors were told the following:

> If you find that by a preponderance of the evidence the defendant has raised the defense of justification, then the burden is upon the state to show that the homicide was not committed in self-defense.

*See* ROA, Vol. 1, at 25-26. The State has conceded that this instruction was "not a standard jury instruction." Ex. N at 59. The State first forfeited, and then expressly waived any procedural objections to this claim being decided de novo, Ex. K, and has similarly waived any merits opposition, Ex. L.

There were three main problems with this instruction, which was critical given that the entire case turned on the question of self-defense. The instruction (1) tasked the jury to decide whether Mr. Nelson had properly raised a self-defense claim, which is a question for the trial court, and not a question for the jury; (2) improperly instructed jurors that Mr. Nelson had the burden to prove by a "preponderance of the evidence" that he had properly raised such a claim, when no such burden existed; and (3) strongly and inaccurately implied that the State must meet its own burden to

35

show that Mr. Nelson did not act in self-defense by only a "preponderance of the evidence," rather than "beyond a reasonable doubt."

Consider, for example, the very likely possibility that jurors were 25% convinced that Mr. Nelson acted in self-defense and 75% convinced that he did not. If this occurred, Mr. Nelson was entitled to an acquittal under Louisiana law. A juror scrupulously following the trial court's instructions, however, likely would have concluded that she should not consider self-defense, because Mr. Nelson failed to show by a "preponderance of the evidence" that self-defense had been invoked. Moreover, the juror like would have concluded that *if* self-defense had been invoked, then the State had overcome its burden of disproving a *prima facie* case of self-defense.

Nevertheless, the trial court denied Mr. Nelson's claim. The following section explains how these errors deprived Mr. Nelson of his constitutional rights, and then addresses errors in the trial court's opinion

### A. The jury instructions misstated the law

There has never been any dispute over whether Mr. Nelson shot Mr. Wilson: He took the stand at trial and candidly told the jury that he shot the decedent. *See* Trial Tr. at 179. Mr. Nelson testified that he had done so only because "because [Mr. Wilson] was going to kill me if I wouldn't have killed him." *Id.* at 180. His case, then, hinged on a single issue at trial: self-defense.

Where there is "*any* evidence which tended to show" that the accused's conduct was in self-defense, or where there is at least "*some* evidence relevant" to that issue, then the jury must consider whether the State has met its burden of proof with respect to that defense. *Stevenson v. United States*, 162 U.S. 313, 314-15 (1896) (emphasis added). Mr. Nelson testified at trial that (1) he had stolen cocaine from Mr. Wilson several days before the shooting; (2) as a result, he had received death threats in the days leading up to the shooting; (3) Mr. Wilson had attempted to kill

him days before the shooting; and (4) Mr. Wilson was actively shooting at him and that he only returned fire in self-defense. *See* Trial Tr. at 172-73, 175-76, 179-80. There is (now) zero dispute that Mr. Nelson properly raised self-defense and that the jurors should have been instructed to consider whether the State had disproved self-defense beyond a reasonable doubt.

Mr. Nelson's testimony plainly constitutes "evidence which tended to show" that his conduct was in self-defense as a matter of law. Therefore, the jury was required to consider whether the State had met its burden of proof with respect to his claim. *Stevenson*, 162 U.S. at 314-15.

Mr. Nelson offered several proposed jury instructions to that accurately stated the law, including the following:

> When an accused pleads self-defense, suggesting that the killing was justifiable, he undertakes no legal burden. The burden, when self-defense is at issue, is not upon the defendant to prove that his actions were reasonable and believed necessary, but rather upon the State to show that the actions were not in self-defense. In other words, once the plea of self-defense has been interposed the burden of proof does not shift to the defendant to prove to your satisfaction and beyond a reasonable doubt that the killing was justifiable. . . .

Special Charge No. 1 (Denied), in ROA, Vol. 1, 137 of 226. The trial court erroneously rejected this proposed charge. Mr. Nelson again proposed a materially similar charge with different language, which the trial court also improperly rejected:

> The burden of proof of the facts relating to a plea of self-defense rests, not upon the defendant, but upon the State. As self-defense is not a special plea, the burden of proof rests upon the State to show, beyond a reasonable doubt, that the killing was done feloniously, and not in self-defense, in order to convict the party accused of felonious homicide. The plea of self-defense does not place upon the accused the burden of proving it, nor does it change the duty of the State to prove the guilt of the accused beyond a reasonable doubt. Accused, relying on self-defense, does not have the burden of proving that the killing was justifiable; but the State has the burden of proving beyond a reasonable doubt that the killing was not justifiable.

Special Charge No. 5 (Denied), in ROA, Vol. 1, 141 of 226.[7]

Each of these proposed instructions align with the well-settled rule in Louisiana that "a defendant in a homicide prosecution who asserts that he acted in self-defense does not have the burden of proof on that issue. The State bears the burden of proving beyond a reasonable doubt that the homicide was . . . not perpetrated in self-defense." *State v. Patterson*, 295 So.2d 792 (La. 1974); *State v. Carter*, 80 So.2d 420, 423 (La. 1955) (holding that "[i]t is the well-settled jurisprudence of this court that an accused relying on self-defense does not have the burden of proving that the killing was justifiable or that he acted in self-defense); *State v. Conda*, 156 La. 679, 101 So. 19, 202 (La. 1924) (holding that "[i]t is upon the state to prove beyond a reasonable doubt that the killing was done feloniously, and therefore not in self-defense."). Instead, as noted above, the instructions ultimately given to the jury by the trial court read:

> If you find that by a preponderance of the evidence the defendant has raised the defense of justification, then the burden is upon the state to show that the homicide was not committed in self-defense.

ROA, Vol. 1, 25-26 of 226. At no time did the trial court define the legal term of art "preponderance of the evidence," or explain that "the burden [that] is upon the state" is *different* from the burden identified and explained in the clause immediately preceding it (i.e., preponderance of the evidence).

The State raised no merits defense on this point—despite being aware of a direct order to file a merits objection, if any, by a date certain—nor could the State in good faith, because it is undisputed that the trial court gave an incorrect instruction. The question of whether the Defendant has put self-defense "at issue" is

---

[7]    Trial counsel for Mr. Nelson also, inexplicably, proposed several instructions that misstated the relevant burdens. This fact, however, is immaterial, since the trial court rejected these proposed instructions, too. The oft-repeated rule that a defendant cannot complain of a jury instruction that he himself proposes only applies when said instruction is actually granted.

not a jury question, and the Defendant does not need to satisfy any "preponderance of the evidence" burden on this point. That was true at the time of trial. *See State v. Savoy*, 418 So. 2d 547, 550 (La. 1982) ("The State has the entire and affirmative burden of proving beyond a reasonable doubt that a homicide was not perpetrated in self-defense. The defendant who raises the issue of self-defense does not assume any burden of proof whatsoever."); *State v. Ardoin*, 54 So. 407, 407 (La. 1911) (reversing murder conviction where "the onus of proof [was] made to shift from the state to defendant" on question of self-defense). It remains true today. *State v. Bridges*, 2023-0166 (La. App. 4 Cir. 2024) ("In a homicide case in which the defendant asserts he acted in self-defense, the State has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense.").

It is difficult to overstate the import of this error, particularly in a case where a defendant takes the stand to testify in support of a self-defense claim. "[W]here the defendant's proposed charge presents, when properly framed, a valid defense, and where there has been *some* evidence relevant to that defense adduced at trial, then the trial judge may not refuse to charge on that defense." *Strauss v. United States*, 376 F.2d 416, 419 (5th Cir. 1967) (emphasis added). When the accused presents a justification defense, they are admitting that: (1) *yes*, they caused bodily injury to the other person; and (2) *yes*, they did so purposefully or knowingly; *but only because* (3) they believed using the force that caused the injury at issue was necessary to protect themself from the other person's imminent use of unlawful force against them. *See, e.g.*, *Gilmore v. Taylor*, 508 U.S. 333, 364 (1993) (Blackmun, J., dissenting) (discussing how a defendant who testifies to self-defense "takes the stand and concedes the elements of murder in order to prove his affirmative defense."). The defendant is, in effect, admitting to the necessary elements of the offense in order to defend against the allegation as a whole. And as long as there is "*any* evidence which tended to show" that the accused's conduct was in self-defense,

39

or at least "*some* evidence relevant" to that issue, then the jury *must* consider whether the State has met its burden of proof with respect to that defense. *See Stevenson*, 162 U.S. at 314-15 (emphasis added); *id*. at 315-16, 322-23 (ruling that, even if the "judge may be entirely satisfied, from the whole evidence in the case," that the accused committed the crime alleged without any complete or mitigating defense, "if there by any evidence fairly tending to bear upon the issue…it is the province of the jury to determine from all the evidence what the condition of mind was, and to say whether the crime" was committed or not).

While the State made a half-hearted attempt to defend the accuracy of these jury instructions orally at the evidentiary hearing—saying, effectively, that the instructions were "good enough"—the State *affirmatively waived* any merits opposition to Mr. Nelson's jury instruction claim through written pleadings prior to the hearing. *See* Ex. K. Ultimately, Mr. Nelson was convicted based on a self-defense jury instruction, central to his case, that completely misstated the law.

**B. The trial court erred in concluding otherwise.**

The trial court's merits decision, which cited no law beyond the procedural history of this very case—and ignored the State's affirmative waiver and forfeiture of both procedural and substantive objections—disregarded all of the foregoing.

After *denying* the State's procedural objections and agreeing to assess the jury instruction claim *de novo*, *see* Ex. F, and then ignoring the State's stipulation that it was not opposing Mr. Nelson's claim on either procedural *or* substantive grounds, *see* Ex. K, the trial court still ruled against Mr. Nelson. The trial court appeared to rule that Fourth Circuit precedent foreclosed Mr. Nelson's claim that the jury instructions were erroneous, though the only case cited for this (obviously incorrect) position was Mr. Nelson's own direct appeal. (Importantly, however, this court never considered on direct appeal the argument that the jury instruction improperly placed an initial "preponderance of the evidence" burden on Mr. Nelson.)

The trial court also erroneously rejected Mr. Nelson's claim that he received ineffective assistance of appellate counsel. The court correctly recognized that Appellate counsel Sherry Watters did "not specifically attack[] the notion of 'burden shifting,'" but effectively held that she did an adequate job litigating the appeal because she unsuccessfully raised *other* objections to the jury instruction. This, of course, is irrelevant: the unexplained failure to litigate a clear and obvious flaw in the critical jury instruction is not excused because the same attorney may have done other things right. *Cf. Hinton v. Alabama*, 571 U.S. 263, 268 (2014) (rejecting the State's argument that because the attorney in question had performed other aspects of representation well, he was not ineffective for failing to rectify an "obvious" problem in the defense.).

Though the trial court correctly concluded that Mr. Nelson's jury instruction and ineffective assistance of counsel claims could and should be reconsidered pursuant to Louisiana Code of Criminal Procedure 930.4(A) in the "interests of justice" (and the State did not seek supervisory review), and the State effectively waived all further procedural and substantive opposition, the trial court inexplicably denied relief. Perhaps the trial court felt that only this Court could correct an error it made three decades ago; if so, this court should act now.

WHEREFORE, for all the reasons given above and for any other reasons that may occur to this Honorable Court, defendant respectfully asks this Court to reverse the decision below erroneously denying Mr. Nelson's petition for post-conviction relief.

[signature on following page]

41

Respectfully submitted,

_____

Thomas Frampton, La. Bar. No. 35775
University of Virginia School of Law
*(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: Tframpton@law.virginia.edu


Kelly Orians, La. Bar No. 36920
University of Virginia School of Law
(for identification purposes only)
580 Massie Drive
Charlottesville, VA 22903
Email: Korians@law.virginia.edu

### VERIFICATION AND CERTIFICATION

COMES NOW Thomas Frampton, being duly sworn, and deposes and states that he has reviewed the forgoing petition; that all the facts therein are true and accurate to the best of his information and belief; that he has notified or will immediately notify the parties listed below that this petition has been filed; and that he has caused, or will immediately cause, a true and accurate copy of this petition to be served forthwith on the parties listed below:

Hon. Kimya M. Holmes, Section "D"
Orleans Criminal District Court
2700 Tulane Avenue
New Orleans, LA 70119

District Attorney Jason Williams or his designee
619 S. White St.
Orleans Parish District Attorney's Office
Orleans, LA 70119

Thomas Frampton, La. Bar No. 35775

SWORN AND SUBSCRIBED TO BEFORE ME THIS __5__ Day of __March__, in the year __2025__.

NOTARY PUBLIC



EMILY ELIZABETH BISHOP
NOTARY
PUBLIC
REG # 8110935
MY COMMISSION
EXPIRES
8/31/2028
COMMONWEALTH OF VIRGINIA

IN THE FOURTH CIRCUIT COURT OF APPEAL

STATE OF LOUISIANA

No. _____

---

**STATE OF LOUISIANA**

**v.**

**LEONARD NELSON**

---

On Writ to Review a Ruling Denying Post-Conviction Relief on the Merits
from the Criminal District Court of Orleans Parish
Case No. 344-648, Section "D"
Honorable Kimya M. Holmes, Judge Presiding

---

**EXHIBITS "A" THROUGH "S"**

---

Thomas Frampton, La. Bar. No. 35775
University of Virginia School of Law
*(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: Tframpton@law.virginia.edu

Kelly Orians, La. Bar No. 36920
University of Virginia School of Law
*(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: Korians@law.virginia.edu

**EXHIBIT LIST**

Ex. A – 000001 – Ruling denying application for PCR (and minute entry setting
        return date)
Ex. B – 000006 – Bill of Indictment
Ex. C – 000008 – PCR Petition (and Notice of Errata)
Ex. D – 000038 – State's Procedural Objections
Ex. E – 000051 – Memorandum in Response to State's Procedural Objections
Ex. F – 000056 – Ruling Denying State's Procedural Objection (Sept. 20, 2024)
Ex. G – 000064 – State's Notice of Intent to Seek a Writ of Review and for
        Extension of Return Date
Ex. H – 000066 – Opposition to Procedurally Improper "Motion for Extension of
        Return Date"
Ex. I – 000068 – Response to Non-Filed Merits Opposition and Supplemental
        Opposition to "Motion to Extend"
Ex. J – 000071 – "State's Opposition to the Merits and Article 930.4 Objections to
        Application for Post Conviction Relief"
Ex. K – 000082 – Joint Motion for Immediate Ruling on Jury Instruction Claim
Ex. L – 000083 – Motion for Ruling on Jury Instruction Claim and Motion to
        Cancel Evidentiary Hearing on *Brady* Claim as Moot
Ex. M – 000088 – Reply Memorandum to State's Merits Opposition
Ex. N – 000094 – Transcript of Evidentiary Hearing Held Dec. 17, 2024
Ex. O – Petitioner's Exhibits
        1 – 000171 - Flash Drive [note: physical copy submitted this day to the Clerk of Court]
        2 – 000172 - Executed Agreement w/ Civil Rights Division
        3 – 000177 - Affidavit of John Rohr (explaining file was "lost or misplaced"
        4 – 000182 - Apology from DA upon Finding File
        5 – 000183 - Letter from Devin Flemming to CRD
        6 – 000184 - Transcript of civil court hearing regarding missing file
        7 – 000200 - Correspondence from OPDA confirming records had not been
            located
        8 – 000212 - Memo seeking permission to reduce Moore charges (explaining
            jurors did not entirely believe State's theory or witnesses against Nelson)
        9 – 000216 – Memo acknowledging Marigny's testimony was "the main
            witness" and testimony was essential to conviction
        10 – [Not introduced]
        11 – 000219 - DA file in Case No. 334-550 (State v. Marigny)
        12 – 000267 - DA file in Case No. 341-057 (State v. Marigny)
        13 – 000315 - DA file in Case No. 342-951(State v. Marigny)
        14 – 000341 - DA file in Case No. 343-461 (State v. Marigny)
        15 – [Not introduced]
        16 – 000386 - Memo acknowledging gun was tested with "negative results"
        17 – 000390 - Memo acknowledging Marigny's attempt to sell testimony
        18 – 000392 - DA screening memo referencing witness who saw both
            defendants shooting
Ex. P – State's Exhibits[1]
Ex. Q – 000394 - Minute Entry from Dec. 17, 2024 (evidentiary hearing and
            exhibit list)
Ex. R – 000395 - Notice of Intent
Ex. S – 000397 - Extension of Return Date (minute entry and motion)

---

[1]  Omitted because duplicative of Petitioner's exhibits

CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO.   344-648                                                          SECTION "D"

STATE OF LOUISIANA

versus

Leonard Nelson

**RULING DENYING POST-CONVICTION RELIEF**

On or about June 27, 2024, Petitioner filed an Application for Post-Conviction Relief, seeking review of his 1991 conviction for second degree murder, and subsequent sentence of life imprisonment at the Department of Corrections. Based upon his application, the hearing conducted, and the record, I now DENY relief.

The Petitioner's application is based upon 3 claims for relief: *Brady* violation, erroneous jury instructions given at trial, and ineffective assistance of counsel by his appellate counsel, Sherry Watters upon his appeal, in violation of the U.S. Constitution.

Petitioner's *Brady* claim primarily hinges upon the testimony of Derrick Marigny, a friend of the decedent in the homicide, who, after he testified against Mr. Nelson, was later given consideration by the District Attorney's Office in the form of a reduction in Marigny's sentence on unrelated drug charges. At the hearing held before this Court, where several exhibits were introduced, memoranda requesting that Mr. Marigny be given consideration in his drug cases in exchange for his testimony were explicitly denied by supervisors within the District Attorney's office.  As the State of Louisiana noted in its reply on the merits in this matter, whether the witness testified in **expectation** of a "deal" is what is relevant (**and** that expectation was not revealed to defense), not whether he was later offered a "deal" after the fact.

While counsel for Petitioner drew inferences during the hearing, speculating that Mr. Marigny expected consideration despite the District Attorney's lack of authority to give it (per exhibits), the Petitioner did not put forth any evidence that would bolster the claim that, although the DA files indicate a reduction in Marigny's charges had been sought and denied, that Marigny nonetheless expected consideration and that that expectation was his basis for testifying.  When questioned on direct examination, Marigny indicated he wanted to testify because the decedent

1

was his friend and his mother's only son. In fact, defense counsel at trial had the opportunity to cross-examine Marigny regarding his past and then-pending criminal history and counsel seemingly, as evidenced by the trial record, began to question Marigny about his expectation of a deal and then withdrew or altered the line of questioning voluntarily, not in response to any objection. Petitioner pointed to the fact that Marigny was hostile and uncooperative with the prosecution until the morning of Nelson's trial, where he then elected to testify, as "proof" that Marigny must have expected consideration in exchange for his testimony, but again, there is no evidence that would support a finding by this Court that Petitioner has met his burden.  Petitioner did not elect to call any fact witness to attest to Marigny's state of mind, his expectations, any verbal agreement of a last-minute "deal" in exchange for testimony, or anything of the like at his evidentiary hearing before this Court which could have bolstered the assertion that Marigny only testified in expectation of a deal he later received.

Petitioner likewise pointed to the memorandum prepared for co-defendant Matthew Moore's trial, which was slated to occur after Marigny **was** ultimately approved for a reduction in his drug cases. The author of the memo indicated concerns that Marigny would not be a good witness in Moore's trial, having ultimately been given consideration in his own cases, and that his ultimate "deal" might cause some post-conviction or appellate issues for Mr. Nelson's matter. While this sequence of events certainly raises this Court's hackles, there remains no evidence, either documentary or testimonial, that Mr. Marigny was given consideration for his testimony **prior to** giving testimony in the trial of Mr. Nelson and that this consideration or "deal" was withheld from the defense in violation of *Brady* and its progeny.

Petitioner also makes a *Napue* claim in relation to Marigny's testimony. Peititoner asserts that the prosecution should have corrected Marigny's testimony that "I deals cocaine from no corner at all," arguing that, although, as discussed, *supra*, Marigny's charges **had not yet been adjusdicated** as to the pending drug charges for which he was incarcerated at the time of his testimony, that the State should have corrected his testimony to reveal what was present in their files on his cases, as evidence that he was a drug dealer.  Petitioner essentially seeks to have this Court rule that an unadjudicated crime for which a person had merely been arrested, not convicted, and had pled "not guilty" in another section of court, should be treated as if it were a

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000002

conviction.  Mr. Marigny had the absolute right to not self-incriminate as to unadjudicated charges that were pending against him.

Petitioner's additional *Brady* claims regarding the disparity between the firearm evidence being tested and apparently yielding no results, differing from the detective's testimony that the evidence was not tested at all, while, again, concerning, do not establish that his conviction was in violation of the U.S. Constitution.

As to Claims II and III, this Court denies the application.  The issue of erroneous jury instructions, contrary to the Petitioner's characterization, **was** litigated and decided on direct appeal.  Appellate counsel Sherry Watters **did** raise the jury instruction issue in general, though not specifically attacking the notion of  "burden shifting" (the instruction to the jury that they needed to find first by a preponderance that the defendant has raised the issue of self-defense before it could assess whether the State had proven it was not self-defense). While Watters may not have articulated in the exact language that Petitioner's current counsel would (or surmises they would have), the issue in general of improper jury instruction **was** raised as an assignment of error (Error No. 4).

The Fourth Circuit Court of Appeal did review all assignments of error in its analysis on appeal, noting that the defense itself submitted erroneous charges to be read to the jury regarding the burden related to self-defense. In the instant Application for Post-Conviction Relief, it is noteworthy that Petitioner does **not** allege ineffective assistance of counsel as to his trial counsel, who submitted the erroneous jury instructions at the time of trial before the trial court.  Its strains this Court's imagination that the Appeals Court would somehow not carefully scrutinize the record as it related to jury instructions in connection with Petitioner's Appeal, Assignment of Error no. 4, and somehow fail to consider the constitutionality of those jury instructions in its analysis. In reality, it **did** assess the issue of improper jury instructions.  Because the issue of erroneous jury instructions was fully litigated on appeal, this claim is without merit.

Because appellate counsel Sherry Watters **did** in fact raise the issue of the erroneous jury instruction **and** the Fourth Circuit Court of Appeal **did** in fact consider her arguments, issuing a written opinion in the matter which specifically addressed Error 4, this Court does not find that appellate counsel was ineffective in her representation of Mr. Nelson.

3

For the aforementioned reasons, the Court DENIES the Petitioner's application.

A copy of this Ruling shall be furnished to Mr. Nelson, the district attorney, and Mr. Nelson's custodian. *See* La. C.Cr.P. art. 930.1.

New Orleans, Louisiana, this 10th day of January, 2025.

_____
Kimya M. Holmes
JUDGE

Mail Ruling to:

Petitioner Leonard Nelson

Email Ruling to:

LA. State Prison, ANGOLA, Warden

Counsel for Petitioner

District Attorney

4

CRIMINAL DISTRICT COURT OF ORLEANS PARISH, LOUISIANA

Page    1

SECTION "D"   Judge: THE HONORABLE KIMYA HOLMES
Minute Clerk: FRANK A. MARULLO, III
Court Reporter: ALLISON BRAXTON
Assist. D.A.: KRISTEN BUTLER
SAVANNAH ROBINSON

OIDP Attorney: CAYLIN GROSSE

Date: FRIDAY, January 10, 2025
Case Number: 344-648
State of Louisiana
        versus
LEONARD NELSON                        Violation: RS 14 30

THE DEFENDANT, LEONARD NELSON, APPEARED BEFORE THE COURT FOR
RULING WITH COUNSEL, KELLY ORIANS, THOMAS FRAMPTON & HOPE PHELPS.

THE COURT DENIED THE APPLICATION FOR POST CONVICTION RELIEF, WITH
WRITTEN REASONS. THE DEFENSE OBJECTED & FILED ORAL NOTICE OF
INTENT TO SEEK WRIT(S).

**HEARING ON WRIT(S) IN THIS MATTER IS SET FOR 02/10/25.**

THE DEFENDANT'S PRESENCE IS NOT REQUIRED.

TRUE COPY

MINUTE CLERK

02-14-25

DATE

_____
FRANK A. MARULLO, III, Minute Clerk

The State of Louisiana

· ITEM #E-7223-90

PARISH OF ORLEANS

SS

Criminal District Court For The Parish Of Orleans

THE GRAND JURORS of the State of Louisiana, duly impaneled and sworn in and for the body of the Parish of Orleans, in the name and by the authority of the said State, upon their oath, PRESENT

That one....LEONARD NELSON........and one,

.............MATTHEW MOORE........EACH,

late of the Parish of Orleans on the............6th............day of....May

in the year of our Lord, one thousand, nine hundred............ninety............in the Parish

of Orleans aforesaid, and within the jurisdiction of the Criminal District Court for the Parish of Orleans
*amended* *manslaughter* *as to △ Matthew Moore only 9-11-91 Chaudron*
................committed ~~first degree murder~~ of HAROLD BOSS, ~~during the perpetration~~

................or attempted perpetration of an armed robbery,

*R.S. 14:31*
*Amended to manslaughter as to △ Moore only.*
*Chaudron 9-11-91*

contrary to the form of Statute of the State of Louisiana in such cases made and provided and against the peace and dignity of the same.

District Attorney for the Parish of Orleans

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000007
000000

I hereby certify that the above and foregoing fingerprints on this bill are the fingerprints of the defendant.

_Matthew Moore_

and that they were placed thereon by said defendant this ___11___ day of

_Sept._, 19_91_.

_M. Celh___
Deputy Sheriff

I hereby certify that the above and foregoing fingerprints on this bill are the fingerprints of the defendant.

_Leonard Nelson_

and that they were placed thereon by said defendant this ___24___ day of

_July_, 19_91_.

_M. Celh___
Deputy Sheriff

Minute Clerk

The accused ----------------------------------------

was sentenced on this ------------ day of ------------ 19

---

SECTION J.

No. 344-648

STATE OF LOUISIANA

276-44 versus 8/4/
276 c L and one,
LEONARD NELSON
TO
MATTHEW MOORE
276 c L
EACH,

INDICTMENT FOR

14:30. ---- FIRST DEGREE MURDER

_A True Bill_

_Henry K Shepard_
Foreman of Grand Jury

New Orleans, _August 2_ 19_90_

Returned into open Court and recorded and

filed ___8 2___ 19_90_

_Chas Connade_, Minute Clerk

Arraigned _____ 19

and pleaded _____

Minute Clerk

NO BOND AS TO EACH DEFENDANT

IN THE ORLEANS PARISH CRIMINAL DISTRICT COURT
STATE OF LOUISIANA

STATE OF LOUISIANA                    )
                                      )
                                      )
v.                                    )          Docket No.:   344-648
                                      )          Section:      D
                                      )          Judge:        Holmes
LEONARD NELSON                        )
_____)

FILED: _____              DEPUTY CLERK: _____

### APPLICATION FOR POST-CONVICTION RELIEF

NOW INTO COURT, comes Leonard Nelson, through undersigned counsel, to move this Honorable Court to accept and deem sufficient this Application for Post-Conviction Relief. This Motion is filed pursuant to the Fifth and Sixth Amendments to the United States Constitution, the Louisiana Code of Criminal Procedure Article 930.8, 930.4 and 930.3(1), and the Louisiana Constitution Art. 1 § 16, and all other applicable law.

### RELEVANT FACTUAL AND PROCEDURAL HISTORY

Leonard Nelson was convicted of second-degree murder for the shooting of Harold "Boss" Wilson; a jury rejected the State's effort to secure a first-degree murder conviction, but also rejected Mr. Nelson's argument he acted in self-defense. After Mr. Nelson's conviction became final in 1993, he began diligently requesting a copy of his records from the Orleans Parish District Attorney's Office (OPDA). Despite submitting more than 15 public records requests to OPDA, paying OPDA $146.50 for his records, and seeking and receiving an order from a Civil Court judge for OPDA to produce records, OPDA failed to give Mr. Nelson his records for nearly three decades. On July 14, 2022 OPDA finally sent Mr. Nelson a copy of their records from his case. These records contained *Brady* evidence that Mr. Nelson had suspected for years might exist: that Derrick Marigny, one of the State's key witnesses, initially insisted on a plea deal for his testimony (and almost certainly received it after his testimony proved critical to securing Mr. Nelson's conviction). This *Brady* violation, combined with other serious trial errors—most notably, an erroneous self-defense instruction—warrants the requested relief.

#### A. NOPD's Investigation

In the early hours of May 6, 1990, Harold "Boss" Wilson was shot outside of the End Zone Lounge, at the intersection of Treasure St. and Bruxelles St. in New Orleans. He died a short time later at the hospital from his injuries. Officers Kevin Williams and Pierre Charbonnet were the

1

first to arrive at the scene. They found Mr. Wilson lying face up, with a faint pulse; a handgun was found 15-20 feet away.[1]

After running the gun's serial number, NOPD determined the gun belonged to Geneva Jackson; it was not stolen and there was no pawnshop record.[2] There is no record of Ms. Jackson ever being contacted about the gun found at the scene; although there is note in the OPDA records indicating that they were interested in learning more about Ms. Jackson's relationship to the gun:

*Figure 1 – OPDA File Vol. 2 of 5  (238 of 317).*

The results of any such investigation were never disclosed to the defense.

Officer Williams spoke to Mr.Tracy Johnson and Ms. Christine Boatner at the scene; both witnesses would later testify at trial, providing testimony that was favorable to both the State *and* to Mr. Nelson.[3] According to Officer Williams's report, Mr. Johnson and Ms. Boatner (who were dating) were sitting in a car at the time of the shooting, and partially observed the encounter.[4] Ms. Boatner told Officer Williams that she observed the incident through the review mirror, corroborated Mr. Johnson's statement, and added no further details.[5]

At the time of the shooting, the decedent (Mr. Wilson) had been standing with two associates, Derrick Marigny and Curtis Miller. Detective Pierce interviewed Derrick Marigny at Charity Hospital, where he was being treated for a gunshot wound to his leg. Mr. Marigny stated that he was standing at Treasure and Bruxelles Street with Mr. Wilson and Curtis Miller when "Skinnyman" and "Mamou" walked up yelling "give it up, give it up . . . take off the medallion and earring"; according to Marigny, when the two men got close, they began shooting.[6] Mr. Marigny (who was prohibited from possessing a gun) denied having a gun on him at the time of the shooting, and he told Detective Pierce that neither Mr. Wilson or Mr. Miller had guns, either.

The NOPD investigation continued into August1990, and eventually police developed Mr. Nelson and Mr. Moore as suspects. Mr. Miller, Mr. Marigny, and Mr. Johnson (all of whom knew

---

[1] Detective Norman Pierce Homicide Report (NOPD Homicide File at 24 of 64); Trial Tr. From March 3, 1991, at 78 (Direct Appeal, Vol. 2 of 2, 97 of 329).
[2] Leonard Nelson NOPD Homicide File at 51 of 64.
[3] Detective Norman Pierce Homicide Report (NOPD Homicide File at 25 of 64); Trial Tr. From March 3, 1991, at 89 (Direct Appeal, Vol. 2 of 2, 108 of 329).
[4] Leonard Nelson NOPD Homicide File at 17 of 64.
[5] *Id.*
[6] Leonard Nelson NOPD Homicide File at 4 of 64.

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000009

the suspects beforehand) identified Mr. Moore in a photo lineup; Ms. Boatner was not able to identify Mr. Moore.[7]

On August 2, 1990, both Mr. Nelson and Mr. Moore (who was tried separately) were indicted by a grand jury for first-degree murder, committed during an armed robbery, in violation of La. R.S. §14:30. There are no records in the OPDA file or the NOPD file accounting for the gun that was found near the victim at the scene. According to a memo from ADA Mary "Missy" McDonald to ADA Ray Bigelow and ADA Wendy Baldwin, the theory that the gun found at the scene was dropped by Mr. Moore was "learned during grand jury testimony."[8]

**B. The State's Case at Trial**

At trial, the State called four non-law enforcement witnesses: Derrick Marigny and Curtis Miller (associates of the decedent), and Tracy Johnson and Christine Boatner. At the time of trial, three of these witnesses (Mr. Marigny, Mr. Miller, and Mr. Johnson) had open criminal cases in Orleans Parish for charges including possession of narcotics, possession with intent to distribute narcotics, and illegal possession of firearms.[9] Under oath, all three of these witnesses denied receiving any favorable treatment from the DA's office in exchange for their testimony in this trial.

There was no dispute at trial about whether Mr. Nelson was responsible for shooting Mr. Wilson on the evening of May 6, 1990. Mr. Nelson took the stand himself and forthrightly admitted as much. What was in dispute was whether at the time of shooting Mr. Nelson was in fear for his life on account of Mr. Marigny, Mr. Miller, and Mr. Wilson possessing guns at the time of the shooting; on account of these three men putting a "contract" out to have Mr. Nelson and Mr. Moore being killed; and on account of Mr. Nelson and Mr. Moore being ambushed by these three men at least twice the week before because Mr. Nelson and Mr. Moore had stolen drugs from them.

Mr. Marigny provided the critical trial testimony against Mr. Nelson. As a note in the (recently disclosed) D.A. file puts it: "Marigney [sic] is an essential and material witness in the murder case against [co-defendant] Mathew [sic] Moore [and] without his testimony, we would not have had sufficient evidence to convict Leonard Nelson."[10] He testified that neither he, Mr. Miller, nor Mr. Wilson (victim) possessed firearms at the time of the shooting, and that Mr. Nelson shot Mr. Wilson as part of an attempted robbery for his jewelry. On cross-examination, Mr.

---

[7] OPDA File, Part 2 of 5 at 118 of 317.
[8] OPDA File, Part 2 of 5 at 10 of 317.
[9] Ms. Boatner did not have an open criminal matter; she was, however, the common law wife of Mr. Johnson.
[10] OPDA File, Part 2 of 5 at 16 of 317

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000010

Marigny testified that although he currently had three open cases for possessing and possessing with intent to distribute cocaine, he denied having any involvement with drugs or drug dealing. He also denied any connection with guns.

Mr. Miller testified similarly. On cross-examination, Mr. Miller testified that although he pled guilty to possessing a firearm on August 28, 1990 (while on probation), he never possessed a gun. Mr. Miller also denied that the probation revocation case that was open at the time of trial (because of his guilty plea on August 28, 1990) had been held open so that he could receive favorable treatment for his testimony in this case.[11]

Although Mr. Johnson and Ms. Boatner were called by the State, their testimony did little to bolster the State's case, and in fact supported Mr. Nelson's self-defense theory. On direct examination, Mr. Johnson testified that when he saw the beginning of the encounter between Mr. Nelson and Mr. Moore (on the one hand) and Mr. Wilson, Mr. Marigny, and Mr. Miller (on the other), he fled because he knew violence was about to ensue. Specifically, he testified on *direct* examination:

Q:    How did you know Harold ["Boss" Wilson]?

A:    From the streets.

Q:    . . . How long had you known him?

A:    Five or ten years.

Q:    . . . Now, at any point while you were there, did you see anyone approach Derrick [Marigny], Percy [*sic*][12], and Harold ["Boss" Wilson]?

A:    Not really approaching them but walking toward to them, walking in their direction.

Q:    Okay, and who was that?

A:    Leonard Nelson and Matthew Moore.

Q:    . . . Okay, tell me what happened.

A:    Well, when I was leaving the club going to the car I noticed them coming up the street going toward the club and noticed Derrick [Marigny] and them over on the corner. And when I saw Derrick [Marigny] go under his shirt I was trying to get out the way going to the car, and by the time I got in the car to close the door I heard the first shot coming from my left behind me.

---

[11] Trial Tr. From March 3, 1991 At 65 (Direct Appeal, Vol. 2 of 2, 84 of 329).

[12] From context, it is clear the transcript is referring to Curtis Miller.

4

> Q:    . . . Now, you say Derrick was going for a. . . . fumbling in his waist. . . .
>
> A:    I didn't actually see a gun but I knew what was going on.[13]

Mr. Johnson also testified that he had previously seen Mr. Marigny, Mr. Miller, and Mr. Wilson possessing firearms and selling drugs.[14] Ms. Boatner's testimony added little, with the exception of the following relative to the additional gun recovered on scene.

The State did not present any physical evidence connecting the gun found near the victim in the case of either Mr. Nelson or Mr. Moore. At trial, Detective Pierce testified that he requested for the gun to be to be fingerprinted.[15] Officer James Gahagan, an NOPD crime lab technician, testified that he did not dust the gun for fingerprints.[16] However, a memorandum prepared by ADA Robin O'Bannon for ADA Ray Bigelow and ADA Wendy Baldwin makes clear that this testimony was false: the gun was fingerprinted and the "gun was tested," though the results apparently yielded no evidence favorable to the prosecution. OPDA's records are unclear whether the test results affirmatively excluded the defendants as having possessed the guns, or whether the results were simply indeterminate. In any event, the results of the fingerprinting were certainly *not* disclosed to Mr. Nelson prior to trial. In a bill of particulars submitted prior to trial Mr. Nelson specifically inquired about physical evidence submitted for examination or testing:

> 30. Has any physical evidence, objects, materials and/or substances now or heretofore in the possession of the State which the State intends to use in the possession of this case been submitted to any examination or test, specifically including but not limited to any chemical, physical or other scientific examinations or tests?    No

*Figure 2 – Motion for Bill of Particulars, OPDA File Vol. 2 of 5  (188 - 191 of 317).*

The state simply replied, "no." Mr. Nelson further inquired about whether the state was in possession of any exculpatory evidence in the State's possession, and the state again simply replied, "no."

> 57. Did the State obtain or does the State have any exculpatory evidence or evidence favorable to the defense and if so, what is the nature and description of such evidence?    No

*Figure 3  – Motion for Bill of Particulars, OPDA File Vol. 2 of 5  (188 - 191 of 317).*

---

[13] Trial Tr. From March 5, 1991 At 16-19 (Direct Appeal, Vol. 2 of 2, 128-30 of 329).
[14] Trial Tr. From March 5, 1991 At 31 (Direct Appeal, Vol. 2 of 2, 142 of 329).
[15] Trial Tr. From March 5, 1991 At 12 (Direct Appeal, Vol. 2 of 2, 123 of 329).
[16] Trial Tr. From March 5, 1991 At 37 (Direct Appeal, Vol. 2 of 2, 148 of 329).

5

At trial, the State accounted for the gun found near the victim by calling Ms. Boatner to testify. Ms. Boatner's testimony was based entirely on what she said she saw through the rearview mirror of a car.[17] Although Ms. Boatner was not able to pick Mr. Moore out of photographic line up prior to trial, at trial, Ms. Boatner testified that she saw Mr. Moore drop the gun.[18]

### C. The Defense's Case at Trial

At trial the Defense argued that at the time of the shooting Mr. Nelson feared for his life. They called six witnesses to testify, including Mr. Nelson. Walter Hebert testified that on May 3, 1990 (three days before the shooting that killed Mr. Wilson), Mr. Marigny gave him a quarter ounce of cocaine to help Mr. Marigny, Mr. Miller, and Mr. Wilson kill Mr. Nelson and Mr. Moore. Gregory Julian testified that he knew Mr. Marigny, Mr. Wilson, and Mr. Miller to be drug dealers. Mr. Julian also testified that Mr. Marigny and Mr. Wilson offered him a contract to kill Mr. Nelson, and that he shared this with Mr. Nelson prior to the shooting on May 6, 1990. Henry Hudson and Craig Jones testified that they knew Mr. Marigny, Mr. Wilson, and Mr. Miller were cocaine dealers, and that they regularly carried guns. Janet Perez testified that the evening of May 6, 1990 she saw Mr. Marigny and Mr. Wilson reach for guns when Mr. Nelson and Mr. Moore approached.

Mr. Nelson testified that, on April 29, 1990, he and Mr. Moore stole Mr. Wilson's drugs. After that, on at least two occasions, Mr. Nelson testified that Mr. Marigny, Mr. Wilson, and Mr. Miller shot at him and Mr. Moore. On the night of the shooting, he, Mr. Marigny, Mr. Wilson, and Mr. Miller all had guns; Mr. Marigny fired first before running away. Mr. Nelson testified that he shot three times, twice at Mr. Wilson. After he and Mr. Moore left the scene, they threw the gun in the Mississippi river.

### D. Jury Instructions

Given that self-defense was the centerpiece of the criminal trial, Mr. Nelson sought to have the jury properly instructed on the issue of self-defense. Specifically, he offered several self-defense instructions aimed at communicating to jurors that the State had a burden of disproving self-defense beyond a reasonable doubt. For instance, he filed a request for an instruction that (accurately) read as follows:

> The burden of proof of the facts relating to a plea of self-defense rests, not upon the defendant, but upon the State. As self-defense is not a special plea, the burden of proof rests upon the State to show, beyond a reasonable doubt, that the killing was done feloniously, and not in self-defense, in order to convict the party accused of felonious homicide. The plea of self-defense does not place upon the accused the

---

[17] Trial Tr. From March 5, 1991 At 66 (Direct Appeal, Vol. 2 of 2, 177 of 329).
[18] Trial Tr. From March 5, 1991 At 69 (Direct Appeal, Vol. 2 of 2, 180 of 329).

6

> burden of proving it, nor does it change the duty of the State to prove the guilt of the accused beyond a reasonable doubt. Accused, relying on self-defense, does not have the burden of proving that the killing was justifiable; bur the State has the burden of proving beyond a reasonable doubt that the killing was not justifiable.[19]

Rejecting these entreaties, the trial court instead gave a jury instruction using the "preponderance of the evidence" standard (without defining it);  the judge's charge properly told jurors that the State carried the ultimate burden of disproving self-defense, but improperly told jurors that a conviction might lie even if they harbored reasonable doubts as to justification:

> If you find that by a preponderance of the evidence the defendant has raised the defense of justification, then the burden is upon the State to show that the homicide was not committed in self-defense.[20]

### E. Verdict and Post Conviction Proceedings

On March 5, 1991, following a two-day trial by jury Mr. Nelson was found guilty of second-degree murder. Mr. Nelson filed a motion for a new trial and for post-verdict judgment of acquittal on April 15, 1991. These motions were denied on July 9, 1991, and again on July 29, 1991. On July 29, 1991 Mr. Nelson was sentenced to life in prison without the benefit of parole, probation, or suspension of sentence.

On September 6, 1991, Mr. Nelson filed a direct appeal in the Louisiana Court of Appeals, Fourth Circuit. Mr. Nelson raised five claims: (1) The trial judge erred when during voir dire the judge remarked to the jury that if they found Mr. Nelson guilty there would be a "whole gauntlet of appeals," (2) that Mr. Nelson's Amendment rights under the United States Constitution were violated when the prosecution used its first eight preemptory strikes against Black jurors, (3) the trial court erred by disallowing relevant impeachment testimony and limiting cross examination of state witnesses, (4) the trial court's jury instruction on self-defense were erroneous, and (5) the State's evidence was insufficient to conclusively demonstrate, beyond a reasonable doubt, that the defendant did not act in self-defense when the victim was killed. On October 15, 1992, Mr. Nelson's appeal was denied and his conviction was affirmed under case number 91-KA-2491. He did not seek review by the Louisiana Supreme Court.

### F.    Mr. Nelson's diligent attempts over a period of nearly two decades to discover all post-conviction claims in his case.

After Mr. Nelson's conviction became final on October 15, 1992, he began relentlessly and diligently requesting his records from the Orleans Parish District Attorney's Office (OPDA). From

---

[19] *See* Special Charge No. 5 (Denied), in Record on Appeal, Vol. 1, 141 of 226.
[20] *See* Transcript of Court's Charge to the Jury, pg. 13-14, Record on Appeal, Vol. 1, 25-26 of 226.

1993 until 2009, Mr. Nelson initiated communication with OPDA—either via formal public records requests or letters requesting a status check—on at least 15 different occasions.[21] It was not until June 14, 2022 that Mr. Nelson was finally provided with a copy of the district attorney's file in his case.[22]

Pursuant to La. C. Cr. P. Art. 930.8 "[n]o application for post conviction relief…shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final." The article further provides that this procedural bar can be waived if the following conditions are met:

> (1) The application alleges, and the petitioner proves or the state admits, that the facts upon which the claim is predicated were not known to the petitioner or his prior attorneys. Further, the petitioner shall prove that he exercised diligence in attempting to discover any post conviction claims that may exist. "Diligence" for the purposes of this Article is a subjective inquiry that shall take into account the circumstances of the petitioner. Those circumstances shall include but are not limited to the educational background of the petitioner, the petitioner's access to formally trained inmate counsel, the financial resources of the petitioner, the age of the petitioner, the mental abilities of the petitioner, or whether the interests of justice will be served by the consideration of new evidence.

As outlined below, Mr. Nelson has met each of these conditions and the procedural bar to his petition should accordingly be waived.

According to an affidavit signed by then-ADA John Rohr, on September 18, 1993 with the assistance of attorney John Keller, Mr. Nelson submitted his first request for his DA file.[23] ADA John Rohr replied indicating Mr. Nelson's files were located in Box 849.[24] This request was submitted again by Mr. Keller on April 14, 1994.[25] On October 18, 1994 ADA Rohr submitted a memorandum along with a copy of Mr. Nelson's public records request to the Appeals Division at OPDA, and Section H. At that time, for an undisclosed reason, Mr. Rohr was informed that the records could *not* be located. According to an affidavit signed by ADA Rohr, Mr. Nelson's records were retrieved from offsite storage on April 27, 1994; after that "the record was missing from its designated box."[26] At some point between when ADA Rohr replied that the records *could* be located in Box 849, and July 14, 1995, Mr. Nelson was sent a bill for $146.50 for 275 pages of records.[27] This amount was withdrawn from Mr. Nelson's prison account on July 14, 1995. On

---

[21] Leonard Nelson OPDA File Vol. 3 of 5 at 6 – 8 of 25; Leonard Nelson OPDA File Vol. 3 of 5 at 2 of 38.
[22] Letter from OPDA to Leonard Nelson, 6/14/22.
[23] See Exhibit A: Affidavit of John Rohr
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] OPDA File, Part 3 of 5 at 18 of 25.

8

March 4, 1996 Mr. Keller was informed by ADA Peter Brandt that the records could not be located and that a refund could be issued to Mr. Nelson.[28] Mr. Keller informed Mr. Nelson of this in a letter dated March 5, 1996.[29] Over the next four years the total number of public records requests submitted by Mr. Nelson himself, and on his behalf, would rise to eleven.[30] On October 5, 2000 a request for refund was submitted to OPDA's accounting department.[31] Mr. Nelson's prison account was refunded later that month.[32]

On October 2, 2003, with the pro-bono assistance of attorney William Aaron, Mr. Nelson submitted to OPDA a Motion for Production of District Attorney files.[33] Mr. Aaron also submitted another public records request on January 19, 2005.  ADA Rohr replied on January 21, 2005 that the records could not be located.[34] Again on February 20, 2006 Mr. Aaron submitted a public records question, and again on April 17, 2006 ADA Rohr replied they could not be located. On September 18, 2006 – exactly 13 years after Mr. Nelson submitted his first request for his records – Mr. Nelson submitted a request to OPDA asking if his file could be located or if it could be destroyed.[35] And ADA Rohr, again, replied that it could not be located.  This round of requests happened again in 2008, and again in 2009.

In 2009, Mr. Nelson sued OPDA in civil court in case number 07-12154 (section E), requesting that OPDA be ordered to give him his records. The case was heard on July 25, 2009 and Judge Madeline M. Landrieu made two findings: 1) that Mr. Nelson's request was timely and that OPDA had a duty to preserve his records, and 2) that OPDA did not preserve his records and are not in possession of his records.[36]

On June 14, 2022, nearly 28 years after Mr. Nelson submitted his first request, a copy of OPDA's records for his case were finally sent to him.[37] According to a letter from OPDA records manager Devin Felming, the bulk of the records pertaining to Mr. Nelson's criminal case were first scanned on December 13, 2018.[38] As of the filing of this petition, undersigned counsel has not been provided with a reason that it took nearly three decades to get Mr. Nelson his records, or

---

[28] See Exhibit A: Affidavit of John Rohr
[29] OPDA File 1 of 5 at 8 of 38.
[30] See Exhibit A: Affidavit of John Rohr
[31] *Id.*
[32] OPDA File 1 of 5 at 5-6 of 38.
[33] See Exhibit A: Affidavit of John Rohr
[34] *Id.*
[35] *Id.*
[36] ODPA File 3 of 5 at 21 of 25.
[37] Letter from OPDA to Leonard Nelson, 6/14/22.
[38] Letter from OPDA Records Custodia to OPDA Civil Rights Division, 05/31/2022.

9

for a reason why after the records were scanned in on December 13, 2018 they were not immediately sent to Mr. Nelson – at that point more than 15 public records requests had been submitted, and one civil judge had ordered OPDA to produce the records.

The diligence of Mr. Nelson's efforts to secure his files is clear. As an incarcerated person with no money to hire lawyers or investigators, who was dependent upon the assistance of pro bono attorneys, family, friends, and inmate legal substitutes, he exercised extraordinary persistence. In turn, although this application is being filed more than two years after Mr. Nelson's conviction became final on direct appeal on October 15, 1992, this application for post-conviction relief presents evidence that has not previously been considered by this court because it was only disclosed by the District Attorney until June 14, 2022. Pursuant to La. C. Cr. P. art. 930.8(A)(1), claims supported by such evidence are not time barred if they are submitted within two years of discovery. Should this court find Mr. Nelson's diligence over the last three decades in sufficient, in the alternative, the State may waive any procedural objection. La. C. Cr. P. art. 930.8(D). Additionally, the claims presented here have not been fully litigated, and are therefore not "successive" under La. C. Cr. P. art. 930.4(A). Finally, the court may also consider these claims "in the interest of justice."  La. C. Cr. P. art. 930.8(A)(1).

## LEGAL ARGUMENT

**I.  Mr. Nelson's Conviction was obtained in violation of the United States and Louisiana Constitutions.**

Pursuant to La. C. Cr. P. § 930.3(1), relief shall be granted for a petitioner in custody if "[t]he conviction was obtained in violation of the constitution of the United States or the state of Louisiana." Petitioner Leonard Nelson's conviction satisfies this criterion for relief, as his conviction was obtained in violation of the Fifth and Sixth Amendment of the United States Constitution.

**A.  The State Failed to Disclose Exculpatory Evidence in Violation of *Brady v. Maryland***

The suppression by the prosecution of evidence favorable to the accused violates a defendant's Fourteenth Amendment due process rights where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence is material, and must be disclosed, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would be different." *See Kyles v. Whitley*, 514 U.S. 419, 432-34 (1995) (quoting *United States v. Bagley*,

473 U.S. 667, 682 (1985)). Establishing a "reasonable probability of a different outcome does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine[ ] confidence in the outcome of the trial." *Id.* at 75–76 (citing *Kyles*, 514 U.S. at 434).

1. **The State Failed to Disclose Impeachment Evidence as to its Star Witness (Derrick Marigny), Failed to Disclose Evidence that Mr. Marigny Received a Deal in Exchange for his Testimony, and Failed to Correct his False Testimony**

Material evidence includes not only exculpatory evidence, but also information that could be used to impeach government witnesses when the reliability or credibility of that witness may determine guilt or innocence. *See Bagley*, 473 U.S. at 676; *accord Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *State v. Kemp*, 00-2228, p.7 (La. 10/15/02), 828 So.2d 540, 545; *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. . . ."); *see also Kyles*, 514 U.S. at 444–52 (discussing impeachment uses of undisclosed evidence); *State v. Bright*, 875 So.2d 37, 41 (La. 5/25/04) ("For purposes of the State's due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence."); *State v. Rosiere*, 488 So. 2d 965 (La. 1986). The *Brady* rule applies whether a general, specific, or even no request at all is made for the evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *State v. Knapper*, 579 So.2d 956, 959 (La. 1991).

The evidence now available to Mr. Nelson after nearly three decades of waiting indicates that prosecutors failed to disclose evidence that could have been used to attack Derrick Marigny's credibility and that suggests a plea deal was offered to Derrick Marigny in exchange for his testimony at Mr. Nelson's trial. Further, it appears *that* prosecutors allowed their eyewitness to provide misleading testimony about this arrangement at trial without correcting his misstatements. *But see Napue v. Illinois*, 358 U.S. 919 (1958).

On June 14, 2022, Mr. Nelson learned that the records he fought so diligently to get access to for nearly three decades contained a memo prepared by ADA Mary "Missy" McDonald (one of two prosecutors on his case) for ADA Ray Bigelow on June 7, 1991 with exculpatory and material information that had never been disclosed to him (but which he had long suspected). According to internal D.A. records, prosecutors had been in conversation with Mr. Marigny prior to trial, hoping to secure his testimony in support of their theory at trial. However, Mr. Marigny told prosecutors that he would *not* testify under oath that Mr. Nelson was responsible for killing Mr. Wilson (unless

11

they met his demands to drop the multiple drug-trafficking charges against him). Specifically, the memos reveal that Mr. Marigny told prosecutors he would *not* provide inculpatory evidence against Mr. Nelson "unless the office offered him a deal concerning his outstanding drug charges."[39] Based on the D.A. files, it appears the trial attorneys were willing to cut such a deal, but ranking attorneys initially denied their requests on Mr. Marigny's behalf. Nevertheless, "approximately one hour before the trial started," it appears that prosecutors secured Mr. Marigny's commitment to "do the right thing."[40] A separate memo authored in August 1991 related to the D.A.'s planned prosecution of Mr. Nelson's co-defendant, Matthew Moore, noted that securing a conviction would likely be impossible because Mr. Marigny "would have to admit drug involvement and *admit the no bill agreement*."[41]

Absent such a deal, Mr. Marigny was facing a mandatory-minimum sentence of at least 15 years (flat) as a habitual offender convicted of cocaine trafficking, and a maximum of 60 years (flat). But immediately after providing his testimony at trial (while Mr. Nelson's motion for a new trial remained pending), prosecutors secured for Mr. Marigny the requested benefit.[42] On June 21, 1991, he pled guilty as charged to PWIT cocaine and was given a five-year suspended sentence; he was not multiple billed. Although a different ADA had been prosecuting Mr. Marigny's case at all prior settings, the day Mr. Marigny entered his plea, his case was personally handled by ADA McDonald. [43]

A jury is entitled to know about any plea agreements that would call into question the credibility of a material witness, especially one that is central to the prosecution's case. *Giglio v. United States*, 405 U.S. 150 (1972). Even absent direct evidence of an express plea agreement in exchange for Mr. Marigny's testimony, there exists a violation of a defendant's Fourteenth Amendment right to due process where the State fails to disclose a witness' expectation of favorable treatment in exchange for his testimony. *Tassin v. Cain*, 517 F.3d 770 (5th Cir. 2008). Because of the importance of Mr. Marigny's testimony to the state's case—here, the ADA characterized him as the "main witness"—it was imperative for the defense to challenge his credibility. Here, the evidence could have been used in multiple ways: (1) it provides strong circumstantial evidence that Mr. Marigny testified in exchange for an implied (if not express)

---

[39] Leonard Nelson OPDA File 2 of 5 at 16 of 317.
[40] *Id.*
[41] *Id.* (emphasis added).
[42] Leonard Nelson OPDA File 2 of 5 at 17 of 317.
[43] Derrick Marigny OPDA File (Case No. 343-461) vol. 1 of 1 at 8 of 45.

12

benefit from the District Attorney; and (2) even if no formal deal was struck, Mr. Nelson could have used the undisclosed "testimony-for-hire" offer by Mr. Marigny to attack his credibility on the stand.

The "materiality" of any given *Brady* violation must be evaluated (1) in light of the strength of the State's case at trial, and (2) in light of additional *Brady* violations that might compound the cumulative impact or import of the suppressed evidence. *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995). Exculpatory evidence that is not significant enough to be "material" in a case where the State's evidence is overwhelming might be "material" in a case where the State's evidence is weaker. *United States v. Agurs*, 427 U.S. 97, 111 (1976) ("On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.").

Here, the best evidence of the "materiality" of Mr. Marigny's testimony is the D.A.'s own internal (private) assessment: "Marigney [sic] is an essential and material witness in the murder case against [co-defendant] Mathew [sic] Moore [and] without his testimony, we would not have had sufficient evidence to convict Leonard Nelson."[44] The conviction secured here relied on the State convincing the jury that at the time Mr. Nelson shot Mr. Wilson he was not in fear for his life. To make that case they had to convince the jury that the gun found at the scene, near the victim, was dropped there by Mr. Moore. And the evidence they had to make that case was exceptionally weak. No physical evidence connected Mr. Moore to that gun – a fact that the State failed to disclose to the defense prior to trial, and instead chose to put on a witness to testify that the gun was in fact *not* tested. The only witness that connected Mr. Moore to that gun witnessed the entire incident through the rearview mirror of a car, and could not identify Mr. Moore in a photographic lineup. And then there was the testimony of Mr. Marigny. Had the *Brady* evidence been disclosed, there is a reasonable probability that Mr. Nelson could have successfully questioned Mr. Marigny's credibility and attacked Mr. Marigny's testimony on this dispositive point. Mr. Nelson also had numerous witnesses testify in support of his claim that Mr. Wilson, Mr. Miller, and Mr. Marigny had enlisted people to help kill him, and twice ambushed him prior to the day of the shooting. Another witness testified that she saw Mr. Marigny and Mr. Wilson draw guns at Mr. Nelson the night of the shooting. Even one of the State's witness (Mr. Johnson) testified that he saw Mr. Marigny reach for a gun.

---

[44] OPDA File, Part 2 of 5 at 16 of 317

13

In other words, given the weaknesses in the State's case, **even a seemingly small piece of non-disclosed exculpatory evidence must be regarded as "material" evidence** in the unique context of this case. However, this is not a case where a seemingly small piece of non-disclosed exculpatory evidence has now been revealed. Instead, the newly disclosed exculpatory evidence discovered here is **very significant**, fatally undermining the credibility of Mr. Marigny – the State's "main witness to the shooting." Evidence that tends to undermine the integrity or good faith of an investigation is exculpatory information that must be disclosed because evidence allowing the defendant to "attack . . . the thoroughness and even the good faith of the investigation" may be material under *Brady*. *Kyles*, 514 U.S. at 445.

And if there is any doubt as to whether this evidence is both exculpatory and material we need only to look at a memorandum prepared by ADA Robin O'Bannon (the other prosecutor who tried Mr. Nelson's case) recommending that the District Attorney abandon its plan to prosecute Mr. Nelson's co-defendant (Matthew Moore) for the same charge in August 29, 1991.[45] As explained in *that* internal memorandum:

> Since Leonard Nelson's trial, this office approved a No bill on Derek Marigny's three drug charges. During the Nelson trial the defense attempted to discredit Mr. Marigny as a drug kingpin who was receiving a deal for his testimony. At the time, Derek denied being a drug dealer, and denied having any plea agreements with this office. . . . Now, however, he has been convicted on PWITD charges. He would have to admit drug involvement and *admit the no bill agreement*. I believe Derek [Marigny]'s testimony could prove harmful to our case against Matthew Moore, in that his credibility and veracity could be easily challenged. Further, any testimony about the No Bill may give the appearance of impropriety at the Nelson trial. . . . [A]n admission at the Moore trial as to the NO BILL may be the ammunition the defense needs for a reversal of the Nelson conviction."[46]

The internal memoranda make it likely that prosecutors violated not only *Brady*, but also their obligations under *Napue*. While the trial transcript indicates that Mr. Nelson had some inkling of the deal that prosecutors had extended to their star-eyewitness, it does not appear that this information was ever formally disclosed. And, even if it was known to defense counsel, prosecutors violated their obligation to correct the record under *Napue* when Mr. Marigny lied under oath about the deal (and about his extensive involvement with drugs and guns). Indeed, prosecutors furiously sought to suppress the relevant line of questioning, but never corrected the record as to the critical point. After his testimony, Mr. Marigny received the precise bargain that he denied he had sought.

---

[45] Leonard Nelson OPDA File 2 of 5 at 18 - 20 of 317.
[46] *Id.*

**B. The Jury Was Mis-Instructed as to the Central Issue at Trial (Self-Defense)**

Before dismissing the jurors for deliberation the Judge gave them the following instruction relative to determining whether Mr. Nelson acted in self-defense when he shot Mr. Wilson:

> If you find that by a preponderance of the evidence the defendant has raised the defense of justification, then the burden is upon the state to show that the homicide was not committed in self-defense.[47]

Mr. Nelson objected to this instruction and proposed an instruction that properly instructed the jurors as to the proper allocation of burdens when self-defense is validly invoked in a homicide trial.[48] This instruction breaks with well settled case law in three ways: 1) the Judge improperly tasked the jury with deciding whether or not a self-defense claim was properly raised by the defense,[49] 2) the Judge improperly instructed jurors that the standard for determining if a self-defense claim was properly raised by the defense is "preponderance of the evidence," [50] and 3) although the Judge properly instructed the jury that it was the State's obligation to rebut a self-defense claim, he failed to specify what burden of proof applied (strongly hinting that disproving self-defense by a preponderance of the evidence was sufficient).[51]

La C.Cr.P. art. 802 states that the Court "shall charge the jury as to the law applicable to the case." This has been interpreted to require the trial judge to charge as to each and every phase of the case whatever is arguably supported by the evidence, whether believed by the judge or not.

---

[47] *See* Transcript of Court's Charge to the Jury, pg. 13-14, Record on Appeal, Vol. 1, 25-26 of 226.

[48] Mr. Nelson proposed the following instruction: The burden of proof of the facts relating to a plea of self-defense rests, not upon the defendant, but upon the State. As self-defense is not a special plea, the burden of proof rests upon the State to show, beyond a reasonable doubt, that the killing was done feloniously, and not in self- defense, in order to convict the party accused of felonious homicide . . . The plea of self-defense does not place upon the accused the burden of proving it, nor does it change the duty of the State to prove the guilt of the accused beyond a reasonable doubt . . . Accused, relying on self-defense, does not have the burden of proving. that the killing was justifiable; but the State has the burden of proving beyond a reasonable doubt that the killing was not justifiable." (*See* Special Charge No. 5, pg. 141 of 226, Record on Appeal Vol. 1 of 2).

[49] Although this claim is being presented more than two years after Mr. Nelson's conviction became final on direct appeal on October 15, 1992, given the diligence Mr. Nelson exercised to secure a copy of his OPDA file over the last two decades the State may waive any procedural objection. La. C. Cr. P. art. 930.8(D). Additionally, the claim presented here has not been fully litigated, and is therefore not "successive" under La. C. Cr. P. art. 930.4(A). Finally, the court may also consider this claim "in the interest of justice." La. C. Cr. P. art. 930.8(A)(1).

[50] Although this claim is being presented more than two years after Mr. Nelson's conviction became final on direct appeal on October 15, 1992, given the diligence Mr. Nelson exercised to secure a copy of his OPDA file over the last two decades the State may waive any procedural objection. La. C. Cr. P. art. 930.8(D). Additionally, the claim presented here has not been fully litigated, and is therefore not "successive" under La. C. Cr. P. art. 930.4(A). Finally, the court may also consider this claim "in the interest of justice." La. C. Cr. P. art. 930.8(A)(1).

[51] This claim was properly raised on direct appeal and the Louisiana Court of Appeal, Fourth Circuit and is therefore successive pursuant to La. C. Cr. P. art. 930.4.; however the court may still consider it "in the interests of justice." La. C. Cr. P. art. 930.4(A).

15

*State v. Miller*, 338 So.2d 678 (La. 1976), and *State v. Brown*, 313 So.2d 581 (La. 1975). In *Miller* the court found that even if the evidence of self-defense that the defendant presented was "extremely doubtful," the question for the judge is not what the judge believed the evidence to prove, but rather "[t]he question is, instead, what the jury would believe the evidence established if they had been instructed on the law of justification." *Miller*, 338 So.2d at 681. Here, instead of following the law applicable to the case the Judge improperly instructed the jury that to determine whether Mr. Nelson was acting in self-defense, they were to engage in a two-step process. First, the judge instructed the jury they were to first "find that by a preponderance of the evidence the defendant has raised the defense of justification."[52] Pursuant to *Miller* and *Brown* this is incorrect; it is the judge's decision whether the defense has presented evidence sufficient for the jury to receive an instruction.

To illustrate why this is a problem, consider the possibility that the trial judge (correctly) believed that self-defense was properly "at issue," but the jurors (incorrectly, perhaps because they did not know the appropriate standard) did not believe self-defense was adequately asserted by the defense. If this occurred, the jury would erroneously refuse to consider the possibility that Mr. Nelson had a valid self-defense claim that they should consider (despite the trial court's correct determination, as a matter of law, that Mr. Nelson had validly raised that possibility).

Second, and perhaps much worse, the judge instructed the jury that the defense shouldered the burden to prove by a "preponderance of the evidence" that the claim of self-defense was raised by Mr. Nelson. This is incorrect. In *State v. Tassin*, the court held that to receive an instruction on self-defense the question is whether the defense has brought evidence sufficient to create a "reasonable inference" that the defendant acted in self-defense. 129 So. 3d 1235, 1248. See also *State v. Miller*, 338 So.2d 678 (La. 1976) (holding that even where the defendant's self-defense claim is "extremely doubtful" an instruction on self-defense should still be charged). Here, by instructing the jurors that they must first find by a preponderance of the evidence that the defendant acted in self-defense, the judge cut jurors off from reaching the only question they were legally required to answer:  whether the State proved *beyond a reasonable doubt* that the defendant did *not* commit the crime in self-defense.

---

[52] *See* Transcript of Court's Charge to the Jury, pg. 13-14, Record on Appeal, Vol. 1, 25-26 of 226.

16

To illustrate why this is a problem, assume (as was likely the case here) that jury concluded that there was a 75% chance that Mr. Nelson *did not* act in self-defense, and a 25% chance that Mr. Nelson *did* act in self-defense. Based on the instruction given, the jurors would refuse to consider the issue of self-defense, because Mr. Nelson failed to meet his initial burden of production to establish by the "preponderance of the evidence" that self-defense was a possibility. Thus, the jurors would fail to consider whether there was a reasonable doubt that Mr. Nelson acted in self-defense (even though they unanimously felt this way), because he did not clear the evidentiary threshold they were erroneously instructed he needed to satisfy to meet his burden of production.

Finally, it is well settled that in a homicide case it is the State's burden to prove beyond a reasonable doubt that the defendant did not act in self-defense.  See *State v. Scott*, 372 So. 3d 42, 47 (La. App. 2nd Cir. 2023) (holding that while it was unsettled what the burden of proof as to a claim of self-defense in a non-homicide situation is, this burden in homicide case is on the state to prove beyond a reasonable doubt); *State v. Cotton*, 634 So. 2d 937, 938 (La. App. 2nd Cir. 1994) (holding that the defendant who asserts self-defense in a homicide case does not assume any burden of proof on that issue; the State has the affirmative duty of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense); *State v. Batiste*, 708 So. 2d 764, 771 (La. App. 5th Cir. 1998) (holding that when a defendant claims self-defense, the state must prove, beyond a reasonable doubt, that the defendant did not act in self-defense) (citing *State v. Rader,* 609 So. 2d 857, 861 (La. App. 5th Cir. 1992) and *State v. Garcia*, 483 So. 2d 953, 956 (La. 1986)). Here, not only did they judge incorrectly instruct jurors that they were to first determine by the preponderance of the evidence whether Mr. Nelson presented a self-defense claim, if the jurors were to make it to the second question (whether the State Mr. Nelson did not act in self-defense) the Judge failed to specify what burden of proof applied (i.e. beyond a reasonable doubt). In context, a reasonable juror interpreting these instructions would likely assume that the State satisfied its burden of disproving self-defense if prosecutors could establish as much by a preponderance of the evidence. This claim was properly raised on direct appeal. The Louisiana Court of Appeal, Fourth Circuit held that the court had not erred because the "[t]ranscript indicated that the charge clearly established that the State had to prove each element of the crime beyond a reasonable doubt." *See* Transcript of Court's Charge to the Jury, pg. 13-14, Record on Appeal, Vol. 1, 25-26 of 226. Although the Court of Appeals was correct to find that the jury had been

17

properly instructed as to the State's burden to prove each element of the crime beyond a reasonable doubt, self-defense is not an element of a crime; it is an affirmative defense. See *State v. Garcia*, 483 So. 2d 953, 957 (holding that justification defenses such as self defense are affirmative defenses because they do not negate any essential element of the crime). As an affirmative defense, the jury was owed a separate instruction explaining that the State also had to prove beyond a reasonable doubt that this affirmative defense did *not* apply (which, it is worth noting, is somewhat anomalous among the various affirmative defenses recognized by Louisiana law). *See, e.g.,* State v. Scott, 372 So. 3d 42, 47 (holding that it is unsettled whether the burden of proof as to a claim of self-defense in a non-homicide situation is: (1) upon the defendant to establish by a preponderance of the evidence that he acted in self-defense; or (2) upon the State to establish beyond a reasonable doubt that the defendant did not act in self-defense). To not provide that instruction left the jury likely to assume that the burden on the State was the lower standard of preponderance of the evidence.

Mr. Nelson's jury was incorrectly instructed as to which party bears the burden in proving whether a defendant acted in self-defense. Further, the jury was not properly instructed as to the proper burden to be applied. Therefore, the conviction against Mr. Nelson was secured in violation of his right to a fair trial under the Louisiana Constitution Art. 1 § 16, as well as his Sixth Amendment right to a jury trial under the United States Constitution, and his Fifth Amendment right to due process under the United States Constitution and must be vacated. *State v. Williamson*, 389 So. 2d 1328, 1331 (Holding that where the jury instructions included a misstatement of the law fairness dictates reversal of the defendants conviction because such an error is of such importance and significance as to violate fundamental requirements of due process); *United States v. Gaudin*, 515 U.S. 506, 507 (holding that a trial judge's refusal to allow the jury to determine the materiality of the alleged false statements infringed the accused's rights guaranteed by the Fifth Amendment's due process clause and the Sixth Amendment's right to a jury trial).

### C. Mr. Nelson's Counsel on Direct Appeal was Ineffective When She Inexcusably Failed to Argue that the Jury Instruction Impermissibly Placed on Mr. Nelson a Substantial Burden of Production

The Sixth Amendment right to effective assistance of counsel extends to direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 389 (1985) (holding "the Due Process Clause of the Fourteenth Amendment guarantees the criminal defendant the effective assistance of counsel on . . . an appeal").

18

Here, although Mr. Nelson's appointed attorney with the Louisiana Appellate Project recognized that she had a responsibility to review the jury instructions, she inexcusably failed to recognize that the jury instruction impermissibly placed on Mr. Nelson a burden of production requiring him to demonstrate by a "preponderance of the evidence" that he acted in self-defense. Thus, this critical issue was never presented to the appellate courts (despite the fact that Mr. Nelson, as noted above, properly preserved the issue before the trial court by offering an accurate instruction). There is no conceivable "strategic" reason for omitting this meritorious appellate issue: by instructing the jurors that the defendant had the initial burden of establishing self-defense by the "preponderance of the evidence," the trial court clearly erred, and an appellate court would have been obliged to reverse the conviction.

By inexcusably failing to raise the issue—indeed, the most promising issue on appeal—Mr. Nelson's appellate counsel deprived him of the effective "counsel" to which he was entitled under the Sixth Amendment.

## II.  Mr. Nelson's risk of recidivism is low and he is well positioned to succeed upon release

The Defendant has now been incarcerated for nearly thirty-four (34) years. Mr. Nelson is now fifty-seven (57) years of age. Although Mr. Nelson is not elderly, because he went to prison so young, multiple studies demonstrate that recidivism decreases with age and the existence of other supportive community measures, such as family and re-entry assistance.[53] On account of his age, Mr. Neslon is now a significantly lower risk for committing further offenses.[54] Upon release, Mr. Nelson will be supervised by *Rise After Reentry* (RAR), where he will reside initially with Louisiana Parole Project and then at *The First 72+*. For a period of three years he will be supervised by Orleans Parish Criminal District Court where he will be required to report to court monthly, and be under the supervision of a probation officer. Mr. Nelson's age, coupled with the extensive support he will receive upon release further reduce his risk of committing further offenses.

---

[53] *See, e.g.*, D.P. Farrington. *Age and Crime*, *in* CRIME AND JUSTICE: AN ANNUAL REVIEW OF RESEARCH Vol. 7 (M. Tonry & N. Morris eds. 1986); G. Sweeton et al., *Age and the Explanation of Crime, Revisited*, 42 J. ADOLESCENCE 932-38 (2013); Marc Mauer, *Long-Term Sentences: Time to reconsider the Scale of Punishment*, 87 UMKC L. REV. 113, 122 (2018).

[54] *See* Lila Kazemian, *Pathways to Desistance From Crime Among Juveniles and Adults: Applications to Criminal Justice Policy and Practice*, NCJ 301503, in DESISTANCE FROM CRIME: IMPLICATIONS FOR RESEARCH, POLICY, AND PRACTICE (Washington, DC: U.S. Department of Justice, National Institute of Justice, Nov. 2021), NCJ 301497, at 1 ("Few individuals remain active in crime after the age of 40.").

## CONCLUSION

WHEREFORE, based upon the above, the Defendant prays this Court grant his petition for post-conviction relief, and his conviction and sentence be vacated.

Respectfully Submitted,

_____
Kelly Orians, La. Bar No. 36920
University of Virginia School of Law *(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: Korians@law.virginia.edu

20

<u>Certificate of Service</u>

I hereby certify that I have caused to be served electronically, by mail, or hand delivery in open court a copy of the foregoing document upon the prosecution on the date of the filing of the motion.

_____
Kelly Orians, La. Bar #36920
University of Virginia School of Law
(*For identification purposes only*)
580 Massie Rd.
Charlottesville, Virginia 22903
Korians@law.virignia.edu

21

IN THE ORLEANS PARISH CRIMINAL DISTRICT COURT
STATE OF LOUISIANA

| | |
|---|---|
| STATE OF LOUISIANA | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| LEONARD NELSON | ) |
| | ) |

Docket No.:    344-648
Section:    D
Judge:    Holmes

FILED: _____    DEPUTY CLERK: _____

CONSIDERING the *Application for Post-Conviction Relief* and the grounds supporting it, this court finds that Leonard Nelson's conviction and subsequent sentence were obtained in violation of the Constitutions of the United States and the State of Louisiana. The Court finds that the underlying conviction and subsequent sentence are constitutionally infirm for grounds set forth in the application. Therefore, pursuant to La. C.Cr.P. art. 930.3(1) this application is hereby GRANTED.

The second-degree murder conviction obtained in case #344-648 "D" against Leonard Nelson is hereby vacated.

_____
Honorable Kimya Holmes
Orleans Criminal Court
Section D


_____
Date

22

# EXHIBIT A

**AFFIDAVIT**

STATE OF LOUISIANA
PARISH OF ORLEANS

BEFORE ME, Notary Public, personally came and appeared **JOHN ROHR** , who after being duly sworn did declare that:

1) Affiant is employed by the District Attorney's Office of New Orleans and is responsible for responding to public records requests directed to the District Attorney of New Orleans in compliance with Louisiana Public Records Law, La. R.S. 44:1 et seq.

2) Pursuant to a Civil Court Order signed by Judge Madeline M. Landrieu, Division "E" that orders the Orleans Parish District Attorney's Office to appear at a hearing on the 19th day of June 2009, Affiant has prepared the accompanying two-page document titled "PUBLIC RECORDS REQUEST HISTORY, State of Louisiana v. Leonard Nelson, Case Number 344-648".

3) Affiant certifies that the fifty-four pages attached to the two-page document titled "PUBLIC RECORDS REQUEST HISTORY, State of Louisiana v. Leonard Nelson, Case Number 344-648" are copies of documents pertaining to requests submitted to the District Attorney's Office of New Orleans and responses to thoses requests.

4) Affiant certifies that the information contained in the attached two-page document titled "PUBLIC RECORDS REQUEST HISTORY, State of Louisiana v. Leonard Nelson, Case Number 344-648", is an accurate, documented history of public records requests submitted to the District Attorney's Office of New Orleans for case 344-648 and the office's responses to those requests.

5) As evidenced by documentation referenced in the two-page document titled "PUBLIC RECORDS REQUEST HISTORY, State of Louisiana v. Leonard Nelson, Case Number 344-648", case 344-648 was retrieved from offsite storage and last known by Affiant to be available on the 27th day of April 1994.

6) As evidenced by documentation referenced in the two-page document "PUBLIC RECORDS REQUEST HISTORY, State of Louisiana v. Leonard Nelson, Case Number 344-648" Affiant issued memoranda to the District Attorney's Appeals Division and Section "H" in an effort to locate case 344-648, the results of which were negative.

7) Affiant certifies that in all requests for case 344-648 from offsite storage subsequent to the 27th day of April 1994, the record was missing from its designated box.

8) To the best of Affiant's knowledge and belief, case 344-648 is lost or misplaced.

9) Affiant has no reason for the absence of case 344-648, nor does he know the current location of the record. Further, he does not know if any person has custody of the record, nor does he know the manner or method of circumstance that led to its loss.

John Rohr

CERTIFIED DA OFFICE COPY

SWORN TO AND SUBSCRIBED
BEFORE ME, NOTARY, THIS
9ᵗʰ  DAY OF June
2009

Donna R. Curdi
# 61423

CERTIFIED DA OFFICE COPY



## PUBLIC RECORDS REQUEST HISTORY
### State of Louisiana v. Leonard Nelson
### Case Number 344-648

1) 9/18/93 fax from attorney John Keller with 9/24/93 response of John Rohr indicating case 344-648 was located in box 849.
2) 4/14/94 fax from John Keller with 4/27/94 response from John Rohr indicating file was located in box 849.
3) 10/6/95 public records request of Leonard Nelson stapled to 10/18/95 memorandum of John Rohr to Section H and appeals areas of D.A.'s Office. Record was not located.
4) 3/4/96 letter to John Keller from Peter Brandt stating that case 344-648 could not be located, and that the D.A.'s Office could issue a refund to him. Attached to this letter is Leonard Nelson's 2/24/96 letter stating that he submitted funds to the D.A.'s Office and wishes to receive a copy of his record.
5) 12/3/97 fax from John Keller with 12/23/97 response from John Rohr that case 344-648 still could not be located.
6) 12/18/97 fax response to John Keller's inquiry as to the status of eleven (11) public records requests, including case 344-648.
7) 7/17/98 fax from John Keller to John Rohr including 7/12/98 correspondence of Leonard Nelson requesting status of search for his record.
8) 7/22/98 letter to John Keller in response to Leonard Nelson's 7/12/98 correspondence. This letter instruct John Keller to inform Leonard Nelson that case 344-648 still cannot be located, and that we offer to reimburse him.
9) 10/4/00 fax from John Keller with 10/10/00 response of John Rohr. Stapled to this are two items. One is a letter from Leonard Nelson requesting a refund. The other item is a 7/24/98 letter from John Keller to Leonard Nelson stating that case 344-648 cannot be located.
10) 10/6/00 memorandum from John Rohr to the Accounting Department of the D.A.'s Office requesting that a refund be issued to Leonard Nelson. Stapled to this are the letters from Leonard Nelson and John Keller referenced in entry number 9.
11) 10/2/03 fax from John Rohr to attorney William Aaron including a Motion For Production Of District Attorney Files.
12) 1/19/05 fax from William Aaron to John Rohr regarding public records request for case 344-648. This includes 1/21/05 response by John Rohr that the record is missing.
13) 4/17/06 fax from John Rohr to William Aaron accompanied by 2/20/06 public records request for case 344-648, made by Leonard Nelson. The fax indicates the record is missing.
14) 10/3/06 fax from William Aaron to John Rohr with John Rohr's response that the record could not be located. Stapled to this is 9/18/06 correspondence of Leonard Nelson asking if his file was located or if it was destroyed.
15) 4/21/08 fax from William Aaron to John Rohr with John Rohr's response that the record could not be located. Stapled to this is 4/14/08 correspondence of Leonard Nelson asking if his file was located or if it was destroyed.

Page 1 of 2

CERTIFIED DA OFFICE COPY

16) 1/26/09 fax from John Rohr to William Aaron indicating that case 344-648 could not be located. Stapled to this is a 1/5/09 letter from Leonard Nelson requesting that an investigation be conducted to determine how his file could have been lost.

Page 2 of 2

CERTIFIED DA OFFICE COPY

IN THE ORLEANS PARISH CRIMINAL DISTRICT COURT
STATE OF LOUISIANA

STATE OF LOUISIANA

v.

LEONARD NELSON

Docket No.:    344-648
Section:    D
Judge:    Holmes

FILED: _____    DEPUTY CLERK: _____

## NOTICE OF ERRATA

NOW INTO COURT, comes Leonard Nelson, through undersigned counsel, to inform this Honorable Court of a typographical error in Mr. Nelson's previous filing. The Application currently reads, at page 13, that new information "was only disclosed by the District Attorney until June 14, 2022." In fact, the information that forms the basis for Mr. Nelson's *Brady* claim was not furnished to him until June 29, 2022; the attached Privileged Mail Log maintained by the Louisiana State Penitentiary provides the correct date. *See* Ex. A.

Respectfully Submitted,

Kelly Orians, La. Bar No. 36920
University of Virginia School of Law *(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: Korians@law.virginia.edu

Certificate of Service

I hereby certify that I have caused to be served electronically, by mail, or hand delivery in open court a copy of the foregoing document upon the prosecution on the date of the filing of the motion.

_____
Kelly Orians, La. Bar #36920
University of Virginia School of Law
(*For identification purposes only*)
580 Massie Rd.
Charlottesville, Virginia 22903
Korians@law.virignia.edu

# Exhibit A

| 06/29/20 | | PRIVILEGD MAIL | | GE 3 | | |
| --- | --- | --- | --- | --- | --- | --- |
| MP | | | | VISED 08-21-96 | | |
| | | | | DATE   06/29/2022 | | |

THE BELOW LISTED INMATES RECEIVED UNOPENED PRIVILEGED MAIL
RETURN TO THE MAIL ROOM.  DELIVERING OFFICER WILL OPEN AN
COPY TO BE FILED AT CAMP.  2ND COPY TO BE RETURNED TO MAI
RECEIVING OFFICER'S SIGNATURE. S/_____
PREPARED BY : MSGT. D. WHITE

PLEASE HAVE EACH INMATE SIGN THIS FORM AND
NSPECT IN T PRESENCE OF THE INMATE.  1ST
M AFTER OFFICER'S & INMATE'S SIGNATURE.
_____  011

| NAME | NO. | LOC | SIGNATURE | FROM |
| --- | --- | --- | --- | --- |
| 21. JOHNSON, PHILLIP | 625934 | OAK 1 | | CLERK US DIST COURT WESTERN DIST OF LA 800 LAFAYETTE ST STE. 2100 LAFAYETTE LA 70501 |
| 22. ANTHONY, WILLARD | 717514 | SPR 3 | | INNO PROJECT 40 WORTH ST STE. 701 NY NY 10013 |
| 23. AUTREY, FERNAND | 313537 | SPR 3 | Fernand Autrey | JUDICIAL EXPENSE FUND 320 CIVIL COURTS BLDG 421 LOYOLA AVE NEW ORLEANS LA 70112 |
| 24. NELSON, LEONARD | 118905 | WAL 7 | | JULIA MERRITT ORLEANS PARISH DIST ATTY 619 S. WHITE ST NEW ORLEANS LA 70119 |
| 25. FLANAGAN, TERRY | 88719 | OAK 2 | erry Flanagan | WILLIAM HOLMES CLERK PARISH OF BIENVILLE 100 COURTHOUSE DR STE. 1100 ARCADIA LA 71001 |
| 26. RICKS, WESLEY | 499599 | CBC U/L | | DOUG WELBORN CLERK 19TH JDC PO BOX 1991 BATON ROUGE LA 70821 |
| 27. DRUMMER, JOHN | 622038 | CYP 3 | John Drummer | EMILY POSNER ATTY 7214 ST CHARLES AVE NEW ORLEANS LA 70118 |
| 28. CHRISTMAS, RASHAWN | 433850 | CBC U/R | RayShawn J. Christmas 6-30-2022 | SUPREME COURT OF UNITED STATES WASHINGTON DC 20543 |
| | | CHD W/R 0 06/14/2022 | | |
| 29. CROSBY, ALLEN | 94047 | WAL 2 | Allen Crosby | STONE PIGMAN WALTHER WITTMAN 909 POYDRAS ST STE. 3150 NEW ORLEANS LA 70112 |
| 30. HOWARD JR., FRED | 117952 | OAK 3 | Fred Howard | CLERK US DSIT COURT WESTERN DIST OF LA 800 LAFAYETTE ST STE. 2100 LAFAYETTE LA 70501 |

STATE OF LOUISIANA                          CRIMINAL DISTRICT COURT

VERSUS                                      PARISH OF ORLEANS

LEONARD NELSON                              CASE NO. 344-648 "D"

FILED:_____

                                            _____
                                            DEPUTY CLERK OF COURT

**NOW INTO COURT,** comes the State of Louisiana, through the undersigned Assistant District Attorney, without any waiver, to object to Defendant's Application for Post Conviction Relief that was filed on or about June 27, 2024. Furthermore, as the complete criminal court record has not yet been available for the undersigned to review, the State may file supplemental procedural objections if any become apparent upon review of the record.

## I.    PROCEDURAL OBJECTION PURSUANT TO LA. C.CR.P. ART. 930.8.

As will be discussed in more detail in a separate section of this filing, all Louisiana applications for post-conviction relief are subject to the rules set forth in La. C.Cr.P. articles 924 et seq. Before a court may rule on the merits of any particular claim in an application for post-conviction relief, it first must find that there are no procedural bars to substantive consideration of that claim or, if any procedural bar exists, that the Defendant has established that an exception to that procedural bar applies to that particular claim.

The Docketmaster for this case shows that Defendant filed previous pleadings seeking collateral review of his conviction.[1] Ultimately, the Louisiana Supreme Court denied review, finding Defendant's district court filing untimely in a per curiam stating:

> Denied. The application was not timely filed in the district court, and applicant fails to carry his burden to show that an exception applies. La.C.Cr.P. art. 930.8; see State ex rel. Glover v. State, 93-2330, pp. 9-11 (La. 9/5/95), 660 So.2d 1189, 1195-96 (distinguishing habeas corpus from post-conviction relief and endorsing La.C.Cr.P. art. 351 and its cmt. (c), which states that "habeas corpus is not the proper procedural device for petitioners who may file applications for post conviction relief;" rather, it "deals with pre-conviction complaints concerning custody.").
> Applicant has now fully litigated his application for post-conviction relief in state court. Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana postconviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4 and within the limitations period as set out in La.C.Cr.P. art. 930.8. Notably, the legislature in

[1] More specific information is contained in the statement of the case and of the facts later in this filing but since as the complete criminal court record has not yet been available for the undersigned to review, that statement may be incomplete or inaccurate. If inaccuracies are noticed after the undersigned has reviewed the complete criminal court record, the State will supplement this filing to point out the inaccuracy and provide corrected information.

344-648 "H-D" St. art. 930.8 Obj.
to APCR, Page 1 of 12

2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Applicant's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final. Hereafter, unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, applicant has exhausted his right to state collateral review. The district court is ordered to record a minute entry consistent with this per curiam.

Writ Action 2019-KH-0595 (La. 11/5/19), 281 So.3d 660 (Mem.). La. C.Cr.P. article 930.8 requires that "[n]o application for post conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final... [.]"

Since timeliness is one of the threshold questions, the State addresses this procedural bar first. Defendant was found guilty on March 5, 1991, and sentenced on July 29, 1991. As outlined in the statement of the case section below, Defendant timely appealed his conviction to the Fourth Circuit and that court affirmed his conviction and sentence on October 15, 1992. *State v. Nelson*, 91-KA-2491, pp. 1-3 (La. App. 4 Cir. 10/15/1992), 606 So.2d 1012 (Table of Unpublished Opinions). His conviction and sentence became final on October 29, 1992, when his time for seeking further review expired. La. C.Cr.P. art. 922(B). The Docketmaster reflects that Defendant filed this instant application for post-conviction relief on or about June 27, 2024, nearly twenty-two years after his conviction and sentence became final. Therefore, the instant application as a whole is untimely on its face, and all claims are untimely, unless one of the narrow exceptions applies to authorize the filing of an application past the expiration of the time limitation.

Louisiana law provides those exceptions in La. C.Cr.P. art. 930.8(A)(1)-(6). They are:

(1)     The application alleges, and the petitioner proves or the state admits, that the facts upon which the claim is predicated were not known to the petitioner or his prior attorneys. Further, the petitioner shall prove that he exercised diligence in attempting to discover any post conviction claims that may exist. "Diligence" for the purposes of this Article is a subjective inquiry that shall take into account the circumstances of the petitioner. Those circumstances shall include but are not limited to the educational background of the petitioner, the petitioner's access to formally trained inmate counsel, the financial resources of the petitioner, the age of the petitioner, the mental abilities of the petitioner, or whether the interests of justice will be served by the consideration of new evidence. New facts discovered pursuant to this exception shall be submitted to the court within two years of discovery. If the petitioner pled guilty or nolo contendere to the offense of conviction and is seeking relief pursuant to Article 926.2 and five years or more have elapsed since the petitioner pled guilty or nolo contendere to the offense of conviction, the petitioner shall not be eligible for the exception provided for by this Subparagraph.

(2)     The claim asserted in the petition is based upon a final ruling of an appellate court establishing a theretofore unknown interpretation of constitutional law and petitioner establishes that this interpretation is retroactively applicable to his case, and the petition is filed within one year of the finality of such ruling.

(3)     The application would already be barred by the provisions of this Article, but the application is filed on or before October 1, 2001, and the date on which the application was filed is within three years after the judgment of conviction and sentence has become final.

(4)     The person asserting the claim has been sentenced to death.

(5)     The petitioner qualifies for the exception to timeliness in Article 926.1.

(6)     The petitioner qualifies for the exception to timeliness in Article 926.2.

La. C.Cr.P. art. 930.8. Defendant has alleged three claims in his instant application for post conviction relief. They are titled in the legal argument section of his application as follows:

I.      Mr. Nelson's Conviction was obtained in violation of the United States and Louisiana Constitutions.

      A.      The State Failed to Disclose Exculpatory Evidence in Violation of Brady v. Maryland

            1.      The State Failed to Disclose Impeachment Evidence as to its Star Witness (Derrick Marigny), Failed to Disclose Evidence that Mr. Marigny Received a Deal in Exchange for his Testimony, and Failed to Correct his False Testimony

      B.      The Jury Was Mis-Instructed as to the Central Issue at Trial (Self-Defense)

      C.      Mr. Nelson's Counsel on Direct Appeal was Ineffective When She Inexcusably Failed to Argue that the Jury Instruction Impermissibly Placed on Mr. Nelson a Substantial Burden of Production[.]

The exceptions listed in 930.8(A)(2)-(6) are not alleged and are clearly inapplicable to this application for post conviction relief. Therefore, the only exception that Defendant can attempt to claim is that in La. C.Cr.P. art. 930.8(A)(1), facts not previously known to a petitioner or his counsel and not discoverable through diligence.

**A.      Defendant's Claim A**

This Court should find that the La. C.Cr.P. art. 930.8(A)(1) exception does not apply to Defendant's Claim A. First, Defendant has not proven, and the state does not admit, that the information upon which this claim is predicated were not known to Defendant or his prior attorneys. Defendant was represented by Clyde Merrit, who was with the Office of the Indigent Defender and who was joined by John Ruskin for trial. In this application for post conviction relief, Defendant has merely set forth conclusory allegations that this information was not known to him or his counsel; he has offered no proof of that allegation. Since at all times, the "petitioner in an application for post conviction relief shall have the burden of proving that relief should be granted[,]" this Court should find that this exception does not apply to Defendant and summarily dismiss this application as untimely. La. C.Cr.P. art. 930.2; La. C.Cr.P. art. 929; La. C.Cr.P. art. 930.8.

Second, Defendant has not, at this point, proven the diligence component required by 930.8(A)(1). Defendant has attached Exhibits A and B to his application, which if taken as true,

arguably show diligence in pursuing a copy of his district attorney file from shortly after his conviction until 2009. However, if Exhibits A and B are taken as true, Defendant's evidence shows that he did not continue to pursue the file after 2009. A determination of diligence is a "subjective inquiry that shall take into account the circumstances of the petitioner[.]" La. C.Cr.P. art. 930.8(A)(1). The exhibits to this application for post conviction relief show that Defendant had the knowledge and opportunity to continue his efforts to seek the district attorney's case file. Section H of this District Court record and Division E of the Orleans Parish Civil District Court (no. 07-12154) found as a matter of fact that the District Attorney's file had been lost and was not available to be turned over to Defendant. It is unfortunate that the file was not available to be provided to Defendant at the times that he asked for it, but that does not circumvent the requirement for diligence. Since Defendant had his copy costs refunded to him, the District Attorney's Office would not have had an open request for the file to fulfill when it was scanned in 2018 (based upon Defendant's APCR Exhibit B). In fact, Defendant ultimately obtained the file only by the District Attorney's Office voluntary disclosure in 2022 after the Civil Rights Division determined the record had been located and digitized, not because Defendant continued to seek it.

Therefore, this Court should find that this exception does not apply to Defendant and summarily dismiss this application as untimely. La. C.Cr.P. art. 930.2; La. C.Cr.P. art. 929; La. C.Cr.P. art. 930.8.

Should this Court determine that the application might be allowed under an exception to the time limitation set forth in La. C.Cr.P. art. 930.8(A), rather than finding the application timely, this Court should hold a hearing to determine whether the State's ability to "respond to, negate, or rebut the allegations of the petition caused by events not under the control of the state which have transpired since the date of original conviction," has been materially prejudiced. Attached as State's Exhibit 1, is a printout from the online obituary for trial counsel Clyde Merritt, who passed away in 2012 and therefore cannot present testimony on the issues raised in this application for post conviction relief.

### B.    Defendant's Claims B and C

The 930.8(A)(1) exception cannot apply to claim B, that the jury was mis-instructed as to self defense, or claim C, ineffective assistance of appellate counsel. Those claims are based upon information that has been contained in the Orleans Parish and Fourth Circuit Court of Appeals records, was available to Defendant within the time limitation in 930.8, and Defendant has not

alleged any information that would subject claims B and C to the exceptions listed in 930.8(A). As such, the State requests this Court to summarily dismiss claims B and C as untimely filed. La. C.Cr.P. art. 929; La. C.Cr.P. art. 930.8.

## II.     STATEMENT OF THE CASE AND STATEMENT OF THE FACTS

On August 2, 1990, the State of Louisiana filed a Bill of Indictment charging Defendant Leonard Nelson, with co-defendant Matthew Moore, with the first-degree murder of Harold Boss a.k.a. Harold Wilson, on May 6, 1990.[2] After a jury trial that ended on Marh 5, 1991, the jury found Defendant guilty of the lesser included offense of second-degree murder. On April 5, 1991, Defendant filed his motion for new trial and motion for post-verdict judgement of acquittal, which the trial court denied on July 9, 1991. On July 29, 1991, the trial court sentenced him to life in the custody of the Louisiana Department of Corrections without the benefit of parole, probation, or suspension of sentence. The Docketmaster does not reflect that Defendant filed a motion to reconsider sentence.

Through counsel Sherry Watters, Defendant appealed his conviction and sentence to the Louisiana Court of Appeals, Fourth Circuit in their docket number 1991-KA-2491. Petitioner's Original Brief to that court alleged five assignments of error:

ASSIGNMENT OF ERROR NO. 1
The trial court erred in commenting to prospective jurors during voir dire about the certainty that appeals would follow their decision (Tr. 3-4).

ASSIGNMENT OF ERROR NO. 3
The trial court erred in restricting the defendant's presentation of his case by disallowing relevant impeachment testimony and limiting cross examination concerning drug activity, possession of weapons and deals made between the State's witnesses and the district attorney, and by preventing the discovery of pertinent information relative to the State's key witnesses' drug activities and their known possession of weapons, while at the same time allowing improper cross examination of defense witnesses (Tr. 90,96,98,102,113,115, 126,129,136,161-8).

ASSIGNMENT OF ERROR NO. 4
The trial court erred in improperly instructing the jury as to "reasonable doubt" and "self defense" over defense objection (Tr. 218-9).

ASSIGNMENT OF ERROR NO. 5
The State failed to prove the defendant was guilty beyond a reasonable doubt of second degree murder; the evidence proves that the homicide was justifiable or, at worst, that the defendant was guilty of manslaughter.

Appellant's Original Brief 1991-KA-2491 unnumbered pages 6-7.

---

[2] All dates of events and filings specified in this Objection are taken from the Orleans Parish Docketmaster or Minutes for that event.

344-648 "H-D" St. art. 930.8 Obj.
to APCR, Page 5 of 12

The facts as they were found by the Fourth Circuit Court of Appeal are as follows.

Derrick Marigny testified that on May 6,1990 at 1:25 a.m., he, Harold Wilson and Curtis Miller were standing on the corner of Bruxelles and Treasure Streets outside of the End Zone Bar. They saw Leonard Nelson and Matthew Moore, whom they knew, cross the street coming toward them. Both the defendant Leonard Nelson and the co-defendant Matthew Moore drew guns. Nelson said, "Give it up. Give it up." Harold Wilson and Curtis Miller ran in one direction while Derrick Marigny ran in another. When Marigny realized Nelson and Moore had pursued Wilson and Miller and not him, he turned to see Wilson taking off his jewelry as he ran. Wilson slipped and fell. Nelson caught up to him. Harold Wilson said, "Please man, please don't kill me. Here you can take it. Please don't kill me." Leonard Nelson responded, "I got your ass now, man," and fired a shot as Wilson lay on the ground. Harold Wilson said, "I'm going to die. I'm going to die." Nelson fired again. Nelson then said to Matthew Moore, "Come on, kill this nigger." Derrick Marigny heard a third shot, but did not see who fired a gun. Leonard Nelson then reached down to take the jewelry, but fled when someone exited a nearby car.

Derrick Marigny then notice that his leg was bleeding and went to Charity Hospital. At Charity Derrick Marigny met Detective Norman Pearce, who was investigating the crime.

Curtis Miller told essentially the same story as Derrick Marigny. Miller testified that he did not have a gun and neither did Marigny nor Wilson.

Both Derrick Marigny and Curtis Miller denied that they and the decedent Harold Wilson had fired on Leonard Nelson and Matthew Moore several days before the Wilson murder.

NOPD Officer Kevin Williams testified he responded to a shooting call and found a gun within fifteen to twenty feet of victim. He spoke to witnesses Tracy Johnson and Christine Boatner.

Pearce testified the gun found near the victim was fully loaded. He conducted two photographic line-ups with Marigny and Miller and both identified Nelson and Moore.

Tracy Johnson testified that as he was leaving the End Zone Lounge, he saw the defendant Leonard Nelson and Matthew Moore approach Marigny, Miller and Wilson. Johnson saw Derrick Marigny reach under his shirt for a gun, but Johnson never saw the gun. Tracy Johnson further testified he heard one shot, turned around, and saw Leonard Nelson shoot Harold Wilson. Johnson said he had seen Marigny, Miller and Wilson sell cocaine.

Christine Boatner testified she saw Leonard Nelson and Matthew Moore approach Marigny, Miller and Wilson. She testified that both Nelson and Moore had guns drawn. She did not see the other three men with guns. Christine Boatner testified that she saw Wilson trip and that Leonard Nelson stood over Harold Wilson and shot Wilson three times.

Ruby Ory, an analytical toxicologist, testified the victim's body contained .02% alcohol, but that blood tests for cocaine were negative.

Fay Spruill, a forensic pathologist, testified the victim suffered three gunshot wounds and that the right chest wound was the fatal one. One of the wounds was caused by a shot fired from a distance of one and one-half feet to two feet. The other two wounds were from shots fired from a longer distance.

Walter Hebert testified for the defense. Hebert stated that he knew all three men. He further testified that three days before Wilson was killed, he, Marigny, Wilson

344-648 "H-D" St. art. 930.8 Obj.
to APCR, Page 6 of 12

and Miller fired on Nelson and Moore. Hebert stated that Derrick Marigny paid him in cocaine.

Gregory Davis testified he knew Marigny, Miller, and Wilson regularly distributed cocaine. Davis testified he met with Marigny and Wilson to enter into a contract to kill Nelson. Davis stated he then told Nelson about the meeting. According to Davis, on one occasion, he offered Nelson shelter in his apartment when someone began shooting at Nelson.

Gregory Julien, Henry Hudson and Craig Jones all testified they knew Marigny, Miller and Wilson were cocaine dealers. They further testified that Marigny, Miller and Wilson regularly carried guns.

Janet Perez said she saw Marigny and Wilson reach for guns when Nelson and Moore approached.

Eileen Winchester testified she knew Marigny, Miller and Wilson, knew them to be drug dealers, and knew they carried guns every day. She testified that she saw Marigny, Miller and Wilson shoot at Nelson and Moore on two occasions in the days immediately preceding the Wilson murder.

Leonard Nelson testified that he knew Marigny, Miller and Wilson sold cocaine in the St. Bernard Housing Project. He testified that he knew Harold Wilson worked fc-r Derrick Marigny. Leonard Nelson testified that on April 29, 1990 he saw Harold Wilson stash some drugs and then stand as a lookout point for police. Leonard Nelson and Matthew Moore stole some of Wilson's drugs while they were unguarded, but Harold Wilson saw them do it. Leonard Nelson and Matthew Moore smoked some of the cocaine and sold the rest. Nelson testified that subsequently and on two separate occasions, Derrick Marigny, Harold Wilson, and Curtis Miller shot at him and Matthew Moore. Leonard Nelson testified that on the night he killed Wilson, Gregory Davis told Nelson that Derrick Marigny had paid Davis to kill Nelson. Nelson testified that he and Moore borrowed guns. Nelson testified that he and Moore saw Marigny, Wilson, and Miller outside the bar. He further testified that Marigny, Wilson and Miller each had a gun. Nelson stated that the victim Harold Wilson said, "Come on man, let's kill them niggers." Nelson stated that Derrick Marigny fired first. Nelson fired once and ran. When he saw Wilson turn around, he fired two shots at him. Nelson testified that he threw the gun in the Mississippi River.

State v. Nelson, 91-KA-2491, pp. 1-3 (La. App. 4 Cir. 10/15/1992), 606 So.2d 1012 (Table of Unpublished Opinions).

At trial, State witness Derrick Marigny, the subject of Defendant's application Claim A, testified adamantly that he had not been offered anything for his testimony. (Trans. Trial pp. 39-49) The Fourth Circuit affirmed Defendant's conviction and sentence on October 15, 1992. That court specifically found each assignment to be without merit.

The record of this case contains no indication that Defendant sought review of his direct appeal at the Louisiana Supreme Court. Therefore, Defendant's conviction and sentence became final on October 29, 1992. La. C.Cr.P. art. 922(B).

The Docketmaster for this case indicates that the trial court denied a "Motion for Post Conviction Relief" on November 10, 1994 and another on June 5, 1996. The undersigned has not yet had the opportunity to review the complete Orleans Parish record in this case number and does

344-648 "H-D" St. art. 930.8 Obj.
to APCR, Page 7 of 12

not have copies of the pleadings or filings to which these entries refer so the State will supplement its objections if needed once these documents have been located.

The Docketmaster indicates that on several more occasions the trial court had before it a motion for production of documents or writ of mandamus. It cannot be assumed that these, or any other defense filings, were attempts to obtain the District Attorney's file. Notably, there is no activity from March 11, 2004 when Defendant's motion for production of documents was denied until June 23, 2015 when the minute clerk set the matter for a post conviction hearing.[3] See generally, Docketmaster entries June 16, 1993 and after.

On June 25, 2015 the trial court ordered that Defendant's motion for production of documents would not be considered.

On December 17, 2015 a post conviction hearing was set for January 5, 2016. On January 5, 2016 the trial court ordered that Defendant's motion for production of documents would not be considered.

On May 4, 2018 the clerk's office received a motion for contradictory hearing. No activity occurred again until January 22, 2019 when the case was set for another post conviction hearing on January 28, 2019. On January 28, 2019, the trial court ordered that Defendant's application for writs of habeas corpus and mandamus will not be considered. The Docketmaster entry for March 18, 2019 indicates the Louisiana Fourth Circuit Court of Appeals denied writ application numbered 2019-K-0168. The Louisiana Fourth Circuit Court of Appeals denied Defendant's writ application on March 8, 2019 on the same basis stating:

> WRIT DENIED.
> Relator seeks review of the trial court's January 16, 2019 ruling not to consider his application for a writ of habeas corpus and mandamus. We find no error in this ruling. See La. C.Cr.P art. 930.4 ("[a]ny claim for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered.").

Writ Decision 2019-K-01689 (La. App. 4 Cir. 3/8/2019) (not reported). The April 15, 2019 entry, indicates that Defendant filed pleadings at the Louisiana Supreme Court in their docket number 2019-KH-0595. The Louisiana Supreme Court provided the undersigned a copy of that writ application, which includes, among other things, a copy of the Application for Writs of Habeas Corpus and Mandamus and the judgment of the trial court issued January 16, 2019. That

---

[3] As this Court is well aware, the clerk of court's system has limited options for event entries and every setting that occurs after a defendant is convicted that does not fall into that specific, limited list of entries is entered as a "post conviction hearing" whether or not it involves an actual application for post conviction relief as defined by the Code of Criminal Procedure.

344-648 "H-D" St. art. 930.8 Obj.
to APCR, Page 8 of 12

application did not involve a request for the District Attorney's file but was a collateral attack on Defendant's conviction alleging insufficient evidence. The trial court denied that application as procedurally barred pursuant to La. C.Cr.P. art. 930.4. The Louisiana Supreme Court denied the writ application as untimely in a per curiam stating:

> Denied. The application was not timely filed in the district court, and applicant fails to carry his burden to show that an exception applies. La.C.Cr.P. art. 930.8; see State ex rel. Glover v. State, 93-2330, pp. 9-11 (La. 9/5/95), 660 So.2d 1189, 1195-96 (distinguishing habeas corpus from post-conviction relief and endorsing La.C.Cr.P. art. 351 and its cmt. (c), which states that "habeas corpus is not the proper procedural device for petitioners who may file applications for post conviction relief;" rather, it "deals with pre-conviction complaints concerning custody.").

> Applicant has now fully litigated his application for post-conviction relief in state court. Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana postconviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4 and within the limitations period as set out in La.C.Cr.P. art. 930.8. Notably, the legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Applicant's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final. Hereafter, unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, applicant has exhausted his right to state collateral review. The district court is ordered to record a minute entry consistent with this per curiam.

Writ Action 2019-KH-0595 (La. 11/5/19), 281 So.3d 660 (Mem.).

While that trial court's January 28, 2019 decision was being litigated in the appellate courts, the Docketmaster reflects that on April 16, 2019 the clerk's office received an application for writ of mandamus and that on April 24, 2019 a post conviction hearing was set for April 29, 2019. On April 29, 2019 the trial court ordered that Defendant's application for writ of mandamus was premature and would not be considered.

Also while that trial court's January 28, 2019 decision was being litigated in the appellate courts, the Docketmaster next reflects that the clerk's office received another application for writ of mandamus on July 18, 2019 and that on November 20, 2019 another post conviction hearing was set for December 3, 2019. On December 3, 2019 "Defendant's Application for Post Conviction Relief is denied." Docketmaster entry for 12/3/2019.

There is no Docketmaster activity on this matter until April 7, 2021 when it indicates the clerk's office received a motion to enroll counsel "on the limited issue of Petitioner's non-unanimous jury verdict." On May 6, 2021 that motion and a motion to stay the proceedings were granted. On June 22, 2021 the defense filed a motion to continue without date. The undersigned is unaware if this motion is still pending.

---

344-648 "H-D" St. art. 930.8 Obj. to APCR, Page 9 of 12

For reasons unknown to the undersigned, as the Docketmaster does not indicate any filing was pending at the time, current defense counsel and Assistant District Attorney Emily Maw appeared for a post conviction hearing on June 6, 2024, at which time Judge Buras self-recused. Judge Buras written reasons for recusal, which are dated June 7, 2024, and on June 13, 2024 the case was randomly reallotted to Section D of the Orleans Parish Criminal District Court.

The Docketmaster reflects that on June 27, 2024 the Orleans Parish Clerk of Court's Office received the instant application for post conviction relief.

As to all filings prior to June 27, 2024 the State will supplement with procedural objections if, once the entire court record has been made available and reviewed, the State finds that any other procedural objections are applicable.

The State now objects the application for post conviction relief as untimely filed and requests, pursuant to La. C.Cr.P. arts. 927 and 930, that if this Honorable Court overrules the procedural objections and that ruling becomes final in favor of Defendant, that the State of Louisiana be given a separate opportunity to file a written response on the merits of any claims not summarily dismissed by this Court.

## III.    PCR LEGAL REQUIREMENTS

As this Honorable Court is aware, the filing of an application for post-conviction relief with a state trial court prompts a specific set of Louisiana statutes and series of legal requirements. First, the court must determine if the application alleges any claim that, if established, would entitle Defendant to relief. La. C.Cr.P. art. 927. If Defendant does not meet this requirement, "[t]he application may be dismissed without an answer... ." La. C.Cr.P. art. 928. Additionally, "[a] petitioner is required to substantiate his claims for post-conviction relief." *State v. Jenkins*, 2014-1148 (La. App. 4 Cir. 5/6/15); 172 So.3d 27, 41, citing La. C.Cr.P. art. 930.2. This means that if the application for post-conviction relief is not substantiated properly, the court should likewise deny the application for post-conviction relief. This can, and should, be done by summary disposition. La. C.Cr.P. art. 929(A).

"A copy of any judgment granting or denying relief and written or transcribed reasons for the judgment shall be furnished to the defendant, the petitioner, the district attorney, and the custodian" of the facility where defendant is housed. La. C.Cr.P. art. 930.1. This is necessary, even if the judgment dismissed the petition without a response by the State, so that all parties can be prepared to respond if ordered to do so by an appellate court. It is important at this point to note

that the court may grant relief on only the limited grounds stated in La. C.Cr.P. arts. 926.1, 926.2, and 930.3. Based upon the pleading filed by Defendant, only Article 930.3 is applicable to this application for post-conviction relief. That Article mandates that:

> relief shall be granted only on the following grounds:
> (1)    The conviction was obtained in violation of the constitution of the United States or the state of Louisiana.
> (2)    The court exceeded its jurisdiction.
> (3)    The conviction or sentence subjected him to double jeopardy.
> (4)    The limitations on the institution of prosecution had expired.
> (5)    The statute creating the offense for which he was convicted and sentenced is unconstitutional.
> (6)    The conviction or sentence constitute the ex post facto application of law in violation of the constitution of the United States or the state of Louisiana.

La. C.Cr.P. art. 930.3 (sections 7 and 8, relative to La. C.Cr.P. arts. 926.1 and 926.2, are omitted).

Second, *only if* a petitioner states a claim that falls under La. C.Cr.P. arts. 926.1, 926.2, or 930.3 *and* that claim would legally entitle the petitioner to relief if it were properly established, then the Court "shall order...the district attorney in the parish in which the defendant was convicted, to file any procedural objections he may have, or an answer on the merits if there are no procedural objections... ." La. C.Cr.P. art. 927. "In any order of the court requiring a response … the court shall render specific rulings dismissing any claim which, if established as alleged, would not entitle the petitioner to relief" and the court "shall order a response only as to such claim or claims which, if established as alleged, would entitle the petitioner to relief." La. C.Cr.P. art. 927. The possible procedural objections are varied.

Third, if the State timely files procedural objections to the application for post-conviction relief, "no answer on the merits of the claim may be ordered until such objections have been considered and rulings thereon have become final." La. C.Cr.P. art. 927. Further, "unless the court has first ruled upon all procedural objections raised by the respondent, and such rulings have become final" the Court shall not order or conduct an evidentiary hearing on the merits of a claim, shall not receive any proffer of evidence over the objection of the respondent, and shall not address the merits of the claim or claims over the objection of the respondent. La. C.Cr.P. art. 930. However, a hearing on the procedural objections including argument and the taking of evidence that is limited to those procedural objections may be appropriate.

Fourth, once the court has dismissed all claims that would not entitle a petitioner to relief or are not established by the pleadings *and* rulings on any procedural objections are final *and* the court determines that the application for post-conviction relief and accompanying documents

properly substantiate the claim(s) made, *then* an evidentiary hearing "shall be ordered whenever there are questions of fact which cannot properly be resolved pursuant to Articles 928 and 929[]" on the remaining claim(s). La. C.Cr.P. art. 930; La. C.Cr.P. art. 927. Since at all times, "[t]he petitioner in an application for post conviction relief shall have the burden of proving that relief should be granted[]" and "[a] petitioner is required to substantiate his claims for post-conviction relief," before any evidentiary hearing or taking of testimony on an application for post-conviction relief can be held, petitioner must establish that an evidentiary hearing is necessary to prove any claim that remains. *State v. Jenkins*, supra; La. C.Cr.P. art. 930.2. In other words, Defendant must prove that there are questions of fact that cannot be resolved based on documents already in the record or attached to the parties' pleadings to obtain an evidentiary hearing.

## IV.    CONCLUSION

Based on the foregoing, the State of Louisiana prays that this Honorable Court:

Find that Defendant has not proven diligence regarding Claim A, regarding Derrick Marigny and, therefore, that Claim A is untimely pursuant to La. C.Cr.P. art. 930.8;

Find that Claims B, regarding the jury instruction as to self-defense, and Claim C, regarding ineffective assistance of appellate counsel are untimely pursuant to La. C.Cr.P. art. 930.8;

Sustain the State's procedural objection pursuant to La. C.Cr.P. art. 930.8; and

Dismiss Petitioner's application for post-conviction relief.

Respectfully submitted this day, July 12, 2024,

Patricia Amos, Bar No. 27029
Assistant District Attorney
Orleans Parish District Attorney's Office
619 South White St.
New Orleans, LA 70119
Telephone: (504) 822-2414
pamos@orleansda.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 12, 2024 a copy of the forgoing has been served on Defendant through his counsel by email to Korians@law.virignia.edu (the email on Defendant's application) and kelly@first72plus.org (the email on previous communications between the undersigned and defense counsel).

Patricia Amos, Bar No. 27029
Assistant District Attorney

🔍  Search by Name

Merritt / Clyde Merritt

# Clyde Darrow Merritt

Send Flowers

⌣ Share                          🔔 Follow

## Clyde Merritt Obituary

C lyde Darrow Merritt of New Orleans, LA age 82 passed away peacefully on Tuesday, December 11, 2012, at Ochsner Foundation Hospital. Beloved husband of Mary Lou Parr Merritt, father of Henry C. Merritt (Wendy), Darren P. Merritt (Julie) and Lee M. Merritt. Grandfather to Jack Merritt, Camille Merritt, Owen Merritt, and Aiden Merritt. Son of the late Henry Eugene Merritt and Anna Lee McNair Merritt and brother of the late Bruce Merritt (Margie). He is also survived by loving nieces and nephews. Clyde proudly served his country with the US Army and was a Korean War Veteran. Clyde also proudly served the legal community in News Orleans as a trial lawyer for 49 years; he retired in March of 2012. Relatives and family friends as well as members of the Lakeview community are invited to a memorial Mass which will be held at St. Dominic Church on Friday evening, December 14 at 7:00 p.m., with visitation beginning at 6:15 p.m. There will be a private burial. Clyde will be deeply missed and will be deeply loved and kept in our hearts, thought and prayers forever.

To plant trees in memory, please visit the Sympathy Store.

Published by The Advocate from Dec. 11 to Dec. 12, 2012.



State's
Exhibit 1

IN THE ORLEANS PARISH CRIMINAL DISTRICT COURT
STATE OF LOUISIANA

STATE OF LOUISIANA     )
     )
    v.     )     Docket No.:  344-648
     )     Section:    D
     )     Judge:    Holmes
LEONARD NELSON     )
     )

FILED: _____     DEPUTY CLERK: _____

**MEMORANDUM IN RESPONSE TO
STATE'S PROCEDURAL OBJECTIONS**

For decades, the District Attorney (1) denied the existence of *Brady* information in undisclosed files, and (2) falsely represented that the file was lost. In fact, it was in the District Attorney's possession all along. Now the District Attorney asserts that Mr. Nelson's application for post-conviction relief should be denied—merits notwithstanding—because he was not "diligent" enough in discovering that (contrary to their legal and ethical obligations) the District Attorney was withholding such information. Such procedural objections should be denied.

**LEGAL ARGUMENT**

**I.    Mr. Nelson's *Brady* Claims are not Procedurally Barred**

The District Attorney acknowledges that it never disclosed Mr. Nelson's file until 2022, notwithstanding decades of requests and litigation by Mr. Nelson seeking to obtain this information. "It is unfortunate that the file was not available to be provided to Defendant at the times he asked for it," the District Attorney acknowledges for the first time in their procedural objections. Still, the District Attorney insists, this Court should ignore valid constitutional infirmities with his conviction on procedural grounds.

While Mr. Nelson, in fact, engaged in lengthy and protracted efforts to obtain the *Brady* information at the heart of his claims—as detailed below[1]—this fact is actually a red herring. Mr.

---

[1]    To recap, as the District Attorney knows, the District Attorney has repeatedly rebuffed Mr. Nelson's efforts to gain access to the relevant information. On July 24, 2009, based on the District Attorney's representations, an Orleans Parish civil court found "as a matter of fact that the record no longer exists and is therefore unavailable to you." *See* OPDA File Vol 3, pg. 20 of 25. The court further found "as a matter of fact that Mr. Nelsons' request for his records was timely, that is that the DA had a duty to preserve you record for those three years, that within that three year period they did in fact have your record and had an ongoing duty to preserve it pursuant to your request[;] however I'm making a finding that they did not and do not have it." *Id.* at pg. 21 of 25. Nevertheless, Mr. Nelson *continued* his efforts to find the relevant information, including litigation for many years throughout the 2010's. Moreover, Mr. Nelson was entitled to rely on affirmative representations by the District Attorney that efforts to locate the file would be ongoing and that he would be notified if and when the requested information surfaced. For instance, in letters in 2005, 2006, and 2008, the District Attorney repeatedly replied to requests from Mr. Nelson stating, "Should the file be discovered the DA's office will notify

1

Nelson could have done *nothing* since the time of his conviction and his post-conviction petition would still be timely, based on the recent disclosure by the District Attorney of the "lost" *Brady* information. As the U.S. Supreme Court held in *Banks v. Dretke*, a defendant does not have a duty to find material exculpatory evidence that is being hidden by the State. *See* 540 U.S. 668, 698 (2004). The opposite is, in fact, true: "When . . . prosecutors conceal significant exculpatory or impeaching material *in the State's possession*, it is ordinarily incumbent on the State to set the record straight. *Id.* at 675-76 (emphasis added). When Mr. Nelson first went to trial and prosecutors opted not to disclose *Brady* information, the burden did not shift to the defendant to prove the State was violating its ethical duties. As the Court held in *Banks*: "It was not incumbent on [the defendant] to prove these representations false; rather, [the defendant] was entitled to treat the prosecutors' submissions as truthful." *Banks v. Dretke* 540 U.S. 668, 698 (2004).

In fact, it is difficult to imagine what *more* an incarcerated prisoner in Mr. Nelson's position could have done to compel a recalcitrant District Attorney's compliance with the Constitution and Louisiana public record laws. Should he have sued *again* and *again* even after a judicial determination that the District Attorney had breached their legal obligations to preserve the records? Should he have sent *even more money* to the District Attorney even after his money was returned to him? Should he have renewed his request after already receiving assurances from the District Attorney that "Should the file be discovered the DA's office will notify you immediately"? Engaging in further litigation would have been frivolous to the point of being sanctionable. The District Attorney's "procedural objections" cite no authority remotely hinting that Article 930.8's diligence requirement imposes such an obligation on petitioners, because no such obligation exists.

## II.    Mr. Nelson's Jury Instruction and IAC Claims are not Procedurally Barred

In addition to Mr. Nelson's *Brady* claim, Mr. Nelson seeks relief based on the manifestly erroneous self-defense instruction that jurors received (and his appellate counsel's failure to recognize this fact). To be clear, the *merits* of his claim are that he would have been found "not guilty" if the jurors were properly instructed on the law. The District Attorney's position appears to be: even if this Court were to agree that he should have been acquitted, he must die in prison because this critical flaw undermining the proceeding was discovered too late. Again, the Louisiana Code of Criminal Procedure does not command this result.

---

you immediately." Notably, although the District Attorney now reveals that the files were "rediscovered" as early as 2018, they were not actually *shared* with Mr. Nelson until 2022.

It is difficult to overstate the import of this error, particularly in a case where a defendant takes the stand to testify in support of a self-defense claim. "[W]here the defendant's proposed charge presents, when properly framed, a valid defense, and where there has been *some* evidence relevant to that defense adduced at trial, then the trial judge may not refuse to charge on that defense." *Strauss v. United States*, 376 F.2d 416, 419 (5th Cir. 1967) (emphasis added). When the accused presents a justification defense, they are admitting that: (1) *yes*, they caused bodily injury to the other person; and (2) *yes*, they did so purposefully or knowingly; *but only because* (3) they believed using the force that caused the injury at issue was necessary to protect themself from the other person's imminent use of unlawful force against them. *See, e.g.*, *Gilmore v. Taylor*, 508 U.S. 333, 364 (Blackmun, J., dissenting) (discussing how a defendant who testifies to self-defense "takes the stand and concedes the elements of murder in order to prove his affirmative defense."). The defendant is, in effect, admitting to the necessary elements of the offense in order to defend against the allegation as a whole. And as long as there is "*any* evidence which tended to show" that the accused's conduct was in self-defense, or at least "*some* evidence relevant" to that issue, then the jury *must* consider whether the State has met its burden of proof with respect to that defense. *See Stevenson v. United States*, 162 U.S. 313, 314-15 (1896) (emphasis added); *id*. at 315-16, 322-23 (ruling that, even if the "judge may be entirely satisfied, from the whole evidence in the case," that the accused committed the crime alleged without any complete or mitigating defense, "if there by any evidence fairly tending to bear upon the issue…it is the province of the jury to determine from all the evidence what the condition of mind was, and to say whether the crime" was committed or not).

At Mr. Nelson's trial, however, jurors were told that they should not consider self-defense an initial "preponderance of the evidence" threshold; there is zero basis in law for that instruction. And, erroneously, it communicated to jurors that they should *not* consider self-defense if they were only 75% convinced that the act was *not* justified (when, under Louisiana law, they should have acquitted).

This Court can and should reach the *merits* of Mr. Nelson's jury instruction and IAC claims for two independent reasons. First, Mr. Nelson's incompetent appellate attorney *did* raise claims related to his jury instructions on direct appeal (which the appellate court rejected). But for reasons that are entirely inexplicable, counsel failed to recognize the improper burden-shifting imposed by the trial court, and the appellate court (perhaps relying on appellate counsel to properly perform their role) did not notice it either when reviewing for errors patent. This is precisely the sort of rare

3

case that La. Code Crim. Proc. art. 930.4(A)'s "in the interest of justice" requirement exists to address. Under Article 930.4(A), a "claim for relief" that *has* been "fully litigated in an appeal" *can* be considered if "required in the interest of justice." Second, the importance of the error in the jury instruction was first noticed by pro bono counsel in 2024 *only because* of the belated discovery of *Brady* material contained within the District Attorney's (improperly withheld) files. In other words, the full import of the error regarding the self-defense instruction was not appreciated until the *Brady* information came to light. As explained above, because Mr. Nelson filed his claims within two years of learning of this information, and was "diligent" in attempting to discover this information previously, the claims can be evaluated on their merits pursuant to La. Code Crim. Proc. art. 930.8(A).

## CONCLUSION

WHEREFORE, based upon the above, the Petitioners pray this Court will reject the State's procedural objections and consider their claims on the merits. Should the court determine that genuine disputes of material fact exist as to the procedural objections, Mr. Nelson requests an evidentiary hearing where he may present additional evidence and call witnesses.

Respectfully Submitted,

_____

Thomas Frampton, La. Bar No. 35775
University of Virginia School of Law *(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: tframpton@law.virginia.edu

Kelly Orians, La. Bar No. 36920
University of Virginia School of Law *(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: Korians@law.virginia.edu

4

<u>Certificate of Service</u>

  I hereby certify that I have caused to be served electronically, by mail, or hand delivery in open court a copy of the foregoing document upon the prosecution on the date of the filing of the motion.

_____
Thomas Frampton, La. Bar No. 35775
University of Virginia School of Law
(*For identification purposes only*)
580 Massie Rd.
Charlottesville, Virginia 22903
tframpton@law.virignia.edu

5

CRIMINAL DISTRICT COURT

FOR THE PARISH OF ORLEANS


STATE OF LOUISIANA     CASE NUMBER: 344-648

VERSUS

Leonard Nelson




Transcript the motion in the above entitled Matter,
as heard before the *Honorable Judge Kimya M. Holmes*
presiding under the date of
September 20, 2024.


APPEARANCES:



FOR THE STATE:
BRAD SCOTT, ESQ.

FOR THE DEFENSE:
KELLY ORIANS, ESQ.





REPORTED BY: Allison Braxton

1

Certified Court Reporter
Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000056

P R O C E E D I N G S

THE COURT:

Now, can we start on Leonard Nelson, Kendrick Howard, Shawn Smith. Which one do you want to go to first? Wait hold on. Make your appearance please?

MS. ORIANS:

Hi, Kelly Orians on behalf of Leonard Nelson. As well as well as Shawn Smith and Kendrick Howard. Who are present on ZOOM.

THE COURT:

Is Patricia Amos coming, are you going to be here?

MR. SCOTT:

Brad Scott, on behalf of the State?

THE COURT:

Can you hear her?

MR. SCOTT:

If I listen hard enough, yes ma'am.

THE COURT:

Hold on one second.

MS. ORIENT:

Yes, we are starting with Nelson at the top.

THE COURT:

We are going to start with Leonard Nelson.

Ms. ORIANS:

Unable to hear.

THE COURT:

Can you not hear me?

MS. ORIANS:

I can hear you, Judge.

THE COURT:

2

So, we're going to begin with, this mike is not working the way I want it too but it's going to have to do for today.   We can start with Leonard Nelson. You want to start with argument, anyone?

MS. ORIANS:

We were not aware that, we were'nt planning on making any arguments today, Your Honor.   We were going to rest on our pleadings, unless we are going to schedule an evidentiary hearing in which time we would, of course, want to make argument and present witnesses.

THE COURT:

State, this is your procedural objections?

MR. SCOTT:

Yes, Your Honor.  Brad Scott, I'm standing in for Patricia Parker Amos.  She filed procedural objections.  We are resting on those pleadings also.  If the Judge wants to rule on those now that's fine.  If you want to set a hearing specifically on those procedural objections, that's fine too.  We are just ready for the Court to tell us how to move forward.

THE COURT:

And for the record the first is a ***BRADY*** violation being alleged by the Defense, correct?

MS. ORIANS:

Petition.

THE COURT:

Petitioner, yes?

MS. ORIANS:

3

Yes, Your Honor.  And I'm sorry to clarify we started with Leonard Nelson, not Kendrick Howard and Shawn Smith?

THE COURT:

Yes, Leonard Nelson.

MS. ORIANS:

Just to clarify.  Yes, Your Honor.

THE COURT:

He is, and Leonard Nelson is present on Zoom.

MR. SCOTT:

Thank you, Judge.

THE COURT:

I see two.  I'm a little confused because it says Leonard Nelson, twice.  So, will the real Leonard Nelson.

MS. ORIANS:

Oh, I see.  Yes.

THE COURT:

Will the real?

MS. ORIANS:

Leonard Nelson has that.

THE COURT:

All right, so that's the real.  So, who is on the top right?  Is that?

MS. ORIANS:

Kendrick Howard.

THE COURT:

Kendrick Howard?

MS. ORIANS:

Yes, ma'am.  And Shawn Smith is below Mr. Howard on my screen.

THE COURT:

4

No, Shawn Smith's name is on there correctly. It's just two Leonard Nelsons. MS. ORIANS:

Yes.

THE COURT:

Yes, Shawn Smith they are all present on via ZOOM. As it relates to Mr. Nelson, the first claim is his Brady claim. I will find that that is not procedurally barred. As it relates to the ineffective assistance of counsel, because it seems to me that the incorrect jury instructions and ineffective assistance of counsel kind of go together. Would you agree?

MS. ORIANS:

Yes, Ma'am.

THE COURT:

While I believe that that is in fact time barred. I will allow that to proceed as well in the interest of justice and that's as it relates to the second and third claim. So, my question is, I have no problem with setting this for an actual hearing as it relates to counts, claims 1, 2, and 3. When will y'all like that hearing? State?

MR. SCOTT:

What Ms. Amos asked me to get from the Court if you were going to proceed is a date to respond in writing on the merits. Is that something that you will be willing to do?

THE COURT:

That's fine.

MR. SCOTT:

Okay.

5

THE COURT:

How long does she believe she needs?   Thirty days?

MR. SCOTT:

Thirty days will be fine, Judge.

THE COURT:

I need a response on the merits by the State, October 21st.

MR. SCOTT:

October 21st?   Thank you, Judge.

THE COURT:

And from that point I will give the petitioners time to respond if needed to that.   How long do you think you need?   A week?

MS. ORIANS:

A week is fine, Your Honor.   Yes, Ma'am.

THE COURT:

All right so I will need your reply by October 28th. We can set this for, how is everyone looking on November 8th for a status hearing on this?   At that point I will have all other filings from both parties and I will either be willing to rule on that date or I'm going to need testimony. I'll let you all know on the 8th and we can set it for a day for testimony.

MS. ORIANS:

So, will it be okay if I were to appear on ZOOM on the 8th, Your Honor?

THE COURT:

That's fine.

MS. ORIANS:

That you the 8th worked.

MR. SCOTT:

6

November 8th, works Judge.

THE COURT:

All right, November 8th on Nelson.

MR. SCOTT:

Judge, as to the procedural objections.  Just note the State's objection for the record.

THE COURT:

Noted.

MR. SCOTT:

Thank you.

**REPORTER'S CERTIFICATE**

This certification is valid only for a transcript accompanied by my original signature on this page.

I, ALLISON BRAXTON, CERTIFIED COURT REPORTER, for the Criminal District Court, Parish of Orleans, State of Louisiana, Section "D", do hereby *CERTIFY* that the hereinbefore transcript was reported by me in the Stenomask reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

NOTE:   THIS CERTIFICATION IS ONLY VALID FOR A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL SIGNATURE AND OFFICIAL SEAL STAMP ON THIS PAGE.

_____

7

                                        Allison T. Braxton

                        Certified Court Reporter

New Orleans, LA.

8



**STATE OF LOUISIANA**    TIME_____    **CRIMINAL DISTRICT COURT**

**VERSUS**    **PARISH OF ORLEANS**

**LEONARD NELSON, ET AL**    **CASE NO. 344648 (D)**

DEPUTY CLERK
CRIMINAL DISTRICT COURT

## STATE'S NOTICE OF INTENT TO SEEK A WRIT OF REVIEW
## AND FOR EXTENSION OF RETURN DATE

NOW INTO COURT, comes the State of Louisiana, through the undersigned Assistant District Attorney for the Parish of Orleans, who respectfully informs the court that it intends to seek review of the ruling by this Honorable Court's ruling wherein:

1. The Court overruled the state's Code of Criminal Procedure article 930.8 procedural objection to the application for post-conviction relief.

The undersigned further moves for additional time in which to file the writ application, that this Court vacate the current filing deadlines for the State's response to the application for post-conviction relief and the Defendant's reply to the State's response, and that the Court convert the ruling date that is set for November 8, 2024, into the return date for the State's writ application and s status on the writ application for the following reasons:

1. Since the Court's ruling on the procedural objection on September 20, 2024, the underside was in preparation for and in the second-degree murder trial of State v. Kentrell Howard, 552-518 "I" that took place October 1-3, 2024;

2. Since the completion of State v. Howard, the undersigned has been absorbed with preparing the District Attorney's responses to two petitions for federal habeas at the United States District Court for the Eastern District of Louisiana, both of which are due on October 25, 2024. They are:

    a. Phillip Anthony v. Tim Hooper, Warden, 24-1352 "P" (2), the 1997 first-degree murder, capital trial of one of four defendants convicted in the robbery and shooting deaths of three employees at a Louisiana Pizza Kitchen restaurant in Orleans case #387-535 "G," the state court record for which consists of over 4,500 pages, and in which the federal court has declared it will not grant an extension; and

    b. Tyrone Duckett v. Tim Hooper, Warden, 24-2117 "H" (5), which is a conviction for second degree murder, attempted second degree murder, and obstruction of justice in Orleans case #536-589 "H," the state court record for which consists of over 1,300 pages;

St. Writ Intent & Mot. for Ext.
p. 1 of 2

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000064

3. The undersigned has been displaced from her office due health risks involved in construction over which she has no control; and

4. On Tuesday, October 15, 2024, the undersigned was diagnosed with an ailment to the rotator cuff in her right shoulder that has required that the right shoulder be immobilized.

WHEREFORE, the State intends to petition the Fourth Circuit Court of Appeal for a writ of supervisory review in this matter and moves this Court to vacate the current filing deadlines for the State's response to the application for post-conviction relief and the Defendant's reply to the State's response, and that the Court convert the ruling date currently set for November 8, 2024, into the return date for the State's writ application and a status on the writ application.

Respectfully Submitted,

s/ *PPAmos*

Patricia Amos (La. Bar #27029)
Assistant District Attorney
619 South White Street
New Orleans, LA 70119
Phone: (504) 822-2414
pamos@orleansda.com

## O R D E R

**CONSIDERING THE FORDOING MOTION;**

**IT IS HEREBY ORDERED** that the state of Louisiana be granted until November 8, 2024, to apply for writs of supervisory review and prohibition in this matter.

**IT IS FURTHER ORDERED** that the current filing deadlines for the State's response to the application for post-conviction relief and the Defendant's reply to the State's response are vacated.

**IT IS FURTHER ORDERD**, that the November 8, 2024, ruling date is converted to a writ status date.

**NEW ORLEANS, LOUISIANA**, this the _____ day of _____, 2024.

_____
The Honorable Kimya M. Holmes, Sect. D

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served by electronic mail, on all counsel of record simultaneous with its filing this day, Friday, October 18, 2024.

s/ *PPAmos*

Patricia Amos

St. Writ Intent & Mot. for Ext.
p. 2 of 2

IN THE ORLEANS PARISH CRIMINAL DISTRICT COURT
STATE OF LOUISIANA



STATE OF LOUISIANA

v.

LEONARD NELSON

Docket No.:    344-648
Section:       D
Judge:         Holmes

FILED: _____          DEPUTY CLERK: _____

### OPPPOSITION TO PROCEDURALLY IMPROPER
### "MOTION FOR EXTENSION OF RETURN DATE"

The State's belated request for an "Extension" (to a return date that has not yet been set) is procedurally improper and should be denied, and a lawful return date of October 19, 2024 be set and enforced. Indeed, it is ironic that—in a case in which the District Attorney has raised frivolous "procedural objections" to meritorious PCR applications—the same office blithely ignores the procedural rules that govern the *State's* conduct in such matters.

The proper procedures are set forth at La. Uni. R. Ct. Appeal. 4-2 and 4-3 and are mandatory. Briefly, if and only if a trial court judge and opposing counsel are given a "notice of intent," Rule 4-2, then a return date must be set which "*shall not exceed 30 days* from the date of the ruling at issue." Rule 4-3 (emphasis added). A trial court *may* "upon proper showing" extend a previously set return date, but only if an original return date has been set in the first instance, and only if a "proper showing" is made. *Id.*

Respectfully, petitioners believe that even if an October 19, 2024 had been previously sought and set, no "proper showing" to extend that date has been made. The State did not previously notice its intent to seek writs, did not object to the merits briefing schedule set by the court, did not request a transcript, and did not contact petitioner or seek consent for such a filing before submitting it to the court. Briefly, the State has known since September 20, 2024 of the court's ruling—and its deadline to respond *on the merits* to the pending PCR applications this coming Monday, October 21, 2024—but has chosen to take no action whatsoever until Friday, October 18, 2024. Though the State's explains at length why ADA Patricia Amos has been overburdened lately, it offers no explanation why ADA Brad Smith (who appeared on behalf of the State at the last setting) or another member of the District Attorney's Appeals Division has been unable to take any action in the case. In sum, the State has demonstrated no diligence whatsoever and there is no "cause" to extend the non-existent deadline.

1

Moreover, as explained in Petitioners' opposition to the State's "procedural objections," the arguments raised by the State are frivolous.

Accordingly, to the extent this Court is willing to entertain the State's belated "Notice," Petitioners request that a return date of no later than October 19, 2024 be set.

Respectfully Submitted,

Thomas Frampton, La. Bar No. 35775
University of Virginia School of Law *(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: tframpton@law.virginia.edu


Kelly Orians, La. Bar No. 36920
University of Virginia School of Law *(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: Korians@law.virginia.edu

Certificate of Service

I hereby certify that I have caused to be served electronically, by mail, or hand delivery in open court a copy of the foregoing document upon the prosecution on the date of the filing of the motion.

Thomas Frampton, La. Bar No. 35775
University of Virginia School of Law
(*For identification purposes only*)
580 Massie Rd.
Charlottesville, Virginia 22903
tframpton@law.virignia.edu

2

IN THE ORLEANS PARISH CRIMINAL DISTRICT COURT
STATE OF LOUISIANA

STATE OF LOUISIANA     )
     )
v.     )     Docket No.:   344-648
     )     Section:     D
     )     Judge:     Holmes
LEONARD NELSON     )
     )

FILED: _____     DEPUTY CLERK: _____

### RESPONSE TO NON-FILED MERITS OPPOSITION AND SUPPLEMENTAL OPPOSITION TO "MOTION TO EXTEND"

The latest an original return date could have been set was 30 days from this Court's ruling, but no return date was set, because the State was not diligent in requesting one. Now, more than 30 days have elapsed. Petitioner has already objected to the "extension" of return date, but now, because more than 30 days have elapsed since the Court's ruling, the trial court is without authority to grant the requested relief and set a "return date" for any future writ application the State might file. The Fourth Circuit has repeatedly "held that a trial court cannot extend the time for filing under Rule 4-3 after the time has expired." *Ross v. City of New Orleans*, 96-1853, p. 2 (La. App. 4 Cir. 9/13/96), 694 So.2d 973, 974, and has consistently denied writ applications on the basis of untimeliness. *Uddo v. Gusman*, 2024-0319 (La. App. 4 Cir. 7/8/24) (La. App. 4th Cir. July 8, 2024). While it is true that the State filed a "notice of intent" after 29 days and a request for a discretionary "extension" of the return date, it failed to show good cause why *more* than 30 days' time was appropriate. Thus, even if we assume that filing a "notice of intent" automatically entitled the State to the *maximum* allowable time (30 days from the ruling) even without the trial court's action, the State is still not entitled to file its later date. At most, the State *was* entitled to a return date that has already come and gone. As noted previously, the State has failed to show good cause for an extension: it did not explain why it failed to order a transcript of the trial court's ruling; why another member of the Appeals Division did not assist the ADA who filed the request; or why the State had failed to *begin* work on an application at any time over the past month. Petitioner respectfully asks the Court to consider the possibility that the request was made—not because of any good-faith disagreement with the trial court's ruling—but because the State realized that it did not have a response to file on the merits, and it was seeking to evade this Court's deadline of October 21, 2024 to file any such opposition.

Separate and apart from the question whether the State may now take an untimely writ application is the question of the State's deliberate non-compliance with this Court's order to file a merits response by October 21, 2024. The State's failure to comply with this Court's order (issued September 20, 2024) supports the hypothesis, suggested above, that the request for an "extension" as to the (non-existent) writ return date was meant primarily as a delay tactic. But it has independent significance. Whether or not the State wants to seek supervisory review of this Court's ruling on its procedural objections, it can and should have complied with this Court's order to file a merits response no later than the fixed deadline. The State clearly recognizes the importance of complying with procedural rules: Indeed, at this very moment, it is adopting the position that Petitioner should die in prison (even *if* his claims are meritorious) because he or his lawyers failed to timely assert them in earlier proceedings.

Accordingly, Petitioner respectfully requests that this Court deny the request for an "extended" writ return date (beyond the original 30 days); grant the pending petition on the merits; and set the matter for a bail hearing and retrial at the Court's earliest convenience.

Respectfully Submitted,

_____
Kelly Orians, La. Bar No. 36920
University of Virginia School of Law *(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: Korians@law.virginia.edu

2

<u>Certificate of Service</u>

I hereby certify that I have caused to be served electronically, by mail, or hand delivery in open court a copy of the foregoing document upon the prosecution on the date of the filing of the motion.

_____
Kelly Orians, La. Bar #36920
University of Virginia School of Law
(*For identification purposes only*)
580 Massie Rd.
Charlottesville, Virginia 22903
Korians@law.virignia.edu

3

STATE OF LOUISIANA

VERSUS

LEONARD NELSON

FILED: _____

CRIMINAL DISTRICT COURT

PARISH OF ORLEANS

CASE NO. 344-648 "D"

_____
DEPUTY CLERK OF COURT

**FILED**
TIME _____
NOV 07 2024
SIG: _____
DEPUTY CLERK
CRIMINAL DISTRICT COURT

## STATE'S OPPOSITION TO THE MERITS AND ARTICLE 930.4 OBJECTIONS TO APPLICATION FOR POST CONVICTION RELIEF FILED ON/ABOUT JUNE 27, 2024

**NOW INTO COURT,** comes the State of Louisiana, through the undersigned Assistant District Attorney, without any waiver, to object to and oppose the merits of Defendant's Application for Post Conviction Relief that was filed on or about June 27, 2024.

### STATEMENT OF THE CASE AND STATEMENT OF THE FACTS

A statement of the case and of the facts was included in the State's Article 930.8 Procedural Objection to Application for Post Conviction Relief Filed on Or About June 27, 2024 that was filed electronically with the Court and Clerk of Court on July 12, 2024. The State will not recite all of that information here, but specifically incorporates it into this filing and will include specific portions that are particularly relevant to this filing.

Defendant appealed his conviction and sentence to the Louisiana Fourth Circuit Court of Appeal in their docket number 1991-KA-2491 and alleged five assignments of error:

> ASSIGNMENT OF ERROR NO. 1: The trial court erred in commenting to prospective jurors during voir dire about the certainty that appeals would follow their decision (Tr. 3-4).
>
> ASSIGNMENT OF ERROR NO. 2: The trial court erred in denying the defendant's Batson challenge to the State's discriminatory use of its peremptory challenges during jury selection (Tr. 5-9).
>
> ASSIGNMENT OF ERROR NO. 3: The trial court erred in restricting the defendant's presentation of his case by disallowing relevant impeachment testimony and limiting cross examination concerning drug activity, possession of weapons and deals made between the State's witnesses and the district attorney, and by preventing the discovery of pertinent information relative to the State's key witnesses' drug activities and their known possession of weapons, while at the same time allowing improper cross examination of defense witnesses (Tr. 90,96,98,102,113,115, 126,129,136,161-8).
>
> ASSIGNMENT OF ERROR NO. 4: The trial court erred in improperly instructing the jury as to "reasonable doubt" and "self defense" over defense objection (Tr. 218-9).
>
> ASSIGNMENT OF ERROR NO. 5: The State failed to prove the defendant was guilty beyond a reasonable doubt of second degree murder; the evidence proves that the homicide was justifiable or, at worst, that the defendant was guilty of manslaughter.

(Appellant's Original Brief 1991-KA-2491 unnumbered pages 6-7 contained in Record on Appeal (ROA) attached to this filing) At trial, the State called Derrick Marigny to testify. Marigny is the

344-648 "D" St. Opp. to Merits of &
art. 930.4 Obj. to APCR, Page 1 of 14

subject of Defendant's application Claim A and testified adamantly at trial that he had not been offered anything for his testimony. (Trans. Trial contained in ROA attached to this filing) The Fourth Circuit affirmed Defendant's conviction and sentence on October 15, 1992. That court specifically found each assignment of error to be without merit. (*State v. Nelson*, 91-KA-2491, pp. 1-3 (La. App. 4 Cir. 10/15/1992), 606 So.2d 1012 (Table of Unpublished Opinions); ROA V. 2, unnumbered pages 1-20) The record of this case contains no indication that Defendant sought review of his direct appeal at the Louisiana Supreme Court and the cover page to the ROA Volume 1 indicates writs were not taken to that court. Therefore, Defendant's conviction and sentence became final on October 29, 1992. (La. C.Cr.P. art. 922(B))

The Docketmaster for this case indicates that the trial court denied a "Motion for Post Conviction Relief" on November 10, 1994 and another on June 5, 1996.

After numerous other entries that do not appear to be relevant to this application for post-conviction relief, on January 28, 2019, the trial court ordered that Defendant's application for writs of habeas corpus and mandamus will not be considered. Defendant sought review from the Louisiana Fourth Circuit Court of Appeals and the writ application was assigned their number 2019-K-01689. The writ application is included in the attached writ application to the Louisiana Supreme Court numbered 2019-KH-0595, which also includes a copy of the motion for writs of habeas corpus and mandamus to the trial court and the trial court's judgement. The motion for writs of habeas corpus and mandamus has no filing stamp but is hand dated February 11, 2019 while the judgment is dated January 16, 2019. The trial court ruled that pursuant to Louisiana Code of Criminal Procedure article 930.4, the "Application for Writs of Habeas Corpus and Mandamus" would not be considered.

The Fourth Circuit denied Defendant's writ application on March 8, 2019 explicitly relying upon Code of Criminal Procedure article 930.4 stating:

> WRIT DENIED.
>
> Relator seeks review of the trial court's January 16, 2019 ruling not to consider his application for a writ of habeas corpus and mandamus. We find no error in this ruling. See La. C.Cr.P art. 930.4 ("[a]ny claim for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered.").

(Writ Decision 2019-K-01689 (La. App. 4 Cir. 3/8/2019) (not reported but contained within writ application 2019-KH-0595 that is attached to this filing)) The Docketmaster entry for March 18, 2019 notes the Fourth Circuit's denial. Defendant sought review to the Louisiana Supreme Court which assigned that writ application their docket number 2019-KH-0595.

The Louisiana Supreme Court provided the undersigned a copy of that writ application, which is attached and includes, a copy of the writ application at the Fourth Circuit, a copy of the Application for Writs of Habeas Corpus and Mandamus to the trial court and the judgment of the trial court issued January 16, 2019. That application was a collateral attack on Defendant's conviction alleging insufficient evidence, an allegation that was raised on direct appeal in Assignment of Error number 5. The trial court denied that application as procedurally barred pursuant to La. C.Cr.P. art. 930.8. The Louisiana Supreme Court denied the writ application as untimely in a per curiam stating:

> Denied. The application was not timely filed in the district court, and applicant fails to carry his burden to show that an exception applies. La.C.Cr.P. art. 930.8; see State ex rel. Glover v. State, 93-2330, pp. 9-11 (La. 9/5/95), 660 So.2d 1189, 1195-96 (distinguishing habeas corpus from post-conviction relief and endorsing La.C.Cr.P. art. 351 and its cmt. (c), which states that "habeas corpus is not the proper procedural device for petitioners who may file applications for post conviction relief;" rather, it "deals with pre-conviction complaints concerning custody.").
>
> Applicant has now fully litigated his application for post-conviction relief in state court. Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana postconviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4 and within the limitations period as set out in La.C.Cr.P. art. 930.8. Notably, the legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Applicant's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final. Hereafter, unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, applicant has exhausted his right to state collateral review. The district court is ordered to record a minute entry consistent with this per curiam.

(Writ Action 2019-KH-0595 (La. 11/5/19), 281 So.3d 660 (Mem.))

While that trial court's January 16, 2019[1] decision was being litigated in the appellate courts, the Docketmaster reflects that on April 16, 2019 the clerk's office received an application for writ of mandamus and that on April 24, 2019 a post-conviction hearing was set for April 29, 2019. On April 29, 2019 the trial court ordered that Defendant's application for writ of mandamus was premature and would not be considered.

Also, while that trial court's January 16, 2019 decision was being litigated in the appellate courts, the Docketmaster next reflects that the clerk's office received another application for writ of mandamus on July 18, 2019 and that on November 20, 2019 another post-conviction hearing was set for December 3, 2019. On December 3, 2019 "Defendant's Application for Post Conviction Relief is denied." (Docketmaster entry for 12/3/2019)

---

[1] The undersigned believes she mistakenly typed the date of the trial court's ruling as January 28, 2019 on page 9 of the State's previous filing objecting to this APCR pursuant to Louisiana Code of Criminal Procedure article 930.8.

344-648 "D" St. Opp. to Merits of &
art. 930.4 Obj. to APCR, Page 3 of 1 Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000073

There is no Docketmaster activity on this matter until April 7, 2021 when it indicates the clerk's office received a motion to enroll counsel "on the limited issue of Petitioner's non-unanimous jury verdict." On May 6, 2021 that motion and a motion to stay the proceedings were granted. On June 22, 2021 the defense filed a motion to continue without date. The undersigned is unaware whether this motion has been ruled upon.

For reasons unknown to the undersigned, as the Docketmaster does not indicate any filing was pending at the time, current defense counsel and Assistant District Attorney Emily Maw appeared for a post-conviction hearing on June 6, 2024, at which time Judge Buras self-recused. Judge Buras issued written reasons for recusal, which are dated June 7, 2024, and on June 13, 2024 the case was randomly reallotted to Section D of the Orleans Parish Criminal District Court.

The Docketmaster reflects that on June 27, 2024 the Orleans Parish Clerk of Court's Office received the instant application for post-conviction relief.

The State previously objected to the application for post-conviction relief as untimely and now objects on the basis of Article 930.4 and opposes the merits of that application for post-conviction relief.

## PROCEDURAL OBJECTION PURSUANT TO LA. C.CR.P. ART. 930.4.

As this Court is aware, all Louisiana applications for post-conviction relief are subject to the rules set forth in La. C.Cr.P. articles 924 et seq. and, before a court may rule on the merits of any particular claim in an application for post-conviction relief, it first must find that there are no procedural bars to substantive consideration of that claim or, if any procedural bar exists, that the Defendant has established that an exception to that procedural bar applies to that particular claim. Therefore, the State addresses this before addressing any merits.

The Docketmaster for this case shows that Defendant filed several previous pleadings seeking collateral review of his conviction. The Docketmaster for this case indicates that the trial court denied a "Motion for Post Conviction Relief" on November 10, 1994 and another on June 5, 1996. Ultimately, the Louisiana Supreme Court held that Defendant's district court filing untimely in a per curiam and holding:

> Denied. The application was not timely filed in the district court, and applicant fails to carry his burden to show that an exception applies. La.C.Cr.P. art. 930.8
>
> …
>
> Applicant has now fully litigated his application for post-conviction relief in state court. Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana postconviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4 and within

the limitations period as set out in La.C.Cr.P. art. 930.8. **Notably, the legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory.** Applicant's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final. **Hereafter, unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, applicant has exhausted his right to state collateral review.** The district court is ordered to record a minute entry consistent with this per curiam.

(Writ Action 2019-KH-0595 (La. 11/5/19), 281 So.3d 660 (Mem.) (emphasis added))

La. C.Cr.P. article 930.4, in its current iteration, requires that:

> A. Unless required in the interest of justice, any claim for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered.
>
> B. If the application alleges a claim of which the petitioner had knowledge and inexcusably failed to raise in the proceedings leading to conviction, the court shall deny relief.
>
> C. If the application alleges a claim which the petitioner raised in the trial court and inexcusably failed to pursue on appeal, the court shall deny relief.
>
> D. A successive application shall be dismissed if it fails to raise a new or different claim.
>
> E. A successive application shall be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application.
>
> F. Any attempt or request by a petitioner to supplement or amend the application shall be subject to all of the limitations and restrictions set forth in this Article. In addition to serving the district attorney for the jurisdiction where the underlying conviction was obtained, any application filed after the first application for post conviction relief shall be served on the district attorney and the attorney general at least sixty days in advance of the hearing on the application. Both the district attorney and the attorney general shall have a right to suspensively appeal any order granting relief.
>
> G. All of the limitations set forth in this Article shall be jurisdictional and shall not be waived or excused by the court or the district attorney.

(La. Code Crim. Proc. Ann. art. 930.4.) The procedural bars against successive post-conviction filings are mandatory. (LSA–C.Cr.P. art. 930.4; *State v. Marshall*, 2014-2091 (La. 10/14/15), 177 So. 3d 324)

Since Article 930.4 presents threshold requirements, the State addresses this procedural bar before addressing the merits. Defendant alleges three claims in this application for post-conviction relief. They are titled in the legal argument section of his application as follows:

I.   Mr. Nelson's Conviction was obtained in violation of the United States and Louisiana Constitutions.

   A.   The State Failed to Disclose Exculpatory Evidence in Violation of Brady v. Maryland

      1.   The State Failed to Disclose Impeachment Evidence as to its Star Witness (Derrick Marigny), Failed to Disclose Evidence that Mr. Marigny Received a Deal in Exchange for his Testimony, and Failed to Correct his False Testimony

   B.   The Jury Was Mis-Instructed as to the Central Issue at Trial (Self-Defense)

344-648 "D" St. Opp. to Merits of &
art. 930.4 Obj. to APCR, Page 5 of Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000075

C.    Mr. Nelson's Counsel on Direct Appeal was Ineffective When She Inexcusably Failed to Argue that the Jury Instruction Impermissibly Placed on Mr. Nelson a Substantial Burden of Production[.]

Defendant's Claims I.B was raised on direct appeal and is, therefore, barred by Article 930.4(A). Since Defendant alleges in his Application that a portion of Claim B was not raised on direct appeal, this Court should recognize that any such portion would then be barred by Article 930.4(E). Contrary to Defendant's assertion in his footnotes 49 and 50 that this Court may entertain portions of this claim in the interest of justice, Article 930.4(E) contains no such exception and the similar exception in Article 930.8 does not apply to claims barred by Article 930.4(E). While the State maintains that this Court must dismiss Claim I.B as procedurally barred, the State additionally maintains that this claim is meritless and addresses the merits later in this filing.

Defendant's Claim I.C was not raised in any prior application for post-conviction relief and is, therefore, barred by Article 930.4(E). Article 930.4(E) contains no interests of justice exception and that exception in Article 930.4(A) and 930.8 do not apply to claims barred by Article 930.4(E). While the State maintains that this Court must dismiss Claim I.C as procedurally barred, the State additionally maintains that this claim is meritless and addresses the merits later in this filing.

## OPPOSITION TO THE MERITS

Throughout his claims Defendant makes only conclusory allegations and expects this court to believe his version of those allegations. Conclusory allegations, such as contained in this application for post-conviction relief, are insufficient to succeed on post-conviction relief or to even entitle defendant to a hearing because at all times it is Defendant's burden to prove the truth of his allegations. (La. C.Cr.P. art. 930.2)

**Claim I.A**

Specific to his argument in Claim I.A, Defendant has offered this Court nothing but assumption and speculation. Defendant repeatedly tells this Court that the State had offered Derrick Marigny a "deal" in exchange for his testimony. As "evidence" of this, he points to several documents he obtained from the District Attorney's file. However, it is important to look at those documents in context of this trial, ROA, and in their entirety so the State has attached copies of these documents to this opposition. An example of why a review of the ROA is important appears on page five of Defendant's Application where he includes snapshots of documents in which Defendant refers to the State's handwritten answers to questions 30 and 57 of a "motion for bill of particulars." What Defendant fails to tell this Court is that the document from which these

344-648 "D" St. Opp. to Merits of &
art. 930.4 Obj. to APCR, Page 6 of Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000076

snapshots are taken does not even appear in the Record on Appeal and the version in the District Attorney's file has no indication it was ever filed and is not signed by defense counsel. A different Application for Bill of Particulars and Motion for Discovery and Inspection appears in the Record on Appeal, Volume 1, at pages 126-132 and the State's Answer to Application for Bill of Particulars and Motion for Discovery and Inspection appears at pages 99-101. The Application for Bill of Particulars actually filed by Defendant does not even contain a question 57.

Defendant contends in this claim is that had the State disclosed this alleged "deal" he would have had the opportunity to cross examine Derrick Marigny about the alleged "deal" and that it is material under *Brady*. Defendant fails to inform this Court that the State asked on direct and defense counsel asked Marigny multiple times on cross examination whether he had been offered anything for his testimony. (*See* Trans. Trial pp. 10-49 for Marigny's entire testimony.) In one place, defense counsel even began the question with, "You're expecting[,]" but moved to another question. Each time he was asked, Marigny replies that he has received no offers or "deals." Defendant assumes Marigny lied, but this Court cannot make assumptions.

What the ROA shows is that the State informed the Court that it was unable to secure Marigny for trial when it filed for and obtained a Motion for Material Witness Bond in the amount of $25,000.00 for both Marigny and Curtis Miller on March 4, 1991. (ROA V. 1, pp. 90-91) The Record also shows that on March 4, 1991, Marigny testified at trial and denied that he had been offered anything in exchange for his testimony. (Trans. Trial pp. 10-49) Documents from the District Attorney's file show that the prosecutors believed Defendant to be the more culpable defendant, did not believe they could successfully convict co-defendant Moore, and sought to obtain the testimony of co-defendant Moore against Defendant: first seeking approval to modify his charges with a sentence of 20-25 years without benefits, then for a sentence of 15 years without benefits. (January 2, 1991 and February 23, 1991 memoranda, respectively, which are attached). Although Defendant has these documents as part of the information provided to him by the District Attorney's Office Civil Rights Division, he has failed to give this Court that context.

Additionally, documents from the District Attorney's file that Defendant does bring to this Court's attention show that on the day of Defendant's trial, Marigny came to court and agreed to testify without any consideration by the District Attorney's Office. (May 28, 1991 memorandum), the request to offer Marigny any consideration was denied (June 7, 1991 memorandum) and that Marigny believed at the time of Defendant's trial that "his own charges would be fully prosecuted."

344-648 "D" St. Opp. to Merits of &
art. 930.4 Obj. to APCR, Page 7 of 11
Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000077

(*Id.*) That memorandum also shows that Marigny had made attempts to better himself and that the prosecutor believed Marigny would be in danger if he were incarcerated for a lengthy period. (*Id.*) The ROA shows Marigny testified as to why he was testifying and denied any offer of assistance from the District Attorney's Office, which is consistent with what the prosecutor said in her memorandum on June 7, 1991.

Months after Defendant's trial, in August 1991, a prosecutor who was not involved in Defendant's case requested authorization to not seek multiple offender adjudication against Marigny. The August 29, 1991 memorandum in which ADA O'Bannon sought and received permission to reduce co-defendant Moore's charge in this case shows that the prosecutor believed the case against Moore had not improved and had, in fact, become worse because "Our whole case depends on the theory that that [sic] the two defendants killed Harold Boss during the perpetration of an armed robbery or attempted armed robbery. The Nelson jury did not believe that an armed robbery or an attempt was in progress. They felt from the circumstances that Nelson specifically intended to kill, ergo, second degree murder. Moore, on the other hand, did not fire his weapon once, and fled the scene rather than shot [sic] Harold's body. He did not approach Harold with Leonard, and made no demands to Harold. He remained on the corner away from Leonard and Harold. The "principal" argument is not a feasible one." (August 29, 1991 memorandum attached.) The District Attorney's documents further show that "Ms. McDonald and [ADA O'Bannon] recommended the NO Bill to Derek Marigny because of the safety factor." (*Id.*) While Defendant wants this Court to believe that the August 1991 memorandum indicates that the prosecutors promised Marigny something in exchange for his testimony, this makes no sense. The August 1991 memo was written after Marigny was convicted of drug offenses and after the State had not sought to adjudicate Marigny a multiple offender, a decision that the prosecutor later stated to her supervisor undermined the State's ability to prosecute Defendant's co-defendant Moore.

Regardless of whether the prosecutors had initially sought to assist Marigny with his charges and were denied, what matters is whether Marigny expected to receive that benefit. Marigny repeatedly denied that he expected anything and the memoranda confirm that Marigny believed his charges would be fully prosecuted. Nothing presented to this Court shows that Marigny had any expectation of receiving a benefit from the State for his testimony, therefore nothing was withheld from Defendant.

344-648 "D" St. Opp. to Merits of &
art. 930.4 Obj. to APCR, Page 8 of 11
Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000078

The simple fact is that the evidence at in this ROA and post-conviction proceedings shows that no offer of assistance was made to Marigny for his testimony, that Marigny testified "Because Harold was like a brother to me, and they killed … he's the only child. And they took that lady only child, they took a good friend of mine[,]" like he said at trial, and, in their full context, the documents now referred to by Defendant do not show anything different. (Trans. Trial p. 48; memoranda attached) Defendant has not proven otherwise and cannot do so.[2] No evidentiary hearing is needed to determine this issue and the evidence shows it is without merit and should be denied.

**Claim I.B**

Here, Defendant primarily alleges the trial judge's jury instruction "breaks with well settled case law in three ways: 1) the Judge improperly tasked the jury with deciding whether or not a self-defense claim was properly raised by the defense, 2) the Judge improperly instructed jurors that the standard for determining if a self-defense claim was properly raised by the defense is "preponderance of the evidence," 3) although the Judge properly instructed the jury that it was the State's obligation to rebut a self-defense claim, he failed to specify what burden of proof applied (strongly hinting that disproving self-defense by a preponderance of the evidence was sufficient)." (APCR p. 15) These are virtually identical to the argument Defendant made at the Louisiana Fourth Circuit Court of Appeal on direct appeal. (ROA V. 1, unnumbered Appellant Orig. Brief Argument No. 4) The Fourth Circuit found this Assignment of Error to be without merit. It specifically stated that "the defense may not complain of the inadequacy of its own jury charge." (Opinion, p. 15 ROA V. 2) The Fourth Circuit also pointed out in its Opinion on Defendant's direct appeal, the Defendant focused only on a small portion of the jury instructions and failed to consider that portion in the context of the whole on appeal, which he has also done so here, and the instructions read by the trial judge were consistent with those requested by trial counsel. The State has attached to this opposition the entire Record on Appeal so that this Court can see the full picture and context of the jury instructions that appear in Volume 2. This Court is not at liberty to second guess the decision of the Fourth Circuit Court of Appeal on this issue despite Defendant now attempting to put a new spin on the same argument.

---

[2] Marigny answered questions about possible assistance with his charges at trial and it is now impossible to ask Marigny any questions; the District Attorney's Office Civil Rights Division determined before they transferred this matter to the Appeals Division that Marigny is deceased.

344-648 "D" St. Opp. to Merits of &
art. 930.4 Obj. to APCR, Page 9 of 14

Therefore, in addition to being procedurally barred by Louisiana Code of Criminal Procedure article 930.4, this claim is without merit and should be denied.

**Claim I.C**

Here, Defendant alleges ineffective assistance of appellate counsel. Since this was not raised in Defendant's previous application(s) for post-conviction relief, it is barred by Article 930.4(E). Article 930.4(E) contains no interests of justice exception and that exception in Article 930.4(A) and 930.8 do not apply to claims barred by Article 930.4(E). Therefore, this Court must dismiss this claim on that basis.

The claim is also without merit. Defendant specifically states, "although Mr. Nelson's appointed attorney with the Louisiana Appellate Project recognized that she had a responsibility to review the jury instructions, she inexcusably failed to recognize that the jury instruction impermissibly placed on Mr. Nelson a burden of production requiring him to demonstrate by a "preponderance of the evidence" that he acted in self-defense." (APCR p. 19) However, Defendant's appellate counsel could not raise that issue on appeal. This is because "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." (La. C.Cr.P. Art. 841) Per the Louisiana Supreme Court, issues "not submitted to the trial court for decision will not be considered by the appellate court on appeal. Constitutional issues are no exception." *State v. Williams*, 830 So.2d 984, 988 (La. 2002) (citing *Vallo v. Gayle Oil Co.*, 646 So. 2d 859 (La. 1994).

Following the jury's retirement to deliberate, trial counsels made the following objections and motions for mistrial, all of which were denied:

> I object and move for a mistrial based on the definition of reasonable doubt given to this jury.
> ...
> I object and move for a mistrial based on the definition of criminal intent emphasizing the criminal intent required in a homicide. ...
> Object and move for a mistrial in the emphasis made by the court when it charged on the aggressive doctrine, when it charged on justification by saying, "but, please note."
> ...
> I object and I ask the court to bring the jury down and convince them that self-defense must be proven beyond a reasonable doubt.
> ...
> I object to the court failing to give a full listing of charges that we gave or any one of those dealing with the refinement of justification.
> ...
> Finally, as you are denying ... have not advised the jury about the requirement of proof beyond a reasonable doubt in the absence of justifiable homicide, move for a mistrial as to that.

344-648 "D" St. Opp. to Merits of &
art. 930.4 Obj. to APCR, Page 10 of 11
Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000080

(ROA V. 2, Trans. Trial 218-221) As can be easily seen, trial counsels did not object to the preponderance language. In fact, as the Fourth Circuit pointed out (Opinion p. 14, ROA V. 2), trial counsel requested the jury be charged using the preponderance language the trial judge used. (Requested Charge 2 ROA V. 1, p. 66; Requested Charge 21 ROA V. 1, p. 85) Therefore, appellate counsel was prohibited from raising this particular argument on appeal and cannot be considered ineffective for following the law. *State v. Dressner*, 2018-0828 (La. 10/29/18), 255 So.3d 537.[3]

## CONCLUSION

Based on the foregoing, the State of Louisiana prays that this Honorable Court deny and dismiss all claims in this application for post-conviction relief as explained in this pleading.

Respectfully submitted this day, November 7, 2024,

Patricia Amos, Bar No. 27029
Assistant District Attorney
Orleans Parish District Attorney's Office
619 South White St.
New Orleans, LA 70119
Telephone: (504) 822-2414
pamos@orleansda.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 7, 2024 a copy of the forgoing pleading, without attachments since Defendant has already been provided copies of each of the documents attached to this pleading, has been served on Defendant through his counsel by email to Korians@law.virignia.edu (the email on Defendant's application) and kelly@first72plus.org (the email on previous communications between the undersigned and defense counsel).

Patricia Amos, Bar No. 27029
Assistant District Attorney

---

[3] If Defendant were to now attempt morphing this claim into an ineffective assistance of trial counsel claim it would undoubtably be procedurally barred by La. C.Cr.P. art. 930.4(E), to which there is no interest justice exception, and cannot legally be considered by this Court.

344-648 "D" St. Opp. to Merits of &
art. 930.4 Obj. to APCR, Page 11 of 11

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000081

FILED
TIME _____

SIG _____
DEPUTY CLERK
CRIMINAL DISTRICT COURT

IN THE ORLEANS PARISH CRIMINAL DISTRICT COURT
STATE OF LOUISIANA

STATE OF LOUISIANA )
)
)
)
)
LEONARD NELSON )
)

Docket No.:   344-648
Section:      D
Judge:        Holmes

FILED: _____          DEPUTY CLERK: _____

### JOINT MOTION FOR IMMEDIATE RULING ON JURY INSTRUCTION CLAIM

The parties agree that the State's filing of November 7, 2024—as it relates to the self-defense issue (pages 4-6, 9)—contains untimely raised procedural objections that are not properly before the Court and may be disregarded by the Court. The parties agree that the question of the accuracy of the self-defense jury instruction is fully briefed and should be ruled upon at the Court's earliest convenience. Should the Court agree with the petitioner that relief is warranted on Petitioner's self-defense jury instruction claim (Claim I.B), the parties agree that the matter is ripe for immediate ruling, as such ruling may render the December 17, 2024 hearing date moot.

Respectfully submitted,

**/s/ Brad Scott**_____
**Brad Scott, La Bar No. 32680**
Assistant District Attorney
619 South White Street
New Orleans, LA 70119
Phone: (504) 234-166
Email: bscott@orleansda.com

**Thomas Frampton (La. Bar No. 35775)**
580 Massie Road
Charlottesville, VA 22903
c: 202-352-8341
e: tframpton@law.virginia.edu
Counsel for Leonard Nelson

IN THE ORLEANS PARISH CRIMINAL DISTRICT COURT
STATE OF LOUISIANA

| | | |
|---|---|---|
| STATE OF LOUISIANA | ) | |
| | ) | |
| v. | ) | Docket No.:  344-648 |
| | ) | Section:  D |
| | ) | Judge:  Holmes |
| LEONARD NELSON | ) | |
| | ) | |

FILED: _____                    DEPUTY CLERK: _____

### MOTION FOR RULING ON JURY INSTRUCTION CLAIM AND
### MOTION TO CANCEL EVIDENTIARY HEARING ON *BRADY* CLAIM AS MOOT

Now, into Court, comes Petitioner Leonard Nelson, who respectfully moves the Court as follows:

### I.    PROCEDURAL BACKGROUND

For three decades, Mr. Nelson diligently requested (and even sued to obtain) *Brady* information contained in the District Attorney's files. *See* PCR Application, \*1-\*10; *Petitioner's Memorandum in Response to State's Procedural Objections*, \*1-\*2. The State's Response: Mr. Nelson was not "diligent" in pursuing the records the State concealed and (falsely) claimed no longer existed. *See State's Procedural Objections*, \*3-\*4 ("Defendant has not, at this point, proven the diligence component required by 930.8(A)(1). . . ."). This Court rejected the State's procedural objections in September 2024 and ordered the State to respond to the PCR application *on the merits* by October 21, 2024.

On October 24, 2024, Petitioner asked this Court to grant his petition because the State disregarded this Court's order to respond on the merits, thus waiving the right to do so. *See Petitioner's Opposition to Procedurally Improper "Motion for Extension of Return Date"* (filed Oct. 18, 2024); *Petitioner's Response to Non-Filed Merits Opposition* (filed Oct. 24, 2024) . Then, the evening before Mr. Nelson's November 8, 2024 court date, the State filed a new pleading consisting almost entirely of *new* (untimely) procedural objections. *See State's Opposition on the Merits*, \*4-\*6, \* 9. Based on the State's last-minute representations, the Court decided to set Mr. Nelson's case back for five weeks to review the record, and to hold an evidentiary hearing (if necessary) on the *Brady* claim if necessary.

But the State's latest filing misses the mark. **On the merits**, there is no actual dispute that Mr. Nelson was convicted based on a self-defense instruction that mangled to relevant law, improperly assigning to Mr. Nelson an initial "preponderance of the evidence" burden. And

**procedurally**, apart from being untimely, the State's filing badly misrepresents the record. As explained in Mr. Nelson's PCR Application, though appellate counsel *did* raise some arguments with respect to the jury instructions, she *did not* argue that the trial court illegally shifted the initial burden to Mr. Nelson. The result of the State's latest misrepresentation is dramatic: Mr. Nelson (who skipped cancer treatment to attend court on Friday) may spend an extra month in prison, including what may be his final Thanksgiving away from his family due to his colon cancer diagnosis; the Court will be forced to expend significant resources consulting the record; and *pro bono* counsel for Mr. Nelson will be obliged to expend significant resources to return to Louisiana for further proceedings court. Accordingly, Mr. Nelson asks that the Court rule on his jury instruction claim (now fully briefed) at the earliest opportunity.

## II.    THE MERITS

On the merits, there is no dispute that Mr. Nelson's jury was mis-instructed as to the central issue in the case: the law of self-defense. The trial court's improper jury instruction was the following:

> If you find by a preponderance of evidence that the defendant has raised the defense of justification, then the burden is upon the state to show that the homicide was not committed in self-defense.

ROA 56-57 (Jury Charge Tx., *13-*14). The instruction was improper because it improperly assigned to the defendant an initial "preponderance of the evidence" burden of production, when no such concept exists under Louisiana law. As explained by Mr. Nelson in his PCR application and in earlier briefing, because Mr. Nelson did not deny committing the shooting in question, the sole issue in the case was self-defense. *See* PCR Application, *15-*18. It was a close case, one in which jurors could have believed Mr. Nelson acted in self-defense, or might have believed that Mr. Nelson *probably did not* act in self-defense but that the State *did not prove lack of justification beyond a reasonable doubt* (in which case a properly instructed jury should have returned a "not guilty" verdict).[1] Accordingly, the jury instructions regarding self-defense—and, in particular, the allocation of the relevant burdens—were critically important. *Id.* If the jurors were 25% convinced that the evidence supported a finding of self-defense, they might have concluded that Mr. Nelson

---

[1]    Notably, the jury *rejected* the State's theory that the killing occurred during an armed robbery, finding Mr. Nelson "not guilty" of that offense, even though it was a central piece of the State's theory of the case. This provides substantial support for the contention that a properly instructed jury would have sided with Mr. Nelson on the self-defense issue.

had failed to satisfy his initial burden (and refused to consider the plea of self-defense), even though Louisiana law dictates that such a defendant is legally innocent.

Apart from ignoring Mr. Nelson's timely objection to the self-defense charge that was read to the jury, the trial court erroneously rejected the following (correct) proposed charge:

> When an accused pleads self-defense, suggesting that the killing was justifiable, he undertakes no legal burden. The burden, when self-defense is at issue, is not upon the defendant to prove that his actions were reasonable and believed necessary, but rather upon the State to show that the actions were not in self-defense. In other words, once the plea of self-defense has been interposed the burden of proof does not shift to the defendant to prove to your satisfaction and beyond a reasonable doubt that the killing was justifiable. . . .

*See* Defense Requested Jury Charge No. 1 (ROA 137). The trial court also erroneously rejected a similar (and similarly correct) proposed charge:

> The burden of proof of the facts relating to a plea of self-defense rests, not upon the defendant, but upon the State. As self-defense is not a special plea, the burden of proof rests upon the State to show, beyond a reasonable doubt, that the killing was done feloniously, and not in self-defense, in order to convict the party accused of felonious homicide.

*See* Defense Requested Jury Charge No. 5 (ROA 141).

**The State has raised no merits defense on this point,** nor could the State, because it is undisputed that the trial court gave an incorrect instruction. The question of whether the Defendant has put self-defense "at issue" is not a jury question, and the Defendant does not need to satisfy any "preponderance of the evidence" burden on this point. That was true at the time of trial. *See State v. Savoy*, 418 So. 2d 547, 550 (La. 1982) ("The State has the entire and affirmative burden of proving beyond a reasonable doubt that a homicide was not perpetrated in self-defense. The defendant who raises the issue of self-defense does not assume any burden of proof whatsoever."); *State v. Ardoin*, 54 So. 407, 407 (La. 1911) (reversing murder conviction where "the onus of proof [was] made to shift from the state to defendant" on question of self-defense). It remains true today. *State v. Bridges*, 2023-0166 (La. App. 4 Cir. 5/17/24) (La. App. 4th Cir. May 17, 2024) ("In a homicide case in which the defendant asserts he acted in self-defense, the State has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense.").

### III.    THE STATE'S LATEST FILING GROSSLY MISCHARACTERIZES THE RECORD IN SUPPORT OF (ANOTHER) UNTIMELY PROCEDURAL OBJECTION

Instead of offering a response **on the merits (as ordered by the trial court)**, the State grossly mischaracterized the record in its November 7, 2024 pleading attempting to raise a new,

untimely procedural objection.[2] Specifically, rather than argue that jurors *were* properly instructed (or otherwise respond to the case law cited in Mr. Nelson's PCR, *see* PCR Application, \*15-\*18) as ordered in September 2024, the ADA assigned to the case falsely stated that a "virtually identical" argument had already been rejected by the Fourth Circuit, and that "[t]his Court is not at liberty to second guess the decision of the Fourth Circuit Court of Appeal on this issue[.]"[3] *See State's Opposition to the Merits*, \*9. Moreover, the State's filing improperly suggested that Mr. Nelson himself had asked for the jury instruction that the jurors ultimately received. *Id.*, \*9 (misleadingly quoting portion of appellate opinion in which Fourth Circuit "specifically stated" that "the defense may not complain of the inadequacy of its own jury charge"). To be clear, this is simply false, and at no time has the Fourth Circuit ever suggested (in Mr. Nelson's case or any other case) that a homicide self-defense jury instruction should place an initial "preponderance of the evidence" burden on the defense.

As correctly explained in the PCR application, Mr. Nelson's new attorney on direct appeal raised some *different* issues with the self-defense jury instructions (which were flawed in multiple respects), and it is true that the Fourth Circuit rejected these different arguments. But inexplicably, appellate counsel failed to contest the most important flaw: that jurors were erroneously told that Mr. Nelson had the initial burden of production with respect to self-defense. No Louisiana court has ever held—in Mr. Nelson's case, or any other—that the jury should be instructed to first decide whether the defendant has properly cleared a "preponderance of the evidence" threshold before evaluating the question of self-defense. All of this was clearly (and accurately) explained in Mr. Nelson's PCR Application. *See* PCR Application, \*15-\*18.

## IV.  CONCLUSION

The State has done everything possible to keep this Court from considering Mr. Nelson's various PCR claims—including his claim that the jury instructions badly mangled the law of self-defense—on the merits. The State will lose on the merits (and has presented no legal argument why the jury instructions were correct). So, instead, the State has sought delay after delay,

---

[2]   There is a particular irony to this untimely tactic. On the one hand, the State appears to argue that Mr. Nelson (even if *substantively* innocent), must die in prison because of his failure to follow *procedural* requirements (i.e., his lawyer did not timely raise certain points). Yet the State shows little regards for the trial court's orders or the procedural rules that govern post-conviction relief proceedings.

[3]   No hint of this argument was contained in the State's procedural objections filed in July 2024. There is an obvious explanation why: If the State had attempted to make the misleading representations at that time, Mr. Nelson could have responded (and rebutted them) as part of his Memorandum in Opposition to the State's Procedural Objections that he filed then.

including willfully disregarding this Court's orders to file a timely merits response. Accordingly, Mr. Nelson asks for the unusual step of cancelling the forthcoming court dates and issuing an immediate ruling on the merits of the jury instruction claim.

Respectfully submitted,

**Thomas Frampton (La. Bar No. 35775)**
580 Massie Road
Charlottesville, VA 22903
c: 202-352-8341
e: tframpton@law.virginia.edu

5



IN THE ORLEANS PARISH CRIMINAL DISTRICT COURT
STATE OF LOUISIANA

STATE OF LOUISIANA )
)
)
v. )  Docket No.: 344-648
)  Section:    D
)  Judge:      Holmes
LEONARD NELSON )
)

FILED: _____          DEPUTY CLERK: _____

## REPLY MEMORANDUM TO STATE'S MERITS OPPOSITION

### I.    The State's Merits Opposition to Claim I

The State repeatedly faults Petitioner for identifying only circumstantial evidence that its star witness was offered a deal to testify, and for "assum[ing] Marigny lied." *See* Merits Opposition, p.7. The State appears to argue (implicitly) that if Petitioner is unable to definitively prove the existence of an express *quid pro quo*, his *Brady* and *Napue* claims must fail. Yet in making this argument, the State's "Merits Opposition" to Claim I fails to cite a single legal authority, and entirely ignores the governing legal standard for claims brought under the Due Process Clause. *See id.*, p. 6-9 (citing no cases and ignoring governing legal standards).

The relevant question is *not* whether Mr. Nelson can prove that Marigny was offered a deal in exchange for his testimony, but rather, whether there is a "reasonable probability" that undisclosed information hidden in the District Attorney's files for nearly 30 years could have undermined jurors' confidence in Marigny's testimony. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). The suppressed evidence—which, at minimum, suggests the existence of a deal and definitively proves that Marigny lied on the stand—was material in this case. The jurors already rejected Marigny's testimony in significant part, a fact that the secret DA files expressly recognized; had prosecutors fully complied with their constitutional obligations, there is a "reasonable probability" the outcome would have been different. *Id.*; *see also* DA Memo (6/7/91) ("Without [Marigny's] testimony, we would not have had sufficient evidence to convict Leonard Nelson."); *see also* DA Memo (8/29/91) (". . . [I]t is highly improbable that we can prove that Matthew Moore specifically intended to kill Harold Boss as a principle to First Degree Murder. Our whole case depends on the theory that the two defendants killed Harold Boss during the perpetration of an armed robbery or an attempted armed robbery. The jury [in Nelson's trial] did not believe that an armed robbery or an attempt was in progress.")

Consider, for example, the (now undisputed, though long-hidden) evidence that Marigny initially insisted that the only way he would testify is if prosecutors cut him a deal on his multiple drug cases. *See* DA Memo 6/7/91 ("Prior to the first trial, Mr. Marigny stated that he would not testify unless the office offered him a deal concerning his outstanding drug charges."). Just as they did at trial, prosecutors now emphasize in their pleading: "The simple fact is that . . . Marigny testified '[b]ecause Harold was like a brother to me, that they killed . . . he's the only child. And they took that lady only child.'" Merit's Opposition, p. 9. This is, of course, a compelling narrative, which is why the State *still* emphasizes it three decades later: Surely such an altruistic witness's testimony should be credited! But imagine how differently the trial might have gone if the Petitioner could have immediately attacked Marigny's testimony at trial with the following hidden in the prosecutors' files:

> O'Bannon and I prosecuted the co-defendant Leonard Nelson, and a verdict of second degree was returned.
>
> Prior to the first trial, Mr. Marigney stated that he would not testify unless the office offered him a deal concerning his outstanding drug charges. (See cases 341-057, 342-951, and 343-461.) The charges against Mr. Marigny are simple possession of cocaine and two counts of PWITD cocaine. If you will recall, I approached you before regarding Mr. Marigny's request. At that time, you indicated that this office would offer no deals in return for his testimony. We relayed this information to Mr. Marigny who in turn stated he would offer no assistance in our trial.

*See* DA Memo (6/7/91). Had prosecutors shared this information, Petitioner's trial counsel could have immediately attacked Marigny as a self-interested drug dealer who sought to barter his testimony to receive an unwarranted benefit in his multiple drug-dealing cases. At the end of the day, it's actually irrelevant whether Marigny was subjectively motivated by fond feelings for Harold or his mom (or, alternatively, by the hope for or a promise of favorable treatment from the District Attorney). What matters is that a reasonable juror might have questioned Marigny's veracity if prosecutors had done what the Due Process Clause requires by disclosing the above impeachment information in their files. The State's failure to share this information (until 30 years later) violates *Brady* and its progeny.

The State similarly ignores the undisputed fact that Marigny repeatedly lied about being a drug dealer—a disputed point that was central to the defense's theory of the case—but failed to correct Marigny's false testimony in violation of *Mooney/Napue*. Specifically, defense counsel

2

attempted (very unsuccessfully) to portray Marigny as a drug dealer, and Marigny (very

successfully) parried these attacks. To offer just one example:

| | |
|---|---|
| Q [by defense counsel]: | Isn't it a fact that you deal cocaine occasionally from that corner, Foy and Milton? |
| BY [Ms. McDonald]: | Objection, Your Honor. |
| A: | I deals cocaine from no corner at all. |

Trial Tr. at 42. But prosecutors *knew* this testimony was a lie, and they had overwhelming

evidence, hidden in their own undisclosed files, to show this. Imagine how different the outcome

might have been if ADA Mary McDonald had told the jurors, as she was obliged to do, the

following after Mr. Marigny's testimony:

> Members of the Jury, I regret to tell you that I am obligated to share some information known to the State at this time. While we still think you should believe Mr. Marigny's testimony that Mr. Nelson was the aggressor, the State knows that Mr. Marigny testified falsely just a moment ago. Indeed, he has previously told me, personally, that he would plead guilty to multiple different charges of distributing cocaine on Milton St. if we would treat him as a "no bill" in those cases, and that he was willing to testify against Mr. Nelson *only* if we did so. In fact, we're prosecuting Mr. Marigny in those three drug-dealing cases because we have overwhelming evidence that he is a drug dealer.
>
> Let me share with you the evidence, from our personal files, that leads me to believe that our star eyewitness just lied. On April 12, 1989, two NOPD officers saw Marigny throw a clear plastic bag of cocaine to the ground one block off of Milton Street. Marigny and the woman he was with were both arrested, but we had to drop the charges against Marigny when the woman stated under oath that the drugs were hers. On January 16, 1990, he was arrested about 50 feet away from that spot on Milton Street. Six NOPD officers caught Marigny red-handed as he tried to conceal a plastic bag containing more than 60 rocks of crack cocaine under some leaves. We only charged him with possession in that case, which is pending now. But on March 19, 1990, in the exact same spot, the Narcotics Strike Force arrested him again with 28 pieces of crack cocaine on his person; he's facing PWIT charges for that one. Somehow that didn't stop him. After a Confidential Informant told NOPD that he was *still* selling crack cocaine from the exact same spot on Milton St., on April 9, 1990, another team of NOPD officers arrested him yet again: Once more, he had dozens of rocks of crack cocaine and more than $1350 in cash on him at the time of his arrest. The shooting in this case occurred on May 5, 1990. In our private notes, we've written that these cases are airtight; there are no real weaknesses in our case to speak of. And we can put him in prison for over 100 years if and when we convict him of these PWIT charges because of his past violent criminal history.
>
> In an ideal world, all of this would have come out through an effective cross-examination of our witness. But defense counsel didn't do a great job, he didn't have all this information, and frankly, Marigny just outsmarted him. Members of the jury, this does not make Marigny a liar with respect to his testimony against Mr. Nelson. But in the unusual circumstance where I put someone on the stand as a key witness in our case-in-chief, and I know he's lied about something material, and the falsity of his testimony is *not* exposed by defense counsel, I have to tell you that. Defense counsel has a duty to win; the State has a duty to see that justice is done, win or lose. So that's what I'm doing here.

*See* DA File, Cases No. 334-550, 341-057, 342-061, 342-951. Petitioner respectfully submits that

if Ms. McDonald had done what she was both legally and ethically obligated to do, there is a

reasonable likelihood that the result could have been different. *See generally* LAFAVE, ET AL., 6 CRIMINAL PROCEDURE § 24.3(d) (4th ed.) ("The duty to correct false evidence"); *Napue v. Illinois*, 360 U.S. 264 (1959) (extending "Mooney principle" to situations where prosecutor fails to correct false testimony of State's witness, even where prosecutor has not suborned perjury); Poulin, *Convictions Based on Lies: Defining Due Process Protection*, 116 PENN. ST. L. REV. 331 (2011) (discussing "prosecution knowledge" requirement and collecting, *inter alia*, cases in which false testimony does not involve government culpability).

Obviously, defense counsel believed that Marigny was lying, but this awareness does not absolve prosecutors of their responsibility to correct the testimony. *United States v. Sanfilippo*, 564 F.2d 176, 177–78 (5th Cir.1977) (holding defendant's due process rights were violated despite defense awareness at trial that prosecution witness's testimony was false, emphasizing that "the duty to correct the false testimony of a Government witness is on the prosecutor"). Nor can prosecutors argue (improbably) that Ms. McDonald might have secretly harbored some doubt as to whether Marigny truly was a cocaine dealer. *See* LAFAVE, ET AL., 6 CRIMINAL PROCEDURE § 24.3(d) (4th ed.) ("The duty to correct false evidence") ("[T]he Court has indicated that the *Mooney* principle does not require actual knowledge by the prosecution of the perjured testimony."). Would the foregoing monologue have proven awkward for prosecutors? Of course. But that is a risk that prosecutors ran when they chose to build a homicide case around the testimony of key eyewitness who they knew to be a crack dealer. The State has the burden of showing beyond a reasonable doubt that the failure to correct this false and misleading testimony was harmless. *See* LAFAVE, ET AL., 6 CRIMINAL PROCEDURE § 24.3(d) (4th ed.) ("The duty to correct false evidence") (discussing lower materiality standard for "false testimony" cases as compared to *Brady* cases). They are nowhere close to meeting that burden here. *See also Trepal v. Secretary, Florida Dept. of Corrections*, 684 F.3d 1088, 1108 & n.22 (11th Cir.2012) ("The *Brady* materiality standard 'is substantially more difficult for a defendant to meet than the "could have affected" standard under *Giglio*.'" (citation omitted)); *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir.1993) (contrasting the materiality standard applicable to *Brady* claims with that applicable to "claims that the prosecution has knowingly used perjured testimony or false evidence").

## II.    The State's Merits Opposition to Claim II

As previously briefed, the State has made *no* merit's opposition to Claim II.

### III.    The State's Merits Opposition to Claim III

The State appears to argue (again, without citing *Strickland* or the relevant cases governing ineffective assistance of counsel) that Mr. Nelson was not denied effective assistance of appellate counsel because appellate counsel was somehow barred from challenging the jury instructions on appeal. Frankly, that is nonsense. The self-defense instruction that was provided to jurors was *not* the instruction requested by Mr. Nelson; Mr. Nelson proposed *correct* jury instructions regarding self-defense (which were not given); and trial counsel timely objected to the instruction at trial. The issue was preserved for appeal, which is further evidenced by the fact that appellate counsel *did* raise some concerns about the self-defense instruction on appeal and the Fourth Circuit rejected them. Yet appellate counsel inexplicably failed to raise the best argument that the self-defense instructions in this case were deficient. Any competent attorney should have been able to look at these jury instructions and recognize: "Huh, that's weird that there's an initial burden that the defense must clear! That doesn't appear anywhere in Louisiana law!" The State has cited to no authority to suggest that a reasonable attorney might think that such an instruction was proper. And the State has not even attempted to argue that Mr. Nelson was not "prejudiced" by the deficient performance.

For the foregoing reasons, Petitioner asks that his claims be granted.

Respectfully submitted,

Thomas Frampton La. Bar. No. 35775
University of Virginia School of Law
*(For Identification Purposes Only)*
Charlottesville, VA 22903
tframpton@law.virginia.edu

Kelly Orians, La. Bar #36920
University of Virginia School of Law
*(For identification purposes only)*
580 Massie Rd.
Charlottesville, Virginia 22903
Korians@law.virignia.edu

5

Certificate of Service

I hereby certify that I have caused to be served electronically, by mail, or hand delivery in open court a copy of the foregoing document upon the prosecution on the date of the filing of the motion.

Thomas Frampton La. Bar. No. 35775
University of Virginia School of Law
*(For Identification Purposes Only)*
Charlottesville, VA 22903
tframpton@law.virginia.edu

6

CRIMINAL DISTRICT COURT

PARISH OF ORLEANS

STATE OF LOUISIANA


STATE OF LOUISIANA                    CASE NO. 344-648

VERSUS

LEONARD NELSON                        SECTION "D"



POST CONVICTION HEARING


***************

Transcript of Post Conviction Hearing in the above-captioned
 and numbered case held before the HONORABLE KIMYA HOLMES,
Judge presiding on Tuesday, the seventeenth day of December,
2024.



PRESENT:

BRADLEY SCOTT, ESQ.,            Assistant District Attorney


KELLY ORIANS, ESQ.,            Attorney for the Defendant,
                                    Leonard Nelson

THOMAS FRAMPTON, ESQ.          Attorney for the Defendant,
                                    Leonard Nelson




REPORTED BY:

Cindy L. Welch, CCR

Certified Court Reporter

<u>INDEX</u>

<u>TESTIMONY OF PROFESSOR KELLY ORIANS:</u>

Direct Examination by Mr. Frampton . . . . . . . .  4

Cross-examination by Mr. Scott . . . . . . . . . . 45

Redirect Examination by Mr. Frampton . . . . . . . 49

<u>ARGUMENTS</u>

Argument by Mr. Frampton . . . . . . . . . . . . . 52

Argument by Mr. Scott  . . . . . . . . . . . . . . 59

Rebuttal Argument by Mr. Frampton  . . . . . . . . 72

**2**

PROCEEDINGS

THE COURT:

Leonard Nelson.

MR. FRAMPTON:

Good morning, Your Honor.  We're prepared to proceed, Mr. Nelson is here.  My co-counsel, Kelly Orians, I believe is in the hallway.

THE COURT:

I'm about to go in the hallway.  And if I go in the hallway, I promise you all I will not be coming back until 2025.

MR. FRAMPTON:

We're prepared to proceed, Your Honor.

MR. SCOTT:

Brad Scott on behalf of the State.

THE COURT:

Nelson, come on down.

All right, this is your case.  I'm listening.

MR. FRAMPTON:

Good morning, Your Honor.  Thomas Frampton and Kelly Orians on behalf of Leonard Nelson, who's present in court.

We're set today for an evidentiary hearing.

MR. SCOTT:

Brad Scott on behalf of the State.

THE COURT:

Call your first witness.

MR. FRAMPTON:

Your Honor, at this time Mr. Nelson calls Kelly Orians.

3

(The witness was sworn and took the stand.)

KELLY ORIANS,

after being duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

MR. FRAMPTON:

And, Your Honor, we've exchanged premarked exhibits with the State.  I have a courtesy copy for the State -- for the Court.  About 20 exhibits, that I will try to introduce as quickly as possible.  But would the Honorable Court like a courtesy copy of what we are --

THE COURT:

Yes, please.

MR. FRAMPTON:

-- planning to introduce in advance?

THE COURT:

Take your time, nobody was here on time for work.  So take your time.

MR. FRAMPTON:

Thank you, Your Honor.

Good morning, Ms. Orians.

DIRECT EXAMINATION

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.  Would you please introduce yourself to the Court, and state where you work?

A.  Kelly Orians.  O-r-i-a-n(as in Nancy)-s(as in Steven).  I'm a law professor at the University of Virginia School of Law.

Q.  And, Professor Orians, what is your connection to this case?

**4**

A. I've been representing Mr. Leonard Nelson for the purposes of pursuing post-conviction relief.

Q. And at the outset of your representation of Mr. Nelson, did you at any time execute with Mr. Nelson a waiver of some kind with the District Attorney's Office for Orleans Parish?

A. Yes, I did.

Q. Would you recognize it if I showed it to you?

A. Yes.

MR. FRAMPTON:

I'm holding what's been previously marked as Defense Exhibit 2. A copy has been provided to the State.

Your Honor, may I have permission to approach the witness? And may I ask for standing permission to move things along?

THE COURT:

Granted.

MR. FRAMPTON:

Okay. I'm handing the witness a copy of Defense Exhibit 2.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. Professor Orians, what is Exhibit 2?

A. This is a Discovery Cooperation and Confidentiality Agreement, executed by myself and Mr. Nelson with the Orleans Parish District Attorney's Office.

Q. And what did Mr. Nelson have to give up as part of that Waiver Agreement?

A. He had to agree not to use any materials

5

provided by OPDA in a lawsuit against OPDA or NOPD related to misconduct in his case.

Q. Okay. Is it a true and accurate copy of the Waiver Agreement?

A. Yes.

MR. FRAMPTON:

At this time we'd offer, file, and introduce Defense Exhibit 2.

MR. SCOTT:

No objection.

THE COURT:

Granted.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. Now at the beginning of this case, did the DA finally give over the DA file in Mr. Nelson's case?

A. Yes, they did.

Q. And was it just with respect to Mr. Nelson, or was it also for some other defendants that the DA's Office had prosecuted?

A. It included other DA files in other cases.

Q. And in total how many pages, ballpark, worth of documents did the DA's Office finally give over?

A. Several thousand. About half a gig -- gigabyte of data.

Q. Okay. And did you copy that information in any form?

A. I copied and pasted it on a thumb drive. A USB drive.

Q. And if I gave you a copy of the thumb drive, would you be able to identify it?

**6**

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000099

A.    Yes.

Q.    All right.

MR. FRAMPTON:

Your Honor, a copy of the thumb drive has been provided to the State, as well. Permission to approach with Defense Exhibit 1?

MR. SCOTT:

Thomas, what number was --

MR. FRAMPTON:

2 first, and then 1.

MR. SCOTT:

Okay.

(The witness was handed Defense Exhibit 1.)

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.    What is Defense Exhibit 1?

A.    This is a full copy of the files provided to me by OPDA, copied onto a disc.  Onto a drive.

Q.    Is it a true and accurate copy of the files that were tendered to you?

A.    Yes.

Q.    And how do you know that?

A.    Because I did it myself.

Q.    Okay.

MR. FRAMPTON:

At this time we'd offer, file, and introduce Defense Exhibit 1.

THE COURT:

Admitted.

MR. FRAMPTON:

Now only because we have some issues

**7**

related to Mr. Nelson's diligence that's been raised by the District Attorney's Office, I have a series of questions regarding that.

The Court has already ruled on that matter, but in an abundance of caution, I'd ask the Court's indulgence to admit four or five exhibits related to that matter.

THE COURT:

That's fine.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.    Did the DA's file include any correspondence involving Mr. Nelson's efforts over the past 33 years to get these documents?

A.    Yes.

Q.    And would you recognize some of those documents and correspondents if I showed it to you?

A.    Yes.

MR. FRAMPTON:

I'm holding what's been previously marked as Defense Exhibit 7.  Approaching the witness.  Handing the witness what has been previously marked as Defense Exhibit 7.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.    Professor Orians, what is Defense Exhibit 7?

A.    It contains a series of letters sent by OPDA to Mr. Nelson in response to his numerous requests for a copy of his DA file.

Q.    And is that over the series of several years?

A.    It's over the series of almost 30 years.

Q.    Okay.  Hang on to that document for now.  At any point did Mr. Nelson have to sue to get a

**8**

copy of these files?

A. Yes, he did.

Q. And how do you know that?

A. Because I have read the transcript of -- that resulted from the hearing on the matter in Civil District Court.

Q. Was that also in the DA's file?

A. Yes.

MR. FRAMPTON:

I'm holding what's been previously marked Exhibit 6.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. Would you recognize that if I showed it to you?

A. Yes.

MR. FRAMPTON:

Handing the witness a copy of Defense Exhibit 6.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. Professor Orians, what is Defense Exhibit 6?

A. A Transcript of the proceeding in Civil District Court in response to Mr. Nelson's lawsuit against OPDA to get a copy of his files.

Q. Now at this point, when Mr. Nelson sued, had he paid the District Attorney's Office to get his file?

A. Yes.

Q. How much did he pay?

A. About $147.50 (one hundred and forty-seven dollars and fifty-cents).

Q. And do you know, Mr. Nelson, was he working

9

at the time at Angola to help pay for that request?

A.   Yes.  He worked in the fields of Angola for 28 years.

Q.   And how much was he paid for working in the fields at Angola?

A.   $.04 (four cents) an hour.

Q.   Okay.  And in response to that lawsuit, did the District Attorney's Office ever file a sworn affidavit regarding what had happened to Mr. Nelson's records?

A.   Yes.

Q.   And what did they say?

A.   The Affidavit signed by John Rohr outlined Mr. Nelson's numerous, over a dozen, public requests under the Public Records Act for his records.  As well as his payment of $147.50 (a hundred and forty-seven dollars and fifty-cents).

Q.   Then why wasn't the DA's Office giving it over, according to the sworn Affidavit?

A.   They had at one point located the files, and then misplaced them.

Q.   Okay.  Would you recognize a copy of that Affidavit if I showed it to you?

A.   Yes.

THE COURT:

     Is that D-3?

MR. FRAMPTON:

     Your Honor, 3 through 7 are out of order.  But yes, it is --

THE COURT:

10

Okay.

MR. FRAMPTON:

-- Exhibit -- Defense Exhibit 3.

THE COURT:

I'm just trying to keep up.

MR. FRAMPTON:

Yes, Your Honor.

I'm approaching the witness with Defense Exhibit 3.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. Professor Orians, what is Defense Exhibit 3?

A. The Affidavit signed by John Rohr.

Q. And the DA's Office swore the file was gone?

A. And -- Yes. The Affidavit notes that the file was misplaced.

Q. At some point subsequent to that, did the DA's Office --

THE COURT:

Wait. I'm -- Just know I'm going to interject, because I have questions. So because the writing is very small, and my eyes are getting very old. "Gone" is one thing, "misplaced" is something else. So I need to -- I need us to use the same language, so I understand what they're saying.

Did they say it was located, and then lost? As is lost in Katrina, we will never get it back? Or we had it, we put it somewhere, and we don't know where it is now?

MR. FRAMPTON:

Your Honor, in an abundance of caution,

11

the digital copy that is Defense Exhibit 1 is the highest quality version of all of them. So I defer to what's in the Affidavit. I can ask the witness to specify.

THE COURT:

Thank you.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. Professor Orians, what happened to the DA's file, according to the sworn statement?

A. Item 7 on the Affidavit notes, "Affiant certifies that in all requests for Case 344-648 from offsite storage, subsequent to the 27th day of April, 1994, the record was missing from its designated box."

Item 8 notes, "To the best of affiant's knowledge and beliefs, Case 344-648 was lost or misplaced." Item 9 notes, "Affiant has no reason for the absence of Case 344-648, nor does he know the current location of the record. Further, he does not know if any person has custody of the record, nor does he know the manor or method of circumstance that led to its loss."

Q. And to be clear though, the DA's Office had lost that long before Katrina?

A. Yes.

Q. Okay. At some point --

THE COURT:

How do we know that? Because of the previous requests beforehand.

MR. FRAMPTON:

Because Mr. Nelson's requests began 33

**12**

years ago.

THE COURT:

And this is dated by John Rohr June of 2009.

MR. FRAMPTON:

Correct.

THE COURT:

Okay.  Continue.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.   At some subsequent to that 2009 Affidavit, did the DA's Office find Mr. Nelson's file?

A.   Yes, they did.

Q.   Okay.  How do you know that?

A.   Because a letter was sent from Devin Fleming to the Civil Rights Division, noting that the record had been located in 2018.  Scanning had begun and continued into 2019.

Q.   Was Mr. Nelson notified in 2018 or 2019 that they'd found their file?

A.   No, he was not.

Q.   Okay.  When the DA's Office finally got in touch with Mr. Nelson, did they apologize for the length of delay?

A.   Yes, they did.

Q.   And how do you know that?

A.   A letter was sent from Julia Merritt in the Civil Rights Division to Mr. Nelson, notifying him that his records had been located.

Q.   And those last two letters that you just referenced from Devin Fleming and Julia Merritt, were those -- copies of those

13

letters found in the DA's file?

A.   Yes, they were.

MR. FRAMPTON:

Holding what's been previously --

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.   Would you recognize them if you saw them?

A.   I would.

MR. FRAMPTON:

Holding what's been previously marked as Defense Exhibit 4 and 5.  Approaching the witness with the Exhibits.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.   Professor Orians, what are Defense Exhibit 4 and 5?

A.   Defense Exhibit 4 is a letter from Julia Merritt to Mr. Nelson.  Defense Exhibit 5 is a letter from Devin Fleming to Julia Merritt.

MR. FRAMPTON:

Your Honor, at this point, we'd offer, file, and introduce Defense Exhibits 3 through 7.

THE COURT:

Admitted.  Hold on, I have 3, 4, 5, 7. I was looking for 6.  You said 3 through 7?

MR. FRAMPTON:

Yes, Your Honor.  3 is the Affidavit, 4 --

THE COURT:

I have that.  I don't recall you doing anything with 6.  That's the only reason why I'm asking.

MR. FRAMPTON:

**14**

6 was the Transcript from the hearing.

The civil lawsuit to obtain the records.

THE COURT:

Okay.  Got it.  Proceed.

MR. FRAMPTON:

All right.

So that's the genesis of the records.  I want to spend a little bit of time talking about the evidence that came out at trial. Just by way of laying the foundation and explaining the relevance of the NAPUE and BRADY evidence that we're going to talk about later in the hearing.

So if I could just briefly ask you a few basic questions.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.  In Mr. Nelson's murder trial, what was the prosecution's theory of the case?  What did the State allege that Mr. Nelson had done?

A.  The State alleged that Mr. Nelson, and his co-defendant Matthew Moore, committed an armed robbery against Harold Wilson, Derrick Marigny, and Curtis Miller on the night of May 6, 1990.  And in the course of that armed robbery, Mr. Wilson was shot and killed, and Mr. Marigny was wounded.

Q.  And what were the objects of the robbery that were alleged?

A.  A chain, and some earrings.

Q.  Okay.  Did Mr. Nelson deny shooting the victim?

A.  He did not.

15

Q. Okay. What was the defense theory of the case?

A. That at the time of the shooting Mr. Nelson feared for his life.

Q. And why did Mr. Nelson fear for his life? Again, according to the defense side of the case.

A. About a week prior to the -- to May 6, 1990, Mr. Nelson and Mr. Moore stole an amount of cocaine from Mr. Wilson, and his associates. In response, Mr. Wilson put a hit out on Mr. Nelson and Mr. Moore.

Twice -- At least two times prior to May 6, Mr. Nelson and Mr. Moore were shot at by people that Mr. Wilson had engaged to kill Mr. Moore and Mr. Nelson. As well as Mr. Wilson and his associates have shot at them, as well.

Q. And in the night in question of the incident, was there a more immediate reason why Mr. Nelson feared for his life?

A. Because when Mr. Moore and Mr. Nelson saw Mr. Wilson and his associates outside of the End-zone Lounge, they were armed. Mr. Wilson and his associates were armed.

Q. Okay. What evidence was there that the Defense offered at trial in support of the theory that you just laid out? Was it just the -- the lawyers arguing, or was there witness testimony to that effect?

A. There were witnesses who testified that they were engaged by Mr. Wilson to kill Mr. Moore

**16**

and Mr. Nelson.

Q. So somebody took the stand and said, "I tried to kill Mr. Nelson"?  Or was hired to do so?

A. Yes.

Q. Okay.  And what else?

A. There was also a gun found at the scene, about 15 to 20 feet from Mr. Wilson.

Q. Okay.  And did Mr. Nelson testify?

A. Mr. Wilson also testified.

Q. Okay.  And --

A. Oh, sorry, Mr. Nelson also testified.

Q. And admitted to robbing this individual of cocaine?

A. Mr. Nelson took the stand and admitted that he had robbed Mr. Wilson and associates of cocaine.  And he also testified that he shot Mr. Wilson.

Q. Okay.  Real quick, did the DA's internal memoranda that we got recently, reflect their assessment of what the jury ended up believing in the case?

A. Yes.

Q. And would you recognize that Memorandum if I showed it to you?

A. Yes.

Q. All right.

MR. FRAMPTON:

Holding what's been previously marked as Defense Exhibit 8.  Showing it to the State.  Approaching the witness.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. What is Defense Exhibit 8?

**17**

A. This is a Memorandum from Robin O'Bannon to Ray Bigelow and Wendy Baldwin in regards to the prosecution of Matthew Moore.

Q. That's the co-defendant whose case was severed, right?

A. Yes.

Q. And could you read the part that is at the bottom of Page 2, with respect to the recap from the DA's internal memoranda about what the jury believed in Mr. Nelson's case.

A. "Our whole case depends on the theory that the two defendants killed Harold Boss during the perpetration of an armed robbery or an attempted armed robbery.  The Nelson jury did not believe that an armed robbery or an attempt was in progress."

Q. Okay.

MR. FRAMPTON:

Offer, file, and introduce, Defense Exhibit 8.

MR. SCOTT:

No objection.

THE COURT:

Admitted.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. And with respect to Mr. Marigny's testimony, was that important testimony at the trial?

A. Yes, it was.

Q. Okay.  And is that just your assessment, or did it also get reflected in internal DA memoranda?

A. It was reflected in internal DA memoranda.

18

Q.   And would you recognize that Memorandum if I showed it to you?

A.   Yes.

MR. FRAMPTON:

Holding what has been previously marked as Defense Exhibit 9.  Approaching the witness with Defense Exhibit 9.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.   And could you identify what I've handed you?

A.   Yes.  This is a Memorandum from Missy McDonald to Ray Bigelow in regards to Derrick Marigny.

Q.   And can you read the portion that is highlighted -- Excuse me, what was the date of that Memorandum?

A.   June 7th, 1991.

Q.   And with respect to the testimony of Marigny, can you read the DA's own internal assessment of how important a witness he was in the case?

A.   "Without his testimony we would not have had sufficient evidence to convict Leonard Nelson."

Q.   All right.  I want to ask you while we're here --

MR. FRAMPTON:

Offer, file, and introduce Defense Exhibit 9.

MR. SCOTT:

No objection.

THE COURT:

Admitted.

**19**

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.   While we're here on this Memorandum, I do want to address this.  Are there other self-serving statements that you know to be false in this memorandum?

MR. SCOTT:

Objection.

MR. FRAMPTON:

If she know them to be false.

THE COURT:

I'll allow.

MR. FRAMPTON:

All right.

DIRECT EXAMINATION BY MR. FRAMPTON:

A.   Yes.

Q.   Okay.  And specifically, I'd like to turn your attention to the sentence, "The jury --

THE COURT:

Which paragraph?

MR. FRAMPTON:

Excuse me.  On Page 1 in the second to last paragraph.

THE COURT:

The one that begins, "Mr. Marigny --

MR. FRAMPTON:

Yes.

THE COURT:

-- was the main witness"?  Okay.

MR. FRAMPTON:

We're gonna unpack this more when we get to our NAPUE and BRADY claims that we found in the DA's file.  But --

20

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. Is it true that Mr. Marigny's testimony was clear, concise, honest, and credible?

A. No.

Q. Okay. And we are going to talk about why the Ms. McDonald knew that to be false at the time that she wrote this memo. Is it true that the jury fully believed Mr. Marigny?

A. No.

Q. And, in fact, we saw in Defense Exhibit 8, the other senior officials in the DA's Office recognize that necessarily in their own Memorandum when the DA's Office acknowledged the jury rejected Mr. Marigny's testimony about this whole robbery story. Right?

A. Yes.

Q. All right. Now, this Memorandum also said there wasn't a quid pro quo deal at the time of testimony. Right?

A. Yes.

Q. Okay. I just want to make sure that we're not, like, hiding the ball here. That that's what's contained in this Memorandum, but we also know that this Memorandum contains other self-serving statements.

A. Yes.

Q. All right.

A. Yes.

MR. FRAMPTON:

In an abundance of caution, if I haven't Your Honor, offer, file, and introduce Defense 8 and Defense 9.

21

MR. SCOTT:

No objection.

THE COURT:

8 was already admitted. Admit 9, as well.

MR. FRAMPTON:

All right. I want to start off by talking about Mr. Nelson's NAPUE claim. Specifically the claim that his due process rights were violated when witnesses who are called by the State's -- by the State, and they solicited testimony that was false, and that prosecution failed to correct that statement that they knew to be false from the stand.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. At trial, did Mr. Marigny testify about whether, or not, he was a drug dealer?

A. Yes.

Q. Who asked him about that?

A. He was asked by the Defense.

Q. And I -- Was he asked just once, or repeatedly?

A. Repeatedly.

Q. And did he acknowledge that he was a drug dealer? Or did he deny that he was a drug dealer?

A. He denied that he was a drug dealer.

Q. Was he asked about whether he dealt drugs from a specific location?

A. He was.

Q. And was that Milton Street?

**22**

A.  Yes, it was.

Q.  A specific block of Milton Street?

A.  Yes.

Q.  And how did he respond with respect to that questioning?

A.  He said that he did not deal drugs from any corner at all.

Q.  Okay.  During the questioning of Mr. Marigny, as he's asked again and again -- I know that Clyde Merritt attempted to suggest that this witness was a drug dealer.  Did he succeed in any way impeaching Mr. Marigny on that point?

A.  No, he did not.

MR. SCOTT:

Judge, excuse me, sorry.  I'm going to just lodge an objection to this line of questioning, because the NAPUE claim contained within the post-conviction relief application concerns the -- the (quote, unquote) "deal".  And I don't believe it concerns anything about whether he's a drug dealer.

THE COURT:

Give me a --

MR. FRAMPTON:

Your Honor, that is incorrect.  Both in our PCR and subsequent briefing we specifically reference false statements --

THE COURT:

Give me the page in your Application for Post-conviction Relief.  Just give me the Page.

MR. FRAMPTON:

**23**

Yes, Your Honor.

THE COURT:

If you tell me that, I will find it. The BRADY is on 10. NAPUE looks like it starts on 11, so let me see.

MR. FRAMPTON:

Yes, Your Honor. Page 14. "The internal memorandum make it likely that prosecutors violated not only BRADY, but also their obligations under NAPUE. While the trial transcript indicates that Mr. Nelson had some inkling of a deal, it does not appear that information was ever formally disclosed.

"And even if it was known to defense counsel, prosecutors violated their obligation to correct the record under NAPUE when Mr. Marigny lied, under oath, about the deal, and about his extensive involvement with drugs and guns."

THE COURT:

I see that at the bottom of Page 14, last paragraph.

MR. FRAMPTON:

And it's much longer, in subsequent briefing, as well.

THE COURT:

I just needed a little bit.

MR. FRAMPTON:

Thank, Your Honor.

THE COURT:

You are on notice. Overruled.

**24**

MR. FRAMPTON:

All right.

I want to talk about the extensive information that was finally disclosed to Mr. Nelson indicating that, in fact, the District Attorney knew that that testimony that Mr. Marigny was giving was false.  So let's talk about the information the DA had.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.  Did you review any DA files relating to the prosecution of Mr. Marigny?

A.  Yes.

Q.  And how many cases did you look at the DA's file for?

A.  Four separate cases.

Q.  Four separate cases.  Did you review the case file for Case No. 334-550, which has been marked as Defense Exhibit 11?

A.  I did.

Q.  Would you recognize it if I showed it to you?

A.  I would.

MR. FRAMPTON:

Approaching the witness Defense Exhibit 11.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.  By the way, these case files that I'm about to show you, are they all within a short period of time, immediately before the facts in this case?

A.  Yes.  They are within less than a year.

Q.  Okay.  And in this case, Defense Exhibit 11, what was it alleged that Mr. Marigny did?

**25**

A. He was accused of dropping a bag full of rocks of cocaine in front of police officers.

Q. Did you review Case No. -- and where did that happen?

A. In -- On Milton Street.

Q. Did you review the Case File for 341-057, marked as Defense Exhibit 12?

A. Yes.

MR. FRAMPTON:

Permission to approach? Handing the witness Defense Exhibit 12.

THE COURT:

Hold on one second. I am not sure if I have 12, or I think everything else may just be --

MR. FRAMPTON:

11 through 15, because they're so thick, the paperclips do not provide. I can have the witness provide the Court their copy of theirs that I printed out.

THE COURT:

I'm wondering if the first page of -- that's 12 or 11? Which one is that, is what I'm asking.

THE WITNESS:

That's 12, I'm holding 12.

THE COURT:

All right, hold on. How many pages is 11?

MR. FRAMPTON:

I think it's approximately 25 pages, Your Honor.

**26**

THE COURT:

11 is?

MR. FRAMPTON:

11 is a little thinner than the other ones. I believe it's --

THE COURT:

I have four pages for 11.

THE WITNESS:

No, 11 is larger than that. 11 is this big. The last page of it looks like that, if that's relevant.

MR. FRAMPTON:

Your Honor, perhaps the witness could give the Court her copy.

THE WITNESS:

Of 11?

THE COURT:

Let me see it for a second. All right. So I just need to -- just give me a second. The case number for 11 is what?

MR. FRAMPTON:

334-550.

THE COURT:

Out of Section B?

MR. FRAMPTON:

I do not have that immediately in front of me, Your Honor. Yes, Your Honor.

THE COURT:

I think I have it. All right. Got it. Okay.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. That, Case 11, at the time of Mr. Marigny's

27

trial, was that one still pending?  Or is --

A.  No, it was not.

Q.  Okay.  How did that case get resolved?

A.  The charges against Mr. Marigny were dismissed after his co-defendant took responsibility for the drugs.

Q.  Okay.  But while he was -- before that happened, we also had Case 341-057.  That's Defense Exhibit 12.  Did you review that DA file?

A.  Yes.

Q.  And in Defense Exhibit 12, what was Mr. Marigny doing at the time?

A.  I believe in this case he was observed by law enforcement officers trying to conceal a bag full of about 60 rocks of cocaine under some leaves.

Q.  Okay.  Did you review Case No. 342-951, Defense Exhibit 13?

A.  I did.

MR. FRAMPTON:

       I'm handing to the witness what's been previously marked as Defense Exhibit 13.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.  Is 13 another PWIT case that was open at the time?

A.  Yes.

Q.  Okay.  And where was Mr. Marigny arrested in that case?

A.  Also on Milton Street.

Q.  And what was he alleged to have done in that case?  Or how much -- how many rocks of

**28**

crack-cocaine did he have on him at that time?

A. I believe in this case he was found with a bag of about two dozen rocks of cocaine on his person.

Q. I believe it's 28, but close enough. All right, so he's got the 60 rocks of cocaine, he makes bail. He's immediately rearrested on the 28 rocks of crack-cocaine from the same location. Does he pick up yet another case?

A. He does.

Q. Okay. And is that Case No. 343-461? Defense Exhibit 14?

A. Yes.

MR. FRAMPTON:

I'm handing the witness the DA's file. Oh, excuse me. I'm handing the witness Defense Exhibit 14.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. What is Defense Exhibit 14?

A. This is the DA file in that case.

Q. Okay. And is that another PWIT crack-cocaine case?

A. It is.

Q. Okay. And in that case do you recall how much crack-cocaine he was arrested with? Or money?

A. He was found with a bag of crack-cocaine on his person, and over $1300 (thirteen-hundred dollars).

Q. Okay. So I don't wanna talk about, not just

**29**

about these open cocaine, crack-cocaine, dealing cases. I want to talk about what the DA's files that we just got actually show about their assessment of the case. Did each of those files --

MR. FRAMPTON:

Your Honor, offer, file, and introduce Defense Exhibit 11, 12, 13, and 14. If they're not already admitted.

MR. SCOTT:

No objection.

THE COURT:

Admitted.

Let me ask a question, just so I have a point of reference. I'm looking at Defense 11. And it looks like the arraignment happened, it looks like, June of '89?

MR. FRAMPTON:

Yes, Your Honor.

THE COURT:

When was this trial?

MR. FRAMPTON:

This trial was in --

THE WITNESS:

March of 1991.

MR. FRAMPTON:

And 11 was closed at that time, Judge. It was the 12, 13, and 14 that are open cases at that time.

THE COURT:

I know. So 11 was adjudicated when the defendant's co-defendant --

30

MR. FRAMPTON:

That's right.  He was standing next to a female co-defendant.  The officers --

THE COURT:

That's Brown?

MR. FRAMPTON:

That's right, Your Honor.  The officers all reported that Mr. Marigny dropped the bagful of cocaine.  Ms. Brown pled "Guilty", I believe as charged, that it was her cocaine.  And at that point the DA's Office dropped that case.

THE COURT:

All right, got it.  So that's that one. But all of that happened before this trial?

MR. FRAMPTON:

Yes, Your Honor.

THE COURT:

All right.  On to 12.

MR. FRAMPTON:

So 12, 13, and 14 were all open and pending at the time of Mr. Marigny's testimony.  Is that correct?

THE WITNESS:

Yes, they were.

THE COURT:

But the arraignment in 12 was March 9th of '90.  So that was before the trial.  Yes?

MR. FRAMPTON:

Yes.

THE COURT:

All right.  Let me go to the next one.

31

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000124

13 -- And how many pieces of crack-cocaine were in 12?

MR. FRAMPTON:

12 was more than 60 rocks of crack-cocaine.

THE COURT:

All right. So 60 rocks of cocaine in an open case in Defense 12, which was arraigned before this trial. 13 -- Is that the one with 28 --

MR. FRAMPTON:

Yes, Your Honor.

THE COURT:

-- pieces of crack? That arraignment was May 25th, of '90. Before this trial. And then 14 is the one with an unspecified amount of crack-cocaine and $1300 (thirteen-hundred dollars). Yes?

MR. FRAMPTON:

I believe it was a bagful of dozens of rocks, but $1300 (thirteen-hundred dollars) is correct. Is what I have in my notes, Your Honor.

THE COURT:

It just said "a bag", so nothing was specified as like the other two. So I can only go by what you told me.

MR. FRAMPTON:

Yes, Your Honor.

THE COURT:

I just want to see -- And let the record reflect I'm looking at the dart sheet, which is basically the back of the District

**32**

Attorney's file. And since I was there for so many years, and had to fill these out daily, I know what I'm looking at.

It looks like the first entry on the dart in D-14 was from September 20th of 1990. That was the arraignment, then it was set for a status hearing. Again, all of those before he testified. Okay.

MR. FRAMPTON:

All right.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. Now inside the DA files, Professor Orians, did the DA also show preparation for those cases to try them?

A. Yes.

Q. Did the DA's Office have witnesses and phone numbers of witnesses?

A. Yes.

Q. Was there anything linking the four cases that we've just discussed about? In terms of where they occurred?

A. They all occurred on the same exact block on Milton Street.

Q. And in any of these files, are there internal DA memoranda regarding the strength of the DA's case?

A. Yes.

Q. Okay. I'd like to turn your attention to a page that -- approximately in the middle of Defense Exhibit 12. Where that Memoranda exists. Does that Memorandum list witnesses the DA plans to call?

33

A.   Yes.

Q.   Is there a few --

THE COURT:

Can you show me what it looks like?

(The witness shows her document to the Court.)

THE COURT:

Can I just suggest Bates stamping next time?

MR. FRAMPTON:

Yes, Your Honor.

THE COURT:

Okay.  Because -- This one?

THE WITNESS:

Yes.

THE COURT:

Okay.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.   And does the DA's Office indicate law enforcement witnesses who are prepared to testify in the case?

A.   Yes.

Q.   Does it identify any weaknesses in the case?

A.   It does not.

Q.   Okay.  Let's turn to that same Memorandum for -- in Exhibit 13, the next case that Mr. Marigny picks up.

A.   Yes.

THE COURT:

And we're going to --

MR. FRAMPTON:

It's about half way through Defense Exhibit 13.  I apologize to the Court for not

**34**

having the page stamp on it.

THE COURT:

I just have to find it.  Hold on.

This one?

THE WITNESS:

Yes, ma'am.

THE COURT:

Okay.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. And in this case, are there law enforcement witnesses who support the State's understanding that Mr. Marigny was in fact a drug dealer?

A. Yes.

Q. Okay.  What weaknesses, if any, are identified in this case?

A. Under "Problems", it notes, these (quote) "These P/O have gotten defendant before!(exclamation point)".

Q. So the only weaknesses is that he was already arrested by these exact same officers for the same offense?

A. Yes.

Q. What about Case Number -- Excuse me, Defense Exhibit 14?  Does that memorandum have law enforcement witnesses who are prepared to testify as to Mr. Marigny's drug dealing?

A. Yes, it does.

Q. Okay.  What are the weaknesses in that case?

A. Again it says, (quote) "P/O arrested defendant before!(exclamation point.)" and then beneath that it says, "Whose

**35**

truck?(question mark.)"

Q. So the chief weakness in all these cases is just that the narcotics units again and again and again keeps arresting Marigny for crack-cocaine dealing at this specific block?

A. Yes.

Q. All right.

THE COURT:

Hold on one second.

(Brief break.)

THE COURT:

Okay. I'm sorry.

MR. FRAMPTON:

We're going to talk about it in a second when we get to the BRADY claims, as well.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. But was there anything else that indicated in the DA's files that you reviewed that Mary McDonald might know that, in fact, Derrick Marigny was a crack-cocaine dealer at that location prior to trial?

A. Yes.

Q. And specifically, had Derrick Marigny talked to her and said that he was willing to swear under oath that he was a crack-cocaine dealer?

A. Yes.

Q. Was that disclosed to the defense?

A. No.

Q. We're going to talk about that when we get to BRADY. So that's with respect to the false testimony that Marigny testified to that he

**36**

wasn't a crack-cocaine dealer.

I want to talk about one other piece of NAPUE, false testimony that came out at trial. And it's with respect to this gun that was recovered from the scene.

A.   Yes.

Q.   Now, according to the State, who was that gun -- who did that gun belong to?

A.   Matthew Moore.

Q.   And the State said that the co -- Matthew Moore being the co-defendant?

A.   Yes.

Q.   According to the defense, who was that gun for?

A.   Either Mr. Wilson, Mr. Marigny, or Mr. Miller.

Q.   So one of the people who allegedly threatened Mr. Nelson?

A.   Yes.

Q.   Okay. At trial, did the State have any evidence linking that gun to Mr. Nelson?

A.   No.

Q.   And with respect to testing of that gun, what did the State's witnesses testify to at trial?

A.   That it was not tested.

Q.   Did you find anything in the DA's file that indicated to the contrary?

A.   Yes.

Q.   Okay.

MR. FRAMPTON:

I'm holding what's been previously

37

marked as Defense Exhibit 16.

Your Honor, we're skipping 15, and I'm not -- there is no Defense Exhibit 15.  But Defense Exhibit 16 was previously marked.

Permission to approach?

THE COURT:

You may.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.  What is Defense Exhibit 16?

A.  It is a Memorandum from Robin O'Bannon to Ray Bigelow and Wendy Baldwin on August 29th, 1991, in regards to Matthew Moore.

Q.  And can you read the portion that is highlighted and identify where in the Memorandum it is?

A.  On the last sentence, in Paragraph 3, it says --

THE COURT:

On page?

THE WITNESS:

On Page 1.

THE COURT:

Okay.

DIRECT EXAMINATION BY MR. FRAMPTON:

A.  It says, "The gun was tested with negative results."

Q.  So when the State's witnesses testified at trial, "We never tested this gun," or, "I never tested," or suggested the gun had never been tested, did at any point a DA say, "Actually, the gun was tested, and there was negative results"?

**38**

A.  No, they did not.

Q.  All right.

MR. FRAMPTON:

Offer, file, and introduce Defense Exhibit 16.

THE COURT:

It's a memorandum, and it's dated August 29th, 1991.  Memorandum to Ray Bigelow from Robin O'Bannon.

All right.  16 is admitted.

MR. FRAMPTON:

All right.

I want to talk now about the <u>BRADY</u> claim.  And while we're on the topic of the gun, I guess I will skip ahead.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.  When they found this gun, according to the evidence, undisputed evidence, at trial, had it been fired?

A.  It had -- There's no evidence that it had been fired that night.

Q.  Was the gun fully loaded at that time?

A.  It was fully loaded.

Q.  Okay.  And to be clear, this is the gun that according to the State belonged to Mr. Nelson's co-defendant at the time.

A.  According to the State, yes.

Q.  Okay.  Did you see anything in the DA's file that suggested otherwise, with respect to who that gun might have belonged to?

A.  Yes.

Q.  Okay.

**39**

MR. FRAMPTON:

I'm holding what has been previously marked as Defense Exhibit 18.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q. Can you identify Defense Exhibit 18. And can you also state the date for the record's sake of what the Memorandum is.

A. This is a memo from Janet Ahern to file. Dated August 12th, 1990.

Q. And specifically, what does Janet Ahern say about the DA's perspective about what Mr. Nelson and his co-defendant did?

A. That both Mister -- "Both Nelson and Morris stood over the victim with guns pointed at him. And it appeared that both of them shot."

Q. So to be clear, this gun then, that had not been fired and was fully loaded, if that information is true, couldn't have been Mr. Nelson. It must have been one of the -- excuse me -- couldn't have been -- belonged to Mr. Nelson, or his co-defendant?

A. Yes.

Q. And that would be evidence that would support the defense theory that the State denied that one of the victim's had a loaded gun on them at the night in question?

A. Yes.

Q. Did any of that ever come out at trial?

A. No, it did not.

Q. Okay. Was that ever disclosed, as far as you know, to defense counsel? That, in fact, the

40

State had in its possession, and at some point, talked to a witness that appeared to indicate that both Mr. Nelson and Mr. Moore had fired their weapons?

A.   I've seen no evidence that it's been disclosed.

Q.   All right.

A.   That it was disclosed before or during trial.

MR. FRAMPTON:

Offer, file, and introduce Defendant Exhibit 18.

THE COURT:

Admitted.

MR. FRAMPTON:

All right.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.   Let's talk about Mr. Marigny at this point. And I want to make this abundantly clear: Is there a smoking gun anywhere in the DA's file that there was a quid pro quo in advance of trial?  That Mr. Marigny was promised that if he testified favorably to the State he would get a deal in his three crack-cocaine cases that were pending at the time?

A.   No, there is not.

Q.   Was there evidence that created a reasonable probability that if it had been shared with the defense they might have questions of Mr. Marigny's credibility?

A.   Yes.

Q.   And to remind the Court, according to the State 33 years ago, and as recently as Ms.

41

Amos's filing last month, what was the reason Mr. Marigny testified in this case?

A.   Because --

Q.   What was his motivation?

A.   He wanted to help Mr. Wilson's mother.  He wanted to do the right thing.

Q.   Did you find anything in the DA's file to indicate that Mr. Marigny did not have as pure motivations for testifying?

A.   Yes.

Q.   Would you recognize that if I showed it to you?

A.   Yes.

MR. FRAMPTON:

Holding what's been previously marked as Defense Exhibit 17.  Providing it to the witness.

DIRECT EXAMINATION BY MR. FRAMPTON:

Q.   Can you identify what Defense Exhibit 17 is?

A.   This is a Memorandum from Missy McDonald to Ray Bigelow, dated June 7th, 1991 in regards to Derrick Marigny.

Q.   And can you read the paragraph, and identify where you are reading from that is highlighted.  With respect to Mr. Marigny's efforts to sell his testimony against Mr. Nelson?

A.   The second paragraph on the first page.

Q.   Could you read it in its entirety, please.

A.   "Prior to the first trial, Mr. Marginy stated he would not testify unless the office offered him a deal concerning his outstanding

42

drug cases.  See Cases 341-057, 342-951, and 343-461.  The charges against Mr. Marigny are simple possession of cocaine, and two counts of PWIT cocaine.

"If you'll recall, I approached you before regarding Mr. Marigny's request.  At that time you indicated that this office would offer no deals in return for his testimony.  We relayed this information to Mr. Marigny, who in turn stated he would offer no assistance in our trial."

Q.   Whether or not Mr. Marigny had a epiphany, or a come to Jesus moment, is that information that would be useful to have as a defense attorney?

A.   Yes.

Q.   Why?

A.   One, because Mr. Marigny's credibility is generally important.  But second, because the defense's theory at trial was that Mr. Marigny and Mr. Wilson and Mr. Miller were drug dealers that Mr. Nelson and Mr. Moore had robbed for drugs.  And that these drug dealers had put a hit out on Mr. Nelson and Mr. Moore in response.

Q.   And particularly with both the NAPUE claim and the BRADY claim, and exploring the materiality of that.  Apart from just being a drug dealer in general, and that being a relevant question, is there any specific significance to where all of these cases that Mr. Marigny was willing to plead "Guilty" to

**43**

occurred?

A. The -- They all occurred on the same block of Milton Street. Which I believe two days prior to the shooting, Mr. Wilson and his associates shot at Mr. Nelson and Mr. Moore over a dozen times.

Q. Okay. Now, I understand that this self-serving Memo, or memo that has certain self-serving statements in it, denies the existence of a quid pro quo in advance of trial, is there any evidence of a quid pro quo after the fact?

A. Yes.

Q. And what is the final -- what is the evidence of that?

A. The last sentence on Page 1 says, "Again, we are requesting that we can help Mr. Marigny as he helped us."

Q. Mr. Marigny scratched the DA's back, they ultimately scratched his back. Correct?

A. That's what the Memo would suggest.

Q. And, in fact, that is what happened with Mr. Marigny's cases. Right?

A. Yes.

Q. Okay. Finally, Mr. Nelson's co-defendant in this case, they held his case. He ultimately got a plea deal. Is that correct?

A. He did.

Q. And in the Memorandum that's previously been introduced for Mr. Bigelow, is there a -- a -- does Mr. Nelson's case, in maintaining the integrity of Mr. Nelson's case, figure into

**44**

the DA's decision about why they didn't go after Mr. Moore full stop?

A.   It did.

Q.   And specifically, what did the DA's Office say about why they needed to not go to trial in Mr. Nelson's case -- excuse me, Mr. Moore's case?

A.   The DA expressed concern that if they were to -- if Mr. Marigny were to testify at Mr. Moore's trial it would give the -- Mr. Nelson the exact ammunition he needed to overturn his conviction.

Q.   Okay.

MR. FRAMPTON:

     If they haven't already been done, offer, file, and introduce Defense Exhibit 17, 18, and any other Exhibit that I've named, that hasn't been formally introduced at this point.

THE COURT:

     Admitted.

MR. FRAMPTON:

     Subject to rebuttal, or redirect rather, no further questions.

THE COURT:

     State?

MR. SCOTT:

     Good morning.

THE WITNESS:

     Good morning.

                    CROSS-EXAMINATION

CROSS-EXAMINATION BY MR. SCOTT:

**45**

Q. So it's true that at trial no -- there was no witness who said they saw the victim with a gun?

A. There was no witness that testified at trial that Mr. Wilson had a gun.

Q. And an independent witness at trial testified that Mr. Marigny lifted up his shirt, but she did not see a gun. Correct?

A. That testimony actually came from Mr. Johnson. Tracy Johnson testified that he saw Mr. Marigny reach for a gun under his shirt.

Q. So the only person who gave testimony at trial that Wilson and his associates were armed is Leonard Nelson?

A. The only -- Mr. Johnson testified at trial that he saw Mr. Marigny reach for a gun.

Q. But never saw a gun.

A. But he did not -- He testified that he did not -- he did not testify that he saw a gun.

Q. He, in fact, testified that he did not see a gun. Correct?

A. I believe he testified that he did -- that he never saw an actual gun as Mister -- because he ducked for cover when he saw Mr. Marigny reach underneath his shirt, because he knew what was about to happen.

Q. And the -- the three pending charges against Mr. Marigny, that came out at trial, right? That he had pending charges?

A. Yes.

Q. It came out at trial that those pending charges concerned drug dealing. Right?

**46**

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000139

A.  I believe that Ms. McDonald actually objected when Mr. Merritt attempted to ask him about the -- about those cases.

Q.  Mr. Merritt asked, "How many cases do you have open for possession of cocaine with intent to distribute?"  Answer: "Two."

THE COURT:

What page?

THE WITNESS:

Of the Trial Transcript.

MR. SCOTT:

Well, this is going to be my State's Exhibit, but this is the Trial Transcript.

THE COURT:

I know.  What page of the Trial Transcript?

MR. SCOTT:

Page 41.

THE COURT:

Thank you.  What line?  All right, so No. 2?  Line 2?  Okay.

MR. SCOTT:

I'm just -- Okay.  Thank you.

CROSS-EXAMINATION BY MR. SCOTT:

Q.  So if the trial transcript reflects that the jury heard that he had open cases for Possession with Intent to Distribute Drugs, the Trial Transcript would be more accurate than your memory?

A.  Absolutely.

Q.  Okay.  And, in fact, the jury also heard from Mr. Marigny himself why he decided to

**47**

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000140

testify.  Isn't that right?

A. Yes.

Q. And he explained that Harold was like a brother to him.

A. Yes.

Q. Right?  Let's talk about the gun that's found on the scene.  There's an August 1991 Memo saying the gun was tested with negative results.  Do you have any idea when the gun was tested?

A. No.

Q. Do you have any indication of where the screener, Ms. Ahern, learned that Nelson and Moore both fired into the body of the victim?

A. I believe she may have discerned that from a statement given by Derrick Marigny.  Not during trial, prior to trial.  During the investigation.

Q. And that statement would be reflected in the DA's file?

A. Yes.

Q. The final Memo that you -- that you testified about about why Mr. Moore's case was not a good case to go to trial.  That Memo reflects reasons other than the plea agreement reached post-trial with Mr. Marigny.  Does it not?

A. I'm sorry?  I lost the quest- --

Q. Yeah, sorry.

A. Can you rephrase that?  Thank you.

Q. One reason in that Memo is the post-trial plea agreement with Mr. Marigny.  Correct?

A. Yes.

**48**

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000141

Q. And there are other reasons in that memo about why Mr. Moore's case was not a good case to take to trial. Is that correct, or incorrect?

A. Yes, I believe that's correct.

Q. All right.

MR. SCOTT:

No further questions.

THE COURT:

Any redirect?

MR. FRAMPTON:

Very briefly.

REDIRECT EXAMINATION

REDIRECT EXAMINATION BY MR. FRAMPTON:

Q. The other witness, in addition to Mr. Nelson, that said that he saw one of the victims reaching for the waistband, reaching for a gun, and then he jumped out of the way, because he, (quote) "Knew what was going to happen next." Was that a defense witness, or was that the DA's witness?

A. That was the DA's witness.

Q. That was Tracy Johnson, the witness called by the State?

A. Yes.

Q. The State asked you about whether or not it came out at trial that there were, in fact, three pending cases against Mr. Marigny. Did Mr. Marigny testify that he was, in fact, "Guilty" of those crimes?

A. No.

Q. Did he actually vociferously deny that he had

**49**

anything to do, whatsoever, with drug dealing?

A.   He denied.

Q.   And when he denied them, did the prosecution at any time seek to correct Mr. Marigny's false testimony?

A.   No, they did not.

MR. FRAMPTON:

Nothing further.

THE COURT:

You can step down.

(The witness exited the stand.)

THE COURT:

Anymore witnesses, defense?

MR. FRAMPTON:

Your Honor, at this time we are not going to call any further witnesses.  And we'd submit on the record that exists at this point.

THE COURT:

State.

MR. SCOTT:

Judge, I just have nine exhibits.  All of this -- all of the State's Exhibits are either excerpts or reproductions of the Defense Exhibits.  But just to make it easier on me to keep track and make my argument coming up, I labeled them State's Exhibits 1 through 9.

I've given Defense a copy of them.  Can I approach?

THE COURT:

50

You may.

MR. FRAMPTON:

Your Honor, no objection from the defense.  These are already all admitted.

THE COURT:

Okay.

MR. FRAMPTON:

Or part of the record on appeal.

THE COURT:

I need to see them.

MS. YARKORZINSKI, LAW CLERK:

Are they all trial transcripts?

MR. SCOTT:

No, they're not all transcripts.  I'll go through them just so the record is clear.

THE COURT:

All right, I'm listening.

MR. SCOTT:

Okay, thanks.

State's Exhibit No. 1 is Page 40, 41, and 42 of Trial Transcript.  State's Exhibit No. 2 is Page 48 of the Trial Transcript. State's Exhibit No. 3 is Pages 54 and 55 of the Trial Transcript, which is Curtis Miller's testimony.

State's Exhibit No. 4 is Page 57 of the Trial Transcript.  State's Exhibit 5 is a Memo from Missy McDonald to Wendy Baldwin dated January 2nd, 1991.  State's Exhibit 6 is a Memo from Missy McDonald to Ray Bigelow and Wendy Baldwin, dated February 23rd, 1991.

THE COURT:

51

February 23rd of '91?

MR. SCOTT:

Yes, Judge.

THE COURT:

All right.

MR. SCOTT:

State's Exhibit No. 7 is a Memo from Mike Reynolds to Ray Bigelow, dated May 28th, 1991. State's Exhibit 8 is a Memo dated June 7th, 1991 from Missy McDonald to Ray Bigelow. And State's Exhibit 9 is a Memo from Robin O'Bannon to Ray Bigelow and Wendy Baldwin, dated August 29th, 1991.

I would prefer just to save for argument the significance of those.

THE COURT:

That's fine.

MR. SCOTT:

Thank you, Judge.

THE COURT:

Admitted. 1 through 9.

MR. SCOTT:

State submits.

THE COURT:

All right.

Argument, Defense?

ARGUMENT BY MR. FRAMPTON

MR. FRAMPTON:

Thank you, Your Honor. Your Honor, this case has been extensively briefed, and so I'll try to confine my argument to summarizing what's already before the Court

52

and reserve any time if the Court has questions for us.

The first, and I think the perhaps the most straight-forward way of resolving this case is with respect to the badly botched self-defense jury instruction that was given in this case. And which, thus far, hasn't come up at the hearing. Simply because the record already establishes it.

Moreover, the Court already has before it a stipulation from both the Defense and the State that the Court can disregard, may disregard, various other untimely procedural objections raised to it. We're just dealing with the merits on this, Judge.

And on the merits, I don't think there's any disagreement. Because the State has not actually filed any merits disagreement as to the propriety of the self-defense instruction.

Judge, the self-defense instruction was this: "If you find by a preponderance of the evidence that the defendant has raised the defense of justification, then the burden is upon the State to show that the homicide was not committed in self-defense."

Judge, that's a self-defense instruction that Your Honor would never give, that I don't think any judge in this courthouse would ever give, any time in the last three decades. Because it's legally incorrect. There is not a preponderance of the evidence

53

burden in any way, shape, or form on the defendant to -- when a self-defense case is at issue.

Rather, the jury should have been instructed, "The State has the sole burden beyond a reasonable doubt to find that the defendant did not act in self defense."  This is a case, Judge, where that self-defense instruction absolutely matters.  Because if the defendant -- if the jurors did not believe Mr. Marigny fully -- Let's say they believed him 75 percent.  And believed Mr. Nelson 25 percent.

And I think that there's good evidence that that's, in fact, what happened in this case by virtue of the fact that the jury rejected Mr. Marigny's testimony as to the question of the supposed armed robbery that was going on.

But if I'm right, that there was a 25-percent belief in Mr. Nelson, and a 75-percent belief in Mr. Marigny, then this is a case where legally Mr. Nelson is "Not Guilty".  Because the State hasn't proven beyond a reasonable doubt that, in fact, he did not act in self defense.

This jury instruction that was given to the jurors instructs them in that circumstance that they should, in fact, convict Mr. Nelson because he hasn't met his threshold burden of showing by a preponderance of the evidence that it's a

**54**

self-defense case.

Importantly, Judge, the State has not opposed us on the merits on the self-defense jury claim. That by itself is reversible error.

Mr. Nelson is also bringing two different types of due process claims. And I want to make sure that I tease out the distinction between a NAPUE claim and a BRADY claim. NAPUE is an older type of due process claim. It goes back to the Mooney Trial from World War One. And NAPUE was on the books before BRADY was.

And the basic principle is that prosecution violates the defendant's due process rights when they call a witness to the stand, who then makes false statements on the stand, and they fail to affirmatively correct the witness.

There are two things that are really important about a NAPUE claim that are going to matter in this case. No. 1, the materiality standard is different. It's basically like trapped in a harmless error. The State has to prove beyond a reasonable doubt that those false statements did not impact the verdict.

No. 2, and this is what's really important about the NAPUE claim, it actually doesn't matter if it's been disclosed to the defense. It doesn't matter if defense counsel knew that Mr. Marigny was a drug

55

dealer or not.

What matters is when a State witness, who is called by the State, makes false statements, and the DA fails to correct those false statements. That's exactly what happened in this case. Clyde Merritt attempted to cross examine Mr. Marigny, but Mr. Marigny lied again and again and again with respect to information that the DA's Office knew was false, that Mary McDonald knew was false, and she failed to comply with her duty under the due process clause to correct the witness.

I realize correcting the witness, or instructing the jury, that the State actually had overwhelming evidence that he was lying would have been awkward for the prosecutors involved in this case. But that is necessarily a risk that the State ran when they based their entire case around the credibility of somebody who they were currently trying to put in prison for life for drug dealing. Particularly when he chose to lie about that drug dealing.

And again, the evidence is not just the overwhelming evidence that was turned over in the DA's file to that regard, it was also that Ms. McDonald had a personal conversation prior to trial with this witness who said, "I will plead 'Guilty' under oath that I have committed all of these crimes, if I get a deal." So there is no question that a NAPUE

56

violation occurred when Mr. Marigny took the stand.

We also believe that there was a NAPUE violation separately when the State's witnesses stated, or at least implied, that the gun had not been tested when, in fact, the DA's Office shows -- a Memorandum from the Da's Office files show that the gun had been tested with (quote) "negative" results.

Finally, we get to the BRADY claim. And as we argued in our brief, the critical question, Your Honor, I don't think is whether we have proof overwhelmingly of a quid pro quo. I will be candid with the Court, we do not. What we do have is evidence that was in the DA's file that was never shared with Defense Counsel. And if it had been shared, there is a reasonable probability that the results of this proceeding would have been different.

Our standard is not to prove that it's more likely than not, or a preponderance of the evidence. The question is if Defense Counsel had had a disclosure from the DA, as mandated by BRADY, that the State's star witness was trying to sell their testimony, would have he been more successfully attack Mr. Marigny.

Remember, the jury just heard that Mr. Marigny was not a drug dealer and was testifying solely out of the goodness of his own heart, because he cared about the

**57**

victims.  And I don't know what was in his heart of hearts that day, Your Honor.  But I do know that if the DA had complied with their BRADY obligations there's a reasonable probability that the result in this case would have been different.

The same is true for other BRADY information that we found in the file. Specifically with respect to the evidence that, if fact, both Mr. Nelson and his co-defendant had fired their guns making it impossible that the witnesses who testified for the State were testifying truthfully. That they were unarmed at the time.

And, again, is confirmed by other notes in the memorandum file, including the fear that if Mr. Moore's prosecution went forward it would provide (quote), "The ammunition the Defense needs for a reversal of the Nelson conviction." (End quote.)

Your Honor, two tiny other pieces that are in the record, but didn't come out during the witnesses testimony.  Mary McDonald, Mr. Nelson's prosecutor, had no involvement in any of Mr. Marigny's drug cases, except the day that his pleas were entered.  And that's reflected on the same sheet that Your Honor referenced with respect to Defense Exhibit 12, 13, and 14 that indicates when each ADA appears in each of the cases.

If Your Honor will indulge me for one moment.

58

Finally, Your Honor, one other piece that appears in the final -- in the files and in the Court Record, is the testimony of the other State's witness who was there at the time. The record reflects, again, although he was unsuccessfully attempted to be impeached, he was out on felony probation. He got arrested on a felony gun charge. Charged with 95.1.

He pled "Guilty" to a misdemeanor in that case, so he acknowledged having the gun that clearly violated his probation. The State kept his case open for an entire year. And immediately after trial his probation was not revoked on the time that he was backing up on that felony burglary case that he was on probation for.

With that, subject to rebuttal, I have nothing further.

THE COURT:

State.

ARGUMENT BY MR. SCOTT

MR. SCOTT:

The jury instruction in this case. Not a standard jury instruction, but by no means legally incorrect. "If you find that by a preponderance of the evidence the defendant has raised the defense of justification." Raised, not proven. Raised. Why else would a jury instruction be read if it's not raised. So the -- in a way the Judge was thinking out loud there.

59

You're not going to read a jury instruction to jury unless the defense has been raised. Not every -- every murder case does not get a self-defense jury instruction. Raising it is as easy as the defendant taking the stand in this case. Or in some cases, just the argument of counsel. And it was raised, and that placed no burden on the defense. There is no burden of proof in that instruction.

All right, State's Exhibit 1. The Court is clarifying a defense. Question, and the Court asks: "Were any deals offered to you?" By the witness: "No, no deal was made with me, whatsoever." And then Clyde Merritt resumes: "You're expecting --" and then he didn't ask the question.

And that's, that, is the crux of the issue in this case. The issue comes down to whether or not the witness was expecting something to happen. And of course, if there's evidence of a deal that's in place, then it goes without saying that the witness is gonna be expecting it. Right?

But in this case, we don't have evidence of a deal in place. So what's missing is the witness's expectations. And that also is not in this record, because that question was not finished. But then Mr. Merritt does explain to the jury, or have the -- Mr. Marigny explain to the jury, that he has open cases for Possession with the Intent to Distribute

60

Cocaine. Again, he denies any deals being made.

This goes to the NAPUE claim. Mr. Merritt asks, "Isn't it a fact that you deal cocaine occasionally from that corner, Foy and Milton." "Objection, Your Honor." And the witness answers before ruling on the objection: "I deals cocaine from no corner at all."

The issue is NAPUE, a false statement that the prosecutor knows to be false that goes uncorrected. Three elements. At the time of this trial this man is innocent until proven guilty. There has been no proof offered. And as much as the DA's Office when we prosecute cases, it's our job to stand behind the Bill of Information. To present all of the evidence.

There is no way, because the prosecutor in this case was not a witness to the underlying crimes of PWIT and Possession, there is no way that she could have known that this was a false statement. And then again, he denies any deals were made. And he explains why he's there:

"Harold was like a brother to me, and they killed that lady only child. And that's like a brother to me, and they killed -- he's the only child. And they took that lady's only child, and they took a good friend of mine." That's why he's there. That also is in one of the memos.

61

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000154

Curtis Miller's testimony.  Curtis Miller was an eyewitness.  He testified at trial that Mr. Nelson ran up on the victim and shot him.  He identified Mr. Nelson in open court at trial.  This case did not -- This isn't a case of a sole eyewitness.  There was other testimony, there was other evidence, that Mr. Nelson committed this crime.

I'm going to go through the memos.  So on January 2nd, 1991, there is a Memo from Ms. McDonald.  And she says in there, in that Memo, "There is a witness who will testify that Matthew Moore dropped his weapon upon fleeing the scene, and this weapon was found not to be fired."

That is a reason for the resolution of Mr. Moore's case.  This memo completely contradicts the defense assertion that we couldn't try Mr. Moore's case because we had made a post-Nelson trial deal with Marigny.

May 28, 1991 Memo.  This is State's Exhibit 6.  This is from Mike Reynolds.  I'm sorry, I got messed up.  Sorry, Judge.  Yeah, State's Exhibit 7.  This is from Mike Reynolds: "This is a request to no bill Marigny."  From Mike Reynolds, not the prosecutor in Mr. Nelson's case.

He says, "I spoke with ADA Janet Ahern who informed me that Derrick Marigny appeared and brought witnesses to the Grand Jury, which resulted in an indictment for First

**62**

Degree Murder in the case of STATE V LEONARD NELSON."

Derrick Marigny, in addition to bringing witnesses to the Grand Jury, made an out-of-court identification. He cooperated with the prosecution from day one. From day one, it would be impossible for him to know he was getting a deal at the time he made the out-of-court identifications with NOPD.

Connected to that memo, Defendant's Exhibit 14 -- I'm going to try to count the pages. The seventh page in. There is a memo from Mike Reynolds to Missy McDonald dated May 25th, 1991. It says, "Scott Gardner has requested that you prepare a memorandum addressed to Ray Bigelow which specifies in detail the cooperation and assistance that Derrick Marigny provided you in the First Degree Murder Case of Leonard Nelson. And why he shouldn't be billed as a multiple offender."

This was not Missy McDonald's idea. Mike Reynolds is saying, "Hey, this guy needs a no-bill. I need approval for that. Can you please help me by writing a memo about his cooperation in -- and his assistance in the trial."

Reasons for the no-bill given to Mr. Marigny is contained in the May 28th, 1991 Memo. Marigny had completed a rehabilitation program. He was in active counseling. And he had been gainfully employed for the last

**63**

14 months.  Those are all really good reasons to get a no-bill.

And again, a no-bill -- maybe not again. I don't -- again, because you know this, Judge.  A no-bill is not mandatory.  A Bill is not mandatory.  It is --

THE COURT:

But seriously, we're talking about Harry Connick's administration.  And I'm only saying that because I was hired by Harry Connick.  You're telling that no-bills on drug cases wasn't mandatory?

Correct me if I'm wrong, he went from looking at 15 years, to getting 18 months?

MR. SCOTT:

I think he got five -- five years.

MR. FRAMPTON:

Your Honor, he was looking at 180 years if he was billed and the cases were run consecutively.  60 -- excuse me.  60, 60, and the third one was possession.  So 140 years. And I believe he got credit for time served effectively.

MS. ORIANS:

Five years suspended.

MR. FRAMPTON:

Five years suspended.

THE COURT:

Okay.

MR. SCOTT:

So the June 7th, 1991 Memo from Missy McDonald to Ray Bigelow.  This is a -- This

**64**

is, I think, a very clear description of what took place in this case. Marigny initially asked for leniency on his open charges. McDonald brought that request to Mr. Bigelow, who denied the request. So he was initially wanted consideration for his testimony, he was told "no". The denial was relayed to Mr. Marigny. And Mr. Marigny said he would not testify. Then he shows up the day of trial --

THE COURT:

Okay, so here's my question.

MR. SCOTT:

Yes, ma'am?

THE COURT:

He says, and I'm paraphrasing, "I want a deal, I'm not testifying." Yes?

MR. SCOTT:

Yes.

THE COURT:

Was that information given to Defense?

MR. SCOTT:

I don't believe so.

THE COURT:

Do you not think that that's <u>BRADY</u>? I mean, I'm just asking.

MR. SCOTT:

It's not. Because the -- the test is at the time of his testimony was he expecting to get anything. And he was specifically told, "You're not getting anything for this testimony."

**65**

THE COURT:

When he asked that question originally, was he told right then and there, "Nope, not happening. You're not getting that deal"?

MR. SCOTT:

He was told prior to his testimony. I don't think he was --

THE COURT:

Okay.

MR. SCOTT:

It doesn't make --

THE COURT:

So I'm asking you --

MR. SCOTT:

-- sense that he was told right then and there, because --

THE COURT:

That's my point. So I'm asking -- It wasn't like this was, "Hey, he wants a deal, or he's not testifying." And they said, "Absolutely not." They had to then go back and check with the First Assistant --

MR. SCOTT:

Uh-huh (Affirmative response).

THE COURT:

-- I'm assuming the Chief of Trials and the First Assistant on whether or not they would get a deal. Yes?

MR. SCOTT:

Yes. That's --

THE COURT:

Okay.

66

MR. SCOTT:

-- that's -- I think that's reflected that's what happened.

THE COURT:

So is there anything reflected to say when he made that assertion, "I'm not going to testify unless I get a deal," to when he was told he's not going to get the deal?

And if you don't know, you don't know.

MR. SCOTT:

I don't.

THE COURT:

I got ya.

MR. SCOTT:

I don't -- I don't know.  And I don't think it's reflected --

THE COURT:

Okay.

MR. SCOTT:

-- in the record, Judge.

THE COURT:

Let me ask you some other questions, then.  So he had -- Is it two or three open cases?  Because --

MR. SCOTT:

It's three.  But just two PWITs, but one possession.

THE COURT:

I know.  Okay.  So and he answered, "I only had two PWITs."  Because that is the question that was posed to him.  Because I saw three cases, but the question posed by

67

Clyde Merritt at trial was how many Possession with the Intent to Distributes he had. Which was two.

So those cases happened -- And when I say "happened", the conviction occurred after this trial. Yes?

MR. SCOTT:

His plea to those?

THE COURT:

The pleas happened after the trial.

MR. SCOTT:

Yes, Judge.

THE COURT:

So what took so long for the cases to go? I mean, it was over a year in most instances on a PWIT case. So I'm just trying to understand. It's one thing to say, "No, you're not getting your deal." And then if they -- if there was this conversation with the ADA that he said he wanted to plead "Guilty", and he would plead "Guilty" if he got a deal. If the answer was absolutely not, why not just take him to trial?

MR. SCOTT:

I don't know, Judge. Those were in different sections of court? We don't know what the docket looked like. There's a lot of reasons why it wouldn't go to trial.

THE COURT:

And one of those could be, "Okay, I'm going to give you your deal, but we have to wait until after the trial so it can't come

**68**

up in cross examination." But, okay. I'm --

MR. SCOTT:

And there's no evidence of that.

THE COURT:

I'm not saying, I'm just asking the questions.

MR. SCOTT:

Okay. Yeah.

THE COURT:

Okay, you can continue.

MR. SCOTT:

So when he shows up the day of trial to testify, again the ADA tells him there's no promises. And she says in this Memo, "Marigny believed that his charges will be fully prosecuted." And that aligns with his testimony, that he was not getting any deals.

In the State's Exhibit No. 9, in the August 29th Memorandum from Robin O'Bannon to Ray Bigelow. It says, (quote) "Since Leonard Nelson's trial, this office approved a no-bill on Derrick Marigny's three drug charges." That shows a clear time line of prior to trial there was no approval of a no-bill. Combined with the previous memo, "That information was relayed to Mr. Marigny."

And then it says, "Because of his conviction," referring to Marigny's plea, "he would now have to admit," and they're talking about the Moore trial. "He would now have to admit drug involvement," because prior to

69

that he was able to say he was not a drug dealer.  And no one knew that to be true, or false.  There was an accusation that he was a drug dealer, but no one knew it to be false.

And he would have to admit that he received a no-bill on his open charges.  Which they refer to as "A no-bill agreement." The word "agreement" there is to his plea.  It's a plea agreement.  It wasn't an agreement as laid out by all the other memos to put that into context.  All the other memos put that into context, and to read it otherwise would be ignoring all the other memos.

His no-bill agreement was an agreement in that case to plead "Guilty as Charged" on three charges, forego three trials, and a lot of State resources, receiving a no-bill.

And then the Memo goes on to state, "Although we steadfastly refused to deal with Marigny in exchange for his testimony," again, more evidence that there was no deal in place, "an admission at the Moore trial as to the no-bill may be the ammunition the defense needs for a reversal of the conviction."

I think it's this Memo.  I don't have it highlighted.  But they reference a (quote) "appearance of impropriety."  Not that they did anything improper, but that there would be an appearance.  And that's why we're here today.  Because there's an appearance.  I

70

admit, there's an appearance.

But the facts, the evidence, does not bear out that there was an actual deal. So there can be an appearance of a deal, but that's not enough.

THE COURT:

So it looks like a duck, walks like a duck, quacks like a duck, but it's a chicken? I guess it's a chicken. Okay.

MR. SCOTT:

Finally, Ms. McDonald appears at Mr. Marigny's plea. That was thrown out at the very end. Judge, I am here today, even though the lead ADA on this case --

THE COURT:

We're not about to do that.

MR. SCOTT:

Her father died on Sunday, and I'm here today, because it is the State that represents the State.

THE COURT:

I agree.

MR. SCOTT:

The fact that an ADA appeared for a plea can have many different reasons. Again --

THE COURT:

I agree. Somebody could have been out sick. I did it a bunch of times. So I understand that. It happens.

MR. SCOTT:

It's just weird that that was argued, and that's the facts of this case.

71

THE COURT:

I understand.

MR. SCOTT:

Thank you, Judge.

THE COURT:

Any rebuttal?

MR. FRAMPTON:

Your Honor, I think I can do this --

THE COURT:

And then I'm going to take a break.

MR. FRAMPTON:

I think I can do this in 90 seconds.

THE COURT:

Okay.

REBUTTAL ARGUMENT BY MR. FRAMPTON

MR. FRAMPTON:

(Quote) "The test is was he expecting to get anything?"  That was the argument of the State.  Respectfully, in 2024 I cannot believe that the District Attorney's Office is so grossly mischaracterizing black letter law from the 1960's.  That is not the test.

The test is was there information in the DA's file that if disclosed creates a reasonable probability that there might have been a different outcome.  The information that was hidden in the DA's file undisputed was that Mr. Marigny was trying to sell his testimony.

That was undisputed, never disclosed to the Defense Counsel, and frankly, every attorney in this room knows that that's good

**72**

information that could have been used to attack and destroy his credibility on the stand.

The second grosse mischaracterization of the law was with respect to the NAPUE claim. There is no way Ms. McDonald could have known that Mr. Marigny was lying, because she was not an eyewitness to his three drug dealing cases. If that is the District Attorney's position, that their obligations under NAPUE are only triggered when they are personally eyewitnesses to a crime, then there is no such thing as NAPUE.

Frankly, it is hard to imagine more evidence in the DA's file that Ms. McDonald knew that their star eyewitness was lying in this case, and she did nothing to correct the record.

But let's assume for a second that he wasn't a drug dealer, Judge. As best case scenario, Ms. McDonald harbored some doubts about that. Then the fact that Mr. Marigny comes to Ms. McDonald and says, "I'm going to commit perjury, I want something in exchange for committing perjury. I'm not a drug dealer, but I will admit under oath that I am drug dealer to get benefits in my case." Well, then that's BRADY. And that wasn't disclosed to the Defense Counsel either.

Finally, with respect to the self-defense claim, the instruction is simply wrong. The argument that you heard from Mr.

73

Scott was never briefed. There is no case law anywhere in Louisiana, nor has the DA's Office suggested there as much.

Suggesting it is proper to assign an initial burden, whether that's a burden of production or persuasion to the jury, let alone a preponderance of the evidence one. The jury was never instructed they had to find beyond a reasonable doubt that, in fact, this was not self defense. That is a completely frivolous argument, as well.

Judge, it's been 33 years. Mr. Nelson has cancer. He missed his radiation appointment at our last court setting that was set back. We are prepared to retry the case if the DA's Office says they want to. But we ask this Court to grant the petition, and we have arguments prepared for bond if the Court does so.

THE COURT:

Okay.

I need to look a little more in-depth into all of this. So I am not going to rule today, but I will issue written instructions. Let's be back here -- Our first day back is the 6th? We can do it that first day. Because I'm not going to accept anymore argument. I'm going to issue written rulings on that day.

But we can set this for a post-conviction status that day. On January 6. Prepare a writ. I need a break, because you

**74**

all have worked my patience today.

Yes, you can set it for a ruling.

(End of proceedings.)

\*     \*     \*     \*     \*

75

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000168

REPORTER'S PAGE

I, CINDY L. WELCH, Certified Court Reporter in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this proceeding was taken, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any words and/or names which could not be verified through reference material have been denoted with the phrase "(sp)"or "(spelled phonetically)."

_____

CINDY L. WELCH

Certified Court Reporter

Registered Professional Reporter

**76**

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000169

REPORTER'S CERTIFICATE

I, CINDY L. WELCH, CCR, official Court Reporter in and for the State of Louisiana, employed as an Official Court Reporter by the Criminal District Court for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that this testimony was reported by me in the steno mask reporting method, was prepared and transcribed by me or under my direction and supervision, and is a true and correct transcript to the best of my ability and understanding, that the transcript has been prepared in compliance with transcript format guidelines required by statute or by the rules of the Board or by the Supreme Court of Louisiana, and that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

_____

Cindy L. Welch, CCR

Certified Court Reporter

New Orleans, Louisiana

February 1, 2025

77

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000170

# Ex. O-1

# (physical flashdrive; provided to La. Ct. App. 4 Cir. with paper filing)



DEFENDANT'S
EXHIBIT
2
_____

Clerk's Office __2_/_28_____ 20 _25_
A True Copy

by _____ Deputy Clerk

Hon. Darren P. Lombard
Clerk of Criminal District Court
Orleans Parish

Privileged

Discovery, Cooperation, and Confidentiality Agreement

The parties agree that the OPDA Civil Rights Division (CRD) will review the following conviction.

Case No.: 344-648 H

Defendant(s): Leonard Nelson

Conviction review is undertaken for the purposes of ascertaining whether the defendant is innocent of the crime(s) for which he or she was convicted, whether the defendant was convicted largely due to State misconduct, or whether racial discrimination or discriminatory practices infected the conviction. A CRD conviction review for wrongful conviction will involve, where relevant: obtaining all relevant documents in the case; communicating frequently with the survivor or victim's family in the case; talking to all relevant witnesses for the defense and prosecution as well as previously unidentified witnesses; conducting a review of the crime scene; and testing, re-testing, analyzing or re-comparing forensic evidence. Conviction review is discretionary. When the defendant requests (and—if represented--his or her attorney agrees), the CRD engages in a review, which includes the sharing of information in order to get to the truth; but there is no guarantee of any outcome.

The CRD may complete its review and recommend no change in the defendant's conviction. The CRD may complete its review and recommend that there be no change of the conviction or sentence. Otherwise, it may recommend of three outcomes:

1. That the State request that the conviction be vacated and then dismissed;
2. That the State agree that the conviction should be vacated and the case re-tried; and
3. That the State agree that the conviction should be vacated on the condition that the defendant agrees to plead guilty to a lesser offense.

In the event that the proposed outcome is rejected either by the District Attorney or by the Defendant and his/her counsel, the case will likely be transferred to the Appeals Division of OPDA. Transfer of the case to Appeals will definitely occur if there is a pending pleading in court or a pleading will be filed. If a transfer occurs under any circumstances, there will be an inevitable delay in the ability of the State

1

to respond to the defendant's claims for relief because the Appeals Division will need time to review the case and prepare for litigation. As part of agreeing to conviction review, the defendant hereby agrees that—in the event the case is transferred to Appeals by the CRD because a proposed resolution (or no resolution) is not acceptable—he or she will not object to the State being granted an additional 90 days to respond to any pending litigation from the date that CRD formally notifies the defendant in writing that the case has been transferred to Appeals.

In order for the CRD to fully review convictions, a joint agreement that facilitates information sharing between the CRD and the defendant's counsel is necessary. Pursuant to this agreement, and as explained in more detail below, the CRD will share either all OPDA records *permitted* under the law, to include attorney notes internal memos, and other work-product, or it will share only those records *required* by the public records laws depending on which selection defense counsel makes below. Acknowledging the above, the parties enter into this discovery, cooperation, and confidentiality agreement (the "Agreement").

**Defendant's Attorney agrees:**

1) To maintain custody of all documents produced pursuant to this Agreement and not allow anyone to copy the documents produced pursuant to this Agreement except copies provided to attorneys, experts, investigators, and staff who are assisting with the investigation and are also bound by attorney-client privilege and the terms of this Agreement. All persons provided copies of documents pursuant to this Agreement shall maintain and abide by the same disclosure and redaction restrictions as the attorney.

2) To abide by any requested restrictions on the dissemination of information provided pursuant to this agreement, including to redact any personal or identifying information, genetic information, and all other information designated by the CRD as "attorney's eyes only" before showing and/or using said documents—this includes showing documents to the Defendant.

3) To be fully cooperative in the CRD investigation. That cooperation includes sharing work product and other investigative materials such as witness statements, reports, recordings or communications or other materials generated or obtained by the Defendant's attorney relevant to the investigation of the asserted claims.

4) To coordinate, when feasible, the scheduling of witness interviews (including of the defendant) and other investigatory assignments in order to prevent potential interference with the CRD investigation and ensure the safety of witnesses and victims and the integrity of the post-conviction investigation. The Defendant will agree to a limited waiver of the attorney-client privilege to allow the CRD to interview prior defense counsel.

2

5) To not object to a 90-day continuance from the date of written notification by CRD to the defense counsel in the event that the CRD's recommendation is not accepted and the case is transferred to the Appeals Division for litigation.

6) Not to use communication between the CRD and defense counsel in any pleadings, other than to demonstrate a date of receipt of documents or a plea offer. The parties understand that communication of any form from any staff member of the CRD that expresses an opinion as to the quality of evidence or appropriate outcome does not bind OPDA and does not reflect the position of the State until it is committed to writing in court. The State's position is that which is represented in court, either in pleadings or stated on the record.

7) That, on behalf of the defendant, defense counsel chooses:

    (a) In order to receive a complete OPDA file, including records that the CRD is not required to provide under public records laws, such as attorney notes, internal memos, and other work product, the defendant will not use any information received from the disclosure of these non-mandatory records to form the basis of any claim in civil court. This provision does not require the defendant to waive any related constitutional claims in criminal court.

Initial here for 7(a) <u>L.N</u>

    OR

(v) It will receive only those OPDA records required to be disclosed by public records laws, which will not include attorney notes, internal memos, and other work product, because the defendant does not agree to refrain—in the event that his conviction is vacated and the charges are dismissed or he is acquitted--from using information received from disclosure of non-mandatory records to form the basis of civil lawsuit against the District Attorney's Office based on an alleged wrongful conviction.

Initial here for 7(b)_____

**The Orleans Parish District Attorney's CRD agrees:**

1) To share and provide copies of materials concerning the original conviction of the defendant and any materials uncovered or discovered during the course of CRD's investigation (e.g., police reports, witness statements, reports of forensic testing, photographs, video and audio recordings) provided that such disclosure is not legally prohibited, does not, in the good faith opinion of the CRD, compromise or otherwise potentially interfere with CRD's investigation, or jeopardize the safety of a witness.

3

2) To make timely and appropriate disclosures of any exculpatory evidence it discovers as part of the ongoing CRD review and as may be related to any potential post-conviction legal claim. In some instances, such disclosure may need to be produced under a protective order or may be withheld for a substantial amount of time in order to avoid jeopardizing any ongoing investigation.

3) To maintain all information obtained from counsel or from the defendant confidentially and not provide access to any information to any other division of the OPDA except when a case is transferred to the Appeals Division as described above. When a CRD case is transferred to Appeals, the CRD will share public records it has collected and all memos, reports, or other documents created or gathered by the CRD during its reinvestigation. It will not share any materials, including witness memos, obtained from the defense except public or court records of the case being reviewed.

**Defendant's Attorney and the CRD both further agree:**
1) To the release of physical evidence, unless prohibited by law (if the CRD consents to or requests forensic testing) for forensic examination and testing. The results of forensic examinations and testing will be equally available to both parties.

2) That while the CRD review is pending, the parties will refrain from continued litigation of the case, discussion of the case with other attorneys on either side, or discussion of this case in the media unless consented to by the other party.

3) If this Agreement is violated, the CRD reserves the right to terminate its review of the matters subject to this Agreement.

4) Notice will be given to the other party of any decision to withdraw from this agreement.

**By signing below, both parties agree to be bound by all of the terms of this agreement until the termination of the CRD review and any post-conviction proceedings resulting from that review.**

Conviction Review Manager
~~Assistant District Attorney~~
Civil Rights Division
Orleans Parish District Attorney's Office

Counsel for the Defendant

Defendant

4



DEFENDANT'S
EXHIBIT
3

Clerk's Office _____2/25_____ 20 25
A True Copy

by _____ Deputy Clerk

Hon. Darren P. Lombard
Clerk of Criminal District Court
Orleans Parish

**AFFIDAVIT**

STATE OF LOUISIANA
PARISH OF ORLEANS

BEFORE ME, Notary Public, personally came and appeared JOHN ROHR, who after being duly sworn did declare that:

1) Affiant is employed by the District Attorney's Office of New Orleans and is responsible for responding to public records requests directed to the District Attorney of New Orleans in compliance with Louisiana Public Records Law, La. R.S. 44:1 et seq.

2) Pursuant to a Civil Court Order signed by Judge Madeline M. Landrieu, Division "E" that orders the Orleans Parish District Attorney's Office to appear at a hearing on the 19th day of June 2009, Affiant has prepared the accompanying two-page document titled "PUBLIC RECORDS REQUEST HISTORY, State of Louisiana v. Leonard Nelson, Case Number 344-648".

3) Affiant certifies that the fifty-four pages attached to the two-page document titled "PUBLIC RECORDS REQUEST HISTORY, State of Louisiana v. Leonard Nelson, Case Number 344-648" are copies of documents pertaining to requests submitted to the District Attorney's Office of New Orleans and responses to those requests.

4) Affiant certifies that the information contained in the attached two-page document titled "PUBLIC RECORDS REQUEST HISTORY, State of Louisiana v. Leonard Nelson, Case Number 344-648", is an accurate, documented history of public records requests submitted to the District Attorney's Office of New Orleans for case 344-648 and the office's responses to these requests.

5) As evidenced by documentation referenced in the two-page document titled "PUBLIC RECORDS REQUEST HISTORY, State of Louisiana v. Leonard Nelson, Case Number 344-648", case 344-648 was retrieved from off-site storage and last known by Affiant to be available on the 27th day of April 1994.

6) As evidenced by documentation referenced in the two-page document "PUBLIC RECORDS REQUEST HISTORY, State of Louisiana v. Leonard Nelson, Case Number 344-648" Affiant located memoranda in the District Attorney's Appeals Division and Section "F" in an effort to locate case 344-648, the results of which were negative.

7) Affiant certifies that in all requests for case 344-648 from off-site storage subsequent to the 27th day of April 1994, the record was missing from its designated box.

8) To the best of Affiant's knowledge and belief, case 344-648 is lost or misplaced.

9) Affiant has no reason for the absence of case 344-648, nor does he know the current location of the record. Further, he does not know if any person has custody of the record, nor does he know the manner or method of circumstance that led to its loss.

_____
[signature]

CERTIFIED DA OFFICE COPY

SWORN TO AND SUBSCRIBED
BEFORE ME, NOTARY, THIS
9ᵗʰ DAY OF _____
2009

Donna R. Curli
# 614 23

CERTIFIED DA OFFICE COPY



PUBLIC RECORDS REQUEST HISTORY
State of Louisiana v. Leonard Nelson
Case Number 344-648

1) 9/18/93 fax from attorney John Keller with 9/24/93 response of John Rohr indicating case 344-648 was located in box 849.

2) 4/14/94 fax from John Keller with 4/27/94 response from John Rohr indicating file was located in box 849.

3) 10/5/95 public records request of Leonard Nelson stapled to 10/18/95 memorandum of John Rohr to Section H and appeals areas of D.A.'s Office. Record was not located.

4) 3/4/96 letter to John Keller from Peter Brandt stating that case 344-648 could not be located, and that the D.A.'s Office could issue a refund to him. Attached to this letter is Leonard Nelson's 2/24/96 letter stating that he submitted funds to the D.A.'s Office and wishes to receive a copy of his record.

5) 12/9/97 fax from John Keller with 12/23/97 response from John Rohr that case 344-648 still could not be located.

6) 12/18/97 fax response to John Keller's inquiry as to the status of eleven (11) public records requests, including case 344-648.

7) 7/17/98 fax from John Keller to John Rohr including 7/12/98 correspondence of Leonard Nelson requesting status of search for his record.

8) 7/22/98 letter to John Keller in response to Leonard Nelson's 7/12/98 correspondence. This letter instruct John Keller to inform Leonard Nelson that case 344-648 still cannot be located, and that we offer to reimburse him.

9) 10/4/00 fax from John Keller with 10/10/00 response of John Rohr. Stapled to this are two items. One is a letter from Leonard Nelson requesting a refund. The other item is a 7/24/98 letter from John Keller to Leonard Nelson stating that case 344-648 cannot be located.

10) 10/6/00 memorandum from John Rohr to the Accounting Department of the D.A.'s Office requesting that a refund be issued to Leonard Nelson. Stapled to this are the letters from Leonard Nelson and John Keller referenced in entry number 9.

11) 10/2/03 fax from John Rohr to attorney William Aaron including a Motion For Production Of District Attorney Files.

12) 1/19/05 fax from William Aaron to John Rohr regarding public records request for case 344-648. This includes 1/21/05 response by John Rohr that the record is missing.

13) 4/17/06 fax from John Rohr to William Aaron accompanied by 2/25/06 public records request for case 344-648, made by Leonard Nelson. The fax indicates the record is missing.

14) 10/3/06 fax from William Aaron to John Rohr with John Rohr's response that the record could not be located. Stapled to this is 9/18/06 correspondence of Leonard Nelson asking if his file was located or if it was destroyed.

15) 4/21/08 fax from William Aaron to John Rohr with John Rohr's response that the record could not be located. Stapled to this is 4/14/08 correspondence of Leonard Nelson asking if his file was located or if it was destroyed.

Page 1 of 2

CERTIFIED DA OFFICE COPY

16) 1/26/09 fax from John Rohr to William Aaron indicating that case 344-648 could not be located. Stapled to this is a 1/5/09 letter from Leonard Nelson requesting that an investigation be conducted to determine how his file could have been lost.

Page 2 of 2

CERTIFIED DA OFFICE COPY





**619 S White Street**
**New Orleans, LA 70119**

(504) 822-2414
www.orleansda.com

**JASON ROGERS WILLIAMS**
**ORLEANS PARISH DISTRICT ATTORNEY**

June 14, 2022

Leonard Nelson, DOC# 118905
Louisiana State Penitentiary
17544 Tunica Trace
Angola, LA 70712

Mr. Nelson:

Our office received your conviction review questionnaire on October 19th, 2021. I received a call from your fiancée, Marlow Lewis, on May 19th of this year. She informed me that you had previously requested your OPDA trial file and had been requesting it since the early 1990s. I looked through my system and located both your trial file and several other documents relating to your requests, including a 2009 hearing re: same.

I began reviewing your file that same day and have been unable to locate proof of a non-unanimous jury verdict in your case. However, I have not located proof that it was unanimous either. I requested your record on appeal from the LSU archives as well. The jury's verdict was not recorded in the transcript. Our detailed review of these files is still ongoing.

I spoke to our current records manager, Devin Fleming, on May 31st and asked him to submit a letter that included the dates when everything in our file was scanned. His letter is attached here.

*I am sending you copies of the following documents:*

♦ OPDA trial file (317 pages)

♦ OPDA post-conviction documents (each part is outlined in Devin's memo)

♦ Record on appeal (# 91-KA-2491)

Lastly, I want to say that I am very sorry for you and your family that it took you so long to get these records. I cannot speak to the previous administrations or record keeping, but this office takes very seriously our commitment to transparency and to serving all of the citizens of Orleans Parish equally. We will continue to review your case and will be in touch if we find anything that raises red flags.

Regards,

_____
Julia Merritt
Investigator, Civil Rights Division





OF THE ORLEANS PARISH DISTRICT ATTORNEY
**JASON R. WILLIAMS**
**DISTRICT ATTORNEY**

05/31/2022

Julia Merritt
Civil Rights Division

Re: *public records - LEONARD NELSON*

The Orleans Parish District Attorney's Records Division is in receipt of the following Public Records Law Request in which Leonard Nelson requested the following:

- **Records for Criminal District Court Case# 344-648**

The Orleans Parish District Attorney's Records Division has processed your request of providing a timeline concerning the above request. Our department has searched all physical and digital inventories and determined that at this time the only materials we're in possession of are five electronic pdf's from the application Docstools. It is also my understanding that the Civil Rights Division will be providing these materials to the requestor and their family member, with that I will be resolving the requestor's requests after I have received notification that your department has provided these records.

- Pt. 1 38 pgs scanned 03/22/2010
- Pt. 2 317 pgs scanned 12/13/2018
    - This appears to be a scan of the original expandable that was removed from offsite storage on or about 04/19/1994, but there is no written record of when the record was returned to our department besides the date it was scanned.
- Pt. 3 25 pgs scanned 03/15/2019
- Pt. 4 9 pgs scanned 04/01/2019
- Pt. 5 2 pgs scanned 04/17/2019

If you need further assistance or have any questions, please contact us.

Respectfully,

Devin Fleming
Records Division

**Public Records Request File # C-000061-2021C**



Clerk's Office ___9/28___ 20 85
A True Copy

by ___ℛ. W___ Deputy Clerk
Hon. Darren P. Lombard
Clerk of Criminal District Court
Orleans Parish

CIVIL DISTRICT COURT

PARISH OF ORLEANS

STATE OF LOUISIANA

LEONARD NELSON                          NO. 07-12154

        VS                              DIVISION "E"

EDDIE JORDAN, JR.,
DISTRICT ATTORNEY

              Proceedings taken in the
above-entitled cause, before the HONORABLE MADELEINE
LANDRIEU, JUDGE PRESIDING, on the 24th day of July,
2009.

APPEARANCES:

    KEITH DOLEY, ESQ.
          Representing the Plaintiff

    WILLIAM D. AARON, JR., ESQ.
    DEWAYNE L. WILLIAMS, ESQ.
          Representing the Defendant

REPORTED BY:
    BARBARA A. BURGER
    CERTIFIED COURT REPORTER

1

CERTIFIED DA OFFICE COPY

P R O C E E D I N G S

THE COURT:

This is case number is 07-12154, Leonard Nelson versus Eddie Jordan, Jr. in his capacity as the District Attorney. It's a Petition for Writ of Mandamus and this proceeding is a little unusual in that the proceeding is before me in my capacity as of a Civil District Court Judge. I denied a Writ of Habeas Corpus because it's a civil proceeding and thought that we could use the technology available to us in the Criminal Courthouse to have Mr. Nelson appear by way of video conferencing instead of present, so Mr. Nelson is incarcerated at Angola. He is appearing before me in a video setting. I can see him. He can see me.

I have introduced him for the first time today to his lawyer, Mr. Keith Doley, who I appointed to represent him in this. I have advised Mr. Nelson that counsel for the D.A. and I are going to excuse ourselves and leave the room so that he can have a communication with Mr. Doley that they have not been allowed to have yet given the status of this proceeding. He has understood that I'm going to do that for him and, Mr. Doley, I'm asking you that when you have finished your communication with him, that you will advise us.

MR. DOLEY:

Okay.

THE COURT:

Thank you. Let's go off the record.

(DISCUSSION OFF THE RECORD).

2

CERTIFIED DA OFFICE COPY

THE COURT:

Mr. Nelson, are you there?

MR. NELSON:

Yes, ma'am. I hear you.

THE COURT:

We're back on the record of this case and I'm going to ask the lawyers now to formerly make their appearances.

MR. DOLEY:

I'm Keith Doley. I've been appointed by the Court to represent you, Mr. Nelson.

MR. AARON:

Bill Aaron and DeWayne Williams on behalf of the Honorable Leon Cannizzaro, District Attorney for the Parish of Orleans.

THE COURT:

Mr. Nelson, you have filed before the Court a Petition for Writ of Mandamus asking that the Court order the District Attorney's office to produce to you records that you've been looking for for some time now.

MR. NELSON:

Yes, ma'am.

THE COURT:

I have ordered the city attorney to appear and explain to the Court why they have not made the record production in accordance with the law. And, Mr. Aaron, I'm going to allow you first to make your statement, unless, Mr. Doley, you want to begin on behalf of Mr. Nelson.

MR. AARON:

As a little housekeeping, at the last

3

CERTIFIED DA OFFICE COPY

hearing which we continued to today, we were going to introduce an affidavit from John Rohr who's the Custodian of Records for the District Attorney's office, a detail affidavit which states all the activities that were done to try to locate the files and all the communications that were received by the office and all of the responses that were made with respect to Mr. Nelson's request. We would like to offer and introduce that into evidence as District Attorney Exhibit A.

THE COURT:

Mr. Doley, do you have any objection to that affidavit?

MR. DOLEY:

Yes. Is it Mr. Borne?

MR. AARON:

Rohr.

MR. DOLEY:

Mr. Rohr would have to be here because it would appear that at some point the District Attorney's office did in fact have this record available to them because in fact they were able to make an accurate count of the pages of Mr. Nelson's bill for payment of this. I mean, I can't cross-examine the affidavit. Can we just hold off on this affidavit and let's see how we go with --

MR. AARON:

Well, I mean, he explains in the affidavit that the last time they saw the file was April 24th of 1994 and that he had personally done a due and diligent search thereafter and couldn't find it.

THE COURT:

CERTIFIED DA OFFICE COPY

The question isn't the manner of what he said. The question is the method of me hearing what he says, whether there's authority in the law for me to get it by affidavit and in a summary proceeding.

MR. DOLEY:

I think that he needs to be present to --

MR. AARON:

Well, let me say this, Judge, normally the Court handles preliminary injunctions in summary proceedings, and most, if not all, the judges do it by affidavit so I don't think this would be anything different.

THE COURT:

I'm going to admit the document.

MR. AARON:

Thank you.

THE COURT:

I note the objection.

MR. DOLEY:

Thank you.

THE COURT:

Mr. Aaron, do you want to proceed?

MR. AARON:

Yes, Your Honor. This matter has been going on, and when I say this matter, the request for public records have been going on at least since 1993. The file was originally located back in 1994 and a letter was sent to Mr. Nelson advising him what the costs would be. For whatever reason subsequent to that, the file was misplaced or lost and for over a decade no one has been able to find the record.

As the Court is aware, the obligation of a

5

CERTIFIED DA OFFICE COPY

custodian with respect to public records only extends for three years, so we would make two arguments. One is that it's been waived more than three years so we have no obligation to have the records. Further, all the law requires is that we make a due and diligent search for the record, and if we cannot find the record, there's ample authority, including Supreme Court precedent, which says that you can't be forced to produce which does not exist.

THE COURT:

Mr. Doley.

MR. DOLEY:

Your Honor, in relation to what Mr. Aaron has presented to the Court, Mr. Nelson has a right to be able to retrieve his record and it would appear that if in fact this case was ongoing, the petition was (inaudible due to technical difficulties) on July 29, 1991 and was affirmed by the Appeals Court October 15th, 1992. If in fact that is the case, then the record should be preserved until 1995. There was a search started in 1993 which would be within the (inaudible due to technical difficulties) so therefore the District Attorney's office should have been able to provide a copy of this record to Mr. Nelson.

With that being said, Mr. Nelson has provided me with a letter that raises some defenses that he wanted to raise as relates to post conviction relief. Those things that he had indicated to me was one that this was a -- this was done in self defense, that that was not -- he was not allowed to be able to put that on the record because of information that

6

CERTIFIED DA OFFICE COPY

was withheld by the District Attorney's Office. There were two police reports that did not come into evidence during the time of trial and in fact those documents should have been in the record to be able to help him with the post conviction relief.

Further, there was a lifting of fingerprints that were supposed to have been done which would have proven that the person who was in fact -- that died in this matter it was his gun and his fingerprints would have been on those -- on that gun. That did not come out at trial. And that the victim was in possession of the firearm at the time of the incident.

There was further information that did not come out in the trial. The fingerprints of the crime lab. The gun was a registered gun. It was not stolen and it was in fact the gun of the deceased, and without this information and without the ability to be able to provide the record to Mr. Nelson, it prevents him from being able to get his post conviction relief that he is seeking and that is a Motion for a New Trial, so with that -- are we still on? (Disconnected due to technical difficulties).

Mr. Nelson, is there anything else that you want to add to those things that I have already stated and put on the record?

MR. NELSON:

Yes, sir. Your Honor, I would like to say that due to my incarceration and the time that -- with my District Attorney file, it would prove -- everything that's in my District Attorney file would prove my innocence, and without my District Attorney

7

CERTIFIED DA OFFICE COPY

file, I can't file a post conviction relief and so that's why I've been trying to get my District Attorney file to prove my innocence because everything in the trial transcript prove that everything was turned over to the District Attorney: Fingerprints, statements and all. I don't have no statements. Everything was turned over to the District Attorney in the District Attorney file.

THE COURT:

Okay.

MR. DOLEY:

Let me add one other thing, that at some point Mr. Nelson was provided with a bill from Section A, case number 344-648 Section A. He was provided with a bill of $146.50. That was information informing him that the file consisted of 275 pages, so at some point in time after his request, the District Attorney had in its possession the file for Mr. Nelson, knew how many pages, was able to provide him with a bill for that for $146. He mailed a check timely to the District Attorney's office for $146.50 for the copies of the file. This was withdrawn from his prison account on July 14th, 1995. The District Attorney acknowledged receipt of the payment and did not -- and has not forwarded any files to him. The plaintiff asserts that from 1995, July of 1995 when he sent the money until 2000, the District Attorney's office claim that they have misplaced the file and that they were searching for the file for him, so this request has been ongoing since 1995 and even earlier since 1993, so, I mean, this is well within the time frame of the three years

8

CERTIFIED DA OFFICE COPY

that the District Attorney's office should have maintained the file in its possession, so I don't know on the criminal side, Judge, what should happen at this point, but at this point with the admission from the District Attorney's office stating that they do not have the records at this point, I think it has to be in the most favorable light to Mr. Nelson at this point that whatever relief that he is seeking from the civil side be granted to him and that would be the record. They can't do that and I think at that point he would have to take whatever measures on the criminal side to move forward with this.

MR. AARON:

If I may, Judge, briefly, the matters raised by Mr. Nelson all deal with post conviction relief. As this Court --

THE COURT:

By Mr. Doley and Mr. Nelson?

MR. AARON:

Right. As this Court is aware in Orleans Parish there's a civil court bench and a criminal court bench. I respectfully suggest that as to any matters dealing with exculpatory evidence, post conviction relief, etc., this Court does not have jurisdiction.

MR. DOLEY:

By no means am I raising that. I'm just saying that whatever relief that the civil bench can give Mr. Nelson. I know that the Judge cannot do anything as relates to his -- those matters have to either be dealt with either at the Criminal District Court level or the Fourth Circuit Court of Appeal.

9

CERTIFIED DA OFFICE COPY

THE COURT:

I'm prepared to rule. Mr. Nelson, I know you can still hear me but the teleconferencing just went off so we're going to wait for it to come back on. Mr. Nelson, are you back?

MR. NELSON:

Yes, ma'am.

THE COURT:

I was waiting for you to come back so we didn't have anything going on here until you did.

MR. NELSON:

Thank you, ma'am.

THE COURT:

No problem. The petition before the Court is filed before me as a civil court judge. I only have civil jurisdiction. Do you understand that I do not have criminal jurisdiction and so I can't rule on the merits of your post conviction relief allegations. The only issue before me is whether or not I can order the District Attorney to produce the records that you're requesting.

MR. NELSON:

Yes, ma'am.

THE COURT:

And I in fact would order them to do so but I'm finding as a matter of fact that the record no longer exists and therefore it is unavailable to you. I can't order them to produce something that has been lost. The question of whether or not you have any rights that would flow to you on the criminal side in a post conviction relief proceeding by virtue of the fact that the District Attorney has lost your record

10

CERTIFIED DA OFFICE COPY

is an issue which I can't reach today.  Do you understand that?

MR. NELSON:

Yes, ma'am.

THE COURT:

But what I am finding as a matter of fact and will issue a judgment that you will get is that we had a hearing, that I have found as a matter of fact, number one, that your request was timely, that is that the District Attorney had a duty to preserve your record for those three years; that within that three-year period they did in fact have your record and had an ongoing duty to preserve it pursuant to your request.  However, I'm making a finding that they did not and do not have it.  I am not rendering an opinion that it was purposeful on their part because it does not appear to the Court that it was. It appears to the Court that it was misplaced in the normal but unusual and certainly unfortunate circumstances of record keeping.  Whether or not any further remedies or rights are available to you as a result of this finding is going to be up to you to pursue in consultation with your attorney.  Do you understand that?

MR. NELSON:

Yes, ma'am.

THE COURT:

The case number that is the underlying case in Criminal District Court -- I'm sorry, in the public records request history, not the underlying Criminal Court's record, but the public records request history is District Attorney's Office of New

11

CERTIFIED DA OFFICE COPY

Orleans, case 344-648, and I wanted to put that on the record.

Do you have any other questions to ask of me before we terminate this hearing?

MR. NELSON:

Yes. I would like to say the reason why I come to Civil District Court because I was getting cases that said the only way I can receive any kind of information from my District Attorney file is through Civil District Court and they have cases saying that if the District Attorney misplaced or lost or destroyed the files, it would have to be who, when and where and what time frame did the file was misplaced or destroyed.

THE COURT:

And we have established that by the affidavit that's been admitted into evidence, and I'm going to have Mr. Doley mail a copy of that affidavit to you.

MR. NELSON:

Yes, ma'am. I have a --

THE COURT:

Mr. Nelson, I don't think you have a copy of this yet, sir.

MR. DOLEY:

You don't have this yet, Mr. Nelson. I'll send it to you.

THE COURT:

He's going to send it to you, and by virtue of that affidavit, the Court, I've admitted that into evidence, is accepting that as the circumstances that surrounded the when, where and how that your records

12

CERTIFIED DA OFFICE COPY

were misplaced.  Okay?

MR. NELSON:

Yes, ma'am.

THE COURT:

So you have now done exactly what the law makes you do and that is come into Civil District Court and have a finding made by the Civil District Court of the when, where and how your records were misplaced.  So you've done exactly what the law has asked you to do and I am granting you the right to have a copy of this record.  Unfortunately, the record is not there to be had.  Whatever rights then flow from that flow to you to pursue in your Criminal Court post conviction relief filing.  Okay?

MR. NELSON:

Yes, ma'am.

THE COURT:

Mr. Doley will explain that to you more thoroughly.  Now let me say this for this record: Mr. Doley was appointed by the Court and agreed to act pro bono on your behalf free of charge for you in the civil case only.  Once he advises you of what the end game of this proceeding, he will not be representing you unless further agreements are made by you.  It's most likely that there will be someone else appointed for you on the criminal side.  Do you understand that?

MR. NELSON:

Yes, ma'am, I understand.  I understand very well.

THE COURT:

And I appreciate, Mr. Doley, you accepting

13

CERTIFIED DA OFFICE COPY

the appointment of the Court.

MR. DOLEY:

No problem.

THE COURT:

Do you have any further questions, Mr. Nelson?

MR. NELSON:

I appreciate you, Mr. Doley. I thank you, Mr. Aaron, for your consistence and diligence with me and Mr. Doley and, Your Honor, thank you and everything. Just thank you, Your Honor.

THE COURT:

Thank you, Mr. Nelson. You have gone off of teleconferencing but we can hear you quite well through the phone. Good luck to you, sir. Stay on the line. Mr. Doley is going to talk to you after I recess this hearing so he can again talk to you privately. Fair enough?

MR. NELSON:

Yes, ma'am.

THE COURT:

This Court is adjourned.

MR. AARON:

Thank you.

MR. WILLIAMS:

Thank you, Judge.

(Whereupon, the proceedings were concluded).

14

CERTIFIED DA OFFICE COPY

CERTIFICATE

I, Barbara A. Burger, an Official Shorthand Reporter in and for the Parish of Orleans, State of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding.



BARBARA A. BURGER

Certified Court Reporter

CERTIFIED DA OFFICE COPY



Clerk's Office ___2/28___ 20_25_
A True Copy

by ___R.W___ Deputy Clerk

Hon. Darren P. Lombard
Clerk of Criminal District Court
Orleans Parish



Harry F. Connick
District Attorney of New Orleans
State of Louisiana
619 SOUTH WHITE STREET
NEW ORLEANS, LOUISIANA 70119

Leonard Nelson #118905
Rec'd $46.50 in
the Legal Mail from
DA Harry Connick
on 10/16/00
Witness ...
2nd ...
...to be
deposited
in account.

Leonard Nelson #118905
Camp D, Raven 4/R13
La. State Prison
Angola, La. 70712

EXHIBIT "A"

CERTIFIED DA OFFICE COPY



**Harry F. Connick**

**District Attorney of New Orleans**

**State of Louisiana**

619 SOUTH WHITE STREET
NEW ORLEANS, LOUISIANA 70119

Renard Nelson #118905
Camp D
La. State Prison
Angola, La 70712

EXHIBIT "B"

CERTIFIED DA OFFICE COPY

**JOHN S. KELLER**
ATTORNEY AT LAW

SUITE 1790, ENTERGY BUILDING
639 LOYOLA AVENUE
P.O. BOX 56367
NEW ORLEANS, LA 70156-6367

NOTARY PUBLIC
ALSO ADMITTED IN THE
STATE OF COLORADO

(504) 588-9173
TELECOPIER (504) 588-9972

March 5, 1996

Mr. Leonard Nelson, #118905
Walnut #3
Louisiana State Prison
Angola, LA  70712

Re:  State v. Nelson, No. 344-648

Dear Mr. Nelson:

This acknowledges receipt of your letter of February 24, 1996.

At this time your file has been misplaced.  We are continuing our search for the subject file.  If you wish, until we locate the file a refund of your payment can be made to you.  Please advise.

Yours truly,

John S. Keller

JSK/klb

*ExHiBiT "C"*

CERTIFIED DA OFFICE COPY

**JOHN S. KELLER**
ATTORNEY AT LAW

SUITE 1790, ENTERGY BUILDING
639 LOYOLA AVENUE
P.O. BOX 56367
NEW ORLEANS, LA 70156-6367

NOTARY PUBLIC
ALSO ADMITTED IN THE
STATE OF COLORADO

(504) 588-9173
TELECOPIER (504) 588-9972

July 24, 1998

Mr. Leonard Nelson, #11890
Louisiana State Penitentiary
Camp D - ? , e 4
Angola, LA  70712

Re:  State of Louisiana v. Leonard Nelson, No. 344-648

Dear Mr. Nelson:

Please be advised that after another warehouse search and a search of records in the file room, we still cannot locate your record.

If you desire a refund at this time, please advise.

Yours truly,

John S. Keller
Assistant District Attorney

JSK/klb

*Exhibit "D"*

CERTIFIED DA OFFICE COPY



**Eddie J. Jordan, Jr.**
**District Attorney of New Orleans**
**State of Louisiana**

William D. Aaron, Jr.
Special Prosecutor
waaron@goinsaaron.com

1010 Common St.
Suite 2600
New Orleans, LA 70112
(504) 569-1807

January 19, 2005

Leonard Nelson #118905
Louisiana State Penitentiary, Pine Unit
Angola, LA 70712

RE:    State of Louisiana v. Leonard Nelson #118905
       Case No:344-648
       Our File No. 75076

Dear Mr. Nelson:

I am in receipt of your Public Records Request of January 14, 2005 regarding documents pertaining to Leonard Nelson. I have contacted Mr. John Rohr of the District Attorney's Office of Orleans Parish requesting the pertinent information, and I will be in touch with you as soon as I learn from him that the file(s) you requested have been located.

With regards, I am

Sincerely yours,

William D. Aaron, Jr.
Special Prosecutor

WDA/gr

EχHɪBɪT "G"

CERTIFIED DA OFFICE COPY



**Eddie J. Jordan, Jr.**
**District Attorney of New Orleans**
**State of Louisiana**

William D. Aaron, Jr.
Special Prosecutor
waaron@goinsaaron.com

1010 Common St.
Suite 2600
New Orleans, LA 70112
(504) 569-1807

January 24, 2005

Leonard Nelson #118905
Louisiana State Penitentiary, Pine Unit
Angola, LA 70712

        RE:   State of Louisiana v. Leonard Nelson #118905
               Case No:344-648
               Our File No. 75196

Dear Mr. Nelson:

    I am in receipt of your Public Records Request of January 14, 2005 regarding documents pertaining to your request. I have contacted Mr. John Rohr of the District Attorney's Office of Orleans Parish requesting the pertinent information, the file(s) you requested have not been located. It is noted that requests for this record have been made going back to 1993. In all cases the record could not be located and at this time the record is still missing. Should the file be discovered, the District Attorney's Office will notify you immediately.

                    Yours very truly,

                    William D. Aaron, Jr.
                    Special Prosecutor

WDA/gr

EXHIBIT "H"

CERTIFIED DA OFFICE COPY



**Eddie J. Jordan, Jr.**
**District Attorney of New Orleans**
**State of Louisiana**

William D. Aaron, Jr.
Special Prosecutor
waaron@goinsaaron.com

9270 Siegen Lane
Suite 404
Baton Rouge, LA 70810
(225) 757-4991

May 15, 2006

Leonard Nelson #118905
Camp C Jaguar 4-R-4
Louisiana State Penitentiary
Angola, LA 70712

RE:    State of Louisiana v. Leonard Nelson #118905
       Case No:344-648
       Our File No. 75196

Dear Mr. Nelson:

I am in receipt of your Public Records Request of February 20, 2006 regarding documents pertaining to your request. I have contacted Mr. John Rohr of the District Attorney's Office of Orleans Parish requesting the pertinent information, the file(s) you requested have not been located. It is noted that requests for this record have been made going back to 1993. In all cases the record could not be located and at this time the record is still missing. Should the file be discovered, the District Attorney's Office will notify you immediately.

Yours very truly,

William D. Aaron, Jr.
Special Prosecutor

WDA/jak

EXHIBIT "I"

CERTIFIED DA OFFICE COPY



**Eddie J. Jordan, Jr.**
**District Attorney of New Orleans**
**State of Louisiana**

William D. Aaron, Jr.
Special Prosecutor
waaron@goinsaaron.com

201 St. Charles Ave.
Suite 3800
New Orleans, LA 70170
(504) 569-1807

October 3, 2006

Leonard Nelson #118905
Camp D Hawk 2-L-7
Louisiana State Penitentiary
Angola, LA 70712

        RE:    State of Louisiana v. Leonard Nelson #118905
                 Case No:344-648
                 Our File No. 75196

Dear Mr. Nelson:

I am in receipt of your Public Records Request of October 3, 2006 regarding documents pertaining to Leonard Nelson. I have contacted Mr. John Rohr of the District Attorney's Office of Orleans Parish requesting the pertinent information, and I will be in touch with you as soon as I learn from him that the file(s) you requested have been located.

With regards, I am

                    Sincerely yours,

                    William D. Aaron, Jr.
                    Special Prosecutor

WDA/td

EXHIBIT "J"

CERTIFIED DA OFFICE COPY



**Eddie J. Jordan, Jr.**
**District Attorney of New Orleans**
**State of Louisiana**

William D. Aaron, Jr.
Special Prosecutor
waaron@goinsaaron.com

201 St. Charles Ave.
Suite 3800
New Orleans, LA 70170
(504) 569-1807

April 21, 2008

Leonard Nelson #118905
Camp D Hawk 2-L-7
Louisiana State Penitentiary
Angola, LA 70712

RE:   State of Louisiana v. Leonard Nelson #118905
       Case No:344-648
       Our File No. 75196

Dear Mr. Nelson:

I am in receipt of your Public Records Request of April 14, 2008 regarding documents pertaining to Leonard Nelson. I have contacted Mr. John Rohr of the District Attorney's Office of Orleans Parish requesting the pertinent information, and I will be in touch with you as soon as I learn from him that the file(s) you requested have been located.

With regards, I am

Sincerely yours,
William D. Aaron Jr./Pamela Kelly

William D. Aaron, Jr.
Special Prosecutor

WDA/bk

EXHIBIT "K"

CERTIFIED DA OFFICE COPY



## KEVA M. LANDRUM-JOHNSON
### District Attorney of New Orleans ~ State of Louisiana

William D. Aaron, Jr.
Special Prosecutor
waaron@goinsaaron.com

201 St. Charles Ave.
Suite 3800
New Orleans, LA  70170
(504) 569-1800

September 12, 2008

Leonard Nelson #118905
Camp D Hawk 2-L-7
Louisiana State Penitentiary
Angola, LA 70712

RE:    State of Louisiana v. Leonard Nelson #118905
       Case No:344-648
       Our File No. 75196

Dear Mr. Nelson:

I am in receipt of your Public Records Request of April 21, 2008, regarding documents pertaining to Leonard Nelson. I have contacted Mr. John Rohr of the District Attorney's Office of Orleans Parish and he has advised me that your record cannot be located. Consequently, we cannot supply a copy of it.

Sincerely yours,

William D. Aaron, Jr.
Special Prosecutor

WDA/bk

EXHIBIT "L"

CERTIFIED DA OFFICE COPY



### LEON A CANNIZZARO, JR.
#### District Attorney of New Orleans ~ State of Louisiana

William D. Aaron, Jr.
Special Prosecutor
waaron@goinsaaron.com

201 St. Charles Ave.
Suite 3800
New Orleans, LA 70170
(504) 569-1800

January 26, 2009

Leonard Nelson, #118905
Camp "J", Gar 3-R-9
Louisiana State Penitentiary
Angola, Louisiana 70712

RE:   State of Louisiana v. Leonard Nelson
      Case No: 344-648
      Our File No: 75196

Dear Mr. Nelson:

I am in receipt of your Public Records Request of January 5, 2009, regarding documents pertaining to Leonard Nelson. I have contacted Mr. John Rohr of the District Attorney's Office of Orleans Parish and he has advised me that your record cannot be located. Consequently, we cannot supply a copy of it.

Sincerely yours,

WD Aaron

William D. Aaron, Jr.
Special Prosecutor

WDA/bk

Ex HiBiT "M"

CERTIFIED DA OFFICE COPY



Clerk's Office ___2|28___ 20_25_
A True Copy

by __RW__ Deputy Clerk

Hon. Darren P. Lombard
Clerk of Criminal District Court
Orleans Parish

MEMORANDUM

TO:    Ray Bigelow
       Wendy Baldwin

FROM:  Robin O'Bannon

DATE:  August 29, 1991

RE:    Matthew Moore, 344-648, 344-729, 344-706 and 344-718
       Request for reduction from First Degree Murder to Manslaughter
       and No Bill

On May 6, 1990 Harold Doss was gunned down by Leonard Nelson on Treasure and Bruxelles Street. Harold, Derek Marigny and Curtis Miller were sitting across the street from the End Zone Lounge "conversating" when Leonard Nelson and Matthew Moore charged them brandishing guns. Leonard Nelson fired several times causing the three friends to take cover any where they could. Derek ran behind a car, and Curtis and Harld ran down a side street. Curtis was able to roll underneath a parked car, but Harold fell down and was unable to get up before Nelson came upon him.

Nelson demanded that Harold "Give it up" and as Harold was begging for his life and trying to remove his jewelry, Nelson shot him twice. Nelson called for Moore, who was back at the corner, and demanded that Moore shoot Harold, as well. Moore did not shoot, so Nelson fired a final shot into Harold's body. The two fled the scene.

Witnesses Tracy Johnson and Crhistine Boatner saw Moore drop his weapon in the middle of the street as the two were running away. The gun was tested with negative results.

On March 4, 1991, Leonard Nelson was convicted of second degree murder and subsequently sentenced to life imprisonment without benefits. He and Matthew Moore are still awaiting trial in three other cases. The other cases are unrelated to the murder charge, but arise out of the same incident.

On May 14, 1990, Cherryl Scott was sitting at a redlight at Carrollton and Earhart when an unknown Black male subject approached her vehicle, and ordered her out. Before she could exit the car, the subject shoved her onto the passenger's seat and motioned for two other subjects, Matthew Moore and Leonard Nelson. The two jumped into the

CERTIFIED DA OFFICE COPY

PAGE -2-
Memorandum:  Matthew Moore

backseat.  The unknown driver had a gun as did Leonard Nelson.  They took off with Ms. Scott and drove around for several hours.  During the ride, Leonard Nelson demanded her purse then proceeded to remove all of her currency.  (approximatley $170.00)

The kidnappers pushed Ms. Scott out of the vehicle approximatley three hours later, leaving her stranded in the St. Bernard Housing Project.  Police Officer Mark McCraney later observed the vehicle and attempted to pull it over.  (At some point after dropping Ms. Scott off, and before the police began pursuit, the unknown driver had gotten out of the vehicle).  The driver, Matthew Moore, turned the vehicle around and drove into Officer McCraney's motor scooter, injuring the officers legs.  Other units responded and both Moore and Nelson were apprehended.  Ms. Scott was brought to the scene and identified both subjects.  (It should be noted that the defendants were handcuffed and in the back seat of a police unit when the identification was made.)

Since Leonard Nelson's trial, this office approved a No bill on Derek Marigny's three drug charges.  During the Nelson trial the defense attempted to discredit Mr. Marigny as a drug kingpin who was recieving a deal for his testimony.  At the time, Derek denied being a drug dealer, and denied having any plea agreements with this office.  AT the time he was telling th truth.  Now, however, he has been convicted on PWITD charges.  He would have to admit drug involvement and admit the no bill agreement.  I believe Derek's testimony could prove harmful to our case against Matthew Moore, in that his crediblity and veracity could be easily challenged.  Further, any testimony about the No Bill may give the appearance of impropriety at the Nelson trial.  Although we steadfastly refuse to deal with Marigny in exchange for his testimony, an admission at the Moore trail as to the NO Bill may be the ammunition the defense needs for a reversal of the Nelson conviction.

Most importantly, however, it is highly improbable that we can prove that Matthew Moore specifically intended to kill Harold Boss as a principal to First Degree Murder.  Our whole case depends on the theory that that the two defendants killed Harold Boss during the perpetration of an armed robbery or an attempted armed robbery.  The Nelson jury did not believe that an armed robbery or an attempt was

CERTIFIED DA OFFICE COPY

PAGE -3-
Memorandum: Matthew Moore

in progress. They felt from the circumstances that Nelson specifically intended to kill, ergo, second degree murder. Moore, on the other hand, did not fire his weapon once, and fled the scene rather than shot Harold's body. He did not approach Harold with Leonard, and made no demands to Harold. He remained on the corner away from Leonard and Harold. The "principal" argument is not a feasible one in light of all the circumstances.

Matthew Moore will plead guilty to Manslaughter and the other charges (armed robbery, kidnapping, attempted murder, and resisting arrest) for seventeen years. Ms. McDonald, Ms Waldron and myself recommend we package all the cases, and offer this deal to the defendant. If you will recall, Ms. McDonald and I prosecuted Nelson; and, we recommended the NO Bill to Derek Marigny because of the safety factor. Ms. Waldron has reviewed this memorandum and concurs.

CERTIFIED DA OFFICE COPY



Clerk's Office _____2|28_____ 20 85
A True Copy

by _R.W_____ Deputy Clerk

Hon. Darren P. Lombard
Clerk of Criminal District Court
Orleans Parish

TO: RAY BIGELOW
FROM: MISSY MCDONALD
RE: DEREK MARIGNY
DATE: 6/7/91

Derek Marigney is an essential and material witness in the murder case against Mathew Moore. (Case # 344-648) Presently, this case is set for trial on 7/24/91. Earlier this year, Ms. O'Bannon and I prosecuted the co-defendant Leonard Nelson, and a verdict of second degree was returned.

Prior to the first trial, Mr. Marigney stated that he would not testify unless the office offered him a deal concerning his outstanding drug charges. (See cases 341-057, 342-951, and 343-461.) The charges against Mr, Marigny are simple possession of cocaine and two counts of PWITD cocaine.  If you will recall, I approached you before regarding Mr. Marigny's request. At that time, you indicated that this office would offer no deals in return for his testimony. We relayed this information to Mr. Marigny who in turn stated he would offer no assistance in our trial.

Approximately one hour before the trial started, Mr. Marigny appeared in court and stated that he would cooperate because it was his friend that was killed and he wanted to do the right thing. Ms. O'Bannon nor myself made any promises to him. In fact, he believed, at the time of trial, that his own charges would be fully prosecuted.

Mr. Marigney was the main witness to the shooting death of Harold Boss Wilson. His testimony was clear, concise, honest and credible. The jury fully believed Mr. Marigny and returned a verdict of guilty of second degree murder. Without his testimony, we would  not have had sufficient evidence to convict Leonard Nelson.

His testimony will be required again in the trial of Matthew Moore. The evidence is very weak against defendant Moore and the trial will suffer immensely without Mr. Marigny's testimony. Again, we are requesting that we can help Mr. Marigny, as he helped us.

CERTIFIED DA OFFICE COPY

As it stands now, Mr. Marigny faces a 15 year minimun sentence if this office convicts and multiple bills Mr. Marigny. We feel that his safety is in jeopardy if he were to be incarcer- ated for that length of time with Leonard Nelson. I have spoken to defense counsel. Glynn Alexander, who has stated that Mr. Marigny is willing to plead guilty to all counts against him for a sentence of 18 months.

Mr. Marigny has been very cooperative with Ms. O'Bannon and myself. He has also successfully completed two drug rehabilita- tion programs. Further, an Uncle in ▮▮▮▮▮▮ has offered Mr. Marigny a job when he gets out as well as a home. We believe that Mr. Marigny will have the opportunity to start a new life in a safe, protected environment once he is released from prison.

Considering Mr. Marigny's continued cooperation with this office, as well as his future safety and well-being, we request that he not be multiple billed in return for a plea of guilty to all charges and a sentence of 18 months.

CERTIFIED DA OFFICE COPY



Clerk's Office ___2|88___ 20 25
A True Copy

by ___RW___ Deputy Clerk
Hon. Darren P. Lombard
Clerk of Criminal District Court
Orleans Parish

# OFFICE OF THE DISTRICT ATTORNEY PARISH OF ORLEANS

CODE — HENRENE BROWN

8905AA48

| ARRAIGNMENT DATE | DEFENDANT | B OF I NUMBER | DEFENDANT NUMBER | DEFENSE ATTORNEY | PLEA |
|---|---|---|---|---|---|
| 9-2-89 | BROWN 02 | | | Don Markton | N.C. |
| '' | MARSANY 01 | | | Glen Alexander | N.C. |

| T DATE 6-23-89 | NEXT EVENT MOTL | ADA | | CODE CFRN | DATA ENTRY Shirley |
|---|---|---|---|---|---|
| GE BCY | | REMARKS | | | 6-14-89 |
| PORTER Mentyr MKJ | | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 23-89 | BROWN 02 | ARGW | | NH | C | 109 | OPD |

| XT DATE 6-2-89 | NEXT EVENT ARGT | ADA | | CODE CFAC | DATA ENTRY Shirley |
|---|---|---|---|---|---|
| GE BCY | | REMARKS | | | 6-14-89 |
| PORTER | | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 2-1-89 | Brown 02 | MctG | | CN | C | 109 | O10 |
| | Marsny 01 | | | | | | |

| XT DATE 8/18/89 | NEXT EVENT MOTG | ADA 1699 | | CODE CREL | DATA ENTRY |
|---|---|---|---|---|---|
| GE BPR | | REMARKS | | | 6/21/89 |
| PORTER | | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 1-8-89 | BROWN | MOTL | 7K5 | GR | | | O10 |
| | MARSANY 01 | | AH9 | | | | |

| XT DATE | NEXT EVENT | ADA Smith | | CODE MYM | DATA ENTRY |
|---|---|---|---|---|---|
| GE BPR | | REMARKS | | | 8/18/89 |
| PORTER | | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 8-30-89 | Brown | STHG | | HB NH | Δ | 111 | O10 |
| | Marsany | | | | | | |

| XT DATE 9-8-89 | NEXT EVENT STHG | ADA | | CODE DCVA | DATA ENTRY |
|---|---|---|---|---|---|
| GE KIA | | REMARKS weather DSC atty show | | | |
| PORTER | | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 9-8-89 | Brown | STHG | | NH | Δ | 111 | O10 |
| | Marsany | | | | | | |

| XT DATE 9-14-89 | NEXT EVENT STHG | ADA Guthman | | CODE DCLA | DATA ENTRY |
|---|---|---|---|---|---|
| GE KIA | | REMARKS | | | 8/89 |
| PORTER | | | | | |

SEE BACK FOR MORE SPACE

CLOSED

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000220

OFFICE OF THE DISTRICT ATTORNEY PARISH OF ORLEANS

CoD = Henrene Brown

| CASE NUMBER | | | SYSTEM NUMBER | | | 80 05AA48 |
|---|---|---|---|---|---|---|
| ARRAIGNMENT DATE | DEFENDANT | B OF I NUMBER | DEFENDANT NUMBER | DEFENSE ATTORNEY | | PLEA |
| 6-2-89 | BROWN 02 | | | Don Pinketon | | NG |
| 11 | MARGONY 01 | | | Roger Alexander | | NG |

NEXT DATE 6-23-89  NEXT EVENT MotHG  ADA  CODE CFRD  DATA ENTRY Shirley  6-14-89
JUDGE BFY
REPORTER Montgas mRC  REMARKS

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 6-23-89 | BROWN 02 | Argu | | NA | C | 109 | oru |

NEXT DATE 6-2-89  NEXT EVENT Argu  ADA  CODE PAD  DATA ENTRY Shirley  6-14-89
JUDGE BFY
REPORTER  REMARKS

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 8/21/89 | Brown 02 | MotHG | | CN | C | 109 | 010 |
| | Marigny 01 | | | | | | |

NEXT DATE 8/18/89  NEXT EVENT MotHG  ADA Tally  CODE CREL  DATA ENTRY  6/21/89
JUDGE ISPO  REMARKS Judge is BR
REPORTER

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 8-18-89 | BROWN | MotHG | TRS | GR | | | 010 |
| | MARIGNY 01 | | Arg | | | | 11 |

NEXT DATE  NEXT EVENT  ADA M Smith  CODE MSMI  DATA ENTRY  8/18/89
JUDGE BPO  REMARKS
REPORTER

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 8-30-89 | Brown | STHG | | NH | Δ | 111 | 010 |
| | Marigny | | | | | | |

NEXT DATE 9-8-89  NEXT EVENT STHG  ADA  CODE NCRa  DATA ENTRY
JUDGE KIA  REMARKS waiting Dse atty show
REPORTER

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 9-8-89 | BROWN | STHG | | NH | Δ | 111 | 010 |
| | MARIGNY | | | | | | |

NEXT DATE 9-14-89  NEXT EVENT STHG  ADA Guthman  CODE DCLA  DATA ENTRY
JUDGE KIA  REMARKS
REPORTER

SEE BACK FOR MORE SPACE

CLOSED



FENDANT RELEASE STATUS

| DEFENDANT | BOND TYPE | AMOUNT | JUDGE | DATE |
|-----------|-----------|--------|-------|------|
|           |           |        |       |      |
|           |           |        |       |      |
|           |           |        |       |      |
|           |           |        |       |      |

## PLEA OFFERS

| DATE | DEFENSE COUNSEL | ADA | REMARKS |
|------|-----------------|-----|---------|
|      |                 |     |         |
|      |                 |     |         |
|      |                 |     |         |
|      |                 |     |         |
|      |                 |     |         |

APPROVED BY

_____

## CLOSING CHECK LIST

Closed to all defendants? _____ yes
Sentence info on file? _____ yes
Copy of bond in file? _____ yes
B of I Photograph in file? _____ no
Updated Rap Sheet in file? _____ yes
Was def. Multiple Billed where Possible to do so? _____ yes
Was sentence a legal one? _____ yes
Victim and Witness letters sent? _____ NA
If Nollied is form signed off? _____ yes

_F. Vattrau_
JVESTIGATOR                          REVIEWED BY _____

_[signature]_
3SISTANT DISTRICT ATTORNEY           DATE _____

7-21-80
ATE

## APPEAL

E FILED: _____
TURN DATE: _____
STANT DISTRICT ATTORNEY _____
RT
OSITION

Petitioner's Writ Application (La. Ct. App. 1 Cir.) Exhibits
000223

COURT NUMBER _____          SYSTEM NUMBER 89051748

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STA |
|------|-----------|-------|--------|----------------|---------------|---------------|
| 6-15-90 | Braun DA | Mara | AP | | | Clad |

| NEXT DATE | Cloud | NEXT EVENT | | ASA Cardova | CODE ECAN | DATA ENTRY [illegible] |
|-----------|-------|------------|---|-----------|-----------|------------------------|
| JUDGE K.A | | | REMARKS | | | 6-18-90 |
| REPORTER | | | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STA |
|------|-----------|-------|--------|----------------|---------------|---------------|
| 7-2-90 | Bizzoli Marigny | STHG | NH | D | 109 | OID |

| NEXT DATE 7-16-90 | NEXT EVENT STHG | ASA Braun | CODE RBRA | DATA ENTRY [illegible] |
|-------------------|-----------------|-----------|-----------|------------------------|
| JUDGE K.A | | REMARKS | | 7-10-90 |
| REPORTER | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STA |
|------|-----------|-------|--------|----------------|---------------|---------------|
| 7-16-90 | Marigny | STHG | DS | | 307 | closed |

| NEXT DATE | NEXT EVENT | ASA Braun | CODE RBRA | DATA ENTRY [illegible] |
|-----------|------------|-----------|-----------|------------------------|
| JUDGE K.A | | REMARKS | | 7-16-90 |
| REPORTER | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STA |
|------|-----------|-------|--------|----------------|---------------|---------------|
| | | | | | | |

| NEXT DATE | NEXT EVENT | ASA | CODE | DATA ENTRY |
|-----------|------------|-----|------|------------|
| JUDGE | | REMARKS | | |
| REPORTER | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT ST. |
|------|-----------|-------|--------|----------------|---------------|---------------|
| | | | | | | |

| NEXT DATE | NEXT EVENT | ASA | CODE | DATA ENTRY |
|-----------|------------|-----|------|------------|
| JUDGE | | REMARKS | | |
| REPORTER | | | | |

COURT NUMBER _____    SYSTEM NUMBER ___ 89067748

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STAT |
|---|---|---|---|---|---|---|
| 1/29/90 | Marieny Brown | STHG | CD | CA | 136 | 010 |

| NEXT DATE | 2/16/90 | NEXT EVENT | STHG | ADA | Skaily | CODE | SADS | DATA ENTRY | 2/23/90 |
|---|---|---|---|---|---|---|---|---|---|
| JUDGE | KIA | | | | | | | | |
| REPORTER | Lois Powell | | REMARKS | | | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STAT |
|---|---|---|---|---|---|---|
| 2/16/90 | Brown Marieny | STHG | CD | ASC | 111 | 010 |

| NEXT DATE | 3/9/90 | NEXT EVENT | STHG | ADA | Skaty | CODE | SADS | DATA ENTRY | 2/23/90 |
|---|---|---|---|---|---|---|---|---|---|
| JUDGE | KIA | | | | Pinkston CD + Alexander | | | | |
| REPORTER | Lois Powell | | REMARKS | no show | | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STAT |
|---|---|---|---|---|---|---|
| 3/9/90 | Brown Marieny | SPHG | HD | | | 010 |
| | | | | | | 010 |

| NEXT DATE | 4/16/90 | NEXT EVENT | SPHG | ADA | Kilmore | CODE | KM | DATA ENTRY | 3/9/90 |
|---|---|---|---|---|---|---|---|---|---|
| JUDGE | KIA | | | | | | | | |
| REPORTER | | | REMARKS | | | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STAT |
|---|---|---|---|---|---|---|
| 4/16/90 | Brown 02 Marieny 01 | SPHG | HD | | | 000 |
| | | | | | | |

| NEXT DATE | 5/25/90 | NEXT EVENT | MMAC | ADA | Kilmore | CODE | KM | DATA ENTRY | 4/6/90 |
|---|---|---|---|---|---|---|---|---|---|
| JUDGE | KIA | | | | | | | | |
| REPORTER | | | REMARKS | | | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STAT |
|---|---|---|---|---|---|---|
| 5-25-90 | Brown 02 | MoNk | GP | | 037 | 90 |
| '' | Marieny 11 | MoNk | NH | | | 010 |

| NEXT DATE | 6-15-90 | NEXT EVENT | MBNK | ADA | Campbell | CODE | ECAN | DATA ENTRY | 5-25-90 |
|---|---|---|---|---|---|---|---|---|---|
| JUDGE | KIA | | | | | | | | |
| REPORTER | | | REMARKS | Note of evidence taken | | | | | |

Brown said that when man gave the police, he knocked the cocaine out of her hand to the ground to avoid her being caught. Write up rolled Presen.

Atty as to Marieny for 7-2-90

SCHEDULED EVENT FORM

COURT NUMBER _____    SYSTEM NUMBER   89051948

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STAT |
|------|-----------|-------|--------|----------------|---------------|----------------|
| | | | | | | 0/0 |
| 10/13/89 | Brown | STHG | HD | | | 0/0 |
| | Marigny | SPHG | HD | | | |

NEXT DATE 10/19/89  NEXT EVENT STHG  ADA ____  CODE ____  DATA ENTRY 10/17/89
JUDGE KEA
REPORTER

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STAT |
|------|-----------|-------|--------|----------------|---------------|----------------|
| | | | | | | 0/0 |
| 10/19/89 | Brown | STHG | HD | | | |
| | Marigny | | | | | |

NEXT DATE 12/1/89  NEXT EVENT STHG  ADA ____  CODE P&H  DATA ENTRY 10/19/89
JUDGE KEA
REPORTER

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STA |
|------|-----------|-------|--------|----------------|---------------|----------------|
| 12/1/89 | Brown | STHG | CN | CT | 135 | 0/0 |
| | Marigny | | | | | |

NEXT DATE 1/16/90  NEXT EVENT STHG  ADA Scott  CODE SFOS  DATA ENTRY 12-3-89
JUDGE KEA
REPORTER B.DIX

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STA |
|------|-----------|-------|--------|----------------|---------------|----------------|
| 1/16/90 | Brown | STHG | NH | D | 111 | 0/0 |
| | Marigny | " | " | " | " | " |

NEXT DATE 1/19/90  NEXT EVENT STHG  ADA Smith  CODE SSMI  DATA ENTRY 1/30/90
JUDGE KEA
REPORTER Lois

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STA |
|------|-----------|-------|--------|----------------|---------------|----------------|
| 1/19/90 | Brown | STHG | CN | CT | 136 | 0/0 |
| | Marigny | STHG | CN | CT | 136 | 0/0 |

NEXT DATE 1/26/90  NEXT EVENT STHG  ADA Smith  CODE SSMI  DATA ENTRY 1/14/90
JUDGE KEA
REPORTER Lois

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000226

**PARISH OF ORLEANS**

The State of Louisiana  SS.

**CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS**

EDWARD CANGELOSI,    Assistant District Attorney for the Parish of Orleans, who in

the name and by the authority of the said State, prosecutes, in this behalf, in proper person comes into

the Criminal District Court for the Parish of Orleans, in the Parish of Orleans, and gives the said

Court here to understand and be informed that one _____HENRENE D. BROWN,_____
was duly charged in a bill of information filed on May 17, 1989, by MARTIN MELTON,
Assistant District Attorney for the Parish of Orleans, under the number 334-550
of the docket of the Criminal District Court for the Parish of Orleans, Section
"AH1", with the crime of violating LRS 40:967, relative to possession of cocaine,
a felony under the law of Louisiana, that afterward, to wit, on the 25th day of
May, 1990, the said accused pled guilty as charged.

And now the said EDWARD CANGELOSI, Assistant District Attorney for the Parish of
Orleans, who prosecutes on behalf of the State of Louisiana; comes into the Criminal
District Court for the Parish of Orleans, in the Parish of Orleans, and gives the
said Court here to understand and be informed that heretofore the said HENRENE D.
BROWN, was duly charged in case number 311-267 of the docket of Section "I" with
the crime of violating LRS 14:67, relative to felony theft, that afterward, on the
18th day of December, 1985, the said accused pled guilt as charged.

The said HENRENE D. BROWN, who was sentenced, as first above set out, is one and
the same person who was sentenced in case number 311-267 "I".

That the said accused should now be sentenced in conformity with the provisions
of R.S. 15:529.1,

contrary to the form of the Statute of the State of Louisiana in such case made and provided and

against the peace and dignity of the same.

_____
Assistant District Attorney for the Parish of Orleans

STATE OF LOUISIANA     CRIMINAL DISTRICT COURT

VS     PARISH OF ORLEANS

DEREK MARIGNY     NO. 334-550  SECTION "B"

ANSWER TO APPLICATION FOR
BILL OF PARTICULARS AND MOTION
FOR DISCOVERY AND INSPECTION

NOW INTO COURT comes the State of Louisiana, through the undersigned Assistant District Attorney for the Parish of Orleans, and in answer to defendant's motion, states:

1-4.  No.

5.  Attached.

6.  No.

7.  No.

8-9.  Both defendants are only charged with possession.

10.  April 12, 1989, 7:10 p.m., 1700 block of Gibson Street.

11.  Attached.

12.  The State will comply with its obligations.

13.  Not applicable.

WHEREFORE, the State prays that its answer be deemed good and sufficient in law, and that it be relieved from further answering.

Assistant District Attorney

STATE OF LOUISIANA        CRIMINAL DISTRICT COURT

VS                        PARISH OF ORLEANS

DEREK MARIGNY             NO. 334-550   SECTION "B"

### ANSWER TO MOTION FOR
### DISCOVERY OF POLICE REPORT
### INCLUDING ALL SUPPLEMENTAL
### INVESTIGATION REPORTS

NOW INTO COURT comes the State of Louisiana, through the undersigned Assistant District Attorney for the Parish of Orleans, and in answer to defendant's motion, states:

No supplemental report was made.

WHEREFORE, the State prays that its answer be deemed good and sufficient in law, and that it be relieved from further answering.

_____
Assistant District Attorney

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000225

















# OFFICE OF THE CRIMINAL SHERIFF     NEW ORLEANS, LA.

## ARREST REGISTER - DISTRICT ATTORNEY'S COPY

**ARRESTEE DATA**

| ARRESTEE NAME | | RACE | SEX | BIRTH DATE | HEIGHT | WEIGHT | HAIR | EYES | SKIN | ARREST NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|
| HARTGHY | DEREK A | N | M | 042666 | 509 | 170 | BLK | BRO | MBR | 01127501 |

| ARRESTEE ADDRESS | | CITY | STATE | | | BIRTH STATE | NATIONALITY | BUREAU OR ID NO. |
|---|---|---|---|---|---|---|---|---|
| 1476 HILTON ST | C. | NEW ORLEANS | LA | | | LA | ELC | |

| OCCUPATION | EMPLOYER | | | | 00478731 |
|---|---|---|---|---|---|
| CATERING | N.O.CONVENTION CENTER | | | | |

| ALIAS NAME | MARITAL STATUS | SOCIAL SEC. NO. | OPERATOR'S LICENSE NO. | LIC. ST. | YEAR |
|---|---|---|---|---|---|
| | SINGLE | | | | |

**MARKS - SCARS - TATTOOS - ETC.**

| IF INJURED DESCRIBE BY WHOM AND IF TREATED; IF INTOXICATED DESCRIBE TO WHAT DEGREE | ADDICT | METHADONE |
|---|---|---|
| ANS..."I'M PRETTY HEALTHY" | | |

| VEHICLE INVOLVED | | | | | | | DISPOSITION |
|---|---|---|---|---|---|---|---|
| LICENSE NUMBER | LIC. ST. | YEAR | VEH. YR. | MAKE | MODEL | TYPE | COLOR | VEHICLE IDENTIFICATION NUMBER | |

**ARREST DATA**

| LOCATION OF ARREST | DOT A ZONE | DATE OF ARREST | TIME OF ARREST | DATE OF BOOKING | TIME OF BOOKING | ITEM NUMBER |
|---|---|---|---|---|---|---|
| 3700 BLK GIBSON ST | 3 | 041289 | 0718PH | 041289 | 0915PH | D1486689 |

| ARRESTING OFFICER'S NAME | OFFICER'S SER. | UNIT | ARREST CREDIT |
|---|---|---|---|
| J COATS | 01219 | 2136 | 22 | FBI #: 934129AAT |

| TRANSPORTING OFFICER'S NAME | OFFICER'S SER. | UNIT | |
|---|---|---|---|
| H CAESAR | 03183 | | FPC: 12111160131213111613 |

**CHARGES AND COURT SCHEDULE**

| | ORDINANCE/STATUTE NO. | AFFIDAVIT NO. | RELATIVE TO | | |
|---|---|---|---|---|---|
| 1 | RS 40 967 (B) (1) | | A46D | POSS CRACK WITH 54 ROCK SUBS) | |
| 2 | | | | 209780 | |

| COURT OF TRIAL | SECTION | DATE OF TRIAL |
|---|---|---|
| CDC | H | |
| | BOND | |

**OFFENSE DATA**

| LOCATION OF OFFENSE | DATE OF OFFENSE | TIME OF OFFENSE | DAY OF WEEK | WEAPON |
|---|---|---|---|---|
| 3700 BLK GIBSON ST | 041289 | 0718PH | | |

| COMPLAINANTS OR WITNESSES NAME | | RACE | SEX | BIRTH DATE | |
|---|---|---|---|---|---|
| 1. STATE OF LOUISIANA | | | | | |
| ADDRESS | CITY | STATE | TELEPHONE NUMBER | | |

| COMPLAINANTS OR WITNESSES NAME | | RACE | SEX | BIRTH DATE | |
|---|---|---|---|---|---|
| 2. | | | | | |
| ADDRESS | CITY | STATE | TELEPHONE NUMBER | | |

**REMARKS:** BRIEF DESCRIPTION OF ARREST, USE SPACE FOR INFORMATION NOT PROVIDED IN BLOCKS

REMARKS...A/S FOUND TO BE IN POSSESION OF NARCOTICS....
EMERGENCY INFO....LAURA FRENCH (MOTHER) 6282-1670
NO ENEMIES IN PP
WAS NOT ABUSED BY A/O
ASSIGNED TO HOD REC......

| SIGNATURE | TIME IN | SIGNATURE |
|---|---|---|
| DEP H COLLINS | 0750PH | DEP T ANTHONY 09057748 |
| BOOKMAN (TYPE NAME) | | BOOKER (TYPE NAME) |

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000238

OFFICE OF THE CRIMINAL SHERIFF — NEW ORLEANS, LA.

ARREST REGISTER - DISTRICT ATTORNEY'S COPY

| ARRESTEE DATA | | | | RACE | SEX | BIRTH DATE | HEIGHT | WEIGHT | HAIR | EYES | SKIN | ARREST NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ARRESTEE NAME BROWN | HEHRENE | | D | N | F | | 503 | 165 | BRO | BRO | MBR | 01127500 |
| ARRESTEE ADDRESS 3718 GIBSON ST | | A | CITY NEW ORLEANS | STATE LA | | | BIRTH STATE LA | NATIONALITY US | | | BUREAU OF ID NO. 09063542 | |
| OCCUPATION UNEMPLOYED | | EMPLOYER | | | | | | | | | | MOTION NUMBER |
| ALIAS NAME | | | MARITAL STATUS MARRIED | SOCIAL SEC NO. | | OPERATOR'S LICENSE NO. | | LIC. ST. | YEAR | | | |

MARKS - SCARS - TATTOOS - ETC. WAL TS

HEALTH "I WEAR A COLOSTOMY BAG"

| ARREST DATA | | | DOT & ZONE | DATE OF ARREST | TIME OF ARREST | DATE OF BOOKING | TIME OF BOOKING | ITEM NUMBER |
|---|---|---|---|---|---|---|---|---|
| LOCATION OF ARREST 3700 BLK GIBSON ST | | | 3 | 041289 | 0710PM | 041289 | 0912PM | D1496609 |
| | | | | OFFICER'S SER. 01219 | UNIT 2136 | ARREST CREDIT 22 | FBI #: 862411 J11 | |
| ARRESTING OFFICER'S NAME J COATS | | | | | | | | |
| TRANSPORTING OFFICER'S NAME N CAESAR | | | | OFFICER'S SER. 02103 | UNIT | FPC: 56PHPOPOPHAAPOPHPHPH | | |

CHARGES AND COURT SCHEDULE

| ORDINANCE/STATUTE NO. | AFFIDAVIT NO. | RELATIVE TO | | |
|---|---|---|---|---|
| RS 40 967 (C) (2) | | AAOP POSS/CRACK/4 ROCKS | | |

209777

COURT OF TRIAL CDC    SECTION M

OFFENSE DATA

| LOCATION OF OFFENSE 3700 BLK GIBSON ST | DATE OF OFFENSE 041289 | TIME OF OFFENSE 0710PM | DAY OF WEEK | WEAPON |
|---|---|---|---|---|
| COMPLAINANT OR WITNESS NAME STATE OF LA | | | | |

REMARKS: BRIEF DESCRIPTION OF ARREST, USE SPACE FOR INFORMATION NOT PROVIDED IN BLOCKS
REMARKS: THE ARRESTED SUBJECT WAS FOUND TO BE IN POSSESSION OF THE ABOVE NARCOTICS...
NO ENEMIES IN OPP...
WAS NOT PHYS ABUSED BY THE A/O...
EMERG INFO "BELINDA COUSIN(SISTER) 2886840...
ASSIGNED TO 7TH FLOOR HOD....

STATE vs.

(1) _____ Marigny _____

(2) _____ Brown _____

(3) _____

CASE NUMBER: 334-550B
VIOLATION (S): 40:967
ITEM NUMBER: 0 14566-85
DATE OF OFFENSE: 4-12-85
TIME OF OFFENSE: 710 pm
LOCATION: 3700 6.650
DATE OF ARREST:
LOCATION:

INVESTIGATOR'S WORKUP

NAME: _____

DATE RECEIVED IN SECTION 8-21-85
DATE INITIAL REVIEW COMPLETE
INV. ✓ SR. ADA _____ JR. ADA _____

BILL OF INFORMATION CHECKED AND ACCURATE - DATE(S) ✓ PLACE(S) ✓ NAME(S) ✓

WITNESS LIST - ADDRESSES O.K. ✓ PHONE #'S O.K. ✓ DATE CHECKED _____

PRELIMINARY HEARING - DATE HELD _____ TRANSCRIPT ORDERED _____ RECEIVED _____

GRAND JURY TESTIMONY - DATE GIVEN _____ ORDERED _____ RECEIVED _____

| DEFENDANT(S) | B OF I NUMBER | B OF I PHOTO | PRINT OUT | FBI RAP | # OF CONV. FEL. MISD. | CERT. COPIES ORD'D REC'D | END IN FILE |
|---|---|---|---|---|---|---|---|
| 1. Quark - Marigny | 274-257 | | ✓ | | | | |
| 2. Witness Brown | | | ✓ | | 2 | ✓ | |
| 3. | | | | | | | |

RECORDS AND PHOTOS

| CRIME LAB (CLOTHING, WEAPONS, ETC.) | ORDERED | RECEIVED | CORONER | HOMICIDE RPT | ORDERED | RECEIVED |
|---|---|---|---|---|---|---|
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | LINEUP PHOTO | | | |
| 5. | | | AND REPORT | | | |

| EVIDENCE ITEM | LOCATION | FUGITIVE BILLS CONV. PLACE ORDERED RECEIVED | DEFENDANT AT LARGE |
|---|---|---|---|
| 1. | | | DATE AT LARGE: |
| 2. | | | AMT OF CAPIAS: |
| 3. | | | COPY OF BOND: |
| 4. | | | COPY OF B.I.: |
| 5. | | | COPY OF _____ |
| 6. | | PACKAGE COMPLETED: | DATE IN N.C.I.C.: |

Defendant on active probation ( ) inactive probation ( ) parole ( ) Case #
Action taken _____
FATALITIES IN CASE: _____ Date _____

A.D.A. CHECK LIST PRIOR TO TRIAL

| NEEDED | FILED, IN FILE OR LOCATED AND BONDED | N/A | ITEM |
|---|---|---|---|
| 1. ( ) | ( ) | ( ) | complete and accurate witness list |
| 2. ( ) | ( ) | ( ) | computer print out |
| 3. ( ) | ( ) | ( ) | FBI rap sheets (current and updated) |
| 4. ( ) | ( ) | ( ) | certified copies of convictions for trial |
| 5. ( ) | ( ) | ( ) | complete multiple bill package |
| 6. ( ) | ( ) | ( ) | lunacy reports |
| 7. ( ) | ( ) | ( ) | all defense motions |
| 8. ( ) | ( ) | ( ) | all state's answers |
| 9. ( ) | ( ) | ( ) | motion to discover alibi witnesses (Art. 727) |
| 10. ( ) | ( ) | ( ) | motion to discover defense documents (Art. 724) |
| 11. ( ) | ( ) | ( ) | motions to discover reports of examinations of tests (Art. 725) |
| 12. ( ) | ( ) | ( ) | motions to discover defense of mental conditions (Art. 726) |
| 13. ( ) | ( ) | ( ) | notice of intent to use confession (Art. 768) |

OPDA(300)

STATE OF LOUISIANA

VS

DEREK MARIGNY

CRIMINAL DISTRICT COURT

PARISH OF ORLEANS

NO. 334-550     SECTION "B"

ANSWER TO MOTION FOR
DISCOVERY OF POLICE REPORT
INCLUDING ALL SUPPLEMENTAL
INVESTIGATION REPORTS

NOW INTO COURT comes the State of Louisiana, through the undersigned Assistant District Attorney for the Parish of Orleans, and in answer to defendant's motion, states:

No supplemental report was made.

WHEREFORE, the State prays that its answer be deemed good and sufficient in law, and that it be relieved from further answering.

Assistant District Attorney

STATE OF LOUISIANA          CRIMINAL DISTRICT COURT

VS                          PARISH OF ORLEANS

DEREK MARIGNY               NO. 334-550  SECTION "B"

ANSWER TO APPLICATION FOR
BILL OF PARTICULARS AND MOTION
FOR DISCOVERY AND INSPECTION

NOW INTO COURT comes the State of Louisiana, through the undersigned Assistant District Attorney for the Parish of Orleans, and in answer to defendant's motion, states:

1-4. No.

5. Attached.

6. No.

7. No.

8-9. Both defendants are only charged with possession.

10. April 12, 1989, 7:10 p.m., 1700 block of Gibson Street.

11. Attached.

12. The State will comply with its obligations.

13. Not applicable.

WHEREFORE, the State prays that its answer be deemed good and sufficient in law, and that it be relieved from further answering.

Assistant District Attorney

*FILED 6-2-89*

STATE OF LOUISIANA

VERSUS

DEREK MARIGNY

NUMBER: 334-550 SECTION: "B"

CRIMINAL DISTRICT COURT

PARISH OF ORLEANS

APPLICATION FOR BILL OF PARTICULARS

AND

MOTION FOR DISCOVERY AND INSPECTION

MAY IT PLEASE THE COURT:

NOW COMES, the defendant, **DEREK MARIGNY,** through his undersigned counsel and moves this Honorable Court for an order granting this his application for bill of particulars, pleading that he is unable to properly prepare his defense on the information filed against him, unless and until he is furnished that State to provide for discovery and inspection the items and information requested herein and provided by LSA C.Cr.P., Article 716-723.

1.  Does the State intend to introduce any oral statements alleged to have been made by the defendant to a person or persons not associated with any law enforcement agencies ? If so, please give the date, time, place and officers or other persons present provided by L.S.A. C.Cr.P., Article 716C.

2.  Does the State intend to introduce any oral statement alleged to have been made by the defendant to a law enforcement officer? If so, please indicate whether the statement were made before or after the arrest of the defendant and whether or not the statements were made in response to interrogation by law enforcement officer. If so, please provide the defendant with

*NO*



substance of any and all oral statement which the State intends to offer into evidence, made by the defendant as provided by L.S.A. C.Cr.P. Article 716 C.

3. Does the District Attorney have knowledge of or the control and custody of any written or recorded statement allegedly made by the defendant?

4. Does the State have in its possession any evidence materially favorable to the defendant or provided by the defendant?

5. Does the District Attorney have in his possession, custody or control of any record of the defendant's criminal arrest and convictions? If so, please furnished the defendant a copy of same as provided by C.Cr.P. Article 717.

6. Does the District Attorney intend to offer evidence of the commission of any other crime admissible under the authority of R.S. 15:455 or 466?

7. Does the State allege that the defendant committed the crime in concert of in conspiracy with another? If yes, please provide the defendant with any and all hearsay statements of the co-conspirators as provided by C. Cr. P. Article 712.

8. Does the State alleged that the _____ was in the actual or constructive possession of _____?

9. To whom was the _____ to be distributed?

10. At what exact date, time and place did the defendant allegedly commit the offense for which he is charged?

11. Please provide the defendant with the required Police Report.

*The state will comply with the allegations*

12.    Please provide the defendant with all the information required pursuant to C.Cr.P. Article 716 through 723.

13.    Please provide the defendant with the same warrant

*N/A* issued for the home of _____ .

WHEREFORE, mover prays that the District Attorney for the Parish of Orleans, State of Louisiana, show cause on a date and time fixed by this Honorable Court why the Bill of Particulars. and Discovery requested herein should not be furnished the defendant **Derek Marigny.**

                              Respectfully Submitted,

                              _____
                              GLYNN E. ALEXANDER
                              4226 Chef Menteur Highway
                              Suite 201
                              New Orleans, Louisiana 70126
                              (504) 948-2288


                              O R D E R

Let the District Attorney for the Parish of Orleans hereby be ordered to show cause on the _____ day of _____, 1989 why the Bill of Particulars and Discovery herein requested should not be furnished the defendant and a copy of the same be served on him through his counsel.

New Orleans, Louisiana     this     _____     day     of

_____,1989   .

                              _____
                                        J U D G E

STATE OF LOUISIANA

VERSUS

DEREK MARIGNY

CRIMINAL DISTRICT COURT

PARISH OF ORLEANS

STATE OF LOUISIANA

NO: 334-559    SECTION "D"

## MOTION FOR DISCOVERY OF POLICE REPORT
## INCLUDING ALL SUPPLEMENTAL INVESTIGATION REPORTS

Defendant, DEREK MARIGNY, through undersigned counsel, moves for discovery of the "Initial Police Report" in connection with this matter. Based upon information and belief, the initial police report or "field report" is ultimately supplemented with a "follow-up investigation report" which is subsequently made a part of or incorporated with the "Initial Police Report" becoming a part thereof. Therefore, it too is requested.

Counsel avers that under State v. Shropshire, 471 So.2d 707 (La. 1985), all such information was held to be available to the defense.

WHEREFORE, defendant prays that he be afforded a copy of the "Initial Police Report" including any and all supplemental memoranda, notes, reports or references pertaining to the circumstances surrounding the investigation of this offense by the New Orleans Police Department.

*No supplemental report was made*

Respectfully Submitted,

_____
GLYNN E. ALEXANDER
Attorney For Defendant
4226 Chef Menteur Highway
Suite 201
New Orleans, LA 70126
(504) 948-2208

## O R D E R

IT IS ORDERED BY THE COURT, that the prosecution provide the defendant, through his counsel, with a copy of the "Initial Police Report" and all references thereto.

New Orleans, Louisiana, this _____ day of _____,

1989.

_____
J U D G E    SECTION "B"
CRIMINAL DISTRICT COURT

OFFICE OF THE DISTRICT ATTORNEY, PARISH OF ORLEANS

REQUEST AND    AUTHORIZATION TO DISMISS    CRIMINAL CASE

191

Complete one request for each Defendant and each case.
USE ONLY IF ENTIRE CASE NOLLIED

DATE SUBMITTED
6    4    90

TO: SCREENING    FROM: _____
(NAME)

S OF I NO.

RE: 334-550 "AH1"    STATE OF LOUISIANA    vs.    DEREK MARIGNY    274297
DEFENDANT

CHARGE    SYSTEM NO.    CHECK ONE:
BILL OF:
□ INDICTMENT
☒ INFORMATION

MONTH  DAY  YEAR
5    17    89

ECAN    40:967    89057748

ANY OTHER PENDING CHARGES — GIVE CASE NO.
342-951 / 343-461

PRESENT STATUS OF CASE:    LAW ENFORCEMENT REMARKS

PRE - TRIAL

PERTINENT FACTS OF CASE
(INCLUDE DATA ON OTHER PENDING STATE OR FEDERAL INDICTMENTS OR INFORMATION,
AND SUMMARY OF PRIOR CRIMINAL RECORD, IF ANY, AS WELL AS JUVENILE RECORDS)

On April 12, 1989 Officers Coats and Caesar on patrol in the St.Bernard project saw a group of people, including the defendant Derek Marigny and his co-defendant Henrene Brown, standing together on the corner. The officers saw Marigny throw a clear plastic bag to the ground. Then they saw Henrene Brown pick up the same plastic bag and put it under her arm. Both Marigny and Brown were arrested. On May 25, 1990 Brown gave a note of evidence after pleading guilty as charged. She said that she was holding the bag of cocaine and Marigny noticed the police first. To prevent her from being caught, he knocked the bag out of her hand, and this is why the police thought Marigny had made the throw down. Based on the guilty plea and note of evidence, permission to Nolle Prosse the case as to Derek Marigny is requested. Note: Marigny has one prior conviction for possession of marijuana. He also has three other pending cases 341-057 - possession of cocaine and 342-951 and 343-461 for distribution of cocaine.

REASONS FOR DISMISSAL: (CHECK APPROPRIATE BOX)

EVIDENCE

□ 302  Analytical Results insufficient to prove Offense.
□ 303  Physical Evidence of Crime unavailable or missing (not recovered, lost)
□ 304  Physical Evidence insufficient to prove offense charged
□ 305  No corroboration of offense (others only to testimony)
□ 306  Testimony and circumstances insufficient to establish a necessary element of the offense.
□ 307  Insufficient Nexus between Defendant and crime.
□ 308  No ID at Lineup.
□ 309  Other Evidence Problems (Used only if specific reason not given above).
□  WITNESS PROBLEMS
Appearance/Attitude
□ 310  Victim signs off, refuses to prosecute or reluctant
□ 311  Victim, no show, unavailable or unlocatable.
□ 314  Essential witness no show, unavailable or unlocatable.
□ 317  Police Officer no show, or unavailable
□ 150  Witness privilege (spousal, 5th, etc.)
Testimony
□ 334  Witness unbelievable or implausible

LACKS PROSECUTIVE MERIT

□ 335  Not suitable for criminal prosecution (violates letter, not spirit of law; office policy; offense of trivial or insignificant nature, etc.)
□ 338  Good Defense (alibi, entrapment, self defense, etc.)
□ 340  Case Moot (e.g., Defendant dies)
□ 341  Defendant joined Armed Services
□ 343  Other
AT LARGE
□ 345  Defendant Unavailable (Over 1 year)
□ 346  Defendant Unavailable (Over 2 years)
□ 347  Defendant Unavailable (Over 3 years)
MOTIONS TO SUPPRESS SUSTAINED
□ 350  Motion to suppress evidence (sustained)
□ 352  Motion to suppress confession (sustained)
□ 355  Motion to suppress ID (sustained)
JURISDICTIONAL
□ 360  Promised (Lack of jurisdiction or venue)
□ 362  Referred to U.S. District Court
□ 365  Referred to Juvenile Court
□ 367  Referred to Municipal Court for City Violation
□ 369  Prescribed

DEFERRED PROSECUTION

□ 370  D.A. Diversion
□ 371  Narcotics Diversion
□ 372  Convicted in other case
□ 374  Other
BOOKKEEPING CODES
□ 380  Direct Bill for Other Offense
□ 381  Forced to Trial (to be Reinstituted)
□ 382  Defendant severed (to be Reinstituted)
□ 383  Duplication
□ 386  Other
PLEA BARGAININGS AND BREAKDOWNS
□ 387  Facilitate conviction of other offender
□ 388  Direct Bill filed for lesser offense
□ 382  Pled to other case in exchange for Nolle in this case No. ____
□ 384  Pled immunity in return for testimony (facilitate conviction of other offender)
□ 386  Other Plea Bargain

PROCEEDING POINT AT WHICH DISMISSAL IS BEING RECOMMENDED: (Check one)

□ 1 Arraignment
□ 2 Motion Hearing
□ 3 Pre-Trial Conference    □ 5 Other Proceeding
□ 4 Trial (Day of)

APPROVAL ACTION

SCREENING ADA
☒ APPROVED    □ NOT APPROVED
Clint Williams    6/5/90
SIGNATURE    DATE

☒ APPROVED    □ NOT APPROVED
Raymond Bigelow    6/5/90
SIGNATURE    DATE

FIRST ASSISTANT
□ NOT APPROVED
6/5/90

A request not approved by the Screening ADA may be appealed to the Division Chief. If not approved by the Division Chief, return to Trial Assistant. If approved, forward all copies to First Assistant. One copy will be returned.

FORM OPDA 101-A (Rev. 7/1/78)    D.A. CASE JACKET













N.O.P.D. — PROPERTY CONTINUATION PAGE 5    ITEM D-14966-89

EVIDENCE

A   1    CLEAR PLASTIC BAG

B   4    WHITE ROCK LIKE SUBSTANCES

NARRATIVE

ON WEDNESDAY, 4-12-89, 710 PM OFFICERS J. COATS AND N. CAESAR MANNING SOD UNIT 2136 (1983 UNMARKED GRAY FORD) AND WORKING IN FULL UNIFORM HAD THE OCCASION TO ARREST DEREK MARIGNY, B/M 4-26-66, AND HENRENE BROWN B/F, 12-16-53. THE FACTS ARE AS FOLLOWS.

OFFICERS COATS AND CAESAR WERE ASSIGNED TO PATROL THE AREA OF THE ST. BERNARD HOUSING PROJECT WHICH IS A KNOWN NARCOTIC AREA (KNOWN BOTH TO MEMBERS OF THE SOD UNIT AND MEMBERS OF THE THIRD DISTRICT. AS THE OFFICERS ENTERED THE 3700 BLOCK OF GIBSON THEY OBSERVED A BLACK MALE LATER IDENTIFIED AS DEREK MARIGNY, 5'10", 170LB. WEARING A YELLOW (GOLD) WINDBREAKER, DARK BLUE JOGGING PANTS, AND WHITE TENNIS SHOES STANDING NEAR ANOTHER GROUP OF FIVE UNKNOWN BLACK MALES. AS THE OFFICERS APPROACHED MARIGNY IN THEIR UNMARKED UNITS MARIGNY MADE A THROWING MOTION WITH HIS RIGHT HAND AND THREW A CLEAR PLASTIC BAG (CIGARETTE CELLOPHAN) CONTAINING SEVERAL ROCKLIKE SUBSTANCES TO THE GROUND. AFTER THROWING THE OBJECTS (EVIDENCE "A,'B") MARIGNY TURNED AND WALKED AWAY. THE OFFICERS EXITED THEIR VEHICLE. OFFICER COATS DETAINED MARIGNY AND PATTED HIM DOWN FOR THE OFFICER'S SAFETY WHILE OFFICER CAESAR WENT TO RETRIEVE THE OBJECT THROWN BY MARIGNY.

WHILE ENROUTE TO RETRIEVE THE EVIDENCE OFFICER CAESAR OBSERVED A BLACK FEMALE, LATER IDENTIFIED AS HENRENE BROWN WALK TO THE OBJECT, PICK THE OBJECT UP, AND PLACE THE OBJECT UNDER HER LEFT ARM.

| NOPD SIGNAL | | NEW ORLEANS POLICE DEPARTMENT | | SUPP STATE COMPUTER NUMBER | | |
|---|---|---|---|---|---|---|
| 966 | | UNIFORM MOTOR VEHICLE TRAFFIC ACCIDENT REPORT AND INCIDENT REPORT | | | | |
| PAGE 6 OF 6 | | CONTINUATION SHEET | | NOPD ITEM NUMBER D-14966.89 | | |
| SEQ | QUANTITY | DESCRIPTION | SERIAL NO. | TYPE | STOLEN | RECOVERED |

AS OFFICER CAESAR APPROACHED NEARER TO BROWN SHE DROPPED THE OBJECT TO THE GROUND. OFFICER CAESAR PLACED BROWN UNDER ARREST AND ADVISED HER OF HE MIRANDA RIGHTS.

OFFICER CAESAR WALKED BROWN BACK TO THE POLICE UNIT WHERE OFFICER COATS WAS DETAINING MARIGNY. OFFICER CAESAR ADVISED OFFICER COATS OF WHAT HE HAD RETRIEVED. OFFICER COATS PLACED MARIGNY UNDER ARREST AND ADVISED HIM OF HIS MIRANDA RIGHTS.

BOTH SUBJECTS WERE TRANSPORTED TO CENTRAL LOCK UP AND BOOKED. MARIGNY WAS BOOKED FOR POSSESSION OF "CRACK" COCAINE WITH INTENT TO DISTRIBUTE AND BROWN WAS BOOKED WITH POSSESSION OF COCAINE. THE EVIDENCE WAS TRANSPORTED TO CP4E AND PLACED ON THE BOOKS UNDER CONTROL NUMBER B04620G WITH OFFICER MOFFETT.

| REPORTING OFFICER | BADGE | REPORTING OFFICER | BADGE | NOPD ACCESS NUMBER |
|---|---|---|---|---|
| JACKIE COATS | 1219 | NORMAN CAESAR | 2183 | |

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000256

Control No. B 046206          NEW ORLEANS POLICE DEPARTMENT          Class 18
                                     EVIDENCE/PROPERTY CARD

Item No. D-14966-89          Catalog No. DEP
Time/Date Confiscated: 7:10PM  4/12/89          Received From: SOD/ Caesar #2183          Affidavit No.
Time/Date Received: 8:00PM  4/12/89          Received By: Moffett
Confiscated From: Accused          Address: 3700 blk. GIbson St
Owner:
Owner's Address:          Telephone No.
Accused: Derek Marigny   B/M  4/26/66          Address: 1470 Hilton St. APt. C
         Henrene Brown   B/F  12/16/53          3718 Gibson St. Apt.A

Court: CDC          Date Arrested: 4/12/89   Charges: 967
Describe Property: E1-(1) clear plastic small bag, (DEP)...
                   E2-(4) white like rock substance, (DEP).......
                        (21grams package)

CRIME LABORATORY
NEW ORLEANS POLICE DEPARTMENT
715 SOUTH BROAD STREET
NEW ORLEANS, LOUISIANA 70119

APRIL 14, 1989

REPORT OF THE CRIME LABORATORY

TO: S.O.D.
ATTN: N. CAESAR

EVIDENCE RECEIVED: 4-13-89

TYPE OF INVESTIGATION: CDS

ITEM NO.: D-14966-89
O.D.: 4-12-89

EXAMINATION REQUESTED: CHEMICAL

SUBJECTS: DEREK MARIGNY N/M
HENRENE BROWN N/F

SPECIMENS AND RESULTS OF LABORATORY ANALYSIS

1. Four pieces of a "rock-like" substance. ------------------
-------------------------------POSITIVE FOR COCAINE.

2. One cigarette cellophane package. ------------NO ANALYSIS.

JOHN F. PALM, JR.
CRIMINALIST II

JFP/bt

OFFICE OF THE DISTRICT ATTORNEY
PARISH OF ORLEANS

Page ___ of ___ Pages

CASE NO.

334-550 B

DATE RECEIVED FROM MOJO 4/19/99

SCREENING ACTION FORM

NARCOTICS STRIKE FORCE

ACCEPTED          REFUSED          DIVERTED          REFERRED

*Circle if any charge is accepted*          *(Circle only if all charges refused)*

| | | | MIDDLE | RACE B | SEX M | DATE OF BIRTH 04/26/66 |

DEFENDANT'S NAME (LAST) (FIRST)
MARIGNY, DEREK A

DEFENDANT'S ADDRESS                                    SYSTEM #                    MAGISTRATE'S CASE NO.
1470 Milton St Apt C    New Orleans, LA    89057748    M209780

| NO. OF CO-DEFENDANTS 1 | DATE SCREENED 5/16/89 | SCREENED BY WILLIAMSON | CODE CWIL | NEW SYSTEM # | # OF I NO. 274297 |
| | | REVIEWED BY | CODE | | MOTION NO. ICD N 00678731 |

CHARGES ACCEPTED

| ITEM NO | ARREST NO | CHARGE | CLASS | INIT-IATOR | TITLE | ATTEMPT ETC | STATUTE | PARA | SUB PARA |
|---|---|---|---|---|---|---|---|---|---|
| D1496689 | 01127501 | POSS. CRACK | 3 | 1 | 40 | ( ) | 967 | A4 (C) | OP (2) |
| | | | | | | ( ) | | ( )( ) | ( ) |
| | | | | | | ( ) | | ( )( ) | ( ) |
| | | | | | | ( ) | | ( )( ) | ( ) |

WORDING OF BILL OF INFORMATION FOR EACH COUNT

POSS. CRACK

| | | DATE OF OFFENSE 4/12/89 | DATE OF ARREST 04/12/89 |
| | | CASE TYPE | SCU # |

| | VICT INFO | RACE SEX | AGE | DOB | RELATION TO DEFENDANT |
| CT. 1 | | | | | |
| CT. 2 | | | | | |
| CT. 3 | | | | | |
| CT. 4 | | | | | |

CHARGES REFUSED OR DIVERTED

| ITEM NO. | ARREST NO. | CHARGE | CLASS | INIT-IATOR | DISPOSITION REFUSAL CODE | TITLE | ATTEMPT ETC | STATUTE | PARA | SUB PARA |
|---|---|---|---|---|---|---|---|---|---|---|
| D1496689 | 01127501 | PWITD CRACK | 2 | 0 | 373 | 40 | ( ) | 967 | A4 (B) | OD (1) |
| | | | | | | | ( ) | | ( )( ) | ( ) |
| | | | | | | | ( ) | | ( )( ) | ( ) |
| | | | | | | | ( ) | | ( )( ) | ( ) |

REFUSAL REASONS:

STATUTE NO.
40:967    IS A THROWDOWN; NO EVID. OF INTENT TO DIST.

REMARKS AND OFFENSE SUMMARY

D.A. CASE JACKET

OPDA 106 - A

**OFFICE OF THE DISTRICT ATTORNEY**
**PARISH OF ORLEANS**

Page ___ of ___ Pages
CASE NO.

**SCREENING ACTION FORM**

NARCOTICS STRIKE FORCE

REFUSED            DIVERTED            REFERRED

ACCEPTED

B    F    DATE OF BIRTH ___/51

DEFENDANT'S NAME (LAST)    (FIRST)    MAGISTRATE'S CASE NO.
BROWN, HENRENE D    SYSTEM #    89—7742    M209777

DEFENDANT'S ADDRESS    CODE
3718 Gibson St Apt A    New Orleans, LA    NEW SYSTEM #    89057748    X OF 1 NO.    174272

NO. OF CO-DEFENDANTS    DATE SCREENED    SCREENED BY    CODE    MOTION NO. 1004
1    5/16/89    WILLIAMSON    CWIL    00063542
    5/10/89    REVIEWED BY

| CHARGES ACCEPTED | | | CLASS | INIT-IATOR | TITLE | ATTEMPT ETC | STATUTE | PARA | SUB PARA |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | ARREST NO. | CHARGE | | | | | | | |
| D1496689 | 01127500 | Poss. Crack | 3 | O | 40 | ( ) | 967 | A4 (C) | OP 2 |
| | | | | | | ( ) | | ( ) | ( ) |
| | | | | | | ( ) | | ( ) | ( ) |
| | | | | | | ( ) | | ( ) | ( ) |

WORDING OF BILL OF INFORMATION FOR EACH COUNT

Poss. Crack

DATE OF OFFENSE 4/12/89    DATE OF ARREST 04/12/89
CASE TYPE    ECU #

| | VICT INFO | RACE SEX | AGE | DOB | RELATION TO DEFENDANT |
|---|---|---|---|---|---|
| CT. 1 | | | | | |
| CT. 2 | | | | | |
| CT. 3 | | | | | |
| CT. 4 | | | | | |

| CHARGES REFUSED OR DIVERTED | | | CLASS | INIT-IATOR | DISPOSITION REFUSAL CODE | TITLE | ATTEMPT ETC | STATUTE | PARA | SUB PARA |
|---|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | ARREST NO. | CHARGE | | | | | | | | |
| | | | | | | | | | ( ) | ( ) |
| | | | | | | | | | ( ) | ( ) |
| | | | | | | | | | ( ) | ( ) |
| | | | | | | | | | ( ) | ( ) |

REFUSAL REASONS:
STATUTE NO.

REMARKS AND OFFENSE SUMMARY

D.A. CASE JACKET    OPDA 108 - A

OFFICE OF THE DISTRICT ATTORNEY
PARISH OF ORLEANS

TRANS T253

WITNESS WORK SHEET

DEFENDANT'S NAME (Last)  (First)  (Middle)    ITEM NO.    MAGISTRATE OR COURT CASE NO.    B OF I NO.

MARIGNY, DEREK

| NO. | POLICE NAME, RANK, BADGE NO. AND ARREST CREDIT # | ADDRESS | 1 DIGIT CODE | PHONE |
|-----|---|---|---|---|
| 1. | P/O J. COATS | NOPD SOD | | HOME |
| 2. | P/O N. CAESAR | NOPD SOD | | WORK 826-7555 |
| 3. | P/O J. PALM | NOPD CRIME LAB | | HOME / WORK 826-7555 |
| 4. | | | | HOME 826-5211 / WORK |

OTHER WITNESSES — LIST IN ORDER OF CALL

| NO. | NAME | ADDRESS | 1 DIGIT CODE | PHONE |
|-----|------|---------|--------------|-------|
| 5. | | | | HOME / WORK |
| 6. | | | | HOME / WORK |
| 7. | | | | HOME / WORK |
| 8. | | | | HOME / WORK |
| 9. | | | | HOME / WORK |
| 10. | | | | HOME / WORK |
| 11. | | | | HOME / WORK |
| 12. | | | | HOME / WORK |
| 13. | | | | HOME / WORK |
| | | | | WORK |

DATES SUBPOENAS MAILED OR WITNESSES NOTIFIED

*TYPES OF WITNESS CODES

**FIRST DIGIT**
A  Arresting Officer
B  Assisting Officer
D  Investigating Officer
1  Other PD
2  Victim
3  Eyewitness
6  Fingerprint
8  Handwriting
5  Narc. Chemist
C  Other Chemist
9  Other Expert

**SECOND DIGIT**
E  Essential
N  Non Essential

ORM OPDA 174 82

D. A. FILE

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000260

May 17, 1989

The State of Louisiana } ss.     **PARISH OF ORLEANS**

**CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS**

MARTIN MELTON,     Assistant District Attorney for the Parish of Orleans, who in the name and by the authority of the said State, prosecutes, in this behalf, in proper person comes into the Criminal District Court for the Parish of Orleans, in the Parish of Orleans, and gives the said Court here to understand and be informed that one  DEREK A. MARIGNY   and one, HENRENE D. BROWN   EACH,

late of the Parish of Orleans, on the_____ 12th _____ day of_ April _____ in the year of our Lord, one thousand nine hundred and_____ eighty-nine _____in the Parish of Orleans aforesaid, and within the jurisdiction of the Criminal District Court for the Parish of Orleans,   did wilfully and unlawfully possess a controlled and dangerous substance, to wit:  COCAINE (CRACK),

contrary to the form of the Statute of the State of Louisiana in such case made and provided and against the peace and dignity of the same.

_____
Assistant District Attorney for the Parish of Orleans

PPIS -121 18.

CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS
STATE OF LOUISIANA

STATE OF LOUISIANA 1989 APR 13 AM 2:49

209780

VS.

DEREK A. MARIGNY

for violating R.S. 40:967

**BOND**

Be It Remembered, That on this 13 day of APRIL, 19 89
DEREK A. MARIGNY
acknowledges self to owe to the State of Louisiana the sum of $16,000.00
Dollars, of good and lawful money of the United States, for the true payment of which sum he binds self, h heirs, executors and administrators firmly by these presents.

The condition of the above obligation is such, that if the above bounden shall personally appear before the Honorable, the Criminal District Court for the Parish of Orleans, to be held on the day for which he shall be so notified at the address given herein, then on whatever day afterwards the said Court shall be held, or he shall be so notified to attend then and there, to answer to the State aforesaid for and concerning the charge recited above, with which offense the said defendant stands charged before said Court, and shall not depart thence without the leave of said Court, and keep the peace in the meantime then the above obligation to be null and void, else in full force and virtue:

PRINCIPAL

**ORDER OF RELEASE**

It is ordered that the Superintendent of the New Orleans Police Department, and/or his duly qualified Police Officers, OR the Criminal Sheriff for the Parish of Orleans, and/or his duly qualified Deputies, release forthwith the above defendant in the above-entitled case, upon h signing the aforesaid bond.

New Orleans, Louisiana, 4/13/89 , 19

By Order of Judge Cannizzaro

JUDGE

**RELEASED**

ARREST # 1127501
POLICE ITEM # D-14966-89
Thursday
April 13, 1989
1:58 AM

Dep. V. Butler

Taken and acknowledged on the day above written, before the Superintendent of the New Orleans Police Department or by one of his duly qualified Police Officers, OR the Criminal Sheriff for the Parish of Orleans, and/or his duly qualified Deputies.

Deputy #1001

CLERK OF COURT

DATE 7/6/89

ATTENTION:  ASSISTANT DISTRICT ATTORNEY SECTION B

THE ATTACHED BOND HAD NOT BEEN MADE OR WAS NOT AVAILABLE WHEN
THE CASE FOLDER WAS ORIGINALLY CREATED IN SCREENING.

THE BOND WAS MADE ON AN ACCEPTED CASE IN YOUR SECTION.  PLEASE
MAKE SURE IT IS PUT INTO THE CASE FOLDER.

THANK YOU.

| he said | the sum of | | dollars. |
| he said | the sum of | | dollars. |
| and the said Indiana Lumbermens Ins. | the sum of | | dollars. |
| | the sum of | fifteen thousand | dollars. |

of good and lawful money of the United States, for the true payment of which respective sums they and each of them bind
hemselves, their respective heirs, executors and administrators firmly by tnese presents.

The condition of the Above Obligation is such. That if the above bounden

Henrene D. Brown

shall personally appear before the Criminal District Court for the Parish of Orleans, to be held on the day for which he shall be so
notified at the address given herein, then on whatever day afterwards the said Court shall be held, or he shall be so notified to attend
then and there, to answer to the State aforesaid for and concerning a charge of _____

Vio. R/S 40:967

with which offense the said                  Henrene D. Brown

stands charged before said Court, and will appear at all stages of the proceedings thereof to answer that charge or any related charge,
and will at all times hold himself amenable to the orders and process of the Court, and, if convicted, will appear for pronouncement
of the verdict and sentence, and shall not depart thence without the leave of said Court, and keep the peace in the meantime, then
the above obligation to be null and void, else in full force and virtue:

X Henrene Brown

Virginia Brown

AS A FURTHER CONDITION OF THIS BOND, I
AGREE TO IMMEDIATELY NOTIFY THE CLERK OF
COURT OF ANY CHANGE OF MY ADDRESS, DIF-
FERENT FROM THE ADDRESS I NOW GIVE UNDER
PENALTY OF CONTEMPT."

(PRINT ADDRESS)   288-6540
3718 Gibson St Apt B
NOLA 70122

538 do Broad St.

Taken and acknowledged on the day above written, before
the undersigned CLERK or DEPUTY CLERK of the
CRIMINAL DISTRICT COURT of the PARISH of
ORLEANS.

Clerk or Deputy Clerk Criminal District Court

Indiana Lumbermens Ins.  P.O. Box 688508, Indianapolis, IN 46268

deposes and says that he is the owner in his own name and in his own right of the real estate located and identified as
being by me dul

All securities on deposit with the insurance commissioner.

that he resides in the Parish of Orleans, at the location hereinafter appearing; that after paying all his just debts and li-
well and truly worth the sum of            fifteen thousand                       dollars liable r
he has not signed or executed any deed, note, bond, contract, assignment or instrument of any kind that will vitiate
enforcement of this bond.

Sworn to and subscribed before me this

27th   day of   June   19 89

Clerk or Deputy of the Criminal District Court of the Parish of Orleans

Situation of the house in which surety r

53F5o

BB15-12178



DATE _7/6/89_

ATTENTION: ASSISTANT DISTRICT ATTORNEY SECTION _B_

THE ATTACHED BOND HAD NOT BEEN MADE OR WAS NOT AVAILABLE WHEN THE CASE FOLDER WAS ORIGINALLY CREATED IN SCREENING.

THE BOND WAS MADE ON AN ACCEPTED CASE IN YOUR SECTION. PLEASE MAKE SURE IT IS PUT INTO THE CASE FOLDER.

THANK YOU.

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000264

BAIL ORDER BY JUDGE QUINLAN

## State of Louisiana — Parish of Orleans

# Criminal District Court for the Parish of Orleans

334-550  "B"

Be it remembered. That on this _____ 27th ___ day of ___ June _____
in the year of our Lord. 19 89 _____ Henrene D. Brown _____ as principal
_____ Indiana Lumbermens Ins. _____ as surety
severally acknowledged themselves to owe to the State of Louisiana the several sums following, that is to say.
the said ___ Henrene D. Brown _____ the sum of ___ fifteen thousand ____ dollars.
the said _____ the sum of _____ dollars.
the said _____ the sum of _____ dollars.
the said _____ the sum of _____ dollars.
and the said ___ Indiana Lumbermens Ins. _____ the sum of ___ fifteen thousand ____ dollars.
of good and lawful money of the United States. for the true payment of which respective sums they and each of them bind
themselves. their respective heirs. executors and administrators firmly by these presents.

The condition of the Above Obligation is such. That if the above bounden

Henrene D. Brown

shall personally appear before the Criminal District Court for the Parish of Orleans. to be held on the day for which he shall be so
notified at the address given herein. then on whatever day afterwards the said Court shall be held. or he shall be so notified to attend
then and there. to answer to the State aforesaid for and concerning a charge of _____

Vio. R/S 40:967

with which offense the said ___ Henrene D. Brown _____

stands charged before said Court. and will appear at all stages of the proceedings thereof to answer that charge or any related charge.
and will at all times hold himself amenable to the orders and process of the Court. and, if convicted. will appear for pronouncement
of the verdict and sentence. and shall not depart thence without the leave of said Court. and keep the peace in the meantime. then
the above obligation to be null and void or else in full force and virtue

(PRINT ADDRESS)  288-680

X Henrene Brown        3718 Gibson St Apt B
                        NOLA 70122

"AS A FURTHER CONDITION OF THIS BOND. I
AGREE TO IMMEDIATELY NOTIFY THE CLERK OF
COURT OF ANY CHANGE OF MY ADDRESS. DIF-
FERENT FROM THE ADDRESS I NOW GIVE UNDER
PENALTY OF CONTEMPT."

Taken and acknowledged on the day above written. before
the undersigned CLERK or DEPUTY CLERK of the
CRIMINAL DISTRICT COURT of the PARISH of
ORLEANS.

Clerk or Deputy Clerk Criminal District Court

Indiana Lumbermens Ins.  P.O. Box 688508, Indianapolis,  IN  46268
_____ being by me duly sworn
deposes and says that he is the owner in his own name and in his own right of the real estate located and identified as follows:

All securities on deposit with the insurance commissioner.

that he resides in the Parish of Orleans. at the location hereinafter appearing; that after paying all his just debts and liabilities he is
well and truly worth the sum of _____ fifteen thousand _____ dollars liable to seizure; that
he has not signed or executed any deed. note. bond. contract. assignment or instrument of any kind that will vitiate or prevent the
enforcement of this bond

Sworn to and subscribed before me this

27th ___ day of ___ June ___ 19 89

Clerk or Deputy of the Criminal District Court of the Parish of Orleans

Situation of the house in which surety makes his domicile

53 F So Broad

BB15-121785





Clerk's Office ___2|28___ 20_25_
A True Copy
_R.W_____ Deputy Clerk
by _____
Hon. Darren P. Lombard
Clerk of Criminal District Court
Orleans Parish

## OFFICE OF THE DISTRICT ATTORNEY PARISH OF ORLEANS

CASE NUMBER                                                    SYSTEM NUMBER  90075098

| ARRAIGNMENT DATE | DEFENDANT | B OF I NUMBER | DEFENDANT NUMBER | DEFENSE ATTORNEY | PLEA |
|---|---|---|---|---|---|
| 3/9/90 | Marigny | | | G. Alexander | NG |

| NEXT DATE 4/6/90 | NEXT EVENT BTN G | ADA Scott | CODE SATS | DATA ENTRY DWhite |
|---|---|---|---|---|
| JUDGE RTA | REMARKS | | | 5-9-90 |
| REPORTER Barbara Bo | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 2-22-90 | MARIGNY | MOTR CAH1 | | GR | | | 010 |

| NEXT DATE | NEXT EVENT | ADA JHinkebein | CODE JHIN | DATA ENTRY 2-23-90 |
|---|---|---|---|---|
| JUDGE BPQ | REMARKS | | | Bun |
| REPORTER | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 4/6/90 | Marigny | STAB | | HD | | | 0 m |

| NEXT DATE 5/25/90 | NEXT EVENT MOAB | ADA | CODE | DATA ENTRY 4-6-90 |
|---|---|---|---|---|
| JUDGE RTA | REMARKS | | | |
| REPORTER | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 5-25-90 | Maing | STAB | | HD | | | 010 |

| NEXT DATE 7-6-90 | NEXT EVENT STAB | ADA Caglias | CODE EGAN | DATA ENTRY 6-4-90 |
|---|---|---|---|---|
| JUDGE RTA | REMARKS | | | |
| REPORTER | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 7-6-90 | Maing | | | | D | C7 | C18 |

| NEXT DATE | NEXT EVENT | ADA | CODE | DATA ENTRY Aug 90 |
|---|---|---|---|---|
| JUDGE | REMARKS | | | |
| REPORTER | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| | | | | HD | | | 010 |

| NEXT DATE | NEXT EVENT | ADA | CODE | DATA ENTRY |
|---|---|---|---|---|
| JUDGE | REMARKS | | | |
| REPORTER | | | | |

SEE BACK FOR MORE SPACE

HB



Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000209

FENDANT RELEASE STATUS

| DEFENDANT | BOND TYPE | AMOUNT | JUDGE | DATE |
|-----------|-----------|--------|-------|------|
|           |           |        |       |      |
|           |           |        |       |      |
|           |           |        |       |      |
|           |           |        |       |      |
|           |           |        |       |      |

## PLEA OFFERS

| DATE | DEFENSE COUNSEL | ADA | REMARKS |
|------|-----------------|-----|---------|
|      |                 |     | As per memos - OK not |
|      |                 |     | to MB this S |
|      |                 |     | Bigelow |
|      |                 |     | 6/11/91 |
|      |                 |     | |

APPROVED BY

## CLOSING CHECK LIST

1) Closed to all defendants? ✓
2) Sentence info on file? ✓
3) Copy of bond in file? ✓
4) B of I Photograph in file? ✓
5) Updated Rap Sheet in file? ✓
6) Was def. Multiple Billed where Possible to do so? ✓
7) Was sentence a legal one? ✓
8) Victim and Witness letters sent? ✓
9) If Nollied is form signed off?

REVIEWED BY
POST CONVICT'ON TRACKING

REVIEWED BY MAR 4  1992

INVESTIGATOR

ASSISTANT DISTRICT ATTORNEY

DATE

DATE        7-1?-9

## APPEAL

DATE FILED:

RETURN DATE:

ASSISTANT DISTRICT ATTORNEY

COURT

DISPOSITION

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000270



COURT NUMBER _____    SYSTEM NUMBER 90015098

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STAT |
|------|-----------|-------|--------|----------------|---------------|----------------|
| 10-15-90 | Marigny, Derek | MAHG | CN | A | 111 | 010 |

NEXT DATE 11-5-90  NEXT EVENT MOHG  ABA Avery  CODE HVE  DATA ENTRY
JUDGE KIA  DEMAND Alexander – no show
REPORTER

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STAT |
|------|-----------|-------|--------|----------------|---------------|----------------|
| 11-5-90 | Marigny, Derek | MOHG | CN | CT | 109 | 010 |

NEXT DATE 11-26-90  NEXT EVENT MOHG  ABA Avery  CODE HVC  DATA ENTRY
JUDGE KIA  DEMAND
REPORTER

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STA |
|------|-----------|-------|--------|----------------|---------------|---------------|
| 11-26-90 | Marigny, Derek | MDHG | CN | D | 111 | 010 |

NEXT DATE 12-19-90  NEXT EVENT MDHG  ABA Avery  CODE HVE  DATA ENTRY 11-26-90
JUDGE KIA  DEMAND Alexander – no show
REPORTER

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STA |
|------|-----------|-------|--------|----------------|---------------|---------------|
| 12-19-90 | Marigny, Derek | MOHG | WV | | | 010 |

NEXT DATE 3-28-91  NEXT EVENT JTTR  ABA Avery  CODE RVE  DATA
JUDGE KIA  DEMAND
REPORTER

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT ST |
|------|-----------|-------|--------|----------------|---------------|--------------|
| 3-28-91 | Derek Marigny | JRTR | CN | D | 113 | OD |

NEXT DATE 3-27-91  NEXT EVENT JRTR  ABA WC  CODE VWEL  DATA ENTRY 3-1-91
JUDGE KIA  DEMAND
REPORTER Barbara



Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000273

FICE OF THE CRIMINAL SHERIFF    NEW ORLEANS, LA.

FOLDER #
00472604

ARREST REGISTER - DISTRICT ATTORNEY'S COPY

ARRESTEE DATA

| ARRESTEE NAME | | RACE | SEX | BIRTH DATE | HEIGHT | WEIGHT | HAIR | EYES | SKIN | ARREST NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|
| HARIGNY | DEREK | B | M | M | 847666 | 509 | 178 | BLK | BRO | DBR | 81159494 |

| ARRESTE ADDRESS | | CITY | STATE | BIRTH STATE | NATIONALITY | BUREAU OF ID NO. |
|---|---|---|---|---|---|---|
| 1470 HILTON ST | C | NEW ORLEANS | LA | LA | US | 274297P |

| OCCUPATION | EMPLOYER | | MOTION NUMBER |
|---|---|---|---|
| RUNNER | N.O. CONVENTION CENTER | | 00478731 |

| ALIAS NAME | MARITAL STATUS | SOCIAL SEC. NO. | OPERATOR'S LICENSE NO. | LIC. ST. | YEAR |
|---|---|---|---|---|---|
| | SINGLE | | | | |

| MARKS - SCARS - TATTOOS - ETC. | ADDICT | METHADONE |
|---|---|---|
| SF  SCAR/UNDER RGT EYE | | |

IF INJURED DESCRIBE BY WHOM AND IF TREATED, IF INTOXICATED DESCRIBE TO WHAT DEGREE

AND...... "PRETTY FAIR."

| VEHICLE INVOLVED | | DISPOSITION |
| LICENSE NUMBER | LIC. ST. | YEAR | VEH. YR. | MAKE | MODEL | TYPE | COLOR | VEHICLE IDENTIFICATION NUMBER | |
|---|---|---|---|---|---|---|---|---|---|

ARREST DATA

| LOCATION OF ARREST | | DIST & ZONE | DATE OF ARREST | TIME OF ARREST | DATE OF BOOKING | TIME OF BOOKING | ITEM NUMBER |
|---|---|---|---|---|---|---|---|
| 1400 BLK HILTON ST | | 3 | 011690 | 0815PM | 011690 | 0958PM | A1993390 |

| ARRESTING OFFICER'S NAME | | OFFICERS SER. | UNIT | ARREST CREDIT | FBI #: 934129AA5 |
|---|---|---|---|---|---|
| C NEAL | | 01775 | 6962 | 16 | |

| TRANSPORTING OFFICER'S NAME | OFFICERS SER. | UNIT | FPC: 121111C01312131111013 |
|---|---|---|---|
| A RECASNER | 01076 | | |

CHARGES AND COURT SCHEDULE

FOR ADDITIONAL CHARGES SEE SUPPLEMENTARY ARREST REGISTER

| ORDINANCE/STATUTE NO. | AFFIDAVIT NO. | RELATIVE TO | |
|---|---|---|---|
| 1 RS 40  967 (B) | (1) | A40D | DIST OF CRACK/64 PIECES |
| 2 | | | Cway/MGH |
| 3 | | | 150K \ 100K |
| 4 | | | |
| 5 | | 221780 | |
| 6 | | DATE OF TRIAL | TIME OF TRIAL |

| COURT OF TRIAL | SECTION | BOND |
|---|---|---|
| CDC | H | |

OFFENSE DATA

| LOCATION OF OFFENSE | DATE OF OFFENSE | TIME OF OFFENSE | DAY OF WEEK | WEAPON |
|---|---|---|---|---|
| 1400 BLK HILTON ST | 011690 | 0815PM | | |

| COMPLAINANTS OR WITNESSES NAME | | RACE | SEX | BIRTH DATE | |
|---|---|---|---|---|---|
| 1. STATE OF LOUISIANA | | | | | |

| ADDRESS | CITY | STATE | TELEPHONE NUMBER |
|---|---|---|---|

| COMPLAINANTS OR WITNESSES NAME | | RACE | SEX | BIRTH DATE | |
|---|---|---|---|---|---|
| 2. | | | | | |

| ADDRESS | CITY | STATE | TELEPHONE NUMBER |
|---|---|---|---|

REMARKS, BRIEF DESCRIPTION OF ARREST, USE SPACE FOR INFORMATION NOT PROVIDED IN BLOCKS

REMARKS.....SUBJECT, DEREK HARIGNY, WAS ARRESTED BY OFFICERS AFTER THE
OFFICERS OBSERVED SUBJECT CONCEAL A PLASTIC BAG CONTAINING 64 PIECES
OF WHITE, ROCK-LIKE OBJECTS BENEATH SOME LEAVES AT THE END OF A POST
IN FRONT OF 1470 HILTON STREET.
NOT ABUSED BY ARRESTING OFFICERS.
NO KNOWN ENEMIES IN PP
ASSIGNED TO HOD REC.
EMERGENCY INFO.....LAURA FRENCH. MOTHER, 282-1070

| SIGNATURE | TIME IN | SIGNATURE |
|---|---|---|
| C WELLS | 0916PM | BOOKED (TYPE NAME) |
| DOORMAN (TYPE NAME) | | |





*fudy 5-7-90*

STATE OF LOUISIANA

vs.

DEREK MARTENY

CRIMINAL DISTRICT COURT

PARISH OF ORLEANS

NO. 341-057 SECTION "ANY"

## ANSWER TO MOTION TO
## SUPPRESS THE EVIDENCE

NOW INTO COURT comes the State of Louisiana, through the undersigned Assistant District Attorney for the Parish of Orleans, and in answer to defendant's Motion to Suppress the Evidence states, that:

Any and all evidence in the possession of the State which it seeks to use against the defendant in this case was obtained incidential to the use of all substentive and procedural safeguards to which the defendant is entitled under the laws and Constitutions of the United States of America and the State of Louisiana.

WHEREFORE, the State prays that its answer be deemed good and sufficient in law, and that it be relieved from further answering.

ASSISTANT DISTRICT ATTORNEY

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000277

VS.                         PARISH OF ORLEANS

DEREK MARIGNY               NO. 341-057, SECTION "AH1"

### ANSWER TO MOTION TO
### SUPPRESS THE CONFESSION

NOW INTO COURT the State of Louisiana, through the undersigned Assistant District Attorney for the Parish of Orleans, and in answer to defendant's Motion to Suppress the Confession states, that:

Any and all confessions and/or inculpatory statements in the possession of the State which it seeks to use against the defendant in this case was obtained incidental to the use of all procedural safeguards to which the defendant is entitled under the laws and Constitutions of the United States of America and the State of Louisiana.

WHEREFORE, the State prays that its answer be deemed good and sufficient in law, and that it be relieved from further answering.

Assistant District Attorney

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000278



STATE OF LOUISIANA             CRIMINAL DISTRICT COURT
        VS.                    PARISH OF ORLEANS
DEREK MARIGNY                  NO. 341-057 SECTION "AH1"

ANSWER TO MOTION TO
SUPPRESS THE IDENTIFICATION

NOW INTO COURT comes the State of Louisiana, through
the undersigned Assistant District Attorney for the Parish
of Orleans, and in answer to defendant's Motion to Suppress
the Evidence states, that:

Any and all identification in the possession of the
State which it seeks to use against the defendant in this
case was obtained incidential to the use of all substantive
and procedural safeguards to which the defendant is entitled
under the laws and Constitutions of the United States of
America and the State of Louisiana.

WHEREFORE, the State prays that its answer be deemed
good and sufficient in law, and that it be relieved from
further answering.

Assistant District Attorney

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000279



STATE OF LOUISIANA

VS

DEREK MARIGNY

CRIMINAL DISTRICT COURT

PARISH OF ORLEANS

NO. 341-057, SECTION "AH1"

## ANSWER TO MOTION FOR A PRELIMINARY EXAMINATION

NOW INTO COURT comes the State of Louisiana, through the undersigned Assistant District Attorney for the Parish of Orleans, who in response to the defendant's Motion for a Preliminary Examination states, that:

As the defendant was not charged by means of a grand jury indictment with this felony offense, he is entitled to a preliminary examination by virtue of the 1974 Louisiana Constitution, Article I, Section 14.

WHEREFORE, the State is prepared to provide the defendant with a preliminary examination and requests that the necessary witnesses be subpoenaed for this purpose.

_____
Assistant District Attorney

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000230

STATE OF LOUISIANA

VS

DEREK MARIGNY

CRIMINAL DISTRICT COURT

PARISH OF ORLEANS

NO. 341-057, SECTION "AR1"

MOTION FOR DISCOVERY
BY THE STATE

NOW INTO COURT, through the undersigned Assistant District Attorney, comes the State of Louisiana and respectfully moves the Court to direct the defense to furnish the State with the following:

I.

The opportunity to inspect and copy, photograph, or otherwise reproduce any results of reports, or copies thereof, of physical and mental examinations and of scientific tests or experiments, of a similar nature, made in connection with the above-captioned case, which are in the possession, custody or control of the defendant, and which the defendant intends to use as evidence at the trial, or were prepared by a witness whom the defendant intends to call at trial, when such results or reports relate to his testimony. See: Louisiana Code of Criminal Procedure Article 725.

II.

The opportunity to inspect and copy, examine, test scientifically, photograph, or otherwise reproduce books, papers, documents, photograph tangible objects, copies, or portions thereof, which are in the possession, custody or

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000281

control of the defendant, and which the defendant intends to use in evidence at trial. See: Louisiana Code of Criminal Procedure, Article 724.

### III.

Further, the State now requests the defendant to notify the State at least ten (10) days prior to trial of the defendant's intention to introduce testimony relating to a mental disease, defect, or other condition bearing upon the issue of whether he had the mental state required for the offense charged. See: Louisiana Code of Criminal Procedure, Article 726.

### IV.

The offense alleged herein was committed on the 16th day of January, 1990; at 8:15 a.m., at or near the 1400 block of Milton Street. The State now requests written notice of the defendant's intention to offer a defense of alibi, stating therein the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi. See: Louisiana Code of Criminal Procedure, Article 727. Said notice is to be served in writing within ten (10) days of this request, unless this Honorable Court directs otherwise.

WHEREFORE, the State of Louisiana, through the undersigned Assistant District Attorney for the Parish of Orleans, prays that the defendant, through counsel, be ordered by the Court to furnish to the State such information as may fall within the purview of the above-indicated statutes.

                                    Assistant District Attorney

O R D E R

Considering the foregoing Motion,

IT IS HEREBY ORDERED that the State be furnished discovery information as may fall within the purview of the above-indicated statutes, on the _____ day of _____, 1990.

_____
Judge, Section
Criminal District Court
Parish of Orleans

New Orleans, Louisiana, this _____ day _____, 1990.

STATE OF LOUISIANA                    CRIMINAL DISTRICT COURT

VERSUS                                PARISH OF ORLEANS

DEREK MARIGNY                         NO. 341-057  SECTION "AH1"

### ANSWER TO MOTION FOR BILL OF PARTICULARS, DISCOVERY AND INSPECTION

NOW INTO COURT, comes the State of Louisiana, through the undersigned Assistant District Attorney for the Parish of Orleans, and in answer to defendant's motion, states:

1. Not applicable.
2. No.
3. No.
4. No.
5. See attached.
6. Not at this time.
7. Not applicable.
8. See motion hearing.
9. Not entitled.
10. January 16, 1990; 8:15 p.m.
11. See attached.
12. See attached.
13. Not applicable.

WHEREFORE, the State prays that its answer be deemed good and sufficient in law, and that it be relieved from further answering.

                                    _____
                                    Assistant District Attorney



Respectfully Submitted;

Elijah E. Alexander, P.A.
Bar No: 2176
4226 Chef Menteur Highway
Suite 200
New Orleans, Louisiana 70126
(504) 948-2200

## ORDER

IT IS ORDERED BY THE COURT, that the prosecution provide the defendant, through their counsel, with a copy of the "Initial Police Report" and all references thereto,

New Orleans, Louisiana this ____ day of ____ 1998.

STATE OF LOUISIANA

VERSUS

DEREK MARIGNY

CRIMINAL DISTRICT COURT

PARISH OF ORLEANS

STATE OF LOUISIANA

NO:341-957   SECTION:"AD HOC I"

## MOTION FOR PRELIMINARY EXAMINATION

NOW INTO COURT, through his undersigned attorney, comes the defendant, DEREK MARIGNY and pursuant to La. C.CR.P. ART.293, moves this court for an order granting him a Preliminary Examination on the grounds that: 1) the defendant is charged with Possession of cocaine ; the evidence against the defendant is not evident;   2) the defendant is not guilty of the crime he is charged with having committed.

WHEREFORE, defendant prays that he be granted a Preliminary Examination so that he may be discharged of this prosecution.

Respectfully submitted,

Glynn E. Alexander
Trial Attorney
Bar #2376
Attorney For Defendant
4226 Chef Menteur Highway
Suite 200
New Orleans, LA 70126
(504) 948-2200

### ORDER

IT IS ORDERED BY THE COURT, that the defendant be and is hereby granted a PRELIMINARY EXAMINATION herein, and that the same be held on the ___ day of _____, 1998 at ____ ___M,

New Orleans, Louisiana this ___ day of _____ 1998,

_____
JUDGE

STATE OF LOUISIANA

VERSUS

DEREK MARIGNY

CASE NO: 341-057

CRIMINAL DISTRICT COURT

PARISH OF ORLEANS

STATE OF LOUISIANA

SECTION: "AD HOC I"

## MOTION TO SUPPRESS

Defendant, DEREK MARIGNY , moves the court under authority of Article 703 of the Louisiana Code of Criminal Procedure to suppress from use at the trial the following:

1.  All physical evidence seized in connection with this case;

2.  All oral or written inculpatory statements made by the defendant;

3.  All out-of-court and/or pre-trial identifications of he defendant made by State witnesses, for the following reasons:

A.  PHYSICAL EVIDENCE SEIZED

Defendant submits that evidence seized or obtained was not the result of a valid arrest and/or search, or of a valid search warrant. The evidence seized was "come at by the exploitation" of some primary illegality. Wong Sun vs. United States, 371 U.S. 471, 488 (1963). The evidence was seized in violation of defendant's right secured by the Fourth and Fourteenth Amendments to the United States Constitution, and by Art. I Section 5 of the Louisiana Constitution (1974).

Defendant seeks to have suppressed any tangible objects or other property, documents, books, papers, writings, and other evidence not at this time known by defendant's at New Orleans, Louisiana, including the following:

B.  ORAL OR WRITTEN INCULPATORY STATEMENTS MADE BY DEFENDANT

Defendant submits that before any inculpatory statements made by him may be introduced into evidence, the U.S. has the burden of proving beyond a reasonable doubt, State vs. Davis, 388 So.2d 607 (La. 1980), that such statements were "not" made under the influence of fear, duress, intimidation, inducements, or promises. State vs. Jackson, 381 So. 485 (la. 1980). Defendant submits that any and all statements made by him were not freely and voluntarily given.

In the event that defendant's arrest was not based upon the information provided by a confidential informant, then defendant submits that the State has the burden of proving that this information was credible and that the information given was reliable ... [illegible] ... defendant submits that his arrest was not supported by probable cause, and therefore, any statement made by him must be suppressed as the fruit of an illegal arrest.

Defendant further submits that ... [illegible] ... advised of his Miranda rights at the time of his arrest and that he also has a right of ... [illegible] ... the nature and consequences of his statement.

J.    DEFENDANT MOVES FIRST, that the state assume the burden of proving that any confession or statement was made freely and voluntarily and was not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises, as provided in La. R.S.Cr.P. Art. 703 [illegible] paragraph [illegible]

K.    DEFENDANT MOVES SECOND, AND IN THE ALTERNATIVE, that in the event the court decline not to suppress defendant's statements, that the state be required to produce to the defendant ... [illegible] ... the contents of any written statement as ... [illegible] ... the nature and substance ... [illegible] ... to be offered in evidence as provided in La. R.S.Cr.P. Art. 703 [illegible] paragraph [illegible]

L.    USE OF COURT AND/OR PRE-TRIAL IDENTIFICATIONS MADE BY STATE WITNESS

[illegible paragraph]

Defendant also submits that he was viewed under circumstances which suggested that he was the perpetrator of the crime with which he is charged. This identification, therefore, violates the principles announced by the United States vs. Wade, 388 U.S. 218, 236-37n.27 (1968). This improperly suggestive identification will cause any future identification of defendant to violate his rights under the Due Process Clause of the 14th Amendment to the United States Constitution.

WHEREFORE, defendant prays that:

1.  All physical evidence seized be suppressed from the trial of this case.

2.  All oral or written inculpatory statements made by the defendant be suppressed that the jury be given an opportunity to hear all evidence concerning the circumstances surrounding the statement; and

3.  All out-of-court and/or pre-trial identifications made by State witnesses of the defendant be suppressed from the trial and that all references to such identifications be prohibited during the trial.

Respectfully Submitted,

Glynn E. Alexander, T.A.
Bar No:  2376
4226 Chef Menteur Highway
Suite 200
New Orleans, Louisiana 70126
(504) 948-2208

ORDER

IT IS ORDERED BY THE COURT, that the defendant be and is hereby granted a MOTION TO SUPPRESS herein, and that the same be held on the _____ day of _____, 1990 at _____ ___.m.

New Orleans, Louisiana this _____ day of _____.

1990.

_____ JUDGE

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000289

CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO:  341-057            DIVISION: "AD HOC I"           DOCKET NO:

STATE OF LOUISIANA

VERSUS

DEREK MARIGNY

APPLICATION FOR BILL OF PARTICULARS
AND
MOTION FOR DISCOVERY AND INSPECTION

MAY IT PLEASE THE COURT:

NOW COMES, the defendant, DEREK MARIGNY, through his undersigned counsel and moves this Honorable Court for an order granting that his application for bill of particulars, pleading that he is unable to properly prepare his defense on the information filed against him, unless and until he is furnished the necessary items for discovery and inspection requested herein and provided by LSA C.Cr.P., Article 716-723.

1.  Does the State intend to introduce any oral statements alleged to have been made by the defendant to a person or persons not associated with any law enforcement agencies ? If so, please give the date, time, place and officers or other persons present provided by L.S.A. C.Cr.P., Article 716C.

2.  Does the State intend to introduce any oral statement alleged to have been made by the defendant to a law enforcement officer? If so, please indicate whether the statement was made before or after the arrest of the defendant and whether or not the statement was made in response to interrogation by law enforcement officer. If so, please provide the defendant with substance of any and all oral statement which the State intends to offer into evidence, made by the defendant as provided by L.S.A. C.Cr.P. Article 716 C.

3.  Does the District Attorney have knowledge of or the control and custody of any written or recorded statement allegedly made by the defendant?

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000290

4 . Does the State have in its possession any evidence materially favorable to the defendant or provided by the defendant?

5. Does the District Attorney have in his possession, custody or control of any record of the defendant's criminal arrest and convictions? If so, please furnish the defendant a copy of same as provided by C.Cr.P. Article 717.

6. Does the District Attorney intend to offer evidence of the commission of any other crime admissible under the authority of R.S. 15:455 or 466?

7. Does the State allege that the defendant committed the crime in concert of in conspiracy with another? If yes, please provide the defendant with any and all hearsay statements of the co-conspirators as provided by C. Cr. P. Article 712.

8. Does the State allege that the defendant was in active or constructive possession of the cocaine?

9. To whom was the cocaine to be distributed?

10. At what exact date, time and place did the defendant allegedly commit the offense for which he is charged?

11. Please provide the defendant with the required Police Report.

12. Please provide the defendant with all the information required pursuant to C.Cr.P. Article 716 through 723.

13. Please provide the defendant with the same warrant issued for the home of _____ (if applicable).

WHEREFORE, mover prays that the District Attorney for the Parish of Orleans, State of Louisiana, show cause on a date and time fixed by this Honorable Court why the Bill of Particulars and Discovery requested herein should not be furnished the defendant, DEREK MARIGNY.

Respectfully submitted,

GLYNN E. ALEXANDER , T.A.
BAR #2376
4226 Chef Menteur Highway
Suite 200
New Orleans, Louisiana 70126
(504) 948-2208



O R D E R

Let the District Attorney for the Parish of Orleans hereby be ordered to show cause on the _____ day of _____, 1990 why the Bill of Particulars and Discovery herein requested should not be furnished the defendant and a copy of the same be served on him through his counsel.

New Orleans, Louisiana    this    _____    day    of _____, 1990.

_____
J U D G E

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000292

CASE REVIEW AND TRIAL BRIEF

STATE vs.
(1) DEREK MARIGNY

(2) _____

(3) _____

CASE NUMBER: 341-057
VIOLATION (S): 460:967
ITEM NUMBER: B-19933-90
DATE OF OFFENSE: 1-16-90
TIME OF OFFENSE: 8:15 PM
LOCATION: 1900 Hilton
DATE OF ARREST: 1-16-90
LOCATION: 1900 Hilton

INVESTIGATOR'S WORKUP.
NAME: R. Walteau

| PERSON(S) | 1 G/T NUMBER | 3 G/J MEMO | | | | |
|---|---|---|---|---|---|---|
| 1. DEREK MARIGNY | 524297 | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |

OPDA(300) 80



TO: RAY BIGELOW
FROM: MISSY MCDONALD
RE: DEREK MARIGNY
DATE: 6/7/91

Derek Marigney is an essential and material witness in the murder case against Mathew Moore. (Case # 344-648) Presently, this case is set for trial on 7/24/91. Earlier this year, Ms. O'Bannon and I prosecuted the co-defendant Leonard Nelson, and a verdict of second degree was returned.

Prior to the first trial, Mr. Marigney stated that he would not testify unless the office offered him a deal concerning his outstanding drug charges. (See cases 341-057, 342-951, and 343-461.) The charges against Mr. Marigny are simple possession of cocaine and two counts of PWITD cocaine. If you will recall, I approached you before regarding Mr. Marigny's request. At that time, you indicated that this office would offer no deals in return for his testimony. We relayed this information to Mr. Marigny who in turn stated he would offer no assistance in our trial.

Approximately one hour before the trial started, Mr. Marigny appeared in court and stated that he would cooperate because it was his friend that was killed and he wanted to do the right thing. Ms. O'Bannon nor myself made any promises to him. In fact, he believed, at the time of trial, that his own charges would be fully prosecuted.

Mr. Marigney was the main witness to the shooting death of Harold Boss Wilson. His testimony was clear, concise, honest and credible. The jury fully believed Mr. Marigny and returned a verdict of guilty of second degree murder. Without his testimony, we would not have had sufficient evidence to convict Leonard Nelson.

His testimony will be required again in the trial of Matthew Moore. The evidence is very weak against defendant Moore and the trial will suffer immensely without Mr. Marigny's testimony. Again, we are requesting that we can help Mr. Marigny, as he helped us.

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000294



As it stands now, Mr. Marigny faces a 15 year minimum sentence if this office convicts and multiple bills Mr. Marigny. We feel that his safety is in jeopardy if he were to be incarcerated for that length of time with Leonard Nelson. I have spoken to defense counsel, Glynn Alexander, who has stated that Mr. Marigny is willing to plead guilty to all counts against him for a sentence of 18 months.

Mr. Marigny has been very cooperative with Ms. O'Bannon and myself. He has also successfully completed two drug rehabilitation programs. Further, an Uncle in California has offered Mr. Marigny a job when he gets out as well as a home. We believe that Mr. Marigny will have the opportunity to start a new life in a safe, protected environment once he is released from prison.

Considering Mr. Marigny's continued cooperation with this office, as well as his future safety and well-being, we request that he not be multiple billed in return for a plea of guilty to all charges and a sentence of 18 months.

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000295

DEFENDANT: Derek Mairvay

BILL OF INFORMATION CORRECT? Ye        CHARGE: Poss. Coc.

PRIORS:                                 POSSIBLE SENTENCE: _____

FELONY:        DATE:      SENTENCE:
14.64                                   MULTIPLE BILL? _____

OFFENSE/ARREST INFORMATION

DATE:    1-16-90

TIME:    8:15 PM

PLACE:   1400 milton

MOTIONS:
EVIDENCE:
                         STATEMENTS:

                                        IDENTIFICATION:

WITNESSES

                              POLICE OFFICERS      LOCATION
                              Neal
                              Recover
                              Slack  ) NEM    Dunn-Col
                              Irving
                              Thomas

GIST:
P/O making pedestrian check.      PROBLEMS:
D. + other standing on porch
watching. Neal + Slack walked
toward D + group Neal saw D
bend down + place object on post
lying on ground + conted w/ leave
Neal found 64 rock there



Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000297

CRIMINAL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LOUISIANA
SECTION F

DENNIS J. WALDRON, JUDGE

STATE OF LOUISIANA                    No. _290 - 693_

DEREK MARIGNY                         Vio. _14:64_

WAIVER OF CONSTITUTIONAL RIGHTS
PLEA OF GUILTY

I, _DEREK MARIGNY_ _____ on my plea of GUILTY
to the crime of _ARMED ROBBERY_
have been informed and understand the charge to which I am pleading guilty. _DM_
                              by jury or by judge
I understand that I have a right to trial/and if convicted a right to appeal and by entering
a plea of guilty in this case I am waiving my rights to trial and appeal. _DM_

The acts constituting the offense to which I am pleading guilty have been explained to
me as well as the fact that for this crime I could possibly receive a sentence of _By min_
_-99 yrs. My SENTENCE WILL BE SUSPEND WITH CREDIT
FOR TIME SERVED_
I understand that by pleading guilty that I am waiving my rights to confront and cross-
examine the witnesses who accuse me of the crime charged, to compulsory process of the
court to require witnesses to appear and testify for me, the privilege against self-incrim-
ination or having to take the stand myself and testify, and to have preliminary pleadings
filed and heard on my behalf. _DM_

I am entering a plea of guilty to this crime because I am, in fact, guilty of this crime. _DM_
I have not been forced, threatened or intimidated into making this plea. _DM_
I am fully satisfied with the handling of my case by my attorney and the way in which he
has represented me. _DM_

Date _9/6/82_                          Defendant _Derek Marigny_

Judge _____              Attorney for Defendant _____

The Judge has addressed me personally as to all of these matters and he has given me
the opportunity to make any statement I desire

_____  David Marigny
Defendant

Δ released 12-13-1985
served 44 mos.



Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000299





DOCKET MASTER
ORLEANS PARISH CRIMINAL DISTRICT COURT
CASE NO. 312-484

PROCEEDINGS

| DATE | |
|---|---|
| 4/16/86 | Defendant Marigny attended by Counsel Endesha Juakali for Trial. Trial reset for 4/30/86. The Defense objected to the continuance. |
| 4/18/86 | Defendant Berra paid $150.00 to the C.O.F. leaving a balance of $350.00. His next payment is due 5/16/86. |
| 4/30/86 | Because of a Jury Trial this matter is ordered reset for trial 5/14/86 as to defendant Marigny. |
| 5/14/86 | Defendant Marigny absent. Attorney Juakali present. Status Hearing is ordered set 5/20/86 as to Defendant Marigny and Trial set on 6/3/86 as to Defendant Marigny. Place Defendant Marigny on the Prison List for 5/20/86. Do not issue subpoenas for 5/20/86. |
| 5/20/86 | Judge Rudolph Becker, III sitting for Judge Frank A. Marullo, Jr. who is in Baton Rouge attending the Legislature. Trial ordered reset for 6/3/86. Place Defendant Marigny only and subpoena his Attorney. Issue subpoenas as to Defendant Marigny only and subpoena his Attorney. |
| 6/3/86 | Defendant Marigny attended by counsel, Endesha Juakali, Esq., for Trial. State filed S1 through S3 into evidence. State and Defense submitted. Jury returned with a verdict of "Guilty of Possession of Controlled Dangerous Substance to-wit: Marijuana." Defendant was sentenced to time already served, with credit for time served. |
| 8/16/86 | Defendant L. Berra granted to 9/3/86 to pay $200.00 to the C.O.F.. |



Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000302





PAGE NO. 3                    MONDAY MAY 2nd., 1983

NO. 290693
STATE OF LOUISIANA        R.S. 14:64
VS.
DEREK A. MARIGNY.

HEARING, on defendant's application for habeas corpus.
Defendant appeared with counsel Jack Dolan Esq.
Motion of defense, defendant Derek Marigny; Warren DeAgano Esq.,
and Mrs. Laura French were duly sworn by the clerk,
testified on the part of the defense and cross-examined
by the state, submitted by both sides.
habeas corpus DENIED by the court and objection reserved
by defense.
the court ordered defendant remanded to the department
of corrections.

CLOSED

YAR







NEW ORLEANS POLICE DEPARTMENT
UNIFORM MOTOR VEHICLE TRAFFIC ACCIDENT REPORT
AND INCIDENT REPORT
CONTINUATION SHEET

966
PAGE 2 OF 2

NOPD ITEM NUMBER: A-19933-90
TYPE: STOLEN

DESCRIPTION

EVIDENCE:

(64) pieces of white rock-like substance contained in a clear plastic bag.
$13.00 dollars in U.S. currency.

NARRATIVE:

On 1-16-90 at approximately 8:15PM Officers Neal, Recasner, Slack Hewitt, Irving and Thomas manning units 962, 954 and 952 of the Narcotic Enforcement for Public Housing had the occassion the arrest subject, Derek Marigny, negro male, D.O.B. 4-26-66 of 1470 Milton street. Officers were working the the St. Bernard Housing Project in the area of the 1400 block of Milton street. The 1400 block of Milton street was known to officers as an area heavy in drug trafficking. Officers had excuted several drug arrest in the pass in the 1400 block of Milton street. Officers were conducting several pedestrain checks in the area when Officer Neal observed several black male subjects standing in front of 1470 Milton street. The subjects standing in front of 1470 Milton were intensed upon looking on while officers frisked subject about a half a block away from where they were standing in the 1400 block of Milton. The officers were working in a plain clothes capacity and driving unmarked vehicle. After a crowd started to gather around to observe what was going on, Officers Neal and Slack proceeded to walk toward the group of subjects standing in front of 1470 Milton street. While walking toward the subjects Officer Neal observed one of the subjects, who was later identified as Derek Marigny, bend down and place a small oject at the end of a post that was lying on the ground and cover it over with leaves. Marigny then started to fumble with his shoe laces as if he was attempting to tie his shoe. Officers Neal and Slack frisked the subjects in front of 1470 Milton st. After the subjects had being frisked, Officer Neal walked over to the exact spot where she observed the subject, Derek Marigny, place the object and brushed back the leaves. Neal located a clear plastic bag containing numerous white rock like objects. The subject, Derek Marigny, was placed under arrest and advised of his rights in a manner in which he stated he

REPORTING OFFICER: Neal, Claudia #1775
REPORTING OFFICER: Recasner, Allen #1076



| NPD SIGNAL | | NEW ORLEANS POLICE DEPARTMENT | | | SUPP. STATE COMPUTER NUMBER | | |
|---|---|---|---|---|---|---|---|
| 966 | | UNIFORM MOTOR VEHICLE TRAFFIC ACCIDENT REPORT AND INCIDENT REPORT | | | | | |
| PAGE 4 OF 4 | | CONTINUATION SHEET | | | NPD ITEM NUMBER A-19933-90 | | |
| SEQ | QUANTITY | DESCRIPTION | SERIAL NO. | TYPE | STOLEN | RECOVERED | |

NARRATIVE CONT'

understood. The arrested subject was processed and transported to central lock up for booking. The evidence was turned over to central evidence and property under control number B *05155Y*

| REPORTING OFFICER | BADGE | REPORTING OFFICER | BADGE | NPD ACCESS NUMBER |
|---|---|---|---|---|
| Neal, Claudia #1775 | | Recasner, Allen #1076 | | |

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000309



CRIME LABORATORY
NEW ORLEANS POLICE DEPARTMENT
715 SOUTH BROAD STREET
NEW ORLEANS, LOUISIANA  70119

JANUARY 17, 1990

REPORT OF THE CRIME LABORATORY

TO:    N.E.P.H.
ATTN:  NEAL & SLACK

EVIDENCE RECEIVED:        01-17-90

TYPE OF INVESTIGATION:  CDS

EXAMINATION REQUESTED:  CHEMICAL          ITEM NO.: A-19988-90
                                          O.D.: 01-16-90
SUBJECTS:
               DEREK MARIGNY

SPECIMENS AND RESULTS OF LABORATORY ANALYSIS

      One sealed plastic envelope containing:

1. One plastic bag containing numerous pieces of rock-like
   material. ------------------------------POSITIVE FOR COCAINE.

   GROSS WEIGHT 23.71   GRAMS
   NET WEIGHT 12.68   GRAMS


EMD/bt                          EDGAR M. DUNN
                                CRIMINALIST II



Control No.    B 058554    NEW ORLEANS POLICE DEPARTMENT
EVIDENCE/PROPERTY CARD    Class LS

Item No. A-19933-90    Catalog No. DEP / 1B    Affidavit No. NEPH/ Neal #1775

Time/Date Confiscated: 8:15PM 1/16/90    Received From: N.Jones

Time/Date Received: 9:25PM 1/16/90    Received By:    Address: 1400 blk. Milton St.

Confiscated From: Accused

Owner:    Telephone No.

Owner's Address:    Address: 1470 Milton St.

Accused: Derek Marigny B/M 4/26/66

Court: CDC    Date Arrested: 1/16/90    Charge: 967

Describe Property: E1-(1) clear sandwich bag containing (1) small clear plastic bag w/(64) pieces
of white hard rock-like substance....(13.7&grams).......
E2-$13.00 in U.S.Currency., (1)$10.00, (3)$1.00 bills....(1B)......

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000311

**OFFICE OF THE DISTRICT ATTORNEY**
**PARISH OF ORLEANS**

**SCREENING ACTION FORM**

NARCOTICS STRIKE FORCE

Page ___ of ___ Pages
CASE NO.
**341657B**

DATE RECEIVED FROM NOPD  3D2/1/90

ACCEPTED
(Circle if case is accepted)

REFUSED    DIVERTED    REFERRED
(Circle only if all charges refused)

| | (LAST) | (FIRST) | | | (MIDDLE) | RACE | SEX | DATE OF BIRTH |
|---|---|---|---|---|---|---|---|---|
| | MARIGNY, DEREK A | | | | | B | M | 04/26/66 |

| ADDRESS | | SYSTEM # | | MAGISTRATE'S CASE NO. |
|---|---|---|---|---|
| 1470 Milton St Apt C | New Orleans, LA | 90075098 | | M221780 |

NO. OF CO-DEFENDANTS: O

DATE SCREENED: 2/7/90  2/5/90

SCREENED BY: WILLIAMSON   CODE: CWIL

B OF 1 NO.: 274297P

MOTION NO. (XXX): 00678731

CHARGES ACCEPTED

| ITEM NO. | ARREST NO | CHARGE | CLASS | INT-IATOR | TITLE | ATTEMPT ETC | STATUTE | PARA | SUB PARA |
|---|---|---|---|---|---|---|---|---|---|
| A1993390 | 01159494 | POSS. CRACK | 3 | 1 | 40 | ( ) | 967 | A4 C | OP 2 |
| | | | | | | ( ) | | ( ) | ( ) |
| | | | | | | ( ) | | ( ) | ( ) |
| | | | | | | ( ) | | ( ) | ( ) |

WORDING OF BILL OF INFORMATION FOR EACH COUNT

POSS. CRACK

DATE OF OFFENSE: -1/16/90    DATE OF ARREST: 01/16/90

CASE TYPE:

| VICT INFO | RACE SEX | AGE | DOB | RELATION TO DEFENDANT |
|---|---|---|---|---|
| CT. 1 | | | | |
| CT. # | | | | |
| CT. 2 | | | | |
| CT. 4 | | | | |

CHARGES REFUSED OR DIVERTED

| ITEM NO. | ARREST NO. | CHARGE | CLASS | INT-IATOR | DISPOSITION REFUSAL CODE | TITLE | ATTEMPT ETC | STATUTE | PARA | SUB PARA |
|---|---|---|---|---|---|---|---|---|---|---|
| " | " | DIST. CRACK | 2 | O | 373 | 40 | ( ) | 967 | A4 B | OP ( ) |
| | | | | | | | ( ) | | ( ) | ( ) |
| | | | | | | | ( ) | | ( ) | ( ) |
| | | | | | | | ( ) | | ( ) | ( ) |

REFUSAL REASON:

STATUTE NO.: 40:967   ALTHOUGH AMT. IS SUBSTANTIAL, IT *** IS NOT INDIVIDUALLY PACKAGED, NO TRANSACTIONS ARE OBSERVED, & ONLY A SMALL AMT. OF MONEY IS RECOVERED (<13); IS BASICALLY A THROWDOWN

REMARKS AND OFFENSE SUMMARY

D.A. CASE JACKET

OPDA 106-A

**OFFICE OF THE DISTRICT ATTORNEY**
**PARISH OF ORLEANS**

**WITNESS WORK SHEET**

TRANS T253

| DEFENDANT'S NAME (Last) | (First) | (Maiden) | ITEM NO. | MAGISTRATE OR COURT CASE NO. | B OF I NO. |
|---|---|---|---|---|---|
| MARIGNY, DEREK | | | | | |

| NO. | POLICE NAME, RANK, BADGE NO. AND ARREST CREDIT # | ADDRESS | 2 DIGIT CODE | PHONE |
|---|---|---|---|---|
| 1. | P/O C. NEAL | NOPD NARCOTICS HANO 1001 LOYOLA RM. 207 | | HOME / WORK 565-7951 |
| 2. | P/O A. RECASNER | | | HOME / WORK |
| 3. | P/O J. SLACK | | | HOME / WORK |
| 4. | P/O R. IRVING | | | HOME / WORK |

OTHER WITNESSES — LIST IN ORDER OF CALL

| NO. | NAME | ADDRESS | 2 DIGIT CODE | PHONE |
|---|---|---|---|---|
| 5. | P/O J. THOMAS | | | HOME / WORK |
| 6. | P/O E. DUNN | NOPD CRIME LAB | | HOME / WORK 826-5211 |
| 7. | | | | HOME / WORK |
| 8. | | | | HOME / WORK |
| 9. | | | | HOME / WORK |
| 10. | | | | HOME / WORK |
| 11. | | | | HOME / WORK |
| 12. | | | | HOME / WORK |
| 13. | | | | HOME / WORK |

DATES SUBPOENAS MAILED OR WITNESSES NOTIFIED

*TYPES OF WITNESS CODES

**FIRST DIGIT**
A   Arresting Officer
B   Assisting Officer
D   Investigating Officer
1   Other PD
2   Victim
3   Eyewitness
6   Fingerprint
8   Handwriting
5   Narc. Chemist
C   Other Chemist
9   Other Expert

**SECOND DIGIT**
E   Essential
N   Non-Essential

D. A. FILE

FORM OPDA 174 69

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000313

The State of Louisiana    CRIMINAL DISTRICT COURT FOR THE PARISH

MARTIN MELTON,    Assistant District Attorney for the Parish of Orleans, who in the name and by the authority of the said State, prosecutes, in this behalf, in proper person comes into the Criminal District Court for the Parish of Orleans, in the Parish of Orleans, and gives the said Court here to understand and be informed that one ___DEREK A. MARIGNY,___

late of the Parish of Orleans, on the ___16th___ day of ___January___ in the year of our Lord, one thousand nine hundred and ___ninety___ in the Parish of Orleans aforesaid, and within the jurisdiction of the Criminal District Court for the Parish of Orleans, did wilfully and unlawfully possess a controlled and dangerous substance.

to wit:  COCAINE (CRACK),

contrary to the form of the Statute of the State of Louisiana in such case made and provided and against the peace and dignity of the same.

_____
Assistant District Attorney for the Parish of Orleans

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000314



## OFFICE OF THE DISTRICT ATTORNEY PARISH OF ORLEANS

SYSTEM NUMBER: Goo74345

| CASE NUMBER | | | | | | |
|---|---|---|---|---|---|---|
| ARRAIGNMENT DATE | DEFENDANT | B OF I NUMBER | DEFENDANT NUMBER | DEFENSE ATTORNEY | | PLEA |
| 5-25-90 | Marigny | | | Alexander | | NPNG |

| NEXT DATE | NEXT EVENT | ADA | | CODE | DATA ENTRY | |
|---|---|---|---|---|---|---|
| 4-6-90 | MOHG | Pallerella | AMCI | 5-25-90 | | |
| JUDGE | REMARKS | | | | | |
| KIA | | | | | | |
| REPORTER | | | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 5/3/90 | Marigny | ARLN | | CON | D | 111 | OID |

| NEXT DATE | NEXT EVENT | ADA | | CODE | DATA ENTRY | | |
|---|---|---|---|---|---|---|---|
| 5/8/90 | ARLN | Pellengh | mDoo | DLET | 5/4/90 | | |
| JUDGE FDW | REMARKS | | | | | | |
| REPORTER | | | | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 5/8/90 | Marigny | ALET | TR | 6K | | AH1 | CLOSED |

| NEXT DATE | NEXT EVENT | ADA | CODE | DATA ENTRY | |
|---|---|---|---|---|---|
| 6 Plea | — | Pellegrin | DLET | 7-9-90 | |
| JUDGE FDW | REMARKS | To follow # 338-550 ; Alexander atty | | | |
| REPORTER | | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 7-6-90 | Marigny | 3TH6 | | C | D | 127 | O50 |

| NEXT DATE | NEXT EVENT | ADA | CODE | DATA ENTRY | |
|---|---|---|---|---|---|
| 7-26-90 | MOBF | Frank | REORA | 7-9-90 | |
| JUDGE KIA | REMARKS | | | | |
| REPORTER | | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 7-16-90 | Marigny | STHG | | HD | 3/23/9 | | OID |

CLOSED

| NEXT DATE | NEXT EVENT | ADA | CODE | DATA ENTRY | |
|---|---|---|---|---|---|
| 8-6-90 | MAHG | Frank | RBRA | 7-6-90 | |
| JUDGE KIA | REMARKS | reappear | | | |
| REPORTER | | | | | |

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 8-6-90 | Marigny | MOHG | | C | S | 104 | OID |

| NEXT DATE | NEXT EVENT | ADA | CODE | DATA ENTRY | |
|---|---|---|---|---|---|
| | | | AVE | | |
| JUDGE | REMARKS | | | | |
| REPORTER | | | | | |

SEE BACK FOR MORE SPACE



90079343

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 8-10-90 | Marigny | MDHG | | C | P | 017 | 010 |

NEXT DATE 9-6-90    NEXT EVENT MDHG    ADA Braun    CODE RBRA    DATA ENTRY
JUDGE KIA    REMARKS    8-10-90
REPORTER

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|---|---|---|---|---|---|---|---|
| 9-6-90 | Marigny | MDHG | | C | D | 111 | 010 |

NEXT DATE 9-17-90    NEXT EVENT STHG    ADA Braun    CODE RBRA    DATA ENTRY
JUDGE KIA    REMARKS    9-6-90
REPORTER

DEFENDANT Marigny    DISPOSITION DATE: 6-21-91    SENTENCING DATE: 6-21-91

| CHARGE | DISPOSITION | CODE | CONFINEMENT TIME | LOCATION | TYPE | HABITUAL OFFENDER | PROBA-TION | FINE | CC | COF | RESTITUTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 40.967 | PGAC | 050 | 5yrs s/s | DOC | CAR | yes | 5yrAP | | | | |

JUDGE: FAH    REPORTER: Marigra    ADA Braun    CODE RBRA
REMARKS: CAA w/ 341-057 & 343-461    DATA ENTRY 6-24-91

DEFENDANT:    DISPOSITION DATE:    SENTENCING DATE:

| CHARGE | DISPOSITION | CODE | CONFINEMENT TIME | LOCATION | TYPE | HABITUAL OFFENDER | PROBA-TION | FINE | CC | COF | RESTITUTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

JUDGE    REPORTER    ADA    CODE
REMARKS    DATA ENTRY

DEFENDANT:    DISPOSITION DATE:    SENTENCING DATE:

| CHARGE | DISPOSITION | CODE | CONFINEMENT TIME | LOCATION | TYPE | HABITUAL OFFENDER | PROBA-TION | FINE | CC | COF | RESTITUTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

JUDGE    REPORTER    ADA    CODE
REMARKS    DATA ENTRY

DEFENDANT    DISPOSITION DATE    SENTENCING DATE

| CHARGE | DISPOSITION | CODE | CONFINEMENT TIME | LOCATION | TYPE | HABITUAL OFFENDER | PROBA-TION | FINE | CC | COF | RESTITUTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

JUDGE    REPORTER    ADA    CODE
REMARKS    DATA ENTRY
NOTICE OF APPEAL FILED    DATE    RETURN DATE

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000317

DEFENDANT RELEASE STATUS

| DEFENDANT | BOND TYPE | AMOUNT | JUDGE | DATE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

PLEA OFFERS

| DATE | DEFENSE COUNSEL | ADA | REMARKS |
|---|---|---|---|
| | | | As per minutes - OK not |
| | | | to MB this D |
| | | | Bigelow 6/11/91 |
| | | | |
| | | | |

APPROVED BY

CLOSING CHECK LIST

1) Closed to all defendants?

2) Sentence info on file?

3) Copy of bond in file?

4) B of I Photograph in file?

5) Updated Rap Sheet in file?

6) Was def. Multiple Billed where Possible to do so?

7) Was sentence a legal one?

8) Victim and Witness letters sent?

9) If Nolled is form signed off?

2-26-92

REVIEWED BY
POST CONVICTION/TRACKING

REVIEWED MAR 4 1992

INVESTIGATOR

ASSISTANT DISTRICT ATTORNEY    DATE

7-?-91

DATE

APPEAL

DATE FILED: _____

RETURN DATE: _____

ASSISTANT DISTRICT ATTORNEY: _____

COURT: _____

DISPOSITION _____

DATE: _____

TO: RAY BIGELOW
FROM: MISSY MCDONALD
RE: DEREK MARIGNY
DATE: 6/7/91

Derek Marigney is an essential and material witness in the murder case against Mathew Moore. (Case # 344-648) Presently, this case is set for trial on 7/24/91. Earlier this year, Ms. O'Bannon and I prosecuted the co-defendant Leonard Nelson, and a verdict of second degree was returned.

Prior to the first trial, Mr. Marigney stated that he would not testify unless the office offered him a deal concerning his outstanding drug charges. (See cases 341-057, 342-951, and 343-461.) The charges against Mr. Marigny are simple possession of cocaine and two counts of PWITD cocaine. If you will recall, I approached you before regarding Mr. Marigny's request. At that time, you indicated that this office would offer no deals in return for his testimony. We relayed this information to Mr. Marigny who in turn stated he would offer no assistance in our trial.

Approximately one hour before the trial started, Mr. Marigny appeared in court and stated that he would cooperate because it was his friend that was killed and he wanted to do the right thing. Ms. O'Bannon nor myself made any promises to him. In fact, he believed, at the time of trial, that his own charges would be fully prosecuted.

Mr. Marigney was the main witness to the shooting death of Harold Boss Wilson. His testimony was clear, concise, honest and credible. The jury fully believed Mr. Marigny and returned a verdict of guilty of second degree murder. Without his testimony, we would not have had sufficient evidence to convict Leonard Nelson.

His testimony will be required again in the trial of Matthew Moore. The evidence is very weak against defendant Moore and the trial will suffer immensely without Mr. Marigny's testimony. Again, we are requesting that we can help Mr. Marigny, as he helped us.

As it stands now, Mr. Marigny faces a 15 year minimun sentence if this office convicts and multiple bills Mr. Marigny. We feel that his safety is in jeopardy if he were to be incarcerated for that length of time wi Leonard Nelson. I have spoken to defense counsel, Glynn Alexander, who has stated that Mr. Marigny is willing to plead guilty to all counts against him for a sentence of 18 months.

Mr. Marigny has been very cooperative with Ms. O'Bannon and myself. He has also successfully completed two drug rehabilitation programs. Further, an Uncle in California has offered Mr. Marigny a job when he gets out as well as a home. We believe that Mr. Marigny will have the opportunity to start a new life in a safe, protected environment once he is released from prison.

Considering Mr. Marigny's continued cooperation with this office, as well as his future safety and well-being, we request that he not be multiple billed in return for a plea of guilty to all charges and a sentence of 18 months.



COURT NUMBER 342951    SYSTEM NUMBER 900 79343

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT ST |
|------|-----------|-------|--------|----------------|---------------|--------------|
| 9-5-90 | Marigny Derek | MOHC | CN | CT | 109 | 010 |

NEXT DATE 11-26-90   NEXT EVENT MOHC   ABA Avery   CODE KAVE   DATA ENTRY
JUDGE KIA
REPORTER   REMARKS Judge ill   9-5-90

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT ST |
|------|-----------|-------|--------|----------------|---------------|--------------|
| 11-26-90 | Marigny Derek | MOHG | CN | A | 111 | 010 |

NEXT DATE 12-19-90   NEXT EVENT MOHC   ABA Avery   CODE KAVE   DATA ENTRY Brenda 11-26-90
JUDGE KIA
REPORTER   REMARKS (Relander - no show)

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT ST |
|------|-----------|-------|--------|----------------|---------------|--------------|
| 12-19-90 | Marigny Derek | MOHC | WV | | | 010 |

NEXT DATE 2-28-91   NEXT EVENT JRTR   ABA Avery   CODE KAVE   DATA ENTRY 12-19-90
JUDGE KIA
REPORTER

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT ST |
|------|-----------|-------|--------|----------------|---------------|--------------|
| 2-28-91 | Derek Marigny | JRTR | CN | D | 113 | 010 |

NEXT DATE 3-27-91   NEXT EVENT JRTR   ABA Welz   CODE Vines   DATA ENTRY Brenda 3-1-91
JUDGE KIA
REPORTER Barbara

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT S |
|------|-----------|-------|--------|----------------|---------------|-------------|
| 3-1-91 | Derek Marigny | MOHC | TRS GR | | | 010 |
| | | → F | | | | |

NEXT DATE   NEXT EVENT   ABA Welz   CODE Vines   DATA ENTRY
JUDGE KIA
REPORTER

COURT NUMBER: _____    SYSTEM NUMBER _____

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT |
|------|-----------|-------|--------|----------------|---------------|-----------|
| 9-12-90 | Marigny Deck | STHG | C | D | 111 | 010 |

| NEXT DATE 9-17-90 | NEXT EVENT STHG | ADA Avery | | COOK | | DATA ENTRY |
| JUDGE | | REMARKS | | | | |
| REPORTER | | | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT |
|------|-----------|-------|--------|----------------|---------------|-----------|
| 9-17-90 | Marigny Deck | STHG | FF | | | 010 |

| NEXT DATE 9-20-90 | NEXT EVENT STHG | ADA Avery | | CODE LATE | | DATA ENTRY |
| JUDGE KIP | | REMARKS Judge went to funeral | | | | |
| REPORTER | | | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT |
|------|-----------|-------|--------|----------------|---------------|-----------|
| 9-20-90 | Marigny Deck | STHG | FK | | | 010 |

| NEXT DATE 9-27-90 | NEXT EVENT STHG | ADA Avery | | CODE KAVE | | DATA ENTRY |
| JUDGE KIP | | REMARKS | | | | |
| REPORTER | | | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT |
|------|-----------|-------|--------|----------------|---------------|-----------|
| 9-27-90 | Marigny Deck | EOO STHG | CN | D | 111 | 010 |

| NEXT DATE 10-15-90 | NEXT EVENT MOHG | ADA Avery | | CODE LAVE | | DATA ENTRY |
| JUDGE KIP | | REMARKS Alexander no show | | | | |
| REPORTER | | | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT |
|------|-----------|-------|--------|----------------|---------------|-----------|
| 10-15-90 | Marigny Deck | MOHG | CN | D | 111 | 010 |

| NEXT DATE 11-5-90 | NEXT EVENT MOHG | ADA Avery | | CODE KAVE | | DATA ENTRY |
| JUDGE KIP | | REMARKS Alexander no show | | | | |
| REPORTER | | | | | | |

OFFICE OF THE CRIMINAL SHERIFF     NEW ORLEANS, LA.

ARREST REGISTER - DISTRICT ATTORNEY'S COPY     NARC

ARRESTEE DATA

CHARGES AND COURT SCHEDULE

POSS WITH CRACK     24.5 GRAMS
RESIST ARREST BY FLIGHT

RS 40  967 (B)
RS 14  108.1

DARE   NAH
100K   100K
2R 3K

224581

OFFENSE DATA

ARREST DATA

REMARKS:

90679 343







NO SENTENCE                    $0.00        0              NPD0000
RS 13 B-29              ARMED ROBBERY-GUN
   NO DISPOSITION      00/00/00  NO REASON GIVEN              999
   NO SENTENCE                    $0.00        0           NPD0000

P/C    13797600

M E M O R A N D U M    T O    F I L E

From:  Ad Hoc I DA's Ralph Brandt & Valerie Welz

Re Case:  31-057 – 312-951 – 313-463  Derek Maugng

This memo to the file is to alert you to any potential problems or peculiarities regarding this case. If you have any questions, please contact one of us for more information.

Δ is a double bill. Has a juvenile Armed Robbery held as an adult, Served 44 months on it.

⟹ Consider filing Motion to increase bond ⟸

Δ was witness in Massey's 1st° Murder trial

1.

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000328

DEFENDANT: _Derek Marvin_
BILL OF INFORMATION CORRECT? _Yes_

CHARGE: _PWITD Crack_
POSSIBLE SENTENCE: _____

PRIORS:

| FELONY: | DATE: | SENTENCE: |
|---|---|---|
| 14.64 | 8.6.82 | 5 yrs |
| | | since 44 months |

MULTIPLE BILL? _2X_

OFFENSE/ARREST INFORMATION

DATE: _3-19-90_

TIME: _occurred 3:25 pm_

PLACE: _1400 Blk Milton_

MOTIONS:
EVIDENCE:

STATEMENTS:

IDENTIFICATION:

WITNESSES
28 rocks
$105.00

POLICE OFFICERS          LOCATION
Neal
Clausing   NEPH
Widh
Thomas                Waggespach lab

GIST:
While patrolling saw D
w/ brown paper bag, reaching
into bag + giving objects to
UNK objects to UNK BMs
P/O exited car + D dropped
bag w/ 28 rocks + fled
during picked up bag.
Thomas apprehended D.

PROBLEMS:
These P/o have gotten
D before!





NEW ORLEANS POLICE DEPARTMENT
UNIFORM MOTOR VEHICLE TRAFFIC ACCIDENT REPORT
AND INCIDENT REPORT
CONTINUATION SHEET

NOPD SIGNAL: 96/6
PAGE 3 of 4
SUPP STATE COMPUTER NUMBER
NOPD ITEM NUMBER: C-24794-90

| SEQ | QUANTITY | DESCRIPTION | SERIAL NO. | TYPE | STOLEN | RECOVERED |
|-----|----------|-------------|------------|------|--------|-----------|

- EVIDENCE -

A. U.S. GOV'T CURRENCY IN DENOMINATIONS OF: (a) $20.00 BILLS, 5-$10.00 BILLS, 3-$5.00 BILLS TOTAL: $105.00

B. 1 BROWN PAPER BAG CONTAINING 28 PIECES OF A TAN HARD ROCK LIKE SUBSTANCE 23.88 grams.

- NARRATIVE -

ON 3-19-90 ABOUT 3:25 P.M. DETECTIVES NEAL, IRVING, THOMAS & WALSH MANNING UNITS 952 + 966 OF THE NARCOTIC ENFORCEMENT IN PUBLIC HOUSING UNIT IN AN UNMARKED UNIT, ATTIRED IN PLAIN CLOTHES HAD THE OCCASION TO ARREST ONE DEREK MARTGNY IN THE 1400 BLK. OF MILTON ST. CIRCUMSTANCES AS FOLLOWS:
    DETECTIVES IRVING, NEAL, WALSH + THOMAS WHILE PATROLLING IN THE 1400 BLK. OF MILTON ST. A KNOWN DRUG AREA OBSERVED THE A/S DEREK MARTGNY HOLDING A BROWN PAPER BAG IN HIS HAND REACHING INTO THE BAG SEVERAL TIMES HANDING AN UNKNOWN TYPE TAN COLORED OBJECT TO SEVERAL UNKNOWN B/M SUBJECT WHO WAS STANDING NEXT TO THE A/S DEREK MARTGNY, SINCE DETECTIVES HAD MADE MANY ARREST FROM THE LOCATION BELIEVED THE TRANSACTION TO BE DRUG RELATED IMMEDIATELY DROVE UP IN FRONT OF THE TRANSACTION WHICH WAS BEING MADE BETWEEN THE SUBJECTS. AS DETECTIVES IMMEDIATELY EXITED THE VEHICLE I.D. THEMSELVES AND OBSERVED THE A/S DISCARD FROM HIS HAND EVIDENCE "B" LISTED ABOVE AS HE AND THE OTHER SUBJECTS THEN FLED ON FOOT. DETECTIVE IRVING IMMEDIATELY PICKED UP EVIDENCE "B" FROM THE GROUND AND OBSERVED THE CONTENTS AS DETECTIVE THOMAS APPREHENDED THE A/S A FEW FEET AWAY FROM THE SCENE WHERE DETECTIVES CHASED THE SUBJECT NEVER LOSING SIGHT OF THE SUBJECT. THE OTHER SUBJECTS FLED IN DIFFERENT DIRECTIONS AND MADE GOOD THEIR ESCAPE.

REPORTING OFFICER: IRVING    BADGE: 583
REPORTING OFFICER: THOMAS    BADGE: 2110
NOPD ACCESS NUMBER:

NOPD SIGNAL
966.

PAGE 4 of 4

**NEW ORLEANS POLICE DEPARTMENT**
**UNIFORM MOTOR VEHICLE TRAFFIC ACCIDENT REPORT**
**AND INCIDENT REPORT**
**CONTINUATION SHEET**

SUPP STATE COMPUTER NUMBER

SEQ | QUANTITY

NOPD ITEM NUMBER
C-24794-90

DESCRIPTION | SERIAL NO. | TYPE | STOLEN | RECOVERED

THE SUBJECT WAS PLACED UNDER ARREST, ADVISED OF HIS RIGHTS.

SEARCH INCIDENTAL TO ARREST EVIDENCE "A" WAS FOUND IN THE SUBJECTS RIGHT FRONT PANTS POCKET.

THE SUBJECT WAS TRANSPORTED TO CIU TO BE BOOKED ACCORDINGLY.

DETECTIVES THEN RELOCATED TO CAHE + PLACED THE EVIDENCE ON THE PROPERTY BOOKS UNDER CONTROL # B061356 ASSISTED BY WALKER OF CD+E.

REPORTING OFFICER
THOMAS

BADGE
2110

REPORTING OFFICER
IRVING

BADGE
583

NOPD ACCESS NUMBER

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000333

**CRIME LABORATORY**
NEW ORLEANS POLICE DEPARTMENT
715 SOUTH BROAD STREET
NEW ORLEANS, LOUISIANA  70119

MARCH 20, 1990

REPORT OF THE CRIME LABORATORY

TO:   N.E.P.H.
ATTN: NEAL

EVIDENCE RECEIVED:       03-20-90

TYPE OF INVESTIGATION:  CDS                    ITEM NO.: C-24794-90
                                               O.D.: 03-19-90

EXAMINATION REQUESTED:  CHEMICAL

SUBJECTS:               DEREK MARIGNY

SPECIMENS AND RESULTS OF LABORATORY ANALYSIS

1. Twenty-eight (28) pieces of a rock like material. --------
   --------------------------------POSITIVE FOR COCAINE.

2. One brown paper bag. -----------------------NOT ANALYZED.

      WEIGHT OF ENVELOPE AND EVIDENCE =  39.7 GRAMS
              WEIGHT OF EVIDENCE =           GRAMS

                                    DANIEL W. WAGUESPACK
                                    CRIMINALIST II

DWW/bt

Control No.    **B 061356**    **NEW ORLEANS POLICE DEPARTMENT**    Class 1S
**EVIDENCE/PROPERTY CARD**

Item No. C-24794-90    Catalog No. DEP/Temporary storage Affidavit No.

Time/Date Confiscated: 3:25pm  3-19-90    Received From: Irving  583  NEPH

Time/Date Received: 4:30pm  3-19-90    Received By: Walker

Confiscated From: Accused    Address: 1400 Blk Miton

Owner:    Telephone No.

Owner's Address:

Accused: Derek Marigny  N/M  4-26-66    Address: 1470 Milton St.

Court: CDC    Date Arrested: 3-19-90    Charge: 967

Describe Property: E1-1 brown paper bag containing 28 pieces of a tan hard roc
like substance........23.88g........DEP
E2-2-$20.00 bills,5-$10.00 bills,3-$5.00 bills,total $105.00.....t
NOTE: I R. Irving attempted to deliver the evidence to CDC proper
room on 3-19-90 at 4:10pm.  CDC property room was closed.

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000335

SD

**OFFICE OF THE DISTRICT ATTORNEY**
**PARISH OF ORLEANS**

DATE RECEIVED FROM NOPD    SD 4/17/90

SCREENING ACTION FORM

NARCOTICS STRIKE FORCE

ACCEPTED    REFUSED    DIVERTED    REFERRED

(Circle if any charge is accepted)    (Circle only if all charges refused)

Page ___ of ___ Pages

CASE NO.  342951 F

| DEFENDANT'S NAME (LAST) | (FIRST) | (MIDDLE) | RACE | SEX | DATE OF BIRTH |
|---|---|---|---|---|---|
| MARIGNY, DEREK A | | | B | M | 04/26/66 |

| DEFENDANT'S ADDRESS | SYSTEM # | MAGISTRATE'S CASE NO. |
|---|---|---|
| 1470 Milton St Apt C  New Orleans, LA | 90079343 | M224581 |

| NO. OF CO-DEFENDANTS | DATE SCREENED | SCREENED BY | CODE | NEW SYSTEM # | B OF 1 NO |
|---|---|---|---|---|---|
| 0 | 4/26/90  4/23/90 | WILLIAMSON | CWIL | | 274297 |

MOTION NO ICEN:  00678731

**CHARGES ACCEPTED**

| ITEM NO | ARREST NO | CHARGE | CLASS | INIT-IATOR | TITLE | ATTEMPT ETC | STATUTE | PARA | SUB PARA |
|---|---|---|---|---|---|---|---|---|---|
| C2479490 | 01167290 | PWITD CRACK | 2 | O | 40 | ( ) | 967 | A4 (B) | OD ( ) |
| | | | | | | ( ) | | ( )( ) | |
| | | | | | | ( ) | | ( )( ) | |
| | | | | | | ( ) | | ( )( ) | |

WORDING OF BILL OF INFORMATION FOR EACH COUNT

PWITD CRACK

| | DATE OF OFFENSE | DATE OF ARREST |
|---|---|---|
| | 3/19/90 | 03/19/90 |

CASE TYPE    ICU #

| VICT INFO | RACE SEX | AGE | DOB | RELATION TO DEFENDANT |
|---|---|---|---|---|
| CT. 1 | | | | |
| CT. 2 | | | | |
| CT. 3 | | | | |
| CT. 4 | | | | |

**CHARGES REFUSED OR DIVERTED**

| ITEM NO. | ARREST NO. | CHARGE | CLASS | INIT-IATOR | DISPOSITION REFUSAL CODE | TITLE | ATTEMPT ETC | STATUTE | PARA | SUB PARA |
|---|---|---|---|---|---|---|---|---|---|---|
| " | " | RESISTING | 4 | O | 334 | 14 | ( ) | 108.1 | ( )( ) | |
| | | | | | | | ( ) | | ( )( ) | |
| | | | | | | | ( ) | | ( )( ) | |
| | | | | | | | ( ) | | ( )( ) | |

REFUSAL REASONS:

STATUTE NO. 14:108.1    Δ ATTEMPTS TO FLEE, BUT IS QUICKLY CAUGHT + ARRESTED W/O INCIDENT

NARCOTIC
STRIKE
FORCE
TRACK II

REMARKS AND OFFENSE SUMMARY

D A CASE JACKET

DPDA 105 - A



OFFICE OF THE DISTRICT ATTORNEY
PARISH OF ORLEANS

WITNESS WORK SHEET

| DEFENDANT'S NAME (Last) | | | ITEM NO. | MAGISTRATE OR COURT CASE NO. | S OT I NO. | |
|---|---|---|---|---|---|---|
| MARIGNY, DEREK | | | | | 2 DIGIT CODE | PHONE HOME |
| POLICE NAME, RANK, BADGE NO. AND ARREST CREDIT # | | | ADDRESS | | | WORK |
| NO. | | | NOPD N.E.P.H. | | | 565-7951 |
| 1. P/O C. NEAL | | | 1001 LOYOLA, RM. 207 | | | HOME |
| | | | | | | WORK |
| 2. P/O R. IRVING | | | | | | HOME |
| | | | | | | WORK |
| 3. P/O T. WALSH | | | | | | HOME |
| | | | | | | WORK |
| 4. P/O J. THOMAS | | | | | 2 DIGIT CODE | PHONE HOME |
| OTHER WITNESSES — LIST IN ORDER OF CALL | | | ADDRESS | | | |
| NO. NAME | | | NOPD CRIME LAB | | | 826-5211 |
| 5. P/O D. WAGUESPACK | | | | | | HOME |
| | | | | | | WORK |
| 6. | | | | | | HOME |
| 7. | | | | | | WORK |
| 8. | | | | | | HOME |
| 9. | | | | | | WORK |
| 10. | | | | | | HOME |
| 11. | | | | | | WORK |
| 12. | | | | | | |
| 15. | | | DATES SUBPOENAS MAILED OR WITNESSES NOTIFIED | | | |

TYPES OF WITNESS CODES

FIRST DIGIT
A  Arresting Officer
B  Assisting Officer
D  Investigating Officer
1  Other PD
2  Victim
3  Eyewitness
4  Fingerprint
6  Handwriting
5  Narc. Chemist
C  Other Chemist
9  Other Expert

SECOND DIGIT
E  Essential
N  Non-Essential

D. A. FILE

FORM OPDA 174 83



04/30/90

PARISH OF ORLEANS

The State of Louisiana ⎰ SS. CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS

MARTIN MELTON, Assistant District Attorney for the Parish of Orleans, who in the name and by the authority of the said State, prosecutes, in this behalf, in proper person comes into the Criminal District Court for the Parish of Orleans, in the Parish of Orleans, and gives the said Court here to understand and be informed that one DEREK A. MARIGNY,

late of the Parish of Orleans, on the 19th day of March in the year of our Lord, one thousand nine hundred and ninety in the Parish of Orleans aforesaid, and within the jurisdiction of the Criminal District Court for the Parish of Orleans, did wilfully and unlawfully possess with the intent to distribute a controlled and dangerous substance, to wit: COCAINE (CRACK),

contrary to the form of the Statute of the State of Louisiana in such case made and provided and against the peace and dignity of the same.

Assistant District Attorney for the Parish of Orleans

342-951

Bail Order Judge Mckay

**State of Louisiana — Parish of Orleans**

# Criminal District Court for the Parish of Orleans

224581

Be it remembered. That on this _____ 19th _____ day of _____ March _____ in the year of our Lord. 19 __90__ Derek A. Marigny _____ as principal

American Bankers Insco. _____ as surety

verally acknowledged themselves to owe to the State of Louisiana the several sums following, that is to say,

| the said Derek A. Marigny | the sum of Ten Thousand | dollars. |
| the said | the sum of | dollars. |
| the said | the sum of | dollars. |
| the said | the sum of | dollars. |
| and the said American Bankers Insco | the sum of Ten Thousand | dollars. |

good and lawful money of the United States, for the true payment of which respective sums they and each of them bind emselves, their respective heirs, executors and administrators firmly by these presents

The condition of the Above Obligation is such. That if the above bounden

Derek A. Marigny

all personally appear before the Criminal District Court for the Parish of Orleans, to be held on the day for which he shall be so otified at the address given herein, then on whatever day afterwards the said Court shall be held, or he shall be so notified to attend en and there, to answer to the State aforesaid for and concerning a charge of _____

Vio: R.s. 40/967

ith which offense the said _____ Derek A. Marigny

ands charged before said Court, and will appear at all stages of the proceedings thereof to answer that charge or any related charge. d will at all times hold himself amenable to the orders and process of the Court, and, if convicted, will appear for pronouncement the verdict and sentence, and shall not depart thence without the leave of said Court, and keep the peace in the meantime, then e above obligation to be null and void else in full force and virtue:

Derek Marigny

(PRINT ADDRESS) 1470 M. Haw  282-5746

AS A FURTHER CONDITION OF THIS BOND, I GREE TO IMMEDIATELY NOTIFY THE CLERK OF OURT OF ANY CHANGE OF MY ADDRESS, DIF-RENT FROM THE ADDRESS I NOW GIVE UNDER NALTY OF CONTEMPT."

Taken and acknowledged on the day above written, before the undersigned CLERK or DEPUTY CLERK of the CRIMINAL DISTRICT COURT of the PARISH of ORLEANS

Clerk or Deputy Clerk Criminal District Court

AmericanBankers Insco.

poses and says that he is the owner in his own name and in his own right of the real estate located and identified as follows: _____ being by me duly sworn

allsecurities on deposit with the insurance commissioner

at he resides in the Parish of Orleans, at the location hereinafter appearing: that after paying all his just debts and liabilities he il and truly worth the sum of _____ Ten Thousand _____ dollars liable to seizure, that has not signed or executed any deed, note, bond, contract, assignment or instrument of any kind that will vitiate or prevent the forcement of this bond.

Sworn to and subscribed before me this 19th _____ day of _____ March _____ 19 __90__

lerk or Deputy of the Criminal District Court of the Parish of Orleans

Situation of the house in which surety makes his domicile

Penno-A10-0021939

COURT COPY    ABI-6

POWER OF ATTORNEY
AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA
VALID IF POSTED BY:    01-JUN-90

POWER AMOUNT $: $$$$10,000.00
POWER NO.    A1C 0021539

KNOW ALL MEN BY THESE PRESENTS that the American Bankers Insurance Company of Florida, a corporation duly organized and existing under the laws of the State of Florida...

This Power of Attorney is for use with Bail Bonds only. Not valid if used in connection with Federal Immigration Bonds. This power valid if altered or erased, valid if used with other powers of this company, void if used to furnish bail in excess of the stated face amount of this power, and can only be used once.

The obligation of the company shall not exceed the sum of **TEN THOUSAND DOLLARS** $$$$$$$$$$$$$$

IN WITNESS WHEREOF, THE AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA has caused these presents to be signed by its duly authorized attorney...

Bond Amount $ 10,000 00

Defendant DEREK A. MARTINEZ

Court Clc

City Ale

State Lh

If rewrite, original is

Executing Agent

By _____
SANFORD NEUBARTH
Attorney-in-Fact

FOR STATE USE ONLY
NOT VALID IF USED IN FEDERAL COURT

Designed By: LSL

---

A1000-1068

deposes and says that he is the owner in
follows: _____

that he resides in the Parish of Orleans, a
liabilities he is well and truly worth the s
he has not signed or executed any deed, n
prevent the enforcement of this bond.

Sworn to and subscribed b

_____ day of _____

Clerk or Deputy of the Criminal Di:
of the Parish of Orleans.

deposes and says that he is the owner in hi
follows: _____

that he resides in the Parish of Orleans, at
liabilities he is well and truly worth the sun
he has not signed or executed any deed, not
prevent the enforcement of this bond.

Sworn to and subscribed bef

_____ day of _____

Clerk or Deputy of the Criminal Distr
of the Parish of Orleans.

deposes and says that he is the owner in his own name and in his own right of the real estate located and identified as
follows: _____

that he resides in the Parish of Orleans, at the location hereinafter appearing: that after paying all his just debts and
liabilities he is well and truly worth the sum of _____ dollars liable to seizure: that
he has not signed or executed any deed, note, bond, contract, assignment or instrument of any kind that will vitiate or
prevent the enforcement of this bond.

Sworn to and subscribed before me this

_____ day of _____ 19___

Clerk or Deputy of the Criminal District Court
of the Parish of Orleans

Situation of the house in which surety makes his domicile



Clerk's Office 2/28 20 25
A True Copy
by R.W Deputy Clerk
Hon. Darren P. Lombard
Clerk of Criminal District Court
Orleans Parish



Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000342

900.81164

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|------|-----------|-------|------|--------|----------------|---------------|--------|
| 9-17-90 | Marigny, Desk | S+HG | | C | D | 112 | D/D |

NEXT DATE 9-19-90    NEXT EVENT S+HG    ADA Ayeu    CODE KAVE    DATA ENTRY
JUDGE K/A
REPORTER    REMARKS

| DATE | DEFENDANT | EVENT | TYPE | RESULT | CONTINUANCE BY | REASON & CODE | STATUS |
|------|-----------|-------|------|--------|----------------|---------------|--------|
| 9-19-90 | Marigny, Derek | S+HG | | ER | | | DO |

NEXT DATE 9-20-90    NEXT EVENT STHG    ADA AzKay    CODE KAVE    DATA ENTRY
JUDGE K/A
REPORTER    REMARKS Judge went to funeral    9-21
DEFENDANT Marigny

| CHARGE | DISPOSITION | CODE | CONFINEMENT TIME | LOCATION | TYPE | HABITUAL OFFENDER | PROBATION | FINE | CC | COF | RESTITUTION |
|--------|-------------|------|-----------------|----------|------|-------------------|-----------|------|----|----|-------------|
| (W):967(b) | PGAC | 050 | 54rs S/S | DOC | CNR | yes | 5yr A/P | | | | |

DISPOSITION DATE: 6-21-91    SENTENCING DATE: 6-21-91
JUDGE: FAH Quinlan    REPORTER Monique    ADA Gray    CODE RBRA    DATA ENTRY
REMARKS @ 1000 JET CNR W/ 341-057 & 342-951
DEFENDANT

SENTENCING DATE: 6-21-91

| CHARGE | DISPOSITION | CODE | CONFINEMENT TIME | LOCATION | TYPE | HABITUAL OFFENDER | PROBATION | FINE | CC | COF | RESTITUTION |
|--------|-------------|------|-----------------|----------|------|-------------------|-----------|------|----|----|-------------|
| | | | | | | | | | | | |

DISPOSITION DATE:
JUDGE:    REPORTER    ADA    CODE
REMARKS    DATA ENTRY
DEFENDANT

| CHARGE | DISPOSITION | CODE | CONFINEMENT TIME | LOCATION | TYPE | HABITUAL OFFENDER | PROBATION | FINE | CC | COF | RESTITUTION |
|--------|-------------|------|-----------------|----------|------|-------------------|-----------|------|----|----|-------------|
| | | | | | | | | | | | |

DISPOSITION DATE:    SENTENCING DATE:
JUDGE    REPORTER    ADA    CODE
REMARKS    DATA ENTRY
DEFENDANT

| CHARGE | DISPOSITION | CODE | CONFINEMENT TIME | LOCATION | TYPE | HABITUAL OFFENDER | PROBATION | FINE | CC | COF | RESTITUTION |
|--------|-------------|------|-----------------|----------|------|-------------------|-----------|------|----|----|-------------|
| | | | | | | | | | | | |

DISPOSITION DATE    SENTENCING DATE
JUDGE    REPORTER    ADA    CODE
REMARKS    DATA ENTRY
NOTICE OF APPEAL FILED    DATE    RETURN DATE

NDANT RELEASE STATUS

| DEFENDANT | BOND TYPE | AMOUNT | JUDGE | DATE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

PLEA OFFERS

| DATE | DEFENSE COUNSEL | ADA | REMARKS |
|---|---|---|---|
| | | | as pu minor, OK not comB this |
| | | | Bigelow 6/10/91 |
| | | | |
| | | | |
| | | | |

APPROVED BY

_____

CLOSING CHECK LIST                    OK Bold 7/17/91

Closed to all defendants? ___✓___
Sentence info on file? ___✓___
Copy of bond in file? ___✓___
B of I Photograph in file? ___✓___
Updated Rap Sheet in file? _____
Was def. Multiple Billed where Possible to do so? ___✓___
Was sentence a legal one? _____
Victim and Witness letters sent? ___✓___
If Nolled is form signed off? _____

                    9-26-91

INVESTIGATOR                         REVIEWED BY
                                     POST CONVICTION/TRACKING

                                     REVIEWED BY  MAR 4  1992

ASSISTANT DISTRICT ATTORNEY          DATE

        7-11-91

DATE

APPEAL

DATE FILED: _____
RETURN DATE: _____
ASSISTANT DISTRICT ATTORNEY: _____
COURT: _____
DISPOSITION: _____
DATE: _____

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000344



TO: RAY BIGELOW
FROM: MISSY MCDONALD
RE: DEREK MARIGNY
DATE: 6/7/91

Derek Marigney is an essential and material witness in the murder case against Mathew Moore. (Case # 344-648) Presently, this case is set for trial on 7/24/91. Earlier this year, Ms. O'Bannon and I prosecuted the co-defendant Leonard Nelson, and a verdict of second degree was returned.

Prior to the first trial, Mr. Marigney stated that he would not testify unless the office offered him a deal concerning his outstanding drug charges. (See cases 341-057, 342-951, and 343-461.) The charges against Mr. Marigny are simple possession of cocaine and two counts of PWITD cocaine. If you will recall, I approached you before regarding Mr. Marigny's request. At that time, you indicated that this office would offer no deals in return for his testimony. We relayed this information to Mr. Marigny who in turn stated he would offer no assistance in our trial.

Approximately one hour before the trial started, Mr. Marigny appeared in court and stated that he would cooperate because it was his friend that was killed and he wanted to do the right thing. Ms. O'Bannon nor myself made any promises to him. In fact, he believed, at the time of trial, that his own charges would be fully prosecuted.

Mr. Marigney was the main witness to the shooting death of Harold Boss Wilson. His testimony was clear, concise, honest and credible. The jury fully believed Mr. Marigny and returned a verdict of guilty of second degree murder. Without his testimony, we would not have had sufficient evidence to convict Leonard Nelson.

His testimony will be required again in the trial of Matthew Moore. The evidence is very weak against defendant Moore and the trial will suffer immensely without Mr. Marigny's testimony. Again, we are requesting that we can help Mr. Marigny, as he helped us.



As it stands now, Mr. Marigny faces a 15 year minimum sentence if this office convicts and multiple bills Mr. Marigny. We feel that his safety is in jeopardy if he were to be incarcerated for that length of time wi Leonard Nelson. I have spoken to defense counsel, Glynn Alexander, who has stated that Mr. Marigny is willing to plead guilty to all counts against him for a sentence of 18 months.

Mr. Marigny has been very cooperative with Ms. O'Bannon and myself. He has also successfully completed two drug rehabilitation programs. Further, an Uncle in California has offered Mr. Marigny a job when he gets out as well as a home. We believe that Mr. Marigny will have the opportunity to start a new life in a safe, protected environment once he is released from prison.

Considering Mr. Marigny's continued cooperation with this office, as well as his future safety and well-being, we request that he not be multiple billed in return for a plea of guilty to all charges and a sentence of 18 months.

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000346



MEMO

To  Missy Mc Donald

From  MM

Date  5/25

re:  Derek Marigny

Scott Gardner has requested that you prepare/write a memorandum addressed to Ray Bigelow which ___ specifies in detail the cooperation and assistance that Derek Marigny provided you in the 1ST degree murder case of Leonard Nelson and why he shouldn't be ___ billed as a multiple offender.

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000347



M E M O R A N D U M

TO:     MISSY McDONALD

FROM:   MIKE REYNOLDS

DATE:   MAY 25, 1991

RE:     DEREK MARIGNY

* * * * * * * * * * * * * * * * *

Scott Gardner has requested that you prepare a memorandum addressed to Ray Bigelow which specifies in detail the cooperation and assistance that Derek Marigny provided you in the first degree murder case of Leonard Nelson and why he shouldn't be billed as a multiple offender.

MR:sd

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000348

COURT NUMBER _____     SYSTEM NUMBER 90081164

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT |
|---|---|---|---|---|---|---|
| 5-23-91 | Maurigay | STHG | HD | | | 010 |
| NEXT DATE 6-12-91 | NEXT EVENT JRTR | ABA | REMARKS Δ-re-appeared | CODE Muy | DATE OUT | 5-29-91 |
| JUDGE FOW | REPORTER | | | | | |
| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT |
| 6-13-91 | Maurigay Duck | JRTR | NH | | | 010 |
| NEXT DATE 6-19-91 | NEXT EVENT STHG | ABA Allen | CODE CATE | DATE OUT | | 6-13-91 |
| JUDGE FRL | REPORTER | REMARKS | | | | |
| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT |
| 6-19-91 | Maurigay | STHG | NH | | | 010 |
| NEXT DATE 6-21-91 | NEXT EVENT STHC | ABA Banns | CODE RBM | DATE OUT | | 6-19-91 |
| JUDGE FAH Buselta | REPORTER | REMARKS | | | | |
| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT |
| 6-21-91 | Maurigay | STHG | GP | | | Odwell |
| NEXT DATE | NEXT EVENT | ABA Hpruux | CODE RBM | DATE OUT | | |
| JUDGE FAH Buselta | REPORTER | REMARKS Guilty plea took place, handled b left this, missy McDonald. | | | | |
| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT |
| | | | | | | |
| NEXT DATE | NEXT EVENT | ABA | CODE | DATE OUT | | |
| JUDGE | REPORTER | REMARKS | | | | |
| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT |
| | | | | | | |
| NEXT DATE | NEXT EVENT | ABA | CODE | DATE OUT | | |
| JUDGE | REPORTER | REMARKS | | | | |
| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT |
| | | | | | | |
| NEXT DATE | NEXT EVENT | ABA | CODE | DATE OUT | | |
| JUDGE | | REMARKS | | | | |

SYSTEM NUMBER 90081164

WINNER

COURT NUMBER F

SYSTEM NUMBER 90081164

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT ST. |
|---|---|---|---|---|---|---|
| 12-19-70 | Mangny Derek | MOHG | WV | | | 010 |

NEXT DATE 2-28-91 — NEXT EVENT TRTR — ABA — CODE MIE — DATA ENTRY
JUDGE KIA
REPORTER

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT ST. |
|---|---|---|---|---|---|---|
| 2-28-91 | Derek Mangny | TRTR | (A) | D | 113 | 010 |

NEXT DATE 3-27-91 — NEXT EVENT TRTR — ABA — WELT — CODE VWEL — DATA ENTRY 3/7/91
JUDGE KIA
REPORTER Barbara

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT ST. |
|---|---|---|---|---|---|---|
| 3-1-91 | Derek Mangny | MOHG TRS GR | | | | 010 |

NEXT DATE — NEXT EVENT — ABA WELT — CODE VWEL — DATA ENTRY
JUDGE KIA
REPORTER

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT ST. |
|---|---|---|---|---|---|---|
| 5-6-91 | Mangny | STHG | HO | | | 010 |

NEXT DATE 5-20-91 — NEXT EVENT SRTR — ABA — CODE MRng — DATA ENTRY 5/3/91
JUDGE FDW
REPORTER

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT ST. |
|---|---|---|---|---|---|---|
| 5-20-91 | Mangny | SRTR | NH | A | 127 | 050 |

NEXT DATE 6-13-91 — NEXT EVENT MOBF — ABA — CODE MRng — DATA ENTRY
JUDGE FDW
REPORTER

COURT NUMBER _____    SYSTEM NUMBER 9008 1164

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT S |
|------|-----------|-------|--------|----------------|---------------|-------------|
| 9-30-90 | Marigny, Derek | STHG | ER | | | O/O |
| NEXT DATE 9-27-90 | NEXT EVENT STHG | ABA Avery LY | | CODE FTVE | DATA ENTRY | |
| JUDGE K117 | REMARKS | | | | | |
| REPORTER | | | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STA |
|------|-----------|-------|--------|----------------|---------------|---------------|
| 9-27-90 | Marigny, Derek | STFL | CN | D | 111 | O/O |
| NEXT DATE 10-15-90 | NEXT EVENT MOHG | ABA Avery | | CODE KAVE | DATA ENTRY | |
| JUDGE KIA | REMARKS Alexander - no show | | | | | |
| REPORTER | | | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT STA |
|------|-----------|-------|--------|----------------|---------------|---------------|
| 10-15-90 | Marigny, Derek | MOHG | CN | D | 111 | O/O |
| NEXT DATE 11-5-90 | NEXT EVENT MOHG | ABA Avery | | CODE KAVE | DATA ENTRY | |
| JUDGE KIA | REMARKS Alexander - no show | | | | | 10-19-90 |
| REPORTER | | | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT ST |
|------|-----------|-------|--------|----------------|---------------|--------------|
| 11-5-90 | Marigny, Derek | MOHG | CN | CI | 109 | O/O |
| NEXT DATE 11-26-90 | NEXT EVENT MOHG | ABA Avery | | CODE KAVE | DATA ENTRY | |
| JUDGE KIA | REMARKS Judge ill | | | | | 11-8-90 |
| REPORTER | | | | | | |

| DATE | DEFENDANT | EVENT | RESULT | CONTINUANCE BY | REASON & CODE | DEFENDANT ST |
|------|-----------|-------|--------|----------------|---------------|--------------|
| 11-26-90 | Marigny, Derek | MOHG | CN | D | 111 | O/O |
| NEXT DATE 12-19-90 | NEXT EVENT MOHG | ABA Avery | | CODE KAVE | DATA ENTRY 11-26-90 | B. Attend |
| JUDGE KIA | REMARKS Alexander - no show | | | | | |
| REPORTER | | | | | | |

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000351

OFFICE OF THE CRIMINAL SHERIFF   NEW ORLEANS, LA.
ARREST REGISTER - CENTRAL LOCKUP SECTION COPY   480428

ARRESTEE DATA

MARINGNY, DEREK  A.

1490 MILTON ST  NO  LA  0"  NO  NEW ORLEANS CONVENTION CENTER

RUNNER  SINGLE

N/A

ANS  IT'S ALRIGHT

ARREST DATA
LOCATION OF ARREST
1400 MILTON ST   3   4-9-90  10:45PM  4-10-90  12:05 AM
2143   952   16
2110

WALSH T.

THOMAS J.

CHARGES AND COURT SCHEDULE   POSS WITD CRACK, 5.79 grams  KAVE  OGH
RS 40-967 (2)(1)  A40D   150K   100K

225421

CDC   M

OFFENSE DATA
1400 MILTON ST   4-9-90

STATE OF LUISIANA

GIST: THE ARRESTED SUBJECT WAS ARRESTED AFTER A SEARCH WARRANT
WAS SERVED ON HIS VEHICLE
WAS NOT ABUSED BY PD
NOKNOW ENEMIES IN PP
ASSIGNED MOD LEC
EMERGENCY INFO: LAURA FRENCH, MOTHER. 282-1070

DEP G. JULIEN   1141PY   DEP M. JONES



Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000353







CHARGE: PW&TD Crack

DEFENDANT: Derek Mabry

BILL OF INFORMATION CORRECT? Yes

POSSIBLE SENTENCE: _____

PRIORS:

FELCNY:      DATE:      SENTENCE:      MULTIPLE BILL? Yes

14.64

OFFENSE/ARREST INFORMATION

DATE: 4-9-90

TIME: 7:45pm 10:45pm

PLACE: 1400 Milton

MOTIONS:      STATEMENTS:      IDENTIFICATION:
EVIDENCE:

WITNESSES            POLICE OFFICERS      LOCATION

                    Thoma               Waguespack
                    Ewing  } NERH        Lab
                    Neal
                    Walsh
                    Jeff Scott
                    Peterman -Narc

                    PROBLEMS:
                    P/o arrested Δ before!
GIST:
CI - Δ selling drugs from brown    whose truck?
pickup at 1400 Blk Milton rear
driveway. P/o arrives-see Δ
by truck. See transaction. When Δ
sees P/o's he runs into apt. P/o drives
off, but CN to watch truck. Δ return
P/o stops Δ. Truck is locked. Get S/w.
Find drugs in car







| NOPD SIGNAL | NEW ORLEANS POLICE DEPARTMENT | | SUPP STATE COMPUTER NUMBER | | |
|---|---|---|---|---|---|
| 966 | UNIFORM MOTOR VEHICLE TRAFFIC ACCIDENT REPORT AND INCIDENT REPORT CONTINUATION SHEET | | NOPD ITEM NUMBER | | |
| PAGE 4 OF 5 | | | D-11830-90 | | |

| SEQ | QUANTITY | DESCRIPTION | SERIAL NO. | TYPE | STOLEN | RECOVERED |
|---|---|---|---|---|---|---|

"CON.T "D"

CHRISTEN DETECTED SOMETHING IN THE DRIVER'S SIDE DOOR PANEL. OFFICER THOMAS RETRIEVED A VICTORIA MATCHBOX WHICH CONTAINED 10 PIECES OF ROCK-LIKE SUBSTANCE. CHRISTEN THEN DETECTED SOMETHING UNDER THE DRIVER'S SIDE FLOOR MAT. OFFICER THOMAS RETRIEVED 200 GR. $5 ROLL UNDER THE FLOOR MAT. CHRISTEN THEN DETECTED SOMETHING IN THE GLOVE COMPARTMENT. OFFICER THOMAS THEN RETRIEVED $1151 00 FROM THE GLOVE COMPARTMENT.

UPON RETRIEVING THE EVIDENCE OFFICER THOMAS ADVISED THE SUBJECT THAT HE WAS NOW UNDER ARREST, AND AGAIN ADVISED HIM OF HIS MIRANDA RIGHTS.

WHILE OFFICER THOMAS WAS FILLING OUT THE FIELD ARREST REPORT MR. MARINONY GRABBED THE MATCH-BOX, THREW IT TO THE GROUND, AND STEPPED ON IT, CAUSING THE ROCKS TO BECOME CRUSHED.

THE ARRESTED SUBJECT WAS THEN TRANSPORTED TO CENTRAL LOCK UP WHERE HE WAS CHARGED AT THE AFOREMENTIONED OFFENSE.

THE EVIDENCE WAS PLACED AT THE PROPERTY AT CENTRAL EVIDENCE AND PROPERTY UNDER CENTRAL NUMBER B-062272.

IT SHOULD BE NOTED THAT THE OFFICERS WERE ATTIRED IN PLAIN CLOTHES, AND DRIVING AN UNMARKED UNIT.

| REPORTING OFFICER | BADGE | REPORTING OFFICER | BADGE | NOPD ACCESS NUMBER |
|---|---|---|---|---|
| J. THOMAS | 210 | R. IWING | 583 | |

| NOPD SIGNAL | | NEW ORLEANS POLICE DEPARTMENT UNIFORM MOTOR VEHICLE TRAFFIC ACCIDENT REPORT AND INCIDENT REPORT CONTINUATION SHEET | | SUPP STATE COMPUTER NUMBER | | |
|---|---|---|---|---|---|---|
| 966 | | | | NOPD ITEM NUMBER D-11930-90 | | |
| PAGE 5 OF 5 | | | SERIAL NO. | TYPE | STOLEN | RECOVERED |
| SEG | QUANTITY | DESCRIPTION | | | | |

CONT'D

THE FOLLOWING OFFICERS PARTICIPATED IN THIS

INCIDENT:

| J. THOMAS | N.O.P.H. |
| P. IRVING | " |
| C. NEAL | " |
| T. WALSH | " |
| SGT. J. SCOTT | NARCOTICS |
| A. DUNCAN | TOW TRUCKS |
| W. BAILEY | N.O.P.D. DRUG DOG. |
| CHRISTEN | |

NOTE: THE TRUCK WAS IMPOUNDED TO ALMONASTER

POUND.

| REPORTING OFFICER | BADGE | REPORTING OFFICER | BADGE | NOPD ACCESS NUMBER |
|---|---|---|---|---|
| J. THOMAS | 2110 | R. IRVING | 583 | |

**CRIME LABORATORY**
NEW ORLEANS POLICE DEPARTMENT
715 SOUTH BROAD STREET
NEW ORLEANS, LOUISIANA  70119

APRIL 16, 1990

REPORT OF THE CRIME LABORATORY

TO:   N.E.P.H.   .
ATTN: THOMAS

EVIDENCE RECEIVED:      04-10-90

TYPE OF INVESTIGATION:  CDS          ITEM NO.: D-11830-90
                                       O.D.: 04-09-90
EXAMINATION REQUESTED:  CHEMICAL

SUBJECTS:               DERRICK MARINGNY

SPECIMENS AND RESULTS OF LABORATORY ANALYSIS

1. One matchbox containing pieces of a rock-like material. --
--------------------------------POSITIVE FOR COCAINE.

        WEIGHT OF ENVELOPE AND EVIDENCE = 18.3  GRAMS
            WEIGHT OF EVIDENCE =    8.1  GRAMS

                                    DANIEL W. WAGUESPACK
                                    CRIMINALIST II

DWW/bt

CRIMINAL ___  ___CT COURT FOR THE PARISH  ' ORLEANS
STATE OF LOUISIANA

CASE NO:                          ITEM NO:

SEARCH WARRANT

ORDER OF SEARCH

TO: THE SUPERINTENDENT OF THE NEW ORLEANS DEPARTMENT
OF POLICE and/or HIS DESIGNATED REPRESENTATIVE.

AFFIDAVIT(S) HAVING BEEN MADE BEFORE ME BY:
OFFICER CLAUDIA NEAL
that he has good reason to believe that on or in the
(premises)(person)(vehicle) located at:
1001 LOYOLA AVE.

VEHICLE DESCRIPTION; 1974 BROWN FORD F150 PICKUP TRUCK

within the Parish of Orleans, State of Louisiana, there is
now being concealed certain property, namely: Controlled
Dangerous Substances. to include Cocaine in all its forms
(powder and "crack"), marijuana, and other narcotic
substances, and any paraphernalia used in the preparation,
packaging, or distribution of CDS.

WHICH said property constitutes evidence of the
commission of a crime or offense against the laws of the
State of Louisiana set forth in the Louisiana Revised
Statutes, and as I am satisfied from the affidavit(s)
submitted in support  of the application for this warrant
that there is probable cause to believe that the aforesaid
property is concealed on the (premises)(person)(vehicle)
above described, and that the aforesaid grounds for the
issuance of this search warrant exist;

YOU ARE HEREBY ORDERED to search forthwith the aforesaid
(premises)(person)(vehicle) for the property specified,
serving this search warrant and making the search, and if
the property be found there, to seize it, leaving a copy of
this warrant and a receipt for the property seized, to make
your written return on this warrant including a written
inventory of the property seized, and to bring the said
seized property into the court (before judge, the clerk, the
sheriff, or any court officer who usually acts as the
custodian) within ten (10) days of this date as required by
law. .

YOU ARE (PROHIBITED) AUTHORIZED to execute this warrant and
to make this search during the daytime or the nighttime and
if the property herein described be found on the
(premises)(person)(vehicle) herein described to seize said
property in accordance with law.

YOU ARE (PROHIBITED) AUTHORIZED to execute this warrant and
to make this search on a Sunday and if the property herein
described be found on the (premises)(person)(vehicle)
herein described to seize said property in accordance with
law.

THIS WARRANT MADE IN DUPLICATE ORIGINAL, NEW ORLEANS,
LOUISIANA, THIS       DAY OF                    19   .

JUDGE, SECTION
CRIMINAL DISTRICT COURT

10; 45 AM.

COPIES:
Original - Unit File
1st Copy - Judge signing warrant
2nd Copy - Person upon whom warrant served
3rd Copy - District Attorney
4th Copy - Record Room
5th Copy - Judge signing warrant when making return
return.

PAGE 1 OF

ITEM NUMBER: -11830-90

CRIMINAL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LOUISIANA

APPLICATION FOR SEARCH WARRANT

BEFORE ME, the undersigned Judge of the Criminal District Court, Parish of Orleans, State of Louisiana, personally came and appeared:

employed by the New Orleans Department of Police, 715 South Broad Street, New Orleans Louisiana,
WHO, after being duly sworn by me, deposed and said that a search warrant should be issued for the search of the following described (premises)(person)(vehicle):

Type of occupancy:     VEHICLE BELIEVED TO BE 1974
structure:             BROWN/WHITE  TEMPORARY TAG 15T1595

For the purpose of seizing the following described property:

CONTROLLED DANGEROUS SUBSTANCES, TO INCLUDE COCAINE IN ALL ITS FORMS (POWDER AND CRACK), MARIJUANA, AND OTHER NARCOTIC SUBSTANCES, AND ANY PARAPHANALIA USED IN THE PREPARATION, PACKAGING, OR DISTRIBUTION OF CONTROLLED DANGEROUS SUBSTANCES.

The reasons and facts for the request of this search warrant are:

ON APRIL 9, AT APPROXIMATELY 7:30PM OFFICER CLAUDIA NEAL, OFFICER RITA IRVING, AND OFFICER JOEY THOMAS ASSIGNED TO THE NARCOTICS ENFORCEMENT IN PUBLIC HOUSING, (N.E.P.H.), RESPECTFULLY REPORT THE FOLLOWING:  AT APPROXIMATELY 7:10PM AS THE OFFICERS WERE IN THE THE ST. BERNARD HOUSING PROJECT THEY RECEIVED INFORMATION THAT A SUBJECT THAT THEY KNOW AS DERRICK MARIGNY WAS SELLING DRUGS IN THE 1400 BLOCK OF MILTON, (REAR DRIVEWAY).IT SHOULD BE NOTED THAT THE OFFICERS HAVE ARRESTED THE SUBJECT DERRICK MARIGNY 2 TIMES IN THE PAST 2 MONTHS FOR DISTRIBUTION OF CRACK COCAINE, FROM THE ST. BERNARD PROJECT.  THE CI WHO HAS PROVED RELIABLE IN THE PAST FURTHER STATED THAT THE SUBJECT WAS STANDING NEXT TO A BROWN PICKUP TRUCK.

AT APPROXIMATELY 7:30PM OFFICERS PROCEEDED TO THE 1400 BLOCK OF MILTON REAR DRIVEWAY AND OBSERVED A SUBJECT BELIEVED TO BE DERRICK MARIGNY STANDING NEXT TO A 1974 BROWN PICKUP TRUCK. AS OFFICERS APPROACHED THE SUBJECT FOR A CLOSER LOOK THEY OBSERVED THAT MARIGNY WAS COUNTING MONEY; MARIGNY THEN HANDED AN UNK. OBJECT TO A N/M WHO WAS STANDING NEXT TO HIM. UPON MAKING EYE CONTACT WITH THE OFFICERS, MARIGNY IMMEDIATELY THREW AN UNK. OBJECT INTO THE 1974  TRUCK. OFFICERS IMMEDIATELY APPROACHED THE SUBJECT AT WHICH TIME THE SUBJECT FLED AWAY FROM THE VEHICLE INTO AN UNKNOWN PROJECT APT. THE SUBJECT WAS WEARING BROWN SHORT SLEEVE SHIRT AND BROWN SHORTS. OFFICERS KEPT THE TRUCK UNDER OBSERVATION AND APPROXIMATELY 5 MINUTES LATER OBSERVED DERRICK MARIGNY WALKING TOWARDS THE 1974 PICKUP TRUCK.

OFFICERS DETAINED DERRICK MARIGNY AND ADVISED HIM THAT  HE WAS UNDER INVESTIGATION FOR DISTRIBUTION OF NARCOTICS; HE

PAGE  2 OF

ITEM NUMBER: D-11830-90

WAS READ HIS RIGHTS BY OFFICER JOEY THOMAS.

OFFICER THOMAS CHECKED THE 1974 TRUCK AND DISCOVERED THAT THE VEHICLES CAB WAS LOCKED. OFFICER THOMAS CONTACTED CANINE HANDLER APRIL OVERMAN, UNIT 2507 AND REQUESTED HER ASSISTANCE IN PROVIDING AN EXTERIOR SEARCH OF THE TRUCK. AT APPROXIMATELY 8:45PM OFFICER OVERMAN, AND DRUG DOG, CHRISTIN ARRIVED IN THE 1400 BLOCK OF MILTON. OFFICER OVERMAN MADE A SWEEP OF THE EXTERIOR OF VEHICLE WITH HER DOG AND THE DOG HIT ON THE CRACK OF THE LEFT DRIVERS DOOR WHERE IT MEETS THE FRAME. OFFICER OVERMAN STATED THAT IN HER OPINION THE DOG HIT ON AN AREA WHERE THE SCENT OF DRUGS WAS FLOWING THROUGH THE DOORWAY OPENING. OFFICERS NOTED THAT THE TRUCK WAS BROWN IN COLOR AND HAD TEMPORARY TAG #15T1595 ON THE REAR WINDSHIELD. THERE WAS NO VIN # ON THE DASHBOARD OF THE VEHICLE. OFFICERS CHECKED THE REAR TAILLIGHT FOR THE YEAR OF THE VEHICLE. OFFICERS ARE NOT ABSOLUTELY SURE OF THE YEAR OF VEHICLE. OFFICERS CONTACTED NOPD TOW WAGON #3907, WHO ARRIVED AT 9:20PM AND TRANSPORTED THE 1974 PICKUP TRUCK TO N.E.F.H. OFFICE, 1001 LOYOLA AVE.

OFFICERS WERE UNABLE TO RUN A REGISTRATION CHECK ON THE VEHICLE DUE TO VIN # NOT VISIBLE

OFFICERS RESPECTFULLY REQUEST PERMISSION TO SEARCH THE VEHICLE FOR CONTRABAND.

*Claudia M. Neal*

AFFIANT

JUDGE OF THE CRIMINAL DISTRICT COURT, SECTION " M "

10:45 PM

SWORN TO AND SUBSCRIBED BEFORE ME,
THIS 9th DAY OF April
1990, AT NEW ORLEANS, LOUISIANA

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000365

CRIMINAL ~~ ~ ~CT COURT FOR THE PARISH ~ ORLEANS
STATE OF LOUISIANA

CASE NO:                                ITEM NO:

SEARCH WARRANT

ORDER OF SEARCH

TO: THE SUPERINTENDENT OF THE NEW ORLEANS DEPARTMENT
OF POLICE and/or HIS DESIGNATED REPRESENTATIVE.

AFFIDAVIT(S) HAVING BEEN MADE BEFORE ME BY:
OFFICER CLAUDIA NEAL
that he has good reason to believe that on or in the
(premises)(person)(vehicle) located at:
1001 LOYOLA AVE.

VEHICLE DESCRIPTION: 1974 BROWN FORD F150 PICKUP TRUCK

within the Parish of Orleans, State of Louisiana, there is
now being concealed certain property, namely: Controlled
Dangerous Substances, to include Cocaine in all its forms
(powder and "crack"), marijuana, and other narcotic
substances, and any paraphernalia used in the preparation,
packaging, or distribution of CDS.

WHICH said property constitutes evidence of the
commission of a crime or offense against the laws of the
State of Louisiana set forth in the Louisiana Revised
Statutes, and as I am satisfied from the affidavit(s)
submitted in support of the application for this warrant
that there is probable cause to believe that the aforesaid
property is concealed on the (premises)(person)(vehicle)
above described, and that the aforesaid grounds for the
issuance of this search warrant exist:

YOU ARE HEREBY ORDERED to search forthwith the aforesaid
(premises)(person)(vehicle) for the property specified,
serving this search warrant and making the search, and if
the property be found there, to seize it, leaving a copy of
this warrant and a receipt for the property seized, to make
your written return on this warrant including a written
inventory of the property seized, and to bring the said
seized property into the court (before judge, the clerk, the
sheriff, or any court officer who usually acts as the
custodian) within ten (10) days of this date as required by
law.

YOU ARE (AUTHORIZED) AUTHORIZED to execute this warrant and
to make this search during the daytime or the nighttime and
if the property herein described be found on the
(premises)(person)(vehicle) herein described to seize said
property in accordance with law.

YOU ARE (AUTHORIZED) AUTHORIZED to execute this warrant and
to make this search on a Sunday and if the property herein
described be found on the (premises)(person)(vehicle)
herein described to seize said property in accordance with
law.

THIS WARRANT MADE IN DUPLICATE ORIGINAL, NEW ORLEANS,
LOUISIANA, THIS        DAY OF                    19   .

                                JUDGE, SECTION
                                CRIMINAL DISTRICT COURT
                                              10:45 AM.

COPIES:
    Original - Unit File
    1st Copy - Judge signing warrant
    2nd Copy - Person upon whom warrant served
    3rd Copy - District Attorney
    4th Copy - Record Room
    5th Copy - Judge signing warrant when making return
               return.

PAGE 1 OF

ITEM NUMBER: -11830-90

CRIMINAL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LOUISIANA

APPLICATION FOR SEARCH WARRANT

BEFORE ME, the undersigned Judge of the Criminal
District Court, Parish of Orleans, State of Louisiana,
personally came and appeared:

employed by the New Orleans Department of Police, 715 South
Broad Street, New Orleans Louisiana,
WHO, after being duly sworn by me, deposed and said
that a search warrant should be issued for the search of the
following described (premises)(person)(vehicle):

Type of occupancy:    VEHICLE BELIEVED TO BE 1974
Structure:            BROWN/WHITE  TEMPORARY TAG 15T1595

For the purpose of seizing the following described
property:

CONTROLLED DANGEROUS SUBSTANCES, TO INCLUDE COCAINE IN ALL
ITS FORMS (POWDER AND CRACK), MARIJUANA, AND OTHER NARCOTIC
SUBSTANCES, AND ANY PARAPHANALIA USED IN THE PREPARATION,
PACKAGING, OR DISTRIBUTION OF CONTROLLED DANGEROUS
SUBSTANCES.

The reasons and facts for the request of this search warrant
are:

ON APRIL 9, AT APPROXIMATELY 7:30PM OFFICER CLAUDIA NEAL,
OFFICER RITA IRVING, AND OFFICER JOEY THOMAS ASSIGNED TO THE
NARCOTICS ENFORCEMENT IN PUBLIC HOUSING, (N.E.P.H.),
RESPECTFULLY REPORT THE FOLLOWING:  AT APPROXIMATELY 7:10PM
AS THE OFFICERS WERE IN THE THE ST. BERNARD HOUSING PROJECT
THEY RECEIVED INFORMATION THAT A SUBJECT THAT THEY KNOW AS
DERRICK MARIGNY WAS SELLING DRUGS IN THE 1400 BLOCK OF
MILTON, (REAR DRIVEWAY).IT SHOULD BE NOTED THAT THE OFFICERS
HAVE ARRESTED THE SUBJECT DERRICK MARIGNY 2 TIMES IN THE
PAST 2 MONTHS FOR DISTRIBUTION OF CRACK COCAINE, FROM THE
ST. BERNARD PROJECT.  THE CI WHO HAS PROVED RELIABLE IN THE
PAST FURTHER STATED THAT THE SUBJECT WAS STANDING NEXT TO A
BROWN PICKUP TRUCK.

AT APPROXIMATELY 7:30PM OFFICERS PROCEEDED TO THE 1400 BLOCK
OF MILTON REAR DRIVEWAY AND OBSERVED A SUBJECT BELIEVED TO
BE DERRICK MARIGNY STANDING NEXT TO A 1974 BROWN PICKUP
TRUCK. AS OFFICERS APPROACHED THE SUBJECT FOR A CLOSER LOOK
THEY OBSERVED THAT MARIGNY WAS COUNTING MONEY; MARIGNY THEN
HANDED AN UNK. OBJECT TO A N/M WHO WAS STANDING NEXT TO HIM.
UPON MAKING EYE CONTACT WITH THE OFFICERS, MARIGNY
IMMEDIATELY THREW AN UNK. OBJECT INTO THE 1974  TRUCK.
OFFICERS IMMEDIATELY APPROACHED THE SUBJECT AT WHICH TIME
THE SUBJECT FLED AWAY FROM THE VEHICLE INTO AN UNKNOWN
PROJECT APT. THE SUBJECT WAS WEARING BROWN SHORT SLEEVE
SHIRT AND BROWN SHORTS. OFFICERS KEPT THE TRUCK UNDER
OBSERVATION AND APPROXIMATELY 5 MINUTES LATER OBSERVED
DERRICK MARIGNY WALKING TOWARDS THE 1974 PICKUP TRUCK.

OFFICERS DETAINED DERRICK MARIGNY AND ADVISED HIM THAT  HE
WAS UNDER INVESTIGATION FOR DISTRIBUTION OF NARCOTICS; HE

PAGE 2 OF

ITEM NUMBER: D-11830-90

WAS READ HIS RIGHTS BY OFFICER JOEY THOMAS.

OFFICER THOMAS CHECKED THE 1974 TRUCK AND DISCOVERED THAT THE VEHICLES CAB WAS LOCKED. OFFICER THOMAS CONTACTED CANINE HANDLER APRIL OVERMAN, UNIT 2507 AND REQUESTED HER ASSISTANCE IN PROVIDING AN EXTERIOR SEARCH OF THE TRUCK. AT APPROXIMATELY 8:45PM OFFICER OVERMAN. AND DRUG DOG, CHRISTIN ARRIVED IN THE 1400 BLOCK OF MILTON. OFFICER OVERMAN MADE A SWEEP OF THE EXTERIOR OF VEHICLE WITH HER DOG AND THE DOG HIT ON THE CRACK OF THE LEFT DRIVERS DOOR WHERE IT MEETS THE FRAME. OFFICER OVERMAN STATED THAT IN HER OPINION THE DOG HIT ON AN AREA WHERE THE SCENT OF DRUGS WAS FLOWING THROUGH THE DOORWAY OPENING. OFFICERS NOTED THAT THE TRUCK WAS BROWN IN COLOR AND HAD TEMPORARY TAG #15T1595 ON THE REAR WINDSHIELD. THERE WAS NO VIN # ON THE DASHBOARD OF THE VEHICLE. OFFICERS CHECKED THE REAR TAILLIGHT FOR THE YEAR OF THE VEHICLE. OFFICERS ARE NOT ABSOLUTELY SURE OF THE YEAR OF VEHICLE. OFFICERS CONTACTED NOPD TOW WAGON #3907, WHO ARRIVED AT 9:20PM AND TRANSPORTED THE 1974 PICKUP TRUCK TO N.E.P.H. OFFICE, 1001 LOYOLA AVE.

OFFICERS WERE UNABLE TO RUN A REGISTRATION CHECK ON THE VEHICLE DUE TO VIN # NOT VISIBLE

OFFICERS RESPECTFULLY REQUEST PERMISSION TO SEARCH THE VEHICLE FOR CONTRABAND.

_Claudia M. Neal_
AFFIANT

JUDGE OF THE CRIMINAL DISTRICT
COURT, SECTION " M "

10:45 PM.

SWORN TO AND SUBSCRIBED BEFORE ME,
THIS 9th DAY OF April
1990, AT NEW ORLEANS, LOUISIANA





| NOPD SIGNAL | NEW ORLEANS POLICE DEPARTMENT | | SUPP STATE COMPUTER NUMBER | | | |
|---|---|---|---|---|---|---|
| 966 | UNIFORM MOTOR VEHICLE TRAFFIC ACCIDENT REPORT AND INCIDENT REPORT CONTINUATION SHEET | | NOPD ITEM NUMBER D —11830-90 | | | |
| PAGE 3 OF 5 | | | SERIAL NO. | TYPE | STOLEN | RECOVERED |
| SEQ | QUANTITY | DESCRIPTION | | | | |

"EVIDENCE"

| A | X | (1) 50 ⅞ BELL (31) 20 ⅞ BELLS    TOTAL $1,351 ⁰⁰ (22) 10 ⅞ BELLS (43) 5 ⅞ BELLS (106) 1 ⅞ BELLS |
|---|---|---|
| B | 1 | VICTROLA MATCHBOX CONTAINING (10) CRUSHED PIECES OF ROCK-LIKE SUBSTANCES. |
| C | 1 | LA. I.D. CARD 005677296 IN THE NAME OF ACCUSED |
| D | 1 | SOCIAL SECURITY CARD IN THE NAME OF ACCUSED |
| E | 1 | WHITNEY BANK BOOK IN THE NAME OF ACCUSED |
| F | 1 | LA. TEMPORARY LICENSE PLATE REGISTERED TO ACCUSED |
| G | 1 | BILL OF PURCHASE FROM THE PICK-UP TRUCK CENTER INC. IN THE NAME OF ACCUSED. |
| H | 1 | BUYERS GUIDE IN THE NAME OF THE ACCUSED FISHNEC4131. |
| I | 1 | FORD TRUCK (BROWN), wth. |

"NARRATIVE"

ON MONDAY, 4-9-90, AT 7:45PM, WHILE MANNING UNIT 952 OF THE NARCOTICS ENFORCEMENT PUBLIC HOUSING UNIT, OFFICERS J. THOMAS, R. IRVING, C. NEAL AND T. WALSH HAD THE OCCASION TO ARREST A SUBJECT NAMED DETEC. MCKINGWN FOR POSSESSION WITH THE INTENT TO DISTRIBUTE CRACK COCAINE.

THE FACTS AND CIRCUMSTANCES LEADING UP TO MR. MARINGLY'S ARREST IS DETAILED IN THE APPLICATION FOR SEARCH WARRANT SIGNED BY JUDGE MARAIS OF MAGISTRATE COURT, WHICH IS ATTACHED.

ON THE AFOREMENTIONED DATE, AT APPROXIMATELY 11PM THE OFFICERS EXECUTED THE SEARCH WARRANT ON THE TRUCK. CHRISTEN DRUGDOG DETECTED SOMETHING IN THE INSIDE DOOR PANEL.

| REPORTING OFFICER | BADGE | REPORTING OFFICER | BADGE | NOPD ACCESS NUMBER |
|---|---|---|---|---|
| J. THOMAS | 2110 | R. IRVING | 583 | |

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000371



| NOPD SERIAL | | NEW ORLEANS POLICE DEPARTMENT UNIFORM MOTOR VEHICLE TRAFFIC ACCIDENT REPORT AND INCIDENT REPORT CONTINUATION SHEET | | SUPP STATE COMPUTER NUMBER | | |
|---|---|---|---|---|---|---|
| 966 | | | | | | |
| PAGE 5 OF 5 | | | | NOPD ITEM NUMBER | | |
| SEQ | QUANTITY | DESCRIPTION | | D-11830-90 | | |
| | CONT'D | | SERIAL NO. | TYPE | STOLEN | RECOVERED |

THE FOLLOWING OFFICERS PARTICIPATED IN THIS
INCIDENT:

J. THOMAS
P. IRVING                    N.S.P.H.
C. NEAL                        "
T. WALSH                      "
SGT. J. SCOTT                  "
A. OVERMAN
W. BAILEY        NARCOTICS
CHRISTEN        TOW TRUCK'S
                N.O.P.D. DRUG DOG.

NOTE: THE TRUCK WAS IMPOUNDED TO ALEXANDER
POUND.

| REPORTING OFFICER | BADGE | REPORTING OFFICER | BADGE | NOPD ACCESS NUMBER |
|---|---|---|---|---|
| J. THOMAS | 2110 | P. IRVING | 583 | |



CRIME LABORATORY
NEW ORLEANS POLICE DEPARTMENT
715 SOUTH BROAD STREET
NEW ORLEANS, LOUISIANA  70119

APRIL 16, 1990

REPORT OF THE CRIME LABORATORY

TO:   N.E.P.H.
ATTN: THOMAS

EVIDENCE RECEIVED:       04-10-90

TYPE OF INVESTIGATION:  CDS          ITEM NO.: D-11830-90
                                     O.D.: 04-09-90
EXAMINATION REQUESTED:  CHEMICAL

SUBJECTS:              DERRICK MARINGNY

        SPECIMENS AND RESULTS OF LABORATORY ANALYSIS

1. One matchbox containing pieces of a rock-like material. --
   --------------------------------POSITIVE FOR COCAINE.

        WEIGHT OF ENVELOPE AND EVIDENCE = 18.3  GRAMS
          WEIGHT OF EVIDENCE =    8.1   GRAMS

                         DANIEL W. WAGUESPACK
                           CRIMINALIST II

DWW/bt

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000374

CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS
STATE OF LOUISIANA

ITEM NO:

CASE NO:

## SEARCH WARRANT

### ORDER OF SEARCH

TO: THE SUPERINTENDENT OF THE NEW ORLEANS DEPARTMENT
OF POLICE and/or HIS DESIGNATED REPRESENTATIVE.

AFFIDAVIT(S) HAVING BEEN MADE BEFORE ME BY:
OFFICER CLAUDIA NEAL
that he has good reason to believe that on or in the
(premises)(person)(vehicle) located at:
1001 LOYOLA AVE.

VEHICLE DESCRIPTION; 1974 BROWN FORD F150 PICKUP TRUCK

within the Parish of Orleans, State of Louisiana, there is
now being concealed certain property, namely: Controlled
Dangerous Substances, to include Cocaine in all its forms
(powder and "crack"), marijuana, and other narcotic
substances, and any paraphernalia used in the preparation,
packaging, or distribution of CDS.

WHICH said property constitutes evidence of the
commission of a crime or offense against the laws of the
State of Louisiana set forth in the Louisiana Revised
Statutes, and as I am satisfied from the affidavit(s)
submitted in support of the application for this warrant
that there is probable cause to believe that the aforesaid
property is concealed on the (premises)(person)(vehicle)
above described, and that the aforesaid grounds for the
issuance of this search warrant exist;

YOU ARE HEREBY ORDERED to search forthwith the aforesaid
(premises)(person)(vehicle) for the property specified,
serving this search warrant and making the search, and if
the property be found there, to seize it, leaving a copy of
this warrant and a receipt for the property seized, to make
your written return on this warrant including a written
inventory of the property seized, and to bring the said
seized property into the court (before judge, the clerk, the
sheriff, or any court officer who usually acts as the
custodian) within ten (10) days of this date as required by
law.

YOU ARE (PROHIBITED) AUTHORIZED to execute this warrant and
to make this search during the daytime or the nighttime and
if the property herein described be found on the
(premises)(person)(vehicle) herein described to seize said
property in accordance with law.

YOU ARE (PROHIBITED) AUTHORIZED to execute this warrant and
to make this search on a Sunday and if the property herein
described be found on the (premises)(person)(vehicle)
herein described to seize said property in accordance with
law.

THIS WARRANT MADE IN DUPLICATE ORIGINAL, NEW ORLEANS,
LOUISIANA, THIS          DAY OF                    19

_____
JUDGE, SECTION _____
CRIMINAL DISTRICT COURT

10:45 R.M.

COPIES:
    Original - Unit File
    1st Copy - Judge signing warrant
    2nd Copy - Person upon whom warrant served
    3rd Copy - District Attorney
    4th Copy - Record Room
    5th Copy - Judge signing warrant when making return
             return.

PAGE 1 OF ____    ITEM NUMBER: C-11830-90

CRIMINAL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LOUISIANA

APPLICATION FOR SEARCH WARRANT

BEFORE ME, the undersigned Judge of the Criminal District Court, Parish of Orleans, State of Louisiana, personally came and appeared:

employed by the New Orleans Department of Police, 715 South Broad Street, New Orleans Louisiana,
WHO, after being duly sworn by me, deposed and said that a search warrant should be issued for the search of the following described (premises)(person)(vehicle):

Type of occupancy: VEHICLE BELIEVED TO BE 1974
Structure: BROWN/WHITE TEMPORARY TAG 15T1595

For the purpose of seizing the following described property:

CONTROLLED DANGEROUS SUBSTANCES, TO INCLUDE COCAINE IN ALL ITS FORMS (POWDER AND CRACK), MARIJUANA, AND OTHER NARCOTIC SUBSTANCES, AND ANY PARAPHANALIA USED IN THE PREPARATION, PACKAGING, OR DISTRIBUTION OF CONTROLLED DANGEROUS SUBSTANCES.

The reasons and facts for the request of this search warrant are:

ON APRIL 9, AT APPROXIMATELY 7:30PM OFFICER CLAUDIA NEAL, OFFICER RITA IRVING, AND OFFICER JOEY THOMAS ASSIGNED TO THE NARCOTICS ENFORCEMENT IN PUBLIC HOUSING, (N.E.P.H.), RESPECTFULLY REPORT THE FOLLOWING: AT APPROXIMATELY 7:10PM AS THE OFFICERS WERE IN THE THE ST. BERNARD HOUSING PROJECT THEY RECEIVED INFORMATION THAT A SUBJECT THAT THEY KNOW AS DERRICK MARIGNY WAS SELLING DRUGS IN THE 1400 BLOCK OF MILTON, (REAR DRIVEWAY).IT SHOULD BE NOTED THAT THE OFFICERS HAVE ARRESTED THE SUBJECT DERRICK MARIGNY 2 TIMES IN THE PAST 2 MONTHS FOR DISTRIBUTION OF CRACK COCAINE, FROM THE ST. BERNARD PROJECT. THE CI WHO HAS PROVED RELIABLE IN THE PAST FURTHER STATED THAT THE SUBJECT WAS STANDING NEXT TO A BROWN PICKUP TRUCK.

AT APPROXIMATELY 7:30PM OFFICERS PROCEEDED TO THE 1400 BLOCK OF MILTON REAR DRIVEWAY AND OBSERVED A SUBJECT BELIEVED TO BE DERRICK MARIGNY STANDING NEXT TO A 1974 BROWN PICKUP TRUCK. AS OFFICERS APPROACHED THE SUBJECT FOR A CLOSER LOOK THEY OBSERVED THAT MARIGNY WAS COUNTING MONEY; MARIGNY THEN HANDED AN UNK. OBJECT TO A N/M WHO WAS STANDING NEXT TO HIM. UPON MAKING EYE CONTACT WITH THE OFFICERS, MARIGNY IMMEDIATELY THREW AN UNK. OBJECT INTO THE 1974 TRUCK. OFFICERS IMMEDIATELY APPROACHED THE SUBJECT AT WHICH TIME THE SUBJECT FLED AWAY FROM THE VEHICLE INTO AN UNKNOWN PROJECT APT. THE SUBJECT WAS WEARING BROWN SHORT SLEEVE SHIRT AND BROWN SHORTS. OFFICERS KEPT THE TRUCK UNDER OBSERVATION AND APPROXIMATELY 5 MINUTES LATER OBSERVED DERRICK MARIGNY WALKING TOWARDS THE 1974 PICKUP TRUCK.

OFFICERS DETAINED DERRICK MARIGNY AND ADVISED HIM THAT HE WAS UNDER INVESTIGATION FOR DISTRIBUTION OF NARCOTICS; HE



PAGE  2 OF

ITEM NUMBER: D-11830-90

WAS READ HIS RIGHTS BY OFFICER JOEY THOMAS.

OFFICER THOMAS CHECKED THE 1974 TRUCK AND DISCOVERED THAT THE VEHICLES CAB WAS LOCKED. OFFICER THOMAS CONTACTED CANINE HANDLER APRIL OVERMAN, UNIT 2507 AND REQUESTED HER ASSISTANCE IN PROVIDING AN EXTERIOR SEARCH OF THE TRUCK. AT APPROXIMATELY 8:45PM OFFICER OVERMAN, AND DRUG DOG, CHRISTIN ARRIVED IN THE 1400 BLOCK OF MILTON. OFFICER OVERMAN MADE A SWEEP OF THE EXTERIOR OF VEHICLE WITH HER DOG AND THE DOG HIT ON THE CRACK OF THE LEFT DRIVERS DOOR WHERE IT MEETS THE FRAME. OFFICER OVERMAN STATED THAT IN HER OPINION THE DOG HIT ON AN AREA WHERE THE SCENT OF DRUGS WAS FLOWING THROUGH THE DOORWAY OPENING. OFFICERS NOTED THAT THE TRUCK WAS BROWN IN COLOR AND HAD TEMPORARY TAG #15T1595 ON THE REAR WINDSHIELD. THERE WAS NO VIN # ON THE DASHBOARD OF THE VEHICLE. OFFICERS CHECKED THE REAR TAILLIGHT FOR THE YEAR OF THE VEHICLE. OFFICERS ARE NOT ABSOLUTELY SURE OF THE YEAR OF VEHICLE. OFFICERS CONTACTED NOPD TOW WAGON #3907, WHO ARRIVED AT 9:20PM AND TRANSPORTED THE 1974 PICKUP TRUCK TO N.E.P.H. OFFICE, 1001 LOYOLA AVE.

OFFICERS WERE UNABLE TO RUN A REGISTRATION CHECK ON THE VEHICLE DUE TO VIN # NOT VISIBLE

OFFICERS RESPECTFULLY REQUEST PERMISSION TO SEARCH THE VEHICLE FOR CONTRABAND.

AFFIANT

JUDGE OF THE CRIMINAL DISTRICT COURT, SECTION " M

10:45 PM.

SWORN TO AND SUBSCRIBED BEFORE ME,
THIS 9th DAY    OF    April
1990, AT NEW ORLEANS, LOUISIANA

Control No.    B 062272    **NEW ORLEANS POLICE DEPARTMENT**
**EVIDENCE/PROPERTY CARD**    Class 1S

2G2

Item No. D-11830-90    Catalog No. DEP./    /4B    Affidavit No.
Time/Date Confiscated: 10:30 PM  04-09-90  Received From: Thomas 2110  NEPH
Time/Date Received: 11:45 PM  04-09-90  Received By: G. Shelmire
Confiscated From: Accused    Address: 1400 Blk. of Milton
Owner:    Telephone No.
Owner's Address:    1470 Milton St. Xtx Aot C
Accused: Maringny, Derrick  N/M  04-26-66  Address:

Court: CDC    Date Arrested: 04-09-90 Charges: RS 40-967
Describe Property: E1-One (1) VICTORIA match box xp containing (10) (crushed) of
white rock-like substances........DEP........5.79 grams

E2- $1,351.00 in U. S. Currency ((1) fifty dollar bill,(38) twenty dolla
bills, (22) ten dollar bills, XX (43) five dollar bills, (106) one dollar
..................4B

E3-One (1) La.' :D. card #005677296 in the name of accused.........2G2
E4- q One (1) Social Security cardz in the name of the accused....2G2

New Orleans Police Department
Asset Forfeitures Section

FORFEITURE CASE RECEIPT

NOPD ITEM # _D-11830-90_    AFS # _90-1122_

Asset to be forfeited:

VALUE: _$1351.00_

DESCRIPTION: _U.S. CURRENCY_

VIN #_____    LIC #_____

RECEIVED BY: _____    DATE
            Assistant District Attorney

___ ACCEPTED    ___ REFUSED    _X_ CIVIL    ___ CRIMINAL
                                 (New Law)      (Old Law)

COMMENTS/PROBLEMS:

**New Orleans Police Department**
**EVIDENCE/PROPERTY**
**CONTINUATION CARD**

Page 2 of 2 Pages

Control No. B 062272

Item No. D 11830-90

. E5-One (1) WHITNEY BAND book in the name of accused.........2G2

' E6-One (1) La. Temporary license plate registered to accused..2G2

'E7-One (1) bill of purchase from the Pick-Up-Truck Center' inc. in the name of the accused................2G2

.E8-One (1) Buyers Guide in the name of the new accused ser.#F15HNEC4131.

............2G2

Petitioner's Writ Application (La. Ct. App.)   Ct. 1 Exhibits
000300

New Orleans Police Department
Asset Forfeitures Section

FORFEITURE CASE RECEIPT

NOPD ITEM # D-11830-90    AFS # 90-1122

Asset to be forfeited:

VALUE: $1351.00

DESCRIPTION: U.S. CURRENCY

VIN #_____    LIC #_____

RECEIVED BY: _____    DATE
                Assistant District Attorney

____ ACCEPTED    ____ REFUSED    X CIVIL    ____ CRIMINAL
                                (New Law)        (Old Law)

COMMENTS/PROBLEMS:

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000381

**OFFICE OF THE DISTRICT ATTORNEY**
**PARISH OF ORLEANS**

SCREENING ACTION FORM

NARCOTICS STRIKE FORCE

Page ___ of ___ Pages

CASE NO. 34346/K

DATE RECEIVED FROM N.O.P.D.
5/10

ACCEPTED (Circle if any charge is accepted)
REFUSED (Circle only if all charges refused)
DIVERTED
REFERRED

| | | | MIDDLE | RACE | SEX | DATE OF BIRTH |
|---|---|---|---|---|---|---|
| DEFENDANT'S NAME (LAST) | MARINGNY, DEREK A (FIRST) | | P | M | 04/26/66 |

DEFENDANT'S ADDRESS
1470 Milton St   Apt C    New Orleans, LA

SYSTEM # 90081164

MAGISTRATE'S CASE NO. M225421

NEW SYSTEM # ___

# OF ___ NO. 274297

NO. OF CO-DEFENDANTS: 0

DATE SCREENED 5/21

SCREENED BY WILLIAMSON   CODE CWIL

DATE SCREENED 5/17/90   REVIEWED BY ___

MOTION NO. (CCN) 00678731

| | | | CLASS | INIT-IATOR | TITLE | ATTEMPT ETC | STATUTE | PARA | SUB PARA |
|---|---|---|---|---|---|---|---|---|---|
| **CHARGES ACCEPTED** | | | | | | | | | |
| ITEM NO. | ARREST NO. | CHARGE | | | | | | | |
| D0118390 | 01169790 | PWITD CRACK | 2 | O | 40 | ( ) | 967 | A4 (B) | OD ( ) |
| | | | | | | ( ) | | ( )( ) | |
| | | | | | | ( ) | | ( )( ) | |
| | | | | | | ( ) | | ( )( ) | |

DATE OF OFFENSE 4/9/90   DATE OF ARREST 04/09/90

WORDING OF BILL OF INFORMATION FOR EACH COUNT

PWITD CRACK

CASE TYPE ___   GOV # ___

| | VICT INFO | RACE SEX | AGE | DOB | RELATION TO DEFENDANT |
|---|---|---|---|---|---|
| CT. 1 | | | | | |
| CT. 2 | | | | | |
| CT. 3 | | | | | |
| CT. 4 | | | | | |

| | | | CLASS | INIT-IATOR | DISPOSITION REFUSAL CODE | TITLE | ATTEMPT ETC | STATUTE | PARA | SUB PARA |
|---|---|---|---|---|---|---|---|---|---|---|
| **CHARGES REFUSED OR DIVERTED** | | | | | | | | | | |
| ITEM NO. | ARREST NO. | CHARGE | | | | | ( ) | | ( )( ) | |
| | | | | | | | ( ) | | ( )( ) | |
| | | | | | | | ( ) | | ( )( ) | |
| | | | | | | | ( ) | | ( )( ) | |

REFUSAL REASONS:
STATUTE NO.

REMARKS AND OFFENSE SUMMARY



OFFICE OF THE DISTRICT ATTORNEY
PARISH OF ORLEANS

WITNESS WORK SHEET

DEFENDANT'S NAME (Last) (First)

MARIGNY, DEREK

| NO. | POLICE NAME, RANK, BADGE NO. AND ARREST CREDIT # | ADDRESS | | | | PHONE |
|---|---|---|---|---|---|---|
| 1. | P/O J. THOMAS | NOPD N.E.P.H. | | | HOME | |
| 2. | P/O R. IRVING | | | | WORK / HOME | 565-7951 |
| 3. | P/O C. NEAL | | | | WORK / HOME | |
| 4. | P/O T. WALSH | | | | WORK / HOME | |

OTHER WITNESSES — LIST IN ORDER OF CALL

| NO. | NAME | ADDRESS | | | | PHONE |
|---|---|---|---|---|---|---|
| 5. | SGT. J. SCOTT | | | | HOME / WORK | |
| 6. | DET. A. OVERMAN | NOPD NARCOTICS | | | HOME / WORK | 826-5450 |
| 7. | P/O D. WAGUESPACK | NOPD CRIME LAB | | | HOME / WORK | 826-5211 |
| 8. | | | | | HOME / WORK | |
| 9. | | | | | HOME / WORK | |
| 10. | | | | | HOME / WORK | |
| 11. | | | | | HOME / WORK | |
| 12. | | | | | HOME / WORK | |
| 13. | | | | | HOME / WORK | |

DATES SUBPOENAS MAILED OR WITNESSES NOTIFIED

TYPES OF WITNESS CODES

FIRST DIGIT
A  Arresting Officer
B  Assisting Officer
D  Investigating Officer
I  Other PD
E  Victim
S  Eyewitness
6  Fingerprint
H  Handwriting
5  Narc. Chemist
C  Other Chemist
9  Other Expert

SECOND DIGIT
E  Essential
N  Non Essential

FORM OPDA 174 83                    D. A. FILE

05/21/90

## PARISH OF ORLEANS

The State of Louisiana } SS. CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS

MICHAEL REYNOLDS    Assistant District Attorney for the Parish of Orleans, who in the name and by the authority of the said State, prosecutes, in this behalf, in proper person comes into the Criminal District Court for the Parish of Orleans, in the Parish of Orleans, and gives the said Court here to understand and be informed that one _____ DEREK MARINGNY _____

late of the Parish of Orleans, on the _____ 9th _____ day of _____ April _____ in the year of our Lord, one thousand nine hundred and _____ ninety _____ in the Parish of Orleans aforesaid, and within the jurisdiction of the Criminal District Court for the Parish of Orleans,    did wilfully and unlawfully possess with intent to distribute a controlled and dangerous substance, to wit: CRACK, (COCAINE),

contrary to the form of the Statute of the State of Louisiana in such case made and provided and against the peace and dignity of the same.    _____
Assistant District Attorney for the Parish of Orleans

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000384

343-461

BAIL ORDER BY JUDGE QUINLAN

## State of Louisiana — Parish of Orleans
# Criminal District Court for the Parish of Orleans
M-225421

Be it remembered, That on this ___10th___ day of ___April___ the year of our Lord, 19 __90__.

Derek Marigny _____ as principal
American Bankers Ins. _____ as surety

verally acknowledged themselves to owe to the State of Louisiana the several sums following, that is to say.

e said ___Derek Marigny___ the sum of ___five thousand___
e said _____ the sum of _____ dollars.
e said _____ the sum of _____ dollars.
e said _____ the sum of _____ dollars.
d the said ___American Bankers Ins.___ the sum of ___five thousand___ dollars.

good and lawful money of the United States, for the true payment of which respective sums they and each of them bind emselves, their respective heirs, executors and administrators firmly by these presents.

The condition of the Above Obligation is such. That if the above bounden ___Derek Marigny___

all personally appear before the Criminal District Court for the Parish of Orleans, to be held on the day for which he shall be so tified at the address given herein, then on whatever day afterwards the said Court shall be held, or he shall be so notified to attend en and there, to answer to the State aforesaid for and concerning a charge of _____

___Vio. R/S 40:967___

th which offense the said ___Derek Marigny___

nds charged before said Court, and will appear at all stages of the proceedings thereof to answer that charge or any related charge. d will at all times hold himself amenable to the orders and process of the Court, and, if convicted, will appear for pronouncement the verdict and sentence, and shall not depart thence without the leave of said Court, and keep the peace in the meantime, then above obligation to be null and void, else in full force and virtue:

X _Derek Marigny_                    (PRINT ADDRESS)    (504)
                                     X _1470 Milton St._   _283-5746_

_____            _CTJ B...Co. 718 S. Bl...._

:S A FURTHER CONDITION OF THIS BOND, I REE TO IMMEDIATELY NOTIFY THE CLERK OF URT OF ANY CHANGE OF MY ADDRESS. DIF-RENT FROM THE ADDRESS I NOW GIVE UNDER NALTY OF CONTEMPT."

Taken and acknowledged on the day above written, before thenndersigned CLERK or DEPUTY CLERK of the CRIMINAL DISTRICT COURT of the PARISH of ORLEANS.

_____
Clerk or Deputy Clerk Criminal District Court

American Bankers Ins.  11222 Quail Roost Rd., Miami, FL

poses and says that he is the owner in his own name and in his own right of the real estate located and identified as follows:

___All securities on deposit with the insurance commissioner.___

t he resides in the Parish of Orleans, at the location hereinafter appearing; that after paying all his just debts and liabilities he i l and truly worth the sum of ___five thousand___ dollars liable to seizure; that has not signed or executed any deed, note, bond, contract, assignment or instrument of any kind that will vitiate or prevent the orcement of this bond.

Sworn to and subscribed before me this

___10th___day of ___April___, 19 __90__.

_____
erk or Deputy of the Criminal District Court of the Parish of Orleans

Situation of the house in which surety makes his domicile

_Pampo - M05 - 006716_



Clerk's Office ___2/28____ 20 28
A True Copy

by ___R.W___ Deputy Clerk
Hon. Darren P. Lombard
Clerk of Criminal District Court
Orleans Parish

(30)

*Ch - [illegible handwritten notes across top]*

**MEMORANDUM**

TO: Ray Bigelow
Wendy Baldwin

FROM: Robin O'Bannon

DATE: August 29, 1991

RE: Matthew Moore, 344-648, 344-729, 344-706 and 344-718
Request for reduction from First Degree Murder to Manslaughter
and No Bill

On May 6, 1990 Harold Boss was gunned down by Leonard Nelson on Treasure and Bruxelles Street. Harold, Derek Marigny and Curtis Miller were sitting across the street from the End Zone Lounge "conversating" when Leonard Nelson and Matthew Moore charged them brandishing guns. Leonard Nelson fired several times causing the three friends to take cover any where they could. Derek ran behind a car, and Curtis and Herld ran down a side street. Curtis was able to roll underneath a parked car, but Harold fell down and was unable to get up before Nelson came upon him.

Nelson demanded that Harold "Give it up" and as Harold was begging for his life and trying to remove his jewelry, Nelson shot him twice. Nelson called for Moore, who was back at the corner, and demanded that Moore shoot Harold, as well. Moore did not shoot, so Nelson fired a final shot into Harold's body. The two fled the scene.

Witnesses Tracy Johnson and Crhistine Boatner saw Moore drop his weapon in the middle of the street as the two were running away. The gun was tested with negative results.

On March 4, 1991, Leonard Nelson was convicted of second degree murder and subsequently sentenced to life imprisonment without benefits. He and Matthew Moore are still awaiting trial in three other cases. The other cases are unrelated to the murder charge, but arise out of the same incident.

On May 14, 1990, Cherryl Scott was sitting at a redlight at Carrollton and Earhart when an unknown Black male subject approached her vehicle, and ordered her out. Before she could exit the car, the subject shoved her onto the passenger's seat and motioned for two other subjects, Matthew Moore and Leonard Nelson. The two jumped into the

CERTIFIED DA OFFICE COPY

PAGE -2-
Memorandum: Matthew Moore

backseat. The unknown driver had a gun as did Leonard Nelson. They took off with Ms. Scott and drove around for several hours. During the ride, Leonard Nelson demanded her purse then proceeded to remove all of her currency. (approximatley $170.00)

The kidnappers pushed Ms. Scott out of the vehicle approximatley three hours later, leaving her stranded in the St. Bernard Housing Project. Police Officer Mark McCraney later observed the vehicle and attempted to pull it over. (At some point after dropping Ms. Scott off, and before the police began pursuit, the unknown driver had gotten out of the vehicle). The driver, Matthew Moore, turned the vehicle around and drove into Officer McCraney's motor scooter, injuring the officers legs. Other units responded and both Moore and Nelson were apprehended. Ms. Scott was brought to the scene and identified both subjects. (It should be noted that the defendants were handcuffed and in the back seat of a police unit when the identification was made.)

Since Leonard Nelson's trial, this office approved a No bill on Derek Marigny's three drug charges. During the Nelson trial the defense attempted to discredit Mr. Marigny as a drug kingpin who was receiving a deal for his testimony. At the time, Derek denied being a drug dealer, and denied having any plea agreements with this office. AT the time he was telling th truth. Now, however, he has been convicted on PWITD charges. He would have to admit drug involvement and admit the no bill agreement. I believe Derek's testimony could prove harmful to our case against Matthew Moore, in that his crediblity and veracity could be easily challenged. Further, any testimony about the No Bill may give the appearance of impropriety at the Nelson trial. Although we steadfastly refuse to deal with Marigny in exchange for his testimony, an admission at the Moore trail as to the NO Bill may be the ammunition the defense needs for a reversal of the Nelson conviction.

Most importantly, however, it is highly improbable that we can prove that Matthew Moore specifically intended to kill Harold Boss as a principal to First Degree Murder. Our whole case depends on the theory that that the two defendants killed Harold Boss during the perpetration of an armed robbery or an attempted armed robbery. The Nelson jury did not believe that an armed robbery or an attempt was

CERTIFIED DA OFFICE COPY

PAGE -3-
Memorandum: Matthew Moore

in progress. They felt from the circumstances that Nelson specifically intended to kill, ergo, second degree murder. Moore, on the other hand, did not fire his weapon once, and fled the scene rather than shot Harold's body. He did not approach Harold with Leonard, and made no demands to Harold. He remained on the corner away from Leonard and Harold. The "principal" argument is not a feasible one in light of all the circumstances.

Matthew Moore will plead guilty to Manslaughter and the other charges (armed robbery, kidnapping, attempted murder, and resisting arrest) for seventeen years. Ms. McDonald, Ms Waldron and myself recommend we package all the cases, and offer this deal to the defendant. If you will recall, Ms. McDonald and I prosecuted Nelson; and, we recommended the NO Bill to Derek Marigny because of the safety factor. Ms. Waldron has reviewed this memorandum and concurs.

CERTIFIED DA OFFICE COPY



Clerk's Office ___2/28_____ 20 25
A True Copy

by ___R.W_____ Deputy Clerk

Hon. Darren P. Lombard
Clerk of Criminal District Court
Orleans Parish



TO: RAY BIGELOW
FROM: MISSY MCDONALD
RE: DEREK MARIGNY
DATE: 6/7/91

Derek Marigney is an essential and material witness in the murder case against Mathew Moore. (Case # 344-648) Presently, this case is set for trial on 7/24/91. Earlier this year, Ms. O'Bannon and I prosecuted the co-defendant Leonard Nelson, and a verdict of second degree was returned.

Prior to the first trial, Mr. Marigney stated that he would not testify unless the office offered him a deal concerning his outstanding drug charges. (See cases 341-057, 342-951, and 343-461.) The charges against Mr. Marigny are simple possession of cocaine and two counts of PWITD cocaine. If you will recall, I approached you before regarding Mr. Marigny's request. At that time, you indicated that this office would offer no deals in return for his testimony. We relayed this information to Mr. Marigny who in turn stated he would offer no assistance in our trial.

Approximately one hour before the trial started, Mr. Marigny appeared in court and stated that he would cooperate because it was his friend that was killed and he wanted to do the right thing. Ms. O'Bannon nor myself made any promises to him. In fact, he believed, at the time of trial, that his own charges would be fully prosecuted.

Mr. Marigney was the main witness to the shooting death of Harold Boss Wilson. His testimony was clear, concise, honest and credible. The jury fully believed Mr. Marigny and returned a verdict of guilty of second degree murder. Without his testimony, we would not have had sufficient evidence to convict Leonard Nelson.

His testimony will be required again in the trial of Matthew Moore. The evidence is very weak against defendant Moore and the trial will suffer immensely without Mr. Marigny's testimony. Again, we are requesting that we can help Mr. Marigny, as he helped us.

CERTIFIED DA OFFICE COPY



DEFENDANT'S
EXHIBIT
18

Clerk's Office ___2|88___ 20 25
A True Copy

by ___R.W___ Deputy Clerk
Hon. Darren P. Lombard
Clerk of Criminal District Court
Orleans Parish



MEMORANDUM

TO: FILE

FROM: AHERN

RE: FIRST DEGREE MURDER CHARGES AGAINST LEONARD NELSON AND MATTHEW MOORE.

DATE: AUGUST 12, 1990

This offense occured on the 6th day of May, 1990, in the early morning hours. The victim, Harold Boss (Wilson) was sitting on the back of a car when the two perpetrators walked up. The victim was sitting with Derek Marigny and Curtis Miller. When the defendants walked up to the three individuals sitting on the car the victim said, Look here comes the robbers. As they approached the victim, they each removed a pistol and Nelson said, Give it up. The victim began backing up and attempting to remove a gold medallion that he had on around his neck. However, as he backed up he fell on his back. Marigny and Miller were able to get out of the line of fire, each of them running in different directions.

Both Nelson and Moore stood over the victim with guns pointed at him and it appeared that both of them shot. However, Christine Boatner was sitting in a car and she says that Moore dropped his gun as they were running away and the gun located on the scene was fully loaded.

Tracey Johnson only observed Leonard Nelson out there that night. However, he was seated in the back seat of a car (the same car that Christine Boatner was seated in.) so his view may have been limited.

Marigny and Miller saw both of the defendants and positively identified both in a photographic line-up. (Both of these men knew the defendants previously.)

These two defendants have other cases pending. They have proven themselves to be violent criminals. It is important to convict Leonard Nelson as charged.

NOTE—Check with the victims family as the bill of information may need to be amended. I could never learn his correct last name.

Also, Franklin Taylor originally told me that he could not testify because he was afraid of what the family of Matthew Moore would do to him. However, after I indicted these two individuals Mr. Taylor called me up and indicated that he would testify against them. He indicated that he had spoken with the family of the defendant and they told him to tell the truth.

Statements were made to Taylor admitting Nelson's involvement but denying Moore's.

The witnesses in this case are not very cooperative, because of the violent reputation of the defendants. Tracey Johnson has been shot by Leonard Nelson before. I had never spoken with Boatner nor Johnson prior to the Grand Jury as they had ignored every attempt to bring them in by both our office and Det. Pierce. Make sure to make contact with them before you need them for motions. Also, note that Boatner did not identify anyone in the photographic line-up. I think she did that because she is afraid and thought if she failed to make and ID she would not be asked to testify. I think without an ID, her testimony is still valuable.

Good luck. If you have any questions, ask.

Victim Contact--Dorothy Arthur-victim's mother 945-4135.

*Ronald Ahern*

CERTIFIED DA OFFICE COPY

CRIMINAL DISTRICT COURT OF ORLEANS PARISH, LOUISIANA

Page    1

SECTION "D"   Judge: THE HONORABLE KIMYA HOLMES
Minute Clerk: FRANK A. MARULLO, III
Court Reporter: CINDY WELCH
Assist. D.A.: GABRIEL BALASQUIDE
SAVANNAH ROBINSON
OIDP Attorney: ADDIE MAGUIRE
OIDP Attorney: NAJAH WILLIAMS

Date: TUESDAY, December 17, 2024
Case Number: 344-648
State of Louisiana
    versus
LEONARD NELSON                Violation: RS 14 30

THE DEFENDANT, LEONARD NELSON, APPEARED BEFORE THE COURT FOR POST
CONVICTION HEARING WITH COUNSEL, THOMAS FRAMPTON & KELLY ORIANS.

A.D.A BRAD SCOTT APPEARED ON BEHALF OF THE STATE.

THE STATE MARKED AND INTRODUCED THE FOLLOWING EXHIBITS INTO
EVIDENCE FOR THE PURPOSE OF THIS HEARING ONLY:

    SE-1     TRANSCRIPT
    SE-2     TRANSCRIPT
    SE-3     TRANSCRIPT
    SE-4     TRANSCRIPT
    SE-5     MEMO
    SE-6     MEMO
    SE-7     MEMO
    SE-8     MEMO
    SE-9     MEMO

THE DEFENSE CALLED THE FOLLOWING WITNESSES, WHO, AFTER BEING DULY
SWORN BY THE COURT GAVE TESTIMONY AND WERE CROSS EXAMINED BY THE
STATE:

    KELLY ORIANS

THE DEFENSE MARKED AND INTRODUCED THE FOLLOWING EXHIBITS INTO
EVIDENCE FOR THE PURPOSE OF THIS HEARING ONLY:

    DE-1     THUMBDRIVE
    DE-11    D.A. FILE
    DE-12    D.A. FILE

    DE-13    D.A. FILE
    DE-14    D.A. FILE
    DE-16    MEMORANDUM
    DE-17    MEMORANDUM
    DE-18    MEMORANDUM
    DE-2     WAIVER AGREEMENT
    DE-3     AFFIDAVIT
    DE-4     LETTER
    DE-5     LETTER
    DE-6     TRANSCRIPT
    DE-7     LETTERS
    DE-8     MEMORANDUM
    DE-9     MEMORANDUM

RULING IN THIS MATTER IS SET FOR 01/06/25.

THE COURT WILL WRIT THE DEFENDANT IN.

(CONTINUED)

TRUE COPY
_Frank A. Marullo, III_
MINUTE CLERK

02-14-25

IN THE CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS
STATE OF LOUISIANA

_____
                                    )
THE STATE OF LOUISIANA              )        Case No. 344-648
            v.                      )        Section D
                                    )        Judge  Holmes
LEONARD NELSON                      )
_____

FILED: _____          DEPUTY CLERK: _____

**NOTICE OF INTENTION TO APPLY FOR SUPERVISORY WRITS
AND MOTION TO SET RETURN DATE**

TO:     The Honorable Judge Kimya Holmes
        Assistant District Attorney

PLEASE TAKE NOTICE of the Petitioner's objection to the trial court's ruling and his intention to apply to the HONORABLE COURT OF APPEAL, FOURTH CIRCUIT for supervisory writs.  The Accused will ask the appellate court to review and annul the action and order of the Honorable Kimya Holmes, Section D, Criminal District Court, Orleans Parish, taken on the 10th day of January, 2025, when the Honorable Judge took the following action and made the following ruling:

Denied defendants application for post-conviction relief filed pursuant to La. C. Cr. P. Art. 930.3(1).

Notice was given orally on January 10th 2025, at Orleans Parish, Louisiana and the Court set a return date of February 10, 2025. This written notice confirms this court prior oral ruling and requests a written ruling confirming that return date be issued.

Respectfully Submitted,

____/s/ Kelly Orians_____
Kelly Orians, La. Bar #36920
University of Virginia School of Law
*(For Identification Purposes Only)*
580 Massie Rd.
Charlottesville, VA 22903

<u>Certificate of Service</u>
I hereby certify that I have caused to be served by hand delivery in open court a copy of the foregoing document upon the prosecution on this the day of filing.

_____/s/Kelly Orians_____

CRIMINAL DISTRICT COURT OF ORLEANS PARISH, LOUISIANA

Page 1

SECTION "D"   Judge: THE HONORABLE KIMYA HOLMES
Minute Clerk: FRANK A. MARULLO, III
Court Reporter: CINDY WELCH
Assist. D.A.: KRISTEN BUTLER
SAVANNAH ROBINSON
OIDP Attorney: FRANCESCA BUZZI

Date: THURSDAY, January 30, 2025
Case Number: 344-648
State of Louisiana
versus
LEONARD NELSON                    Violation: RS 14 30

DEFENSE COUNSEL KELLY ORIANS APPEARED ON BEHALF OF DEFENDANT, LEONARD NELSON, FOR UNSCHEDULED ACTIVITY; DEFENDANT DID NOT APPEAR.

THE COURT GRANTED THE MOTION TO EXTEND WRIT RETURN DATE. THE DEFENSE NOW HAS UNTIL 03/12/25 TO FILE A WRIT.

TRUE COPY

_Frank A. Marullo, III_
MINUTE CLERK

02-14-25
DATE

_____
FRANK A. MARULLO, III, Minute Clerk

IN THE CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS
STATE OF LOUISIANA

_____
                                        )
THE STATE OF LOUISIANA                  )          Case No. 344-648
            v.                          )          Section D
                                        )          Judge  Holmes
LEONARD NELSON                          )
_____

FILED: _____          DEPUTY CLERK: _____

## **ORDER**

A return date is set for the _____ day of _____, 2025.


_____
Judge Holmes
Orleans Parish Criminal District Court, Section D

IN THE ORLEANS PARISH CRIMINAL DISTRICT COURT
STATE OF LOUISIANA

STATE OF LOUISIANA        )
                            )
      v.                   )         Docket No.:   344-648
                            )         Section:      D
                            )         Judge:       Holmes
Leonard Nelson         )
                            )
                            )

FILED:_____          DEPUTY CLERK: _____

**MOTION TO EXTEND WRIT RETURN DATE**

On January 10, 2025, pursuant to La. Uni. R. Ct. Appeal 4-2, the Defense provided notice of our intent to seek a writ of this court's decision to deny Leonard Nelson's application for post conviction relief. This Court set a writ return date of February 10, 2025. The Defense has requested copies of the relevant hearings and has not yet received those transcripts. Therefore, additional time is needed to prepare the writ in this case. Pursuant to La. Uni. R. Ct. Appeal 4-3 the Defense is requesting a 30 day extension of the original return date.

Respectfully Submitted,

_____

**Kelly Orians, La. Bar No. 36920**
University of Virginia School of Law
*(for identification purposes only)*
580 Massie Drive
Charlottesville, VA 22903
Email: Korians@law.virginia.edu

1

IN THE ORLEANS PARISH CRIMINAL DISTRICT COURT
STATE OF LOUISIANA

_____
STATE OF LOUISIANA            )
                              )
        v.                    )        Docket No.:    344-648
                              )        Section:       D
                              )        Judge:         Holmes
Leonard Nelson                )
_____)

FILED: _____          DEPUTY CLERK: _____

**ORDER**

CONSIDERING the MOTION TO EXTEND WRIT RETURN DATE and the grounds

supporting it this court finds that a proper showing exists to extend the writ return.

The writ return date originally set for February 10, 2025 has been extended to the _____ day

of _____, 2025.


_____
Honorable Judge Kimya Holmes
Orleans Criminal Court
Section D


_____
Date

2

Petitioner's Writ Application (La. Ct. App. 4 Cir.) Exhibits
000400